## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

JOHN H. MURPHY,

     Plaintiff,

v.

MILLARD C. FARMER, JR.,
ALFRED L. KING, JR.,
LARRY KING, P.C.,
DEBORAH  L. BEACHAM, and
MY ADVOCATE CENTER, INC.,

     Defendants.

CIVIL ACTION FILE

NO. ___3:15-cv-92-TCB___

## **COMPLAINT**

Plaintiff John H. Murphy, for his Complaint against Defendants, alleges as follows:

### INTRODUCTION

1.    This Complaint asserts Georgia RICO and Federal RICO claims against members of the "Conflictineering Enterprise," an association-in-fact enterprise comprised of individuals and entities led by Defendant Millard C. Farmer, Jr., an attorney with a decades-long history of litigation misconduct and unethical behavior.  As found by one Florida court:

> Millard C. Farmer, Jr., has set a past pattern for insulting, contemptuous, contumacious[,] dilatory, and disruptive misconduct of the type designed to directly impede the orderly administration of justice. . . .

*State v. Bundy*, Case No. 78-169-CF, Order Denying Motion to Appear *Pro Hac Vice* (Fla. Cir. Ct., Columbia Cnty. Sept. 21, 1978).  In the 35-plus years since Mr. Farmer's request to represent Ted Bundy was rejected by the Florida court due to his well-established litigation misconduct, Mr. Farmer only has broadened and perfected his "Conflictineering" tactics.[1]

2.     Mr. Farmer's ongoing misconduct has not gone unnoticed by courts in Georgia and in other jurisdictions.  *See, e.g.*, *In re Farmer*, 212 Ga. App. 372, 442 S.E.2d 251 (1994) (upholding order of contempt against Mr. Farmer because "[t]he dignity of the judicial process was at stake in the conduct of Farmer and his client, and the authority of the court was at stake by their judge-baiting refusal to obey the court's order"); *Stephens v. Ivey*, 212 Ga. App. 407, 408, 442 S.E.2d 248, 250

---

[1] "Conflictineering" is the term Mr. Farmer has coined to describe his style of terroristic lawyering.  Mr. Farmer even has published a guide to his methodology for misusing the legal process to extract unwarranted concessions.  *See* http://www.goextranet.net/Seminars/Conflictineering/IntroductionAll.htm (copy of "Introduction" attached as **Exhibit 1**).  Mr. Farmer's own published guide provides a general roadmap to much of the specific illegal and criminal conduct perpetrated by the Conflictineering Enterprise in the "Child Custody Litigation" (the underlying state court litigation brought by Plaintiff John Murphy in which Defendant Farmer represents Non-Party Co-Conspirator Michelle Murphy).

(1994) (holding that trial judge was not required to recuse himself as requested by Mr. Farmer merely because the trial judge had held Mr. Farmer and his client in contempt of court); *Farmer v. Holton*, 146 Ga. App. 102, 245 S.E.2d 457 (1978) (upholding criminal contempt order against Mr. Farmer because of his "disrespectful or contumacious conduct toward the court"), *overruled on other grounds*, *In re Crane*, 253 Ga. 667, 324 S.E.2d 443 (1985); *Farmer v. Strickland*, 652 F.2d 427 (5th Cir. 1981) (upholding two orders in which the trial court "summarily found attorney Millard C. Farmer, Jr., in criminal contempt of court for contumacious conduct during his representation of a criminal defendant").

3.     In two recent decisions by the Georgia Court of Appeals in the Child Custody Litigation, Mr. Farmer and his co-counsel, Defendant Alfred L. King, Jr., were (a) sanctioned for filing a "frivolous" appeal and admonished for their "numerous discourteous or disparaging remarks about other persons involved in the case, particularly John Murphy's wife" (*Murphy v. Murphy*, 328 Ga. App. 767, 759 S.E.2d 909, 915 (2014), *recons. denied* (July 31, 2014), *cert. denied* (Ga. Nov. 17, 2014)); and (b) publicly rebuked a second time for "unsupported and irrelevant assertions" intended to demean a witness, with the Court of Appeals noting Mr. Farmer's and his co-counsel's "lack of professionalism does less than nothing to advance their cause" (*Murphy v. Murphy*, 330 Ga. App. 169, 767 S.E.2d 789

(2014), *recons. denied* (Dec. 5, 2014), *cert. denied* (Ga. Mar. 2, 2015), *recons. denied* (Apr. 9, 2015)).

4.     Mr. Farmer has employed and continues to employ his tactics in an illegal effort to extort payments, forced concessions, and other unjust benefits in exchange for, in his own words, "restoring order" to the individuals victimized by his illegal and unethically manufactured litigation chaos.

5.     Plaintiff and his wife have spent over three years of their lives and hundreds of thousands of dollars litigating what should have been a straightforward and simple child custody modification proceeding in Georgia state court, *John Harold Murphy v. Nancy Michelle Murphy*, Civ. A. No. 2012-V-413 (Ga. Super. Ct., Coweta Cnty., filed Apr. 11, 2012) (the "Child Custody Litigation").

6.     Over the course of that three-year period, and continuing to the present, Mr. Farmer and his co-defendants/co-conspirators have sought for financial gain and other reasons to extort and otherwise injure Mr. Murphy, by means of a plan they conceived and have been executing by a pattern of racketeering activity reaching into several states and the United States Territory of the Virgin Islands.

7.     The "Conflictineering Enterprise" masterminded and led by Defendant Farmer includes (a) Defendant Alfred L. King, Jr. a/k/a Larry King,

who served as Mr. Farmer's co-counsel by and through his law firm Larry King, P.C., throughout the time of the Conflictineering scheme until he finally withdrew from the Child Custody Litigation in September 2014; (b) Defendant Deborah L. Beacham, a self-proclaimed "child advocate"; and (c) Ms. Beacham's purported front organization, Defendant My Advocate Center, Inc. ("My Advocate Center").[2] These individuals, entities, and co-conspirators collectively are referred to as the "RICO Defendants."

8.      Among the RICO Defendants' additional co-conspirators/co-participants in the Conflictineering Enterprise are, among others: (a) Michelle Murphy, Mr. Murphy's ex-wife and the defendant in the Child Custody Litigation; (b) Robert "Rob" Hartman, Michelle Murphy's brother; (c) Kimellen Tunkle, Mr. Farmer's assistant; (d) T.B., a minor child, and his mother; and (e) other individuals (some of whom are identified below) that Defendants Beacham and My Advocate Center have involved in this scheme.  These individuals collectively are referred to as the "Non-Party Co-Conspirators."

---

[2] On information and belief, Defendant Beacham also operates an array of various "social media" accounts, including "The Throwaway Client" and "Hedge Funds for Kids," to further the illegal scheme and to create the false perception of support for the activities of Defendant Beacham, My Advocate Center and, in turn, the Conflictineering Enterprise.

9.     Through the commission of a variety of criminal acts, which constitute a pattern of racketeering activity, the Conflictineering Enterprise has illegally expanded and prolonged the Child Custody Litigation to an exponential degree, in addition to causing extensive harm to Mr. Murphy completely outside of the Child Custody Litigation.  These criminal acts were willful and intended to harass, intimidate, and place enough illicit pressure on Mr. Murphy and his current spouse to extort them into abandoning his claims in the Child Custody Litigation and paying Defendant Farmer's demand for "attorney's fees."

10.     The Conflictineering Enterprise operates by, among other things, attempting to drive an emotional wedge between Mr. Murphy and his wife, and otherwise generating discord within their marriage; alienating the minor children who are the subject of the Child Custody Litigation (the "Children") from Mr. Murphy and his wife (thereby causing the Children severe psychological harm); and the numerous criminal acts detailed below, including the filing of multiple false reports with governmental agencies knowingly misrepresenting that Mr. Murphy had engaged in "child abuse."

11.     Mr. Farmer himself acknowledges that the end goals of his terroristic litigation tactics are (a) to bring undue pressure on the opposing party to relinquish valid claims or defenses; and thereby (b) to extort the abandonment of such claims

and the payment of monies from his target (here, Mr. Murphy and his wife).  In

fact, according to Mr. Farmer's Conflictineering play-book, after creating personal

and psychological chaos, he will end the assault by "restoring order in exchange

for a fair disposition."  In a civil case such as the Child Custody Litigation, such a

"fair disposition" necessarily involves the payment of money (specifically,

payment of an exorbitant sum of "attorney's fees" to Mr. Farmer for his multi-year

terror campaign against Mr. Murphy and his spouse), in addition to the

abandonment of legitimate legal claims.

12.    To effectuate this illegal scheme, Defendants Farmer and King first

initiated a sham "third-party" claim against Mr. Murphy's spouse in the Child

Custody Litigation, knowing such a claim was completely without any legal or

factual basis.[3]  The filing of a manifestly baseless "third-party" claim against Mr.

Murphy's wife was done solely to place pressure on her to persuade her husband to

abandon his child custody claims and to secure a large shakedown payment for Mr.

Farmer and his co-conspirators.  Indeed, Defendant King first showed the

---

[3] As explained more fully below, the Child Custody Litigation involves only the
parents of the affected children – here, Mr. Murphy and his ex-wife Michelle
Murphy.  The trial court quickly determined the third-party claim to be completely
without merit and dismissed it.  That dismissal now has become final and binding,
because Mr. Farmer improperly attempted to take an unauthorized immediate
appeal of the ruling.  *See Murphy v. Murphy*, No. A13A1248, Order [dismissing
appeal] (Ga. Ct. App. Aug. 12, 2013), *cert. denied* (Ga. Apr. 22, 2014).

Conflictineering Enterprise's hand when he contacted Mr. Murphy's wife immediately after filing the frivolous third-party claim against her – before she even could hire her own attorney – and offered her the "opportunity" to capitulate to the demands of the Conflictineering Enterprise early, before the terroristic behavior and attacks intensified. When they did not capitulate, Mr. Farmer and the Conflictineering Enterprise embarked upon a campaign of illegal, illicit and unprofessional conduct within the litigation process aimed solely at extorting Mr. Murphy and his wife. Recently, Mr. Farmer, through Non-Party Co-Conspirator Michelle Murphy, communicated to Mr. Murphy that the Child Custody Litigation – and the chaos inflicted upon Mr. Murphy and his wife by the Conflictineering Enterprise – cannot be resolved without a payment to Mr. Farmer of $500,000.00.

13.    The RICO Defendants and the Non-Party Co-Conspirators have engaged in, and conspired to engage in, criminal behavior constituting predicate acts under Georgia and Federal racketeering statutes. Members of the Conflictineering Enterprise have, among other criminal acts:

- attempted extortion and theft by extortion by publicly disseminating information regarding Mr. Murphy, his wife, and others connected to the Child Custody Litigation accusing them of criminal offenses, in an

attempt to obtain money and litigation concessions from Mr. Murphy (O.C.G.A. § 16-8-16);

- attempted to extort Mr. Murphy by disseminating information regarding Mr. Murphy, his wife, and others connected to the Child Custody Litigation aimed at subjecting them to hatred, contempt, and ridicule, or impairs their credit or professional reputations, in an attempt to obtain money and litigation concessions from Mr. Murphy (O.C.G.A. § 16-8-16);

- attempted to bribe a state court judge (O.C.G.A. § 16-10-2);

- intimidated or attempted to intimidate judges, parties, witnesses, experts, court officials, professionals appointed by the Court, and others (O.C.G.A. §§ 16-10-93 & 16-10-97);

- coordinated and executed an interstate conspiracy to kidnap the Children and film them without informing or obtaining permission from their custodial parent (Mr. Murphy), in furtherance of an extortion scheme (14 V.I.C. § 1052);

- deliberately interfered with the legal custody of the Children who are the subject of the Child Custody Litigation (O.C.G.A. § 16-5-45);

- manufactured evidence, fabricated charges, and filed untrue statements as false pretexts for seeking unwarranted legal and other relief (O.C.G.A. § 16-10-20.1);

- traveled in interstate commerce with the intent to promote, manage, establish, carry on, or facilitate unlawful activity, namely, kidnapping for extortion in violation of 14 V.I.C. § 1052, and thereafter, performed or attempted to perform kidnapping for extortion in violation of 14 V.I.C. § 1052 (18 U.S.C. § 1952);

- generated and transmitted, over interstate wires, false reports of child abuse to public authorities in Tennessee, the USVI, and perhaps other states (T.C.A. § 37-1-413, 14 V.I.C. § 2146(c), 18 U.S.C. § 1343); and

- obstructed the Georgia state court's adjudication of the Child Custody Litigation.

14.     All of these crimes were perpetrated with a goal of placing illicit and undue pressure on Mr. Murphy and his wife to relinquish his claims in the Child Custody Litigation (without any regard for the "best interests" of the Children) and extort a "pay off" to Mr. Farmer and the Conflictineering Enterprise.  Indeed, even when Mr. Farmer primarily did capital defense work, he would take on non-capital

work "if the clients have money."  *See* David G. Stout, The Lawyers of Death Row, N.Y. TIMES, Feb. 14, 1998 (excerpts attached as **Exhibit 2**).  Where, as in the Child Custody Litigation, his own civil client did not "have money," the "pay off" necessarily would have to come from the adverse party.

15.     To intimidate and bring additional pressure on Mr. Murphy, the RICO Defendants, by and through the Conflictineering Enterprise, also have made false statements over interstate wires to the media in New York and other states, for the purpose of knowingly and willfully presenting Mr. Murphy and his wife in a false light while also impacting and harming the company for which Mr. Murphy consults.  These false statements have interfered with Mr. Murphy's consulting relationship and his relationships with clients of his employer.  The RICO Defendants also have made false statements publicly (including on broadcasts from an Atlanta-area radio station that subsequently were rebroadcast over the Internet) in an attempt to conceal and obfuscate their own wrongdoing as some form of crusade for justice, as well as in an effort to obstruct Mr. Murphy's extensive efforts to parent and maintain a healthy relationship with the Children.

16.     As set forth in greater detail below, the RICO Defendants' criminal conduct violates the Georgia Racketeer Influenced and Corrupt Organizations Act, § 16-14-4, *et seq.*, as well as the Federal Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1961, *et seq.*, through predicate acts that include, among other crimes, attempted bribery, attempted theft by extortion, witness tampering, intimidation of court officials, kidnapping, and the interstate transmission of false reports of child abuse.

17. The RICO Defendants' conduct also gives rise to state law claims for defamation, tortious interference with existing contractual relations, and intentional infliction of emotional distress.

18. Defendants' misconduct entitles Mr. Murphy to the recovery of damages, including but not limited to compensatory, treble, and punitive damages for (a) the substantial amount of unnecessary attorney's fees, expenses, and other damages caused by the RICO Defendants' crimes and terroristic tactics (which damages exceed $75,000); (b) Mr. Murphy's out-of-pocket costs incurred securing necessary psychological treatment of the Children attributable to the tactics of the Conflictineering Enterprise (these damages also exceed $75,000); and (c) the time, effort, and expense Mr. Murphy has been required to expend to refute the slanderous accusations of the RICO Defendants and the Non-Party Co-Conspirators, in order to protect his position with his employer and his relationships with clients.

19.     Mr. Murphy also is entitled to general damages for the *per se* defamatory accusations by the RICO Defendants and Non-Party Co-Conspirators that (a) Mr. Murphy, his wife, and his attorneys in the Child Custody Litigation have committed crimes (including repeated false accusations that Mr. Murphy bribed the original trial judge and other independent professionals involved in the Child Custody Litigation); (b) Mr. Murphy, his wife, and his attorneys in the Child Custody Litigation have been guilty of a debasing act ("stealing" the Children); and (c) were calculated to injure Mr. Murphy, his wife, and his attorneys in their trade, office, or profession.  Moreover, Mr. Murphy is entitled to punitive damages from Defendants Beacham and My Advocate Center, because these Defendants willfully refused to retract defamatory statements after Mr. Murphy made a demand to retract such statements.

20.     Mr. Murphy also is entitled to actual and punitive damages for the RICO Defendants' tortious interference with existing contractual relations and intentional infliction of emotional distress.

**PARTIES AND RELEVANT NON-PARTIES**

**Plaintiff**

21.     Plaintiff John H. Murphy is an individual and citizen of the United States Territory of the Virgin Islands ("USVI"), residing in St. Thomas, USVI.

**RICO Defendants**

22.     The RICO Defendants identified below are individuals and entities that have conspired to conduct the affairs, directly and indirectly, of the Conflictineering Enterprise by and through a pattern of racketeering activity.  Each of the RICO Defendants has committed criminal acts as part of the scheme to extort Plaintiff, and each has participated in the operation and management of the criminal Conflictineering Enterprise.  As noted above, these Defendants are referred to collectively herein as the "RICO Defendants."

23.     Defendant Millard C. Farmer, Jr. is an individual and resident of the State of Georgia.  Mr. Farmer is an attorney currently licensed to practice law in the State of Georgia.  At all times relevant to the allegations in this Complaint, Mr. Farmer has represented Non-Party Co-Conspirator Michelle Murphy, Plaintiff's ex-wife and the sole Defendant in the Child Custody Litigation.  Mr. Farmer is the person primarily responsible for originating, assembling, and leading the Conflictineering Enterprise.  Mr. Farmer may be served with process at his residence in Atlanta, Georgia.

24.     Defendant Alfred L. King, Jr. a/k/a Larry King is an individual and resident of the State of Florida.  Although he has represented publicly that he is now retired, Mr. King is an attorney currently licensed to practice law in the State

of Georgia.  Prior to his alleged retirement, Mr. King practiced law by and through Defendant Larry King, P.C., a law firm located at 210 North McDonough Street, Jonesboro, Georgia 30237.  On information and belief, Larry King, P.C. is the alter ego of Larry King, at least with respect to Mr. King's practice of law.  Until September 2014, Mr. King was co-counsel (together with Mr. Farmer) for Non-Party Co-Conspirator Nancy Michelle Murphy in the Child Custody Litigation. Mr. King and Larry King, P.C. may be served with process at his residence in Indian Rocks Beach, Florida.

25.   Defendant Deborah L. Beacham is an individual and resident of the State of Georgia.  Ms. Beacham is the Executive Director (and, upon information and belief, the sole shareholder) of Defendant My Advocate Center.  Ms. Beacham may be served at her residence in Roswell, Georgia.

26.   My Advocate Center, Inc. ("My Advocate Center") is a Georgia corporation whose principal office is listed with the Georgia Secretary of State's office as 880 Marietta Highway, Suite 630-166, Roswell, Georgia 30075 (a mailbox facility).  My Advocate Center may be served through its registered agent, Ms. Beacham, at 3355 Lenox Road, Suite 750, Atlanta, Georgia 30326.

**Non-Party Co-Conspirators**

27.    Certain other non-party individuals played roles, direct or indirect, in the Conflictineering Enterprise's scheme to extort Plaintiff.  Foremost among the Non-Party Co-Conspirators are the following:

(a)    Michelle Murphy, Plaintiff's ex-wife and the sole defendant in the Child Custody Litigation;

(b)    Robert Hartman, Michelle Murphy's brother;

(c)    Kimellen Tunkle, a paralegal working with Mr. Farmer;

(d)    T.B., a minor;

(e)    Christy B., mother of T.B.;

(f)    David Johnson of Strategic Visions, LLC;

(g)    Kimberly Krautter of 13th Generation Strategies; and

(h)    James O'Brien, the host of a radio show sponsored by Defendant My Advocate Center entitled "Pro Advocate Radio."

28.    David Johnson and Kimberly Krautter have acted as spokespersons for the Conflictineering Enterprise and are residents of the State of Georgia.  Mr. Johnson and Ms. Krautter assisted the RICO Defendants in the development of their public pressure campaign and, in concert with one or more of the RICO Defendants, authored, issued, or otherwise published false and misleading press

releases, media statements, and other communications in furtherance of the RICO Defendants' extortionate scheme.

29.     At all relevant times, each and every non-party identified above was acting in concert with, or as agent for, one or more of the RICO Defendants and, as described in greater detail below, further conspired with one or more of the RICO Defendants to perform the acts averred herein.

## SUBJECT-MATTER JURISDICTION AND VENUE

30.     This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  *See* 28 U.S.C. § 1332(e) ("States" in section 1332(a)(1) includes "Territories").

31.     This Court also has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because (a) some of the claims in this action arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968; and (b) the remaining claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United State Constitution.

32.     This Court has personal jurisdiction over Defendants pursuant to both (a) 18 U.S.C. § 1965; and (b) Georgia's long-arm statute, O.C.G.A. § 9-10-91.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the actions and events giving rise to this action occurred within this judicial district and division.

## FACTUAL BASES FOR CLAIMS

**John and Michelle Murphy Divorce in 2006.**

34.     Mr. Murphy and his ex-wife, Michelle Murphy, were married from 1996 to 2006.  They have two children, J.M. and T.M (the "Children").

35.     The divorce of Mr. Murphy and Michelle Murphy became final on December 20, 2006, when the Superior Court of Troup County, Georgia entered a "Final Decree of Divorce" in *John Murphy v. Michelle Murphy*, Civ. A. No. 2004-CV-494 (Ga. Super. Ct., Troup Cnty.) (the "Divorce Decree").

36.     Pursuant to the terms of the Divorce Decree, Mr. Murphy and Michelle Murphy were granted joint legal custody of the Children and Michelle Murphy was granted primary physical custody.

37.     In the divorce litigation with Mr. Murphy, Michelle Murphy was represented by attorney Delia "Dee" Crouch.

**Defendant Farmer Commences Malpractice Litigation Against Dee Crouch, Becomes Aware of Mr. Murphy's and His Current Wife's Net Worth, and Extorts an Excessive Payment That Yields Substantial "Attorney's Fees."**

38.     On December 15, 2008, Michelle Murphy, represented by Mr. Farmer, filed a "Complaint Seeking Relief for the Negligent, Actionable Conduct of Legal Malpractice, Breach of Expressed [sic] and Implied Contractual Duty, Breach of Fiduciary Duty and Unjust Enrichment" in the Superior Court of Coweta County against Ms. Crouch (the "Crouch Malpractice Litigation").

39.     In the Crouch Malpractice Litigation, Michelle Murphy (through Mr. Farmer) claimed that Ms. Crouch had mishandled the equitable distribution of a pension between Michelle Murphy and Mr. Murphy in the divorce case resulting in an alleged shortfall of approximately $50,000 to Michelle Murphy.

40.     To comply with the requirements of O.C.G.A. § 9-11-9.1, Michelle Murphy attached an affidavit from Defendant Larry King expressing his opinion that Ms. Crouch had provided "substandard legal representation."

