## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| JOHN H. MURPHY, | |
| Plaintiff, | |
| v. | CIVIL ACTION FILE |
| MILLARD C. FARMER, JR., | NO. 3:15-CV-00092-TCB |
| ALFRED L. KING, JR., | |
| LARRY KING, P.C., | |
| DEBORAH  L. BEACHAM, and | |
| MY ADVOCATE CENTER, INC., | |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff John H. Murphy, for his Amended Complaint against Defendants, alleges as follows:

## INTRODUCTION

1.      This Amended Complaint asserts Georgia RICO and Federal RICO claims against members of the "Conflictineering Enterprise," an association-in-fact enterprise comprised of individuals and entities led by Defendant Millard C. Farmer, Jr., an attorney with a decades-long history of litigation misconduct and unethical behavior.  As found by one Florida court:

> Millard C. Farmer, Jr., has set a past pattern for insulting, contemptuous, contumacious[,] dilatory, and disruptive misconduct of the type designed to directly impede the orderly administration of justice.  . . .

*State v. Bundy*, Case No. 78-169-CF, Order Denying Motion to Appear *Pro Hac Vice* (Fla. Cir. Ct., Columbia Cnty. Sept. 21, 1978).  In the 35-plus years since Defendant Farmer's request to represent Ted Bundy was rejected by the Florida court due to his well-established litigation misconduct, he has broadened and perfected his "Conflictineering" tactics.[1]

2.     Defendant Farmer's ongoing misconduct has not gone unnoticed by courts in Georgia and in other jurisdictions.  *See, e.g.*, *In re Farmer*, 212 Ga. App. 372, 442 S.E.2d 251 (1994) (upholding order of contempt against Defendant Farmer because "[t]he dignity of the judicial process was at stake in the conduct of Farmer and his client, and the authority of the court was at stake by their judge-baiting refusal to obey the court's order"); *Stephens v. Ivey*, 212 Ga. App. 407,

---

[1]  "Conflictineering" is the term Defendant Farmer has coined to describe his style of terroristic lawyering.  Defendant Farmer even has published a guide to his methodology for misusing the legal process to extract unwarranted concessions. *See* http://www.goextranet.net/Seminars/Conflictineering/IntroductionAll.htm (copy of "Introduction" previously filed as **Exhibit 1**).  Defendant Farmer's own published guide provides a general roadmap to much of the specific illegal and criminal conduct perpetrated by the Conflictineering Enterprise in the "Child Custody Litigation" (the underlying state court litigation brought by Plaintiff John Murphy in which Defendant Farmer represents Non-Party Co-Conspirator Michelle Murphy).

408, 442 S.E.2d 248, 250 (1994) (holding that trial judge was not required to recuse himself as requested by Defendant Farmer merely because the trial judge had held Defendant Farmer and his client in contempt of court); *Farmer v. Holton*, 146 Ga. App. 102, 245 S.E.2d 457 (1978) (upholding criminal contempt order against Defendant Farmer because of his "disrespectful or contumacious conduct toward the court"), *overruled on other grounds*, *In re Crane*, 253 Ga. 667, 324 S.E.2d 443 (1985); *Farmer v. Strickland*, 652 F.2d 427 (5th Cir. 1981) (upholding two orders in which the trial court "summarily found attorney Millard C. Farmer, Jr., in criminal contempt of court for contumacious conduct during his representation of a criminal defendant").

3.     In two recent decisions by the Georgia Court of Appeals in the state court litigation brought by Mr. Murphy, Defendant Farmer and his co-counsel, Defendant Alfred L. King, Jr., were (a) sanctioned for filing a "frivolous" appeal and admonished for their "numerous discourteous or disparaging remarks about other persons involved in the case, particularly John Murphy's wife" (*Murphy v. Murphy*, 328 Ga. App. 767, 759 S.E.2d 909, 915 (2014), *recons. denied* (July 31, 2014), *cert. denied* (Ga. Nov. 17, 2014)); and (b) publicly rebuked a second time for "unsupported and irrelevant assertions" intended to demean a witness, with the Court of Appeals noting Defendants Farmer's and King's "lack of professionalism

does less than nothing to advance their cause" (*Murphy v. Murphy*, 330 Ga. App. 169, 767 S.E.2d 789 (2014), *recons. denied* (Dec. 5, 2014), *cert. denied* (Ga. Mar. 2, 2015), *recons. denied* (Apr. 9, 2015)).

4.      Defendant Farmer and other members of the racketeering enterprise have employed and continue to employ tactics in an illegal effort to extort payments, forced concessions, and other unjust benefits in exchange for, in Defendant Farmer's own words, "restoring order" to the individuals victimized (Mr. Murphy, his wife, and others) by their illegal and unethically manufactured litigation chaos.

5.      Mr. Murphy and his wife have spent over three years of their lives and hundreds of thousands of dollars litigating what should have been a straightforward and simple child custody modification proceeding in Georgia state court, *John Harold Murphy v. Nancy Michelle Murphy*, Civ. A. No. 2012-V-413 (Ga. Super. Ct., Coweta Cnty., filed Apr. 11, 2012) (the "Child Custody Litigation").

6.      Over the course of that three-year-plus period, and continuing to the present, Defendant Farmer and his co-defendants/co-conspirators have sought for financial gain and other reasons to extort and otherwise injure Mr. Murphy, by means of a plan they conceived and have been executing via a pattern of

racketeering activity reaching into several states and the United States Territory of the Virgin Islands.

7.    The "Conflictineering Enterprise" masterminded and led by Defendant Farmer includes (a) Defendant Alfred L. King, Jr. a/k/a Larry King, who served as Defendant Farmer's co-counsel in the Child Custody Litigation and in separate litigation against Ms. Nan Freeman (the court reporter for several of the hearings in the Child Custody Litigation) by and through his law firm, Defendant Larry King, P.C.; (b) Defendant Deborah L. Beacham, a self-proclaimed "child advocate"; and (c) Ms. Beacham's purported front organization, Defendant My Advocate Center, Inc. ("My Advocate Center").[2]  These individuals, entities, and co-conspirators collectively are referred to as the "RICO Defendants."

8.    Among the RICO Defendants' additional co-conspirators/co-participants in the Conflictineering Enterprise are: (a) Michelle Murphy, Mr. Murphy's ex-wife and the defendant in the Child Custody Litigation; (b) Robert "Rob" Hartman, Michelle Murphy's brother; (c) Kimellen Tunkle, Defendant

---

[2]  On information and belief, Defendant Beacham also operates an array of various "social media" accounts, including "The Throwaway Client" and "Hedge Funds for Kids," to further the illegal scheme and to create the false perception of support for the activities of Defendant Beacham, My Advocate Center, and, since August 2014, the Conflictineering Enterprise.  Defendant Beacham also has created at least one false identity (Rebecca Bennett) to further the false perception My Advocate Center is a legitimate organization with significant personnel and resources.

Farmer's assistant; (d) T.B., a minor child, and his mother; and (e) other individuals (some of whom are identified below) that Defendants Beacham and My Advocate Center have involved in this scheme. These individuals collectively are referred to as the "Non-Party Co-Conspirators."

9.    Through the commission of a variety of criminal acts, which constitute a pattern of racketeering activity, the Conflictineering Enterprise has illegally expanded and prolonged the Child Custody Litigation to an exponential degree, in addition to causing extensive harm to Mr. Murphy outside of the Child Custody Litigation. These criminal acts were willful and intended to harass, intimidate, and place enough illicit pressure on Mr. Murphy and his current spouse to extort them into abandoning his claims in the Child Custody Litigation, paying Defendant Farmer's extortionate demand for "attorney's fees" for himself and Defendant King, and conferring other benefits on Defendants Beacham and My Advocate Center.

10.    The Conflictineering Enterprise operates by, among other things, attempting to drive a wedge between Mr. Murphy and his wife, and otherwise generating discord within their marriage; alienating the minor children who are the subject of the Child Custody Litigation (the "Children") from Mr. Murphy and his wife (thereby causing the Children psychological harm); and the numerous

criminal acts detailed below, including the filing of multiple false reports with governmental agencies knowingly misrepresenting that Mr. Murphy had engaged in "child abuse."

11.     Defendant Farmer himself acknowledges that the end goals of his terroristic litigation tactics are (a) to bring undue pressure on the opposing party to relinquish valid claims or defenses; and thereby (b) to extort the abandonment of such claims and the payment of monies from his target (here, Mr. Murphy and his wife).  In fact, according to Defendant Farmer's Conflictineering play-book, after creating personal and psychological chaos, he will end the assault by "restoring order in exchange for a fair disposition."  In a civil case such as the Child Custody Litigation, such a "fair disposition" necessarily involves the payment of money (specifically, payment of an exorbitant sum of "attorney's fees" to Defendants Farmer and King for their multi-year terror campaign against Mr. Murphy, his spouse, and others), in addition to the abandonment of legitimate legal claims.

12.     To effectuate this illegal scheme, Defendants Farmer and King first initiated a sham "third-party" claim against Mr. Murphy's spouse in the Child Custody Litigation, knowing such a claim was completely without any legal or

factual basis.[3]  The filing of a manifestly baseless "third-party" claim against Mr.

Murphy's wife was done solely to place pressure on her to persuade her husband to

abandon his child custody claims and to secure a large shakedown payment for

Defendants Farmer and King.  Indeed, utilizing a "good cop bad cop" strategy,

Defendant King (as the "good cop") first showed the Conflictineering Enterprise's

hand when he contacted Mr. Murphy's wife immediately after filing the frivolous

third-party claim against her – before she even could hire her own attorney – and

offered her the "opportunity" to capitulate to the demands of the Conflictineering

Enterprise early, before the terroristic behavior and attacks intensified.  When they

did not capitulate, Defendant Farmer (as the "bad cop") and the Conflictineering

Enterprise embarked upon a campaign of illegal, illicit and unprofessional conduct

aimed solely at extorting Mr. Murphy and his wife.  Recently, Defendant Farmer,

through Non-Party Co-Conspirator Michelle Murphy, communicated to Mr.

Murphy that the Child Custody Litigation – and the chaos inflicted upon Mr.

---

[3]  As explained more fully below, the Child Custody Litigation involves only the
parents of the affected children – here, Mr. Murphy and his ex-wife Michelle
Murphy.  The trial court quickly determined the third-party claim to be completely
without merit and dismissed it.  That dismissal now has become final and binding,
because Defendants Farmer and King improperly attempted to take an
unauthorized immediate appeal of the ruling.  *See Murphy v. Murphy*, No.
A13A1248, Order [dismissing appeal] (Ga. Ct. App. Aug. 12, 2013), *cert. denied*
(Ga. Apr. 22, 2014).

Murphy and his wife by the Conflictineering Enterprise – cannot be resolved without a payment to Defendant Farmer of $500,000.00.

13.     The RICO Defendants and the Non-Party Co-Conspirators have engaged in, and conspired to engage in, criminal behavior constituting predicate acts under Georgia and Federal racketeering statutes.  Members of the Conflictineering Enterprise have, among other criminal acts:

- attempted extortion and theft by extortion by publicly disseminating information regarding Mr. Murphy, his wife, and others connected to the Child Custody Litigation (a) accusing them of criminal offenses, (b) subjecting them to hatred, contempt, and ridicule, or (c) impairing their credit or professional reputations, in an attempt to obtain money and litigation concessions from Mr. Murphy (O.C.G.A. § 16-8-16);

- attempted to bribe a state court judge (O.C.G.A. § 16-10-2);

- intimidated or attempted to intimidate judges, parties, witnesses, experts, court officials, professionals appointed by the Court, and others (O.C.G.A. §§ 16-10-93 & 16-10-97);

- coordinated and executed an interstate conspiracy, including interstate travel from Georgia to the USVI, to kidnap the Children and film them without informing or obtaining permission from their custodial

parent (Mr. Murphy), in furtherance of an extortion scheme (18
U.S.C. § 1201, 18 U.S.C. § 1952, 14 V.I.C. § 1052);

- deliberately interfered with the legal custody of the Children who are
  the subject of the Child Custody Litigation (O.C.G.A. § 16-5-45);

- generated and transmitted, over interstate wires, false reports of child
  abuse to public authorities in Tennessee, the USVI, and perhaps other
  states (T.C.A. § 37-1-413, 14 V.I.C. § 2146(c), 18 U.S.C. § 1343);

- operated Defendant My Advocate Center as a scheme or artifice to
  defraud and, in furtherance of that scheme, transmitted interstate wire
  communications, in violation of 18 U.S.C. § 1343; and

- engaged in other acts of mail and wire fraud to further the objectives
  of the Conflictineering Enterprise (18 U.S.C. §§ 1341, 1343).

14.    All of these crimes were perpetrated with the goals of placing illicit
and undue pressure on Mr. Murphy and his wife to relinquish his claims in the
Child Custody Litigation (without any regard for the "best interest" of the
Children); extorting a "pay off" to Defendant Farmer and the Conflictineering
Enterprise; and enhancing the public profiles and revenue streams of the RICO
Defendants.  Indeed, even when Defendant Farmer primarily did capital defense
work, he would take on non-capital work "if the clients have money."  *See* David

G. Stout, The Lawyers of Death Row, N.Y. TIMES, Feb. 14, 1998 (excerpts

previously filed as **Exhibit 2**[4]).  Where, as in the Child Custody Litigation, his

own client does not "have money," the "pay off" necessarily would have to come

from the adverse party.

15.     To intimidate and bring additional pressure on Mr. Murphy, the RICO

Defendants, by and through the Conflictineering Enterprise, also have made false

statements over interstate wires to the media in New York and other states, for the

purpose of knowingly and willfully presenting Mr. Murphy and his wife in a false

light.  The RICO Defendants also have made false statements publicly (including

on broadcasts from an Atlanta-area radio station that subsequently were

rebroadcast over the Internet) in an attempt to conceal and obfuscate their own

wrongdoing as some form of crusade for justice, as well as in an effort to obstruct

Mr. Murphy's extensive efforts to parent and maintain a healthy relationship with

the Children.

16.     Defendants' misconduct entitles Mr. Murphy to the recovery of

damages, including but not limited to compensatory, treble, and punitive damages

for (a) the substantial amount of unnecessary attorney's fees, expenses, and other

---

4  In accordance with Local Rule 15.1, Mr. Murphy incorporates by reference the
28 Exhibits attached to his initial Complaint [Dkt. 1-1].

damages caused by the RICO Defendants' crimes and terroristic tactics (which damages exceed $75,000); and (b) Mr. Murphy's out-of-pocket costs incurred securing necessary psychological treatment of the Children attributable to the tactics of the Conflictineering Enterprise (these damages also exceed $75,000).

17.    Mr. Murphy also asserts a state-law claim of defamation against Defendants Farmer, Beacham, and My Advocate Center.  Mr. Murphy is entitled to general damages for the *per se* defamatory accusations by the RICO Defendants and Non-Party Co-Conspirators that (a) Mr. Murphy, his wife, and his attorneys in the Child Custody Litigation have committed crimes (including repeated false accusations that Mr. Murphy bribed the original trial judge and other independent professionals involved in the Child Custody Litigation); and (b) Mr. Murphy, his wife, and his attorneys in the Child Custody Litigation have been guilty of a debasing act ("stealing" the Children).  Moreover, Mr. Murphy is entitled to punitive damages from Defendants Beacham and My Advocate Center, because these Defendants willfully refused to retract defamatory statements after Mr. Murphy made a demand to retract such statements.

## PARTIES AND RELEVANT NON-PARTIES

**Plaintiff**

18.     Plaintiff John H. Murphy is an individual and citizen of the United States Territory of the Virgin Islands ("USVI"), residing in St. Thomas, USVI.

**RICO Defendants**

19.     The RICO Defendants identified below are individuals and entities that have conspired to conduct the affairs, directly and indirectly, of the Conflictineering Enterprise by and through a pattern of racketeering activity.  Each of the RICO Defendants has committed criminal acts as part of the scheme to extort Plaintiff, and each has participated in the operation and management of the criminal Conflictineering Enterprise.  As noted above, these Defendants are referred to collectively herein as the "RICO Defendants."

20.     Defendant Millard C. Farmer, Jr. is an individual and resident of the State of Georgia.  Defendant Farmer is an attorney currently licensed to practice law in the State of Georgia.  At all times relevant to the allegations in this Amended Complaint, Defendant Farmer has represented Non-Party Co-Conspirator Michelle Murphy, Plaintiff's ex-wife and the sole Defendant in the Child Custody Litigation.  Defendant Farmer is the person primarily responsible

for originating, assembling, and leading the Conflictineering Enterprise.
Defendant Farmer may be served with process at his residence in Atlanta, Georgia.

21.    Defendant Alfred L. King, Jr. a/k/a Larry King is an individual and
resident of the State of Florida.  Although he has represented publicly that he is
now retired, Defendant King is an attorney currently licensed to practice law in the
State of Georgia.  Prior to his alleged retirement, Defendant King practiced law by
and through Defendant Larry King, P.C., a law firm located at 210 North
McDonough Street, Jonesboro, Georgia 30237.  On information and belief,
Defendant Larry King, P.C. is the alter ego of Larry King, at least with respect to
Defendant King's practice of law.  Defendant King was co-counsel (together with
Defendant Farmer) for Non-Party Co-Conspirator Michelle Murphy in the Child
Custody Litigation and in separate litigation brought by Michelle Murphy against
Nan Freeman, a court reporter in the Child Custody Litigation.  Defendant King
and Larry King, P.C. may be served with process at his residence in Indian Rocks
Beach, Florida.

22.    Defendant Deborah L. Beacham is an individual and resident of the
State of Georgia.  Ms. Beacham is the Executive Director (and, upon information
and belief, the sole shareholder) of Defendant My Advocate Center.  Ms. Beacham
may be served at her residence in Roswell, Georgia.

- 14 -

23.    My Advocate Center is a Georgia corporation whose principal office is listed with the Georgia Secretary of State's office as 880 Marietta Highway, Suite 630-166, Roswell, Georgia 30075 (a mailbox facility).  My Advocate Center may be served through its registered agent, Ms. Beacham, at 3355 Lenox Road, Suite 750, Atlanta, Georgia 30326.

**Non-Party Co-Conspirators**

24.    Certain other non-party individuals played roles, direct or indirect, in the Conflictineering Enterprise's scheme to extort Plaintiff.  Foremost among the Non-Party Co-Conspirators are the following:

> (a)    Michelle Murphy, Plaintiff's ex-wife and the sole defendant in the Child Custody Litigation;
>
> (b)    Robert Hartman, Michelle Murphy's brother;
>
> (c)    Kimellen Tunkle, a paralegal working with Defendant Farmer;
>
> (d)    T.B., a minor;
>
> (e)    Christy B., mother of T.B.;
>
> (f)    David Johnson of Strategic Visions, LLC;
>
> (g)    Kimberly Krautter of 13th Generation Strategies; and
>
> (h)    James O'Brien, the host of a radio show sponsored by Defendant My Advocate Center entitled "Pro Advocate Radio."

25.     David Johnson and Kimberly Krautter have acted as spokespersons for the Conflictineering Enterprise and are residents of the State of Georgia.  Mr. Johnson and Ms. Krautter assisted the RICO Defendants in the development of their public pressure campaign and, in concert with one or more of the RICO Defendants, authored, issued, or otherwise published false and misleading press releases, media statements, and other communications in furtherance of the RICO Defendants' extortionate scheme.

26.     At all relevant times, each and every non-party identified above was acting in concert with, or as agent for, one or more of the RICO Defendants and, as described in greater detail below, further conspired with one or more of the RICO Defendants to perform the acts averred herein.

## SUBJECT-MATTER JURISDICTION AND VENUE

27.     This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  *See* 28 U.S.C. § 1332(e) ("States" in section 1332(a)(1) includes "Territories").

28.     This Court also has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because (a) some of the claims

in this action arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968; and (b) the remaining claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United State Constitution.

29.     This Court has personal jurisdiction over Defendants pursuant to both (a) 18 U.S.C. § 1965; and (b) Georgia's long-arm statute, O.C.G.A. § 9-10-91.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the actions and events giving rise to this action occurred within this judicial district and division.

## FACTUAL BASES FOR CLAIMS

**John and Michelle Murphy Divorce in 2006.**

31.     Mr. Murphy and his ex-wife, Michelle Murphy, were married from 1996 to 2006.  They have two children, J.M. and T.M (the "Children").

32.     The divorce of Mr. Murphy and Michelle Murphy became final on December 20, 2006, when the Superior Court of Troup County, Georgia entered a "Final Decree of Divorce" in *John Murphy v. Michelle Murphy*, Civ. A. No. 2004-CV-494 (Ga. Super. Ct., Troup Cnty.) (the "Divorce Decree").

33.     Pursuant to the terms of the Divorce Decree, Mr. Murphy and

Michelle Murphy were granted joint legal custody of the Children and Michelle

Murphy was granted primary physical custody.

34.     In the divorce litigation with Mr. Murphy, Michelle Murphy was

represented by attorney Delia "Dee" Crouch.

**Defendant Farmer, with Defendant King's Participation, Commences Malpractice Litigation Against Dee Crouch, Becomes Aware of Mr. Murphy's and His Current Wife's Net Worth, and Extorts an Excessive Payment That Yields Substantial "Attorney's Fees."**

35.     On December 15, 2008, Michelle Murphy, represented by Defendant

Farmer, filed a "Complaint Seeking Relief for the Negligent, Actionable Conduct

of Legal Malpractice, Breach of Expressed [sic] and Implied Contractual Duty,

Breach of Fiduciary Duty and Unjust Enrichment" in the Superior Court of Coweta

County against Ms. Crouch (the "Crouch Malpractice Litigation"). *Michelle*

*Murphy v. Delia Crouch*, No. 08-V-2137 (Ga. Super. Ct., Coweta Cnty.).

36.     In the Crouch Malpractice Litigation, Michelle Murphy (through

Defendant Farmer) claimed that Ms. Crouch had mishandled the equitable

distribution of a pension between Michelle Murphy and Mr. Murphy in the divorce

case resulting in an alleged shortfall of approximately $50,000 to Michelle

Murphy.

37.    To comply with the requirements of O.C.G.A. § 9-11-9.1, Michelle Murphy attached an affidavit from Defendant Larry King expressing his opinion that Ms. Crouch had provided "substandard legal representation." In Defendant King's affidavit, he acknowledges having reviewed the entire divorce case file of Mr. Murphy as well as financial information of Mr. Murphy.  Defendant Farmer paid Defendant King fees for his participation in the Crouch Malpractice Litigation.

38.    On November 30, 2010, Defendant Farmer moved to join Mr. Murphy as a defendant in the Crouch Malpractice Litigation, which motion was granted.

39.    Shortly thereafter, Defendant Farmer engaged in a discussion with Mr. Murphy, Mr. Murphy's wife, and Mr. Murphy's attorney regarding the litigation.  During that discussion, Defendant Farmer refused to accept the full amount in dispute (approximately $50,000) as a payment from Mr. Murphy to resolve the case.  In refusing to accept the full amount in dispute to resolve the case, Defendant Farmer repeatedly proclaimed:  "We are talking about a hairdresser and her boys!"

40.    Defendant Farmer began talking directly with Mr. Murphy's wife, who was not a party to the lawsuit.  In one conversation, Defendant Farmer stated to Mr. Murphy's wife, "If I don't get what I want, I will continue to litigate for

years because I am not charging Michelle."  Defendant Farmer continued, "It

matters what I want!"

41.     Defendant Farmer made it clear that since he had expanded the case

by joining Mr. Murphy in the Crouch Malpractice Litigation, he would ensure that

the case would be unnecessarily protracted, expensive, and painful unless resolved

"fairly" for Defendant Farmer.  On the basis of these threats from Defendant

Farmer, Mr. Murphy and his wife capitulated to Defendant Farmer's extortionate

demands and paid him and Michelle Murphy $150,000, three times the amount in

dispute, to have "order restored" and the case resolved.

42.     As a result of the proceedings in and settlement of the Crouch

Malpractice Litigation, Defendants Farmer and King became acutely aware of the

wealth of Mr. Murphy and his wife.

**Mr. Murphy Commences the Child Custody Litigation.**

43.     In 2011, Mr. Murphy became concerned about several issues related

to Michelle Murphy's mental condition, physical custody, and parenting of the

children.  These issues included, but were not limited to: the Children's

absenteeism from school; the Children's access to firearms, alcohol, and drugs;

concerns about inappropriate and premature sexual behavior; Michelle Murphy

repeatedly expressing to Mr. Murphy her intention to move the Children a greater

distance from him; Michelle Murphy's refusal to take the Children to professional counseling sessions as she previously had agreed to do; and Michelle Murphy's refusal to take one of the Children to the hospital under emergency conditions, despite having been instructed to do so by the Children's treating psychologist.

44.     In view of these and other serious concerns, on April 11, 2012, Mr. Murphy filed the Child Custody Litigation, seeking a modification of the custody arrangements and parenting time provisions contained in the Final Decree of Divorce.