41.     On November 30, 2010, Mr. Farmer moved to join Mr. Murphy as a defendant in the Crouch Malpractice Litigation, which motion was granted.

42.     Shortly thereafter, Mr. Farmer engaged in a discussion with Mr. Murphy, Mr. Murphy's wife, and Mr. Murphy's attorney regarding the litigation. During that discussion, Mr. Farmer refused to accept the full amount in dispute

(approximately $50,000) as a payment from Mr. Murphy to resolve the case.  In refusing to accept the full amount in dispute to resolve the case, Mr. Farmer repeatedly proclaimed:  "We are talking about a hairdresser and her boys!"

43.    Mr. Farmer began talking directly with Mr. Murphy's wife, who was not a party to the lawsuit.  In one conversation, Mr. Farmer stated to Mr. Murphy's wife, "If I don't get what I want, I will continue to litigate for years because I am not charging Michelle."  Mr. Farmer continued, "It matters what I want!"

44.    Mr. Farmer made it clear that since he had expanded the case by joining Mr. Murphy in the Crouch Malpractice Litigation, he would ensure that the case would be unnecessarily protracted, expensive, and painful unless resolved "fairly" for Mr. Farmer.  On the basis of these threats from Mr. Farmer, Mr. Murphy and his wife capitulated to his extortionate demands and paid him and Michelle Murphy $150,000, three times the amount in dispute, to have "order restored" and the case resolved.

45.    As a result of the proceedings in and settlement of the Crouch Malpractice Litigation, Defendants Farmer and King became acutely aware of the wealth of Mr. Murphy and his wife and formed the view that they were fertile targets for the Conflictineering Enterprise (*i.e.*, that they would be willing to relinquish legitimate legal positions to avoid the terroristic approach of

Conflictineering, and that they were capable of paying excessive sums of money to Defendant Farmer and the Conflictineering Enterprise to "restore order").

**Mr. Murphy Commences the Child Custody Litigation.**

46.     In 2011, Mr. Murphy became concerned about several issues related to Michelle Murphy's mental condition, physical custody, and parenting of the children.  These issues included, but were not limited to: the Children's absenteeism from school; the Children's access to firearms, alcohol, and drugs; concerns about inappropriate and premature sexual behavior; Michelle Murphy repeatedly expressing to Mr. Murphy her intention to move the Children a greater distance from him; Michelle Murphy's refusal to take the Children to professional counseling sessions as she previously had agreed to do; and Michelle Murphy's refusal to take one of the Children to the hospital under emergency conditions, despite having been instructed to do so by the Children's treating psychologist.

47.     In view of these and other serious concerns, on April 11, 2012, Mr. Murphy filed the Child Custody Litigation, seeking a modification of the custody arrangements and parenting time provisions contained in the Final Decree of Divorce.

48.     At all pertinent times, Defendant Farmer, assisted by Ms. Tunkle, has represented Michelle Murphy in the Child Custody Litigation.  Until he withdrew

on or about September 10, 2014, Defendant King also represented Michelle

Murphy in the Child Custody Litigation, as co-counsel with Mr. Farmer.  Mr.

King's name was on each and every pleading and brief filed in the Child Custody

Litigation until he withdrew in September 2014.

49.     Evidencing that their tactics are designed to attack and abuse the

litigation process (and cannot be characterized as any legitimate effort to achieve

the objectives of the Child Custody Litigation), Mr. Farmer and Mr. King, have

filed more than 20 motions to disqualify the original trial judge (Coweta County

Superior Court Chief Judge A. Quillian Baldwin, Jr., hereinafter "Judge Baldwin"),

other judges of the Superior Court of Coweta County, the judge appointed to

replace Judge Baldwin, and multiple judges of the Court of Appeals of Georgia, as

well as other individuals involved with the case.

50.     On May 11, 2012, Michelle Murphy filed an Answer (seeking an

upward modification of child support and other monetary relief) in the Child

Custody Litigation and asserted a patently frivolous and vexatious "Third-Party

Complaint" against Mr. Murphy's wife seeking, *inter alia*, "statutory damages,

compensatory damages and punitive damages, together with attorney's fees."

**Defendant King Contacts Mr. Murphy's Wife Regarding an Early Pay-Off to the Conflictineering Enterprise to Avoid Further Attacks.**

51.     Shortly after service of the baseless "Third-Party Complaint" on Mr. Murphy's wife, and before the appearance of an attorney on her behalf, Mr. King approached her on behalf of the Conflictineering Enterprise about settling early and thereby avoiding what Defendant King referred to as Mr. Farmer's "excessive litigation."

52.     By letter dated June 6, 2012 (copy attached as **Exhibit 3**), Mr. King wrote Mr. Murphy's wife (from the State of Georgia across state lines to her place of business in the State of New York), specifically identifying her as the "Founder/Chief Investment Officer" of "Galtere, Ltd."  Mr. King stated that his purpose in writing Mr. Murphy's wife was to "privately discuss the core dispute and resolve this matter outside the courtroom."  Mr. King proposed that he and she come up with a "plan" for resolving the litigation that could be presented to Michelle Murphy and urged upon Mr. Murphy by his spouse.

53.     Approximately one week later, on or about June 12, 2012, Mr. King called Mr. Murphy's wife, across interstate wires, and again proposed a private meeting involving just the two of them.  Mr. King stated to Mr. Murphy's wife words to the effect of, "My role in this litigation is a lot different than Mr. Farmer's.  Mr. Farmer is a litigator.  *He only knows excessive litigation.*"

- 23 -

54.     The clear message conveyed by Mr. King was that, if Mr. Murphy's wife was not willing to persuade her husband to abandon his claims in the Child Custody Litigation and settle early, they both would face continued and escalated "excessive litigation" at the hands of Mr. Farmer, whom they already knew would take unreasonable positions (as he had done by refusing payment of the total amount in dispute and instead demanding almost three times that amount to resolve the Crouch Malpractice Litigation) and would file frivolous, defamatory submissions (as he had done with the initial motions to recuse Judge Baldwin).

55.     Mr. Murphy's wife declined to meet privately with Mr. King.

**The Conflictineering Enterprise Sharpens its Focus on the Net Worth of Mr. Murphy and his Wife, Thereby Confirming its True Mission and Lack of Concern for the Best Interests of the Children.**

56.     On July 18, 2012, Mr. Murphy amended his Complaint in the Child Custody Litigation.  In response, Michelle Murphy (through Defendants Farmer and King) filed a frivolous "First Amended Third Party Complaint" against Mr. Murphy's wife on August 2, 2012.

57.     The First Amended Third-Party Complaint is replete with abusive, impertinent material, and fixated on the alleged financial means and assets of Mr. Murphy and his wife.  Among other allegations, this filing alleged the following assets and expenditures of Mr. Murphy and his wife:  (a) a "private twin engine jet

airplane" (First Am. TPC ¶ 1.12.1); (b) a "more than two million dollar home" (*id.* ¶ 1.12.3); (c) a "chauffeured limousine to carry the children to a restaurant and a $1,000 for the dining tab for five persons" (*id.* ¶ 1.12.4); and (d) a donation in Mr. Murphy's name (to give Mr. Murphy an "undeserved feeling of importance," according to Messrs. Farmer and King) of a "half million dollars to the University of Tennessee at Chattanooga for an artificial playing surface on its football practice field" (*id.* ¶ 1.12.14).  Over and over again, Defendants Farmer and King pled details regarding one of the principal driving forces behind their Conflictineering scheme—their desire to leverage the Child Custody Litigation to generate fees for themselves from the alleged wealth and holdings of Mr. Murphy and his wife.

58.    These allegations have nothing to do with the substantive issues in the Child Custody Litigation.  Instead, the repeated inclusion of such allegations confirms the Conflictineering Enterprise's focus upon the assets they could target for themselves.  At the same time, the Conflictineering Enterprise was acting antithetically to the legitimate purpose of the Child Custody Litigation, which is promptly to adjudicate the merits of Mr. Murphy's concerns with Michelle Murphy's parenting and its impact upon the "best interests" of the Children.

59.    On September 20, 2012, Michelle Murphy filed her "Second Amended Answer with Affirmative Defenses, Second Amended Counterclaim and

Second Amended Third Party Complaint," again focused upon the wealth of Mr.

Murphy and his current wife.  Among other allegations, this specious filing

contains references to (a) "an immense amount of personal wealth and income"

(Second Am. TPC ¶ 1.2.3); (b) access to "an eight million dollar twin jet airplane"

(*id.* ¶ 1.13.7); (c) spending "an average of One thousand six hundred sixty five

dollars ($1,665) per month for clothes" (*id.* ¶ 1.13.8); and (d) spending "an average

of Six hundred twenty five dollars ($625) per month for political contributions"

(*id.* ¶ 1.13.9).

60.    None of these allegations has anything whatsoever to do with the

limited issues presented in the Child Custody Litigation.

61.    Multiple additional filings by Defendants Farmer and King throughout

the Child Custody Litigation replicate this focus and fixation on net worth and

wealth.  Once viewed through the prism of Mr. Farmer's "Conflictineering"

scheme, it becomes clear the repeated references to net worth and wealth are

constant reminders that in order to end the terroristic attacks by the

Conflictineering Enterprise, Mr. Farmer and the RICO Defendants require a

substantial payoff to "restore order."

62.    On January 11, 2013, the Court entered an Order dismissing the Third

Party Complaint against Mr. Murphy's wife.  In the Order, the Court found "that

there is not a sufficient relationship or a legitimate issue to which the third party

defendant should be subjected to this action or where any relief could be granted to

the third party plaintiff by the inclusion of the third party defendant."

**Defendant Farmer and His Conflictineering Enterprise Expand Their Pattern of Racketeering by Attacking the First Guardian ad Litem and Then Launching an Assault on the Second Guardian ad Litem That the Georgia Court of Appeals Found to be "Baseless" and "Meritless."**

63.    At the same time Defendants Farmer and King were submitting

pleadings focused on the wealth of Mr. Murphy and his spouse, their litigation

approach in the Child Custody Litigation was to (a) delay any adjudication of the

merits of Mr. Murphy's concerns with Michelle Murphy's parenting of the

Children; and (b) interfere with any effort by independent third parties to examine

Michelle Murphy's conduct and advise the trial court with respect to the "best

interests" of the Children.

64.    These efforts, which span the entirety of the Child Custody Litigation,

confirm that another primary goal of the Conflictineering Enterprise was to thwart

the legitimate litigation purpose of the Child Custody Litigation, *i.e.*, to determine

which parent's custody would be in the "best interests" of the Children.  To the

contrary, the goal of the Conflictineering Enterprise was to cause Mr. Murphy and

his wife (a) to relinquish Mr. Murphy's legitimate claims for modification of the

custody and visitation provisions relative to J.M. and T.M.; and (b) to capitulate

and pay an outrageous amount of money to the Conflictineering Enterprise to make the litigation and the illegal tactics being deployed against them go away (as they had done in connection with the Crouch Malpractice Litigation).

65.    Among many other examples, Defendants Farmer and King engaged in systematic attacks on both attorneys appointed to serve as Guardian ad Litem (or "GAL") for the Children, in an attempt to abuse and intimidate them into withdrawing.

66.    The purpose of a GAL is to represent the best interests of the Children, separate and apart from the interests of the parents involved in the custody dispute.  The very reason a court appoints such a representative for children is to ensure that their rights and interests are protected and not subjugated to the rights and desires of adversarial parents.

67.    From the outset of the litigation, Mr. Farmer vigorously resisted the appointment of a GAL to represent the best interests of the Children.  At the first hearing in the case, Mr. Farmer protested the appointment of a GAL and stated that his client refused to pay any portion of the GAL's fees.  The Court resolved Mr. Farmer's objection by ordering Mr. Murphy to pay all of the GAL's fees, subject to the possibility of an equitable allocation at the conclusion of the case.

68.     Mr. Farmer and his Conflictineering Enterprise undertook to intimidate and badger the first GAL (Melissa Griffis) with the intent of causing her to withdraw.  Because of these malicious attacks, less than two months after being appointed, Ms. Griffis withdrew as the GAL.

69.     On June 18, 2012, Elizabeth "Lisa" Harwell was appointed the new GAL. Two weeks later, Defendants Farmer and King moved to disqualify Ms. Harwell, submitting a 64-page motion mockingly entitled "Second Version of Justice's Sad Lexicon, the Tinker to Evers to Chance Motion for Disqualification of Elizabeth 'Lisa' F. Harwell as Guardian ad Litem."  This baseless and malicious filing included a modified versions of the poem "Baseball's Sad Lexicon," that leveled various unfounded accusations of corruption and unethical conduct against Ms. Harwell, the trial judge, another Coweta County judge (Judge Jack Kirby), and Mr. Murphy's trial counsel in the Child Custody Litigation.

70.     The Court denied all of the motions to disqualify Ms. Harwell. Defendants Farmer and King appealed the refusal to disqualify Ms. Harwell.  The Court of Appeals ruled this appeal was "frivolous," imposing the maximum sanction available on Defendants Farmer and King.  *See Murphy v. Murphy*, 328 Ga. App. 767, 759 S.E.2d 909. 915 (2014), *recons. denied* (July 31, 2014), *cert. denied* (Ga. Nov. 17, 2014).  As the Court of Appeals correctly recognized, this

appeal (like other appeals taken by Defendants Farmer and King on behalf of

Michelle Murphy) was taken "purely for the purpose of delaying resolution of John

Murphy's custody modification petition – an act that is antithetical to the

children's best interests."

71.    The Court of Appeals also noted that the appellate brief submitted by

Defendants Farmer and King contained "numerous discourteous and disparaging

remarks about other persons involved in the case, particularly John Murphy's

wife" and that the brief was completely lacking a "tone that is respectful and

appropriate to the seriousness of the issues."  This finding further confirms that the

true purpose of the Conflictineering Enterprise's tactics is not legitimate litigation

of the issues, but rather the utilization of vicious *ad hominem* attacks and illegal

obstructionist tactics designed exclusively to bring emotional and psychological

pressure on Mr. Murphy and his wife (a) to relinquish the child custody claims and

instead (b) to pay substantial sums in order to end the terroristic attacks and (in Mr.

Farmer's words) "restore order."

**With no Disclosure to The Court or Mr. Murphy of His Prior Representation, Defendant Farmer Engineers the Involvement of His Former Client as The Children's Psychiatrist in an Attempt to Improperly Influence The Child Custody Litigation.**

72.    Following the appointment of Ms. Harwell as the GAL in the summer

of 2012, the Court requested professional input from her and a psychologist who

had been treating the children, Dr. Tony Johnson, as to whether a professionally-performed custody evaluation was warranted.  Rather than allowing these two independent professionals to respond to the Court's inquiries regarding the best interests of the children, Mr. Farmer insisted that the boys' treating psychiatrist, Dr. Patricia Nice, consult with Dr. Johnson regarding the need for a custody evaluation.

73.    At the time Mr. Farmer insisted upon Dr. Nice's involvement in the Court's decision of whether to recommend a custody evaluation, he failed to disclose to the Court or to counsel that he previously had represented Dr. Nice in several matters, including a matter related to her employment.  In connection with that representation, Mr. Farmer became aware of the temporary suspension of Dr. Nice's Physician and Surgeon License ("Professional License") by the State of Illinois many years earlier.

74.    The suspension of Dr. Nice's Professional License in Illinois involved allegations of prescription substance use.  Dr. Nice overcame these issues long ago, and her Professional License was restored fully by the State of Illinois.  There have been no subsequent issues with any of her professional licenses, including her license from the State of Georgia.

75.    Not only did Mr. Farmer fail to disclose his prior attorney-client relationship with Dr. Nice, he also failed to disclose that he chose not to charge Dr. Nice for his services as her attorney.  Instead of charging Dr. Nice for his services, Mr. Farmer sought to create a *quid pro quo* arrangement in which Dr. Nice would provide her professional services at no charge in matters involving his clients.  Mr. Farmer apparently believed he had engineered a situation in which the testifying professional, Dr. Nice, a former client represented without charge, would feel indebted and would "owe him one."

76.    Without disclosing his prior attorney-client relationship or the "she owes me one" arrangement that he believed he had in place with Dr. Nice, Mr. Farmer insisted that Dr. Nice become involved to provide testimony relative to the ultimate issues in the Child Custody Litigation.

**In Connection With a November 15, 2012 Hearing in The Child Custody Litigation, Defendant Farmer Obstructs Justice by Illegally Intimidating His Former Client and Influencing her Testimony**.

77.    The trial court scheduled a hearing in the Child Custody Litigation for November 15, 2012.  Prior to this hearing, Mr. Farmer arranged to meet with Dr. Nice to obtain a preview of the findings and professional opinions that she would be providing at the hearing.

78.     During this meeting, Mr. Farmer informed Dr. Nice that he expected her to support his client, Michelle Murphy, and her position in the Child Custody Litigation.  Dr. Nice told Mr. Farmer that she found it difficult to do so for several reasons, including (a) Michelle Murphy's refusal to keep appointments for herself and the children to see Dr. Nice, such that gaps in their treatment existed and their mental-health progress had been hampered; and (b) Michelle Murphy herself had shown indications of troubling conduct such that Dr. Nice believed Michelle Murphy was in critical need of psychiatric or other professional treatment.

79.     Mr. Farmer refused to accept Dr. Nice's professional opinions and her view of the facts.  Instead, Mr. Farmer demanded that Dr. Nice suppress any evidence, information, or opinions that would present Michelle Murphy or her relationship with the Children in a negative light – even if those concerns were genuine, accurate, and based upon her inquiries and professional opinion.  In order to emphasize his intolerance for any testimony that would in any manner be detrimental to his client's interests in the Child Custody Litigation, Mr. Farmer threatened Dr. Nice that if she provided such testimony, he would "destroy" her publicly, professionally, and personally.

80.     Influenced and intimidated by her own former lawyer's criminal and unethical threats, Dr. Nice testified timidly at the November 15, 2012 hearing.

This outcome caused Mr. Farmer to believe that his witness intimidation tactics had worked and that Dr. Nice truly was under his influence and control.  As a result, Mr. Farmer pressed for Dr. Nice to be even more heavily engaged in the Child Custody Litigation.

81.    At the hearing on November 15, 2012, the central issue of whether a full custody evaluation should be performed was raised by Ms. Harwell, the Children's GAL.  Ms. Harwell proposed that she and the children's psychologist, Dr. Tony Johnson, collaborate on the issue and report their recommendations back to the court.

82.    Mr. Farmer objected to Ms. Harwell's involvement with the custody evaluation process.  In view of Mr. Farmer's corrupt and illegal intimidation of Dr. Nice, it is apparent that the real reason Mr. Farmer objected to Ms. Harwell's involvement was because it would thwart his illicit scheme to get his former client (Dr. Nice) involved in the case and provide him with what he assumed would be an inside advantage.  Consistent with Mr. Farmer's belief that Dr. Nice was "in his pocket," he insisted that instead of Dr. Johnson collaborating with the GAL (Ms. Harwell), Dr. Johnson should work with Dr. Nice to assist the Court in determining whether a custody evaluation was needed.

**Despite Defendant Farmer's Intimidation Tactics, His Former Client (Dr. Nice) Joins Dr. Johnson in Recommending a Full Custody Evaluation for the Children.**

83.     Given his seemingly successful efforts to intimidate Dr. Nice previously, Mr. Farmer anticipated that she would capitulate to his threats and refuse to recommend a full custody evaluation.

84.     Despite Mr. Farmer's threats, however, Dr. Nice stood firm in her professional obligations and resolve.  As a result, on December 20, 2012, Dr. Nice and Dr. Johnson authored a joint letter to the Court expressing their recommendation that a full custody evaluation should be performed.  A copy of this letter is attached as **Exhibit 4.**

85.     The Court, however, refused to move forward with the custody evaluation because Defendants Farmer and King had filed an immediate appeal of the order denying Michelle Murphy's initial motion to disqualify Judge Baldwin. (This improper appeal ultimately was dismissed by the Georgia Court of Appeals for lack of appellate jurisdiction on July 16, 2013, which the Georgia Supreme Court affirmed on other grounds on June 30, 2014.)

86.     As the Children's GAL, Ms. Harwell wrote the Court on January 16, 2013, urging it to proceed with the full custody evaluation recommended by Drs. Johnson and Nice.  A copy of this letter is attached as **Exhibit 5.**  In response,

Judge Baldwin hand-wrote on the letter: "We need to wait until the Court of Appeals has ruled on Millard's appeal." *See id.*

87.     Just as Defendants Farmer and King had intended, their frivolous appeal of the original order denying the initial motion to recuse Judge Baldwin successfully delayed the performance of any custody evaluation as well as any other substantive examination of the merits of Mr. Murphy's claims for months. During this delay (and in apparent response to Dr. Johnson's and Dr. Nice's joint professional opinion that a full custody evaluation should be performed), at Mr. Farmer's urging and through Michelle Murphy's actions, the Children ceased attending their appointments with Drs. Johnson and Nice.

88.     Moreover, under the influence of Mr. Farmer and Michelle Murphy, the Children became increasingly hostile to and alienated from Mr. Murphy and his wife. The parental alienation resulting from these tactics has caused damage to the Children and necessitated their placement in residential treatment, resulting in out-of-pocket damages to Mr. Murphy and his wife of approximately $200,000.

**The Georgia Court of Appeals Dismisses Defendants Farmer's And King's Improper Appeal of the Denied Motions to Recuse Judge Baldwin, an Important Hearing is Scheduled, and Devastating Affidavits are Received by the Court Regarding Michelle Murphy.**

89.     After virtually no substantive proceedings had occurred in the Child Custody Litigation for several months, on July 16, 2013, the Georgia Court of

Appeals unanimously disposed of Michelle Murphy's defective appeal of the order denying her initial motions to disqualify Judge Baldwin. *See Murphy v. Murphy*, 322 Ga. App. 829, 747 S.E.2d 21 (2013), *aff'd on other grounds*, 295 Ga. 376, 761 S.E.2d 53 (2014).

90.     Following the dismissal of Michelle Murphy's appeal, Mr. Murphy immediately sought to schedule a hearing on his request for temporary custody. The Court scheduled the hearing for August 6, 2013.

91.     On August 5, 2013, the day before the scheduled August 6 hearing, Mr. Murphy submitted the affidavit of Bryan McLendon.  Mr. McLendon testified that he had rented a room from Michelle Murphy at her house for nearly two years, and also had provided transportation for the Children.