45.     At all pertinent times, Defendant Farmer, assisted by Ms. Tunkle, has represented Michelle Murphy in the Child Custody Litigation.  Defendant King, by and through Defendant Larry King, P.C., also has represented Michelle Murphy in the Child Custody Litigation as co-counsel with Defendant Farmer.  Defendant King's name was on each and every pleading and brief filed in the Child Custody Litigation until September 2014.  As a result of Defendants Farmer and King becoming acutely aware of the wealth of Mr. Murphy and his wife, they formed the view that they were fertile targets for the Conflictineering Enterprise (*i.e.*, that they would be willing to relinquish legitimate legal positions to avoid the terroristic approach of Conflictineering, and that they were capable of paying

excessive sums of money to Defendant Farmer and the Conflictineering Enterprise to "restore order").

46.    Evidencing that their tactics are designed to attack and abuse the litigation process (and cannot be characterized as any legitimate effort to achieve the true objective of the Child Custody Litigation, which is to determine which parent's custody is in the Children's "best interest"), Defendant Farmer and Defendant King filed more than 20 motions to disqualify the original trial judge (Coweta County Superior Court Chief Judge A. Quillian Baldwin, Jr., hereinafter "Judge Baldwin"), other judges of the Superior Court of Coweta County, the judge appointed to replace Judge Baldwin, and multiple judges of the Court of Appeals of Georgia, as well as other individuals involved with the case.

47.    On May 11, 2012, Michelle Murphy filed an Answer (seeking an upward modification of child support and other monetary relief) in the Child Custody Litigation and asserted a patently frivolous and vexatious "Third-Party Complaint" against Mr. Murphy's wife seeking, *inter alia*, "statutory damages, compensatory damages and punitive damages, together with attorney's fees."

**Defendant King Directly Contacts Mr. Murphy's Wife Regarding an Early Pay-Off to the Conflictineering Enterprise to Avoid Further Attacks.**

48.    Shortly after service of the baseless "Third-Party Complaint" on Mr. Murphy's wife, and before the appearance of an attorney on her behalf, Defendant

King approached her on behalf of the Conflictineering Enterprise about settling early and thereby avoiding what Defendant King referred to as Defendant Farmer's "excessive litigation."

49.     By letter dated June 6, 2012 (copy previously filed as **Exhibit 3**), Defendant King wrote Mr. Murphy's wife (from the State of Georgia across state lines to her place of business in the State of New York), specifically identifying her as the "Founder/Chief Investment Officer" of "Galtere, Ltd."  Defendant King stated that his purpose in writing Mr. Murphy's wife was to "privately discuss the core dispute and resolve this matter outside the courtroom."  Defendant King proposed that he and she come up with a "plan" for resolving the litigation that could be presented to Michelle Murphy and urged upon Mr. Murphy by his spouse.

50.     Approximately one week later, on or about June 12, 2012, Defendant King called Mr. Murphy's wife, across interstate wires, and again proposed a private meeting involving just the two of them.  Defendant King stated to Mr. Murphy's wife words to the effect of, "My role in this litigation is a lot different than Mr. Farmer's.  Mr. Farmer is a litigator.  *He only knows excessive litigation.*"

51.     The clear message conveyed by Defendant King was that, if Mr. Murphy's wife was not willing to persuade her husband to abandon his claims in the Child Custody Litigation and settle early, they both would face continued and

escalated "excessive litigation" at the hands of Defendant Farmer, whom they

already knew would take unreasonable positions (as he had done by refusing

payment of the total amount in dispute and instead demanding almost three times

that amount to resolve the Crouch Malpractice Litigation) and would file frivolous,

defamatory submissions (as he had done with the initial motions to recuse Judge

Baldwin).

52.     Mr. Murphy's wife declined to meet privately with Defendant King.

**The Conflictineering Enterprise Sharpens its Focus on the Net Worth of Mr.
Murphy and his Wife, Thereby Confirming its True Mission and Lack of
Concern for the Best Interests of the Children.**

53.     On July 18, 2012, Mr. Murphy amended his Complaint in the Child

Custody Litigation.  In response, Michelle Murphy (through Defendants Farmer

and King) filed a frivolous "First Amended Third Party Complaint" against Mr.

Murphy's wife on August 2, 2012.

54.     The First Amended Third-Party Complaint is replete with abusive,

impertinent material, and fixated on the purported financial means and assets of

Mr. Murphy and his wife.  Among other allegations, this filing alleged the

following assets and expenditures of Mr. Murphy and his wife:  (a) a "private twin

engine jet airplane" (First Am. TPC ¶ 1.12.1); (b) a "more than two million dollar

home" (*id.* ¶ 1.12.3); (c) a "chauffeured limousine to carry the children to a

restaurant and a $1,000 for the dining tab for five persons" (*id.* ¶ 1.12.4); and (d) a donation in Mr. Murphy's name (to give Mr. Murphy an "undeserved feeling of importance," according to Messrs. Farmer and King) of a "half million dollars to the University of Tennessee at Chattanooga for an artificial playing surface on its football practice field" (*id.* ¶ 1.12.14).  Over and over again, Defendants Farmer and King pled details regarding one of the principal driving forces behind their Conflictineering scheme—their desire to leverage the Child Custody Litigation to generate fees for themselves from the alleged wealth and holdings of Mr. Murphy and his wife.

55.     These allegations have nothing to do with the substantive issues in the Child Custody Litigation.  Instead, the repeated inclusion of such allegations confirms the Conflictineering Enterprise's focus upon the assets they could target for themselves.  At the same time, the Conflictineering Enterprise was acting antithetically to the legitimate purpose of the Child Custody Litigation, which is promptly to adjudicate the merits of Mr. Murphy's concerns with Michelle Murphy's parenting and its impact upon the "best interests" of the Children.

56.     On September 20, 2012, Michelle Murphy filed her "Second Amended Answer with Affirmative Defenses, Second Amended Counterclaim and Second Amended Third Party Complaint," again focused upon the wealth of Mr.

Murphy and his current wife.  Among other allegations, this specious filing

contains references to (a) "an immense amount of personal wealth and income"

(Second Am. TPC ¶ 1.2.3); (b) access to "an eight million dollar twin jet airplane"

(*id.* ¶ 1.13.7); (c) spending "an average of One thousand six hundred sixty five

dollars ($1,665) per month for clothes" (*id.* ¶ 1.13.8); and (d) spending "an average

of Six hundred twenty five dollars ($625) per month for political contributions"

(*id.* ¶ 1.13.9).

57.     None of these allegations has anything whatsoever to do with the

limited issues presented in the Child Custody Litigation.

58.     Multiple additional filings by Defendants Farmer and King throughout

the Child Custody Litigation replicate this focus and fixation on net worth and

wealth.  Once viewed through the prism of Defendant Farmer's "Conflictineering"

scheme, it becomes clear the repeated references to net worth and wealth are

constant reminders that in order to end the terroristic attacks by the

Conflictineering Enterprise, Defendant Farmer and the RICO Defendants require a

substantial payoff to "restore order."

59.     On January 11, 2013, the Court entered an Order dismissing the Third

Party Complaint against Mr. Murphy's wife.  In the Order, the Court found "that

there is not a sufficient relationship or a legitimate issue to which the third party

defendant should be subjected to this action or where any relief could be granted to the third party plaintiff by the inclusion of the third party defendant."

**Defendant Farmer and His Conflictineering Enterprise Expand Their Pattern of Racketeering by Attacking the First Guardian ad Litem and Then Launching an Assault on the Second Guardian ad Litem That the Georgia Court of Appeals Found to be "Baseless" and "Meritless."**

60.     At the same time Defendants Farmer and King were submitting pleadings focused on the wealth of Mr. Murphy and his spouse, their litigation approach in the Child Custody Litigation was to (a) delay any adjudication of the merits of Mr. Murphy's concerns with Michelle Murphy's parenting of the Children; and (b) interfere with any effort by independent third parties to examine Michelle Murphy's conduct and advise the trial court with respect to the "best interests" of the Children.

61.     These efforts, which span the entirety of the Child Custody Litigation, confirm that another primary goal of the Conflictineering Enterprise was to thwart the legitimate litigation purpose of the Child Custody Litigation, *i.e.*, to determine which parent's custody would be in the "best interest" of the Children.  To the contrary, the goal of the Conflictineering Enterprise was to cause Mr. Murphy and his wife (a) to relinquish Mr. Murphy's legitimate claims for modification of the custody and visitation provisions relative to J.M. and T.M.; and (b) to capitulate and pay an outrageous amount of money to the Conflictineering Enterprise to make

the litigation and the illegal tactics being deployed against them go away (as they had done in connection with the Crouch Malpractice Litigation).

62.     Among many other examples, Defendants Farmer and King engaged in systematic attacks on both attorneys appointed to serve as Guardian ad Litem ("GAL") for the Children, in an attempt to abuse and intimidate them into withdrawing.

63.     The purpose of a GAL is to represent the best interests of the Children, separate and apart from the interests of the parents involved in the custody dispute.  The very reason a court appoints such a representative for children is to ensure that their rights and interests are protected and not subjugated to the rights and desires of adversarial parents.

64.     From the outset of the Child Custody Litigation, Defendant Farmer and Defendant King vigorously resisted the appointment of a GAL to represent the best interests of the Children.  At the first hearing in the case, Defendant Farmer protested the appointment of a GAL and stated that his client refused to pay any portion of the GAL's fees.  The Court resolved Defendant Farmer's objection by ordering Mr. Murphy to pay all of the GAL's fees, subject to the possibility of an equitable allocation at the conclusion of the case.

65.     Defendant Farmer and his Conflictineering Enterprise undertook to intimidate, harass, and badger the first GAL (Melissa Griffis) with the intent of causing her to withdraw.  As a result of these malicious attacks, less than two months after being appointed, Ms. Griffis withdrew as the GAL.

66.     On June 18, 2012, Elizabeth "Lisa" Harwell was appointed the new GAL. Two weeks later, Defendants Farmer and King moved to disqualify Ms. Harwell, submitting a 64-page motion mockingly entitled "Second Version of Justice's Sad Lexicon, the Tinker to Evers to Chance Motion for Disqualification of Elizabeth 'Lisa' F. Harwell as Guardian ad Litem."  This baseless and malicious filing sarcastically included a modified version of the poem "Baseball's Sad Lexicon," that leveled various unfounded accusations of corruption and unethical conduct against Ms. Harwell, the trial judge, another Coweta County judge (Judge Jack Kirby), and Mr. Murphy's trial counsel in the Child Custody Litigation.

67.     The Court denied all of the motions to disqualify Ms. Harwell. Defendants Farmer and King appealed the Court's refusal to disqualify Ms. Harwell.  The Court of Appeals ruled this appeal was "frivolous," imposing the maximum sanction available on Defendants Farmer and King.  *See Murphy v. Murphy*, 328 Ga. App. 767, 759 S.E.2d 909. 915 (2014), *recons. denied* (July 31, 2014), *cert. denied* (Ga. Nov. 17, 2014).  As the Court of Appeals correctly

recognized, this appeal (like other appeals and other actions taken by Defendants

Farmer and King on behalf of Michelle Murphy) was taken "purely for the purpose

of delaying resolution of John Murphy's custody modification petition – an act that

is antithetical to the children's best interests."

68.     The Court of Appeals also noted that the appellate brief submitted by

Defendants Farmer and King contained "numerous discourteous and disparaging

remarks about other persons involved in the case, particularly John Murphy's

wife" and that the brief was completely lacking a "tone that is respectful and

appropriate to the seriousness of the issues."   This finding further confirms that the

true purpose of the Conflictineering Enterprise's tactics is not legitimate litigation

of the issues, but rather the utilization of vicious *ad hominem* attacks and illegal

obstructionist tactics designed to bring emotional and psychological pressure on

Mr. Murphy and his wife (a) to relinquish the child custody claims and (b) to pay

substantial sums in order to end the terroristic attacks and "restore order."

**With no Disclosure to The Court or Mr. Murphy of His Prior Representation,
Defendant Farmer Engineers the Involvement of His Former Client as The
Children's Psychiatrist in an Attempt to Improperly Influence The Child
Custody Litigation.**

69.     Following the appointment of Ms. Harwell as the GAL in the summer

of 2012, the Court requested professional input from her and a psychologist who

had been treating the children, Dr. Tony Johnson, as to whether a custody

evaluation, performed by a licensed Georgia professional, was warranted.  Rather than allowing these two independent professionals to respond to the Court's inquiries regarding the best interests of the children, Defendant Farmer insisted that the boys' treating psychiatrist, Dr. Patricia Nice, consult with Dr. Johnson regarding the need for a custody evaluation.

70.    At the time Defendant Farmer insisted upon Dr. Nice's involvement in the Court's decision of whether to recommend a custody evaluation, he failed to disclose to the Court or to counsel that he previously had represented Dr. Nice in several matters, including a matter related to her employment.  In connection with that representation, Defendant Farmer became aware of the temporary suspension of Dr. Nice's Physician and Surgeon License ("Professional License") by the State of Illinois many years earlier.

71.    The suspension of Dr. Nice's Professional License in Illinois involved allegations of prescription substance use.  Dr. Nice overcame these issues long ago, and her Professional License was restored fully by the State of Illinois.  There have been no subsequent issues with any of her professional licenses, including her license from the State of Georgia.

72.    Not only did Defendant Farmer fail to disclose his prior attorney-client relationship with Dr. Nice, he also failed to disclose that he chose not to

charge Dr. Nice for his services as her attorney.  Instead of charging Dr. Nice for

his services, and without even revealing his intentions to her (let alone any

complicity on her part), Defendant Farmer sought to create a *quid pro quo*

arrangement in which Dr. Nice would provide her professional services at no

charge in matters involving his clients.[5]  As such, Defendant Farmer insidiously

believed he had engineered a situation in which the testifying professional, Dr.

Nice, a former client represented without charge, would feel indebted and would

"owe him."

73.    Without disclosing his prior attorney-client relationship or the "she

owes me one" arrangement that he believed he had engineered with respect to an

unknowing Dr. Nice, Defendant Farmer insisted that Dr. Nice become involved to

provide testimony relative to the ultimate issues in the Child Custody Litigation.

**In Connection With a November 15, 2012 Hearing in The Child Custody
Litigation, Defendant Farmer Obstructs Justice by Illegally Intimidating His
Former Client and Influencing her Testimony**.

74.    The trial court scheduled a hearing in the Child Custody Litigation for

November 15, 2012.  Prior to this hearing, Defendant Farmer arranged to meet

---

[5] There is no evidence whatsoever that Dr. Nice had even the slightest knowledge
of this scheme by Defendant Farmer, let alone any knowing participation.

with Dr. Nice to obtain a preview of the findings and professional opinions that she would be providing at the hearing.

75.     During this meeting, Defendant Farmer informed Dr. Nice that he expected her to support his client, Michelle Murphy, and her position in the Child Custody Litigation.  In a follow-up email, Dr. Nice informed Defendant Farmer that she found it difficult to do so for several reasons, including (a) Michelle Murphy's refusal to keep appointments for herself and the children to see Dr. Nice, such that gaps in their treatment existed and their mental-health progress had been hampered; and (b) Michelle Murphy herself had shown indications of troubling conduct.

76.     Defendant Farmer refused to accept Dr. Nice's professional opinions and her view of the facts.  Having observed prior behavior from Defendant Farmer in situations where people did not cooperate with him, Dr. Nice reasonably feared that he expected her to suppress any evidence, information, or opinions that would present Michelle Murphy or her relationship with the Children in a negative light – even if those concerns were genuine, accurate, and based upon her inquiries and professional opinion.  In short, Dr. Nice understood that Defendant Farmer would seek to  "destroy" her publicly, professionally, and personally if she provided any

evidence or testimony that would be detrimental to his client's position in the Child Custody Litigation.

77.    Influenced and intimidated by her former attorney, Dr. Nice did not provide any testimony at the November 15, 2012 hearing that was harmful to the interests of Defendant Farmer's client.  This outcome caused Defendant Farmer to believe that his witness intimidation tactics had worked and that Dr. Nice truly was under his influence and control.  As a result, Defendant Farmer pressed for Dr. Nice to be even more heavily engaged in the Child Custody Litigation.

78.    At the hearing on November 15, 2012, the central issue of whether a full custody evaluation should be performed was raised by Ms. Harwell, the Children's GAL (in consultation with Dr. Nice and Dr. Johnson).  Ms. Harwell proposed that she and the children's psychologist, Dr. Tony Johnson, collaborate on the issue and report their recommendations back to the court.

79.    Defendant Farmer objected to Ms. Harwell's involvement with the custody evaluation process.  In view of Defendant Farmer's corrupt and illegal intimidation of Dr. Nice, it is apparent that the real reason he objected to Ms. Harwell's involvement was because it would thwart his illicit scheme to get his former client (Dr. Nice) involved in the case and provide him with what he assumed would be an inside advantage.  Consistent with Defendant Farmer's

erroneous belief that Dr. Nice was "in his pocket," he insisted that instead of Dr.

Johnson collaborating with the GAL (Ms. Harwell), Dr. Johnson should work with

Dr. Nice to assist the Court in determining whether a custody evaluation was

needed.

**Despite Defendant Farmer's Intimidation Tactics, His Former Client (Dr. Nice) Joins Dr. Johnson in Recommending a Full Custody Evaluation for the Children.**

80.     Given his efforts to intimidate Dr. Nice previously, Defendant Farmer

anticipated that she would capitulate to his threats and refuse to recommend a full

custody evaluation.

81.     Despite Defendant Farmer's threats, however, Dr. Nice stood firm in

her professional obligations and resolve.  As a result, on December 20, 2012, Dr.

Nice and Dr. Johnson authored a joint letter to the Court expressing their

recommendation that a full custody evaluation should be performed.  A copy of

this letter previously was filed as **Exhibit 4.**

82.     The Court, however, refused to move forward with the custody

evaluation because Defendants Farmer and King had filed an immediate appeal of

the order denying Michelle Murphy's initial motion to disqualify Judge Baldwin.

(This improper appeal ultimately was dismissed by the Georgia Court of Appeals

for lack of appellate jurisdiction on July 16, 2013, which the Georgia Supreme

Court affirmed on other grounds on June 30, 2014.)

83.    As the Children's GAL, Ms. Harwell wrote the Court on January 16,

2013, urging it to proceed with the full custody evaluation recommended by Drs.

Johnson and Nice.  A copy of this letter previously was filed as **Exhibit 5.**  In

response, Judge Baldwin hand-wrote on the letter: "We need to wait until the Court

of Appeals has ruled on Millard's appeal."  *See id.*

84.    Just as Defendants Farmer and King had intended, their frivolous

appeal of the original order denying the initial motion to recuse Judge Baldwin

successfully delayed the performance of any custody evaluation as well as any

other substantive examination of the merits of Mr. Murphy's claims for months.

During this delay (and in apparent response to Dr. Johnson's and Dr. Nice's joint

professional opinion that a full custody evaluation should be performed), at

Defendant Farmer's urging and through Michelle Murphy's actions, the Children

ceased attending their appointments with Drs. Johnson and Nice.

85.    Moreover, under the influence of Defendant Farmer and Michelle

Murphy, the Children became increasingly hostile to and alienated from Mr.

Murphy and his wife.  The parental alienation resulting from these tactics has

caused damage to the Children and necessitated their placement in residential

treatment for several months, resulting in out-of-pocket damages to Mr. Murphy and his wife of approximately $200,000.

**The Georgia Court of Appeals Dismisses Defendants Farmer's And King's Improper Appeal of the Denied Motions to Recuse Judge Baldwin, an Important Hearing is Scheduled, and Devastating Affidavits are Received by the Court Regarding Michelle Murphy.**

86.     After virtually no substantive proceedings had occurred in the Child Custody Litigation for several months, on July 16, 2013, the Georgia Court of Appeals unanimously disposed of Michelle Murphy's defective appeal of the order denying her initial motions to disqualify Judge Baldwin.  *See Murphy v. Murphy*, 322 Ga. App. 829, 747 S.E.2d 21 (2013), *aff'd on other grounds*, 295 Ga. 376, 761 S.E.2d 53 (2014).

87.     Following the dismissal of Michelle Murphy's appeal, Mr. Murphy immediately sought to schedule a hearing on his request for temporary custody. The Court scheduled the hearing for August 6, 2013.

88.     On August 5, 2013, the day before the scheduled August 6 hearing, Mr. Murphy submitted the affidavit of Bryan McLendon.  Mr. McLendon testified that he had rented a room from Michelle Murphy at her house for nearly two years, and also had provided transportation for the Children.

89.     Mr. McLendon also detailed disturbing sexual and other misconduct involving Michelle Murphy, and testified regarding hazardous incidents involving the Children while they were in Michelle Murphy's custody.

90.     Shortly after the filing of this affidavit, Defendant Farmer contacted Mr. McLendon, also a former client of Defendant Farmer, for the overt purpose of threatening him with imprisonment, intimidating him, and pressuring him to recant his sworn testimony against Michelle Murphy.

91.     Defendant Farmer also moved to continue the August 6 hearing to August 13, 2013.  The Court granted this request.

**Defendant Farmer Obstructs Justice by Threatening And Intimidating Dr. Johnson Prior to His Testimony at the August 13, 2013 Hearing.**

92.     The children's psychologist, Dr. Tony Johnson, was issued a subpoena commanding him to appear and testify at the August 13, 2013 hearing.

93.     Prior to the August 13, 2013 hearing, and with knowledge that Dr. Johnson (and Dr. Nice) had become aware of his client's mental condition, behavioral issues, and poor parenting practices such that he was pushing for a full custody evaluation, Defendant Farmer undertook to ensure that Dr. Johnson understood that there would be personal and professional consequences to him in the event that he testified in a manner that was in any way harmful to the interests of Michelle Murphy (Defendant Farmer's client).

- 38 -

94.     On information and belief, Defendant Farmer represented to Dr. Johnson that if he provided any testimony at the August 13, 2013 hearing that negatively impacted Michelle Murphy's position, Defendant Farmer would cause Dr. Johnson difficulties with Georgia state licensing authorities.

95.     Defendant Farmer issued these threats to Dr. Johnson with the express and unlawful purpose and intention of intimidating Dr. Johnson, influencing his testimony, and obstructing justice.

96.     As discussed below, this was not the only instance in which the Conflictineering Enterprise threatened Dr. Johnson.

**For the Second Time, Defendant Farmer Attempts to Intimidate his Former Client Dr. Nice and Obstruct Justice, but Dr. Nice Remains Resolute in Her Professional Responsibilities and Her Recommendation That a Full Custody Evaluation Needed to be Conducted.**

97.     By the summer of 2013, Dr. Nice's concerns regarding Michelle Murphy had become much more defined, particularly as they impacted the Children.  With her last intimidating encounter with Defendant Farmer fresh in her mind, and acutely aware that her opinions regarding Michelle Murphy were not going to be tolerated by Defendant Farmer, Dr. Nice had no desire to meet or speak with him prior to the August 13, 2013 hearing.

98.     Anticipating that Michelle Murphy's mental condition and behavior was at great risk of being exposed, Defendant Farmer made desperate attempts to

get in contact with Dr. Nice prior to the August 13 hearing.  Finally, the day before the August 13 hearing, Defendant Farmer connected with Dr. Nice by telephone.

99.     In this August 12, 2013 telephone call, Dr. Nice informed Defendant Farmer that her professional responsibilities required her to testify truthfully and that she would not suppress, alter, or embellish anything such that her testimony at the August 13, 2013 hearing would be truthful and forthcoming without regard to whether it would be beneficial or not to his client and her legal positions in the Child Custody Litigation.

100.    Among other things, Dr. Nice informed Defendant Farmer that she had become aware of additional facts and details regarding Michelle Murphy, her behavior with the Children, and the existence of issues that, in her professional judgment and required immediate attention from medical professionals trained in the troubling issues presented by Michelle Murphy's relationship with the Children.  Dr. Nice also reiterated her opinion that a full custody evaluation needed to be conducted, that the children needed continuing care, and that Michelle Murphy needed professional care.

101.    On information and belief, following Dr. Nice's preview of her testimony to him, it was clear to her that Defendant Farmer expected her to suppress evidence and her opinions that reflected poorly on his client, Michelle

Murphy.  Having become aware of sensitive personal information regarding Dr. Nice during his representation of her, Defendant Farmer was in the position to use it against her and Dr. Nice had a reasonable fear that he would do so.  Based upon earlier observations of Defendant Farmer, Dr. Nice also feared that he would seek to create problems for her with state licensing authorities and engage in other acts aimed at ruining her personal and professional reputation.

102.   In a continuation of their "good cop" (Defendant King) "bad cop" (Defendant Farmer) technique, Defendant King intercepted Dr. Nice on her way into the courthouse for the August 13, 2013 hearing.  Utilizing a much calmer, low-key approach, Defendant King sought a preview from Dr. Nice of her testimony and attempted to influence and shape it for the benefit of Defendants Farmer and King.

103.   Despite her well-founded fears, at the August 13, 2013 hearing, Dr. Nice testified truthfully regarding her serious concerns about the Children and Michelle Murphy's parenting of the Children.

104.   Upon receiving Dr. Nice's testimony (and the testimony of other witnesses during a four-hour hearing), the Court halted the hearing and called counsel for the parties and the GAL back to chambers.

105.   In chambers, the Court announced that it would order a full custody evaluation.  Defendant Farmer insisted that no custody evaluation needed to be performed and that, if a custody evaluation was to be performed, it was imperative that the custody evaluator be someone from outside of Newnan, Georgia (where the case is pending).  Defendant Farmer himself urged the Court to reach out to the Superior Court of Fulton County for a list of potential custody evaluators.  The Court agreed to contact Fulton County Superior Court Judge Doris Downs.