92.     Mr. McLendon also detailed disturbing sexual and other conduct involving Michelle Murphy, and testified regarding hazardous incidents involving the Children while in Michelle Murphy's custody.

93.     Shortly after the filing of this affidavit, Mr. Farmer contacted Mr. McLendon for the overt purpose of intimidating him and pressuring him to recant his testimony against Michelle Murphy.

94.     Mr. Farmer also moved to continue the August 6 hearing to August 13, 2013.  The Court granted this request.

**Defendant Farmer Obstructs Justice by Threatening And Intimidating Dr. Johnson Prior to His Testimony at the August 13, 2013 Hearing.**

95.     The children's psychologist, Dr. Tony Johnson, was issued a subpoena commanding him to appear and testify at the August 13, 2013 hearing.

96.     Prior to the August 13, 2013 hearing, and with knowledge that Dr. Johnson (and Dr. Nice) had become aware of his client's mental condition, behavioral issues, and poor parenting practices such that he was pushing for a full custody evaluation, Defendant Farmer undertook to ensure that Dr. Johnson understood that there would be personal and professional consequences to him in the event that he testified in a manner that was in any way harmful to the interests of Michelle Murphy (Defendant Farmer's client).

97.     On information and belief, Defendant Farmer represented to Dr. Johnson that if he provided any testimony at the hearing that negatively impacted Michelle Murphy's position, Defendant Farmer would cause Dr. Johnson difficulties with Georgia state licensing authorities.

98.     Defendant Farmer issued these threats to Dr. Johnson with the express and unlawful purpose and intention of intimidating Dr. Johnson, influencing his testimony, and obstructing justice.

99.     As discussed below, this was not the only instance in which the Conflictineering Enterprise threatened Dr. Johnson.

**For the Second Time, Defendant Farmer Attempts to Intimidate his Former Client Dr. Nice and Obstruct Justice, but Dr. Nice Remains Resolute in Her Professional Responsibilities and Her Recommendation That a Full Custody Evaluation Needed to be Conducted.**

100.   By the summer of 2013, Dr. Nice's concerns regarding Michelle Murphy had become much more defined, particularly as they impacted the Children.  With her last intimidating encounter with Mr. Farmer fresh in her mind, and acutely aware that her opinions regarding Michelle Murphy were not going to be tolerated by Mr. Farmer, Dr. Nice had no desire to meet or speak with him prior to the August 13, 2013 hearing.

101.   Anticipating that his client's mental condition and behavior was at great risk of being exposed, Mr. Farmer made desperate attempts to get in contact with Dr. Nice prior to the August 13 hearing.  Finally, the day before the August 13 hearing, Mr. Farmer connected with Dr. Nice by telephone.

102.   In this August 12, 2013 telephone call, Dr. Nice informed Mr. Farmer that her professional responsibilities required her to testify truthfully and that she would not suppress, alter, or embellish anything.  Dr. Nice made it clear to Mr. Farmer that her testimony at the August 13, 2013 hearing would contain facts, information, and opinion that would be truthful and forthcoming without regard to whether it would be beneficial or not to his client and her legal positions in the Child Custody Litigation.

103.   Among other things, Dr. Nice informed Mr. Farmer that she had become aware of additional facts and details regarding Michelle Murphy, her behavior with the Children, and the existence of issues that, in her professional judgment, required immediate attention from medical professionals trained in psycho-sexual issues involving parents and their children.  Dr. Nice also reiterated her opinion that a full custody evaluation needed to be conducted, that the children needed continuing care, that Michelle Murphy needed imminent professional care, and that the Children would benefit from a change in custody to Mr. Murphy.

104.   On information and belief, following Dr. Nice's preview of her testimony to him, Mr. Farmer again demanded that she suppress evidence and her opinions that reflected poorly on his client, Michelle Murphy.  In making that demand, Mr. Farmer also threatened Dr. Nice that he would reveal the revocation of her Professional License in Illinois (relating to alleged prescription substance use) of which he had become aware while representing her as his client.  Mr. Farmer also made threats of reporting her to state licensing authorities and general threats of ruining her personal and professional reputation.

105.   Despite Mr. Farmer's threats, at the August 13, 2013 hearing, Dr. Nice testified truthfully regarding her serious concerns about the Children and Michelle Murphy's parenting of the Children.

106.   Upon receiving Dr. Nice's testimony (and other witnesses during a four-hour hearing), the Court halted the hearing and called counsel for the parties and the GAL back to chambers.

107.   In chambers, the Court announced that it would order a full custody evaluation.  Mr. Farmer insisted that no custody evaluation needed to be performed and that, if a custody evaluation was to be performed, it was imperative that the custody evaluator be someone from outside of Newnan, Georgia (where the case is pending).  Mr. Farmer himself urged the Court to reach out to the Superior Court of Fulton County for a list of potential custody evaluators.  The Court agreed to contact Fulton County Superior Court Judge Doris Downs.

108.   The Court proceeded exactly as it said it would, contacted Judge Downs and then circulating a list of potential custody evaluators that it received from her to counsel for the parties on August 21, 2013.  Ms. Harwell, the Children's GAL, conducted due diligence on the professionals provided by Judge Downs and ultimately recommended Dr. Nancy McGarrah.

109.   Thereafter, on August 23, 2013, the Court entered an order requiring the parties to submit to a full custody evaluation by Dr. McGarrah.  A true and correct copy of the August 23 Order is attached as **Exhibit 6**.

110.   The August 23 Order required Mr. Murphy and Michelle Murphy (as well as Mr. Murphy's current wife) to "fully cooperate with the custody evaluator."  The August 23 Order also provided, "Neither party shall discuss any of the issues, allegations or claims in this Case with the Children, unless such discussions are necessary to implement the terms of this Order or the terms of the Final Decree."  Aug. 23 Order, at 6-7.  The August 23 Order further required Mr. Murphy to pay all initial costs associated with the custody evaluation, subject to re-allocation at the conclusion of the case.  *See* Aug. 23 Order, at 6.

111.   Defendants Farmer and King (on behalf of Michelle Murphy) appealed the August 23 Order.  As part of the same decision in which the Georgia Court of Appeals rejected the appeal of the order refusing to disqualify Ms. Harwell as the GAL, the Court of Appeals found this appeal by Defendants Farmer and King to be "frivolous" and interposed solely to delay an examination of the merits of Mr. Murphy's child custody claims.  *Murphy v. Murphy*, 328 Ga. App. 767, 759 S.E.2d 909 (2014), *recons. denied* (July 31, 2014), *cert. denied* (Ga. Nov. 17, 2014).

**Defendant Farmer Follows Through on his Unethical Threats to Disclose His Former Client's Personal Information And Attempt to Ruin Her Reputation.**

112.   By Mr. Farmer's own admission, he contacted the "Illinois Medical Licensing Board" seeking to obtain written information regarding Dr. Nice's

license status "days **before** the hearing" on August 13, 2013.  *See* Aug. 19, 2013 Mot. to DQ, at 22 (emphasis added) (excerpts from this motion attached as **Exhibit 7**).  At the August 13 Hearing, Mr. Farmer even cross-examined Dr. Nice on her prior issues of substance use.  Mr. Farmer would later characterize this as the "the substance abuse area of her cross-examination." *Id.* at 22-23.

113.   In the wake of the August 13 hearing, and in light of Dr. Nice having testified fully and truthfully regarding her serious concerns with the Children and Michelle Murphy's parenting conduct, Mr. Farmer made good on his threats to disclose the personal and confidential information he had learned during his prior representation of Dr. Nice.

114.   Specifically, following the August 13 Hearing, Mr. Farmer filed a series of briefs (on August 19, August 28, and September 13, 2013) that revealed his knowledge and awareness of Dr. Nice's prior substance use issues in Illinois just as he had threatened.  Among other items, Mr. Farmer stated that Dr. Nice "most likely was experiencing the effects of substance abuse just before her testimony" (Aug. 19 Mot., at 7); "appeared to be under the influence of a controlled substance to the extent that the witness was presenting false testimony and exhibiting erratic behavior" (*id.*); was a "substance abusing psychiatrist" (*id.* at 11); had a "history of being a substance abuser" (*id.* at 22); and "has a long history

of substance abuse as a member of the medical profession…" (Aug. 28 Mot., at 4; Sept. 13 Mot., at 12).

115.   At no time has Dr. Nice consented to the disclosure of this information by her former lawyer.  In addition to being illegal, Mr. Farmer's conduct violates Rule of Professional Conduct 1.6.  Ga. R. Prof. Conduct 1.6(a) ("A lawyer shall maintain in confidence all information gained in the professional relationship with a client, including information which the client has requested to be held inviolate or the disclosure of which would be embarrassing or would likely be detrimental to the client, unless the client gives informed consent . . . .").

**Non-Party Co-Conspirator Michelle Murphy Refuses to Participate in the Court-Ordered Custody Evaluation, While Defendant Farmer Embarks on an Illegal Campaign to Intimidate the Custody Evaluator.**

116.   Despite the fact that the August 23 Order required "[a]ll reasonable efforts" be made to complete the custody evaluation by October 15, 2013, Michelle Murphy refused to participate.  At the same time, Mr. Farmer attempted to intimidate Dr. McGarrah and dissuade her from serving as the custody evaluator.

117.   On September 4, 2013, Mr. Farmer wrote Dr. McGarrah (without copying Mr. Murphy's counsel), demanding various information from her before "advising [his client] about making her decision to execute the contract" for Dr. McGarrah's services in the custody evaluation.  Mr. Farmer also asked Dr.

McGarrah irrelevant, highly inappropriate questions about whether she thought the pleadings and orders entered in the custody case "gave the appearance of justice." A copy of Mr. Farmer's September 4, 2013 letter to Dr. McGarrah is attached as **Exhibit 8.**

118.   The next day, on September 5, 2013, Dr. McGarrah responded to Mr. Farmer's September 4, 2013 letter, copying Mr. Murphy's counsel, and acknowledging receipt of both the Court's August 23 Order and Mr. Farmer's September 4 Letter.

119.   Mr. Farmer then sent Dr. McGarrah another letter, dated September 13, 2013, in which he attacked Dr. McGarrah for disclosing his prior letter: "You are not at liberty to disclose my communications with you." Mr. Farmer further threatened Dr. McGarrah that he would be contacting the APA Ethics Committee to review "the ethical restraints of [Dr. McGarrah's] discipline."  A copy of Mr. Farmer's September 13, 2013 Letter to Dr. McGarrah is attached as **Exhibit 9**.

120.   In the meantime, because Michelle Murphy refused to cooperate with the custody evaluation, Mr. Murphy amended a previously-filed motion for contempt against her. This amendment, dated September 27, 2013, sought contempt not only based on Michelle Murphy's failure to cooperate with the custody examination, but also based on statements made by both of the Children

confirming that both Michelle Murphy and Mr. Farmer were discussing the

substantive issues in the Child Custody Litigation with the Children, in violation of

the Court's August 23 Order.

**The Principal Architects of the Conflictineering Enterprise (Defendants Farmer and King) and Their Client Michelle Murphy All Are Held in Contempt in the Child Custody Litigation.**

121.   At the contempt hearing on October 3, 2013, Mr. Murphy presented

uncontradicted testimony that he and his wife had taken every possible step to

proceed with the custody evaluation required by the August 23 Order, including

signing all required documentation and paying the full retainer amount of $6,400.

122.   Although Defendant King appeared, neither Michelle Murphy nor Mr.

Farmer chose to be present at the October 3 hearing.  At the conclusion of the

October 3 hearing, the Court found Michelle Murphy, Mr. Farmer, and Mr. King in

contempt of court.

123.   On November 19, 2013, the Court entered a written Order regarding

its contempt filings against Michelle Murphy, Mr. Farmer, and Mr. King.  A true

and correct copy of the November 19, 2013 Order is attached as **Exhibit 10**.

124.   With respect to Michelle Murphy, the November 19, 2013 Order ruled

that she "willfully has refused to cooperate with, and instead has frustrated, the

custody evaluation required by the August Order."  Moreover, both Michelle

Murphy and Mr. Farmer were found to have been "discussing the issues, allegations, and claims in this case with the children," in violation of the explicit prohibition contained in the August 23 Order.

125.   The Court also found that Defendants Farmer and King had "willfully directed" Michelle Murphy not to appear at the hearing, without providing "any valid excuse" for her failure to appear.

126.   As with the other adverse rulings in the Child Custody Litigation, Defendants Farmer and King, on behalf of themselves and Michelle Murphy, appealed the November 19, 2013 Order.  On November 17, 2014, the Georgia Court of Appeals excused Michelle Murphy's failure to appear at the hearing, but otherwise rejected every aspect of her appeal of the trial court's contempt order, including its findings of contempt by Michelle Murphy for her failure to participate in the custody evaluation.  *See Murphy v. Murphy*, 330 Ga. App. 169, 767 S.E.2d 789 (2014), *recons. denied* (Dec. 5, 2014), *cert. denied* (Ga. Mar. 2, 2015), *recons. denied* (Apr. 9, 2015).

**Defendants Farmer and King Continue Their Obstructive Pattern of Filing Frivolous, Redundant Motions to Disqualify Judge Baldwin and Re-Confirm the Goals of the Conflictineering Enterprise—Relinquishment of the Child Custody Claims and a "Shakedown" Payment by Mr. Murphy and His Wife.**

127.   In the wake of the August 13 hearing at which the custody evaluation was ordered, Defendants Farmer and King filed another series of frivolous,

overlapping motions to recuse Judge Baldwin.  These motions contained

inappropriate, inflammatory, and irrelevant personal attacks on Mr. Murphy and

his wife, many of which were targeted specifically at their assets and wealth.

128.   For example, in a disqualification motion filed August 19, 2013,

Defendants Farmer and King alleged that "[t]he inclusion of [Mr. Murphy's wife] .

. . in the litigation will expose the type of disposable income and assets that John

Harold Murphy fraudulently and illegally conceals from the Court and [ ] Michelle

Murphy," notwithstanding that the third-party complaint against Mr. Murphy's

wife already had been dismissed and that the divorce and distribution of assets

between Mr. Murphy and Michelle Murphy had been finalized seven years earlier.

129.   This same motion also asserted that Mr. Murphy was "showered with

many hundreds of thousands, if not millions of dollars of disposable income each

year by [his wife]," described Mr. Murphy's wife as the "bag person for John

Harold Murphy's disposable income and assets," and referred to her as a "very

wealthy and astute person."

130.   In an August 28, 2013 "amendment" to the August 13 motion,

Defendants Famer and King similarly described Mr. Murphy and his wife as a

"multimillionaire couple," alleging they are "many times over multimillionaires."

131.   The trial court in the Child Custody Litigation orally denied all of the pending disqualification motions at the outset of the October 3 contempt hearing. On December 4, 2013, the Court entered a written Order denying all of the outstanding motions to disqualify.  A copy of the December 4, 2013 Order is attached as **Exhibit 11.**

132.   The Court's December 4, 2013 Order specifically found that Mr. Farmer's recent motions to disqualify included an inexplicable and irrelevant fixation with the wealth of Mr. Murphy and his wife:  "Mr. Farmer spends over 20 pages in his motion to disqualify talking about the Plaintiff's wife, Renee Haugerud, and her financial situation."  Dec. 4 Order, at 5.  Mr. Farmer and the Conflictineering Enterprise's acute and rapacious focus on the wealth of Mr. Murphy and his wife further evidences that a principal aim of their racketeering acts was to secure a "shakedown" payment from them.

**Defendants Farmer and King Ratchet Up Their Efforts to Intimidate the Custody Evaluator, While Their Client Continues to Refuse to Comply With The  Custody Evaluation Ordered by The Court.**

133.   On January 8, 2014, Defendants Farmer and King filed, on behalf of Michelle Murphy, an entirely frivolous "Motion to Disqualify Cliff Valley Psychologists, P.A. and Nancy A. McGarrah, Ph.D. as 'Custody Evaluator.'"  This disqualification motion included many inflammatory accusations against the

Children's GAL Lisa Harwell, including assertions that Ms. Harwell had taken "revenge" upon Michelle Murphy and that she had improperly selected Dr. McGarrah to perform the custody evaluation.

134.   In the meantime, and notwithstanding the prior contempt Order entered against her, Michelle Murphy defiantly continued to refuse to cooperate with the custody evaluation ordered by the Court.

135.   In light of Michelle Murphy's continuing refusal to cooperate with the court-ordered custody evaluation, Mr. Murphy filed a Motion for a Rule 35[4] mental examination of Michelle Murphy.  Shortly after Mr. Murphy's Motion for Rule 35 Examination was scheduled for hearing, Defendants Farmer and King filed yet another motion to disqualify Judge Baldwin that immediately was denied.

136.   In light of the continued filing of frivolous motions and other obstructive behavior by Defendants Farmer and King, the Court entered an Order governing further proceedings on March 13, 2014 (the "March 13 Order").  The March 13 Order provided, among other things, that "[a]ny further disrespect to the Court, both in person or in writing, will not be tolerated" and that "[a]ny further

---

[4] "Rule 35" refers to O.C.G.A. § 9-11-35(a) which provides, in pertinent part: "When the mental or physical condition of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical examination by a physician or to submit to a mental examination by a physician or a licensed psychologist . . . . "

frivolous motions with the purpose to delay or obstruct this Court shall prohibit the offending party from any attorney's fees." A copy of the March 13 Order is attached as **Exhibit 12**.

137.   At the hearing on March 17, 2014, Dr. McGarrah confirmed that while Mr. Murphy and his wife had done everything necessary and possible to complete the court-ordered custody evaluation, Michelle Murphy had not participated in any manner whatsoever.

138.   At the conclusion of the hearing, the Court ordered Michelle Murphy to submit to a Rule 35 examination by Dr. McGarrah, warning her that her continued refusal to comply with the Court's orders could result in temporary custody of the Children being granted to Mr. Murphy.

139.   The day after the hearing, on March 18, 2014, Mr. Farmer sent Dr. McGarrah another letter manifestly intended to intimidate her. Mr. Farmer's letter stated that Michelle Murphy would not sign any of the documents necessary for Dr. McGarrah's office to conduct any testing and further stated that Michelle Murphy would not "participate in any examination that you deem provides you with any immunity from liability whether by statute or contract." The clear import of this and other threats in the letter was that (a) Dr. McGarrah would be sued if she issued any type of opinion adverse to Michelle Murphy; and (b) Mr. Farmer

would claim his March 18, 2014 letter effectuated a waiver of her statutory

immunity in any such litigation. A true and correct copy of Farmer's March 18,

2014 Letter to Dr. McGarrah is attached as **Exhibit 13.**

140. The day after receiving Mr. Farmer's threatening letter, Dr. McGarrah

moved to withdraw as the custody evaluator and as the psychologist appointed to

conduct the Rule 35 examination.

141. On April 1, 2014, the Court entered an Order granting Dr. McGarrah's

motion to withdraw as custody evaluator and appointing Dr. H. Elizabeth "Betty"

King as the new custody evaluator. A copy of this Order is attached as **Exhibit 14**.

142. Also on April 1, 2014, the Court entered an Order requiring Michelle

Murphy to submit to a Rule 35 psychological evaluation by Dr. King (to be

completed no later than May 23, 2014) and setting a compliance hearing for May

27, 2014 (during which temporary custody would be addressed, if necessary).

**Michelle Murphy Loses Custody of The Children at a May 27, 2014 Hearing.**

143. At the May 27 hearing, Michelle Murphy admitted she had not

complied with the custody evaluation or the Rule 35 mental examination, and

further admitted that she had violated the prohibition on discussing the issues in the

Child Custody Litigation with the Children. The Court then ruled from the bench

that temporary custody of the Children was awarded to Mr. Murphy.

144.   On June 5, 2014, the Court entered an Order memorializing his award of temporary custody of the Children to Mr. Murphy.  A copy of the June 5, 2014 Order is attached as **Exhibit 15**.

145.   Mr. Farmer attempted to challenge the temporary custody ruling by an "Emergency Motion" to the Georgia Supreme Court (which Mr. Farmer amended after entry of the June 5, 2014 Order).  That motion was denied on June 11, 2014. *See Murphy v. Murphy*, No. S13G1651 (Ga. June 11, 2014).

**Following The Award of Temporary Custody to Mr. Murphy, Mr. Farmer And Michelle Murphy Urge One of The Children to Run Away And Utilize The Dangerous Situation to Demand Litigation Concessions From Mr. Murphy.**

146.   In the weeks following the May 27, 2014 hearing, Michelle Murphy constantly and systematically contacted both of the Children innumerable times, sometimes calling or texting either or both of them as often as a dozen times or more per day.  Even after the entry of the June 5, 2014 Order prohibiting Michelle Murphy from having any contact with the Children, she, directly and indirectly, continued to contact the Children numerous times per day.

147.   During this same time, Michelle Murphy, with the knowledge of and, on information and belief, at the direction of Mr. Farmer, instructed the Children to physically resist any effort by Mr. Murphy to take the Children's mobile phones from them, and to use any effort by Mr. Murphy to take the phones away from the

Children as a pretext for an altercation with Mr. Murphy.  Michelle Murphy provided these instructions to the Children with the intention of further alienating the Children from their father and instigating an altercation that she and Farmer then would use to falsely claim the Children were being abused or mistreated by Mr. Murphy.

148.   By June of 2014, Mr. Murphy and his wife had taken the children to their permanent residence in St. Thomas, USVI.

149.   On June 8, 2014, Mr. Murphy demanded that T.M. relinquish the mobile phone Michelle Murphy had purchased for T.M.  T.M. refused, and Mr. Murphy attempted to take the phone.  T.M. physically resisted, resulting in an incident in which T.M. scraped one of his lips against his braces.

150.   On June 8, 2014, after the incident with T.M. and his braces, Michelle Murphy communicated with the Children via text message repeatedly, instructing them to get photographic evidence and send it to her with a text or voicemail message detailing that Mr. Murphy had caused the alleged "injury."

151.   One day later, on June 9, 2014, Defendants Farmer and King, on behalf of Michelle Murphy, filed a "Supplement" to an "Emergency Motion" she had filed in the Supreme Court of Georgia, falsely representing that Mr. Murphy had abused T.M. when trying to take his mobile phone away from him.

152.   In light of the June 9 filing's confirmation that Michelle Murphy was continuing to violate the "no contact" order, Mr. Murphy demanded that J.M. (the older child) relinquish the cell phone Michelle Murphy had bought for him.  J.M. refused to relinquish the phone and went to a different room in Mr. Murphy's residence.