106.   The Court proceeded exactly as it said it would, contacted Judge Downs and then circulated a list of potential custody evaluators that it received from her to counsel for the parties on August 21, 2013.  Ms. Harwell, the Children's GAL, conducted due diligence on the professionals provided by Judge Downs and ultimately recommended that Dr. Nancy McGarrah be engaged as the custody evaluator.

107.   Thereafter, on August 23, 2013, the Court entered an Order requiring the parties to submit to the full custody evaluation by Dr. McGarrah.  A true and correct copy of the August 23 Order previously was filed as **Exhibit 6**.

108.   The August 23 Order required Mr. Murphy and Michelle Murphy (as well as Mr. Murphy's current wife) to "fully cooperate with the custody evaluator."  The August 23 Order also provided, "Neither party shall discuss any of

the issues, allegations or claims in this Case with the Children, unless such

discussions are necessary to implement the terms of this Order or the terms of the

Final Decree." Aug. 23 Order, at 6-7. The August 23 Order further required Mr.

Murphy to pay all initial costs associated with the custody evaluation, subject to re-

allocation at the conclusion of the case. *See* Aug. 23 Order, at 6.

109.   As they did with respect to all of the trial court's orders, Defendants

Farmer and King (on behalf of Michelle Murphy) appealed the August 23 Order.

As part of the same decision in which the Georgia Court of Appeals rejected the

appeal of the order refusing to disqualify Ms. Harwell as the GAL, the Court of

Appeals found this appeal by Defendants Farmer and King to be "frivolous" and

interposed solely to delay an examination of the merits of Mr. Murphy's child

custody claims. *Murphy v. Murphy*, 328 Ga. App. 767, 759 S.E.2d 909 (2014),

*recons. denied* (July 31, 2014), *cert. denied* (Ga. Nov. 17, 2014).

**Defendant Farmer Follows Through and Publicly Discloses His Former
Client's Personal Information.**

110.   By Defendant Farmer's own admission, he contacted the "Illinois

Medical Licensing Board" seeking to obtain written information regarding Dr.

Nice's license status "days ***before*** the hearing" on August 13, 2013. *See* Aug. 19,

2013 Mot. to DQ, at 22 (emphasis added) (excerpts from this motion previously

filed as **Exhibit 7**). At the August 13 Hearing, Defendant Farmer even questioned

Dr. Nice in what he referred to in subsequent filings as "the substance abuse area of her cross-examination." *Id.* at 22-23.

111.   In the wake of the August 13 hearing, and in light of Dr. Nice having testified fully and truthfully regarding her serious concerns with the Children and Michelle Murphy's parenting misconduct, Defendant Farmer made good on his threats to disclose the personal and confidential information he had learned during his prior representation of Dr. Nice.

112.   Specifically, following the August 13 Hearing, Defendant Farmer filed a series of briefs (on August 19, August 28, and September 13, 2013) that revealed his knowledge, awareness and offensive use of Dr. Nice's personal information.  Among other items, Defendant Farmer stated that Dr. Nice "most likely was experiencing the effects of substance abuse just before her testimony" (Aug. 19 Mot., at 7); "appeared to be under the influence of a controlled substance to the extent that the witness was presenting false testimony and exhibiting erratic behavior" (*id.*); was a "substance abusing psychiatrist" (*id.* at 11); had a "history of being a substance abuser" (*id.* at 22); and "has a long history of substance abuse as a member of the medical profession …." (Aug. 28 Mot., at 4; Sept. 13 Mot., at 12).

113.   At no time has Dr. Nice consented to the disclosure of this information by her former lawyer.  In addition to being illegal, Defendant Farmer's

conduct violates Rule of Professional Conduct 1.6.  Ga. R. Prof. Conduct 1.6(a)

("A lawyer shall maintain in confidence all information gained in the professional

relationship with a client, including information which the client has requested to

be held inviolate or the disclosure of which would be embarrassing or would likely

be detrimental to the client, unless the client gives informed consent . . . .").

**Non-Party Co-Conspirator Michelle Murphy Refuses to Participate in the
Court-Ordered Custody Evaluation, While Defendant Farmer Embarks on an
Illegal Campaign to Intimidate the Custody Evaluator.**

114.   Despite the fact that the August 23 Order required "[a]ll reasonable

efforts" be made to complete the custody evaluation by October 15, 2013, Michelle

Murphy refused to participate.  At the same time, Defendant Farmer attempted to

intimidate Dr. McGarrah and dissuade her from serving as the custody evaluator.

115.   On September 4, 2013, Defendant Farmer wrote Dr. McGarrah

(without copying Mr. Murphy's counsel), demanding various information from her

before purportedly "advising [his client] about making her decision to execute the

contract" for Dr. McGarrah's services in the custody evaluation.  Defendant

Farmer also asked Dr. McGarrah irrelevant, highly inappropriate questions about

whether she thought the pleadings and orders entered in the custody case "gave the

appearance of justice."   A copy of Defendant Farmer's September 4, 2013 letter to

Dr. McGarrah previously was filed as **Exhibit 8.**

116.   The next day, on September 5, 2013, Dr. McGarrah responded to Defendant Farmer's September 4, 2013 letter, copying Mr. Murphy's counsel, and acknowledging receipt of both the Court's August 23 Order and Defendant Farmer's September 4 Letter.

117.   Defendant Farmer then sent Dr. McGarrah another letter, dated September 13, 2013, in which he attacked Dr. McGarrah for disclosing his prior letter to counsel for Mr. Murphy:  "You are not at liberty to disclose my communications with you."  Defendant Farmer further threatened Dr. McGarrah that he would be contacting the APA Ethics Committee to review "the ethical restraints of [Dr. McGarrah's] discipline."   A copy of Defendant Farmer's September 13, 2013 Letter to Dr. McGarrah previously was filed as **Exhibit 9**.

118.   In the meantime, because Michelle Murphy refused to cooperate with the custody evaluation, Mr. Murphy amended a previously-filed motion for contempt against her.  This amendment, dated September 27, 2013, sought contempt not only based on Michelle Murphy's failure to cooperate with the custody examination, but also based on statements made by both of the Children confirming that both Michelle Murphy and Defendant Farmer were discussing the substantive issues in the Child Custody Litigation with the Children, in violation of the Court's August 23 Order.

**The Principal Architects of the Conflictineering Enterprise (Defendants Farmer and King) and Their Client Michelle Murphy All Are Held in Contempt in the Child Custody Litigation.**

119.   At the contempt hearing on October 3, 2013, Mr. Murphy presented uncontradicted testimony that he and his wife had taken every possible step to proceed with the custody evaluation required by the August 23 Order, including signing all required documentation and paying the full retainer amount of $6,400.

120.   Although Defendant King appeared, neither Michelle Murphy nor Defendant Farmer chose to be present at the October 3 hearing.  At the conclusion of the October 3 hearing, the Court found Michelle Murphy, Defendant Farmer, and Defendant King in contempt of court.

121.   On November 19, 2013, the Court entered a written Order regarding its contempt filings against Michelle Murphy, Defendant Farmer, and Defendant King.  A true and correct copy of the November 19 Order previously was filed as **Exhibit 10**.

122.   With respect to Michelle Murphy, the November 19, 2013 Order ruled that she "willfully has refused to cooperate with, and instead has frustrated, the custody evaluation required by the August Order."  Moreover, both Michelle Murphy and Defendant Farmer were found to have been "discussing the issues,

allegations, and claims in this case with the children," in violation of the explicit

prohibition contained in the August 23 Order.

123.   The Court also found that Defendants Farmer and King had "willfully

directed" Michelle Murphy not to appear at the hearing, without providing "any

valid excuse" for her failure to appear.

124.   As with the other adverse rulings in the Child Custody Litigation,

Defendants Farmer and King, on behalf of themselves and Michelle Murphy,

appealed the November 19, 2013 Order.  On November 17, 2014, the Georgia

Court of Appeals excused Michelle Murphy's failure to appear at the hearing, but

otherwise rejected every aspect of the appeal of the trial court's contempt order,

including its findings of contempt by Michelle Murphy for her failure to participate

in the custody evaluation and contempt by Defendant Farmer in discussing the

issues in the Child Custody Litigation with the Children.  *See Murphy v. Murphy*,

330 Ga. App. 169, 767 S.E.2d 789 (2014), *recons. denied* (Dec. 5, 2014), *cert.*

*denied* (Ga. Mar. 2, 2015), *recons. denied* (Apr. 9, 2015).

**Defendants Farmer and King Continue Their Obstructive Pattern of Filing
Frivolous, Redundant Motions to Disqualify Judge Baldwin and Re-Confirm
the Goals of the Conflictineering Enterprise—Relinquishment of the Child
Custody Claims and a "Shakedown" Payment by Mr. Murphy and His Wife.**

125.   In the wake of the August 13 hearing at which the custody evaluation

was ordered, Defendants Farmer and King filed another series of frivolous,

overlapping motions to recuse Judge Baldwin.  These motions contained

inappropriate, inflammatory, and irrelevant personal attacks on Mr. Murphy and

his wife, many of which were targeted specifically at their assets and wealth.

126.   For example, in a disqualification motion filed August 19, 2013,

Defendants Farmer and King alleged that "[t]he inclusion of [Mr. Murphy's wife] .

. . in the litigation will expose the type of disposable income and assets that John

Harold Murphy fraudulently and illegally conceals from the Court and [ ] Michelle

Murphy," notwithstanding that the third-party complaint against Mr. Murphy's

wife already had been dismissed and that the divorce and distribution of assets

between Mr. Murphy and Michelle Murphy had been finalized seven years earlier.

127.   This same motion also asserted that Mr. Murphy was "showered with

many hundreds of thousands, if not millions of dollars of disposable income each

year by [his wife]," described Mr. Murphy's wife as the "bag person for John

Harold Murphy's disposable income and assets," and referred to her as a "very

wealthy and astute person."

128.   In an August 28, 2013 "amendment" to the August 13 motion,

Defendants Famer and King similarly described Mr. Murphy and his wife as a

"multimillionaire couple," alleging they are "many times over multimillionaires."

129.   The trial court in the Child Custody Litigation orally denied all of the

pending disqualification motions at the outset of the October 3 contempt hearing.

On December 4, 2013, the Court entered a written Order denying all of the

outstanding motions to disqualify.  A copy of the December 4, 2013 Order

previously was filed as **Exhibit 11.**

130.   The Court's December 4, 2013 Order specifically found Defendant

Farmer's recent motions to disqualify included an inexplicable and irrelevant

fixation with the wealth of Mr. Murphy and his wife:  "Defendant Farmer spends

over 20 pages in his motion to disqualify talking about the Plaintiff's wife, Renee

Haugerud, and her financial situation."  Dec. 4 Order, at 5.  Defendant Farmer and

the Conflictineering Enterprise's acute and rapacious focus on the wealth of Mr.

Murphy and his wife further evidences that a principal aim of their racketeering

acts was to secure a "shakedown" payment from them, in addition to pressuring

Mr. Murphy to abandon his valid claims regarding custody of the Children.

**Defendants Farmer and King Ratchet Up Their Efforts to Intimidate the**
**Custody Evaluator, While Their Client Continues to Refuse to Comply With**
**The Custody Evaluation Ordered by The Court.**

131.   On January 8, 2014, Defendants Farmer and King filed, on behalf of

Michelle Murphy, an utterly frivolous "Motion to Disqualify Cliff Valley

Psychologists, P.A. and Nancy A. McGarrah, Ph.D. as 'Custody Evaluator.'"  This

disqualification motion included many inflammatory accusations against the Children's GAL Lisa Harwell, including assertions that Ms. Harwell had taken "revenge" upon Michelle Murphy and that she had improperly selected Dr. McGarrah to perform the custody evaluation.

132.   In the meantime, and notwithstanding the prior contempt Order entered against her, Michelle Murphy defiantly continued to refuse to cooperate with the custody evaluation ordered by the Court.

133.   In light of Michelle Murphy's continuing refusal to cooperate with the court-ordered custody evaluation, Mr. Murphy filed a Motion for a Rule 35[6] mental examination of Michelle Murphy.  Shortly after Mr. Murphy's Motion for Rule 35 Examination was scheduled for hearing, Defendants Farmer and King filed yet another motion to disqualify Judge Baldwin that immediately was denied.

134.   In light of the continued filing of frivolous motions and other obstructive behavior by Defendants Farmer and King, the Court entered an Order governing further proceedings on March 13, 2014 (the "March 13 Order").  The March 13 Order provided, among other things, that "[a]ny further disrespect to the

---

[6]  "Rule 35" refers to O.C.G.A. § 9-11-35(a) which provides, in pertinent part: "When the mental or physical condition of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical examination by a physician or to submit to a mental examination by a physician or a licensed psychologist . . . . "

Court, both in person or in writing, will not be tolerated" and that "[a]ny further frivolous motions with the purpose to delay or obstruct this Court shall prohibit the offending party from any attorney's fees." A copy of the March 13 Order previously was filed as **Exhibit 12**.

135.   At the hearing on March 17, 2014, Dr. McGarrah confirmed that while Mr. Murphy and his wife had done everything necessary and possible to complete the court-ordered custody evaluation, Michelle Murphy had not participated in any manner whatsoever.

136.   At the conclusion of the hearing, the Court ordered Michelle Murphy to submit to a Rule 35 examination by Dr. McGarrah, warning her that her continued refusal to comply with the Court's orders could result in temporary custody of the Children being granted to Mr. Murphy.

137.   The day after the hearing, on March 18, 2014, Defendant Farmer sent Dr. McGarrah another letter manifestly intended to intimidate her. Defendant Farmer's letter stated that Michelle Murphy would not sign any of the documents necessary for Dr. McGarrah's office to conduct any testing and further stated that Michelle Murphy would not "participate in any examination that you deem provides you with any immunity from liability whether by statute or contract." The clear import of this and other threats in the letter was that (a) Dr. McGarrah

would be sued if she issued any type of opinion adverse to Michelle Murphy; and

(b) Defendant Farmer would claim his March 18, 2014 letter effectuated a waiver

of her statutory immunity in any such litigation.  A true and correct copy of

Farmer's March 18, 2014 Letter to Dr. McGarrah previously was filed as **Exhibit**

**13.**

138.   The day after receiving Defendant Farmer's threatening letter, Dr.

McGarrah moved to withdraw as the custody evaluator and as the psychologist

appointed to conduct the Rule 35 examination.

139.   On April 1, 2014, the Court entered an Order granting Dr. McGarrah's

motion to withdraw as custody evaluator and appointing Dr. H. Elizabeth "Betty"

King as the new custody evaluator.  A copy of this Order previously was filed as

**Exhibit 14**.

140.   Also on April 1, 2014, the Court entered an Order requiring Michelle

Murphy to submit to a Rule 35 psychological evaluation by Dr. King (to be

completed no later than May 23, 2014) and setting a compliance hearing for May

27, 2014 (during which temporary custody would be addressed, if necessary).

**Michelle Murphy Loses Custody of The Children at the May 27, 2014 Hearing.**

141.   At the May 27 hearing, Michelle Murphy admitted she had not

complied with the custody evaluation or the Rule 35 mental examination, and

further admitted that she had violated the prohibition on discussing the issues in the

Child Custody Litigation with the Children.  The Court then ruled from the bench

that temporary custody of the Children was awarded to Mr. Murphy.

142.   On June 5, 2014, the Court entered an Order memorializing its award

of temporary custody of the Children to Mr. Murphy.  A copy of the June 5, 2014

Order previously was filed as **Exhibit 15**.

143.   Defendants Farmer and King attempted to challenge the temporary

custody ruling by an "Emergency Motion" to the Georgia Supreme Court (which

Defendants Farmer and King amended after entry of the June 5, 2014 Order).  That

motion was denied on June 11, 2014.  *See Murphy v. Murphy*, No. S13G1651 (Ga.

June 11, 2014).

**Following The Award of Temporary Custody to Mr. Murphy, Defendant
Farmer And Michelle Murphy Urge One of The Children to Run Away And
Utilize The Dangerous Situation to Demand Litigation Concessions From Mr.
Murphy.**

144.   In the weeks following the May 27, 2014 hearing, Michelle Murphy

constantly and systematically contacted both of the Children innumerable times,

sometimes calling or texting either or both of them as often as a dozen times or

more per day.  Even after the entry of the June 5, 2014 Order prohibiting Michelle

Murphy from having any contact with the Children, she, directly and indirectly,

continued to contact the Children numerous times per day in blatant violation of the Court's Order.

145.   During this same time, Michelle Murphy, with the knowledge of and, on information and belief, at the direction of Defendant Farmer, instructed the Children to physically resist any effort by Mr. Murphy to take the Children's mobile phones from them, and to use any effort by Mr. Murphy to take the phones away from the Children as a pretext for an altercation with Mr. Murphy.  Michelle Murphy provided these instructions to the Children with the intention of further alienating them from their father and instigating an altercation that she and Defendants Farmer and King then would use to falsely claim the Children were being abused or mistreated by Mr. Murphy.

146.   By June of 2014, Mr. Murphy and his wife had taken the children to their permanent residence in St. Thomas, USVI.

147.   On June 8, 2014, Mr. Murphy demanded that T.M. relinquish the mobile phone Michelle Murphy had purchased for T.M.  T.M. refused, and Mr. Murphy attempted to take the phone.  Just as he had been instructed to do by the Conflictineering Enterprise, T.M. physically resisted, resulting in an incident in which T.M. scraped one of his lips against his braces.

148.   On June 8, 2014, after the incident with T.M. and his braces, Michelle Murphy communicated with the Children via text message repeatedly, instructing them to get photographic evidence and send it to her with a text or voicemail message detailing that Mr. Murphy had caused the alleged "injury."

149.   One day later, on June 9, 2014, Defendants Farmer and King, on behalf of Michelle Murphy, filed a "Supplement" to an "Emergency Motion" they had filed in the Supreme Court of Georgia, falsely representing that Mr. Murphy had abused T.M. when trying to take his mobile phone away from him.

150.   In light of the June 9 filing's confirmation that Michelle Murphy was continuing to violate the "no contact" order, Mr. Murphy demanded that J.M. (the older child) relinquish the cell phone Michelle Murphy had bought for him.  J.M. refused to relinquish the phone and went to a different room in Mr. Murphy's residence.

151.   Based on cell phone records retrieved from J.M.'s phone, J.M. spoke with Michelle Murphy and Defendant Farmer at or around the time Mr. Murphy demanded that he relinquish his cell phone.

152.   In the afternoon of June 9, 2014, Michelle Murphy communicated with J.M. via text message, stating that she had a plan to get J.M. out of Mr. Murphy's home.

153.   Shortly thereafter, J.M. ran away from Mr. Murphy's residence in St. Thomas.  On information and belief (including statements made to Mr. Murphy by T.M.), Michelle Murphy or Defendant Farmer, or both of them, encouraged and instructed J.M. to run away from Mr. Murphy's home.

154.   J.M. was missing for several hours.  During the time that J.M. had run away from Mr. Murphy's residence, J.M. spoke via cell phone with Michelle Murphy on multiple occasions, and also spoke with Defendant Farmer.  Based on J.M.'s cell phone records and his communications with Mr. Murphy during the time that he was missing, Michelle Murphy or Defendant Farmer, or both of them, were coaching J.M. to seek to obtain concessions from Mr. Murphy in the Child Custody Litigation in exchange for revealing J.M.'s location to Mr. Murphy and agreeing to return home that evening.

155.   Specifically, Michelle Murphy or Defendant Farmer, or both of them, directed J.M. to demand that Mr. Murphy state in writing that he agreed the Children would be better off in Newnan, Georgia with Michelle Murphy and that he immediately would return the Children to Michelle Murphy.  As instructed by Michelle Murphy or Defendant Farmer, J.M. demanded that Mr. Murphy send him a text message stating, "I will work with you to get you back to Newnan."  Mr.

Murphy complied with the demand, and sent J.M. that text message.  J.M. then forwarded to Michelle Murphy the text message he caused Mr. Murphy to send.

156.   By encouraging J.M. to remain missing and at risk of serious injury in order to pressure Mr. Murphy to agree to litigation concessions, Michelle Murphy and Defendant Farmer engaged in the intimidation and extortion of Mr. Murphy.

157.   The morning after the runaway incident, Michelle Murphy immediately began to pressure J.M., via text message, to follow up with Mr. Murphy about implementing the litigation concessions extracted as a condition of J.M. disclosing his location.  Michelle Murphy sent multiple text messages to J.M. asking if Mr. Murphy was sending J.M. back and if a flight had been scheduled.

158.   Later that night, on June 10, 2014, Michelle Murphy communicated via text message to J.M., making reference to the prior day's events as involving "negotiations" and a "deal" and "ransom."

**Defendant Farmer Furthers The Witness Intimidation Scheme And Further Endangers The Children By Filing a False Report of Child Abuse With Virgin Islands Authorities.**

159.   At almost exactly the same time he discovered J.M. was missing, Mr. Murphy was visited at his residence by a representative of the U.S. Virgin Islands Department of Human Services ("VI-DHS").  The representative stated she was there to investigate a report of child abuse filed by Defendant Farmer.

160.   The VI-DHS representative conducted detailed interrogations of Mr. Murphy and his wife and also conducted a thorough and comprehensive inspection of their residence and household.  The VI-DHS representative did not discover one shred of evidence that in any manner supported the outrageous and untrue allegations made by Defendant Farmer in his false report.

161.   As a result of Defendant Farmer's false report of child abuse, Mr. Murphy was unable to leave his residence immediately to search for J.M. Defendant Farmer's misconduct and misrepresentations to USVI authorities impacted the efforts to locate J.M., caused enormous physical and emotional stress for Mr. Murphy, and caused Mr. Murphy to incur attorney's fees.

**Defendants Farmer and King Attempt to Bribe Judge Baldwin by Way of a Frivolous Lawsuit Against the Court's Long-Time Court Reporter.**

162.   Shortly after the attempt to intimidate Mr. Murphy to make litigation concessions in order to ensure the safe return of J.M., Defendants Farmer and King embarked upon an insidious scheme to attempt to bribe the trial judge in the Child Custody Litigation by threatening and then filing frivolous litigation against Nan Freeman (Judge Baldwin's long-time court reporter).

163.   Specifically, on June 18-19, 2014, Defendant Farmer sent Ms. Freeman a series of e-mails in which he demanded that Ms. Freeman provide him

the audio tapes of certain hearings in the Child Custody Litigation (as opposed to merely providing the written transcripts).

164.   On June 19, 2014, Judge Baldwin agreed to make the audio recordings available to Defendant Farmer.  Despite Judge Baldwin's capitulation to his demands, Defendant Farmer continued to utilize the threat of a lawsuit against Ms. Freeman to demand even further concessions, namely that he must be provided with his own personal copy of the audio recording.

165.   Judge Baldwin ultimately capitulated to these demands as well, entering an Order on June 26, 2014 providing for audio copies of the specific hearing at issue (the May 27, 2014 hearing) to be delivered to counsel for both parties.  A copy of the June 26, 2014 Order previously was filed as **Exhibit 16**.

166.   Despite the June 26 Order, Defendants Farmer and King nevertheless already had filed on June 25, 2014 a lawsuit against Nan Freeman, her business (Freeman Reporting, Inc.), and the eight members of the Board of Court Reporting in Fulton County (the "Nan Freeman Litigation"). *Michelle Murphy v. Nan Freeman, et al.*, No. 2014-CV-248210 (Ga. Super. Ct., Fulton Cnty.).  In the Nan Freeman Litigation, Defendants Farmer and King alleged various purported constitutional claims and sought compensatory and punitive damages against Nan

Freeman and her business.  Attorney Ken Gordon appeared on behalf of Ms.

Freeman in the Nan Freeman Litigation.

167.   Shortly after his appearance in the case, Mr. Gordon was contacted by

Defendant Farmer, who represented to Mr. Gordon that he would dismiss the Nan

Freeman Litigation if Ms. Freeman persuaded Judge Baldwin (a) to recuse himself

from the Child Custody Litigation and to "back-date" his recusal to a date prior to

May 27, 2014; and (b) to vacate his June 5, 2014 ruling granting temporary

custody to Mr. Murphy and prohibiting Michelle Murphy from having contact with

the Children.  Mr. Gordon and his client declined Defendant Farmer's proposal.

An affidavit from Mr. Gordon attesting to these events is attached as **Exhibit 29**.

168.   This effort by Defendant Farmer, acting on behalf of Defendant King

and other members of the Conflictineering Enterprise, to bribe and extort a

member of the Georgia state judiciary – by suing his court reporter, and then

offering to dismiss the case in exchange for the judge recusing himself and

vacating an earlier Order in separate litigation – is unethical, illegal, and

reprehensible.  In his response to a Grievance filed by Mr. Murphy with the State

Bar of Georgia, Defendant Farmer did not deny offering to dismiss the frivolous

Nan Freeman Litigation in exchange for favorable rulings in the Child Custody

Litigation, but rather defended it as a "request that the legal rights of Michelle Murphy be restored to where they were before."

169.    After Defendant Farmer voluntarily dismissed his frivolous claims against the Board of Court Reporting, the Nan Freeman Litigation was transferred from Fulton County Superior Court to Troup County Superior Court (the county in which Nan Freeman resides).  Ken Gordon thereafter filed a motion for summary judgment, after which an Amended Complaint was filed eliminating all of the bogus constitutional claims originally pled against Nan Freeman and her business and instead asserting meritless common law claims.  Ultimately the trial court granted summary judgment to Nan Freeman on all of Michelle Murphy's claims. A copy of the Order granting summary judgment in the Nan Freeman Litigation is attached as **Exhibit 30**.