153.   Based on cell phone records retrieved from J.M.'s phone, J.M. spoke with Michelle Murphy and Mr. Farmer at or around the time Mr. Murphy demanded that he relinquish his cell phone.

154.   In the afternoon of June 9, 2014, Michelle Murphy communicated with J.M. via text message, stating that she had a plan to get J.M. out of Mr. Murphy's home.

155.   Shortly thereafter, J.M. ran away from Mr. Murphy's residence in St. Thomas.  On information and belief (including statements made to Mr. Murphy by T.M.), Michelle Murphy or Mr. Farmer, or both of them, encouraged and instructed J.M. to run away from Mr. Murphy's home.

156.   J.M. was missing for several hours.  During the time that J.M. had run away from Mr. Murphy's residence, J.M. spoke via cell phone with Michelle Murphy on multiple occasions, and also spoke with Mr. Farmer.  Based on J.M.'s cell phone records and his communications with Mr. Murphy during the time that

he was missing, Michelle Murphy or Mr. Farmer, or both of them, were coaching

J.M. to seek to obtain concessions from Mr. Murphy in the Child Custody

Litigation in exchange for revealing J.M.'s location to Mr. Murphy and agreeing to

return home that evening.

157.   Specifically, Michelle Murphy or Mr. Farmer, or both of them,

directed J.M. to demand that Mr. Murphy state in writing that he agreed the

Children would be better off in Newnan, Georgia with Michelle Murphy and that

he immediately would return the Children to Michelle Murphy.  As instructed by

Michelle Murphy or Mr. Farmer, J.M. demanded that Mr. Murphy send him a text

message stating, "I will work with you to get you back to Newnan."  Mr. Murphy

complied with the demand, and sent J.M. that text message.  J.M. then forwarded

to Michelle Murphy the text message he caused Mr. Murphy to send.

158.   By encouraging J.M. to remain missing and at risk of serious injury in

order to pressure Mr. Murphy to agree to litigation concessions, Michelle Murphy

and Mr. Farmer engaged in the intimidation and extortion of Mr. Murphy.

159.   The morning after the runaway incident, Michelle Murphy

immediately began to pressure J.M., via text message, to follow up with Mr.

Murphy about implementing the litigation concessions extracted as a condition of

J.M. disclosing his location.  Michelle Murphy sent multiple text messages to J.M. asking if Mr. Murphy was sending J.M. back and if a flight had been scheduled.

160.   Later that night, on June 10, 2014, Michelle Murphy communicated via text message to J.M., making reference to the prior day's events as involving "negotiations" and a "deal" and "ransom."

**Defendant Farmer Furthers The Witness Intimidation Scheme And Further Endangers The Children By Filing a False Report of Child Abuse With Virgin Islands Authorities.**

161.   At almost exactly the same time he discovered J.M. was missing, Mr. Murphy was visited at his residence by a representative of the U.S. Virgin Islands Department of Human Services ("VI-DHS").  The representative stated she was there to investigate a report of child abuse filed by Defendant Farmer.

162.   The VI-DHS representative conducted detailed interrogations of Mr. Murphy and his wife and also conducted a thorough and comprehensive inspection of their residence and household.  The VI-DHS representative did not discover one single shred of evidence that in any manner supported the outrageous and untrue allegations made by Mr. Farmer in his false report.

163.   As a result of Mr. Farmer's false report of child abuse, Mr. Murphy was unable to leave his residence immediately to search for J.M.  Defendant Farmer's misconduct and misrepresentations to USVI authorities impacted the

efforts to locate J.M., caused enormous physical and emotional stress for Mr.

Murphy, and caused Mr. Murphy to incur attorney's fees.

**Mr. Farmer Attempts to Bribe Judge Baldwin by Way of a Frivolous Lawsuit Against the Court's Long-Time Court Reporter.**

164.   Shortly after the attempt to intimidate Mr. Murphy to make litigation

concessions in order to ensure the safe return of J.M., Defendant Farmer embarked

upon an insidious scheme to attempt to bribe the trial judge in the Child Custody

Litigation by threatening and then filing frivolous litigation against Nan Freeman

(Judge Baldwin's long-time court reporter).

165.   Specifically, on June 18-19, 2014, Mr. Farmer sent Ms. Freeman a

series of e-mails in which he demanded that Ms. Freeman provide him the audio

tapes of certain hearings in the Child Custody Litigation (as opposed to merely

providing the written transcripts).

166.   On June 19, 2014, Judge Baldwin agreed to make the audio

recordings available to Mr. Farmer.  Despite Judge Baldwin's capitulation to his

demands, Defendant Farmer continued to utilize the threat of a lawsuit against Ms.

Freeman to demand even further concessions, namely that he must be provided

with his own personal copy of the audio recording.

167.   Judge Baldwin ultimately capitulated to these demands as well,

entering an Order on June 26, 2014 providing for audio copies of the specific

hearing at issue (the May 27, 2014 hearing) to be delivered to counsel for both parties.  A copy of the June 26, 2014 Order is attached as **Exhibit 16**.

168.   Despite the June 26 Order and Mr. Farmer's receipt of the audio tapes of the hearing, Defendants Farmer and King nevertheless filed a lawsuit against Nan Freeman, her business (Freeman Reporting, Inc.), and the eight members of the Board of Court Reporting (the "Nan Freeman Lawsuit").  Attorney Ken Gordon appeared on behalf of Ms. Freeman in the Nan Freeman Lawsuit.

169.   Shortly thereafter, Mr. Farmer contacted Mr. Gordon, representing to Mr. Gordon that he would dismiss the Nan Freeman Lawsuit if Ms. Freeman persuaded Judge Baldwin (a) to recuse himself from the Child Custody Litigation; and (b) to vacate his June 5, 2014 ruling granting temporary custody to Mr. Murphy and prohibiting Michelle Murphy from having contact with the Children.  Mr. Gordon and his client declined Mr. Farmer's proposal.

170.   This effort by Mr. Farmer to bribe and extort a member of the Georgia state judiciary  – by suing his court reporter, and then offering to dismiss the case in exchange for the judge recusing himself and vacating an earlier Order in separate litigation –is unethical, illegal, and reprehensible.

**Michelle Murphy Threatens Dr. Tony Johnson at The Newnan Target, Telling Him She is Going to "Take Him Down."**

171.   At the same time Mr. Farmer was attempting to bribe Judge Baldwin, Non-Party Co-Conspirator Michelle Murphy was engaged in witness intimidation of Dr. Tony Johnson, the Children's treating psychologists and one of the professionals who had recommended a full custody evaluation relative to Mr. Murphy's claims in the Child Custody Litigation.

172.   Specifically, on June 22, 2014, Michelle Murphy approached Dr. Johnson at the Newnan Target, located at 555 Bullsboro Drive, Newnan, Georgia 30265.  Michelle Murphy began harassing Dr. Johnson in the checkout line, stating that Dr. Johnson was the reason Michelle Murphy had lost custody of the Children.

173.   Dr. Johnson left the checkout line, but was followed by Michelle Murphy, who continued to harass him.  Michelle Murphy ultimately stated to Dr. Johnson that she was going to "take him down."  A true and correct copy of the police report Dr. Johnson filed regarding this incident is attached as **Exhibit 17**.

**The Conflictineering Enterprise's Next Illegal Scheme Involved a Conspiracy With a Minor Child, T.B., to Manufacture False Evidence of Child Abuse by Mr. Murphy.**

174.   During the summer of 2014, Mr. Murphy and his wife were endeavoring to facilitate the Children's transition to their new living arrangement with them.  Among numerous additional steps taken to help the Children adjust to

their new circumstances, Mr. Murphy and his wife allowed them to invite a minor friend, T.B., to visit with them for an extended period of time over the summer. Mr. Murphy and his wife even paid for several plane tickets for T.B. and all of T.B.'s expenses while visiting.

175.   Upon T.B.'s return to Newnan, Michelle Murphy met with T.B. secretly for purposes of launching and engineering an illegal scheme with T.B. whereby (a) T.B. would ask Mr. Murphy and his wife to allow and even pay for T.B. to return to the USVI for another extended visit with the Children, during which (b) T.B. would attempt to manufacture false evidence that Mr. Murphy was abusing the Children, so that (c) the Conflictineering Enterprise could raise additional false claims of child abuse.

176.   In furtherance of this scheme, T.B. contacted Mr. Murphy and his wife in order to plead with them to permit and pay for yet another lengthy visit with the boys.  Unaware of T.B.'s involvement in the conspiratorial scheme to manufacture false evidence, and in an effort to do everything they could to help the Children, Mr. Murphy and his wife agreed to another visit by T.B. and, once again, purchased T.B.'s plane ticket to the USVI.

177.   During this second visit, T.B. enticed the Children to engage in a number of delinquent and even criminal acts.  Among other things, T.B. urged the

Children to steal alcoholic beverages and consume them covertly; acquired and sought to acquire cigars and marijuana to smoke with the Children; persuaded the Children to purchase and manufacture their own marijuana pipes; and helped the Children roll "blunts," consisting of marijuana mixed with cigar tobacco.

**Defendants Farmer And King File a Fabricated "Emergency Motion" in Anticipation of Receiving The False Evidence of Child Abuse Manufactured by T.B., But The Illicit Conspiracy is Uncovered Shortly Before The Scheduled Hearing.**

178.   While engaged in the foregoing acts, T.B. remained in contact with Michelle Murphy and possibly other members of the Conflictineering Enterprise regarding his efforts to manufacture false evidence of Mr. Murphy's alleged abuse.

179.   In anticipation of T.B. returning to Newnan, Defendants Farmer and King, on behalf of Michelle Murphy, filed an "Emergency Motion for Relief from John Harold Murphy and Renee L. Haugerud Contributing to the Delinquency of Minors" alleging that Children were consuming alcohol and drugs (the purported evidence of which T.B. had conspired to fabricate and then attempted to manufacture).

180.   Shortly after the filing of the Emergency Motion, T.B. returned from his second extended visit with the Children.  Defendants Farmer and other members of the Conflictineering Enterprise (including at least Michelle Murphy

and Ms. Tunkle) immediately met with T.B. to discuss the results of T.B.'s efforts to manufacture false evidence of child abuse by Mr. Murphy.

181.   Based on these discussions with T.B., on August 8, 2014, Defendants Farmer and King filed a "First Amendment" to the Emergency Motion, identifying T.B. as the "confidential informant" and expanding the false claims that Mr. Murphy had provided the Children with drugs and alcohol.

182.   As the sole support for his August 8 filing, Defendant Farmer submitted his own affidavit in which he disclosed facts revealing the illicit scheme to manufacture evidence by the Conflictineering Enterprise and T.B.  According to Defendant Farmer's affidavit, when Michelle Murphy secretly met with T.B. after his first visit with the Children, he described to her wide-ranging and dangerous abusive conduct by Mr. Murphy.  Yet, rather than notify T.B.'s parents of this purported abuse or alert the appropriate authorities, Michelle Murphy encouraged T.B. to visit the Children again to obtain "verification" of the alleged abuse for her own use.  In other words, Michelle Murphy conspired with T.B. for him to return to the purportedly "abusive" environment to "verify" the alleged abuse.

183.   In reality, T.B. would not be "verifying" anything, but rather would be attempting to manufacture false evidence that Mr. Murphy was "abusing" the Children by giving them drugs and alcohol.

184.   On August 11, 2014, Mr. Murphy filed a motion seeking to cancel the hearing that had been scheduled on the Emergency Motion (for August 13) unless all evidence relevant to the conspiracy to manufacture evidence was produced by Mr. Farmer.

185.   Later in the day on August 11, 2014, Defendants Farmer and King (on behalf of Michelle Murphy) filed their next manifestly frivolous motion to disqualify Judge Baldwin.  Having been caught red-handed in their scheme to manufacture evidence, their obvious purpose in filing this disqualification motion was to delay the hearing that was scheduled for August 13 (the focus of which now would be on the conspiracy to manufacture evidence).

186.   As intended by Defendants Farmer and King, on August 12, 2014, the Court entered an Order providing that, in light of the August 11 Motion for Disqualification, the hearing on the Emergency Motion that had been scheduled for August 13 would be canceled.  A copy of this August 12, 2014 Order is attached as **Exhibit 18.**

187.   Two weeks later, on August 26, 2014, Defendant King moved to withdraw as co-counsel for Michelle Murphy, stating he was retiring from the practice of law.  The Court granted this motion on September 10, 2014.  *See* Order [allowing King to Withdraw] (Sept. 10, 2014) (copy attached as **Exhibit 19**).

**The Conflictineering Enterprise Trespasses on Mr. Murphy's Property to "Smuggle" Cell Phones to The Children.**

188.   In August of 2014, Non-Party Co-Conspirator Robert Hartman and perhaps other members of the Conflictineering Enterprise trespassed onto Mr. Murphy's private property in St. Thomas to (a) smuggle new cell phones to the Children, so that Michelle Murphy could continue to violate the "no contact" order entered in the Child Custody Litigation; and (b) deliver to J.M. a "runaway kit," complete with camping lights and GPS devices, to facilitate and encourage another "runaway" event deliberately intended to endanger his welfare and to facilitate extortionate activity by the Conflictineering Enterprise.

189.   The "smuggled" phones also were used to further alienate the Children from their father and his wife by encouraging J.M. and T.M. to defy them at every turn, including an express directive to answer any questions from Mr. Murphy and his wife with nothing more than a "Yes" or "No."  The Children also were encouraged to tell the administrators, teachers, and other students at their school that they were "prisoners" who were being held in the USVI by Mr. Murphy against their will.

**Defendant Beacham Travels to St. Thomas to Kidnap The Children And Conduct a Clandestine Videotaped "Interview" in Order to Generate Additional Pressure on Mr. Murphy And His Wife.**

190.    Contemporaneous with their deliberate efforts to further alienate the Children from Mr. Murphy and his wife, Michelle Murphy and members of the Conflictineering Enterprise launched a so-called "social media" campaign to bring additional pressure on Mr. Murphy to relinquish the child custody claims and pay off the Conflictineering Enterprise.

191.    Shortly after the "social media" campaign was launched, Defendant Beacham and her front entity, Defendant My Advocate Center, joined the Conflictineering Enterprise.  Defendants Beacham and My Advocate Center hold themselves out as purported "advocates" who provide, among other services, litigation assistance in child custody disputes, even though Ms. Beacham is not a licensed Georgia attorney.

192.    In late August or early September of 2014, in furtherance of the goals of the Conflictineering Enterprise and with the knowledge, encouragement, and support of other members of the Conflictineering Enterprise, Defendant Beacham traveled to St. Thomas, USVI, with the intention and purpose of kidnapping the Children and then conducting a clandestine meeting and "interview" with them (all

without the knowledge or consent of their father and custodial parent, Mr. Murphy).

193.   To conduct this clandestine interview, and in furtherance of the goals of the Conflictineering Enterprise, Defendant Beacham enticed the Children to sneak off Mr. Murphy's property and to get into the back seat of a waiting van that she and the Conflictineering Enterprise had arranged.

194.   Having illegally lured the Children off their parent's property, Defendant Beacham then engaged in a heavily-scripted videotaped "interview" with the Children.  A review of the videotaped interview released confirms Defendant Beacham asked the Children highly leading questions, the obvious purpose of which was to elicit false or distorted allegations of child abuse or other alleged misconduct by Mr. Murphy.

195.   The Conflictineering Enterprise fully expected and intended to leverage this videotaped "interview" to further pressure Mr. Murphy to give up his child custody claims and to make a shakedown payment to terminate the continuing terroristic attacks and deliberate endangerment of the Children.

196.   The Conflictineering Enterprise thereafter showed portions of the "interview" at so-called "town hall" meetings organized and conducted in Newnan, Georgia by Michelle Murphy, Defendant Beacham, and possibly other members of

the Conflictineering Enterprise.  Portions of the videotaped "interview" also have been posted on Non-Party Co-Conspirator Michelle Murphy's Facebook page and her website dedicated to "free[ing]" the Children, J.M. and T.M.

197.   In addition to furthering the goals of the Conflictineering Enterprise, Defendants Beacham and My Advocate Center also have used portions of the videotaped USVI "interview" to attempt to enhance the profile (and media coverage) of themselves and the "advocacy" services they provide to litigants in child custody cases.  Defendants Beacham and My Advocate Center intended to profit from their racketeering acts and the acts of other members of the Conflictineering Enterprise in the form of additional business and broader awareness of their services, in addition to any other financial agreement or arrangement they may have with other members of the Conflictineering Enterprise.

**The Conflictineering Enterprise's "Social Media" Campaign Deliberately Endangers The Children**.

198.   In early September of 2014, the Children commenced the school year at a highly-respected private school in St. Thomas, USVI.

199.   By virtue of her continuous contact with the Children (in systematic violation of the June 5, 2014 "no contact" order entered in the Child Custody Litigation), co-conspirators Michelle Murphy and her brother, Rob Hartman,

became aware of specific details regarding the private school the Children were attending.

200.   Despite the significant risk of endangerment to the Children, Michelle Murphy or Mr. Hartman, or both of them, published specific details regarding the Children's school and other aspects of their private lives on the completely public Facebook page that they host.

201.   At the same time, the Conflictineering Enterprise continued to make widespread and grossly exaggerated claims regarding the extent of Mr. Murphy's and his wife's wealth.  Among other things, Michelle Murphy's Facebook page repeatedly describes Mr. Murphy's wife as a "billionaires" [sic].  In other words, Michelle Murphy or other members of the Conflictineering Enterprise, through their public Facebook page, deliberately and recklessly identified the Children as a highly-attractive target for would-be kidnappers and provided all the information needed to execute a kidnapping of the Children.

202.   Moreover, by the time the Children started school in St. Thomas, Michelle Murphy and other members of the Conflictineering Enterprise had created a plethora of false and misleading "posts" on various social media sites, all proclaiming that the Children had been placed with Mr. Murphy as a result of the purported bribery of Georgia judicial and quasi-judicial officials.

203.   When the Children attended school in St. Thomas, they inevitably had greater and more ready access to "smart" phones and other devices able to access the Internet.  Mr. Murphy lost any ability to limit efforts by the Conflictineering Enterprise (a) to urge the Children to resist any efforts by Mr. Murphy to help them adjust to their new environment and (b) to entice the Children to engage in additional conduct potentially endangering themselves, such as another runaway incident or another incident like the "interview/kindapping" by Defendant Beacham.

204.   As a result of these and other intentional acts by the Conflictineering Enterprise, the Children performed poorly at school, alienated students and others at the school with false claims of being held against their will by Mr. Murphy, and engaged in additional behavior harmful to themselves and others.

205.   By late September of 2014, multiple professionals recommended to Mr. Murphy that the Children needed to be placed in residential treatment, in order to begin addressing the deep psychological damage resulting from the parental alienation and other harm caused by the Conflictineering Enterprise and to terminate Michelle Murphy's highly damaging ongoing contact with the Children.

206.   In accordance with the advice of these professionals and the recommendation of the GAL, Mr. Murphy placed each of the Children in a

residential boarding school that provided both (a) fully accredited academics and tutors, competitive sports programs, outdoor activities, and offsite activities, as well as (b) ongoing and systematic therapy and treatment for the Children, to address the psychological and emotional damage caused by Michelle Murphy, Mr. Farmer, and other members of the Conflictineering Enterprise.

207.   As a result of placing the Children at this residential school, Mr. Murphy incurred out-of-pocket costs of approximately $12,000 per month per child for the facility alone, in addition to substantial travel costs and other expenses related to the Children's placement in the facility.

208.   Mr. Murphy thereafter paid for and participated in a family rebuilding program with the Children designed to address the specific psychological and emotional damage resulting from the Conflictineering Enterprise's actions.

209.   Mr. Murphy ultimately incurred approximately $200,000 in out-of-pocket costs addressing the harm to the Children by Mr. Farmer, Michelle Murphy, and the Conflictineering Enterprise.

**The Conflictineering Enterprise Contacts Numerous Media Sources in an Effort to Damage Mr. Murphy by Publishing False Stories Regarding The Child Custody Litigation.**

210.   Defendants Farmer and Beacham, together with co-conspirators Michelle Murphy, Kimberly Krautten, and David Johnson, attempted to persuade

multiple media outlets to publish false stories regarding the Child Custody Litigation. The goals of this effort were to bring pressure on Mr. Murphy to relinquish the child custody claims and pay off the Conflictineering Enterprise.

211.   In early September 2014, after being contacted by Mr. Farmer and perhaps other members of the Conflictineering Enterprise, the financial publication *FINalternatives* published an article regarding the Child Custody Litigation.

212.   Consistent with journalistic ethics, the author of the *FINalternatives* article contacted Mr. Murphy for comments on the article prior to publication. Mr. Murphy's discussions with the *FINalternatives* journalist confirmed that Defendant Farmer and Non-Party Co-Conspirator Michelle Murphy had made numerous false statements regarding the Child Custody Litigation, Mr. Murphy, and his wife.

213.   On September 10, 2014, *FINalternatives* published an article that quoted Michelle Murphy as stating that the Children were being "held against their will" and "imprisoned" at the home of Mr. Murphy and his wife on St. Thomas. A true and correct copy of this article is attached hereto as **Exhibit 20**.

214.   The *FINalternatives* article also quoted other manifestly false statements by Defendant Farmer regarding Mr. Murphy, including that he lied to the custody evaluator appointed in the Child Custody Litigation.

215.   The next week, members of the Conflictineering Enterprise succeeded in persuading the local news outlet in Newnan, Georgia, the *Newnan Times-Herald*, to publish an article regarding the Child Custody Litigation.

216.   On September 17, 2014, the *Newnan Times-Herald* published an article entitled "Coweta Mother Fights To Return Her Sons To The United States." A true and correct copy of this article (as supplemented later on September 17 by the *Newnan Times-Herald*) is attached hereto as **Exhibit 21**.

217.   In the September 17, 2014 *Newnan Times-Herald* article, Defendant Farmer was quoted as stating, "How many people could stand over half a million dollars of litigation?" – an obvious reference to Mr. Murphy and his wife and their financial means.[5]  Defendant Farmer was quoted further as stating that "they picked the wrong person and the wrong lawyer."  This was yet another re-affirmation of the Conflictineering Enterprise's resolve to continue to bring unwarranted attacks on Mr. Murphy and his wife, unless and until Mr. Murphy agreed to drop his custody modification suit and pay off the Conflictineering Enterprise.

---

[5] As noted above, Mr. Farmer subsequently demanded the payment of this same amount ($500,000) to terminate the Conflictineering Enterprise's attack on, and "restore order" to, Mr. Murphy and his current wife.