170.    At the same time Defendants Farmer and King were litigating the Nan Freeman Litigation, Defendant Farmer also had demanded the initiation of a criminal investigation of Ms. Freeman for allegedly overbilling the counties to which she provided court reporting services.  These allegations were investigated fully by the Cobb County District Attorney's office and found to be completely without merit.  To the contrary, Ms. Freeman systematically had been undercharging the various counties for which she worked.  A true and correct copy

of the "Investigative File Memo" by Bert Love dated May 18, 2015 is attached as **Exhibit 31**.

171.   Thereafter, on information and belief, Defendant Farmer threatened the court reporter in the Nan Freeman Litigation that he would file the same frivolous litigation against her that he had filed against Ms. Freeman if she did not capitulate to his demands relative to audio recordings of hearings in the Nan Freeman Litigation.  In response to Defendant Farmer's threats to his court reporter, on July 20, 2015, the judge in the Nan Freeman Litigation entered an Order (copy attached as **Exhibit 32**) providing the parties and their counsel "shall not contact the court reporter."

**Non-Party Co-Conspirator Michelle Murphy Threatens Dr. Tony Johnson at The Newnan Target, Telling Him She is Going to "Take Him Down."**

172.   Simultaneously with the attempt of Defendants Farmer and King to bribe Judge Baldwin, Non-Party Co-Conspirator Michelle Murphy was engaged in witness intimidation of Dr. Tony Johnson, the Children's treating psychologist and one of the professionals who had recommended a full custody evaluation relative to Mr. Murphy's claims in the Child Custody Litigation.

173.   Specifically, on June 22, 2014, Michelle Murphy approached Dr. Johnson at the Newnan Target, located at 555 Bullsboro Drive, Newnan, Georgia

30265.  Michelle Murphy began harassing Dr. Johnson in the checkout line, stating that Dr. Johnson was the reason Michelle Murphy had lost custody of the Children.

174.   Dr. Johnson left the checkout line, but was followed by Michelle Murphy, who continued to harass him.  Michelle Murphy ultimately stated to Dr. Johnson that she was going to "take him down."  A true and correct copy of the police report Dr. Johnson filed regarding this incident previously was filed as **Exhibit 17**.

**The Conflictineering Enterprise's Next Illegal Scheme Involved a Conspiracy With a Minor Child, T.B., to Manufacture False Evidence of Child Abuse by Mr. Murphy.**

175.   During the summer of 2014, Mr. Murphy and his wife were endeavoring to facilitate the Children's transition to their new living arrangement with them.  Among numerous steps taken to help the Children adjust to their new circumstances, Mr. Murphy and his wife allowed them to invite a minor friend, T.B., to visit with them for an extended period of time over the summer.  Mr. Murphy and his wife even paid for several plane tickets for T.B. and all of T.B.'s expenses while visiting.

176.   Upon T.B.'s return to Newnan, Michelle Murphy met with T.B. secretly for purposes of launching and engineering an illegal scheme with T.B. whereby (a) T.B. would ask Mr. Murphy and his wife to allow and even pay for

T.B. to return to the USVI for another extended visit with the Children, during which (b) T.B. would attempt to manufacture false evidence that Mr. Murphy was abusing the Children, so that (c) the Conflictineering Enterprise could raise additional false claims of child abuse.

177.   In furtherance of this scheme, T.B. contacted Mr. Murphy and his wife in order to plead with them to permit and pay for yet another lengthy visit with the boys.  Unaware of T.B.'s involvement in the conspiratorial scheme to manufacture false evidence, and in an effort to do what they could to help the Children, Mr. Murphy and his wife agreed to another visit by T.B. and, once again, purchased T.B.'s plane ticket to the USVI.

178.   During this second visit, T.B. enticed the Children to engage in a number of delinquent and even criminal acts.  Among other things, T.B. urged the Children to steal alcoholic beverages and consume them covertly; acquired and sought to acquire cigars and marijuana to smoke with the Children; persuaded the Children to purchase and manufacture their own marijuana pipes; and helped the Children roll "blunts," consisting of marijuana mixed with cigar tobacco.

**Defendants Farmer And King File a Fabricated "Emergency Motion" in Anticipation of Receiving The False Evidence of Child Abuse Manufactured by T.B., But The Illicit Conspiracy is Uncovered Shortly Before The Scheduled Hearing.**

179.    While engaged in the foregoing acts, T.B. remained in contact with Michelle Murphy and possibly other members of the Conflictineering Enterprise regarding his efforts to manufacture false evidence of Mr. Murphy's alleged abuse.

180.    In anticipation of T.B. returning to Newnan, Defendants Farmer and King, on behalf of Michelle Murphy, filed an "Emergency Motion for Relief from John Harold Murphy and Renee L. Haugerud Contributing to the Delinquency of Minors" alleging that Children were consuming alcohol and drugs (the purported evidence of which T.B. had conspired to fabricate and then attempted to manufacture).

181.    Shortly after the filing of the Emergency Motion, T.B. returned from his second extended visit with the Children.  Defendants Farmer and other members of the Conflictineering Enterprise (including at least Michelle Murphy and Ms. Tunkle) immediately met with T.B. at T.B.'s home to discuss the results of T.B.'s efforts to manufacture false evidence of child abuse by Mr. Murphy.

182.    Based on these discussions with T.B., on August 8, 2014, Defendants Farmer and King filed a "First Amendment" to the Emergency Motion, identifying

T.B. as the "confidential informant" and expanding the false claims that Mr.

Murphy had provided the Children with drugs and alcohol.

183.   As the sole "support" for Farmer's and King's August 8 filing,

Defendant Farmer submitted nothing more than his own affidavit in which he

disclosed facts revealing the illicit scheme to manufacture evidence by the

Conflictineering Enterprise and T.B.  According to Defendant Farmer's affidavit,

when Michelle Murphy secretly met with T.B. after his first visit with the

Children, he described to her wide-ranging and dangerous abusive conduct by Mr.

Murphy.  Yet, rather than notify T.B.'s parents of this purported abuse or alert the

appropriate authorities, Michelle Murphy surreptitiously encouraged T.B. to visit

the Children again to obtain "verification" of the alleged abuse for her own use.  In

other words, Michelle Murphy conspired with T.B. for him to return to the

purportedly "abusive" environment to "document" the alleged abuse.

184.   In reality, T.B. would not be "documenting" anything, but rather

would be attempting to manufacture false evidence that Mr. Murphy was

"abusing" the Children by giving them drugs and alcohol.

185.   On August 11, 2014, Mr. Murphy filed a motion seeking to cancel the

hearing that had been scheduled on the Emergency Motion (for August 13) unless

all evidence relevant to the conspiracy to manufacture evidence was produced by

Defendants Farmer and King.

186.   Later in the day on August 11, 2014, Defendants Farmer and King (on

behalf of Michelle Murphy) filed their next manifestly frivolous motion to

disqualify Judge Baldwin.  Having been caught red-handed in their scheme to

manufacture evidence, their obvious purpose in filing their latest disqualification

motion was to delay the hearing that was scheduled for August 13 (the focus of

which now would be on their conspiracy to manufacture evidence).

187.   As intended by Defendants Farmer and King, on August 12, 2014, the

Court entered an Order providing that, in light of the August 11 Motion for

Disqualification, the hearing on the Emergency Motion that had been scheduled for

August 13 would be canceled.  A copy of this August 12, 2014 Order previously

was filed as **Exhibit 18.**

188.   Two weeks later, on August 26, 2014, Defendant King suddenly

moved to withdraw as co-counsel for Michelle Murphy, claiming he was retiring

from the practice of law. On August 27, 2014, Defendant King filed a similar

motion in the Nan Freeman Litigation.  At the time of Defendant King's motions,

he reasonably foresaw the continuing activities of the Conflictineering Enterprise

to extort monies from Mr. Murphy and his wife and to bring illegal pressure on Mr.

Murphy to abandon his claims in the Child Custody Litigation.  Nevertheless,

Defendant King did not take any action to disavow or defeat the objectives of the

Conflictineering Enterprise.  Thus, Defendant King did not withdraw from the

Conflictineering Enterprise, even if he withdrew from actively serving as co-

counsel with Defendant Farmer in the Child Custody Litigation.  The Court

granted this motion on September 10, 2014.  *See* Order [allowing withdrawal]

(Sept. 10, 2014) (copy previously filed as **Exhibit 19**).

**The Conflictineering Enterprise Trespasses on Mr. Murphy's Property to "Smuggle" Cell Phones to The Children.**

189.   In August of 2014, Non-Party Co-Conspirator Robert Hartman and

perhaps other members of the Conflictineering Enterprise trespassed onto Mr.

Murphy's private property in St. Thomas to (a) smuggle new cell phones to the

Children, so that Michelle Murphy could continue to violate the "no contact" order

entered in the Child Custody Litigation; and (b) deliver to J.M. a "runaway kit,"

complete with camping lights and GPS devices, to facilitate and encourage another

"runaway" event deliberately intended to endanger his welfare and to facilitate

extortionate activity by the Conflictineering Enterprise.

190.   The "smuggled" phones also were used to facilitate the kidnapping of

the Children for purposes of conducting a pre-planned "interview" with them by

Defendant Beacham (as described in further detail below) and to further alienate

the Children from their father and his wife, by encouraging J.M. and T.M. to defy

them at every turn, including an express directive to answer any questions from

Mr. Murphy and his wife with nothing more than a "Yes" or "No."  The Children

also were encouraged to tell the administrators, teachers, and other students at their

school that they were "prisoners" who were being held in the USVI by Mr.

Murphy against their will.

**Defendant Beacham Travels to St. Thomas to Kidnap The Children And Conduct a Clandestine Videotaped "Interview" in Order to Generate Additional Pressure on Mr. Murphy And His Wife.**

191.   Contemporaneous with their deliberate efforts to further alienate the

Children from Mr. Murphy and his wife, Michelle Murphy and members of the

Conflictineering Enterprise launched a so-called "social media" campaign in

August 2014, to bring additional pressure on Mr. Murphy to relinquish the child

custody claims and pay off the Conflictineering Enterprise.

192.   Shortly after the "social media" campaign was launched, Defendant

Beacham and her front entity, Defendant My Advocate Center, joined the

Conflictineering Enterprise.  Defendants Beacham and My Advocate Center hold

themselves out as purported "advocates" who provide, among other services,

litigation assistance in child custody disputes, even though Ms. Beacham is not a

licensed Georgia attorney or a paralegal.

193.   On or before August 29, 2014 (within three days or less of Defendant King's efforts to withdraw as co-counsel in the Child Custody Litigation and the Nan Freeman Litigation), in furtherance of the goals of the Conflictineering Enterprise and with the participation, knowledge, encouragement, and support of other members of the Conflictineering Enterprise, Defendant Beacham traveled to St. Thomas, USVI, with the intention and purpose of kidnapping the Children and then conducting a clandestine meeting and "interview" with them (all without the knowledge or consent of their father and custodial parent, Mr. Murphy).

194.   To conduct this clandestine interview, and in furtherance of the goals of the Conflictineering Enterprise, Defendant Beacham enticed the Children to sneak off Mr. Murphy's property and to get into the back seat of a waiting van that she and the Conflictineering Enterprise had arranged.

195.   Having illegally lured the Children off their parent's property, Defendant Beacham then engaged in a heavily-scripted videotaped "interview" with the Children.  A review of the videotaped interview released confirms Defendant Beacham asked the Children highly leading questions, the obvious purpose of which was to elicit false or distorted allegations of child abuse or other alleged misconduct by Mr. Murphy.

196.   The Conflictineering Enterprise fully expected and intended to leverage this videotaped "secret interview" and Defendant Beacham's illegal conduct to further pressure Mr. Murphy to give up his child custody claims and to make a shakedown payment to terminate the continuing terroristic attacks and deliberate endangerment of the Children.  Defendants Beacham and My Advocate Center joined the Conflictineering Enterprise to further its objectives and to further their own closely-related objective of increasing the profile and profitability of My Advocate Center, which Defendant Beacham operates as a scheme to defraud.

**Defendant Beacham's Allegations Regarding Her Own Divorce Proceedings.**

197.   Defendant Beacham, the owner and operator of  Defendant My Advocate Center, is not a licensed attorney, has no training in psychology, and is not a licensed social worker.  According to the representations she makes in her "LinkedIn" profile (copy attached as **Exhibit 33**), Ms. Beacham's only degree is a Bachelor of Science from Belhaven College in Jackson, Mississippi.

198.   Defendant Beacham's involvement in family law matters arose from her own divorce from C. Wayne Beacham, *Deborah L. Beacham v. Charles Wayne Beacham*, Civ. A. No. 06-1-9530-34 (Ga. Super. Ct., Cobb Cnty. filed Dec. 16, 2006).  Defendant Beacham was represented by attorneys Kathy L. Portnoy and Charla Strawser, then with Alembik, Fine & Callner, P.A.  Mr. Beacham was

represented by Peter V. Hasbrouck of Martenson, Hasbrouck & Simon LLP.  The case was assigned to Cobb County Superior Court Judge S. Lark Ingram.

199.   The custody evaluator in Defendant Beacham's divorce, Sarah Brogdon, J.D., L.C.S.W. of Peachtree Psychological Associates, referred the parties to Dr. Betty King (the same psychologist currently serving as the custody evaluator in the Child Custody Litigation) for psychological evaluations. Defendant Beacham thereafter published on the Internet a copy of a "Psychological Consultation" by Dr. King.  Statements Defendants Beacham has made about this report in her own court filings and otherwise, as well as the content of the handwritten notes on this report, confirm that Defendant Beacham is the subject of the "Psychological Consultation" by Dr. King published by Defendant Beacham herself.  A copy of this "Psychological Consultation" is attached as **Exhibit 34**.

200.   In the Psychological Consultation, Dr. King expressed profound concerns that Defendant Beacham is "psychologically disturbed" and interpreted her Minnesota Multiphasic Personality Inventory (or MMPI) to indicate "paranoid symptoms and a diagnosis of Paranoia or Acute Delusional Disorder should be considered."  Dr. King also found indications of a "thought disorder" that warranted further evaluation.  Dr. King concluded that Defendant Beacham's "thinking is not logical or consistent" and "may indicate that she cannot make good

decisions for the children," such that it was not clear she could "successfully function as a single mother with two small children."

201.   In one of the three subsequent lawsuits Defendant Beacham brought against her own attorneys in the divorce litigation (Ms. Portnoy and Ms. Strawser), she herself described Dr. King's report as finding her "overly paranoid," further confirming that she is, in fact, the subject of the published report by Dr. King

202.   In her various lawsuits against her former attorneys, Defendant Beacham alleges that, because of Dr. King's adverse psychological examination and its impact on the custody evaluation, she had no choice but to accept an unfavorable financial settlement in order to retain custody of her children. Specifically, Defendant Beacham alleges she received "less than 20%" of the alleged $6 million marital estate, meaning she received less than $1.2 million. Defendant Beacham also claims she was pressured to accept "only $3,500 per month" in child support.

203.   In another filing recently submitted in yet another *pro se* litigation filed by Defendant Beacham, she repeatedly alleges she had to "buy back" primary custody of her children by agreeing to an unfavorable settlement.  Under Defendant Beacham's theory, she relinquished an equitable property division in order to retain custody of her children, despite findings by the court-appointed

professionals that she had serious psychological issues calling into question her

ability to serve as the primary custodian following the divorce.

**Defendant Beacham Begins Operating My Advocate Center in 2011, Ostensibly to Provide Litigation Support Services in Family Law Matters But Actually Providing Only a Platform for the Dissemination of Defamatory Accusations by Disgruntled Family Court Litigants.**

204.   Defendant Beacham began operating Defendant My Advocate Center

in 2011.  According to www.myadvocatecenter.com, My Advocate Center offers

an array of resources and tools to assist parents and professionals in custody

disputes.  *See* pages of website attached as **Exhibit 35**.  As confirmed by a

deposition of Defendant Beacham taken in another case in late 2014, these material

representations are false.  In fact, Defendant Beacham operates My Advocate

Center as a "one-woman shop" providing no legitimate litigation support services.

205.   The page entitled "Why My Advocate Center?" asserts that My

Advocate Center "offers a collection of experts and resources to give individuals a

way to know they are on the right path and in good hands when entering into or

navigating through a legal conflict," later referring to My Advocate Center's

"team" as working with clients to "reinforce strengths, eliminate mystery and help

litigants make the best choices."  *Id.* at 2.

206.   A page entitled "Case Analysis" similarly holds out My Advocate

Center as having "Analysts and Legal Counsel" who "are second to none" and

states:  "You are in the right place to become informed about why your case is taking so long, or why it seems to be going down a black hole."  *Id.* at 3.

207.   The page "For Parents" describes My Advocate Center's services as including "coaching" to help litigants "become [their] own best advocate" and lists a variety of tasks with which MAC can help.  My Advocate Center also promises to refer parents to "M-A-C-Qualified Professionals."  This page confirms My Advocate Center provides its alleged "case management" services "on a fee basis." *Id.* at 5.

208.   Another page entitled "Facing Divorce?  Your First Step is Here" urges family court litigants to consult with My Advocate Center "before you file or if you have just hired an attorney."  This page goes on to warn parties to avoid what other family court litigants experience "when you are not prepared and don't have the right team around you."  Again, these services are provided for a fee: "We charge a minimal amount for consulting, which is designed to help you prepare for limiting exposure and stress in the process."  *Id.* at 7.

209.   A page entitled "Better Team Building – Better Results" claims, "No other service and leadership team possesses the insight, skill, commitment, talent & creativity – and practical experience – that we do."  This page further claims: "Our Leadership Team has proven results in problem-solving around high-conflict

cases."  Continuing, My Advocate Center represents it has an "Advisory Council":

"We work from practical experience with the issues you are facing, and bring to

that 'Real Life Vantage Point' an Advisory Council that commands respect in the

industry because of integrity, commitment to clients and children, and with a track

record that cannot be undermined."  And My Advocate Center claims it is "backed

by some of the best leaders in the industry."  *Id.* at 10.

210.   Noticeably absent from My Advocate Center's webpage are any

testimonials from clients or attorneys regarding their favorable experience with My

Advocate Center.  Also absent is any listing of any cases in which My Advocate

Center allegedly provided its services.  Instead, the page contains content about

various cases in which Defendant Beacham allegedly has uncovered "court

corruption" similar to what she believes occurred in her own divorce lawsuit.

211.   In fact, My Advocate Center does not have a "team" of experts, much

less an "Advisory Council" (or even a Board of Directors).  To the contrary, it

appears to consist entirely of Defendant Beacham, who has served as its only full-

time employee (at least through November 2014).  According to a deposition of

Defendant Beacham taken in *Domenicone v. Domenicone*, Case No. 2014-CV-

244167 (Ga. Super. Ct., Fulton Cnty.) (excerpts attached as **Exhibit 36**), My

Advocate Center had only one other employee "off and on" in 2013-2014, and

even that employee was not paid.  Moreover, even though My Advocate Center is a corporation, it does not have a Board of Directors, and apparently does not have any officers or directors other than Defendant Beacham.

212.   The only other employee listed anywhere on My Advocate Center's website is "Rebecca Bennett."  During Defendant Beacham's deposition in *Domenicone*, however, she admitted that "Rebecca Bennett" is an alias, a false identity she created when she began researching family law matters.  *Id.* at 18.

213.   When asked about the picture used on Rebecca Bennett's social media accounts, Defendant Beacham explained that it was a "stock picture," meaning one she pulled off the Internet.  Exemplars of Internet postings under Defendant Beacham's "Rebecca Bennett" alias are attached hereto as **Exhibit 37**.

214.   The facts of *Domenicone* show that, as with the actions of Defendants Beacham and My Advocate Center in furtherance of the Conflictineering Enterprise, the only "service" actually provided by My Advocate Center is the dissemination of false accusations by disappointed family court litigants, cloaked with the illusion of legitimacy by virtue of My Advocate Center's false claim to be a genuine organization providing true litigation support services.

215.   In *Domenicone*, for example, one parent had leveled false accusations of child molestation against the other parent in an effort to prevail in a custody dispute.  These accusations were found to be completely without merit.

216.   Nevertheless, in conjunction with a screening of the movie "Divorce Corp." by Defendants Beacham and My Advocate Center, a short film entitled "Will You Fight For Me?" was shown, in which the false accusations of child molestation were presented in a dramatic fashion.  Defendant Beacham published the "Will You Fight For Me?" video on My Advocate Center's website and authored posts on My Advocate Center regarding the *Domenicone* case in which she claimed the parent accused of molestation had "purchased" the testimony of the Guardian Ad Litem to testify falsely that there was no child molestation.[7]

217.   During her deposition, Defendant Beacham confirmed that My Advocate Center constitutes her only employment and that she generates income through My Advocate Center through "consulting" and "donations."

---

[7] Notably, the purported "expert" in *Domenicone* who testified that the molestation occurred is Dr. Joyanna Silberg, who subsequently conducted a purported four-hour interview of Michelle Murphy and then concluded, contrary to the opinions of every other professional involved in the Child Custody Litigation, that she was psychologically healthy and should be given custody of the Children.  Multiple courts have rejected purported "expert" testimony by Dr. Silberg and harshly criticized her credibility and the reliability of her conclusions.  *See, e.g.*, *Doe v. Roe*, 2012 WL 2899327, *29, *33 (Conn. Super. Ct. Feb. 2, 2012); *K.M. v. S.M.M.*, 2011 WL 3176534, *23, *26-27 (N.J. Super. App. Div. July 28, 2011).

218.   In addition to the various references on My Advocate Center's website to case management services being offered for a fee, several pages solicit "donations" (even though My Advocate Center is not a 501(c)(3) tax-exempt entity).  In fact, Defendants Beacham and My Advocate Center recently began offering donors a "soft-to-the-touch *iPouch* (valued at $119.00) as a gift for the first 25 donations of $75.00 or more."  Copies of this page and another page from My Advocate Center's website soliciting donations are attached as **Exhibit 38**.

219.   Thus, at the time she joined the Conflictineering Enterprise in August of 2014, Defendant Beacham was operating My Advocate Center as a scheme or artifice to defraud, whereby she would entice clients and donors to line her own pockets by holding My Advocate Center out as a legitimate organization providing case management services to child custody litigants.  In fact, the only service actually provided by Defendant Beacham was the dissemination of false accusations against family court litigants and professionals.

220.   At the time Defendants Beacham and My Advocate Center joined the Conflictineering Enterprise, Defendants Farmer and other members of the Conflictineering Enterprise had launched a "social media" campaign intended to further increase the illicit pressure on Mr. Murphy to relinquish his claims in the Child Custody Litigation and pay off the Conflictineering Enterprise.  Defendants

Beacham and My Advocate Center similarly had utilized social and other media to disseminate false accusations and thereby bring undue and illegal public pressure on family court litigants and professionals.  Defendants Beacham and My Advocate Center viewed the Child Custody Litigation as a prime opportunity to enhance the profile of My Advocate Center with potential clients and sponsors.

221.   As discussed below, the Conflictineering Enterprise showed portions of Defendant Beacham's so-called "secret interview" of the Children at "town hall" meetings organized and conducted in Newnan, Georgia by Defendant Farmer, Michelle Murphy, Defendant Beacham, and possibly other members of the Conflictineering Enterprise.  Portions of the videotaped "interview" also have been posted on My Advocate Center's website (as well as on Non-Party Co-Conspirator Michelle Murphy's Facebook page and her website dedicated to "free[ing]" the Children, J.M. and T.M.).  Defendant Beacham also has posted numerous stories regarding the Child Custody Litigation on My Advocate Center's website.

222.   In addition to furthering the goals of the Conflictineering Enterprise, Defendants Beacham and My Advocate Center also have used portions of the videotaped USVI "interview" to attempt to enhance the profile (and media coverage) of themselves and the "advocacy" services they allegedly provide to litigants in child custody cases.  Defendants Beacham and My Advocate Center

intended to profit from their racketeering acts and the acts of other members of the Conflictineering Enterprise in the form of additional business and broader awareness of their services, in addition to any other financial agreement or arrangement they may have with other members of the Conflictineering Enterprise.

**The Conflictineering Enterprise's "Social Media" Campaign Deliberately Endangers The Children**.

223.   In early September of 2014, the Children commenced the school year at a highly-respected private school in St. Thomas, USVI.

224.   By virtue of her continuous contact with the Children (in systematic violation of the June 5, 2014 "no contact" order entered in the Child Custody Litigation), co-conspirators Michelle Murphy and her brother, Rob Hartman, became aware of specific details regarding the private school the Children were attending.

225.   Despite the significant risk of endangerment to the Children, Michelle Murphy or Mr. Hartman, or both of them, published specific details regarding the Children's school and other aspects of their private lives on the completely public Facebook page that they host.

226.   At the same time, the Conflictineering Enterprise continued to make widespread and grossly exaggerated claims regarding the extent of Mr. Murphy's and his wife's wealth.  Among other things, Michelle Murphy's Facebook page

repeatedly describes Mr. Murphy's wife as a "billionaires" [sic].  In other words, Michelle Murphy or other members of the Conflictineering Enterprise, through their public Facebook page, deliberately and recklessly identified the Children as a highly-attractive target for would-be kidnappers and provided all the information needed to execute a kidnapping of the Children.