218.   The September 17, 2014 article also quoted co-conspirator Michelle Murphy as falsely stating the Children were being "imprisoned" by Mr. Murphy.

219.   Immediately after publication of the article, Mr. Murphy contacted the *Newnan Times-Herald* and supplied the pertinent court orders from the Child Custody Litigation that categorically contradict the misrepresentations made by the Conflictineering Enterprise.  Within hours, the *Newnan Times-Herald* amended the online version of the September 17 article to reflect the truth about the Child Custody Litigation (including that the Children were taken away from Michelle Murphy due to her failure to comply with the court-ordered mental examination).

220.   The next day, September 18, 2014, the *Newnan Times-Herald* published a second article, entitled "Estranged Mother Refused Court-Ordered Evaluations."   A copy of this article is attached as **Exhibit 22**.

221.   The September 18, 2014 article noted Michelle Murphy's refusal to comply with court orders, as confirmed by the May 27, 2014 hearing at which she testified that she had not complied with the court-ordered mental examination.

**Members of The Conflictineering Enterprise Conduct "Town Hall" Meetings And Begin to Picket The State Court, All in an Escalating Effort to Pressure Mr. Murphy And The Court Relative to The Child Custody Litigation.**

222.   On September 18, 2014, Defendants Farmer, Beacham, and My Advocate Center, together with co-conspirator Michelle Murphy and others,

conducted their first "town hall" meeting in Newnan, Georgia.  This event, which was publicized widely through the Conflictineering Enterprise's "social media" campaign, featured numerous false and misleading statements by Defendants Farmer and Beacham, as well as Michelle Murphy.

223.   On September 23, 2014, Defendants Farmer, Beacham, and My Advocate Center, together with co-conspirator Michelle Murphy, held their second "town hall" meeting in Newnan, Georgia.  Again, this meeting was replete with false accusations against Mr. Murphy, his wife, and others made by Defendants Farmer and Beacham, as well as Non-Party Co-Conspirator Michelle Murphy.

224.   On September 30, 2014, Michelle Murphy and others held a "picket" outside the Coweta County courthouse in Newnan, Georgia.

225.   On October 14, 2014, Michelle Murphy and others held another "picket" in Newnan, Georgia.

226.   On October 18, 2014, Michelle Murphy and others held a "picket" outside the offices of John Murphy's trial counsel in Newnan, Georgia.

227.   Based on other postings made as part of Michelle Murphy's "social media" campaign, other picketing events were conducted in November 2014, involving Michelle Murphy, Robert Hartman, and perhaps others.

228.   All of these activities by the Conflictineering Enterprise were intended to bring additional improper pressure on Mr. Murphy and his wife to withdraw the Child Custody Litigation and capitulate to the other demands of the Conflictineering Enterprise, including the payment of substantial "attorney's fees" to Mr. Farmer.  Conversely, none of these activities furthers the legitimate goals of the Child Custody Litigation, *i.e.*, to determine custody based on the "best interest" of the Children.  To the contrary, this conduct deeply poisons the environment in which Michelle Murphy proposes for the Children should live.

**Defendant Farmer And Non-Party Co-Conspirator Michelle Murphy Threaten Mr. Murphy And His Wife, Then File Another False Report of Child Abuse With The Tennessee Department of Children's Services.**

229.   Early in the morning of October 2, 2014, Michelle Murphy left a voicemail message at the Chattanooga, Tennessee home of John Murphy and his wife stating the following threat, "We are about to bombard Chattanooga."

230.   In response to this threat, Mr. Murphy immediately filed a police report with the local authorities.

231.   In October, 2014, Defendant Farmer and Non-Party Co-Conspirator Michelle Murphy contacted the Tennessee Department of Children's Services ("TDCS"), via an interstate telephone call from Georgia and filed yet another false report of child abuse.  This false report resulted in Mr. Murphy and his wife being

visited at their Chattanooga home and questioned by a representative of TDCS.

This false report also resulted in Mr. Murphy incurring attorney's fees.

**Defendant Farmer Files Another Series of Frivolous Motions in The Child Custody Litigation, Leading The Trial Court to Enter an Order Requiring Him to Obtain Leave of Court Before Filing Any Other Motions.**

232.   As a result of Defendant Farmer's and Non-Party Michelle Murphy's false report to and continuing contact with the TDCS, the Conflictineering Enterprise learned that the Children had been placed in residential treatment.

233.   Immediately after learning this information, on October 6, 2014, Defendant Farmer filed yet another frivolous "Emergency" motion in the Child Custody Litigation, which again sought the disqualification of Judge Baldwin.

234.   As a result of these continuing frivolous filings and prior litigation misconduct by Defendant Farmer, the Court entered an Order on October 20, 2014, finding that "Defendant [Michelle Murphy] and her attorney [Mr. Farmer] have filed numerous motions and petitions in the above styled case.  Most of these filings have been frivolous, malicious, vexatious and redundant."  A true and correct copy of the October 20 Order is attached as **Exhibit 23**.

**The Conflictineering Enterprise's "Social Media" Campaign Disseminates Information Subjecting Mr. Murphy, Ms. Haugerud, Judge Baldwin, Mr. Murphy's Attorney, Dr. McGarrah, Ms. Harwell, and Other People Connected to The Child Custody Litigation to Hatred, Contempt, And Ridicule, or to Impair Their Professional or Business Reputation.**

235.   Beginning in or around August 2014 and continuing to the present, Michelle Murphy and other members of the Conflictineering Enterprise have engaged in a so-called "social media" campaign.  This social media campaign has been used to disseminate information about Mr. Murphy, Ms. Haugerud, Judge Baldwin, Mr. Drake, Dr. McGarrah, Ms. Harwell, Dr. Elizabeth ("Betty") King, the child custody evaluator appointed by the court, Dr. Nice, and other people connected to the Child Custody Litigation to hatred, contempt, and ridicule, or to impair their professional or business reputation, in an effort by the Conflictineering Enterprise to intimidate these individuals and to bring additional pressure on Mr. Murphy to relinquish the child custody claims and pay off the Conflictineering Enterprise.

236.   The false, defamatory information disseminated through the "social media campaign" includes, among numerous other statements, (1) accusations that Mr. Murphy physically and emotionally abused the Children, abuses alcohol, is prosecuting the Child Custody Litigation solely for reasons of financial gain and to the detriment of the Children, and has engaged in bribery, witness tampering, and

other forms of illegal influence in the Child Custody Litigation; (2) accusations that Ms. Haugerud (Mr. Murphy's wife) has facilitated Mr. Murphy's abuse of the Children, has used the Children to secure tax advantages for her business, and has engaged in bribery, witness tampering, and other forms of illegal influence in the Child Custody Litigation; (3) accusations that Judge Baldwin has accepted bribes from Mr. Murphy and Ms. Haugerud in connection with his rulings in the Child Custody Litigation; and (4) accusations that Mr. Drake, Dr. McGarrah, Ms. Harwell, Dr. King, Dr. Nice and other people connected to the Child Custody Litigation have acted contrary to their professional responsibilities as a result of being "bought" by Mr. Murphy to wrongfully favor Mr. Murphy in the Child Custody Litigation.

237.   The defamatory posts on the Facebook page operated by the Conflictineering Enterprise are too numerous to catalog.  Over multiple months, there have been at least several posts per week to the Facebook page containing false and defamatory statements.

238.   Defendant Beacham, through her front organization My Advocate Center, attempted to give these spurious accusations greater credibility by publishing them on My Advocate Center's website, www.myadvocatecenter.com. On or about September 7, 2014, for example, Defendant Beacham posted a story

on My Advocate Center's website regarding the Child Custody Litigation in which she stated the Children were "purchased in Georgia with the help of certain court professionals." Defendant Beacham further stated that the Children were "silenced by the custody experts paid to ensure the case turns out a certain way." A true and correct copy of the September 7, 2014 post is attached as **Exhibit 24**.

239. On or about September 17, 2014, Defendant Beacham posted another story on My Advocate Center's website regarding the Child Custody Litigation, in which she stated that the Children are "being held against their will" and that Mr. Murphy's wife "is actively involved in this case, and it is apparent that her millions have influence over these court professionals." A true and correct copy of the September 17, 2014 post is attached as **Exhibit 25**.

240. On or about March 13, 2015, Defendant Beacham posted another story regarding the Child Custody Litigation on the My Advocate Center website which made numerous false and defamatory statements regarding Mr. Murphy, his wife, his attorneys, Judge Baldwin, and other participants in the Child Custody Litigation. Among other things, Defendant Beacham stated: (a) "This is how family court professionals engaged in trafficking of children ensure than their victims are never recovered."; (b) "Is it really acceptable to punish attorneys and parents for standing up to fraud and racketeering practices, fighting to save

children?"; (c) "if kids are bought and sold, does it matter what they are used for?";

(d) "this mess and related damages could have been avoided if laws were upheld,

ethics rules and judicial canons upheld, and if [J.M.'s] and [T.M.'s] needs had been

put above the greed of child custody experts and attorneys involved"; (e) "when

you force a parent to use only child custody experts who are known for abandoning

abused children, falsifying reports, committing perjury, and participating in fraud,

what do you expect?"; (f) "the court was using extortion tactics to force the mother

to work with one of these two doctors"; and (g) "It is such a big deal to them that

they block the truth from being known that they hired Atlanta law firm Kilpatrick

Townsend & Stockton to ensure that the trial court was not investigated for

wrongdoing and that the higher courts did not get to learn that transcripts were

incomplete and that fraud had occurred."  A true and correct copy of the March 13,

2015 post is attached hereto as **Exhibit 26.**

**Michelle Murphy Stalks Mr. Murphy And His Wife When They Visit The
Children at The Residential Facility And Notifies Mr. Murphy of Defendant
Farmer's $500,000 Pay Off Demand.**

241.   As noted above, Mr. Murphy placed the Children in a residential

treatment facility in late September, 2014.

242.   On November 24, 2014, Non-Party Co-Conspirator Michelle Murphy

entered the campus of the Children's residential treatment facility without

permission or authorization.  An employee discovered Michelle Murphy on the property and observed that she was taking pictures. The employee approached Michelle Murphy and informed her that she was not authorized to take pictures of the property, whereupon Michelle Murphy informed him that she actually was "filming" the property instead of taking pictures.  Michelle Murphy then pulled out a bullhorn and began yelling to the Children, calling them by name and stating: "This is your mother and I know you are here and I am doing everything I can to get you out."  Michelle Murphy repeated this several times.

243.   When the employee pulled out his phone to call the police, Michelle Murphy ran to her car and sped away from the campus.  A copy of the police report regarding this incident is attached as **Exhibit 27.**

244.   On January 1, 2015, in connection with a birthday of one of the Children, Mr. Murphy and his wife traveled to the residential treatment center to visit with the Children.  Unbeknownst to Mr. Murphy and his wife, Michelle Murphy had spent several days waiting outside of the facility so she could confront them when they picked up the Children for the birthday celebration.

245.   Michelle Murphy followed Mr. Murphy, his wife, and the Children to a shopping mall, where she confronted them unexpectedly and demanded to be allowed to spend time with the Children.  Given Michelle Murphy's repeated acts

of confrontational behavior (including her assaultive conduct towards Dr. Tony Johnson in the Newnan Target), and given the delicate status of the Children's treatment, Mr. Murphy acquiesced in Michelle Murphy's demands and allowed her to visit with the Children in the presence of Mr. Murphy and his wife

246.   After Michelle Murphy had been allowed to participate in a birthday meal with the Children, Mr. Murphy and Michelle Murphy discussed possible approaches for attempting to resolve the Child Custody Litigation, including the possibility of a mediation that did not involve any attorneys.

247.   Michelle Murphy stated to Mr. Murphy that Defendant Farmer had told her she owed him $500,000 in attorney's fees and costs and that the Child Custody Litigation could not be resolved or even mediated unless Defendant Farmer was paid $500,000.  These and other statements by Michelle Murphy to Mr. Murphy demonstrate that Defendant Farmer was unwilling to abide by Michelle Murphy's desires relative to settlement of the case, but instead improperly was dictating whether and on what terms the Child Custody Litigation could be settled.

**When Mr. Murphy Refuses to Pay the $500,000 Pay-Off Demand, The Conflictineering Enterprise Escalates its Defamatory Attacks to Include "Defamacasts" Broadcast by an Atlanta-Area Radio Station.**

248.   Mr. Murphy and his wife categorically rejected the demand to pay Defendant Farmer $500,000 in order to terminate the attacks of the Conflictineering Enterprise.  In response, the Conflictineering Enterprise intensified their defamatory attacks on Mr. Murphy, his wife, and the other participants in the Child Custody Litigation, including by broadcasting multiple defamatory radio programs over 92.5 The Bear, a radio station operating out of Senoia, Georgia.

249.   In January 2015 (shortly after Michelle Murphy had presented the $500,000 demand to Mr. Murphy), Defendant Beacham, through her front entity, Defendant My Advocate Center, began disseminating a radio show known as "Pro Advocate Radio."  Defendants Beacham and My Advocate Center paid for distribution of Pro Advocate Radio over at least one traditional radio station (92.5 The Bear) and over at least one Internet radio station (Business Radio X, operating out of Buckhead, Atlanta, Georgia).

250.   Pro Advocate Radio is "hosted" by Non-Party Co-Conspirator James O'Brien and most if not all of the episodes feature Defendant Beacham as at least one of the "guests" on the show.

251.   On March 14 and 21, 2015, Defendants Beacham and My Advocate Center broadcast two Pro Advocate Radio shows over 92.5 The Bear that contained numerous defamatory statements regarding Mr. Murphy, his wife, Mr. Murphy's attorneys, and numerous other participants in the Child Custody Litigation.  The March 14 show subsequently was re-broadcast over Business Radio X on March 16, 2015, and the March 21 show subsequently was re-broadcast over Business Radio X on March 23 and March 30, 2015.

252.   Many of the defamatory statements broadcast by Defendants Beacham and My Advocate Center over Pro Advocate Radio falsely accused Mr. Murphy and others of participating in criminal acts.  Among other defamatory statements, the March 14 Pro Advocate Radio show (a) asserted that it was "pre-determined" that the Children "would go missing and be taken permanently from their home ..."; (b) asserted that facts are "being misrepresented to the higher courts, to the Court of Appeals and to the Georgia Supreme Court"; (c) asserted that Mr. Murphy had the Children "set up to be taken"; (d) asserted that the Children "have been missing for months"; (e) asserted that the two independent psychologists appointed by the state trial court to serve as custody evaluators " were brought into this case to help traffic these [Children] out of Georgia. "; (f) asserted that "the amount of fraud that has been covered up ... is significant"; and (g) asserted that "there are

millions of dollars at stake in taxes that won't have to be paid if those [Children] are living in the Virgin Islands."

253.   Several of the defamatory assertions made during the March 14 broadcast were summarized at the end of the March 21 broadcast.  Among other things, the March 21 Pro Advocate Radio show again asserted that it was "definitely pre-arranged for the [Children] to be removed" from Michelle Murphy; asserted that Mr. Murphy's attorney in the Child Custody Litigation has a "very uncomfortable relationship" with the judges of Coweta County, by virtue of having served as a campaign chairperson for a sitting judge; and asserted that a transcript in the Child Custody Litigation was "altered" by court reporter Nan Freeman.

254.   In response to a defamation retraction letter written by Mr. Murphy to 92.5 The Bear, the attorney for 92.5 The Bear stated that "the content and the facts alleged during the Shows" had been reviewed by Defendant Farmer prior to the airings of the shows and had been "verified by him to be truthful and accurate."

**Defendant Farmer Moves to Disqualify The Newly-Appointed Judge to The Child Custody Litigation, Confirming That The True Objective of The Conflictineering Enterprise is a Pay Off Rather Than a Prompt Resolution of The Custody Issues.**

255.   Mr. Murphy filed the Child Custody Litigation in April of 2012. Since that time, Defendant Farmer has engaged in every possible tactic to delay and obstruct the proceedings.  Among other things, Defendant Farmer filed at least 20 different motions to disqualify Judge Baldwin.

256.   On February 9, 2015, Judge Baldwin voluntarily recused himself from the Child Custody Litigation under Georgia Superior Court Rule 25.7 (pursuant to which a recusal is neither an admission nor a denial of any of the allegations raised in a motion to recuse).  Thereafter, on February 11 and February 19, the remaining judges of the Coweta Judicial Circuit also voluntarily recused themselves from the Child Custody Litigation.

257.   On March 19, 2015, the parties received notice that Senior Judge William S. Ison had been appointed to preside over the Child Custody Litigation and had scheduled a hearing for May 18, 2015.

258.   Despite the fact that Michelle Murphy had filed multiple purported "Emergency Motions" in the Child Custody Litigation that had not been adjudicated, and despite the fact that the Children had been removed from the custody of Michelle Murphy on May 27, 2014 (almost ten months earlier),

Defendant Farmer did not accept Senior Judge Ison's appointment and allow the Child Custody Litigation to move forward as promptly as possible.

259.   Instead, on the evening of March 26, 2015, Defendant Farmer, on behalf of Michelle Murphy, filed a 179-page motion to disqualify Senior Judge Ison.  On March 30, 2015, before Mr. Murphy had an opportunity to respond to the motion to disqualify, Judge Ison voluntarily recused himself from the litigation.

260.   The net result of Defendant Farmer moving to disqualify Judge Ison in the Child Custody Litigation was to further delay a simple custody case filed over three years ago.  No rational actor seeking the best interests of the Children would obstruct and delay resolution of the proceedings.

261.   In fact, Defendant Farmer's March 26, 2015 motion to disqualify Judge Ison confirms that the true goals of the Conflictineering Enterprise have nothing to do with the best interests of the Children.  Instead, the goal of the Conflictineering Enterprise is to elicit another large "pay off" from Mr. Murphy and his wife to Defendant Farmer, just as Defendant Farmer elicited years earlier in the Dee Crouch litigation.

262.   In fact, on page 45 of the motion to disqualify Judge Ison, Defendant Farmer states as follows with respect to Mr. Murphy's wife:  "Renee L. Haugerud is the person who primarily settled the malpractice case that was brought against

Delia Tedder Crouch and who could settle this case." *See* Mot. to Disqualify

Senior Judge William Ison, at 45 (excerpts attached as **Exhibit 28**).

263.   In other words, and consistent with Defendant Farmer's motion to

disqualify the newly-appointed judge in the Child Custody Litigation, the only goal

of the Conflictineering Enterprise is a "settlement" that yields a large payment of

attorney's fees to Defendant Farmer, without regard to the bests interests of the

Children.

### COUNT I: GEORGIA RICO
### (Against All Defendants)

264.   Mr. Murphy incorporates by reference paragraphs 1 - 263 of this

Complaint as if set forth in full.

265.   The RICO Defendants and Non-Party Co-Conspirators comprised an

enterprise and participated in the enterprise, either directly or indirectly, through a

pattern of racketeering activity.  Consequently, the RICO Defendants and Non-

Party Co-Conspirators have violated O.C.G.A. § 16-14-4(b).

### *Enterprise*

266.   The RICO Defendants and Non-Party Co-Conspirators constitute an

enterprise as they are a group of individuals or entities associated in fact because

they had (a) a common purpose – to pressure Mr. Murphy to relinquish his claims

in the Child Custody Litigation and to extract extortionate payments in order to

terminate the illegal actions of the Conflictineering Enterprise; (b) relationships among those associated with the enterprise; and (c) longevity sufficient to permit the RICO Defendants and Non-Party Co-Conspirators to pursue the enterprise's purpose over the course of several years.

267.   While Mr. Farmer is the architect of the Conflictineering Enterprise, each RICO Defendant is associated with the Enterprise because each RICO Defendant knowingly engaged in or aided and abetted the Enterprise's racketeering activities.  Each RICO Defendant has participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

### *Racketeering Activity: Predicate Acts*

268.   The RICO Defendants and Non-Party Co-Conspirators have engaged in predicate acts that constitute "racketeering activity" under the Georgia RICO statute, *see* O.C.G.A. § 16-14-3(8).  Specifically, the RICO Defendants and Non-Party Co-Conspirators engaged in attempted theft by extortion (O.C.G.A. § 16-8-16), bribery (O.C.G.A. § 16-10-2), intimidation of court officers (O.C.G.A. § 16-10-97), influencing witnesses (O.C.G.A. § 16-10-93), filing false documents (O.C.G.A. § 16-10-20.1), interference with custody (O.C.G.A. § 16-5-45), and crimes that are chargeable under the laws of the several states and which are

punishable by imprisonment for more than one year, including filing a false report

(T.C.A. § 37-1-413) and kidnapping for extortion (14 V.I.C. § 1052).

### Georgia RICO Racketeering Act No. 1:  Attempted Theft by Extortion (O.C.G.A. § 16-8-16)

269.   Mr. Farmer, Michelle Murphy, Larry King, Larry King, P.C., and

other members of the Conflictineering Enterprise as described herein have

attempted to commit the offense of theft by extortion in violation of O.C.G.A. §

16-8-16, by unlawfully seeking to obtain payments and other property of or from

Mr. Murphy, including Mr. Murphy's relinquishment of his claims in the Child

Custody Litigation and the payment of excessive "attorney's fees" to Mr. Farmer.

Among other acts, Mr. Farmer, Michelle Murphy, and other members of the

Conflictineering Enterprise committed and threatened to commit multiple criminal

offenses; accused multiple people of criminal offenses; disseminated information

tending to subject people to hatred, contempt, and ridicule, or to impair the

person's credit or business reputation(s); and attempted to cause an official to take

or withhold action.

270.   With respect to the actual and threatened commission of criminal

offenses, Mr. Farmer, Michelle Murphy, and the Conflictineering Enterprise have

committed, attempted to commit, and threatened to continue to commit the

criminal offenses of influencing witnesses, bribery, interference with custody, the

filing of false child abuse reports, and the filing of false documents.  The factual

bases for these crimes is outlined above and further explained below.

271.   Mr. Farmer, Michelle Murphy, and the Conflictineering Enterprise

also have committed the crime of reckless conduct in violation of O.C.G.A. § 16-5-

60 by endangering the bodily safety of the Children by consciously disregarding a

substantial and unjustifiable risk that their acts or omissions will cause harm or

endanger the safety of the Children.  Their disregard for the safety of the Children

constitutes a gross deviation from the standard of care which a reasonable person

would exercise in the situation.  Moreover, their reckless conduct was done for the

purpose of  unlawfully seeking to obtain payments and other property of or from

Mr. Murphy, including Mr. Murphy's relinquishment of his claims in the Child

Custody Litigation and the payment of excessive "attorney's fees" to Mr. Farmer.