227.   Moreover, by the time the Children started school in St. Thomas, Michelle Murphy and other members of the Conflictineering Enterprise had created a plethora of false and misleading "posts" on various social media sites, all proclaiming that the Children had been placed with Mr. Murphy as a result of the purported bribery of Georgia judicial and quasi-judicial officials.

228.   When the Children attended school in St. Thomas, they inevitably had greater and more ready access to "smart" phones and other devices able to access the Internet.  Mr. Murphy lost any ability to limit efforts by the Conflictineering Enterprise (a) to urge the Children to resist any efforts by Mr. Murphy to help them adjust to their new environment and (b) to entice the Children to engage in additional conduct potentially endangering themselves, such as another runaway incident or another incident like the "interview/kidnapping" by Defendants Beacham and My Advocate Center.

229.   As a result of these and other intentional acts by the Conflictineering Enterprise, the Children performed poorly at school, alienated students and others at the school with false claims of being held against their will by Mr. Murphy, and engaged in additional behavior harmful to themselves and others.

230.   By late September of 2014, multiple professionals recommended to Mr. Murphy that the Children needed to be placed in residential treatment, in order to begin addressing the deep psychological damage resulting from the parental alienation and other harm caused by the Conflictineering Enterprise and to terminate Michelle Murphy's highly damaging ongoing contact with the Children.

231.   In accordance with the advice of these professionals and the recommendation of the GAL, Mr. Murphy placed each of the Children in a residential boarding school that provided both (a) fully accredited academics and tutors, competitive sports programs, outdoor activities, and offsite activities, as well as (b) ongoing and systematic therapy and treatment for the Children, to address the psychological and emotional damage caused by Michelle Murphy, Defendant Farmer, and other members of the Conflictineering Enterprise.

232.   As a result of placing the Children at this residential school, Mr. Murphy incurred out-of-pocket costs of approximately $12,000 per month per

child for the facility alone, in addition to substantial travel costs and other expenses related to the Children's placement in the facility.

233.   Mr. Murphy thereafter paid for and participated in a family rebuilding program with the Children designed to address the specific psychological and emotional damage resulting from the Conflictineering Enterprise's actions.

234.   Mr. Murphy ultimately incurred approximately $200,000 in out-of-pocket costs addressing the harm to the Children by Defendant Farmer, Michelle Murphy, and the Conflictineering Enterprise.

**The Conflictineering Enterprise Contacts Numerous Media Sources in an Effort to Damage Mr. Murphy by Publishing False Stories Regarding The Child Custody Litigation.**

235.   Defendants Farmer and Beacham, together with co-conspirators Michelle Murphy, Kimberly Krautten, and David Johnson, attempted to persuade multiple media outlets to publish false stories regarding the Child Custody Litigation.  The goals of this effort were to bring pressure on Mr. Murphy to relinquish the child custody claims and pay off the Conflictineering Enterprise.

236.   In early September 2014, after being contacted by Defendant Beacham and perhaps other members of the Conflictineering Enterprise, the financial publication *FINalternatives* published an article regarding the Child Custody Litigation.

237.   Consistent with journalistic ethics, the author of the *FINalternatives* article contacted Mr. Murphy for comments on the article prior to publication.  Mr. Murphy's discussions with the *FINalternatives* journalist confirmed that Defendant Farmer and Non-Party Co-Conspirator Michelle Murphy had made numerous false statements regarding the Child Custody Litigation, Mr. Murphy, and his wife.

238.   On September 10, 2014, *FINalternatives* published an article that quoted Michelle Murphy as stating that the Children were being "held against their will" and "imprisoned" at the home of Mr. Murphy and his wife on St. Thomas. A true and correct copy of this article previously was filed as **Exhibit 20**.

239.   The *FINalternatives* article also quoted other manifestly false statements by Defendant Farmer regarding Mr. Murphy, including that he lied to the custody evaluator appointed in the Child Custody Litigation.

240.   The next week, members of the Conflictineering Enterprise succeeded in persuading the local news outlet in Newnan, Georgia, the *Newnan Times-Herald*, to publish an article regarding the Child Custody Litigation.

241.   On September 17, 2014, the *Newnan Times-Herald* published an article entitled "Coweta Mother Fights To Return Her Sons To The United States." A true and correct copy of this article (as supplemented later on September 17 by the *Newnan Times-Herald*) previously was filed as **Exhibit 21**.

242.   In the September 17, 2014 *Newnan Times-Herald* article, Defendant Farmer was quoted as stating, "How many people could stand over half a million dollars of litigation?" – an obvious reference to Mr. Murphy and his wife and their financial means.[8]  Defendant Farmer was quoted further as stating that "they picked the wrong person and the wrong lawyer."  This was yet another re-affirmation of the Conflictineering Enterprise's resolve to continue to bring unwarranted attacks on Mr. Murphy and his wife, unless and until Mr. Murphy agreed to drop his custody modification suit and pay off the Conflictineering Enterprise.

243.   The September 17, 2014 article also quoted co-conspirator Michelle Murphy as falsely stating the Children were being "imprisoned" by Mr. Murphy.

244.   Immediately after publication of the article, Mr. Murphy contacted the *Newnan Times-Herald* and supplied the pertinent court orders from the Child Custody Litigation that categorically contradict the misrepresentations made by the Conflictineering Enterprise.  Within hours, the *Newnan Times-Herald* amended the online version of the September 17 article to reflect the truth about the Child

---

[8] As noted above, Defendant Farmer subsequently demanded the payment of this same amount ($500,000) as a condition to his agreeing to Michelle Murphy even discussing the possibility of settling the Child Custody Litigation and terminating the Conflictineering Enterprise's attack on Mr. Murphy and his current wife.

Custody Litigation (including that the Children were taken away from Michelle Murphy due to her failure to comply with the court-ordered mental examination).

245.   The next day, September 18, 2014, the *Newnan Times-Herald* published a second article, entitled "Estranged Mother Refused Court-Ordered Evaluations."  A copy of this article previously was filed as **Exhibit 22**.

246.   The September 18, 2014 article noted Michelle Murphy's refusal to comply with court orders, as confirmed by the May 27, 2014 hearing at which she testified that she had not complied with the court-ordered mental examination.

**Members of the Conflictineering Enterprise Conduct "Town Hall" Meetings And Begin to Picket the State Court, All in an Escalating Effort to Pressure Mr. Murphy and the Court Relative to the Child Custody Litigation.**

247.   On September 18, 2014, Defendants Farmer, Beacham, and My Advocate Center, together with co-conspirator Michelle Murphy and others, conducted their first "town hall" meeting in Newnan, Georgia.  This event, which was publicized widely through the Conflictineering Enterprise's "social media" campaign, featured numerous false and misleading statements by Defendants Farmer and Beacham, as well as Michelle Murphy.

248.   At this meeting, Defendant Beacham repeated her narrative about her own divorce attorneys allegedly "setting her up to fail."  She claims to have "200 cases" in Atlanta and "dozens" more in Augusta, "with more and more every day

coming through the website."  In her view, these cases demonstrate that family

court professionals are "putting profit over protection."

249.   Defendant Beacham further admitted at this meeting that she agreed to

go down to the Virgin Islands to create the "secret interview" of the boys because

Michelle Murphy would be arrested for "attempted kidnapping."   Michelle

Murphy funded the costs of Defendant Beacham's trip.

250.   Consistent with her own narrative regarding Dr. King's identification

of her own serious mental health issues, Defendant Beacham defended Michelle

Murphy's refusal to submit to the court-ordered psychological examination, stating

Dr. King was a "ringer" who has thrown "hundreds of cases."  Defendant Beacham

asserted "Betty King will misdiagnose" and "write a false report."  She warned the

audience:  "Do not, under any circumstances, subject yourself to Betty King."

251.   One attendee at this meeting, "Julia," disagreed with the strategy

articulated by Defendants Farmer and Beacham that Michelle Murphy not submit

to the court-ordered psychological examination.  After identifying herself as a

"CASA" (a guardian ad litem who works with foster children who have been

removed from abusive environments), Julia stated to Defendant Farmer:  "But

here's the problem, okay, if she doesn't [go to the psychological examination] the

kids will be removed from her permanently."

252.   After Julia refused to back down on this issue, Defendant Farmer

confirmed he and the other members of the Conflictineering Enterprise were not

acting in furtherance of the legitimate objectives of the Child Custody Litigation,

but rather were "sacrificing" the interests of their own client (Michelle Murphy)

for the sake of a purported quest for a "system of justice":

| | |
|---|---|
| Mr. Farmer: | There have to be people in history that sacrifice for the rest of us. |
| Ms. Julia: | But why should she sacrifice? |
| Mr. Farmer: | It's a – why should she sacrifice? |
| Ms. Julia: | Yeah.  Why should she sacrifice and lose her kids? |
| Mr. Farmer: | Because somebody has to sacrifice. |
| Ms. Julia: | So she has to do it? |
| Mr. Farmer: | ***Somebody has to sacrifice.  If anybody doesn't sacrifice, we're not going to have a system of justice.*** |

In fact, as this colloquy and other information shows with alarming clarity,

Defendant Farmer and the other members of the Conflictineering Enterprise

are willing to sacrifice and subordinate the interests of Michelle Murphy,

their purported client – as well as the best interest of the Children at issue in

the Child Custody Litigation – to achieve the objectives of the

Conflictineering Enterprise, including payments from Mr. Murphy.

253.   On September 23, 2014, Defendants Farmer, Beacham, and My Advocate Center, together with co-conspirator Michelle Murphy, held their second "town hall" meeting in Newnan, Georgia.  Again, this meeting was replete with false accusations against Mr. Murphy, his wife, and others made by Defendants Farmer and Beacham, as well as Non-Party Co-Conspirator Michelle Murphy.

254.   During this meeting, Defendant Beacham again claimed to have given up $2 million in her prior divorce settlement in order to "buy" custody of her children.  Defendant Beacham again confirmed her intentional participation in the kidnapping scheme in which she created the "secret interview" video.  And Defendant Beacham admitted to contacting *FINalternatives* about the Child Custody Litigation, resulting in the publication of the September 10 article.

255.   On September 30, 2014, Michelle Murphy and others held a "picket" outside the Coweta County courthouse in Newnan, Georgia.

256.   On October 14, 2014, Michelle Murphy and others held another "picket" in Newnan, Georgia.

257.   On October 18, 2014, Michelle Murphy and others held a "picket" outside the offices of Mr. Murphy's trial counsel in Newnan, Georgia.

258.   Based on other postings made as part of Michelle Murphy's "social media" campaign, other picketing events were conducted in November 2014, involving Michelle Murphy, Robert Hartman, and perhaps others.

259.   All of these activities by the Conflictineering Enterprise were intended to bring additional improper pressure on Mr. Murphy and his wife to withdraw the Child Custody Litigation and capitulate to the other demands of the Conflictineering Enterprise, including the payment of substantial "attorney's fees" to Defendant Farmer.  Conversely, none of these activities furthers the legitimate goals of the Child Custody Litigation, *i.e.*, to determine custody based on the "best interest" of the Children.  To the contrary, this illegal conduct deeply poisons the environment in which Michelle Murphy proposes for the Children to live.

**Defendant Farmer And Non-Party Co-Conspirator Michelle Murphy Threaten Mr. Murphy And His Wife, Then File Another False Report of Child Abuse With The Tennessee Department of Children's Services.**

260.   Early in the morning of October 2, 2014, Michelle Murphy left a voicemail message at the Chattanooga, Tennessee home of John Murphy and his wife issuing the following threat, "We are about to bombard Chattanooga."

261.   In response to this threat, Mr. Murphy immediately filed a police report with the local authorities.

262.   In October of 2014, Defendant Farmer and Non-Party Co-Conspirator Michelle Murphy contacted the Tennessee Department of Children's Services ("TDCS"), via an interstate telephone call from Georgia and filed yet another false report of child abuse.  This false report resulted in Mr. Murphy and his wife being visited at their Chattanooga home and questioned by a representative of TDCS. This false report also resulted in Mr. Murphy incurring attorney's fees.

**Defendant Farmer Files Another Series of Frivolous Motions in the Child Custody Litigation, Leading the Trial Court to Enter an Order Requiring Him to Obtain Leave of Court Before Filing Any Further Motions.**

263.   As a result of Defendant Farmer's and Non-Party Michelle Murphy's false report to and continuing contact with the TDCS, the Conflictineering Enterprise learned that the Children had been placed in residential treatment.

264.   Immediately after learning this information, on October 6, 2014, Defendant Farmer filed yet another frivolous "Emergency" motion in the Child Custody Litigation, which again sought the disqualification of Judge Baldwin.

265.   As a result of these continuing frivolous filings and prior litigation misconduct by Defendant Farmer, the Court entered an Order on October 20, 2014, finding that "Defendant [Michelle Murphy] and her attorney [Defendant Farmer] have filed numerous motions and petitions in the above styled case.  Most of these

filings have been frivolous, malicious, vexatious and redundant."  A true and correct copy of the October 20, 2014 Order previously was filed as **Exhibit 23**.

266.    Among other things, the October 20, 2014 Order forbid Defendant Farmer from filing any further motions without the Court's permission.  Defendant Farmer instead must submit a "Request to File" attaching the proposed motion, which the Court will allow to be filed it if not "frivolous, malicious, vexatious, or redundant."  *Id.*

**The Conflictineering Enterprise's "Social Media" Campaign Disseminates Information Subjecting Mr. Murphy, Ms. Haugerud, Judge Baldwin, Mr. Murphy's Attorney, Dr. McGarrah, Ms. Harwell, and Other People Connected to The Child Custody Litigation to Hatred, Contempt, And Ridicule, or to Impairment of Their Professional or Business Reputation.**

267.    Beginning in or around August 2014 and continuing to the present, Michelle Murphy and other members of the Conflictineering Enterprise have engaged in a so-called "social media" campaign.  This social media campaign has been used to disseminate false information about Mr. Murphy, Ms. Haugerud, Judge Baldwin, Mr. Drake, Dr. McGarrah, Ms. Harwell, Dr. Betty King, Dr. Nice, and other people connected to the Child Custody Litigation. In turn, it has exposed these individuals to hatred, contempt, and ridicule, or impairment of their professional or business reputations, all in an effort by the Conflictineering Enterprise to intimidate these individuals and to bring additional pressure on Mr.

Murphy to relinquish the child custody claims, pay off the Conflictineering Enterprise,  and otherwise generate benefits to the members of the Enterprise.

268.   The false, defamatory information disseminated through the "social media campaign" includes, among numerous other statements, (1) accusations that Mr. Murphy physically and emotionally abused the Children, abuses alcohol, is prosecuting the Child Custody Litigation solely for reasons of financial gain and to the detriment of the Children, and has engaged in bribery, witness tampering, and other forms of illegal influence in the Child Custody Litigation; (2) accusations that Ms. Haugerud (Mr. Murphy's wife) has facilitated Mr. Murphy's abuse of the Children, has used the Children to secure tax advantages for her business, and has engaged in bribery, witness tampering, and other forms of illegal influence in the Child Custody Litigation; (3) accusations that Judge Baldwin has accepted bribes from Mr. Murphy and Ms. Haugerud in connection with his rulings in the Child Custody Litigation; and (4) accusations that Mr. Drake, Dr. McGarrah, Ms. Harwell, Dr. King, Dr. Nice and other people connected to the Child Custody Litigation have acted contrary to their professional responsibilities as a result of being "bought" by Mr. Murphy to wrongfully favor Mr. Murphy in the Child Custody Litigation.

269.   The defamatory posts on the Facebook page operated by the Conflictineering Enterprise are too numerous to catalog.  Over multiple months, there were at least several posts per week to the Facebook page containing false and defamatory statements.

270.   Defendant Beacham, through her front organization My Advocate Center, attempted to give these spurious accusations greater credibility by publishing them on My Advocate Center's website, www.myadvocatecenter.com. On or about September 7, 2014, for example, Defendant Beacham posted a story on My Advocate Center's website regarding the Child Custody Litigation in which she stated the Children were "purchased in Georgia with the help of certain court professionals."  Defendant Beacham further stated that the Children were "silenced by the custody experts paid to ensure the case turns out a certain way."  A true and correct copy of the September 7, 2014 post previously was filed as **Exhibit 24**.

271.   On or about September 17, 2014, Defendant Beacham posted another story on My Advocate Center's website regarding the Child Custody Litigation, in which she stated that the Children are "being held against their will" and that Mr. Murphy's wife "is actively involved in this case, and it is apparent that her millions have influence over these court professionals."  A true and correct copy of the September 17, 2014 post previously was filed as **Exhibit 25**.

272.   On or about March 13, 2015, Defendant Beacham posted another story regarding the Child Custody Litigation on the My Advocate Center website which made numerous false and defamatory statements regarding Mr. Murphy, his wife, his attorneys, Judge Baldwin, and other participants in the Child Custody Litigation.  Among other things, Defendant Beacham published:  (a) "This is how family court professionals engaged in trafficking of children ensure than their victims are never recovered."; (b) "Is it really acceptable to punish attorneys and parents for standing up to fraud and racketeering practices, fighting to save children?"; (c) "if kids are bought and sold, does it matter what they are used for?"; (d) "this mess and related damages could have been avoided if laws were upheld, ethics rules and judicial canons upheld, and if [J.M.'s] and [T.M.'s] needs had been put above the greed of child custody experts and attorneys involved"; (e) "when you force a parent to use only child custody experts who are known for abandoning abused children, falsifying reports, committing perjury, and participating in fraud, what do you expect?"; (f) "the court was using extortion tactics to force the mother to work with one of these two doctors"; and (g) "It is such a big deal to them that they block the truth from being known that they hired Atlanta law firm Kilpatrick Townsend & Stockton to ensure that the trial court was not investigated for wrongdoing and that the higher courts did not get to learn that transcripts were

incomplete and that fraud had occurred."  A true and correct copy of the March 13,

2015 post previously was filed as **Exhibit 26.**

**Michelle Murphy Stalks Mr. Murphy and His Wife When They Visit the
Children at the Residential Facility and Notifies Mr. Murphy of Defendant
Farmer's $500,000 Pay Off Demand.**

273.   As noted above, after receiving professional and other informed

advice regarding the best interest of the Children, Mr. Murphy placed them in a

residential treatment facility in late September, 2014.

274.   On November 24, 2014, Non-Party Co-Conspirator Michelle Murphy

entered the campus of the Children's residential treatment facility without

permission or authorization.  An employee discovered Michelle Murphy on the

property and observed that she was taking pictures. The employee approached

Michelle Murphy and informed her that she was not authorized to take pictures of

the property, whereupon Michelle Murphy informed him that she actually was

"filming" the property instead of taking pictures.  Michelle Murphy then pulled out

a bullhorn and began yelling to the Children, calling them by name and stating:

"This is your mother and I know you are here and I am doing everything I can to

get you out."  Michelle Murphy repeated this embarrassing outburst several times.

275.   When the employee pulled out his phone to call the police, Michelle Murphy ran to her car and sped away from the campus.  A copy of the police report regarding this incident previously was filed as **Exhibit 27.**

276.   On January 1, 2015, in connection with a birthday of one of the Children, Mr. Murphy and his wife traveled to the residential treatment center to visit with the Children.  Unbeknownst to Mr. Murphy and his wife, Michelle Murphy had spent several days waiting outside of the facility so she could confront them when they picked up the Children for the birthday celebration.

277.   Michelle Murphy followed Mr. Murphy, his wife, and the Children to a shopping mall, where she confronted them unexpectedly and demanded to be allowed to spend time with the Children.  Given Michelle Murphy's repeated acts of confrontational behavior (including her assaultive conduct towards Dr. Tony Johnson in the Newnan Target), and given the delicate status of the Children's treatment, Mr. Murphy acquiesced in Michelle Murphy's irrational demands and allowed her to visit with the Children in the presence of Mr. Murphy and his wife

278.   After Michelle Murphy had been allowed to participate in a birthday meal with the Children, Mr. Murphy and Michelle Murphy discussed possible approaches for attempting to resolve the Child Custody Litigation, including the possibility of a mediation that did not involve any attorneys.

279.   Michelle Murphy stated to Mr. Murphy that Defendant Farmer had told her she owed him $500,000 in attorney's fees and costs and that the Child Custody Litigation could not be resolved or even mediated unless Defendant Farmer was paid $500,000 by Mr. Murphy.  These and other statements by Michelle Murphy to Mr. Murphy demonstrate that Defendant Farmer was unwilling to abide by Michelle Murphy's desires relative to settlement of the case, but instead improperly was dictating whether and on what terms the Child Custody Litigation could be settled and "order" would be "restored."

**When Mr. Murphy Refuses to Pay the $500,000 Shake-Down Demand, the Conflictineering Enterprise Escalates its Defamatory Attacks to Include "Defamacasts" Broadcast by an Atlanta-Area Radio Station.**

280.   Mr. Murphy and his wife categorically rejected the demand to pay Defendant Farmer $500,000 in order to terminate the attacks of the Conflictineering Enterprise.  In response, the Conflictineering Enterprise intensified their defamatory attacks on Mr. Murphy, his wife, and the other participants in the Child Custody Litigation, including by broadcasting multiple defamatory radio programs over 92.5 The Bear, a radio station operating out of Senoia, Georgia.

281.   In January 2015 (shortly after Michelle Murphy had presented the $500,000 demand to Mr. Murphy), Defendant Beacham, through her front entity,

Defendant My Advocate Center, began disseminating a radio show known as "Pro Advocate Radio."  Defendants Beacham and My Advocate Center paid for distribution of Pro Advocate Radio over at least one traditional radio station (92.5 The Bear) and over at least one Internet radio station (Business Radio X, operating out of Buckhead, Atlanta, Georgia).

282.   Pro Advocate Radio is "hosted" by Non-Party Co-Conspirator James O'Brien and most if not all of the episodes feature Defendant Beacham as at least one of the "guests" on the show.

283.   On March 14 and 21, 2015, Defendants Beacham and My Advocate Center broadcast two Pro Advocate Radio shows over 92.5 The Bear that contained numerous defamatory statements regarding Mr. Murphy, his wife, Mr. Murphy's attorneys, and numerous other participants in the Child Custody Litigation.  The March 14 show subsequently was re-broadcast over Business Radio X on March 16, 2015, and the March 21 show subsequently was re-broadcast over Business Radio X on March 23 and March 30, 2015.

284.   Many of the defamatory statements broadcast by Defendants Beacham and My Advocate Center over Pro Advocate Radio falsely accused Mr. Murphy and others of participating in criminal acts.  Among other defamatory statements published by Defendants Beacham and My Advocate Center, the March 14 Pro

Advocate Radio show asserted (a) it was "pre-determined" the Children "would go missing and be taken permanently from their home ..."; (b) facts are "being misrepresented to the higher courts, to the Court of Appeals and to the Georgia Supreme Court"; (c) Mr. Murphy had the Children "set up to be taken"; (d) the Children "have been missing for months"; (e) the two independent psychologists appointed by the state trial court to serve as custody evaluators "were brought into this case to help traffic these [Children] out of Georgia"; (f) "the amount of fraud that has been covered up ... is significant"; and (g) "there are millions of dollars at stake in taxes that won't have to be paid if those [Children] are living in the Virgin Islands."

285.   Several of the defamatory assertions made during the March 14 broadcast were summarized at the end of the March 21 broadcast.  Among other things, the March 21 Pro Advocate Radio show again asserted that it was "definitely pre-arranged for the [Children] to be removed" from Michelle Murphy; asserted that Mr. Murphy's attorney in the Child Custody Litigation has a "very uncomfortable relationship" with the judges of Coweta County, by virtue of having served as a campaign chairperson for a sitting judge; and asserted that a transcript in the Child Custody Litigation was "altered" by court reporter Nan Freeman.

286.   In response to a defamation retraction letter written by Mr. Murphy to 92.5 The Bear, the attorney for 92.5 The Bear stated that "the content and the facts alleged during the Shows" had been reviewed by none other than the chief architect of the Conflictineering Enterprise, Defendant Farmer, prior to the airings of the shows and had been "verified by him to be truthful and accurate."

287.   Defendants Beacham and My Advocate Center also recorded a show in which Defendant Farmer and Michelle Murphy were interviewed.  This coordinated activity confirms the active, extensive, and continuous involvement of Defendants Beacham and My Advocate Center in the Conflictineering Enterprise.

**Defendant Farmer Moves to Disqualify The Newly-Appointed Judge to The Child Custody Litigation, Confirming That The True Objective of The Conflictineering Enterprise is a Pay Off Rather Than a Prompt Resolution of The Custody Issues.**

288.   Mr. Murphy filed the Child Custody Litigation in April of 2012. Since that time, Defendant Farmer has engaged in every possible tactic to delay and obstruct the proceedings.  Among other things, Defendant Farmer filed at least 20 different motions to disqualify Judge Baldwin.

289.   On February 9, 2015, Judge Baldwin voluntarily recused himself from the Child Custody Litigation under Georgia Superior Court Rule 25.7 (pursuant to which a recusal is neither an admission nor a denial of any of the allegations raised

in a motion to recuse).[9]  Thereafter, on February 11 and February 19, the remaining judges of the Coweta Judicial Circuit also voluntarily recused themselves from the Child Custody Litigation.