272.   As explained above, Michelle Murphy, at the direction and approval

of Mr. Farmer and with the collaboration of other members of the Conflictineering

Enterprise, through their public Facebook page and social media campaign,

deliberately and recklessly identified the Children as highly-attractive targets for

would-be kidnappers and provided all the information needed to execute a

kidnapping of the Children.

273.   In addition, at the direction of Michelle Murphy, T.B. enticed the Children to engage in a number of delinquent and criminal acts that were a direct endangerment to the Children's safety and wellbeing, including urging the Children to steal alcoholic beverages and consume them covertly, obtaining and providing marijuana and cigars to smoke with the Children, persuading the Children to purchase and manufacture their own marijuana pipes, and helped the Children roll "blunts," consisting of marijuana mixed with cigar tobacco.  Michelle Murphy directed T.B. to entice the Children to engage in these delinquent and criminal acts for the purpose of manufacturing false evidence that Mr. Murphy was abusing the Children so the Conflictineering Enterprise could raise false claims of child abuse against Mr. Murphy.

274.   As explained above, Mr. Farmer, Michelle Murphy, Ms. Beacham, My Advocate Center, and other members of the Conflictineering Enterprise also recklessly endangered the bodily safety of the Children by enticing them to run away from Mr. Murphy.

275.   As explained above, Mr. Farmer, Michelle Murphy, Ms. Beacham, My Advocate Center, Mr. Hartman, and other members of the Conflictineering Enterprise, through their "social media campaign" and other media outlets intentionally have disseminated and continue to disseminate information about Mr.

Murphy, Ms. Haugerud, the Court, Mr. Drake, Dr. McGarrah, Ms. Harwell, Dr. King, Dr. Nice, and other individuals connected to the Child Custody Litigation that would tend to subject those people to hatred, contempt, and ridicule, or to impair their professional or business reputation(s), or accuse them of criminal offenses.

276.   Members of the Conflictineering Enterprise also have published many defamatory statements about Mr. Murphy and his wife on social media and other websites, and have delivered these falsehoods to people and organizations associated with Mr. Murphy and his wife or their business, to further defame them.

277.   On September 10, 2014, Mr. Farmer, Michelle Murphy, and possibly other members of the Conflictineering Enterprise supplied false, defamatory information about Mr. Murphy and his wife to a financial publication entitled *FINalternatives*, in a malicious effort to harm their business reputations.  Based upon the information supplied by the Conflictineering Enterprise, *FINalternatives* published an article entitled, "Prominent Hedgie Renee Haugerud Embroiled in Ugly Child Custody Battle."

278.   In addition to other false, defamatory information, the *FINalternatives* article quoted Michelle Murphy as stating that the Children were being "held against their will" and "imprisoned" at the home of Mr. Murphy and his wife in St.

Thomas, USVI.  The *FINalternatives* article also quoted Mr. Farmer as making untrue accusations toward Mr. Murphy, including that he lied to the custody evaluator in the Child Custody Litigation.

279.   Members of the Conflictineering Enterprise also have disseminated information tending to subject Dr. Nice to hatred, contempt, and ridicule, or to impair her personal or business reputation through the Child Custody Litigation proceedings.  Following the August 13, 2013 hearing in the Child Custody Litigation, at which Dr. Nice testified fully and truthfully about her serious concerns for the Children and with Michelle Murphy's parenting conduct, Mr. Farmer improperly disclosed highly personal information about Dr. Nice's alleged prescription substance use problem many years ago, which he had learned during his prior representation of Dr. Nice.

280.   Mr. Farmer also falsely accused Dr. Nice of currently engaging in professional and illegal misconduct, including being "under the influence of a controlled substance" while "presenting false testimony and exhibiting erratic behavior."  Mr. Farmer disclosed this information and made these false accusations to harm Dr. Nice's personal, professional, and business reputation and to intimidate her as a witness in the Child Custody Litigation.

281.   These acts were undertaken in an effort to place illicit pressure on Mr. Murphy to abandon his claims in the Child Custody Litigation and to obtain extortionate payments from Mr. Murphy in exchange for stopping the criminal activity and ending the "chaos."

### Georgia RICO Racketeering Act No. 2:  Attempted Bribery (O.C.G.A. § 16-10-2)

282.   Mr. Farmer, aided and abetted by Defendants Larry King and Larry King, P.C., attempted to bribe Judge Baldwin in violation of O.C.G.A. § 16-10-2, by offering to dismiss Mr. Farmer's lawsuit against Ms. Freeman in exchange for Judge Baldwin's agreement to recuse himself from the Child Custody Litigation and to make his recusal retroactive so that his prior ruling giving Mr. Murphy temporary custody of the Children would be nullified.

283.   As set forth above, at the conclusion of the hearing on May 27, 2014, the Court awarded sole temporary custody of the Children to Mr. Murphy.

284.   In June of 2014, despite having a copy of the transcript from the hearing as well as access to the audio recording of the hearing, Mr. Farmer sent multiple threatening e-mails demanding that Ms. Freeman, the court reporter, send Mr. Farmer the audio recording of the hearing.

285.   Ultimately, Mr. Farmer and Mr. King filed a lawsuit on behalf of Michelle Murphy against Ms. Freeman, her business, Freeman Reporting, Inc., and

other individuals.  In addition to declaratory, injunctive, and other relief, the lawsuit seeks punitive damages against Ms. Freeman.

286.   Mr. Farmer and Mr. King were well-aware of Ms. Freeman's longstanding professional relationship with Judge Baldwin.  The baseless lawsuit against Ms. Freeman was filed as a transparent attempt by Mr. Farmer to gain leverage over Judge Baldwin, to intimidate Ms. Freeman (Judge Baldwin's court reporter), and for other improper purposes.

287.   After filing the lawsuit against Ms. Freeman, Mr. Farmer contacted Ken Gordon, Ms. Freeman's attorney in that lawsuit.  Mr. Farmer told Mr. Gordon that he would dismiss his lawsuit against Ms. Freeman and her business, if, in exchange, Ms. Freeman would convince Judge Baldwin to recuse himself from the Child Custody Litigation and make such recusal retroactive to the ruling awarding temporary custody of the Children to Mr. Murphy.

288.   By offering to give Judge Baldwin relief from having Ms. Freeman, his own professional court reporter, subjected to a stressful and vexatious lawsuit she could not afford, Mr. Farmer acted with the purpose of influencing the Court in the performance of his official functions as the judge in the Child Custody Litigation.

### Georgia RICO Racketeering Act No. 3:  Intimidation of Court Officer
### (O.C.G.A. § 16-10-97)

289.   Ms. Freeman, as the court reporter in the Child Custody Litigation, is an officer of the court pursuant to O.C.G.A. § 16-10-97(b).

290.   Judge Baldwin, as the judge presiding over the Child Custody Litigation at all times pertinent to this Complaint, is an officer of the court pursuant to O.C.G.A. § 16-10-97(b).

291.   The e-mails sent to Ms. Freeman by Mr. Farmer after the May 27, 2014 hearing were threatening actions and communications, causing the Court to enter an Order giving Mr. Farmer access to the audio recording of the May 27, 2014 hearing, even though the Court found that Mr. Farmer was not legally entitled to them.

292.   The lawsuit Mr. Farmer and Mr. King filed against Ms. Freeman, her business, and others was an additional threatening action and communication.

293.   The threatening e-mails and lawsuit were made by Mr. Farmer and Mr. King for the illegal purpose of intimidating or impeding Ms. Freeman in the discharge of her duties as the court reporter in the Child Custody Litigation.

294.   In addition, as demonstrated by Mr. Farmer's attempt to bribe the Court, the threatening e-mails and lawsuit were made by Mr. Farmer for the illegal

purpose of intimidating or impeding Judge Baldwin in the discharge of his duties as the judge presiding over the Child Custody Litigation.

295.   Likewise, Ms. Harwell, as the GAL for the Children in the Child Custody Litigation, is an officer of the court pursuant to O.C.G.A. § 16-10-97(b).

296.   Mr. Farmer made multiple untrue and highly inflammatory accusations involving Ms. Harwell's personal and professional reputation in his multiple motions to disqualify Ms. Harwell and multiple attempts to contact Ms. Harwell directly.   Mr. Farmer made these accusations and attempts to contact Ms. Harwell with the intent of intimidating and deterring Ms. Harwell from testifying freely, fully, and truthfully as the Children's GAL in the Child Custody Litigation.

297.   Mr. Farmer made these accusations and communications to Ms. Harwell for the purpose of intimidating or impeding her in the discharge of her duties as the GAL in the Child Custody Litigation.

### Georgia RICO Racketeering Act No. 4:  Influencing Witnesses (O.C.G.A. § 16-10-93)

298.   Mr. Farmer and Michelle Murphy also influenced or attempted to influence witnesses in violation of O.C.G.A. § 16-10-93, by threatening harm or damage to the property or employment of witnesses in the Child Custody Litigation, including but not limited to Dr. Nice, Dr. McGarrah, Dr. Johnson, Ms.

Harwell, and Mr. McLendon, with the intent of deterring these witnesses from testifying freely, fully, and truthfully in the Child Custody Litigation.

### *Intimidation of Dr. Nice*

299.   Mr. Farmer committed the offense of influencing witnesses against Dr. Nice, the psychiatrist whom Mr. Farmer actually demanded become involved in the Child Custody Litigation.

300.   In 2012, when the Court requested the input of Dr. Johnson (the Children's treating psychologist) as to a custody evaluation, Mr. Farmer insisted that Dr. Nice also needed to be involved.

301.   Mr. Farmer did not disclose to the court or to Mr. Murphy's counsel that he previously had represented Dr. Nice as her attorney and that he had not charged Dr. Nice for his services as her attorney.  Instead of charging Dr. Nice for his services, Mr. Farmer believed he had a *quid pro quo* arrangement with Dr. Nice, such that she would provide her professional services at no charge in matters involving certain of his clients.  Thus, upon information and belief, Mr. Farmer believed he had engineered a situation in which the testifying professional in his legal matters was a former client, indebted and "owing him one."

302.   In connection with Mr. Farmer's representation of Dr. Nice as her attorney, Mr. Farmer became aware of the existence and details of the temporary

suspension of Dr. Nice's Physician and Surgeon License by the State of Illinois many years prior.

303.   Dr. Nice testified at hearings during the Child Custody Litigation on November 15, 2012 and August 13, 2013.  Prior to each hearing and despite resistance from Dr. Nice, Mr. Farmer contacted Dr. Nice to demand thatshe support his client, Michelle Murphy, and her position in the Child Custody Litigation.

304.   Dr. Nice informed Mr. Farmer during these pre-hearing meetings that she found it difficult to support Michelle Murphy's position for several reasons, including at least the following: (a) Michelle Murphy's failure to keep appointments for herself and the children to see Dr. Nice, such that gaps in their treatment existed and their mental-health progress had been hampered; and (b) Michelle Murphy herself had shown indications of troubling conduct such that Dr. Nice believed Michelle Murphy was in critical need of psychiatric or other professional treatment.

305.   Mr. Farmer refused to accept Dr. Nice's professional opinions and her view of the facts.  Instead, Mr. Farmer demanded that Dr. Nice suppress any evidence, information, or opinions that would present Michelle Murphy or her

relationship with the children in a negative light – even if they were accurate and based upon her professional opinion.

306.   In order to emphasize his intolerance for any testimony that would in any manner be detrimental to his client's interests in the Child Custody Litigation, Mr. Farmer notified Dr. Nice that if she provided such testimony, he would "destroy" her publicly, professionally and personally.

307.   While Mr. Farmer's threats and intimidation successfully influenced Dr. Nice to testify timidly at the November 15, 2012 hearing, because her concerns regarding Michelle Murphy and the welfare of the Children increased and were so profound, Dr. Nice refused when Mr. Farmer again demanded that Dr. Nice testify favorably for Michelle Murphy and suppress evidence at the August 13, 2013 hearing.

308.   Specifically, Dr. Nice informed Mr. Farmer that, since their last conversation in 2012, she had become aware of additional facts and details regarding Michelle Murphy, her behavior with the children, and the existence of issues that, in her professional judgment, required immediate attention from medical professionals trained in psycho-sexual issues involving parents and their children.  Dr. Nice also expressed her opinion that a full custody evaluation needed to be conducted, that the children needed continuing care, that Michelle Murphy

needed imminent professional care, and that the children would benefit from a change in primary custody to Mr. Murphy.

309.   In response, Mr. Farmer not only continued his threats against Dr. Nice, including his threats to publically disclose the revocation of Dr. Nice's Professional License long ago in Illinois, but by his own admission, he reached out to the "Illinois Medical Licensing Board" for information about Dr. Nice's license status "days *before* the hearing" at which Dr. Nice rendered the opinions that were unfavorable to Mr. Farmer and his client's position.  *See* Aug. 19, 2013 Mot. to DQ, at 22 (emphasis added).

310.   In the wake of the August 13, 2013 hearing, and in light of Dr. Nice having testified fully and truthfully regarding her serious concerns with the Children and Michelle Murphy's parenting conduct, Mr. Farmer made good on his threats to disclose the highly personal information, which he had learned during his prior representation of Dr. Nice and which was protected by the attorney-client privilege.

311.   Specifically, Mr. Farmer filed a series of briefs - the August 19 Motion, the August 28 Amendment, and the September 13 Addendum in order to personally attack and abuse her.  In these filings, Mr. Farmer characterizes his former client as:   "…an expert witness for John Murphy who most likely was

experiencing the effects of substance abuse just before her testimony";

"…appear[ing] to be under the influence of a controlled substance to the extent that the witness was presenting false testimony and exhibiting erratic behavior"; "the substance abusing psychiatrist"; "…a psychiatrist who has a history of being a substance abuser and who has been called a 'pill pusher'";  "The Substance Abusing Psychiatrist, Expert Witness for John Harold Murphy"; and as "...Dr. Patricia Nice, who has a long history of substance abuse as a member of the medical profession…"

*Intimidation of Dr. McGarrah*

312.   Mr. Farmer also improperly influenced Dr. McGarrah, the psychologist appointed by the court on August 23, 2013 to perform a custody evaluation of Mr. Murphy and Michelle Murphy.

313.   In September 2013, following the August 23, 2013 Order appointing Dr. McGarrah, Mr. Farmer sent two intimidating letters to Dr. McGarrah, attacking her personally and professionally.  Among other things, Mr. Farmer accused Dr. McGarrah of professional misconduct, asked Dr. McGarrah inappropriate questions regarding the pleadings in the case, threatened to contact the APA Ethics Committee regarding "the ethical restraints of [Dr. McGarrah's] discipline."

314.   Mr. Murphy and Ms. Haugerud complied with the August 23, 2013 and were evaluated by Dr. McGarrah.  At the direction of Mr. Farmer, however, Michelle Murphy refused to comply with the Order by refusing to allow Dr. McGarrah to evaluate her.  Consequently, the court held a hearing on March 17, 2014 to hear testimony and argument on Michelle Murphy's compliance with the August 23, 2013 Order.

315.   Dr. McGarrah appropriately and accurately testified at the March 17, 2014 hearing that Michelle Murphy refused to participate in the custody evaluation.

316.   One day after the March 17, 2014 hearing, displeased with Dr. McGarrah's testimony having been unfavorable to his client, Mr. Farmer sent Dr. McGarrah yet another letter manifestly intended to intimidate her.

317.   Even though Mr. Farmer knew at that time that Dr. McGarrah was represented by counsel, Mr. Farmer delivered this letter directly to Dr. McGarrah and merely copied her counsel.

318.   Despite the August 23, 2013 Order commanding the parties to cooperate fully with the custody evaluation, and notwithstanding the Court having ordered Michelle Murphy to submit to the Rule 35 mental examination, Mr. Farmer's March 18, 2014 letter  to Dr. McGarrah stated explicitly that Michelle

Murphy would not sign any of the documents necessary for Dr. McGarrah's office to conduct any examination, further stating that Michelle Murphy would not "participate in any examination that you deem provides you with any immunity from liability whether by statute or contract."

319.   The clear import of Mr. Farmer's threat to Dr. McGarrah was that (a) Dr. McGarrah would be sued if she issued any type of opinion adverse to Michelle Murphy and (b) Mr. Farmer would claim his March 18, 2014 letter effectuated a waiver of her statutory immunity in any such litigation.

320.   Additional threatening language in Mr. Farmer's letter confirmed this overt attempt to intimidate Dr. McGarrah:  "You are not to perform any services that limit your liability or provide you immunity in any manner under OCGA § 19-9-3(a)(7) or the other laws of Georgia, any agreement that you maintain provides you immunity or any Order from Judge A. Quillian Baldwin, Jr. that you maintains [sic] you immunity."  Mr. Farmer issued these instructions about the law to Dr. McGarrah directly, knowing that at the time Dr. McGarrah was represented by counsel.

321.   Mr. Farmer's letter concluded by demanding that Dr. McGarrah accept his purported "conditions for you being the psychologist who conducts the OCGA § 9-11-35 examination."

322.   Unsurprisingly, the day after receiving Mr. Farmer's patently threatening letter, Dr. McGarrah moved to withdraw as custody evaluator. Mr. Farmer's intimidation tactics at the March 17, 2014 hearing and in his September 4, 2013, September 13, 2013 and March 18, 2014 letters to Dr. McGarrah caused her to withdraw as custody evaluator, thereby successfully intimidating and deterring Dr. McGarrah from further testifying freely, fully, and truthfully in the Child Custody Litigation.

### Intimidation of Dr. Johnson

323.   Mr. Farmer and Michelle Murphy also have attempted to influence Dr. Tony Johnson, the Children's psychologist who was treating them prior to and during the Child Custody Litigation.

324.   On information belief, prior to the August 13, 2013 hearing in the Child Custody Litgation, and with knowledge that Dr. Johnson had become aware of Michelle Murphy's mental condition, behavioral issues, and poor parenting practices, Mr. Farmer ensured that Dr. Johnson understood that there would be personal and professional consequences to him in the event that he testified in a manner unfavorable to Michelle Murphy's interests.  The consequences threatened by Mr. Farmer included, but were not limited to, causing Dr. Johnson difficulties with state licensing authorities.

325.   Mr. Farmer issued these threats to Dr. Johnson with the express and unlawful purpose of intimidating Dr. Johnson, deterring Dr. Johnson from testifying freely, fully, and truthfully in the Child Custody Litigation, and obstructing justice.

326.   Michelle Murphy also attempted to intimidate and influence Dr. Johnson.  Specifically, on or about June 22, 2014, Michelle Murphy approached Dr. Johnson at the Newnan Target, located at 555 Bullsboro Drive, Newnan, Georgia 30265.  Michelle Murphy began harassing Dr. Johnson in the checkout line, stating that Dr. Johnson was the reason Michelle Murphy had lost custody of the Children.

327.   Dr. Johnson left the checkout line but was followed by Michelle Murphy, who continued to harass him.  Michelle Murphy ultimately stated to Dr. Johnson that she was going to "take him down."

328.   The next day, Michelle Murphy came to Dr. Johnson's office, even though she did not have an appointment, and asked to speak with Dr. Johnson.  Dr. Johnson refused to see Michelle Murphy.

329.   Michelle Murphy made these threats and engaged in these threatening acts with the express and unlawful purpose of intimidating Dr. Johnson, deterring

Dr. Johnson from testifying freely, fully, and truthfully in the Child Custody

Litigation, and obstructing justice.

*Intimidation of Ms. Harwell*

330.   Mr. Farmer also attempted to intimidate and influence Lisa Harwell,

the second GAL appointed in the Child Custody Litigation.

331.   Shortly after Ms. Harwell was appointed as GAL, Mr. Farmer filed a

motion to disqualify Ms. Harwell in the Child Custody Case.  Mr. Farmer

proceeded in filing three more motions seeking to disqualify Ms. Harwell and

amendments to the motions.

332.   The motions to disqualify Ms. Harwell contain untrue and highly

inflammatory personal and professional allegations and accusations against Ms.

Harwell intending to pressure Ms. Harwell into withdrawing as GAL.  For

example, the motions make accusations that Ms. Harwell had taken "revenge"

upon Michelle Murphy and that she had improperly selected Dr. McGarrah to

perform the custody evaluation.

333.   Mr. Farmer's highly inflammatory accusations involving Ms.

Harwell's personal and professional reputation, in his multiple motions to

disqualify Ms. Harwell and his multiple attempts to contact Ms. Harwell directly,

were made with the intent of deterring Ms. Harwell from testifying freely, fully, and truthfully in the Child Custody Litigation.

*Intimidation of Mr. McLendon*

334.  Mr. Farmer also attempted to influence Bryan McLendon, a former client of Mr. Farmer who had rented a room from Michelle Murphy at her house for nearly two years, and also had served as a chauffeur for Michelle Murphy for the transportation of the Children.

335.  On August 5, 2013, Mr. Murphy filed an affidavit from Mr. McLendon in the Child Custody Case.  As set forth more fully above, Mr. McLendon detailed in the affidavit disturbing sexual and other conduct involving Michelle Murphy.  Mr. McLendon also testified in the affidavit regarding hazardous incidents involving the Children while in Michelle Murphy's custody.

336.  Shortly after Mr. Murphy filed Mr. McLendon's affidavit, Mr. Farmer contacted Mr. McLendon with the intent to and for the purpose of intimidating him and pressuring him to recant his testimony against Michelle Murphy.

337.  Mr. Farmer's communications with Mr. McLendon were made with the intent of deterring Mr. McLendon from testifying freely, fully, and truthfully in the Child Custody Litigation.

**Georgia RICO Racketeering Act No. 6:**
**Filing a False Report of Child Abuse via Interstate Wires**
**(18 U.S.C. § 1343, 14 V.I.C. §§ 2144(a), 2146(c))**

338.   On June 9, 2014, Mr. Farmer communicated a false report of child abuse against Mr. Murphy via interstate telephone communication from Georgia to the VI-DHS.  As a result of this false report, a representative from VI-DHS visited Mr. Murphy at his residence in St. Thomas, USVI.

339.   The VI-DHS representative conducted detailed interrogations of Mr. Murphy and his wife and also conducted a thorough and comprehensive inspection of their residence and household.  In doing so, the VI-DHS representative did not discover one single shred of evidence that in any manner supported the allegations made by Mr. Farmer in his false report.