290.   On March 19, 2015, the parties received notice that Senior Judge William S. Ison had been appointed to preside over the Child Custody Litigation and had scheduled a hearing for May 18, 2015.

291.   Despite the fact that Michelle Murphy had filed multiple purported "Emergency Motions" in the Child Custody Litigation that had not been adjudicated, and despite the fact that the Children had been removed from the custody of Michelle Murphy on May 27, 2014 (almost ten months earlier), Defendant Farmer did not accept Senior Judge Ison's appointment and allow the Child Custody Litigation to move forward as promptly as possible.

292.   Instead, on the evening of March 26, 2015, Defendant Farmer, on behalf of Michelle Murphy, filed a 179-page motion to disqualify Senior Judge Ison.  On March 30, 2015, before Mr. Murphy had an opportunity to respond to the motion to disqualify, Judge Ison voluntarily recused himself from the litigation.

---

[9] Moreover, upon information and belief, the Judicial Qualifications Commission of Georgia has investigated Defendant Farmer's complaint against Judge Baldwin thoroughly, determined that no violation of the Code of Judicial Conduct occurred, and dismissed Defendant Farmer's complaint in its entirety.

293.   The net result of Defendant Farmer moving to disqualify Judge Ison in the Child Custody Litigation was to further delay a simple custody case filed over three years ago.  No rational actor seeking the best interests of the Children would obstruct and delay resolution of the proceedings on a such a serial basis.

294.   Defendant Farmer's March 26, 2015 motion to disqualify Judge Ison confirms that the true goals of the Conflictineering Enterprise have nothing to do with the best interests of the Children.  Instead, the goal of the Conflictineering Enterprise is to elicit another large "pay off" from Mr. Murphy and his wife to Defendant Farmer, just as Defendant Farmer elicited years earlier in the Dee Crouch litigation.

295.   In fact, on page 45 of the motion to disqualify Judge Ison, Defendant Farmer states as follows with respect to Mr. Murphy's wife:  "Renee L. Haugerud is the person who primarily settled the malpractice case that was brought against Delia Tedder Crouch and who could settle this case."  *See* Mot. to Disqualify Senior Judge William Ison, at 45 (excerpts previously filed as **Exhibit 28**).

296.   In other words, and consistent with Defendant Farmer's motion to disqualify the newly-appointed judge in the Child Custody Litigation, the goal of the Conflictineering Enterprise is a "settlement" that yields a large payment of attorney's fees to Defendant Farmer and other benefits to the Conflictineering

Enterprise, without regard to the bests interests of the Children or even the client,

Michelle Murphy.

297.   On April 15, 2015, Senior Judge E. Byron Smith was appointed to be

the new judge in the Child Custody Litigation.  On May 11, 2015, Judge Smith

issued an Order scheduling a status conference in the Child Custody Litigation for

June 10, 2015.

**At the June 10, 2015 Status Conference, Judge Smith Orders Michelle Murphy And All Connected to Her to Remove All Social Media Regarding the Child Custody Litigation and Orders a Final Report from the Guardian Ad Litem, After Which Michelle Murphy Allegedly Attempts to Commit Suicide.**

298.   During the status conference on June 10, 2015, Judge Smith orally

granted a motion by Mr. Murphy to enjoin Michelle Murphy from publishing

information regarding the Child Custody Litigation, the Children, Mr. Murphy, or

his wife on the Internet.  Tr. (**Exhibit 39**), at 39 ("I'm going to stop the

Facebook."); *id.* at 50-51 ("Social media.  I am going to grant that motion."); *id.* at

52 ("I don't want any more of this [social] media mess.  I think that's horrible.").

Judge Smith subsequent entered a "Social Media Order" precluding Michelle

Murphy, Defendant Farmer, and any other person "acting on her behalf or in

concert with her" (such as Defendant Beacham) from posting any information

regarding the Child Custody Litigation, Mr. Murphy, his wife, or the Children on

the Internet.  A copy of the Social Media Order is attached as **Exhibit 40**.

299.   Defendant Beacham has refused to remove the highly defamatory articles regarding the Child Custody Litigation from My Advocate Center's website, despite counsel for Mr. Murphy providing notice of the Social Media Order to counsel (in this action) for Defendants Beacham and My Advocate Center.  *See* Letter from Taylor Drake to Mary Helen Moses (July 29, 2015) (copy without exhibits attached as **Exhibit 41**).  By virtue of the filing and service of this Amended Complaint with Exhibits (including the Social Media Order) on their counsel in this action, Defendants Beacham and My Advocate Center now are on formal notice of the Social Media Order entered in the Child Custody Litigation.

300.   Judge Smith also ordered the Children's GAL (Lisa Harwell) to prepare and publish a final report and recommendation as to permanent custody of the Children to the Court.

301.   The June 10, 2015 status conference with Judge Smith ended at approximately 11:30 a.m.  Around 8:45 that evening, officers from the Coweta County Sheriff's Office were called to Michelle Murphy's home to investigate an attempted suicide.  A copy of the "Incident Report" for this event is attached as **Exhibit 42**.

302.   According to the narrative section of the Incident Report, Michelle Murphy had been observed laying in the driveway of her house with "recent

lacerations to her wrist" that apparently were "still bleeding."  *See* Incident Report, at 3.  When the person who spotted her attempted to help her, Michelle Murphy went inside the garage and told him to "leave her alone," at which point he called the police.  *Id.*

303.   When the police arrived, they found the residence where Michelle Murphy would have the Children live "appeared to have been ransacked," with furniture overturned and other household items "strewn about the residence."  *Id.* After Michelle Murphy failed to answer the door, the deputies entered the house through an open window and discovered her "laying on the floor of the garage with self-inflicted lacerations to her wrists."  *Id.*  The officers discovered "[n]umerous notes" discussing the custody dispute as the "reason for her actions."  *Id.*

304.   The officers identified a "dagger" as well as a "Smith and Wesson Ladysmith .38 Special Serial # CFH0809 and a bag of bullets" on the couch of the residence.  *Id.*  Another knife was located on the kitchen counter, and Michelle Murphy's cellphone was discovered with a "shattered screen."  *Id.*  The weapons and other items were seized, and Michelle Murphy was taken to Piedmont Newnan hospital for "medical treatment and evaluation."  *Id.*

305.   On June 15, 2015, after receiving a copy of the Incident Report, Mr. Murphy's counsel in the Child Custody Litigation wrote Defendant Farmer and

demanded that he secure immediate psychological help for Michelle Murphy.  A copy of this letter is attached as **Exhibit 43**.

306.   In response, Defendant Farmer cavalierly dismissed these serious concerns with his client's stability as "[a]nother of the John Harold Murphy attempts to create false reports about Michelle Murphy."  *See* E-mail from Defendant Farmer to the Children's GAL and all counsel (**Exhibit 44**).  According to Defendant Farmer, Michelle Murphy "did not attempt to commit suicide," but rather "suffered a fall on the concrete walk when she tripped over the hose."  *Id.*

307.   Defendant Farmer asserted he could not be troubled to investigate the matter further:  "I am attempt [*sic*] to answer your client's  RICO Complaint and Bar Complaint and do not have the time to deal with your client's attempt to fabricate another of his retaliatory acts."  *Id.*

308.   Mr. Murphy thereafter received copies of photographs taken by the law enforcement officers investigating Michelle Murphy's suicide attempt as well as video of the scene recorded by the officers at her residence. Copies of two pictures of suicide notes found on the scene and recovered by law enforcement officers are attached as **Exhibit 45**.  These pictures (as well as the video taken at the scene) confirm that the very serious incident at Michelle Murphy's residence

on June 10, 2015, did not involve Michelle Murphy inadvertently tripping over a hose in her yard, as suggested by Defendant Farmer.

**Defendant Beacham Files an Amended Complaint in *Pro Se* Litigation Regarding the Foreclosure of Her Residence, Demanding "Restitution" from Mr. Murphy for Interfering with Her Scheme to Defraud.**

309.   At the same time Defendant Beacham has been operating My Advocate Center as a scheme to defraud family law litigants, "sponsors," and others, she has litigated multiple lawsuits against her attorneys in her divorce action and also commenced *pro se* litigation challenging the foreclosure of her residence.

310.   In 2012, Defendant Beacham filed a *pro se* malpractice action against her divorce attorneys.  *Deborah L. Beacham v. Alembik, Fine & Callner, P.A.*, Civ. A. No. 2012-cv-211671 (Ga. Super. Ct., Fulton Cnty. filed Fed. 20, 2012).  This action apparently was dismissed without prejudice and closed on May 31, 2012.

311.   Defendant Beacham then re-filed litigation against her divorce attorneys a few months later, omitting the malpractice claims but asserting claims for breach of fiduciary duty and fraud.  *Deborah L. Beacham v. Alembik, Fine & Callner, P.A.*, Civ. A. No. 2012-CV-221561 (Ga. Super. Ct., Fulton Cnty. filed Sept. 14, 2012).  Based on filings from this action posted by Defendant Beacham

on the Internet, it appears Defendant Beacham omitted the malpractice claims to avoid having to submit the affidavit required by O.C.G.A. § 9-11-9.1.

312.   As with Defendant Beacham's initial malpractice action, her divorce attorneys moved to dismiss her second action against them.

313.   Judge Henry M. Newkirk granted the motion to dismiss on November 19, 2012.  Defendant Beacham appealed *pro se* to the Georgia Court of Appeals, which affirmed the dismissal in an unpublished decision on November 15, 2013. Ga. Ct. App. No. A13A1235.  Defendant Beacham filed a Motion for Reconsideration that was denied on December 11, 2013, then moved to file a second Motion for Reconsideration, which the Court of Appeals denied.

314.   Defendant Beacham's Petition for Certiorari to the Georgia Supreme Court was denied on June 16, 2014.  Ga. S. Ct. No. S14C0616.  Her motion for reconsideration of the denial of certiorari also was denied.

315.   In the meantime, Defendant Beacham attempted to file yet another lawsuit against her lawyers in Fulton County Superior Court, this time alleging a claim for breach of contract.  *Deborah L. Beacham v. Alembic, Fine & Callner*, Civ. A. No. 2014-CV-245276 (filed Apr. 18, 2014).  Judge Newkirk dismissed this case with prejudice on August 4, 2014.

316.   In 2015, Defendant Beacham initiated another *pro se* action challenging the foreclosure of her residence. *Deborah L. Beacham v. Seterus, Inc., Bank of America, and Brock & Scott PLLC*, Civ. A. No. 2015-CV-255583 (Ga. Super. Ct., Fulton Cnty. filed Jan. 6, 2015).

317.   On May 6, 2015, Defendant Beacham filed a *pro se* federal action again challenging the foreclosure of her residence.  *Deborah L. Beacham v. Seterus, Inc., et al.*, No. 1:15-CV-01608-WSD (N.D. Ga. filed May 6, 2015).  All of the Defendants moved to dismiss this action.

318.   On July 24, 2015, Defendant Beacham filed an Amended Complaint in her federal litigation challenging the foreclosure.  This lengthy filing, which appears to borrow heavily from Mr. Murphy's RICO allegations in this case, asserts a broad-reaching "Family Court Enterprise" encompassing numerous litigants, attorneys, and court professionals.  Excerpts from Defendant Beacham's Amended Complaint are attached as **Exhibit 46**.

319.   Defendant Beacham's Amended Complaint in the foreclosure action identifies more than a dozen family law cases in which she claims some form of corruption occurred, including the Child Custody Litigation and the *Domenicone* case referenced above.  *See id.* at pages 16-33.  These matters presumably constitute other cases in which Defendants Beacham and My Advocate Center

have become involved and disseminated false accusations in order to bring illicit public pressure on family court litigants and professionals to relinquish valid claims or otherwise capitulate to illegitimate demands.

320.   Defendant Beacham purports to assert various claims against Mr. Murphy in her Amended Complaint.  Count V of the Amended Complaint, entitled "Tortious Interference With Existing Contractual Relations," confirms that Defendant Beacham, as with the other members of the Conflictineering Enterprise, expects a payment from Mr. Murphy to terminate her dissemination of false statements regarding him, his wife, and the Child Custody Litigation.

321.   According to the Amended Complaint, at the time she joined the Conflictineering Enterprise, Defendant Beacham was "building revenue streams and sponsorships for My Advocate Center and Pro Advocate Radio."  Am. Compl. ¶ 90.  "[T]his is Ms. Beacham's business and livelihood."  *Id.*

322.   Defendant Beacham then alleges Mr. Murphy "intentionally and maliciously interfered with Ms. Beacham's contractual relationships supporting this business and radio show and Ms. Beacham's ongoing relationships in the professional community" and "intended to cause damage to Ms. Beacham's ability to bring in sponsorships and investors, to her ability to earn income through consulting, and to her ability to support[] other families in need by threating the

radio stations she is contracted with and by emailing outrageous and frivolous allegations to the station owners Ms. Beacham is relying on for the success of her business and funding plans." *Id.* ¶¶ 91, 93; *see also id.* ¶ 95.

323.   Defendant Beacham concludes this frivolous claim by demanding "restitution" from Mr. Murphy for interfering with her operation of My Advocate Center as a scheme to defraud:  "Defendant J Murphy has dishonestly claimed that he is damaged, but continues to spend hundreds of thousands of dollars to cause harm to Ms. Beacham, her business and business relationships, and can afford to feed his willful intentions to retaliate against anyone attempting to expose this enterprise or to rescue the boys who have repeatedly asked for help in dealing with his abuse. *If J Murphy can afford all of these law firms, the public relations expert, several private investigators and the psychiatric lockdown facility, then he can afford to pay restitution to Ms. Beacham*." *Id.* ¶ 96 (emphasis added).

324.   On August 3, 2015, Defendant Beacham filed hundreds of pages of additional material in her *pro se* foreclosure action, including yet another Amended Complaint.  Although time constraints preclude a full review of these voluminous materials, Defendant Beacham demands "immediate relief in the amount of $150,000.00," as well as "[s]pecific financial relief" of "$2,000,000.00," from Mr. Murphy. *See Beacham v. Seterus, et al., supra*, Dkt. 17-1, at 54, 57, 66.

325.   These allegations confirm that Defendants Beacham and My Advocate Center agreed with both objectives of the Conflictineering Enterprise: (1) to bring undue and illicit pressure on Mr. Murphy to abandon his legitimate claims in the Child Custody Litigation, without regarding to the "best interests" of the Children; and (2) to secure the payment of money from Mr. Murphy and his wife as well as other benefits in exchange for terminating the dissemination of false statements regarding Mr. Murphy, his wife, and the Child Custody Litigation.

326.   Even apart from this direct demand for payment, Defendant Beacham also joined the Conflictineering Enterprise to increase the profile and media coverage of Defendant My Advocate Center, in an effort to increase the sponsorships and "client" fees that go directly to her own pocket.

327.   Defendants Beacham and My Advocate Center have appeared publicly with Defendant Farmer to increase the profile of My Advocate Center and enhance the false perception that members of the Conflictineering Enterprise are legitimate activists.  On May 2, 2015, Defendants Beacham and Farmer were speakers at the Athens Human Rights Festival, with Defendant Farmer identified as an "Activist Attorney."  *See* Schedule of Events attached as **Exhibit 47**.

## COUNT I: GEORGIA RICO
### (Against All Defendants)

328.   Mr. Murphy incorporates by reference paragraphs 1 - 327 of this Amended Complaint as if set forth in full.

329.   The RICO Defendants and Non-Party Co-Conspirators comprised an enterprise and participated in the enterprise, either directly or indirectly, through a pattern of racketeering activity.  Consequently, the RICO Defendants and Non-Party Co-Conspirators have violated O.C.G.A. § 16-14-4(b).

### *Enterprise*

330.   The RICO Defendants and Non-Party Co-Conspirators constitute an enterprise as they are a group of individuals or entities associated in fact because they had (a) a common purpose – to pressure Mr. Murphy to relinquish his claims in the Child Custody Litigation and to extract extortionate payments and other benefits in order to terminate the illegal actions of the Conflictineering Enterprise; (b) relationships among those associated with the enterprise; and (c) longevity sufficient to permit the RICO Defendants and Non-Party Co-Conspirators to pursue the enterprise's purpose over the course of several years.

331.   While Defendant Farmer is the architect of the Conflictineering Enterprise, each RICO Defendant is associated with the Enterprise because each RICO Defendant knowingly engaged in or aided and abetted the Enterprise's

racketeering activities.  Each RICO Defendant has participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

### *Racketeering Activity: Predicate Acts*

332.    The RICO Defendants and Non-Party Co-Conspirators have engaged in predicate acts that constitute "racketeering activity" under the Georgia RICO statute, *see* O.C.G.A. § 16-14-3(8).  Among other criminal acts, the RICO Defendants and Non-Party Co-Conspirators engaged in attempted theft by extortion (O.C.G.A. § 16-8-16); attempted bribery (O.C.G.A. § 16-10-2); attempted intimidation of witnesses and court personnel (O.C.G.A. §§ 16-10-93 and 16-10-97); attempted manufacturing of evidence and filing of false documents (O.C.G.A. § 16-10-20.1); and interference with custody (O.C.G.A. § 16-5-45). The RICO Defendants and Non-Party Co-Conspirators also have engaged in crimes that are chargeable under the laws of the United States or of the several states and are punishable by imprisonment for more than one year, including interstate travel and kidnapping for extortion (18 U.S.C. § 1201, 18 U.S.C. § 1952, and 14 V.I.C. § 1052); filing of false reports of child abuse (T.C.A. § 37-1-413, 14 V.I.C. § 2146(e), and 18 U.S.C. § 1343; and mail and wire fraud (18 U.S.C. § 1341 and 1343.

**Georgia RICO Racketeering Act No. 1:  Attempted Theft by Extortion**
**(O.C.G.A. § 16-8-16)**

333.   All Defendants, together with other members of the Conflictineering

Enterprise as described herein, have attempted to commit the offense of theft by

extortion in violation of O.C.G.A. § 16-8-16, by unlawfully seeking to obtain

payments and other property of or from Mr. Murphy, including Mr. Murphy's

relinquishment of his claims in the Child Custody Litigation and the payment of

excessive attorney's fees.  Among other acts, Defendants and other members of the

Conflictineering Enterprise committed and threatened to commit multiple criminal

offenses; accused multiple people of criminal offenses; disseminated information

tending to subject people to hatred, contempt, and ridicule, or to impairment of the

person's credit or business reputation(s); and attempted to cause a public official to

take or withhold action.

334.   With respect to the actual and threatened commission of criminal

offenses, Defendants Farmer and King, together with Michelle Murphy and other

members of the Conflictineering Enterprise have committed, attempted to commit,

and threatened to continue to commit the criminal offenses of influencing

witnesses, bribery, interference with custody, the filing of false child abuse reports,

and the filing of false documents.  The factual bases for these crimes is outlined

above and further explained below.

335.   Defendant Farmer, Michelle Murphy, and other members of the Conflictineering Enterprise also have committed the crime of reckless conduct in violation of O.C.G.A. § 16-5-60 by endangering the bodily safety of the Children by consciously disregarding a substantial and unjustifiable risk that their acts or omissions will cause harm or endanger the safety of the Children.  Their disregard for the safety of the Children constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.  Moreover, their reckless conduct was done for the purpose of  unlawfully seeking to obtain payments and other property of or from Mr. Murphy, including Mr. Murphy's relinquishment of his claims in the Child Custody Litigation and the payment of excessive attorney's fees.

336.   As explained above, Michelle Murphy, at the direction and approval of Defendant Farmer and with the collaboration of other members of the Conflictineering Enterprise, through their public Facebook page and social media campaign, deliberately and recklessly identified the Children as highly-attractive targets for would-be kidnappers and provided all the information needed to execute a kidnapping of the Children.

337.   In addition, at the direction of Michelle Murphy, T.B. enticed the Children to engage in a number of delinquent and criminal acts that were a direct

endangerment to the Children's safety and wellbeing, including urging the

Children to steal alcoholic beverages and consume them covertly, obtaining and

providing marijuana and cigars to smoke with the Children, persuading the

Children to purchase and manufacture their own marijuana pipes, and helped the

Children roll "blunts," consisting of marijuana mixed with cigar tobacco.  Michelle

Murphy directed T.B. to entice the Children to engage in these delinquent and

criminal acts for the purpose of manufacturing false evidence that Mr. Murphy was

abusing the Children so the Conflictineering Enterprise could raise false claims of

child abuse against Mr. Murphy.

338.   As explained above, Defendant Farmer and Michelle Murphy, also

recklessly endangered the bodily safety of the Children by enticing them to run

away from Mr. Murphy.

339.   As explained above, Defendants Farmer, Beacham, and My Advocate

Center, together with Michelle Murphy and other members of the Conflictineering

Enterprise, have utilized their "social media campaign" and other media outlets to

disseminate information about Mr. Murphy, Ms. Haugerud, the Court, Mr. Drake,

Dr. McGarrah, Ms. Harwell, Dr. King, Dr. Nice, and other individuals connected

to the Child Custody Litigation that would tend to subject those people to hatred,

contempt, and ridicule, or to impairment of their professional or business reputation(s), or accuse them of criminal offenses.

340.   Members of the Conflictineering Enterprise also have published many defamatory statements about Mr. Murphy and his wife on social media and other websites, and have delivered these falsehoods to people and organizations associated with Mr. Murphy and his wife or their business, to further defame them.

341.   On September 10, 2014, Defendant Beacham, Defendant Farmer, Non-Party Co-Conspirator Michelle Murphy, and possibly other members of the Conflictineering Enterprise supplied false, defamatory information about Mr. Murphy and his wife to a financial publication entitled *FINalternatives*, in a malicious effort to harm their business reputations.  Based upon the information supplied by the Conflictineering Enterprise, *FINalternatives* published an article entitled, "Prominent Hedgie Renee Haugerud [Mr. Murphy's wife] Embroiled in Ugly Child Custody Battle."

342.   In addition to other false, defamatory information, the *FINalternatives* article quoted Michelle Murphy as stating that the Children were being "held against their will" and "imprisoned" at the home of Mr. Murphy and his wife in St. Thomas, USVI.  The *FINalternatives* article also quoted Defendant Farmer as

making untrue accusations toward Mr. Murphy, including that he lied to the custody evaluator in the Child Custody Litigation.

343.   Members of the Conflictineering Enterprise also have disseminated information tending to subject Dr. Nice to hatred, contempt, and ridicule, or to impairment of her personal or business reputation through the Child Custody Litigation proceedings.  Following the August 13, 2013 hearing in the Child Custody Litigation, at which Dr. Nice testified truthfully about her serious concerns for the Children and with Michelle Murphy's parenting conduct, Defendant Farmer improperly disclosed highly personal information about Dr. Nice's alleged prescription substance use issue many years ago, which he had learned during his prior representation of Dr. Nice.

344.   Defendant Farmer also falsely accused Dr. Nice of currently engaging in professional and illegal misconduct, including being "under the influence of a controlled substance" while "presenting false testimony and exhibiting erratic behavior."  Defendant Farmer disclosed this information and made these false accusations to harm Dr. Nice's personal, professional, and business reputation and to intimidate her as a witness in the Child Custody Litigation.

345.   These acts were undertaken in an effort to place illicit pressure on Mr. Murphy to abandon his claims in the Child Custody Litigation and to obtain

extortionate payments from Mr. Murphy and other benefits in exchange for

stopping the criminal activity, ending the "chaos," and restoring "order."

### Georgia RICO Racketeering Act No. 2:  Attempted Bribery
### (O.C.G.A. § 16-10-2)

346.   Defendant Farmer, aided and abetted by Defendants Larry King and

Larry King, P.C., attempted to bribe Judge Baldwin in violation of O.C.G.A. § 16-

10-2, by offering to dismiss the lawsuit against Ms. Freeman commenced by

Defendants Farmer, King, and Larry King, P.C. in exchange for Judge Baldwin's

agreement to recuse himself from the Child Custody Litigation and to make his

recusal retroactive so that his prior ruling giving Mr. Murphy temporary custody of

the Children would be nullified.

347.   As set forth above, at the conclusion of the hearing on May 27, 2014,

the Court awarded sole temporary custody of the Children to Mr. Murphy.

348.   In June of 2014, despite having a copy of the transcript from the

hearing as well as access to the audio recording of the hearing, Defendant Farmer

sent multiple threatening e-mails demanding that Ms. Freeman, the court reporter,

send Defendant Farmer the audio recording of the hearing.

349.   Ultimately, Defendants Farmer and King filed a lawsuit on behalf of

Michelle Murphy against Ms. Freeman, her business, Freeman Reporting, Inc., and

other individuals.  In addition to declaratory, injunctive, and other relief, the

lawsuit sought punitive damages against Ms. Freeman.

350.   Defendants Farmer and King were well aware of Ms. Freeman's

longstanding professional relationship with Judge Baldwin.  The baseless lawsuit

against Ms. Freeman was filed as a transparent attempt by Defendants Farmer and

King to gain leverage over Judge Baldwin, to intimidate Ms. Freeman (Judge

Baldwin's court reporter), and for other improper purposes.