340.   Defendant Farmer's filing of a false report of child abuse with VI-DHS caused Mr. Murphy to incur attorney's fees and other costs.

341.   Defendant Farmer's filing of a false report also caused Mr. Murphy extreme psychological and emotional stress, as it was timed to coincide with the Conflictineering Enterprise's scheme to have J.M. runaway from Mr. Murphy's residence and attempt to elicit litigation concessions from Mr. Murphy relative to the Child Custody Litigation.  Because of Defendant Farmer's filing of the false

report and the ensuing visit from a representative of VI-DHS, Mr. Murphy was unable immediately to leave his resident to search for J.M.

342.   Filing a false report or child abuse is chargeable under the laws of the USVI and is punishable by imprisonment for more than one year.

### Georgia RICO Racketeering Act No. 7: Interference with Custody (O.C.G.A. § 16-5-45)

343.   Defendants Farmer, Beacham, and My Advocate Center, together with Non-Party Co-Conspirator Michelle Murphy, committed the offense of interference with custody in violation of O.C.G.A. § 16-5-45 when, without lawful authority to do so, they knowingly or recklessly took or enticed the Children away from Mr. Murphy, the parent who has sole lawful custody of the Children.

344.   First, Mr. Farmer and Michelle Murphy interfered with the custody of Mr. Murphy's son, J.M., on June 9, 2014, while J.M. was in the sole custody of Mr. Murphy.  Specifically, on information and belief, Mr. Farmer and Michelle Murphy enticed J.M. to run away from Mr. Murphy's residence via telephone conversations with J.M.

345.   J.M. left the residence for several hours.  During that time, Michelle Murphy, and Mr. Farmer, spoke directly to J.M. over the telephone.

346.   Michelle Murphy sought to use minor child J.M. to elicit litigation concessions related to the custody case from Mr. Murphy.  Specifically, Michelle

Murphy told J.M. to demand that Mr. Murphy send J.M. a text message confirming that he would work with J.M. to return J.M. to Newnan, Georgia in exchange for J.M. disclosing J.M.'s location to Mr. Murphy.  Michelle Murphy told J.M. to refuse to divulge J.M.'s location to Mr. Murphy unless Mr. Murphy agreed to these litigation concessions.  J.M. communicated these demands to Mr. Murphy.

347.   To apply additional pressure upon Mr. Murphy to succumb to the scheme and make the litigation concessions, contemporaneously with J.M. running away, Mr. Farmer made a false report of child abuse to the USVI child protection authorities.  Mr. Farmer made this false report knowing that the police would go to Mr. Murphy's home and find J.M. missing.

348.   Second, in late August or early September 2014, Ms. Beacham and My Advocate Center interfered with the custody of the Children by enticing the Children away from their custodial parent, Mr. Murphy, detaining them while Ms. Beacham used the Children to manufacture false evidence in the custody case

349.   Upon information and belief, Mr. Farmer, Michelle Murphy, or other members of the Conflictineering Enterprise arranged and paid for Ms. Beacham to travel to St. Thomas so she could surreptitiously meet up with the Children, detain them in a van, and videotape them.

350.   As detailed above, during her videotaped "interview," Ms. Beacham asked the children a series of questions designed to manufacture false allegations about their living environment with Mr. Murphy.

351.   Ms. Beacham conducted her manufactured "interview" for the purpose of manufacturing false evidence in the custody case and intimidating Mr. Murphy into forfeiting his claims in the Child Custody Litigation and paying money to the members of the Conflictineering Enterprise.

352.   Upon information and belief, Mr. Farmer, Michelle Murphy, and other members of the Conflictineering Enterprise aided and abetted Ms. Beacham in these acts by, among other things, enticing the children to meet surreptitiously with Ms. Beacham and financing Ms. Beacham's travel.

**Georgia RICO Racketeering Act No. 8:**
**Filing a False Report via Interstate Wires**
**(18 U.S.C. § 1343, T.C.A. § 37-1-413)**

353.   Mr. Farmer committed the offense of filing a false report in violation of T.C.A. § 37-1-413 by knowingly and maliciously reporting, or causing, encouraging, aiding, counseling, or procuring another to report, a false accusation that a one or both of the Children had sustained a wound, injury, disability or physical or mental condition caused by the brutality, abuse, or neglect of Mr. Murphy.

354.   Filing a false report is chargeable under the laws of the State of Tennessee and is punishable by imprisonment for more than one year.

355.   In early October, 2014, Mr. Farmer filed a false report of child abuse with the Tennessee Department of Children's Services.

356.   Mr. Farmer made the report knowing that the report was false and with the malicious intent to cause Mr. Murphy harm, including but not limited to the loss of Mr. Murphy's custody of the Children and injury to his personal and professional reputation.

357.   The report also was made with the malicious intent to cause Mr. Murphy to relinquish his claims in the Child Custody Litigation and make an extortionate payment to the Conflictineering Enterprise so that they would cease the terroristic acts such as filing false reports of child abuse.

**Georgia RICO Racketeering Act No. 9: Kidnapping for Extortion**
**(14 V.I.C. § 1052)**

358.   Defendants Beacham and My Advocate Center, aided and abetted by Defendant Farmer and Non-Party Co-Conspirators Michelle Murphy and Robert Hartman, committed the crime of kidnapping for extortion in violation of 14 V.I.C. § 1052, by enticing the Children away from their custodial parent, Mr. Murphy, and detaining them while Ms. Beacham used the children to manufacture false evidence in the Child Custody Litigation in order to intimidate Mr. Murphy to

obtain a litigation result more favorable to Michelle Murphy in the Child Custody Litigation, to obtain extortionate payments to members of the Conflictineering Enterprise, or both.

359.   Kidnapping for extortion is chargeable under the law of the Territory of the Virgin Islands and punishable by imprisonment for more than one year.

360.   In late August or early September 2014, Ms. Beacham and My Advocate Center enticed the Children away from their custodial parent, Mr. Murphy, and detained them while Ms. Beacham used the Children to manufacture false evidence in the custody case

361.   Upon information and belief, Mr. Farmer, Michelle Murphy, or other members of the Conflictineering Enterprise arranged for and paid for Ms. Beacham to travel to St. Thomas so she could meet surreptitiously with the Children, detain them in a van, and videotape a heavily-scripted "interview" with them.

362.   As detailed above, during her videotaped "interview," Ms. Beacham asked the children a series of questions designed to manufacture false allegations about their living environment with Mr. Murphy.

363.   Ms. Beacham conducted her "interview" for the purpose of manufacturing false evidence in the custody case and intimidating Mr. Murphy

into forfeiting his claims in the Child Custody Litigation and paying money to the members of the Conflictineering Enterprise.

364.   Upon information and belief, Mr. Farmer, Michelle Murphy, and other members of the Conflictineering Enterprise aided and abetted Ms. Beacham in these acts by, among other things, enticing the children to meet surreptitiously with Ms. Beacham and financing Ms. Beacham's travel.

## Continuity

365.   These incidents of racketeering activity satisfy the requirements of close-ended continuity and of open-ended continuity.

### *Close-Ended Continuity*

366.   The RICO Defendants' and Non-Party Co-Conspirators' incidents of racketeering activity were not isolated incidents, but were separate yet interrelated acts forming a systematic and ongoing pattern of racketeering activity.

367.   This racketeering activity started in or about 2010 and continues in operation at this date.

368.   Between 2012 and the present, the RICO Defendants and Non-Party Co-Conspirators engaged in multiple acts of racketeering in furtherance of their Conflictineering scheme to extort from Mr. Murphy payments and other property, including Mr. Murphy's claims in the Child Custody Litigation.

369.   The Conflictineering Enterprise's acts of racketeering activity have been conducted as part of the same scheme, having the same or similar intent, results, accomplices, victims, and methods of commission.  The intent of each act of racketeering activity is to cause so much disruption and "chaos" in Mr. Murphy's personal and professional life that he would (a) relinquish his claims in the Child Custody Litigation, without regard to the merit of those claims or the best interests of the Children; and (b) pay excessive purported "attorney's fees" to Mr. Farmer, for his own benefit and to be distributed to the other members of the Conflictineering Enterprise.

### *Open-Ended Continuity*

370.   The RICO Defendants' and Non-Party Co-Conspirators' racketeering activity started in or before 2012 and continues in operation at this date.

371.   The RICO Defendants' and Non-Party Co-Conspirators' racketeering activity will continue into the future with a threat of repetition, especially given that the activity is Mr. Farmer's regular way of doing business and "practicing" law.

### **RICO Injury**

372.   The RICO Defendants' extortionate scheme has injured Mr. Murphy by causing him to incur a substantial amount of unnecessary attorney's fees,

expenses, and other damages directly by reason of the RICO Defendants' crimes and terroristic abuse of the Georgia judicial system.

373.   In addition to attorneys' fees, payments to third parties to redress the public dissemination of falsehoods, and expenses relating to providing constant monitoring of the Children in an effort to protect them from further racketeering conduct, Mr. Murphy has suffered harm to his livelihood, personal reputation, professional reputation, and marriage.  Among other things, Mr. Murphy has been required to devote substantial time, effort, and money to addressing publicly-disseminated falsehoods regarding the Child Custody Litigation, to maintain his position with his employer and retain critical client relationships.

374.   The Conflictineering Enterprise also has caused damage to Mr. Murphy's consulting relationship with his employer by adversely impacting Mr. Murphy's relationships with it and with its clients.  Defendants' actions, including but not limited to their broad-reaching dissemination of defamatory accusations against Mr. Murphy and his wife, have caused Mr. Murphy's performance of his consulting contract to be more difficult and more expensive.

375.   The Conflictineering Enterprise also severely damaged to the psychological well-being of the Children.  Mr. Murphy has incurred approximately $200,000 in out-of-pocket costs directly related to psychological treatment of the

Children arising out of the Conflictineering Enterprise's efforts to alienate the Children from Mr. Murphy and his wife and other criminal acts by the Conflictineering Enterprise involving the Children.

376.   These injuries to Mr. Murphy are and continue to be a direct, proximate result of the RICO Defendants' violation of O.C.G.A. § 16-14-4(b).  Mr. Murphy is a victim of the RICO Defendants' unlawful Conflictineering Enterprise. Mr. Murphy has suffered and continues to suffer litigation expenses and other damages arising from the racketeering conduct of the Conflictineering Enterprise and other injury to his personal, professional, and general reputation in an amount to be determined at trial.

377.   Pursuant to O.C.G.A. § 16-14-6(c), Mr. Murphy is entitled to recover compensatory damages, treble damages, punitive damages, plus costs of investigation and attorney's fees, from the RICO Defendants.

378.   The RICO Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, making punitive damages appropriate.

## COUNT II:  CONSPIRACY TO VIOLATE GEORGIA RICO
### (Against All Defendants)

379.   Mr. Murphy incorporates by reference paragraphs 1 – 263 of this Complaint as if set forth in full.

380.   The RICO Defendants and Non-Party Co-Conspirators have unlawfully, knowingly, and willfully combined, conspired, confederated, endeavored, and agreed together and with others to violate O.C.G.A. § 16-14-4(b) as described above, in violation of O.C.G.A. § 16-14-4 (c).

381.   Upon information and belief, the RICO Defendants and Non-Party Co-Conspirators knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate O.C.G.A. § 16-14-4(b), in violation O.C.G.A. § 16-14-4(C).

382.   Upon information and belief, the RICO Defendants and Non-Party Co-Conspirators agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Conflictineering Enterprise's affairs through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b).

383.   Each RICO Defendant knew about and agreed to facilitate the

Conflictineering Enterprise's scheme to extort from Mr. Murphy.  It was part of the

conspiracy that the RICO Defendants and the Non-Party Co-Conspirators would

commit a pattern of racketeering activity in the conduct of the affairs of the

Enterprise, including the acts of racketeering described herein.

384.   As a direct and proximate result of the RICO Defendants' conspiracy,

the acts of racketeering activity of the Conflictineering Enterprise, the overt acts

taken in furtherance of that conspiracy, and violations of O.C.G.A. § 16-14-4(c),

Mr. Murphy has been injured.  Among other injuries, the RICO Defendants'

conspiracy has caused Mr. Murphy to incur a substantial amount of unnecessary

attorney's fees, expenses, and other damages from the RICO Defendants' crimes

and terroristic abuse of the Georgia judicial system.

385.   In addition to enormous attorneys' fees, payments to third parties to

redress the public dissemination of falsehoods, and expenses relating to providing

constant monitoring of the Children in an effort to protect them from further

racketeering conduct, Mr. Murphy has suffered harm to his livelihood, personal

reputation, professional reputation, and marriage.  Among other things, Mr.

Murphy has been required to devote substantial time, effort, and money to

addressing publicly-disseminated falsehoods regarding the Child Custody

Litigation, to maintain his position with his employer and retain critical client relationships.

386.   The RICO Defendants' conspiracy also severely damaged to the psychological well-being of the Children.  Mr. Murphy has incurred approximately $200,000 in out-of-pocket costs directly related to psychological treatment of the Children arising out of the Conflictineering Enterprise's efforts to alienate the Children from Mr. Murphy and his wife and other criminal acts by the Conflictineering Enterprise involving the Children.

387.   These injuries to Mr. Murphy are and continue to be a direct, proximate result of the RICO Defendants' violation of O.C.G.A. § 16-14-4(b).  Mr. Murphy is a victim of the RICO Defendants' unlawful Conflictineering Enterprise. Mr. Murphy has suffered and continues to suffer litigation expenses and other damages arising from the racketeering conduct of the Conflictineering Enterprise and other injury to his personal, professional, and commercial reputation in an amount to be determined at trial.

388.   Pursuant to O.C.G.A. § 16-14-6(c), Mr. Murphy is entitled to recover compensatory damages, treble damages, and punitive damages, plus costs of investigation and attorneys' fees, from the RICO Defendants.

389.   The RICO Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, making punitive damages appropriate.

## COUNT III:  FEDERAL RICO
### (Against All Defendants)

390.   Mr. Murphy incorporates by reference paragraphs 1 – 263 of this Complaint as if set forth in full.

391.   The RICO Defendants and Non-Party Co-Conspirators comprise an enterprise that has engaged and continues to engage in, and has an effect on, interstate commerce.  The RICO Defendants and Non-Party Co-Conspirators have participated and continue to participate in the Enterprise, either directly or indirectly, through a pattern of racketeering activity.  Consequently, the RICO Defendants and Non-Party Co-Conspirators have violated 18 U.S.C.A. § 1962(c).

### Enterprise

392.   The RICO Defendants and Non-Party Co-Conspirators constitute an "association in fact" enterprise under 18 U.S.C. § 1961(4) because they are a group of individuals or entities associated in fact.  As an association in fact enterprise, the RICO Defendants and Non-Party Co-Conspirators had and continue to have (a) a purpose – to harass, intimidate, and place enough illicit pressure on Mr. Murphy to

extort him into paying exorbitant sums of money and abandoning his claims in the

Child Custody Litigation; (b) relationships among those associated with the

Conflictineering Enterprise; and (c) longevity sufficient to permit the RICO

Defendants and Non-Party Co-Conspirators to pursue the Conflictineering

Enterprise's purpose over a course of several years.

393.   While Mr. Farmer is the principal architect of the Conflictineering

Enterprise, each RICO Defendant is associated with the Conflictineering

Enterprise because each RICO Defendant knowingly engaged in or aided and

abetted the Enterprise's racketeering activities.  Each RICO Defendant has

participated, directly or indirectly, in the conduct of the affairs of the Enterprise

through a pattern of racketeering activity.

## Interstate Commerce

394.   The Conflictineering Enterprise has engaged in and had an effect on

interstate commerce by committing crimes in and from various states and U.S.

territories, including but not limited to Georgia, Tennessee, New York, and the

USVI, in furtherance of its extortionate scheme.

## Racketeering Activity: Predicate Acts

395.   The RICO Defendants and Non-Party Co-Conspirators have engaged

and continue to engage in predicate acts that constitute "racketeering activity"

under the Federal RICO statute.  18 U.S.C. § 1961(1).  Specifically, the RICO

Defendants and Non-Party Co-Conspirators have engaged in crimes chargeable

under State law that are punishable by imprisonment for more than one year,

including attempted extortion (O.C.G.A. § 16-8-16), bribery (O.C.G.A. § 16-10-2),

and kidnapping (14 V.I.C. § 1052).  The RICO Defendants and Non-Party Co-

conspirators also have engaged in interstate travel in aid of racketeering enterprises

in violation of 18 U.S.C. § 1952 and wire fraud in violation of 18 U.S.C. § 1343.

### Federal RICO Racketeering Act No. 1: Attempted Theft by Extortion (O.C.G.A. § 16-8-16)

396.   Mr. Farmer, Michelle Murphy, Larry King, Larry King, P.C., and

other members of the Conflictineering Enterprise have attempted to commit the

offense of theft by extortion in violation of O.C.G.A. § 16-8-16, by unlawfully

seeking to obtain payments and other property of or from Mr. Murphy, including

Mr. Murphy's relinquishment of his claims in the Child Custody Litigation and his

payment of excessive "attorney's fees" to Mr. Farmer.  Among other acts, Mr.

Farmer, Michelle Murphy, and other members of the Conflictineering Enterprise

committed and threatened to commit multiple criminal offenses; accused multiple

people of criminal offenses; disseminated information tending to subject people to

hatred, contempt, and ridicule, or to impair the person's credit or business

reputation; and attempted to cause an official to take or withhold action.

397.   With respect to the actual and threatened commission of criminal offenses, Mr. Farmer, Michelle Murphy, Larry King, Larry King, P.C., and the Conflictineering Enterprise have committed, attempted to commit, and threatened to continue to commit the criminal offenses of influencing witnesses, bribery, interference with custody, the filing of false child abuse reports, and the filing of false documents.  The factual bases for these crimes is provided above and further explained below.

398.   Mr. Farmer, Michelle Murphy, and the Conflictineering Enterprise also have committed the crime of reckless conduct in violation of O.C.G.A. § 16-5-60 by endangering the bodily safety of the Children by consciously disregarding a substantial and unjustifiable risk that their acts or omissions will cause harm or endanger the safety of the Children.  Their disregard for the safety of the Children constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.  Moreover, their reckless conduct was done for the purpose of  unlawfully seeking to obtain payments and other property of or from Mr. Murphy, including Mr. Murphy's relinquishment of his claims in the Child Custody Litigation and his payment of excessive "attorney's fees" to Mr. Farmer.

399.   As explained above, Michelle Murphy, at the direction and approval of Mr. Farmer and with the collaboration of other members of the Conflictineering

Enterprise, through their public Facebook page and social media campaign, deliberately and recklessly identified the Children as highly-attractive targets for would-be kidnappers and provided all the information needed to execute a kidnapping of the Children.

400.   In addition, at the direction of Mr. Farmer and Michelle Murphy, T.B. enticed the Children to engage in a number of delinquent and criminal acts that were a direct endangerment to the Children's safety and wellbeing, including urging the Children to steal alcoholic beverages and consume them covertly, obtaining marijuana and cigars to smoke with the Children, persuading the Children to purchase and manufacture their own marijuana pipes, and helping the Children roll "blunts," consisting of marijuana mixed with cigar tobacco.  Mr. Farmer and Michelle Murphy directed T.B. to entice the Children to engage in these delinquent and criminal acts for the purpose of manufacturing false evidence that Mr. Murphy was abusing the Children so the Conflictineering Enterprise could raise false claims of child abuse against Mr. Murphy.

401.   As explained above and in more detail below, Mr. Farmer, Michelle Murphy, Ms. Beacham, My Advocate Center, and other members of the Conflictineering Enterprise also recklessly endangered the bodily safety of the Children by enticing them to run away from Mr. Murphy.

402.   These acts were undertaken in an effort to cause "chaos" in the personal and professional life of Mr. Murphy in order to place illicit pressure on Mr. Murphy to abandon his claims in the Child Custody Litigation and to obtain extortionate payments from Mr. Murphy in exchange for stopping the criminal activity and ending the "chaos."

403.   Numerous members of the Conflictineering Enterprise, including Mr. Farmer, Michelle Murphy, Mr. King, Larry King, P.C., Ms. Beacham, and My Advocate Center disseminated information tending to subject Mr. Murphy to hatred, contempt, and ridicule, or to impair his personal or business reputation.

404.   Members of the Conflictineering Enterprise also have published many defamatory statements about Mr. Murphy and his wife on social media and other websites, and have delivered them to people and organizations associated with Mr. Murphy and his wife or their business, to further defame them.

405.   On September 10, 2014, Mr. Farmer, Michelle Murphy, and other members of the Conflictineering Enterprise supplied false, defamatory information about Mr. Murphy and his wife to a financial publication entitled *FINalternatives*, in a malicious effort to harm their business reputations.  Based upon the information supplied by the Conflictineering Enterprise, *FINalternatives* published

an article entitled, "Prominent Hedgie Renee Haugerud Embroiled in Ugly Child Custody Battle."

406.   In addition to other false, defamatory information, the *FINalternatives* article quoted Michelle Murphy as stating that the Children were being "held against their will" and "imprisoned" at the home of Mr. Murphy and his wife in St. Thomas, USVI.  The *FINalternatives* article also quoted Mr. Farmer as making personal and untrue accusations toward Mr. Murphy, including that he lied to the custody evaluator in the Child Custody Litigation.

407.   Members of the Conflictineering Enterprise also have disseminated information tending to subject Dr. Nice to hatred, contempt, and ridicule, or to impair her personal or business reputation.  Following the August 13, 2013 hearing in the Child Custody Litigation, at which Dr. Nice testified fully and truthfully about her serious concerns for the Children and with Michelle Murphy's parenting conduct, Mr. Farmer improperly disclosed highly personal information about Dr. Nice's alleged prescription substance use problem many years ago, which he had learned during his prior representation of Dr. Nice.

408.   Mr. Farmer also falsely accused Dr. Nice of currently engaging in professional and illegal misconduct, including being "under the influence of a controlled substance" while "presenting false testimony and exhibiting erratic

- 130 -

behavior." Mr. Farmer disclosed this information and made these false accusations as revenge for her truthful testimony against his client's interests and to harm Dr. Nice's personal, professional, and business reputation.

## Federal RICO Racketeering Act No. 2: Attempted Bribery
### (O.C.G.A. § 16-10-2)

409.   Mr. Farmer attempted to bribe the Court in violation of O.C.G.A. § 16-10-2, by offering to dismiss his and Mr. King's lawsuit against Ms. Freeman in exchange for Judge Baldwin's agreement to recuse himself from the Child Custody Litigation and making his recusal retroactive so that his prior ruling giving Mr. Murphy temporary custody of the Children would be nullified.