351.   After filing the lawsuit against Ms. Freeman, Defendant Farmer

contacted Ken Gordon, Ms. Freeman's attorney in that lawsuit.  Defendant Farmer

told Mr. Gordon that he would dismiss his lawsuit against Ms. Freeman and her

business, if, in exchange, Ms. Freeman would convince Judge Baldwin to recuse

himself from the Child Custody Litigation and make such recusal retroactive to the

ruling awarding temporary custody of the Children to Mr. Murphy.

352.   By offering to give Judge Baldwin relief from having Ms. Freeman,

his own professional court reporter, subjected to a stressful, expensive and

vexatious lawsuit she could not afford, Defendant Farmer, aided and abetted by

Defendant King, acted with the purpose of influencing Judge Baldwin in the

performance of his official functions as the judge in the Child Custody Litigation.

- 124 -

**Georgia RICO Racketeering Act No. 3:  Intimidation of Court Officer
(O.C.G.A. § 16-10-97)**

353.   Ms. Freeman, as the court reporter in the Child Custody Litigation, is an officer of the court pursuant to O.C.G.A. § 16-10-97(b).

354.   Judge Baldwin, as the judge presiding over the Child Custody Litigation at all times pertinent to this Amended Complaint, is an officer of the court pursuant to O.C.G.A. § 16-10-97(b).

355.   The e-mails sent to Ms. Freeman by Defendant Farmer after the May 27, 2014 hearing were threatening actions and communications, causing the Court to enter an Order giving Defendant Farmer access to the audio recording of the May 27, 2014 hearing, even though the Court found that Defendant Farmer was not legally entitled to them.

356.   The lawsuit Defendant Farmer and King filed against Ms. Freeman, her business, and others was an additional threatening action and communication.

357.   The threatening e-mails and lawsuit were made by Defendants Farmer and King for the illegal purpose of intimidating or impeding Ms. Freeman in the discharge of her duties as the court reporter in the Child Custody Litigation.

358.   In addition, as demonstrated by Defendant Farmer's attempt to bribe the Court, the threatening e-mails and lawsuit were made by Defendants Farmer

and King for the illegal purpose of intimidating or impeding Judge Baldwin in the discharge of his duties as the judge presiding over the Child Custody Litigation.

359.   Likewise, Ms. Harwell, as the GAL for the Children in the Child Custody Litigation, is an officer of the court pursuant to O.C.G.A. § 16-10-97(b).

360.   Defendants Farmer and King made multiple untrue and highly inflammatory accusations involving Ms. Harwell's personal and professional reputation in their multiple motions to disqualify Ms. Harwell.  Other members of the Conflictineering Enterprise published such allegations on the Internet.  All of these false accusations against Ms. Harwell were made with the intent of intimidating and deterring Ms. Harwell from testifying freely, fully, and truthfully and otherwise functioning professionally as the Children's GAL in the Child Custody Litigation.

### Georgia RICO Racketeering Act No. 4:  Influencing Witnesses (O.C.G.A. § 16-10-93)

361.   Defendant Farmer and Michelle Murphy also influenced or attempted to influence witnesses in violation of O.C.G.A. § 16-10-93, by threatening harm or damage to the property or employment of witnesses in the Child Custody Litigation, including but not limited to Dr. Nice, Dr. McGarrah, Dr. Johnson, Ms. Harwell, and Mr. McLendon, with the intent of deterring these witnesses from testifying freely, fully, and truthfully in the Child Custody Litigation.

362.   In addition to these incidents, Defendants Farmer and Michelle Murphy attempted to influence Mr. Murphy in connection with the incident in which J.M. ran away from Mr. Murphy's residence, by coaching J.M. to elicit litigation concessions from Mr. Murphy in exchange for revealing his location and otherwise terminating the ongoing threat to J.M.'s personal safety.

### Intimidation of Dr. Nice

363.   Defendant Farmer committed the offense of influencing witnesses against Dr. Nice, the psychiatrist whom Defendant Farmer actually demanded become involved in the Child Custody Litigation.

364.   In 2012, when the Court requested the input of Dr. Johnson (the Children's treating psychologist) as to a custody evaluation, Defendant Farmer insisted that Dr. Nice also needed to be involved.

365.   Defendant Farmer did not disclose to the court or to Mr. Murphy's counsel that he previously had represented Dr. Nice as her attorney and that he had not charged Dr. Nice for his services as her attorney.  Instead of charging Dr. Nice for his services, Defendant Farmer believed he had a *quid pro quo* arrangement with Dr. Nice, such that she would provide her professional services at no charge in matters involving certain of his clients.  Thus, upon information and belief, Defendant Farmer believed he had engineered a situation in which the testifying

professional in his legal matters was a former client, indebted and "owing him one."

366.   In connection with Defendant Farmer's representation of Dr. Nice as her attorney, Defendant Farmer became aware of the existence and details of the temporary suspension of Dr. Nice's Physician and Surgeon License by the State of Illinois many years prior.

367.   Dr. Nice testified at hearings during the Child Custody Litigation on November 15, 2012 and August 13, 2013.  Prior to each hearing and despite resistance from Dr. Nice, Defendant Farmer contacted Dr. Nice to confirm his belief that Dr. Nice would support his client, Michelle Murphy, and her position in the Child Custody Litigation.

368.   Dr. Nice informed Defendant Farmer during these pre-hearing meetings that she found it difficult to support Michelle Murphy's position for several reasons, including at least the following: (a) Michelle Murphy's failure to keep appointments for herself and the Children, such that gaps in their treatment existed and their mental-health progress had been hampered; and (b) Dr. Nice believed Michelle Murphy was in need of psychiatric or other professional treatment.

369.   Defendant Farmer refused to accept Dr. Nice's independent professional opinions and her view of the facts.

370.   Aware of Defendant Farmer's tactics, Dr. Nice reasonably feared that if she provided testimony contrary to the interest of Defendant Farmer, he would "destroy" her publicly, professionally and personally.

371.   While Defendant Farmer's intimidation influenced Dr. Nice's testimony at the November 15, 2012 hearing, because of her concerns regarding Michelle Murphy and the welfare of the Children together with her own professional responsibilities, Dr. Nice refused to suppress evidence and opinion at the August 13, 2013 hearing.

372.   Specifically, Dr. Nice formed to view that Michelle Murphy and her behavior with the Children generated issues that, in her professional judgment, required attention from medical professionals trained in the troubling issues presented by Michelle Murphy's relationship with the Children.  Dr. Nice also expressed her opinion to the Court that a full custody evaluation needed to be conducted, that the Children needed continuing care, that Michelle Murphy needed imminent professional care, and that the Children would benefit from a change in primary custody to Mr. Murphy.

373.   Defendant Farmer, by his own admission, reached out to the "Illinois Medical Licensing Board" for information about Dr. Nice's license status "days *before* the hearing" at which Dr. Nice rendered the opinions that were unfavorable to Defendant Farmer and his client's position.  *See* Aug. 19, 2013 Mot. to DQ, at 22 (emphasis added).

374.   In the wake of the August 13, 2013 hearing, and in light of Dr. Nice having testified truthfully regarding her serious concerns with the Children and Michelle Murphy's parenting conduct, Defendant Farmer  publicly disclosed the highly personal information, which he had learned during his prior representation of Dr. Nice.

375.   Specifically, Defendant Farmer filed a series of briefs – the August 19 Motion, the August 28 Amendment, and the September 13 Addendum – in order to personally attack and abuse her in retaliation for her truthful testimony that was not favorable to his client.  In these filings, Defendant Farmer characterizes his former client (and the same professional whose involvement in the case he himself insisted upon) as:   "…an expert witness for John Murphy [which she was not] who most likely was experiencing the effects of substance abuse just before her testimony"; "…appear[ing] to be under the influence of a controlled substance to the extent that the witness was presenting false testimony and exhibiting erratic

behavior"; "the substance abusing psychiatrist"; "…a psychiatrist who has a history of being a substance abuser and who has been called a 'pill pusher'";  "The Substance Abusing Psychiatrist, Expert Witness for John Harold Murphy"; and as "...Dr. Patricia Nice, who has a long history of substance abuse as a member of the medical profession…"

### Intimidation of Dr. McGarrah

376.   Defendant Farmer also improperly influenced Dr. McGarrah, the psychologist appointed by the court on August 23, 2013 to perform the custody evaluation of Mr. Murphy and Michelle Murphy that the Court also ordered.

377.   In September 2013, following the August 23, 2013 Order appointing Dr. McGarrah, Defendant Farmer sent two intimidating letters to Dr. McGarrah, attacking her personally and professionally.  Among other things, Defendant Farmer accused Dr. McGarrah of professional misconduct, asked Dr. McGarrah inappropriate questions regarding the pleadings in the case, and threatened to contact the APA Ethics Committee regarding "the ethical restraints of [Dr. McGarrah's] discipline."

378.   Mr. Murphy and Ms. Haugerud complied with the August 23, 2013 and were evaluated by Dr. McGarrah.  At the direction of Defendant Farmer, however, Michelle Murphy refused to comply with the Order by refusing to allow

Dr. McGarrah to evaluate her.  Consequently, the court held a hearing on March 17, 2014 to hear testimony and argument regarding Michelle Murphy's compliance with the August 23, 2013 Order.

379.   Dr. McGarrah appropriately and accurately testified at the March 17, 2014 hearing that Michelle Murphy refused to participate in the custody evaluation.

380.   One day after the March 17, 2014 hearing, displeased with Dr. McGarrah's testimony having been unfavorable to his client, Defendant Farmer sent Dr. McGarrah yet another letter manifestly intended to intimidate her.

381.   Even though Defendant Farmer knew at that time that Dr. McGarrah was represented by counsel, Defendant Farmer delivered this letter directly to Dr. McGarrah and merely copied her counsel.

382.   Despite the August 23, 2013 Order commanding the parties to cooperate fully with the custody evaluation, and notwithstanding the Court having ordered Michelle Murphy to submit to the Rule 35 mental examination, Defendant Farmer's March 18, 2014 letter  to Dr. McGarrah stated explicitly that Michelle Murphy would not sign any of the documents necessary for Dr. McGarrah's office to conduct any examination, further stating that Michelle Murphy would not

"participate in any examination that you deem provides you with any immunity from liability whether by statute or contract."

383.   The clear import of Defendant Farmer's threat to Dr. McGarrah was that (a) Dr. McGarrah would be sued if she issued any type of opinion adverse to Michelle Murphy and (b) Defendant Farmer would claim his March 18, 2014 letter effectuated a waiver of her statutory immunity in any such litigation.

384.   Additional threatening language in Defendant Farmer's letter confirmed this overt attempt to intimidate Dr. McGarrah:  "You are not to perform any services that limit your liability or provide you immunity in any manner under OCGA § 19-9-3(a)(7) or the other laws of Georgia, any agreement that you maintain provides you immunity or any Order from Judge A. Quillian Baldwin, Jr. that you maintains [sic] you immunity."  Defendant Farmer issued these instructions about the law to Dr. McGarrah directly, knowing that at the time Dr. McGarrah was represented by counsel.

385.   Defendant Farmer's letter concluded by demanding that Dr. McGarrah accept his purported "conditions for you being the psychologist who conducts the OCGA § 9-11-35 examination."

386.   The day after receiving Defendant Farmer's patently threatening letter, Dr. McGarrah moved to withdraw as custody evaluator and Rule 35

examiner. Defendant Farmer's intimidation tactics at the March 17, 2014 hearing

and in his September 4, 2013, September 13, 2013 and March 18, 2014 letters to

Dr. McGarrah caused her to withdraw as custody evaluator and Rule 35 examiner,

thereby successfully intimidating and deterring Dr. McGarrah from further

testifying freely, fully, and truthfully in the Child Custody Litigation.

### *Intimidation of Dr. Johnson*

387.   Defendant Farmer and Michelle Murphy also have attempted to

influence Dr. Tony Johnson, the Children's psychologist who was treating the

Children prior to and during the Child Custody Litigation.

388.   On information belief, prior to the August 13, 2013 hearing in the

Child Custody Litigation, and with knowledge that Dr. Johnson had become aware

of Michelle Murphy's mental condition, behavioral issues, and poor parenting

practices, Defendant Farmer ensured that Dr. Johnson understood that there would

be personal and professional consequences to him in the event that he testified in a

manner unfavorable to Michelle Murphy's interests.  The consequences threatened

or implied by Defendant Farmer included, but were not limited to, causing Dr.

Johnson difficulties with state licensing authorities.

389.   Defendant Farmer issued or implied these threats to Dr. Johnson with

the express and unlawful purpose of intimidating Dr. Johnson, deterring Dr.

Johnson from testifying freely, fully, and truthfully in the Child Custody Litigation, and obstructing justice.

390.   Michelle Murphy also attempted to intimidate and influence Dr. Johnson.  Specifically, on or about June 22, 2014, Michelle Murphy approached Dr. Johnson at the Newnan Target, located at 555 Bullsboro Drive, Newnan, Georgia 30265.  Michelle Murphy began harassing Dr. Johnson in the checkout line, stating that Dr. Johnson was the reason Michelle Murphy had lost custody of the Children.

391.   Dr. Johnson left the checkout line but was followed by Michelle Murphy, who continued to harass him.  Michelle Murphy ultimately stated to Dr. Johnson that she was going to "take him down."

392.   The next day, Michelle Murphy came to Dr. Johnson's office, even though she did not have an appointment, and asked to speak with Dr. Johnson.  Dr. Johnson refused to see Michelle Murphy.

393.   Michelle Murphy made these threats and engaged in these threatening acts with the express and unlawful purpose of intimidating Dr. Johnson, deterring Dr. Johnson from testifying freely, fully, and truthfully in the Child Custody Litigation, and obstructing justice.

### *Intimidation of Ms. Harwell*

394.   Defendant Farmer also attempted to intimidate and influence Lisa Harwell, the second GAL appointed in the Child Custody Litigation.

395.   Shortly after Ms. Harwell was appointed as GAL, Defendant Farmer filed a motion to disqualify Ms. Harwell in the Child Custody Case.  Defendant Farmer proceeded in filing three more motions seeking to disqualify Ms. Harwell and amendments to the motions.

396.   The motions to disqualify Ms. Harwell contain untrue and highly inflammatory personal and professional allegations and accusations against Ms. Harwell intending to pressure Ms. Harwell into withdrawing as GAL.  For example, the motions make accusations that Ms. Harwell had taken "revenge" upon Michelle Murphy and that she had improperly selected Dr. McGarrah to perform the custody evaluation.

397.   Defendant Farmer's highly inflammatory accusations involving Ms. Harwell's personal and professional reputation, in his multiple motions to disqualify Ms. Harwell and his multiple attempts to contact Ms. Harwell directly, were made with the intent of deterring Ms. Harwell from testifying freely, fully, and truthfully in the Child Custody Litigation.

### *Intimidation of Mr. McLendon*

398.   Defendant Farmer also attempted to influence Bryan McLendon, a former client of Defendant Farmer, who had rented a room from Michelle Murphy at her house for nearly two years, and also had served as a driver for Michelle Murphy for the transportation of the Children.

399.   On August 5, 2013, Mr. Murphy filed an affidavit from Mr. McLendon in the Child Custody Case.  As set forth more fully above, Mr. McLendon detailed in the affidavit disturbing sexual and other conduct involving Michelle Murphy.  Mr. McLendon also testified in the affidavit regarding hazardous incidents involving the Children while in Michelle Murphy's custody.

400.   Shortly after Mr. Murphy filed Mr. McLendon's affidavit, Defendant Farmer contacted Mr. McLendon with the intent to and for the purpose of intimidating him and pressuring him to recant his testimony against Michelle Murphy.

401.   Defendant Farmer's communications with Mr. McLendon were made with the intent of deterring Mr. McLendon from testifying freely, fully, and truthfully in the Child Custody Litigation.

**Georgia RICO Racketeering Act No. 5: Kidnapping and Kidnapping for Extortion (18 U.S.C. § 1201, 18 U.S.C. § 1952, 14 V.I.C. § 1052)**

402.   Defendants Beacham and My Advocate Center, aided and abetted by Defendant Farmer and Non-Party Co-Conspirators Michelle Murphy and Robert Hartman, committed the crimes of kidnapping in violation of 18 U.S.C. § 1201 and kidnapping for extortion in violation of 14 V.I.C. § 1052, by enticing the Children away from their custodial parent, Mr. Murphy, and detaining them while Ms. Beacham used the children to manufacture false evidence in the Child Custody Litigation in order to intimidate Mr. Murphy to obtain a litigation result more favorable to Michelle Murphy in the Child Custody Litigation, to obtain extortionate payments to members of the Conflictineering Enterprise, or both.

403.   Defendant King also should be held liable for the kidnapping. Although Defendant King had moved to withdraw as co-counsel in the Child Custody Litigation immediately before Defendants Beacham and My Advocate Center engaged in the kidnapping (on information and belief, Defendant King's decision to withdraw as co-counsel was motivated in part by his learning of the kidnapping scheme), Defendant King took no steps to disavow or defeat the purpose of the Conflictineering Enterprise generally or the kidnapping/interview scheme in particular.

404.   Defendant Beacham and My Advocate Center engaged in interstate travel to engage in the  kidnapping of J.M. and T.M in the USVI.  Under the 2006 amendments to 18 U.S.C. § 1201, this satisfies the jurisdictional requirement for federal kidnapping.  Defendant Beacham and My Advocate Center also engaged in interstate travel in aid of a racketeering enterprise in violation of 18 U.S.C. § 1952.

405.   Kidnapping for extortion is chargeable under the law of the Territory of the Virgin Islands and punishable by imprisonment for more than one year.

406.   In late August or early September 2014, Ms. Beacham and My Advocate Center enticed or inveigled the minor Children away from their custodial parent, Mr. Murphy, and detained them while Ms. Beacham used the Children to manufacture false evidence in the custody case

407.   Defendant Farmer, Michelle Murphy, or other members of the Conflictineering Enterprise arranged for and paid for Ms. Beacham to travel to St. Thomas so she could meet surreptitiously with the Children, detain them in a van, and videotape a heavily-scripted "interview" with them.

408.   Ms. Beacham conducted her "interview" for the purpose of manufacturing false evidence in the custody case and intimidating Mr. Murphy into forfeiting his claims in the Child Custody Litigation and paying money to the members of the Conflictineering Enterprise.

- 139 -

409.   Upon information and belief, Defendant Farmer, Michelle Murphy, and other members of the Conflictineering Enterprise aided and abetted Defendant Beacham in these acts by, among other things, enticing the children to meet surreptitiously with Ms. Beacham and financing Ms. Beacham's travel.

410.   Non-Party Co-Conspirator Rob Hartman also aided and abetted the acts of Defendants Beacham and My Advocate Center by smuggling cell phones to J.M. and T.M., which phones were used by other members of the Conflictineering Enterprise to deceive J.M. and T.M. about the true purpose of the "interview" and coordinate the logistics of the kidnapping.

### Georgia RICO Racketeering Act No. 6:
### Filing a False Report of Child Abuse via Interstate Wires
### (18 U.S.C. § 1343, 14 V.I.C. §§ 2144(a), 2146(c), T.C.A. § 37-1-413)

411.   Defendant Farmer twice made false reports of child abuse by Mr. Murphy over interstate wires, to the VI-DHS and to Tennessee authorities.  These reports were in furtherance of the objectives of the Conflictineering Enterprise.

### *Defendant Farmer's False Report to VI-DHS*

412.   On June 9, 2014, Defendant Farmer communicated a false report of child abuse against Mr. Murphy via interstate telephone communication from Georgia to the VI-DHS.  As a result of this false report, a representative from VI-DHS visited Mr. Murphy at his residence in St. Thomas, USVI.

413.   The VI-DHS representative conducted detailed interrogations of Mr. Murphy and his wife and also conducted a thorough and comprehensive inspection of their residence and household.  In doing so, the VI-DHS representative did not discover one single shred of evidence that in any manner supported the allegations made by Defendant Farmer in his false report.

414.   Defendant Farmer's filing of a false report of child abuse with VI-DHS caused Mr. Murphy to incur attorney's fees and other costs.

415.   Defendant Farmer's filing of a false report also caused Mr. Murphy extreme psychological and emotional stress, as it was timed to coincide with the Conflictineering Enterprise's scheme to have J.M. runaway from Mr. Murphy's residence and attempt to elicit litigation concessions from Mr. Murphy relative to the Child Custody Litigation.  Because of Defendant Farmer's filing of the false report and the ensuing visit from a representative of VI-DHS, Mr. Murphy was unable immediately to leave his residence to search for J.M.

416.   Filing a false report or child abuse is chargeable under the laws of the USVI and is punishable by imprisonment for more than one year.

### Defendant Farmer's False Report to the Tennessee Authorities

417.   In early October, 2014, Defendant Farmer filed a false report of child abuse with the Tennessee Department of Children's Services.

418.   Filing a false report is chargeable under the laws of the State of Tennessee and is punishable by imprisonment for more than one year.

419.   Defendant Farmer committed the offense of filing a false report in violation of T.C.A. § 37-1-413 by knowingly and maliciously reporting, or causing, encouraging, aiding, counseling, or procuring another to report, a false accusation that a one or both of the Children had sustained a wound, injury, disability or physical or mental condition caused by the brutality, abuse, or neglect of Mr. Murphy.

420.   In reliance on Defendant Farmer's false report, the Tennessee Department of Children's Services visited Mr. Murphy and his wife.  As with Defendant Farmer's false report of child abuse to VI-DHS, the Tennessee authorities found absolutely no evidence of any child abuse whatsoever.

421.   Defendant Farmer made the false reports of child abuse over interstate wires in furtherance of the Conflictineering Enterprise's scheme to extort Mr. Murphy into relinquishing his claims in the Child Custody Litigation, paying the members of the Conflictineering Enterprise to terminate their terroristic tactics, and conferring other benefits on the members of the Conflictineering Enterprise.

**Georgia RICO Racketeering Act No. 7: Interference with Custody
(O.C.G.A. § 16-5-45)**

422.   Defendants Farmer, Beacham, and My Advocate Center, together with Non-Party Co-Conspirator Michelle Murphy, committed the offense of interference with custody in violation of O.C.G.A. § 16-5-45 when, without lawful authority to do so, they knowingly or recklessly took or enticed the Children away from Mr. Murphy, the parent who has sole lawful custody of the Children.

423.   First, Defendant Farmer and Michelle Murphy interfered with the custody of Mr. Murphy's son, J.M., on June 9, 2014, while J.M. was in the sole custody of Mr. Murphy.  Specifically, on information and belief, Defendant Farmer and Michelle Murphy enticed J.M. to run away or to prolong his time away from Mr. Murphy's residence via telephone conversations with J.M.

424.   J.M. left the residence for several hours.  During that time, Michelle Murphy, and Defendant Farmer, spoke directly to J.M. over the telephone via interstate wire.

425.   Michelle Murphy sought to use minor child J.M. to elicit litigation concessions related to the custody case from Mr. Murphy.  Specifically, Michelle Murphy told J.M. to demand that Mr. Murphy send J.M. a text message confirming that he would work with J.M. to return J.M. to Newnan, Georgia in exchange for J.M. disclosing J.M.'s location to Mr. Murphy.  Michelle Murphy told J.M. to

refuse to divulge J.M.'s location to Mr. Murphy unless Mr. Murphy agreed to these litigation concessions.  J.M. communicated these demands to Mr. Murphy.

426.   To apply additional pressure upon Mr. Murphy to succumb to the scheme and make the litigation concessions, contemporaneously with J.M. running away, Defendant Farmer made a false report of child abuse to the USVI child protection authorities.  Defendant Farmer made this false report knowing that public officials would go to Mr. Murphy's home and find J.M. missing.

427.   Second, in late August or early September 2014, Ms. Beacham and My Advocate Center interfered with the custody of the Children by enticing the Children away from their custodial parent, Mr. Murphy, detaining them while Ms. Beacham used the Children to manufacture false evidence in the custody case.

428.   Upon information and belief, Defendant Farmer, Michelle Murphy, or other members of the Conflictineering Enterprise arranged and paid for Ms. Beacham to travel to St. Thomas so she could surreptitiously meet up with the Children, detain them in a van, and videotape them.

429.   As detailed above, during her videotaped "interview," Ms. Beacham asked the children a series of questions designed to manufacture false allegations about their living environment with Mr. Murphy.

430.   Ms. Beacham conducted her heavily scripted "interview" for the purpose of manufacturing false evidence in the custody case and intimidating Mr. Murphy into forfeiting his claims in the Child Custody Litigation and paying money to the members of the Conflictineering Enterprise.

431.   Defendant Farmer, Michelle Murphy, Rob Hartman, and other members of the Conflictineering Enterprise aided and abetted Ms. Beacham in these acts by, among other things, trespassing on Mr. Murphy's property to deposit cell phones and other materials, enticing the Children to meet surreptitiously with Defendant Beacham, and financing Defendant Beacham's travel.

### Georgia RICO Racketeering Act No. 8: Wire Fraud (18 U.S.C. § 1353)

432.   Defendant Beacham operates Defendant My Advocate Center as a scheme or artifice to defraud.  The website for My Advocate Center makes multiple false statements regarding the resources and experience My Advocate Center offers to family court litigants.  Based on these false statements, Defendant Beacham solicits clients and donations in furtherance of My Advocate Center's purported purpose of offering legitimate services to assist family court litigants.

433.   Rather than provide legitimate case management or litigation support services, Defendant Beacham uses My Advocate Center's false appearance as a legitimate organization to lend credibility to false accusations by disgruntled

family court litigants against the parents, family court attorneys, and other court professionals, as shown by the actions in the Child Custody Litigation and in the *Domenicone* litigation.