410.   As set forth above, at the conclusion of the hearing on May 27, 2014, the Court awarded Mr. Murphy sole temporary custody of the Children.

411.   In June of 2014, despite having a copy of the transcript from the hearing as well as access to the audio recording of the hearing, Mr. Farmer sent multiple threatening e-mails demanding that Ms. Freeman, the court reporter, send Mr. Farmer the audio recording of the hearing.

412.   Ultimately, Mr. Farmer filed a lawsuit on behalf of Michelle Murphy against Ms. Freeman, her business, Freeman Reporting, Inc., and other individuals. In addition to declaratory, injunctive, and other relief, the lawsuit seeks punitive damages against Ms. Freeman.

413.   Mr. Farmer is well-aware of Ms. Freeman's longstanding professional relationship with the Court.  The baseless lawsuit against Ms. Freeman is a transparent attempt by Mr. Farmer to gain leverage over Judge Baldwin.

414.   After filing the lawsuit against Ms. Freeman, Mr. Farmer called Ken Gordon, Ms. Freeman's attorney in that lawsuit.  Mr. Farmer told Mr. Gordon that he would dismiss his lawsuit against Ms. Freeman and her business, if, in exchange, Ms. Freeman would convince Judge Baldwin to recuse himself from the Child Custody Litigation and make such recusal retroactive to the ruling awarding temporary custody of the Children to Mr. Murphy.

415.   By offering to give Judge Baldwin relief from having Ms. Freeman, his professional court reporter, subjected to a vexatious and stressful lawsuit she could not afford, Mr. Farmer acted with the purpose of influencing Judge Baldwin in the performance of his official functions as the judge in the Child Custody Litigation.

## Federal RICO Racketeering Act No. 3: Kidnapping For Extortion
### (14 V.I.C. § 1052)

416.   Defendants Beacham and My Advocate Center, aided and abetted by Defendant Farmer and Non-Party Co-Conspirators Michelle Murphy and Robert Hartman, committed the crime of kidnapping for extortion in violation of 14 V.I.C. § 1052, by enticing the Children away from their custodial parent, Mr. Murphy,

and detaining them while Ms. Beacham used the children to manufacture false evidence in the Child Custody Litigation in order to intimidate Mr. Murphy to obtain a litigation result more favorable to Michelle Murphy in the Child Custody Litigation, to obtain extortionate payments to members of the Conflictineering Enterprise, or both.

417.   Kidnapping for extortion is chargeable under the law of the Territory of the Virgin Islands and punishable by imprisonment for more than one year.

418.   In late August or early September 2014, Ms. Beacham and My Advocate Center enticed the Children away from their custodial parent, Mr. Murphy, and detained them while Ms. Beacham used the Children to manufacture false evidence in the custody case

419.   Upon information and belief, Mr. Farmer, Michelle Murphy, or other members of the Conflictineering Enterprise arranged and paid for Ms. Beacham to travel to St. Thomas so she could meet surreptitiously with the Children, detain them in a van, and videotape a heavily-scripted "interview" with them.

420.   As detailed above, during her videotaped "interview," Ms. Beacham asked the children a series of questions designed to manufacture false allegations about their living environment with Mr. Murphy.

421.   Ms. Beacham conducted her manufactured "interview" for the purpose of manufacturing false evidence in the custody case and intimidating Mr. Murphy into forfeiting his claims in the Child Custody Litigation and paying money to the members of the Conflictineering Enterprise.

422.   Upon information and belief, Mr. Farmer, Michelle Murphy, and other members of the Conflictineering Enterprise aided and abetted Ms. Beacham in these acts by, among other things, enticing the children to meet surreptitiously with Ms. Beacham and financing Ms. Beacham's travel.

## Federal RICO Racketeering Act No. 4:
### Interstate Travel in Aid of Racketeering Enterprises
### (18 U.S.C. § 1952)

423.   Ms. Beacham and My Advocate Center, aided and abetted by Mr. Farmer and Michelle Murphy, traveled in interstate commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of unlawful activity, namely, kidnapping for extortion in violation of 14 V.I.C. § 1052, and thereafter, performed or attempted to perform unlawful activity, namely, kidnapping for extortion in violation of 14 V.I.C. § 1052, as described above.  Thus, Ms. Beacham and My Advocate Center committed the crime of interstate travel in aid of racketeering enterprises in violation of 18 U.S.C. § 1952.

424.   As described above, Ms. Beacham and My Advocate Center traveled from Georgia to the USVI with the intent to commit kidnapping for extortion. Once in the USVI, Ms. Beacham and My Advocate Center committed kidnapping for extortion by enticing the Children away from their custodial parent, Mr. Murphy, and detaining them while Ms. Beacham used the Children to manufacture false evidence in the Child Custody Litigation in order to intimidate Mr. Murphy to obtain a litigation result more favorable to Michelle Murphy in the Child Custody Litigation, to obtain extortionate payments to members of the Conflictineering Enterprise, or both.

425.   Upon information and belief, Mr. Farmer, Michelle Murphy, and other members of the Conflictineering Enterprise aided and abetted Ms. Beacham in these acts by, among other things, enticing the children to surreptitiously meet with Ms. Beacham and financing Ms. Beacham's travel.

**Federal RICO Racketeering Act No. 5: Wire Fraud
(18 U.S.C. § 1343)**

426.   Mr. Farmer also engaged in at least two acts of wire fraud when he used the interstate wires to transmit false reports of child abuse to child protection authorities in the Territory of the USVI and the State of Tennessee.

427.   Specifically, Mr. Farmer and other members of the Conflictineering Enterprise, participated in, devised, or intended to devise a scheme or plan to

defraud Mr. Murphy, or a scheme or plan for obtaining money or property from

Mr. Murphy, including causing Mr. Murphy to relinquish his claims in the Child

Custody Litigation and to pay Mr. Farmer exorbitant sums by making reports of

child abuse against Mr. Murphy that were false and under fraudulent pretenses,

representations, or promises.

428.   First, on June 9, 2014, Mr. Farmer communicated a false report of

child abuse against Mr. Murphy via interstate telephone communication from

Georgia to the VI-DHS.  In reliance on this false report, a representative from VI-

DHS visited Mr. Murphy at his residence in St. Thomas, USVI.

429.   The VI-DHS representative conducted detailed interrogations of Mr.

Murphy and his wife and also conducted a thorough and comprehensive inspection

of their residence and household.  In doing so, the VI-DHS representative did not

discover one single shred of evidence that in any manner supported the allegations

made by Mr. Farmer in his false report.

430.   Defendant Farmer's filing of a false report of child abuse with VI-

DHS caused Mr. Murphy to incur attorney's fees and other costs.

431.   Second, on or around October, 2014, Defendant Farmer contacted the

Tennessee Department of Children's Services ("TDCS"), via interstate telephone

communication from Georgia and filed yet another false report of child abuse against Mr. Murphy.

432.   In reliance on this false report, a representative of TDCS visited Mr. Murphy and his current wife at their Chattanooga home and questioned them.  This false report also resulted in Mr. Murphy incurring attorney's fees.

433.   The TDCS did not find any evidence of child abuse by Mr. Murphy or his wife.

434.   The statements made or omitted by Mr. Farmer to child protection authorities in the USVI and Tennessee as part of the Conflictineering Enterprise's scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, Mr. Murphy to part with his money or property, including his claims in the Child Custody Litigation and the payment of exorbitant sums to Mr. Farmer, in return for the Conflictineering Enterprise halting the filing of false reports.

435.   Because Mr. Farmer was located in Georgia while making the false reports, or causing the false reports to be made, in the USVI and Tennessee via telephone, Mr. Farmer used, or caused to be used, a wire communication to carry out or attempt to carry out an essential part of the scheme.

**Continuity**

436.   These incidents of racketeering activity satisfy the requirements of close-ended continuity and of open-ended continuity, as they have been ongoing for over two-and-a-half years without any evidence of ceasing.

### *Close-Ended Continuity*

437.   The RICO Defendants' and Non-Party Co-Conspirators' incidents of racketeering activity were not isolated incidents, but were separate yet interrelated acts forming a systematic and ongoing pattern of racketeering activity under 18 U.S.C. § 1961(5).

438.   This racketeering activity started in or about 2010 and continues in operation at this date.

439.   Between 2012 and the present, the RICO Defendants and Non-Party Co-Conspirators engaged in multiple acts of racketeering in furtherance of the Conflictineering Enterprise's scheme to defraud Mr. Murphy out of extortionate payments and other property, including Mr. Murphy's claims in the Child Custody Litigation.

440.   The Conflictineering Enterprise's acts of racketeering activity have been conducted as part of the same scheme, having the same or similar intent, results, accomplices, victims, and methods of commission.  The intent of each act

of racketeering activity is to cause so much disruption and "chaos" in Mr.

Murphy's personal and professional life that he would (a) relinquish his claims in

the Child Custody Litigation, without regard to the merit of those claims or the best

interests of the Children; and (b) pay purported "attorney's fees" to Mr. Farmer, to

be distributed to the other members of the Conflictineering Enterprise.

### *Open-Ended Continuity*

441.   The RICO Defendants' and Non-Party Co-Conspirators' racketeering

activity will continue into the future with a threat of repetition, especially given

that the activity is Mr. Farmer's regular way of doing business.

### RICO Injury

442.   The RICO Defendants' extortionate scheme has injured Mr. Murphy

by causing him to incur a substantial amount of unnecessary attorney's fees,

expenses, and other damages directly by reason of the RICO Defendants' crimes

and terroristic abuse of the Georgia judicial system.

443.   In addition to attorney's fees, payments to third parties to redress the

public dissemination of falsehoods, and expenses relating to providing constant

monitoring of the Children in an effort to protect them from further racketeering

conduct, Mr. Murphy has suffered harm to his livelihood, personal reputation,

professional reputation, and marriage.  Among other things, Mr. Murphy has been

required to devote substantial time, effort, and money to addressing publicly-disseminated falsehood regarding the Child Custody Litigation, to maintain his position with his employer and retain critical client relationships.

444.    The Conflictineering Enterprise also has caused damage to Mr. Murphy's consulting relationship with his employer by adversely impacting Mr. Murphy's relationships with it and with its clients.  Defendants' actions, including but not limited to their broad-reaching dissemination of defamatory accusations against Mr. Murphy and his wife, have caused Mr. Murphy's performance of his consulting contract with his employer to be more difficult and more expensive.

445.    The Conflictineering Enterprise also severely damaged to the psychological well-being of the Children.  Mr. Murphy has incurred approximately $200,000 in out-of-pocket costs directly related to psychological treatment of the Children arising out of the Conflictineering Enterprise's efforts to alienate the Children from Mr. Murphy and his wife and other criminals acts by the Conflictineering Enterprise involving the Children.

446.    These injuries to Mr. Murphy are and continue to be a direct, proximate result of the RICO Defendants' violation of 18 U.S.C. § 1962(c).  Mr. Murphy is a victim of the RICO Defendants' unlawful Conflictineering Enterprise. Mr. Murphy has suffered and continues to suffer litigation expenses and other

damages arising from the racketeering conduct of the Conflictineering Enterprise and other injury to his personal, professional, and commercial reputation in an amount to be determined at trial.

447.   Pursuant to 18 U.S.C. § 1964(c), Mr. Murphy is entitled to recover compensatory damages, treble damages, punitive damages, plus costs and attorney's fees, from the RICO Defendants.

448.   The RICO Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, making punitive damages appropriate.

## COUNT IV:  CONSPIRACY TO VIOLATE FEDERAL RICO
### (Against All Defendants)

449.   Mr. Murphy incorporates by reference paragraphs 1 - 263 of this Complaint as if set forth in full.

450.   The RICO Defendants and Non-Party Co-Conspirators have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

451.   Upon information and belief, the RICO Defendants and Non-Party Co-Conspirators knew that they were engaged in a conspiracy to commit the

predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

452.   Upon information and belief, the RICO Defendants and Non-Party Co-Conspirators agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Conflictineering Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

453.   Each RICO Defendant knew about and agreed to facilitate the Conflictineering Enterprise's scheme to extort from Mr. Murphy.  It was part of the conspiracy that the RICO Defendants and the Non-Party Co-Conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth herein.

454.   As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Conflictineering Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Mr. Murphy has been injured in his business and property, as set forth above.

455.   Pursuant to 18 U.S.C. § 1964(c), Mr. Murphy is entitled to recover compensatory damages, treble damages, and punitive damages, plus costs and attorneys' fees, from the RICO Defendants.

456.   The RICO Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, making punitive damages appropriate.

## COUNT V:  DEFAMATION
**(Against Defendants Farmer, Beacham, and My Advocate Center)**

457.   Mr. Murphy incorporates by reference paragraphs 1 - 263 of this Complaint as if set forth in full.

458.   Defendants Farmer, Beacham, and My Advocate Center have published numerous defamatory statements regarding Mr. Murphy, his wife, his attorneys, and other participants in the Child Custody Litigation.

459.   Among other publications, Defendant Farmer (a) participated in two "town hall" meetings in Newnan, Georgia, in which he slandered Mr. Murphy, his wife, and his attorneys to the multiple attendees at those meetings; (b) enticed media coverage of the Child Custody Litigation and then made false statements to the journalists covering those stories, which statements were quoted in the published stories; (c) wrote a letter to Non-Party Co-Conspirator Michelle

Murphy's "social media" followers, specifically intending that letter to be published on the Facebook page and website Michelle Murphy created in an effort to increase pressure on Mr. Murphy to relinquish his claims in the Child Custody Litigation and capitulate to the Conflictineering Enterprise's demands; and (d) encouraged, aided, abetted, and acquiesced in Michelle Murphy's continual publication on social media of libelous accusations against Mr. Murphy, his wife, his attorneys, and multiple other participants in the Child Custody Litigation (even after Mr. Murphy filed a motion to shut down all "social media" regarding Mr. Murphy, his wife, the Children, or the Child Custody Litigation).

460.   Defendant Beacham and her front organization, Defendant My Advocate Center, also published numerous defamatory statements regarding Mr. Murphy, his wife, his attorneys, and other participants in the Child Custody Litigation.  Among other publications, Defendants Beacham and My Advocate Center (a) participated in at least one of the "town hall" meetings organized by Non-Party Co-Conspirator Michelle Murphy, in which Ms. Beacham slandered Mr. Murphy, his wife, and his attorneys to the multiple attendees at those meetings; (b) posted multiple stories on www.myadvocatecenter.com regarding the Child Custody Litigation that libeled Mr. Murphy, his wife, his attorneys, Judge Baldwin, multiple professionals involved in the Child Custody Litigation, and

other participants in the Child Custody Litigation; (c) posted on the Internet portions of the clandestine "interview" Ms. Beacham conducted of J.M. and T.M.in St. Thomas, which interview constituted the crime of kidnapping for extortion under Virgin Islands law; (d) posted multiple defamatory statements or stories on other social media, including Twitter and LinkedIn; and (e) broadcast, through the show "Pro Advocate Radio," slanderous statements regarding Mr. Murphy, his wife, his attorneys, Judge Baldwin, multiple professionals involved in the Child Custody Litigation, and other participants in the Child Custody Litigation over 92.5 The Bear, a radio station operating out of Senioa, Georgia, and over the Internet, through a website operating as Business Radio X.

461.   Defendants Farmer, Beacham, and My Advocate Center knew the defamatory statements were false or made the statements with reckless disregard of their truth or falsity.  Among other things, Defendants Beacham and My Advocate Center persisted in making the false statements even after receiving a demand for retraction of defamatory statements that included numerous court orders from the Child Custody Litigation demonstrating the statements were false.

462.   Defendants Farmer, Beacham, and My Advocate Center made the statements with malice.  Among other things, Defendants Farmer, Beacham, and My Advocate Center made the statements in furtherance of the twin goals of the

Conflictineering Enterprise to (a) bring undue and illicit pressure on Mr. Murphy to relinquish his claims in the Child Custody Litigation and (b) capitulate to Defendant Farmer's demands for payment of $500,000 in "attorney's fees" to end the terroristic attacks on Mr. Murphy, his wife, and the Children.

463.   The defamatory statements of Defendants Farmer, Beacham, and My Advocate Center are not privileged.  Any privilege that otherwise might apply to defamatory statements by Defendant Farmer in court filings does not apply to the public publication and broadcast of such defamatory statements outside of filings in the Child Custody Litigation.

464.   Many of the defamatory statements published by Defendants Farmer, Beacham, and My Advocate Center accuse Mr. Murphy, his wife, and his attorneys of criminal conduct (including bribing Judge Baldwin and other professionals involved in the Child Custody Litigation).  Many of the defamatory statements charge Mr. Murphy and his wife with having committed a debasing act which may exclude them from society, including "stealing" the Children.  And many of the defamatory statements refer to Mr. Murphy's and his wife's trade, office, or profession and are calculated to injury them in their business.  All of these statements are defamatory *per se*, entitling Mr. Murphy to general damages without the need to show special damages.

465.   Moreover, Mr. Murphy has incurred special damages as a result of these defamatory publications.  Among other things, Mr. Murphy (a) incurred attorney's fees monitoring the defamatory publications and demanding the retraction of such publications; (b) paid a third-party public relations consultant to manage the adverse publicity sought to be generated by Defendants; (c) paid other employees to monitor the numerous social media outlets utilized by Defendants and other members of the Conflictineering Enterprise to publish their falsehoods; and (d) devoted substantial time and effort to redressing the defamatory assertions in connection with his business, including multiple discussions with clients refuting the defamatory accusations.

466.   The conduct of Defendants Farmer, Beacham, and My Advocate Center shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, making punitive damages appropriate.

### COUNT VI:  TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS
### (Against Defendants Farmer, Beacham, and My Advocate Center)

467.   Mr. Murphy incorporates by reference paragraphs 1 - 263 of this Complaint as if set forth in full.

468.   At all times Defendants engaged in the conduct described above, Mr. Murphy was employed as a consultant for Galtere, Ltd. ("Galtere").  Mr. Murphy's responsibilities with Galtere require interactions with clients of Galtere. Defendants knew of Mr. Murphy's consulting contract with Galtere.

469.   Defendants Farmer, Beacham, and My Advocate Center intentionally and maliciously interfered with Mr. Murphy's contractual relationship with Galtere and with Mr. Murphy's ongoing relationships with Galtere's clients.  Defendants' actions do not fall within any recognized privilege.

470.   Defendants intended to cause damage to Mr. Murphy's consulting relationship with Galtere by adversely impacting Mr. Murphy's relationships with Galtere and with Galtere's clients.

471.   As a result of Defendants' interference, Mr. Murphy has been damaged.  Defendants' actions, including but not limited to their broad-reaching dissemination of defamatory accusations against Mr. Murphy and his wife, have caused Mr. Murphy's performance of his consulting contract with Galtere to be more difficult and more expensive.  In addition to the substantial time and effort devoted by Mr. Murphy to refuting Defendants' accusations and explaining the truth about the Child Custody Litigation to Galtere's clients, Mr. Murphy and his wife have hired a third-party public relations consultant, incurred attorney's fees

and expenses, and expended other out-of-pocket costs relative to combating Defendants' interference and protecting Galtere's and Mr. Murphy's interests.

472.   Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, making punitive damages appropriate.

## COUNT VII:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

473.   Mr. Murphy incorporates by reference paragraphs 1 - 263 of this Complaint as if set forth in full.

474.   Defendants' conduct was intentional or reckless.  The entire purpose of Defendants' scheme was to humiliate Mr. Murphy (as well as his wife and other participants in the Child Custody Litigation) in order to bring illicit pressure on him to relinquish his claims in the Child Custody Litigation and capitulate to Defendant Farmer's demand for an extortionate pay off.

475.   Defendants' conduct was extreme and outrageous.  Among other outrageous acts, Defendants attempted to bribe Judge Baldwin; attempted to influence multiple witnesses in the Child Custody Litigation; encouraged J.M. to run away and then to demand written concessions from Mr. Murphy as the "ransom" for disclosing his location; traveled to St. Thomas to entice the Children

off of Mr. Murphy's property in order to conduct a clandestine "interview" that was then broadcast over the Internet; and published "defamacasts" over a radio station in the Atlanta area.  Defendant Farmer's conduct particularly is outrageous, given that he has been a member of the State Bar of Georgia for nearly 50 years.

476.   Defendants' conduct caused Mr. Murphy (as well as Mr. Murphy's wife and the Children) severe emotional distress.  Among other things, Defendants' conduct has caused Mr. Murphy and his wife to incur approximately $200,000 in out-of-pocket costs for psychological treatment of the Children, to attempt to redress the severe psychological injury inflicted upon Mr. Murphy's family as a result of (a) Defendants' efforts to alienate the Children from Mr. Murphy and his wife; and (b) Defendants' direct involvement of the Children in some of the criminal conduct detailed above.

477.   Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, making punitive damages appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for the following relief:

(1)     On Counts I and II, compensatory damages, treble damages, punitive damages, attorney's fees, costs of litigation, and costs of investigation, pursuant to O.C.G.A. § 16-14-6(c), against all Defendants, jointly and severally;

(2)     On Counts III and IV, compensatory damages, treble damages, punitive damages, attorney's fees, and costs of litigation, pursuant to 18 U.S.C. § 1964(c), against all Defendants, jointly and severally;

(3)     On Count V, general, special, and punitive damages against Defendants Farmer, Beacham, and My Advocate Center, jointly and severally;

(4)     On Count VI, compensatory and punitive damages against Defendants Farmer, Beacham, and My Advocate Center, jointly and severally;

(5)     On Count VII, compensatory and punitive damages against all Defendants, jointly and severally;

(5)     Pursuant to O.C.G.A. § 13-6-11, an award against all Defendants, jointly and severally, of Plaintiff's expenses of litigation, because Defendants have acted in bad faith, have been stubbornly litigation, and have caused Plaintiff unnecessary trouble and expense;

(6)     Pursuant to this Court's inherent, statutory, or other authority, an award to Plaintiff of his attorney's fees, costs of investigation, and expenses of litigation; and

(7)     Any and all further relief the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), the Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted, May 21, 2015.

s/ Wilmer Parker
WILMER PARKER
Georgia Bar No. 563550

*Attorney for Plaintiff*
*John H. Murphy*

MALOY JENKINS PARKER
75 Fourteenth St., 25th Floor
Atlanta, Georgia 30309
(404) 875-2700
parker@mjplawyers.com