These false statements are disseminated over the Internet and interstate wires in an attempt to bring undue pressure on the accused parties to relinquish valid claims and to increase the visibility, profile, and revenue of My Advocate Center. Moreover, as shown by Defendant Beacham's demands in the Amended Complaint filed in her foreclosure action, Defendant Beacham also has demanded "restitution" from Mr. Murphy as a result of his efforts to terminate the dissemination of false statements regarding the Child Custody Litigation.

### Georgia RICO Racketeering Act No. 9: Mail and Wire Fraud (18 U.S.C. § 1353)

434.   Defendants King and Larry King, P.C. engaged in mail fraud by sending the June 6, 2012 letter to Mr. Murphy's wife across state lines.  This letter, sent shortly after Mr. Murphy's wife had been named as a defendant in a frivolous Third Party Complaint filed by Defendants Farmer and King, proposed that Defendant King and Mr. Murphy's wife come up with a "plan" for resolving the Child Custody Litigation.

435.   Approximately one week later, on or about June 12, 2012, Defendant King engaged in wire fraud by calling Mr. Murphy's wife, across interstate wires, and again proposing a private meeting involving just the two of them.

436.   At the time Defendants King and Larry King, P.C. sent this letter and made this call, the Conflictineering Enterprise had been formed and had agreed upon the scheme to bring illicit pressure on Mr. Murphy to relinquish his valid claims in the Child Custody Litigation and to extort a large payment from Mr. Murphy and his wife to the members of the Conflictineering Enterprise.

437.   The clear message conveyed by Defendant King was that, if Mr. Murphy's wife was not willing to persuade her husband to abandon his claims in the Child Custody Litigation and settle early, they both would face continued and escalated "excessive litigation" at the hands of Defendant Farmer, whom they already knew would take unreasonable positions and file frivolous, defamatory submissions (as he had done with the initial motions to recuse Judge Baldwin).

### Continuity

438.   Unlike Federal RICO, Georgia RICO does not require a showing of continuity.  Nevertheless, these incidents of racketeering activity satisfy the requirements of closed-ended continuity and of open-ended continuity.

### *Closed-Ended Continuity*

439.   The RICO Defendants' and Non-Party Co-Conspirators' incidents of racketeering activity were not isolated incidents, but were separate yet interrelated acts forming a systematic and ongoing pattern of racketeering activity.

440.   This racketeering activity started in or about 2010 and continues in operation at this date.

441.   Between 2012 and the present, the RICO Defendants and Non-Party Co-Conspirators engaged in multiple acts of racketeering in furtherance of their Conflictineering scheme to extort from Mr. Murphy payments and other property, including Mr. Murphy's claims in the Child Custody Litigation.

442.   The Conflictineering Enterprise's acts of racketeering activity have harmed numerous victims including, but not limited to, Mr. Murphy, Mr. Murphy's wife, the Children, Ms. Freeman, Judge Baldwin, Dr. Nice, Dr. Johnson, Dr. McGarrah, Mr. McClendon, Mr. Drake, Ms. Harwell, and Dr. King.

443.   The Conflictineering Enterprise's acts of racketeering activity have been conducted as part of the same scheme, having the same or similar intent, results, accomplices, victims, and methods of commission.  The intent of each act of racketeering activity is to cause so much disruption and "chaos" in Mr. Murphy's personal and professional life that he will (a) relinquish his claims in the

Child Custody Litigation, without regard to the merit of those claims or the best interests of the Children; and (b) pay excessive purported "attorney's fees" or "restitution" to be distributed to the members of the Conflictineering Enterprise.

### Open-Ended Continuity

444.   The RICO Defendants' and Non-Party Co-Conspirators' racketeering activity started in or before 2012 and continues in operation at this date.

445.   The RICO Defendants' and Non-Party Co-Conspirators' racketeering activity will continue into the future with a threat of repetition, especially given that the activity is Defendant Farmer's regular way of doing business and "practicing" law.

446.   The Conflictineering Enterprise has engaged in racketeering activity against Mr. Murphy and others for over five years. Their goal throughout has been to extort money, litigation concessions, and property from Mr. Murphy and others as well as other benefits for themselves. The Conflictineering Enterprise has not yet achieved its goals, and until these goals are achieved, it likely will continue the racketeering activity.

### RICO Injury

447.   The RICO Defendants' extortionate scheme has injured Mr. Murphy by causing him to incur a substantial amount of medical fees for the treatment of

the Children as well as unnecessary attorney's fees, expenses, and other damages directly by reason of the RICO Defendants' crimes and terroristic abuse of the Georgia judicial system.

448.   In addition to attorneys' fees, payments to third parties to redress the public dissemination of falsehoods, and expenses relating to providing professional treatment and monitoring of the Children in an effort to protect them from further racketeering conduct, Mr. Murphy has suffered harm to his livelihood, personal reputation, professional reputation, and marriage.  Among other things, Mr. Murphy has been required to devote substantial time, effort, and money to addressing publicly-disseminated falsehoods regarding the Child Custody Litigation, to maintain his position with his employer and retain critical client relationships.

449.   The Conflictineering Enterprise also has caused damage to Mr. Murphy's consulting relationship with his employer by adversely impacting Mr. Murphy's relationships with it and with its clients.  Defendants' actions, including but not limited to their broad-reaching dissemination of defamatory accusations against Mr. Murphy and his wife, have caused Mr. Murphy's performance of his consulting responsibilities to be more difficult and more expensive.

450.   The Conflictineering Enterprise also severely damaged to the psychological well-being of the Children.  Mr. Murphy has incurred approximately $200,000 in out-of-pocket costs directly related to psychological treatment of the Children arising out of the Conflictineering Enterprise's efforts to alienate the Children from Mr. Murphy and his wife and other criminal acts by the Conflictineering Enterprise involving the Children.

451.   These injuries to Mr. Murphy are and continue to be a direct, proximate result of the RICO Defendants' violation of O.C.G.A. § 16-14-4(b).  Mr. Murphy is a victim of the RICO Defendants' unlawful Conflictineering Enterprise. Mr. Murphy has suffered and continues to suffer litigation expenses and other damages arising from the racketeering conduct of the Conflictineering Enterprise and other injury to his personal, professional, and general reputation in an amount to be determined at trial.

452.   Pursuant to O.C.G.A. § 16-14-6(c), Mr. Murphy is entitled to recover compensatory damages, treble damages, punitive damages, plus costs of investigation and attorney's fees, from the RICO Defendants.

453.   The RICO Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the

presumption of conscious indifference to consequences, making punitive damages appropriate.

## COUNT II:  CONSPIRACY TO VIOLATE GEORGIA RICO
### (Against All Defendants)

454.   Mr. Murphy incorporates by reference paragraphs 1 – 327 of this Amended Complaint as if set forth in full.

455.   The RICO Defendants and Non-Party Co-Conspirators have unlawfully, knowingly, and willfully combined, conspired, confederated, endeavored, and agreed together and with others to violate O.C.G.A. § 16-14-4(b) as described above, in violation of O.C.G.A. § 16-14-4 (c).

456.   Upon information and belief, the RICO Defendants and Non-Party Co-Conspirators knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate O.C.G.A. § 16-14-4(b), in violation O.C.G.A. § 16-14-4(C).

457.   Upon information and belief, the RICO Defendants and Non-Party Co-Conspirators agreed to conduct or participate, directly or indirectly, in the

conduct, management, or operation of the Conflictineering Enterprise's affairs through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b).

458.   Each RICO Defendant knew about and agreed to facilitate the Conflictineering Enterprise's scheme to extort from Mr. Murphy.  It was part of the conspiracy that the RICO Defendants and the Non-Party Co-Conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering described herein.

459.   As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Conflictineering Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of O.C.G.A. § 16-14-4(c), Mr. Murphy has been injured.  Among other injuries, the RICO Defendants' conspiracy has caused Mr. Murphy to incur a substantial amount of unnecessary attorney's fees, expenses, and other damages from the RICO Defendants' crimes and terroristic abuse of the Georgia judicial system.

460.   In addition to significant attorneys' fees, payments to third parties to redress the public dissemination of falsehoods, and expenses relating to providing constant monitoring of the Children in an effort to protect them from further racketeering conduct, Mr. Murphy has suffered harm to his livelihood, personal reputation, professional reputation, and marriage.  Among other things, Mr.

Murphy has been required to devote substantial time, effort, and money to addressing publicly-disseminated falsehoods regarding the Child Custody Litigation, to maintain his position with his employer and retain important client relationships.

461.   The RICO Defendants' conspiracy also severely damaged to the psychological well-being of the Children.  Mr. Murphy has incurred approximately $200,000 in out-of-pocket costs directly related to psychological treatment of the Children arising out of the Conflictineering Enterprise's efforts to alienate the Children from Mr. Murphy and his wife and other criminal acts by the Conflictineering Enterprise involving the Children.

462.   These injuries to Mr. Murphy are and continue to be a direct, proximate result of the RICO Defendants' violation of O.C.G.A. § 16-14-4(b).  Mr. Murphy is a victim of the RICO Defendants' unlawful Conflictineering Enterprise. Mr. Murphy has suffered and continues to suffer litigation expenses and other damages arising from the racketeering conduct of the Conflictineering Enterprise and other injury to his personal, professional, and commercial reputation in an amount to be determined at trial.

463.   Pursuant to O.C.G.A. § 16-14-6(c), Mr. Murphy is entitled to recover compensatory damages, treble damages, and punitive damages, plus costs of investigation and attorneys' fees, from the RICO Defendants.

464.   The RICO Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, making punitive damages appropriate.

## COUNT III:  FEDERAL RICO
### (Against All Defendants)

465.   Mr. Murphy incorporates by reference paragraphs 1 – 327 of this Amended Complaint as if set forth in full.

466.   The RICO Defendants and Non-Party Co-Conspirators comprise an enterprise that has engaged and continues to engage in, and has an effect on, interstate commerce.  The RICO Defendants and Non-Party Co-Conspirators have participated and continue to participate in the Enterprise, either directly or indirectly, through a pattern of racketeering activity.  Consequently, the RICO Defendants and Non-Party Co-Conspirators have violated 18 U.S.C.A. § 1962(c).

### Enterprise

467.   The RICO Defendants and Non-Party Co-Conspirators constitute an "association in fact" enterprise under 18 U.S.C. § 1961(4) because they are a group

of individuals or entities associated in fact.  As an association in fact enterprise, the RICO Defendants and Non-Party Co-Conspirators had and continue to have (a) a purpose – to harass, intimidate, and place enough illicit pressure on Mr. Murphy to extort him into paying exorbitant sums of money and abandoning his claims in the Child Custody Litigation; (b) relationships among those associated with the Conflictineering Enterprise; and (c) longevity sufficient to permit the RICO Defendants and Non-Party Co-Conspirators to pursue the Conflictineering Enterprise's purpose over a course of several years.

468.   While Defendant Farmer is the principal architect of the Conflictineering Enterprise, each RICO Defendant is associated with the Conflictineering Enterprise because each RICO Defendant knowingly engaged in or aided and abetted the Enterprise's racketeering activities.  Each RICO Defendant has participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

### Interstate Commerce

469.   The Conflictineering Enterprise has engaged in and had an effect on interstate commerce by committing crimes in and from various states and U.S. territories, including but not limited to Georgia, Tennessee, New York, and the USVI, in furtherance of its extortionate scheme.

**Racketeering Activity: Predicate Acts**

470.   The RICO Defendants and Non-Party Co-Conspirators have engaged and continue to engage in predicate acts that constitute "racketeering activity" under the Federal RICO statute.  18 U.S.C. § 1961(1).  The RICO Defendants and Non-Party Co-Conspirators have engaged in crimes chargeable under State law that are punishable by imprisonment for more than one year, including attempted extortion (O.C.G.A. § 16-8-16), bribery (O.C.G.A. § 16-10-2), and kidnapping (14 V.I.C. § 1052).  The RICO Defendants and Non-Party Co- conspirators also have engaged interstate travel in aid of kidnapping in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 1201, mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343.

471.   To avoid duplication and redundancy, Mr. Murphy relies upon and incorporates the details pled above with respect to the following predicate acts giving rise to his Georgia RICO claim:  (a) attempted theft by extortion (Georgia RICO No. 1); (b) attempted bribery (Georgia RICO No. 2); (c) kidnapping and kidnapping for extortion (Georgia RICO No. 5); (d) Filing a False Report of Child Abuse via Interstate Wires (Georgia RICO No. 6); (e) wire fraud (Georgia RICO No. 8); and (f) mail and wire fraud (Georgia RICO No. 9).

**Continuity**

472.   These incidents of racketeering activity satisfy the requirements of closed-ended continuity and of open-ended continuity, as they have been ongoing for over two-and-a-half years without any evidence of ceasing.

*Closed-Ended Continuity*

473.   The RICO Defendants' and Non-Party Co-Conspirators' incidents of racketeering activity were not isolated incidents, but were separate yet interrelated acts forming a systematic and ongoing pattern of racketeering activity under 18 U.S.C. § 1961(5).

474.   This racketeering activity started in or about 2010 and continues in operation at this date.

475.   Between 2012 and the present, the RICO Defendants and Non-Party Co-Conspirators engaged in multiple acts of racketeering in furtherance of the Conflictineering Enterprise's scheme to defraud Mr. Murphy out of extortionate payments and other property, including Mr. Murphy's claims in the Child Custody Litigation.

476.   The Conflictineering Enterprise's acts of racketeering activity have harmed numerous victims including, but not limited to, Mr. Murphy, Mr.

Murphy's wife, the Children, Ms. Freeman, Judge Baldwin, Dr. Nice, Dr. Johnson, Dr. McGarrah, Mr. McClendon, Mr. Drake, Ms. Harwell, and Dr. King.

477.   The Conflictineering Enterprise's acts of racketeering activity have been conducted as part of the same scheme, having the same or similar intent, results, accomplices, victims, and methods of commission.  The intent of each act of racketeering activity is to cause so much disruption and "chaos" in Mr. Murphy's personal and professional life that he would (a) relinquish his claims in the Child Custody Litigation, without regard to the merit of those claims or the best interests of the Children; and (b) pay purported "attorney's fees" to Defendant Farmer, to be distributed to the other members of the Conflictineering Enterprise.

### *Open-Ended Continuity*

478.   The RICO Defendants' and Non-Party Co-Conspirators' racketeering activity will continue into the future with a threat of repetition, especially given that the activity is Defendant Farmer's regular way of doing business.

479.   The Conflictineering Enterprise has engaged in racketeering activity against Mr. Murphy and others for over five years. Its goals throughout have been to extort money, litigation concessions, and property from Mr. Murphy and others. Because the Conflictineering Enterprise has not achieved its goals, the Enterprise likely will continue the racketeering activity.

**RICO Injury**

480.   The RICO Defendants' extortionate scheme has injured Mr. Murphy by causing him to incur a substantial amount of unnecessary attorney's fees, expenses, and other damages directly by reason of the RICO Defendants' crimes and terroristic abuse of the Georgia judicial system.

481.   In addition to attorney's fees, payments to third parties to redress the public dissemination of falsehoods, and expenses relating to providing medical care and monitoring of the Children in an effort to protect them from further racketeering conduct, Mr. Murphy has suffered harm to his livelihood, personal reputation, professional reputation, and marriage.  Among other things, Mr. Murphy has been required to devote substantial time, effort, and money to addressing publicly-disseminated falsehood regarding the Child Custody Litigation, to maintain his position with his employer and retain important client relationships.

482.   The Conflictineering Enterprise also has caused damage to Mr. Murphy's consulting relationship with his employer by adversely impacting Mr. Murphy's relationships with it and with its clients.  Defendants' actions, including but not limited to their broad-reaching dissemination of defamatory accusations

against Mr. Murphy and his wife, have caused Mr. Murphy's performance of his consulting contract with his employer to be more difficult and more expensive.

483.   The Conflictineering Enterprise also severely damaged to the psychological well-being of the Children.  Mr. Murphy has incurred approximately $200,000 in out-of-pocket costs directly related to psychological treatment of the Children arising out of the Conflictineering Enterprise's efforts to alienate the Children from Mr. Murphy and his wife and other criminal acts by the Conflictineering Enterprise involving the Children.

484.   These injuries to Mr. Murphy are and continue to be a direct, proximate result of the RICO Defendants' violation of 18 U.S.C. § 1962(c).  Mr. Murphy is a victim of the RICO Defendants' unlawful Conflictineering Enterprise. Mr. Murphy has suffered and continues to suffer litigation expenses and other damages arising from the racketeering conduct of the Conflictineering Enterprise and other injury to his personal, professional, and commercial reputation in an amount to be determined at trial.

485.   Pursuant to 18 U.S.C. § 1964(c), Mr. Murphy is entitled to recover compensatory damages, treble damages, punitive damages, plus costs and attorney's fees, from the RICO Defendants.

486.   The RICO Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, making punitive damages appropriate.

## COUNT IV:  CONSPIRACY TO VIOLATE FEDERAL RICO
### (Against All Defendants)

487.   Mr. Murphy incorporates by reference paragraphs 1 - 327 of this Amended Complaint as if set forth in full.

488.   The RICO Defendants and Non-Party Co-Conspirators have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

489.   Upon information and belief, the RICO Defendants and Non-Party Co-Conspirators knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

490.   Upon information and belief, the RICO Defendants and Non-Party Co-Conspirators agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Conflictineering Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

491.   Each RICO Defendant knew about and agreed to facilitate the Conflictineering Enterprise's scheme to extort from Mr. Murphy.  It was part of the conspiracy that the RICO Defendants and the Non-Party Co-Conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth herein.

492.   As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Conflictineering Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Mr. Murphy has been injured in his business and property, as set forth above.

493.   Pursuant to 18 U.S.C. § 1964(c), Mr. Murphy is entitled to recover compensatory damages, treble damages, and punitive damages, plus costs and attorneys' fees, from the RICO Defendants.

494.   The RICO Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the

presumption of conscious indifference to consequences, making punitive damages appropriate.

## COUNT V:  DEFAMATION
### (Against Defendants Farmer, Beacham, and My Advocate Center)

495.   Mr. Murphy incorporates by reference paragraphs 1 - 327 of this Amended Complaint as if set forth in full.

496.   Defendants Farmer, Beacham, and My Advocate Center have published numerous defamatory statements regarding Mr. Murphy, his wife, his attorneys, and other participants in the Child Custody Litigation.

497.   Among other publications, Defendant Farmer (a) participated in two "town hall" meetings in Newnan, Georgia, in which he slandered Mr. Murphy, his wife, and his attorneys to the multiple attendees at those meetings; (b) enticed media coverage of the Child Custody Litigation and then made false statements to the journalists covering those stories, which statements were quoted in the published stories; (c) wrote a letter to Non-Party Co-Conspirator Michelle Murphy's "social media" followers, specifically intending that letter to be published on the Facebook page and website Michelle Murphy created in an effort to increase pressure on Mr. Murphy to relinquish his claims in the Child Custody Litigation and capitulate to the Conflictineering Enterprise's demands; and (d) encouraged, aided, abetted, and acquiesced in Michelle Murphy's continual

publication on social media of libelous accusations against Mr. Murphy, his wife, his attorneys, and multiple other participants in the Child Custody Litigation (even after Mr. Murphy filed a motion to shut down all "social media" regarding Mr. Murphy, his wife, the Children, or the Child Custody Litigation).

498. Defendant Beacham and her front organization, Defendant My Advocate Center, also published numerous defamatory statements regarding Mr. Murphy, his wife, his attorneys, and other participants in the Child Custody Litigation. Among other publications, Defendants Beacham and My Advocate Center (a) participated in both of the "town hall" meetings organized by Non-Party Co-Conspirator Michelle Murphy, in which Ms. Beacham slandered Mr. Murphy, his wife, and his attorneys to the multiple attendees at those meetings; (b) posted multiple stories on www.myadvocatecenter.com regarding the Child Custody Litigation that libeled Mr. Murphy, his wife, his attorneys, Judge Baldwin, multiple professionals involved in the Child Custody Litigation, and other participants in the Child Custody Litigation; (c) posted on the Internet portions of the clandestine "interview" Ms. Beacham conducted of J.M. and T.M.in St. Thomas, which interview constituted the crime of kidnapping for extortion under Virgin Islands law; (d) posted multiple defamatory statements or stories on other social media, including Twitter and LinkedIn; and (e) broadcast, through the show

"Pro Advocate Radio," slanderous statements regarding Mr. Murphy, his wife, his attorneys, Judge Baldwin, multiple professionals involved in the Child Custody Litigation, and other participants in the Child Custody Litigation over 92.5 The Bear, a radio station operating out of Senioa, Georgia, and over the Internet, through a website operating as Business Radio X.

499.   Defendants Farmer, Beacham, and My Advocate Center knew the defamatory statements were false or made the statements with reckless disregard of their truth or falsity.  Among other things, Defendants Beacham and My Advocate Center persisted in making the false statements even after receiving a demand for retraction of defamatory statements that included numerous court orders from the Child Custody Litigation demonstrating the statements were false.

500.   Defendants Farmer, Beacham, and My Advocate Center made the statements with malice.  Among other things, Defendants Farmer, Beacham, and My Advocate Center made the statements in furtherance of the twin goals of the Conflictineering Enterprise to (a) bring undue and illicit pressure on Mr. Murphy to relinquish his claims in the Child Custody Litigation and (b) capitulate to Defendant Farmer's demands for payment of $500,000 in "attorney's fees" to end the terroristic attacks on Mr. Murphy, his wife, and the Children.

501.   The defamatory statements of Defendants Farmer, Beacham, and My Advocate Center are not privileged.  Any privilege that otherwise might apply to defamatory statements by Defendant Farmer in court filings does not apply to the public publication and broadcast of such defamatory statements outside of filings in the Child Custody Litigation.

502.   Many of the defamatory statements published by Defendants Farmer, Beacham, and My Advocate Center accuse Mr. Murphy, his wife, and his attorneys of criminal conduct (including bribing Judge Baldwin and other professionals involved in the Child Custody Litigation).  Many of the defamatory statements charge Mr. Murphy and his wife with having committed a debasing act which may exclude them from society, including "stealing" the Children.  And many of the defamatory statements refer to Mr. Murphy's and his wife's trade, office, or profession and are calculated to injury them in their business.  All of these statements are defamatory *per se*, entitling Mr. Murphy to general damages without the need to show special damages.

503.   Moreover, Mr. Murphy has incurred special damages as a result of these defamatory publications.  Among other things, Mr. Murphy (a) incurred attorney's fees monitoring the defamatory publications and demanding the retraction of such publications; (b) paid a third-party public relations consultant to

manage the adverse publicity sought to be generated by Defendants; and (c) paid

other employees to monitor the social media outlets utilized by Defendants and

other members of the Conflictineering Enterprise to publish their falsehoods.

504.   The conduct of Defendants Farmer, Beacham, and My Advocate

Center shows willful misconduct, malice, fraud, wantonness, oppression, or that

entire want of care which would raise the presumption of conscious indifference to

consequences, making punitive damages appropriate.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for the following relief:

(1)     On Counts I and II, compensatory damages, treble damages, punitive

damages, attorney's fees, costs of litigation, and costs of investigation, pursuant to

O.C.G.A. § 16-14-6(c), against all Defendants, jointly and severally;

(2)     On Counts III and IV, compensatory damages, treble damages,

punitive damages, attorney's fees, and costs of litigation, pursuant to 18 U.S.C. §

1964(c), against all Defendants, jointly and severally;

(3)     On Count V, general, special, and punitive damages against

Defendants Farmer, Beacham, and My Advocate Center, jointly and severally;

(4)     Pursuant to O.C.G.A. § 13-6-11, an award against all Defendants,

jointly and severally, of Plaintiff's expenses of litigation, because Defendants have

acted in bad faith, have been stubbornly litigation, and have caused Plaintiff

unnecessary trouble and expense;

(5)     Pursuant to this Court's inherent, statutory, or other authority, an

award to Plaintiff of his attorney's fees, costs of investigation, and expenses of

litigation; and

(6)     Any and all further relief the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), the Plaintiff hereby demands a trial by jury

of all issues so triable.

Respectfully submitted, August 5, 2015.

s/ Wilmer Parker

| | |
|---|---|
| MALOY JENKINS PARKER | WILMER PARKER |
| 75 Fourteenth St., 25th Floor | Georgia Bar No. 563550 |
| Atlanta, Georgia 30309 | |
| (404) 875-2700 | *Attorney for Plaintiff* |
| parker@mjplawyers.com | *John H. Murphy* |

## **CERTIFICATE OF FONT AND POINT SELECTION**

I hereby certify that the foregoing was prepared in Times New Roman font,

14 point type, in compliance with Local Rule 5.1(C).

## **CERTIFICATE OF SERVICE**

I hereby certify I have electronically filed the foregoing using the District's

CM/ECF system which will automatically send e-mail notification and forward a

copy to counsel of record in this matter.

Dated: August 5, 2015.

s/ Wilmer Parker
WILMER PARKER
Georgia Bar No. 563550
MALOY JENKINS PARKER
75 Fourteenth St., 25th Floor
Atlanta, Georgia 30309
(404) 875-2700
parker@mjplawyers.com
*Attorney for Plaintiff*
*John H. Murphy*