**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

**John H. Murphy,**
    **Plaintiff**,

      vs.                           No.   3:15-cv-92-TCB

Millard C. Farmer, Jr.
Deborah L. Beacham and
My Advocate Center, Inc.
   **Defendants.**           **Memorandum to**

**Motion in Limine  Supported with Constitutionally Challenging the Abridged,
now Spoliated, Constitutional Protections due Millard Farmer and other
Accused Parties that John Harold Murphy charges to be a part of the actionable
conduct included in his Civil RICO Complaints [ 1]; [31] and otherwise**

1

1. Defense of this case is based upon the constitutionally justified and morally warranted legal defenses provided by two lawyers and the voluntary assistance provided by the Client's family and the community of supporters of this mother Nancy Michelle Murphy (Michelle Murphy) who were attempting to protect Michelle Murphy's  children from the consequences of the judicial corruption being inflicted upon this mother, her children and her counsel by Taylor Drake, Glover & Davis and their hand selected and corrupted judge, A. Quillian Judge Baldwin, Jr., Taylor Drake and the associates of Taylor Drake's law firm, Glover & Davis, that marketed judicial corruption involving criminal conduct by its participants and beneficiaries. The judicial corruption involving Judge Baldwin was purchased on behalf of the front-Plaintiff.John Harold Murphy.

2.  John Harold Murphy is the front-Plaintiff in this  Civil RICO case for Renee L. Haugerud and her *Galtere et al Enterprises*. Hedge fund operations. This front-Plaintiff with funds derived from his spouse, Renee L. Haugerud's *Galtere et al Enterprises*. Hedge fund operations compensated Taylor Drake and Glover & Davis to engage in the abridgments of U.S and State of Georgia constitutional abridgments. The constitutional abridgments and the

2

accompanying rule of law violating conduct included the hand selection of Coweta Judicial Circuit Judge Baldwin a judge with the authority as the exclusive trier of fact in the child custody case for which he was selected.

3. The front-Plaintiff after engaging in a Settlement Agreement and Release with Michelle Murphy. her counsel, Millard Farmer, Larry King and these lawyer's associates and others activated the Judicial corruption action against a released party, Nancy Michelle Murphy who to evade default, required responsive pleadings to be filed by Michelle Murphy's counsel.

Millard Farmer and Larry King as counsel for Michelle Murphy defended the judicial corruption conduct of the front-Plaintiff including his active participation with his lawyers in the Judicial corruption, the judicial corruption's participant's spoliated evidence and other abridged constitutional rule of law protections of Michelle Murphy and her counsel

The Front-Plaintiff, as a continuation of the judicial corruption, its spoliation of evidence and other abridgment of constitutional protections and the release brought this Civil RICO case, accompanied by State Bar of Georgia grievances with false swearing of Patricia Nice, M.D, John Harold Murphy and others. These State Bar Grievances appear to be crafted and produced by counsel for the Front Plaintiff in this Civil RICO case.

The defense of the Civil RICO actions against Millard Farmer and Larry King

3

and the other accused persons is only such actions that counsel determines necessary to protect the accused person from the Constitutional abridgments and the other rule of law contractual and illegal conduct violations.

It is the Plaintiff's' Civil RICO causes of action that are the Civil RICO accused persons and Defendant's defense to the illegal and constitutional abridgment causes of action that this in limine motion seeks protections with the Court grant of this in limine motion of the charged conduct of the accused persons.

Identifying the illegal conduct of front- Plaintiff is necessary to explain the Defendants' justified conduct for which the in limine protections are sought.

2.The Supreme Court of Georgia, under its inherent and constitutional authority, **Effective July 1, 1985** enacted Uniform Superior Court Rules, The Preamble to these rules dictates as follows. "It is the intention of these rules and the policy of this State that these rules prevail over local practices and procedures and shall be in force uniformly throughout the State."

3The .Uniform Superior Court Rules are the " public policy of the State of Georgia.

1.   the Coweta Judicial Circuit did not create and enforce a Uniform Superior Court Rule  3 et seq,.that provides as follows

**Rule 3.1. Method of Assignment**   multi-judge circuits, unless a majority of the judges in a circuit elect to adopt a different

4

2. system, all actions, civil and criminal, shall be assigned by the clerk of each superior court according to a plan approved by such judges to the end that each judge is allocated an equal number of cases. The clerk shall have no power or discretion in determining the judge to whom any case is assigned; the clerk's duties are ministerial only in this respect and the clerk's responsibility is to carry out the method of assignment established by the judges. The assignment system is designed to prevent any persons choosing the judge to whom an action is to be assigned; all persons are directed to refrain from attempting to affect such assignment in any way. If the order or the timing of filing is a factor in determining case assignment, neither the clerk nor any member of the clerk's staff shall disclose to any person the judge to whom a case is or will be assigned until such time as the case is in fact filed and assigned.

5. The Coweta Judicial Circuit does not adhere to this Case Management plan. Judge Baldwin not only violates USR31, Judge Baldwin. also does not adhere to the other mandated Duty of the Trial Judge rules including Uniform Superior Court Rule 25, *etse*q.

Rule 3.1, doesn't just establish Rule 3.1The Rule and the Supreme Court of Georgia mandates the random assignment of Superior Court Judges to cases. Lawyers, Judges and all other persons are mandated to not violate Rule 3.1.

3. The Coweta Judicial Circuit Judges, Taylor Drake, Glover & Davis and others violated the Supreme Court's mandated Rule 3.1 without enacting any Order, or legal process addressing case assignment, The Circuit did not provide, any

5

public notice, or notice to the Georgia Supreme Court, about the Coweta

Circuit's Rule 3.1 defiance

4.  Quite the opposite occurred, the evidence about the United States Fourteenth

Amendment  due process abridgments were spoliated.so that constitutional and

rule of law abridgments could not be detected. The Coweta Circuit judges

abandoned enforcement of Uniform Superior Court Rule 3.1 mandated

compliance. It is relevant to identify that it was in the Coweta Judicial Circuit

that  Millard Farmer litigated with associates for about ten (10) years to have a

constitutional jury pool provided. See, *Davis v. Zant* 721 F.2d 1478 (11th

Cir. 1984)

5.   By participating in violating USCR3.1, some of the judges and lawyers in the

Coweta Judicial Circuit illegally obtained personal benefits that these judges

and lawyers were not authorized by law to obtain; others judges used their

disobedience of the rule of law to provide income to Senior Judges who filled

the judicial role  that the people's authorized holder of the judicial position

judges did not wish.  Sadly, other judges and lawyers and people, apparently,

very realistically for fear of such treatment as Judge A. Quillian Baldwin, Jr.,

Taylor Drake  and the Glover & Davis lawyers have inflicted upon Millard

Farmer, Larry King  and others could only perform as one of the initial

closet  informant to Millard Farmer of the illegal conduct. Then there were

Commented [M1]:

6

others, maybe who wished to assist in breaking up the consequences of the
judicial corruption, who did not have the credentials, but had the skill,
knowledge and dedication, who provided  Michelle Murphy and thereby,
Millard Farmer the valuable information to assist Michelle Murphy in protecting
her children who were being abusively treated with the uncontrolled
availability of alcohol to the children and their friends  by an alcoholic father.
The publishing of, false accusation about the children and their mother and
other abridgements of the rule of law by the Plaintiff in this case This abusive
treatment was partly for the financial benefits that the children provided to
Renee L. Haugerud and her *Galtere et al Enterprises*. during one period of time,
Taylor Drake obtained the ability to select, Judge Baldwin,  a judge who was
willing to participate in Judicial corruption with this corrupt lawyer.

6.   Taylor Drake and Glover & Davis who with spoliated evidence engaged in his
illegal conduct apparently without being detected by other lawyers and
community people, This  illegal conduct was accomplished  through The illegal
absence of enforcement of USR3.1

7.  .For example, Taylor Drake and  other Glover & Davis  lawyers financially
benefitted from the absence of enforcement of a case management plan. There
were other lawyers acting illegally in concert with Judge Baldwin and other
Coweta Judicial Circuit Judges. The Coweta Judicial Circuit Judges knowingly,

intentionally refused to enforce Uniform Superior Court Rule 3.1, or any legal

alternative. This is illegal conduct that the front-Plaintiff in this Civil RICO case

paid to participate and who financially benefited while this front-Plaintiff

damaged Millard Farmer and other Defendants and persons accused of assisting

Michelle Murphy who were also damaged by the illegal conduct of the front-

Plaintiff, John Harold Murphy for Renee L. Haugerud's hedge *Galtere et al*

*Enterprises*

8. The USCR3.1Case Management Rule serves as the gatekeeper to the U.S.

Fourteenth Amendment Due Process protection from the opening conduct of

judicial corruption by deterring the corrupt judge and a corrupt lawyer from

being assured of providing judicial corruption for a specifically designated case.

The hand Selection of a Judge in a custody of minor children case has a large

financial and political benefit to both a corrupt lawyer, and a corrupt judge, as

the judge is the exclusive trier of fact (sole juror) in child custody cases and in

contempt of court accusations against persons involved in the custody cases.

This illegal conduct should be considered as the equivalent t to the tampering

with a juror..(It appears that Judge Baldwin got short changed in this case, as his

purchased and used judicial corruption had the value of over One Million

Dollars to Renee L. Haugerud, the front-Plaintiff and others including Taylor

Drake and Glover & Davis and others Judge Baldwin, much the same as addicts

8

to other things had to continue his corruption, as he had been consistently financially and politically supported for years by Taylor Drake, and  Glover & Davis.  with financial payments and political benefits for the smaller levels of corruption that he was expected to provide.

9.   The gerrymandered selection of Judge Baldwin occurred when he  acted in concert with  the *deal* initiated with Taylor Drake's  ex parte communication to Judge Baldwin related to Judge Baldwin's role in Taylor Drake being allowed to violate Uniform Superior Rule 3.1 in a combined  judge and trier of fact (sole juror) corrupt deal in the modification of custody case that Taylor Drake initiated against Michelle Murphy. This illegal conduct by Taylor Drake and Glover & Davis. was a pattern of their judicial corruption. Taylor Drake replicated, with slight modification,  the Glover & Davis City of *Savanah v Batson Cook* judge selection illegal conduct into a modification of custody action for John Harold Murphy that also involving what he and his hand selected judicial operative, Judge A. Quillian Baldwin, Jr. most likely believed, that if they were caught, they would be protected by their political connections at the State Bar of Georgia and at that time, with members of the then composed Judicial Qualifications Commission that has now been modified.

9

10. This corruption with its spoliated evidence assured Judge Baldwin of financial and political benefits that Judge Baldwin accepted knowing of this illegal violation of the rule of law that corrupted the judicial process.

11. Taylor Drake and Glover & Davis used this corrupt type of judge selection process for their important clients who are clients with money that finance the corruption.  The judge selection system with compensation to the judge was illegal; however; in this case it became far more than illegal. Taylor Drake and Glover and Davis who were habitual offenders of various types of illegal judge selection process used the corruption to spoliate evidence that is a part of what is sought with this motion.to support this in limine request.

12. The violations of the Uniform Superior Court Rule 3.1 in concert with the that violating judge also violating Uniform Superior Court Duty of Trial Judge Rule 25.3 breaks down the gateway to the components of the ultimate desired and obtained other corrupt conduct, implemented by Taylor Drake and Glover & Davis. This other corruptions abridged Michelle right to representation of counsel who were not being corruptly attacked with illegal criminal contempt convictions and fines for addressing the Plaintiff and his lawyers illegal attacks upon Michelle Murphy and her counsel.

13. Taylor Drake, Glover & Davis Judge Baldwin and others who were engaging in criminal conduct that threatens the nature to the constitutional

10

freedoms that distinguish our justice system from the old Star Chamber system or injustice that primarily benefited persons of wealth.

14. Do not misunderstand the corruption during the modification of custody case.

15. Judge Baldwin, Taylor Drake and Glover with malice inflicted financial punishment upon Millard Farmer Larry King and others accused in the Civil RICO case. This was done to corrupt the judicial system in the Coweta Judicial Circuit. and to damage the law practice of Millard Farmer. and the businesses and livelihood of others who acted to deter the judicial corruption and other illegal conduct.

16. The motivation for this civil RICO case has a simplistic explanation.

Millard Farmer was successful in having the judges in the Coweta Judicial for the first time in the history of the Uniform Superior Court Rules to begin enforcing USCR 3.1 Case Management Plan. This required the twenty (20) disqualifications and several appellate attempts. The Civil RICO front-Plaintiff opposed every motion of Millard Farmer and Larry  King to minimize, or abolish the rule of law abridgments and  the judicial coruption.  Never did any of the thieves of judicial fairness attempt to discuss a solution to the smallest of disputes. The Plaintiff wanted only the full value of the corruption that he purchased and could have only attained with his purchased judicial corruption.  That full value of the judicial corruption is the amount of tax and other

11

benefits that *Galtere et al Enterprises*. received from illegally obtaining custody of children, albeit that the custody was obtained temporarily.

The fight for the custody in a substantial part was a business deal. For the front-Plaintiff John Harold Murphy, Renee L. Haugerud, their cadre of lawyers.

The front-Plaintiff in this case, John Harold Murphy with Taylor Drake, Glover & Davis engaged in corrupt judicial conduct that Millard Farmer during his representation of Michelle Murphy exposed in part. Now, this front-Plaintiff brings the Civil RICO case against Millard Farmer and the other Defendants and persons who attempted to assist Michelle Murphy. The legally corrupted dirty hands of the front-Plaintiff as a matter of law deprives John Harold Murphy of any relief from this federal court. and justifies the in limine protections that are requested in this motion.  The front-Plaintiff has eaten at the trough of Coweta Judicial Circuit's corruption too long. The only persons who have attempted to correct the judicial corruption at any time during the front-Plaintiff's tour of corruption are the persons accused in the Civil RICO case of wrong doing.

   The Civil RICO case is about more corruption involving spoliation of evidence. The in-limine request is Due Process justified. A jury of lay persons cannot be expected  to understand the constitutional abridgments and the consecutive ruling, to avoid  waiver requirements of  *Hargis*, 294 Ga. 818, 822-823 (2014) and *Pyatt  v. State* __Ga. __ S15A1734 (March 2016)   and the other Duty of Trial Judge   disqualification

motion requirements  when confronted with the Front-Plaintiff's counsel statements that this lawyer (Millard Farmer) filed twenty (20) disqualification motions against your Coweta Judicial Circuit judge. The requested investigation by the federal authorities protects Millard Farmer and other Civil RICO accused persons and entities, as whistle blowers and in their other roles as protectors of this mother and her children for the abusive treatment that was being inflicted upon these children.

17. In limine protections are necessary to  prevent a travesty of justice that the Civil RICO Complaint is written to accomplish with the prejudice of irrelevant bias creating statements.

18. Without the judicial corruption, this case's custody issues would have been quickly resolved, as it was during the divorce and the malpractice negligence case involving John Harold Murphy and before it ended, Renee L. Haugerud.

19. The judicial corruption was necessary to satisfy the hedge fund's business needs. **The time has arrived to have a FBI, SEC and IRS investigation of this illegal conduct and spoliation**.

20. Taylor Drake, A. Quillian Baldwin, Jr. and Glover & Davis granted entry into their open door of Judicial Corruption to at least ten or more other lawyers associated with  four or more different law firms. Millard Farmer

could never establish a contact with a lead lawyer who could resolve

disputes.  Larry King before Renee L> Haugarud was sought as a party was

accused of being unethical for attempting to discuss a solution to the case

with her  The lawyers not talking with opposing counsel  was more than just

unusual.

21. Each law firm appeared to have a proprietary interest in their billing

opportunities with Renee Haugerud's hedge fund entity. Once Millard

Farmer drove from Atlanta to Newnan to resolve a rather simple problem

relating to the children's school. No sooner than Millard Farmer began

talking with Taylor Drake about very small issues that should be easy to

resolve, Lisa Harwell, whose office was a block away, came to door of the

upstairs Glover & Davis office that Millard Farmer was had been escorted to

meet with Taylor Drake in private. Lisa Harwell, the replacement GAL

barged in the room and asked if we were ready to talk with her. Millard

Farmer told Lisa Harwell that he would like to talk in private with Taylor

Drake for a while and asked that she leave the room. Lisa Harwell left the

room for a few minutes and then came back in the room and announced that

she had Judge Baldwin on the phone. Millard Farmer greeted Judge Baldwin

pleasantly who in making no more noise than a deer standing in the middle

of the road, Judge Baldwin asked, what is the emergency? Millard Farmer

14

explained he knew of no emergency, was not requesting the phone call, or anything. Millard Farmer then explained how he had been deceived into believing that if he came to Newnan that he and Taylor Drake could discuss issues in general about the case that could be resolved.  The meeting ended with Taylor Drake and Lisa Harwell telling Judge Baldwin that there was the need for an emergency hearing. These two lawyers were simply creating a show case event for a client that would pay for some unproductive courtroom appearance time. Lisa Harwell with prepaid GAL fees paid by the Plaintiff. compensated Patricia Nice M.D, a psychiatrist, $15,00 to attend a hearing before  Judge Baldwin during which Judge Baldwin asked her the same question, What is the emergency?.  Dr. Nice fumbled and mumbled around for a while and then stated that she did not see any emergency. That was $1,500 toward the share of Dr. Nice in the corruption' other parties financial benefits  that she later returned in-kind by swearing falsely on at least two documented occasions. See Exhibit (.)In dealing with false swearing in the affidavit of Patricia Nice, Millard Farmer was observing a subset of the judicial Corruption that financially unnecessarily compensated expert witnesses.  On one occasion that Dr. Nice testified with her office records in her hands the relevant issue before the Court was whether, or not Michelle Murphy had brought the children to Dr. Nice for medication that

15

John Harold Murphy  wished for the children to have the medication to enhance their school performance. This became a legal issue when the mother was going before a corrupt judge that could take her children on violating his order. Michelle Murphy was not opposed to the medication until she observed the children could not sleep normally at night and then could not be awaken in the morning if she followed the suggestion to medicate the children to sleep. . To support that the children were not seeing Dr. Nice on a regular basis   Dr. Nice testified on the many periods of time that the children had been absent from her office. (**Ex. 66**)

22. At the final custody hearing, that Buddy Parker replaced Taylor Drake, Buddy Parker presented an affidavit of Dr. Nice that falsely showed the children's regularly seen by Dr. Nice.  Millard Farmer was not counsel at the final hearings during which Buddy Parker did and the other lawyers for the front-Plaintiff did not produce Dr. Nice as a live witness.

23. The children were treated by John Harold Murphy and Renee L. Haugerud and their cadre of lawyers like a commodity of a hedge fund operator.

*Galtere et al Enterprises*   profited very sustainable, as the recovered spoliated evidence will show when the federal investigators and Millard Farmer are provided an opportunity to question Renee L. Haugerud under oath.

No litigant should be subjected to Judicial corruption in any form, but when the

16

judicial corruption extends to such other expanded corruption, as bring a Civil RICO action, supported affidavits of witnesses containing false statements criminal contempt actions that are State Bar Grievances with the false swearing under oath against the lawyers who, with others are exposing the illegal corruption, that judicially participated the at that time, the   corruption has reached the stage that a federal court should in limine address the Fourteen Amendment Due Process Equal Protection and First Amendment *Packingham v. North Carolina*, 582 U.S. ___ (2017) government action that is prohibiting Michelle Murphy and her family's use of the internet  The Court, without any hearing Ordered Millard Farmer fined $500 a day for each day that the website on the Internet about the case was operative. Millard Farmer had nothing to do with the publishing on the internet about the case, but was threatened if he did not control the government' Order of no internet publication. (Judge Baldwin and Senior Judge Smith.) . At the time of that Order the Plaintiff and Renee L. Haugerud Galtere *et al Enterprises*. compensated a professional publicity agent, Patrick Crosby, to engage in publishing selected pleading of Millard Farmer on the internet. Patrick Crosby was assisted by compensated counsel for the Front-Plaintiff in selecting and commenting on pleadings and motions of Millard Farmer included comments that Patrick Crosby was publishing "The Truth."

The Orders of Judge Baldwin in the Custody case attest to the Due Process

abridgment of the Front-Plaintiff to the extent that the Court should grant the in limine request to exclude the material of the RICO Plaintiff as information obtained in violation of the Fifth Amendment protections of the persons assisting Michelle Murphy, as the custodial parent Renee L. Haugerud and her *Galtere et al Enterprises*. of the children had been taken from the custodial parent under conditions that abridged the constitutional protections of the children and their mother. Family members attempting to learn information about children who are being held hostage, who only made reasonable efforts to learn of the safety of the children are exempt from RICO actions of persons who obtained the children without due process of law by a judge who was engaging in illegal conduct.   The hostage holder of the children, the Front-Plaintiff would not allow the children access to the telephone to inform their mother of their Condition. The children were sending messages from their friends that needed investigation. At one point the front-Plaintiff displayed a document to the children that was represented to be a letter from Judge Baldwin to the children. Information provided to Millard is that the the misrepresented letter was provided by to the children by John Harold Murphy with the assistance of Taylor Drake and was a written communication sent in interstate commerce.  that the Front-Plaintiff in his case maintained was a communication from Judge Baldwin with of justice. The evidence that supports the defenses of the Defendants is spoliated, as a part to the judicial corruption.

18

RICO case is a federal attempt at Georgia's eliminated *Yost v. Torok et al* 256 Ga.92 aa(1986) 344 SE2d 414 put to rest litigation that was replaced. Using the John Harold Murphy pleading standard, there are more Civil and Criminal RICO claims against his accusers than against the defendants. The federal investigation sought with this motion resolves the judicial corruption issue and the spoliation of evidence issue. The so-called investigation about Nan Freeman and the abusive treatment of the children by John Harold Murphy and Renee L. Haugerud are just proof of the bias of the persons supplying information about Nan Freeman 's overcharging private clients for their work and not documenting Judge Baldwin's commitment to the children to allow them to testify and testimony provided by supporters for this hair stylist mother of two minor children who worked out-of-her home after her divorce from t John Harold Murphy, who married Renee L. Haugerud, a hedge fund operator.

24. After their marriage Renee L. Haugerud learned that she and her businesses could benefit if John Harold Murphy had custody of the two minor children of John Harold Murphy that Michelle Murphy had physical custody that she obtained with an agreement made the Court's Final Divorce Decree Order. . When Michelle Murphy refused to move from Newnan, GA to Chattanooga TN, John Harold Murphy initiated a modification of custody case against Michelle Murphy.

19

25. Millard Farmer with 50 years of trial experience in representing clients without money to adequately fairly litigate and Larry King, an attorney with over 35 years of experience in in domestic relations cases agreed to represent this mother in the modification of custody case. this mother and her counsel. And family used their legal judgments that displeased the party paying the for the litigation cost of the front-**plaintiff, who brings the Complaint** for the protection of Renee L. Haugerud and *Galtere et al Enterprises'* spoliation of evidence of illegal, fiduciary conduct, for tampering with Michelle Murphy's witness and other illegal conduct. John Harold Murphy and *Galtere et al Enterprises* are not constitutionally, or by Georgia law, entitled to sustain this civil RICO action against the defendants and those accused of assisting them for causes related to exposure of *Galtere et al Enterprises illegal conduct* and for providing defense of the illegal conduct of Judge Baldwin and the illegal conduct of *Galtere et al Enterprises*' including the cadre of lawyers acting on behalf of the Plaintiff and *Galtere et al Enterprises* 'Plaintiff to the extent that John Harold Murphy is the front-Plaintiff for the funders of the judicial corruption.

26. Millard Farmer first represented Michelle Murphy in a legal malpractice negligence case that was against a lawyer who negligently represented Michelle Murphy in a divorce case that John Harold Murphy filed to obtain

20

a not fair divorce proceeding against Michelle Murphy. Larry King was the legal malpractice expert witness for Michelle Murphy in that legal malpractice case.

27. Information discovered during that malpractice case alerted Millard Farmer to the false swearing, general absence of integrity and illegal conduct of John Harold Murphy related to litigation matters and more particularly the absence of John Harold Murphy's integrity and illegal conduct in matters related to Michelle Murphy, and their children. The willingness of John Harold Murphy to often swear falsely, The enormous wealth his wife, Renee. Haugerud, a hedge fund operator and the disparity in the wealth with Michelle Murphy who was the mother with the physical custodial caretaker responsibilities of her minor children when compared and the wealth of her former husband's wife presented unique responsibilities for Millard Farmer and Larry King to fulfill for Michelle Murphy, their client. This responsibility was dangerously enhanced when combined with the most the most dangerous of all litigation issues which was that Taylor Drake and Glover & Davis, the lawyers for John Harold Murphy were funded in this custody case, by a hedge fund manager with wealth that was used to continue the infection of Judge Baldwin's judicial corruption. that Taylor

21

Drake and Glover & Davis financially and politically created with Coweta

Judicial Circuit Judge Baldwin and others.

The intent of the Civil RICO case was and has been a deprivation of the Constitutional

protections of the Defendants and those accused of attempting to assist Michelle

Murphy. , who as in the Civil RICO cased uses the following components of conduct

to engage in what some will call trafficking in the custody of minor children from Utah

to Thomas U.S. Virgin Islands.

28.

29. This Case Management, plan, when enforced makes it more difficult for

lawyers to select judges with whom they participate in judicial corruption.

selection of judges

30. Larry King, is a lawyers with over 35 years' experience in domestic relations

litigation and Millard Farmer with over (50 years of litigation experience

were faced with a formattable task without the Taylor Drake and Glover

&Davis lawyers hand selection of Judge Baldwin in a custody case in which

Judge Baldwin was also empowered, as the exclusive trier of fact (the only

juror) who from the first hour was beholding to his political and financial

allies, Taylor Drake and Glover & Davis.

22

31. After detecting that Judge Baldwin was purchased by Taylor Drake and the Glover & Davis lawyers The task for Michelle Murphy's lawyers was to have this illegal conduct corrected by having Judge Baldwin disqualified.

32. Cannon 2A, 2B, Canon 3E of the Code of Judicial Conduct are substantive grounds for recusal or disqualification of a judge. These grounds should be assessed in light of two well-recognized principles of Georgia law. First, no one has a right to select the judge of their choice, and a judge, of course, has no right to select the cases over which the judge presides. See Uniform Superior Court Rule 3.1. Yet,  the illegal conduct that the Rule was enacted to protect is what happened in this case and happened in the Coweta Judicial Circuit on a regular basis. (V3 pp.447-448) until Millard Farmer and Larry King began the duty to disqualify Judge Baldwin, the corrupted judge who entered the deal with Taylor Drake , the corrupt lawyer  to be hand selected in an ex parte process to adjudicate the case that John Harold Murphy initiated against Michelle Murphy.

33. The Civil RICO case supplementary litigation scheme, was supplemented with lawyers for John Harold Murphy filing time consuming to respond State Bar of Georgia Grievances on behalf of John Harold Murphy and his financed expert witness, Patricia Nice, M.D. a psychiatrist, See **Ex 66**

1. John Harold Murphy, is not eligible to sustain the Civil RICO case individually, or on behalf of *Galtere et al, the* **real party and cause at interest in this Civil**

23

**RICO case brought in John Harold Murphy's name, the front plaintiff.** The case is brought for the protection of Renee L. Haugerud and *Galtere et al Enterprises'* spoliation of evidence of illegal, fiduciary conduct, for tampering with a witness and other illegal conduct.  John Harold Murphy and *Galtere et al Enterprises* are not constitutionally, or by Georgia law, entitled to sustain this civil RICO action against the defendants and those accused of assisting them for causes related to exposure of *Galtere et al Enterprise's illegal conduct* and for providing defense of the illegal conduct of Judge Baldwin and the illegal conduct of *Galtere et al Enterprises,* including the cadre of lawyers acting on behalf of the Plaintiff and *Galtere et al Enterprises.*'

A person, as John Harold Murphy, now attempts, cannot constitutionally abridge a lawyer's client's Fourteenth Amendment Due Process, Equal Protection and First Amend Protection to the extent that Taylor Drake and the other lawyers of John Harold Murphy and Renee L.  attacked and abridged these protections of Michelle Murphy, Millard Farmer and Larry King and thereafter bring a Civil RICO action against these pro bono lawyers for defending their client and themselves to the extent that any lawyer could have defended their client and themselves under the conditions created by the unconstitutional conduct of the ex *parte* hand selected Judge Baldwin, as the exclusive trier of fact in the custody case (*Taylor v. Taylor* 293 Ga, 616 (2013). A Court cannot jerrymander the triers

of fact, as this corrupt selection of the judge in the child custody case did. Millard Farmer and Larry King conduct in calling the Court attention with motions to the illegal judicial corruption came at a high price; The Due Process protections of *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) provide justification for each alleged cause of action in the Civil RICO case, as a matter of law and public policy. An organized society cannot allow a corrupted judge to engage in the conduct of Judge Baldwin against the persons attempting to assist a mother with minor children from the such as Glover && Davis who were repeat offenders of *their Savannah* corruption.

This case in every respect, against Millard Farmer involves his defense of Michelle Murphy, a client of Millard Farmer, and  The case against the others involves  those persons assisting Michelle Murphy in the Coweta Judicial Circuit case that gives rise to this Civil RICO Case was adjudicated outside the Due Process protections of *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) that the Plaintiff, though his counsel Taylor Drake and Glover & Davis, with an ex parte plan (deal)  with Judge Baldwin created for the constitutional Due Process abridgment that they illegally engaged with the intent to financially and legally damage Michelle Murphy and her counsel.. This in limine motion Motion seeks for this Court, as ancillary to the in limine protections sought to adjudicate the conduct of Taylor Drake,

25

Glover & Davis and Judge Baldwin as violative of the Fourteenth Amendment Due Process, Equal Protections and First Amendment Protections of Millard Farmer, all other Defendants and persons accused of assisting them in the causes of action in the Complaint.

**The underlying Modification of Custody Case's Unconstitutional Infirmity**

The Coweta Judicial Circuit has a lengthy history of depriving litigants of constitutionally composed juries, Millard Farmer and associates for nearly forty (40) years have called this discriminatory unconstitutional conduct to the attention of the Coweta Judicial Circuit's judges. Ironically, now Millard Farmer for himself and others once again calls upon that protection of this for his defense as a client

1.  The Defendants with false accusations were attacked with this Civil *RICO* case and elsewhere. **Millard Farmer is not liable to Plaintiff and committed** no predicate RICO acts**.** Millard Farmer did not engage in any type of extortion, or attempts to bribe any one, or to offer anyone money to engage in judicial corruption Millard Farmer was not the cause of the delays in this case. Addressing ther judicial corruption created by Taylor Drake, Glover & Davis and Judge Baldwin and Court of Appeals Judge Christopher J. McFadden created the delays.

2. Court of Appeals Judge Christopher J. McFadden, while the issue of Judge

26

Baldwin' disqualificaion was pending before the panel that he was on that had adjudicated that it had jurisdiction of the issue legislatively lobbied for enactment of a law that would deny the Court of Appeals jurisdiction of Michelle Murphy's pending appeal involving selection of Judge Baldwin. This lobbying occurred after the Court of Appeals had found it had jurisdiction under the existing law that Christopher J. McFadden sought and had appealed and adjudicated as retroactive in Millard Farmer's appeal of the illegal selection of Judge Baldwin**; It Due to the** new statute that Court of Appeals Judge McFadden was able to get enacted,that was applied retroactive, it was necessary to file with the Supreme Court of Georgia to have the retroactively overturned. The issue of Judge Baldwin hand selection was never addressed on the merits. the spoliation of evidence   is relevant to Millard Farmer's motion in limineand to all phrases ofthe corruption

3. gia State Ba.r Grievance that Counsel of John Harold Murphy filed against Millard Farmer for witnesses who spoliated evidence and who otherwise made relevant false statements under oath about Millard Farmer and his client; the spoliation is relevant to the Glover & Davis conduct  of persons' accused by John Harold Murphy in   illegal regulatory conduct of the hedge fund businesses defending Millard Farmer, Michelle Murphy, her minor children and persons assisting Michelle Murphy, who have been required to litigate

4. 2 This is a statement that the Plaintiff and Renee L. Haugerud cannot make under

oath without **their** committing another **of their** RICO predicate acts.

5.  . The *deal* among Judge Baldwin, Glover & Davis and Taylor Drake was planned with their knowledge that they were abridging Uniform Superior Court Rule 3.1, the rule of law, and Codes of Judicial and Rules of Professional Conduct with their participation in an unconstitutional *ex parte* gerrymandering judge selection scheme

6.  That *deal* provided enormous illegally obtained financial benefits to Taylor Drake, Glover & Davis and these lawyers' client, Renee L. Haugerud's Galtere Ltd., "a global investment, hedge fund and trading company" that involved John Harold Murphy (or, *Galtere et al Enterprises*)

7.  Renee L. Haugerud was aware that her husband, John Harold Murphy, and their personal friend, Coweta Judicial Circuit Judge Louis Jack Kirby, guided the Plaintiff into illegal conduct by suggesting the lawyer for the Plaintiff to obtain for his planned modification of custody case against Nancy Michelle Murphy, a financially and politically weak, relatively new resident to the Coweta Judicial Circuit area. This mother styled hair from her home and spent the remainder of her time caring for her two boys.

8.  Michelle Murphy, early in the case informed Millard Farmer. that Renee L. Haugerud met with her, as a professed peace-maker, to inform Michelle Murphy that **she should 'not put herself through this, because it was a done deal."**

9.  It is accurate that it was a well-planned and financially perfected

28

*deal*.  Renee L. Haugerud knew that the deal was done, because

she knew that John Harold was an experienced law violator

10.  The problem with the illegal "deal" was that Michelle Murphy,
unexpected by the deal's makers, had two lawyers whom,
admittedly, she could not afford with her child rearing
obligations, but who were so professionally offended by the
illegal conduct that they had observed John Harold Murphy
engage during the divorce case that these lawyers were willing to
represent this mother, in protecting the best interest of her
children from the illegal lifestyle and conduct that John Harold
Murphy was engaging as a kept man, engaging in illegal for and
with the hedge fund resources of Renee L. Haugerud's *Galtere et
al Enterprises*

10. Judge Baldwin's illegal deal to be the judge was only the initial "*deal*" of the

totality of the Judicial corruption.

11. There are approximately 5,000 pages of documents identifying the judicial

corruption. That corruption was as contagious, as the stuffing in the purse of Renee L.

Haugerud that John Harold Murphy carried, could find other participants to  judicially

and other wise illegally infect.

12. Judge Baldwin was a hostage, without a sanctuary, from his initial "deal". It was painful to see Taylor Drake's, once respected selected judge judicially wither into the character traits of some of the white-collar criminals that this Judge once saw, or sentenced.

34. Millard Farmer and Larry King never at any time had other than a professional legal relationship and the accompanying legal obligations that were a part of that professional relationship, with Michelle Murphy or her family members and has never represented John Harold Murphy, Renee L. Haugerud or any of their businesses.

35. The Civil RICO assertions against Millard Farmer begin with accusation about Millard Farmer's legal representation of his clients that pre-date 1978 and then move chronologically forward by falsely alleging that those 1978 and thereafter accusation involving Millard Farmer relate to Millard Farmer's representation of Michelle Murphy in that malpractice negligence case and further support the accusations in this Civil RICO case.

36. The malpractice negligence case that John Harold Murphy and Renee L. Haugerud and others became involved was voluntarily closed with a comprehensive consensual settlement agreement, [**Ex 64** ] intended to be a release to end all disputes, excepting for the large universe of Released parties

30

protected rights for indemnification from the Settlement Agreement and

Release's violators.

37.  **John Harold Murphy violated the Settlement Agreement and Release** John

Harold Murphy's violation was first noticed by Millard Farmer when, for

financial and other benefits to him, Renee L. Haugerud and their hedge fund

businesses he initiated his first version of the Civil RICO Complaint [  **1**]

]against the Defendants, *et al*. The first version of the Civil RICO Complaint,

without being dismissed, was amended [  **31**] with duplications and

incorporations from the Complaint's first version [**1**]. The Amended Civil RICO

Complaint continues the violations of the Settlement Agreement and Release.

[Ex**64**]

38. That **Mutual Release and Settlement Agreement [Ex 64** ] was drafted by

counsel for Renee L. Haugerud and John Harold Murphy and was executed  at

their counsel's request in exchange for good and valuable consideration. It

released the universe of persons with prior involvement in the Murphys'

disputes, including but not limited to John Harold Murphy, Michelle Murphy,

Millard Farmer, Larry King and a larger universe of other people charged in the

Civil RICO Complaint, including designated protected parties, their counsel and

all counsel's associates and assistants.

39. Michelle Murphy, as a part of that settlement was paid for some of her financial damages. Michelle Murphy, nor her children were compensated fully for John Harold Murphy's spoliated evidence of his illegal division of the marital assets, child support and other illegal conduct, including John Harold Murphy's retention of marital and child support assets that John Harold Murphy illegally retains and is contractually due Michelle Murphy.

40. John Harold Murphy, who was aware of Taylor Drake's judicial corruption plan, compensated Taylor Drake and Glover & Davis to engage with Judge Baldwin in their ex *parte,* consensual illegal hand selection of Judge Baldwin to be the judge in John Harold Murphy's modification of custody case against Michelle Murphy. (John Harold Murphy v. Nancy Michelle Murphy, Civ. A. No. 2012-V-413 (Ga. Super.Ct., Coweta Cnty., filed Apr. 11, 2012)

41. Taylor Drake and Glover & Davis, long before the beginning of the case involving John Harold Murphy and Michelle Murphy, engage in an lengthy progression of consensual illegal purchases from Judge Baldwin, of his authority as a Coweta Judicial Circuit judge and thereby his additional exclusive authority as a trier of fact the (only juror) in cases involving the custody of minor children and other matters where the judge essentially, was the exclusive trier of fact, as in licensing and attorney fees matters.

32

42. Judge Baldwin intentionally and at times, with malice.in Michelle Murphy's case abused his authority, which abridged the U.S.  Fourteenth Amendment Due Process, Equal Protection and First Amendment Protections of Michelle Murphy, her minor children, her counsel, Millard Farmer, Larry King and other persons attempting to assist Michelle Murphy and her children in obtaining spoliated evidence related to the abuse of the minor children and the children's best interest.

43. Judge Baldwin engaged in illegal conduct for present and future compensation, and/or political power, that provided Judge Baldwin assurance of additional compensation.  Judge Baldwin obtained personal benefits for himself and others, some of whom consensually assisted Judge Baldwin in spoliating evidence of his illegal and fraudulent conduct that violated his duties as a trial judge and oath of office,  that Judge Baldwin owed not just to Michelle Murphy, her counsel and other accused Civil RICO parties, but Judge Baldwin owed this duty to all people, even those who do not provide the judge campaign election money and political support for a judge, or for a Judge's choice for a political office with in kind valuable political support and favoritism.

44. That universe of affected persons by the judicial corruption addresses the importance of a federal investigation. Millard Farmer exhausted a state court attempt to present evidence and to have a hearing on the corruption. That Corruption Motion is Ex **67**. and is so factually relevant to the conditions that

33

Millard Farmer and Larry King were representing Michelle Murphy pro bono that

it and the excerpts of the facts contained in that 98-page motion are include,

without that motion's attachments after the following full title of that motion in

**this  following Memo of law**.to the

Motion for an Investigation, Public Disclosure and Termination of the
Corruption of Judge A. Quillian Baldwin, Jr. and those Participating in,
conspiring with and initiating his Corruption, by financing, and otherwise
providing incentive to those persons and entities engaging in fraud,
perjury, false statements and false swearing

This Motion includes a Request for the immediate Disqualification of Judge Baldwin,
until he is provided his Due Process protections that accompany the most appropriate
discipline for his judicial misconduct and removed. Included here is a Plea to Judge
Baldwin's Personal Jurisdiction while Seeking Other Relief that is Necessary to
Access Murphy and T immediately.

January 1, 2015 Picture of John Harold Murphy rRenee L. Haugerud, Michelle Murphy, and the
minor children J.M.and T.M Omitted. (or, "family") Jan. 1, 2015 Photo taken in Utah. **They met
to work this out fairly!**

Michelle Murphy urgently needs State of Georgia Funded financial and investigative

Motion continues

**3. Two Different Sets of Books Documenting One Transaction is another
timeworn, but never the less true, identity of an Attempt to Hide Corruption that
is of itself corruption.**

3.1Judge A. Quillian Baldwin, Jr. mandated that there be two sets of books of the

pleading filed on behalf of Michelle Murphy in this case. One set is kept by the Clerk

of Superior Court of Coweta and available to the public and the other document,

without any hearing are not retained by, or tendered to the Clerk of Court. Judge A. Quillian Baldwin, Jr. will not permit Nancy Michelle Murphy to file any new action, motions, or petitions without his approval of the document that counsel for Michelle Murphy seeks to file.3.2This Order by Judge Baldwin has resulted in him denying the right of counsel for Michelle Murphy to file two motions to disqualify him and other documents and motions. Before counsel for Michelle Murphy can have the proposed filing retained by the clerk of court, counsel for Michelle Murphy must present the proposed filing to Judge Baldwin for his approval after first serving the proposed filing upon opposing counsel. This requirement is per se judicial corruption that invites ex parte communications with opposing counsel There is no such illegal requirement placed upon opposed counsel and this illegal restraint was placed upon Michelle Murphy's counsel without an opportunity for a hearing and was the subject of a motion to disqualify Judge Baldwin. If the proposed document is rejected for filing by Judge Baldwin, The Clerk of Court does not retain an official record of the document for appellate review.

35

review

### ORDER

Defendant and her attorney have filed numerous motions and petitions in the above styled case. Most of these filings have been frivolous, malicious, vexatious and redundant. "No person is free to abuse the courts by inundating them with frivolous suits which burden the administration of the courts for no useful purpose." Higdon v. Higdon, 321 Ga.App. 260, 266, 739 S.E.2d 498, 504 (Ga.App.,2013) citing In re Carter, 235 Ga.App. 551, 552(1), 510 S.E.2d 91 (1998).

Therefore, the Court hereby ORDERS that before filing any new actions, motions or petitions, Defendant must satisfy certain conditions:

1) Defendant must file a "Request to File," in the Clerk of Court's Office;
2) attach the document she wishes to file to the "Request," as an "Exhibit";
3) attach to any such pleading, motion, petition, or any other filing, a copy of this Order; and
4) present a courtesy copy of the Request, along with the Exhibit to the Judge's Chambers.

If the Court finds that the action is not frivolous, malicious, vexatious, or redundant then the Court will approve the action, motion, or petition for filing. The purpose of this Order is to aid the Court in the orderly administration of its business.

SO ORDERED, this 16TH day of October 2014.

Honorable A. Quillian Baldwin, Jr.

The Background of the Case is Relevant, to understanding the Corruption that resulted in the Contempts that were Retaliatory, but Worse, were Against all protection of the LAW provided to a litigant and the litigant's lawyer.

Michelle Murphy, the custodial parent, is defending herself and the choices of her children to live with her as a family in two equally difficult arenas due to her income and financial resources. She is defending in the courts and defending in the real world, where the children are being financially deprived and emotionally attacked to facilitate their takeover by John Harold Murphy and Renee Haugerud, his current multimillionaire spouse. (V16 p.3436)

The money derived from the business of Renee L. Haugerud financed Patrick

36

Crosby, a profession public relation expert, who attempts to sponsor to the public that Michelle Murphy is an "unfit" mother.

While the efforts of John Harold Murphy and Renee Haugerud, are in two very different arenas, they and their cadre of lawyers have one unified tactic, *i.e.,* to financially deplete the resources of Michelle Murphy to cause her submission. See, *e.g*., Renee Haugerud's Motion for Attorney's Fees (V7 p.1437); Glover & Davis' request for attorney fees (Tr. Oct. 3, 2013, p.68, lines 13-22) motion for $9,000 supersedeas bond to allow appeal of her contempt action that was confirmed by the Court of Appeals and is now pending on a petition for writ of certiorari to the Georgia Supreme Court.V18, p.3823)

The contempts adjudicated by Judge A. Quillian Baldwin, Jr. originated in this modification of custody case (V1 p.1) initiated against the custodial parent, Michelle Murphy, by John Harold Murphy, who only lived in their home until TMwas 18 months old and JM was 30 months old before moving to New York, leaving Michelle Murphy, Murphy, now age 16, and T M, now almost 14 years old, in Georgia.

The litigation against Michelle Murphy was initiated and continued with combined attempts by John Harold Murphy to create a financial crisis for Michelle Murphy with the combination of expensive litigation costs and the deprivation of financial, educational support for the children that he and Renee Haugerud voluntarily provided since Superior Court Judge Louis Jack Kirby performed John Harold Murphy's marriage ceremony with Renee Haugerud, a multimillionaire hedge fund operator. (V16 p.3440)

After Michelle Murphy, informed John Harold Murphy that she would not yield to his request for her and the children to move to Tennessee near Renee Haugerud's home on Lookout Mountain, he began the financial assault upon the

family by withdrawing transportation for the children from Newnan to the private school in Atlanta that Murphy/Haugerud had previously, voluntarily provided. (V9 p.1768)

The type of conduct in which John Harold Murphy and Renee L. Haugerud have engaged is a clear indication that it is not in the "best interest of the children." It is a part of their agenda that is to obtain another possession that just happens at this time to be the children, whom they display as ornaments. Their possession is to fill a void in what Renee Haugerud calls her 21st payoff life. (V14, 2766)

Taylor Drake, the Glover & Davis lawyer initially sent a proposed contract to Michelle Murphy that required her and the children to move to Chattanooga, or be imperiled with this modification litigation. (V8 p.1567)

John Harold Murphy and Renee Haugerud apparently view Michelle Murphy only as a "nanny" or a surrogate mother for the children. John Harold Murphy maintained that Renee Haugerud was the natural mother of T Murphy on a recent visit to the emergency room for his alcohol poisoning that occurred while visiting in their Atlanta residence. (V16, p.3489) Murphy/Haugerud consider Michelle Murphy to be a hair stylist beneath their social and economic status and do not accord her the dignity deserved for the mother who raised the children when their father left their home for New York and other women long before he began living with Renee Haugerud.

When Michelle Murphy refused to move from Newnan to Tennessee, the Glover & Davis lawyer used an "emergency" motion to select Judge Baldwin.

He was easily selected by the Glover & Davis lawyer falsely alleging an emergency, with the sworn statement of John Harold Murphy that Michelle Murphy was planning to move to South Carolina. (V1 p.13) The Standing Order prevents such a move, in

38

the Coweta Judicial Circuit, upon the filing of any type of domestic relations complaint without the feigned emergency hearing on the day that Judge Baldwin was presiding. This tactic was used by the Glover & Davis lawyer to hand pick Judge Baldwin for this case. (V1, p.7)

Judge Baldwin, without granting a requested hearing, over strenuous objection, signed, without reading, a Glover & Davis prepared order illegally appointing Melissa Griffis, the Glover & Davis selected guardian ad litem (V1, p.23) and provided her authority unauthorized by law. This guardian ad litem had co-sponsored a judicial political rally with Taylor Drake, attended by Judge Baldwin on the night before her appointment. The Order, contrary to what Judge Baldwin was told that he was signing, made Michelle Murphy potentially liable for payment of the fees of the guardian ad litem. (Tr. Nov. 15, 2012, p.33, l. 25- p. 34, l. 22)

The guardian ad litem was illegally granted the authority to temporarily modify custody without judicial approval that **shall** be followed. This illegal authority is not authorized and statute, or the Uniform Superior Court Rules. Uniform Superior Court Rule 24.9 provides the authority authorized for a guardian ad litem. Superior Court judges are restricted The authority that the Glover & Davis lawyers included in the appointment order that Judge Baldwin signed without reading is, as follows.

39

The GAL may make temporary recommendations/adjustments during the pendency of this action regarding custody and parenting time and the parties shall follow said recommendations of GAL. (V1 p.23)

Judge Baldwin, without knowing, or by intentionally misstating the Uniform Superior Court Rules, states as follows in his disqualification order.

While the court acknowledges that it is better practice to read such order, in this case it was not needed. The GAL order was a standard order that the Judge has seen a number of times. Further, the order tracts the Uniform Superior Court Rules for the duties of a GAL.

Judge Baldwin did accurately state that the Glover & Davis lawyer includes this illegal authority in the Glover & Davis prepared guardian ad litem appointment orders that apparently Judge Baldwin, as a matter of practice always signs without reading.

Elizabeth "Lisa" F. Harwell the replacement guardian ad litem after Melissa Griffis resigned, who was not even provided the authority to change temporary custody that Melissa Griffis was granted and without any legal authority, to the detriment of Michelle Murphy, attempted to use authority granted to Melissa Griffis to create an order to Michelle Murphy about the children going to school in Atlanta rather than near their home in Coweta County. This order by Elizabeth "Lisa" F. Harwell created expensive litigation costs for Michelle Murphy. (V16 p.3394).

The illegal conduct of theGAL, Elizabeth "Lisa" F. Harwell, is relevant, as it

40

was Elizabeth "Lisa" F. Harwell alone who selected the psychologist with the illegal contract that Judge Baldwin attempts, with an aspect of the contempt, to force Michelle Murphy to sign.

This conduct of Elizabeth "Lisa" F. Harwell attempting to modify custody at the beginning of the school year with the approval of the Judge accepting the blanket assignment of this authority in the appointment order, initiated an expanded disqualification of Judge Baldwin motion that he denied on June 7, 2012. (V2 p.306), That disqualification motion addresses the illegal conduct that Judge Baldwin identifies as "messing" with him. Judge Baldwin has no respect for those who seek the protections provided by the LAW.

The June 7, 2012 denial of disqualification Order was appealed to the Court of Appeals and was not adjudicated on the substance of the conduct of Judge Baldwin, but upon procedural grounds.

It is relevant to here state that violations of the Code of Judicial Conduct can occur even if the violations of the Code are not reversible legal error.

The June 7, 2012 Order disputed other facts in the affidavit supporting the disqualification motion and further violated the Uniform Superior Court Rule 25, *et seq.* as Judge Baldwin did not refer the motion to another judge and did not cease acting on the merits of the case, as required by USCR 25.3 Duty of Judge.

The lynchpin in all appellate matters in this case is Judge Baldwin's violations of the Canons of the Code of Judicial Conduct (or, "Canons") and the Glover &

Davis lawyer's selection of Judge Baldwin. The Glover & Davis judge shopping selection of Judge Baldwin was doable with a combined feigned "emergency" motion (V1 p.13) and the absence of a Uniform Superior Court Rule 3.1 case management plan. (V2 p.310; V3 pp. 436, 447, 506) Glover & Davis lawyers engage in a pattern of judge selection conduct. Superior Court Judge Louis Jack Kirby knew of this when he suggested Taylor Drake as counsel for John Harold Murphy.  See, *Mayor & Aldermen of Savannah v. Batson-Cook Co.*, 291 Ga. 114 (2012).

When John Harold Murphy began withdrawing transportation for the children voluntarily provided to an Atlanta private school that Murphy/Haugerud had previously offered to the children, (V9 p.1768) Michelle Murphy informed the John Harold Murphy that she could not afford the transportation to Atlanta schools twice a day while engaging in her occupation as a hair stylist. Taylor Drake after rejecting alternative suggestions for transportation, wrote a letter accusing this hair stylist of "laziness" in not making the two trips to the Atlanta schools each day from Newnan. (V9 p.1783)

When Michelle Murphy made it clear that if alternative suggestions for transportation (Tr. Aug. 30, 2012 p. 10) were not accepted she would not take the children to the Atlanta schools, Elizabeth "Lisa" F. Harwell, without court approval, ordered the children to stay with John Harold Murphy in Atlanta at the beginning of school. (V9 p.1788)

   Michelle Murphy refused to surrender the children, as ordered by Elizabeth

42

"Lisa" F. Harwell and enrolled the children in public school in Coweta County.

Taylor Drake then obtained an "emergency" hearing before Judge Baldwin on August 30, 2012. Judge Baldwin, after hearing the testimony of the psychiatrist expert witness for John Harold Murphy to whom Elizabeth "Lisa" F. Harwell committed to pay $1,500 to testify, was unable to identify any emergency. (Tr. Aug.30, 2012 p. 72, lines 20-25) The hearing was a flop for the goals of "Murph," as Elizabeth "Lisa" F. Harwell called John Harold Murphy.

Judge Baldwin, at that August 30, 2012 hearing, issued the following threat to Michelle Murphy, whom he knew could not afford the litigation.

> **But let me just talk again to the parties. Do y'all want to keep putting all this money out here, fussing about this thing?**
>
> **I mean, again, if you don't have anything to fear, if everything is all right, and everything's been done the way it's supposed to be done, you don't have anything to fear about losing custody of the children.**
>
> **And I just wanted to know if y'all really want to just keep dragging this out like this. You know, y'all can spend money to kingdom come, that kind** of thing. **And there's no kind of guarantee that I'm going to award any attorney's fees, you know,**

43

**to cover any of this stuff. There's nothing that**

**requires me to do that. And so I just want all to**

**think about that.**   (Tr. Aug. 30, 2012, p. 29, lines 2-15)

It was at the next hearing that Elizabeth "Lisa" F. Harwell, an attorney who appears before Judge Kirby on a regular basis with her private clients, (Tr. Aug. 30, 2012, p. 68, line 9) was caught by counsel for Michelle Murphy converting funds to her personal use in violation of USCR 24.9(8)(g). As a part of the corruptive conduct of Judge Baldwin, he approved of the violation of the LAW by Elizabeth "Lisa" F. Harwell (Tr. Nov 15, 2012, p.30, l. 9-p.33, l. 22).She then began attempting to get Judge Baldwin to Order the employment of another expert psychologist, called a "custody evaluator." There are no special circumstances to justify this unnecessary expense. This was yet another expensive, unnecessary "expert witness" litigation tactic in which Michelle Murphy could not afford to equally participate and litigate.

Those costs were paid from the bank accounts controlled by Renee L. Haugerud. Elizabeth "Lisa" F. Harwell selected "custody evaluator," not experts for the best interest of the children, as their lives were being tormented by the snatch and grab litigation tactics of the John Harold Murphy and Renee L. Haugerud cadre of lawyers, investigators and experts who cannot even legally turn up an untidy lawn.

44

Judge Baldwin, who was very ruffled by the disqualification motions' disclosure of his conduct and the appeal of his Order denying them, began to participate with the Glover & Davis lawyers, who were using the tremendous disparity in income and wealth of the parties as a detriment to Michelle Murphy.

In his June 7, 2012 Order, Judge Baldwin disputed the relevant facts contained in the supporting affidavit**.** (V2 p.306) See, *Isaacs v. State*, 257 Ga. 126 (1987); *Birt v. State* 256 Ga. 483 (1986). Judge Baldwin opposed each disqualification motions that he denied with a travesty of justice Order that was filed on December 4, 2013, without referring the matter to another judge. (V17, p.3827)

It was necessary for Michelle Murphy to present a ready to file Petition for a mandamus to the Attorney General to waive service before Judge Baldwin following the advice of the Attorney General denied the motion with the December 4, 2013.  See, the attached petition for mandamus that was presented to the Attorney General.  XXXX

**The disqualification motions affected the contempt adjudications; more accurately stated, the disqualification motions were Judge Baldwin's corruptive motivation for the contempt adjudications.**

After Judge Baldwin's June 7, 2012 denial of his disqualification, Judge Baldwin clothed himself with a Teflon armor attitude and declared as follows.

`And I'm not going to recuse myself.  I'll tell you`

45

**right now, I'm not going to recuse myself.  And I'm
going to put in there -- because y'all have already
had your chance on recusal.  It's been appealed.  They
upheld me staying in this case and not recusing myself.
And we're just going to keep it like that.**[emphasis
supplied] (Tr. Oct. 3, 2013, p. 17) See, *Murphy v. Murphy*, 322 Ga. App. 829
(2013)

Counsel for Michelle Murphy has never understood if the above statement of Judge
Baldwin. This statement could be a part of Judge Baldwin's absence of knowledge
about the law, or it could be a sophisticate cover for the statement that Judge Baldwin
made on August 13, 2013 when he informed counsel that he was a classmate of the
soon to be Chief Justice Hugh Thompson. Judge Baldwin after identifying the
relationship stated that after this case that he was going to contact Justice Thompson
and ask that he eliminate appeals of disqualification motions until the end of domestic
relations cases. If Judge Baldwin did make the request and discussed the case, this
should be revealed to counsel for Michelle Murphy. Certainly, Justice Thompson had
no role in the conduct of Judge Baldwin, but it is difficult to determine the reason that
Judge Baldwin continually made the same statement that a lawyer is only granted one
opportunity to seek a recusal.

46

Sticking by that manifesto that a lawyer can only file one motion, regardless of later events, but failing to perform his non-discretionary, sworn duty, Judge Baldwin refused to obey the non-discretionary dictates of Uniform Superior Court Rule 25, *et seq*. (Recusal) and never entered an order adjudicating any other disqualification motions that were filed on June 13, 2012 (V3, p.436)**;** July 2, 2012 (V3, p.502); Aug. 19, 2013 (V10, p.1904); Aug. 28, 2013 (V11, p.2195); Sept. 13, 2013 (V12, p.2321); Oct. 7, 2013 (V14, p.2890); and Nov. 26, 2013 (V17, p.3639) until December 4, 2013 when he entered yet another Order in which he, as he did in his June 7, 2012 denial of his disqualification motion, once again opposed by disputing his disqualification motion's affidavits with both deceptive and false statements. (V17 p.3827)

Adding grounds to his disqualification and thereby his corruption in the unadjudicated, pending disqualification motions, Judge Baldwin, with the motions pending, and without adhering to USCR 25.3 to "temporarily cease to act upon the merits of the matter and shall immediately determine the timeliness of the motion and the legal sufficiency of the affidavit, and make a determination, assuming any of the facts alleged in the affidavit to be true, whether recusal would be warranted"  proceeded with the Glover & Davis request to hear the merits at an August 13, 2013 hearing. That hearing resulted in the August 23, 2013 Order.

The August 23, 2013 Order (V11, p.2187) modified visitation, *i.e*., modified custody, (*Edge v Edge,* 290 Ga 551, 552 (2012) as determined by the Divorce Decree (V2,

47

p.411 ) and Standing Order of all the Circuit Judges (V1, p.7), after the Court refused to allow Michelle Murphy to present evidence, (Tr. Aug. 13, pp.235, 274) or to complete the cross-examination of John Harold Murphy's witness (Tr. Aug 13, p. 276), at the August 13, 2013 hearing, contrary to *Shore v. Shore*, 253 Ga. 183 (Ga. 1984) and its progeny. All, while there were four pending, unadjudicated judge disqualifications motions. (V3 p.436; V10 p.1904; V11 p.2195; V14 p.2890)

Baldwin never read before signing and filing the *ex parte* obtained August 23, 2013 Order. (V11 p.2214) Judge Baldwin defends the *ex parte* letter delivered by Michael Williams Warner (V14, p.2752) that accompanied the proposed August 23, 2013 Order.

> **THE COURT I'm just tired of things -- Like I noticed**
> **in this thing y'all talk about some kind of ex parte**
> **conversations. I don't think I have had any ex parte**
> **conversations with Mr. Drake about this anytime**
> **lately if I ever had any. I don't think, since the**
> **beginning of this case I have, partly because of**
> **all the stuff that's been going on in the State**
> **about ex parte conversations. *      *      * And I**
> **don't believe I have had any ex parte conversations,**
> **and I don't see how y'all could know about any**

48

`unless you supposedly have my phones bugged or his` **(Tr. Oct. 3, 2013, p.15, lines 4-17).**

`phone bugged.`

Before Michelle Murphy received or learned of the *ex parte* supported August 23, 2013 Order, a deputy sheriff, whose office is represented by Glover & Davis PA, came to the home of Michelle Murphy to get the children to comply with the modified visitation, *nunc pro tunc* to August 13, 2013. (V14, p. 2702)

The August 23, 2013 Order was obtained with an *ex parte* communication to Judge Baldwin, containing facts not in evidence and false statements, not provided to counsel for Michelle Murphy, until after the Order was obtained and filed.  (Tr. Oct. 3, 2013, p. 19, lines 12-23)

On August 29, 2013, the Glover & Davis lawyers filed a Motion for Indirect Criminal Contempt accompanied only with a "notice of hearing" without a Rule Nisi or subpoena requiring that Michelle Murphy attend a hearing. (V12, p.2243), Michelle Murphy responded on September 23, 2013 to that contempt motion with detailed, supporting affidavits refuting the motion. (V14, p.2721)

That motion and the Amended Contempt were abuses of the criminal process.

A proceeding on the motion occurred on October 3, 2013 without a Rule Nisi or subpoena for any person to attend. The response, with support of affidavits from the children, with a recorded cell phone conversation by one of the children

49

with John Harold Murphy, clearly indicated that John Harold Murphy could not sustain an indirect criminal contempt, even if he had provided the due process required service, as he consented to the children not visiting, as he was in St. Thomas on his visitation time. (V14, pp. 2743, 2758, 2763)

After John Murphy and the Glover & Davis lawyers orchestrated the Deputy Sheriff's illegal display of force to the children gimmick that did not result in an incident, and the Glover & Davis lawyer realized after obtaining the response, supported by the affidavits of the children and their mother, that John Harold Murphy had made a false statement under oath, they changed their attack.

The Glover & Davis lawyers then attempted to use the August 23, 2013 Order, while it was on appeal to the Supreme Court of Georgia (V14 p.2774) as the basis for the hasty, illegal filing on Friday, September 27, 2013 of an Amended Contempt Motion (V14 p.2779) The Amended Contempt Motion was one shoddy piece of legal work apparently designed only to take additional advantage of Judge Baldwin while also initiating a threat of incarceration action against Michelle Murphy and her lawyers to appease Murphy/Haugerud.

The Amended Contempt Motion was not supported with a notice of hearing that would have been an infirm due process notice to a person charged with the October 3, 2013 indirect contempts. (V14 p.2807)

The Amended Contempt Motion did not include a Rule Nisi

50

The Amended Contempt Motion did not subpoena any person.

The Amended Contempt Motion was not even copied to Larry King.

The Amended Contempt Motion stated that it was for contempt of "Defendant's lawyer" [singular] when Michelle Murphy had two lawyers and the lawyer charged was not named. (V14, p.2782)

The Amended Contempt Motion was not a charging document that comported with the LAW to the extent that it could legally be adjudicated. (V14, p.2817) The Thursday, October 3, 2013 court calendar posted and sent to counsel from the Clerk of Court of Coweta County did not indicate that the Amended Motion for Contempt, or any motion for contempt, was on the Thursday, October 3, 2013 calendar, as the "Prosecutor/Plaintiff" Taylor Drake of Glover& Davis did not obtain from the Judge, or any Clerk, a Rule Nisi to have served upon the persons charged. (V14 p. 2807) See, *Crocker v. Crocker*, 132 Ga. App. 587, 589 (1974)

Michelle Murphy, Larry King and Millard Farmer filed a comprehensive response to the September 27, 2013 Amended Motion for Contempt. (V16, p.3334) The response pled to the jurisdiction of Judge Baldwin to hear the Amended Contempt Motion.

Judge Baldwin abrogated his judicial authority in all relevant matters in the entirety of this case to the Glover & Davis lawyers. It is unconscionable, but certainly not unpredictable that Judge Baldwin delegated the preparation of the

contempt orders to the Glover & Davis lawyers.

It is unconscionable that the Taylor Drake included false findings of fact in the Order that he prepared for Judge Baldwin to sign. The Glover & Davis lawyer included the findings in the Order that Judge Baldwin may or may not have read before singing, as on previous occasions Judge Baldwin did not read the orders that he signed.

The November 19, 2013 Order falsely states, without evidence that "Defendant and her lawyers had reasonable and sufficient notice of the hearing." Again, the Order states that "The Court further finds that Defendant had reasonable notice of the hearing but failed to appear and present evidence."

The ironic aspect of this finding that Defendant "failed to present evidence" is the August 23, 2013 Order that "Defendant" is accused of violating resulted from a hearing on August 13 where Michelle Murphy and each of her counsel did appear, but Judge Baldwin aborted the hearing for a personal commitment and never allowed Michelle Murphy to present any evidence, including the principal and teacher from the children's school, who awaited all of the hearing to testify. *Shore v. Shore*, 253 Ga. 183 (1984) and its progeny.

There was absolutely no evidence to support that Michelle Murphy, Larry King or Millard Farmer were provided a Rule Nisi, a subpoena to appear or any other notice that fulfills the requirements of due process.

Judge Baldwin doesn't read the orders that he signs, and, worse, has such little understanding of the law relating to contempt that on October 3, 2013, he initially held Larry King in contempt for just attempting to explain the impropriety of Judge Baldwin beginning the hearing with the shoddy papers that the Glover & Davis lawyers filed without the vaguest understanding of the due process protections associated with criminal prosecutions, albeit the prosecution for contempt.

The inability of Judge Baldwin even to allow Larry King to explain the due process protections involved in contempt actions speaks the reason that Uniform Superior Court Rule 3.1 was never implemented in the Coweta Judicial Circuit and the reason that due process protections in the court is at such a low level that orders drafted by political friends are signed without reading.

Cannon 2A, 2B, Canon 3E of the Code of Judicial Conduct are substantive grounds for recusal or disqualification of a judge. These grounds should be assessed in light of two well-recognized principles of Georgia law. First, no one has a right to select the judge of their choice, and a judge, of course, has no right to select the cases over which the judge presides. *See* Uniform Superior Court Rule 3.1. Yet, that is what happened in this case and happened in the Coweta Judicial Circuit on a regular basis. (V3 pp.447-448)

Persons accused of conduct that subjects them to incarceration are entitled to a

53

trier of fact who is not biased. Judge Baldwin and the contempt convictions do not open the first gate to uphold the contempt convictions under the *Cole v. Arkansas*, 333 U.S. 196 (1948) standard of adequate notice of the charges and under the *In re Winship,* 397 U. S. 358, requirement that to support a criminal conviction the record must reasonably support a finding of guilt beyond a reasonable doubt.

Judge Baldwin not only deprived the applicants of a fair hearing, he deprived the applicants of a motion for new trial before a fair jurist, when, after the November 19, 2013 contempt Order, he denied all the disqualification motions that were pending before the November 19, 2013 Order., thereby not allowing another judge to take over this case. With Judge Baldwin remaining in the case there is no possibility for the applicants to obtain a fair ruling on a motion for new trial that reviews the criminal contempt convictions under a different standard. See, *Walker v. State*, 292 Ga. 262, 264-265 (Ga. 2013)

> In particular, Section (B) (7) of Canon 3 of the Georgia Code of Judicial Conduct forbids a judge from considering an *ex parte* communication: Judges shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. Judges shall not initiate or consider *ex parte* communications, or consider other communications made to them outside the presence of the parties concerning a pending or impending proceeding.

54

*Ex parte* communications "are presumed to have been in error."

"[W]hen the court considers facts not properly in evidence, the other party has rights that cannot be protected fully if he is thus denied the privilege of cross-examination. *Arnau v. Arnau*, 207 Ga. App. 696, 697 (Ga. Ct. App. 1993)

The law relating to indirect contempt is clear. Michelle Murphy, Millard Farmer and Larry King were accorded no due process protections that *Crocker v. Crocker*, 132 Ga. App. 587, 589 (1974) identifies must be provided:

In cases of constructive contempt of court, where the alleged contumacious conduct is disobedience to a mandate of the court, not an act in the presence of the court or so near thereto as to obstruct the administration of justice, the law requires that a rule nisi issue and be served upon the accused, giving him notice of the charges against him, and that he be given an opportunity to be heard. [citations omitted]

1.6.2   Michelle Murphy need an investigator who has the authority to require statement under oath about the participation of the following person with the corruption of Judge Baldwin.

**Elizabeth "Lisa" F. Harwell**, the guardian ad litem who illegally took funds in violation of Uniform Superior Court Rule 24.9(9)(g) that Judge Baldwin allowed after her illegal was disclosed by counsel for Michelle Murphy.

**Melissa Griffis,** who co-sponsored the fund raiser attended by Judge Baldwin on

55

the night before Taylor Drake judge shopped to obtain Judge Baldwin who, over strong objection of counsel for Michelle Murphy signed without reading an Order appointing Melissa Griffis, as the guardian ad litem with authority to change temporary custody of the children without approval of the Court. Her compensation was set at $250 per hour while the mediators in Coweta County are paid $100 per hour.

**Nan Freeman** of Georgia that required to legally perform her obligations as an official court reporter.

The transcript that documents that Nan Freeman did not provide a transcript of four pages of the May 27, 2014 "Blame Yourself, Blame Yourself, Blame Yourself until after an action by Larry King to obtain that transcript. It was also necessary to bring a civil complaint against Nan Freeman in the Superior Court of Fulton County that has been transferred to the Superior Court of Troup County after compliance by the Fulton County jurisdiction defendants. Copy of the deposition transcript of Nan Freeman is Exhibit 68 There is a video recording that supports the transcript that is available.

**Peter Durham** sponsored false statement on behalf of Renee L. Haugerud and was a participant in the garnish of the bank account of Elvira Dimitrij, the wife of Millard Farmer on behalf and apparently with the authority of John Harold Murphy.

**Renee L. Haugerud** passim

Representative of **Galtere LTD**, Galtere N.A., Inc. and the businesses that Renee L. Haugerud has a business interest in St. Thomas USVI

Nathan Lee of Glover & Davis who represents Coweta County

56

Peter J. Skandalakis, District Attorney Coweta Judicial Circuit and ADA, Monique Lynn Fouque (wife of Superior Court Judge Jack Kirby)  who were advised of the illegal conduct of Nan Freeman. But did not seek the investigation of the private client court charges and did not have accurate complete invoices to document their statements that they got extra copies of transcripts.

Mark Lawrence Degennaro, Attorney for Troup County

Willis McKenzie LLP  who had knowledge of the absence of enforcement of the Case Management Plan in the Coweta Judicial Circuit.

Representative of Foxy's Bar Jost Van Dyke, BVI

This is the Bar that the children were taken by the Front Plaintiff to purchase "Pain Killer' alcoholic drinks without his supervision and the location that the Front-Plaintiff would drive with the children in the car to the pick-up location while he John Harold was so drunk that the children begged to be allowed to exit the car.

Judge Louis Jack Kirby is the Coweta Judicial Circuit who before becoming a Superior Court Judge represented John Harold Murphy when he secreted approximately $180,000 in stock options that he exercised on the day after Michelle Murphy executed the divorce settlement agreement.

Probate Judge of Troup County Georgia

John Harold Murphy and Renee L. Haugerud each with false swearing on separate document made knowingly false statements to obtain marriage licenses for Superior Court Judge Louis Jack Kirby to use in a marriage ceremony that Coweta Judicial Circuit Louis Judge Kirby used in Walker County Georgia to marry John Harold Murphy and Renee L. Haugerud. There is a video deposition of Judge Kirby' statement about the marriage and his being deceived by John Harold Murphy.

2.1.5                         We were likewise warned in *Mayor &*

*Alderme*n *of Savannah v. Batson-Cook Co*., 291 Ga. 114 (2012), another Glover &

Davis PA case of the law firm in this case that was also involved judicial corruption. That case also resulted from judge shopping that occurred during the absence of a Uniform Superior Court Rule 3.1 case management plan. Quotes from an appeal portions of the application (exhibit xx follow.

The quotes are to support the factual statements made in the application

This application seeks an appeal of the November 19, 2013 adjudications of contempt against Nancy Michelle Murphy, Larry King and Millard Farmer (V17 p.3624) that resulted from a Thursday, October 3, 2013 proceeding involving the Amended Motion for Contempt (Tr. Oct 3, 2013) that was filed on Friday, September 27, 2013, and not noticed for a hearing. (V14 p. 2779)

There was no Rule Nisi or subpoena that required the attendance of Michelle Murphy, Larry King and Millard Farmer at the previously scheduled October 3, 2013 hearing on an earlier filed Motion for Contempt (V12, p.2243) that also did not require attendance of these applicants with a Rule Nisi or subpoena. See, *Crocker v. Crocker*, 132 Ga. App. 587, 589 (1974).

The adjudicated contempts resulted only from assertions made in the September 27, 2013 filed Amended Motion for Contempt.

The assertions in the Amended Motion were based upon an August 23, 2013 Order that was rendered for an August 13, 2013 hearing that was terminated over

objection of counsel without Nancy Michelle Murphy (or, "Michelle Murphy") being allowed to present her witnesses or evidence, or even to complete the cross-examination of John Harold Murphy's expert witness, who, with a history of substance abuse, was slurring her words. See, *Shore v. Shore* 253 Ga. 183 (1984) and its progeny.

The Applicants were not provided even a due process, insufficient Notice of Hearing for the Amended Motion for Contempt.

The August 23, 2013 Order that was the basis for the assertions in the Amended Motion for Contempt was noticed for appeal by Michelle Murphy before the Amended Motion for Contempt was filed. (V14 p.2774)

There were numerous motions to disqualify Judge A. Quillian Baldwin that were not adjudicated before the filing of the Amended Motion for Contempt. (*infra,* p. 17; V3 p.436; V10 p.1904; V11 p.2195; V14 p.2890)

Michelle Murphy, Larry King and Millard Farmer filed a comprehensive response to the September 27, 2013 Amended Motion for Contempt. (V16, p.3334) The response pled to the jurisdiction the "Amended Contempt."

Judge Baldwin was clearly placed on notice of the pending appeal, his failure to adjudicate his disqualification and the fact that the August 23, 2013 Order was

obtained by the Glover & Davis lawyers with an *ex parte* letter that contained false statements about Michelle Murphy that were not in evidence.

This application details the disqualification of Judge Baldwin and misconduct of the Glover & Davis lawyers in order to expose the malicious abuse of the criminal process to obtain an illegal advantage in the underlying case.

**Michelle Murphy held in contempt of August 23, 2013 Order and incarcerated** until she signs documents submitted to her by a psychologist, Nancy McGarrah, that provided this psychologist complete immunity -- not just statutory, bad faith immunity, and obligated Michelle Murphy, a hair stylist, to be responsible for expensive fees and financial liability to depose the witness, have the witness' presence in Court. (V17 p.3627)

**Michelle Murphy ordered to** pay $5,000 to John Murphy within thirty (30) days pursuant to OCGA. 19-9-3 and is based on, inter alia, the attorney's fees Plaintiff incurred in seeking to compel Defendant's compliance with the August 23, 2013 Order. See, *Horn v. Shepherd*, 292 Ga. 14, 14-21 (2012) The Court did not consider the disparity of the ability to pay. (V17 p.3628)

**Millard Farmer held in indirect criminal contempt** of the provisions of the August 23, 2013 Order prohibiting Defendant or her attorneys from discussing this case or the issues raised herein with the Children and further in contempt for Michelle Murphy's failure to appear at October 3, 2013 indirect criminal contempt

60

hearing. Millard Farmer was ordered incarcerated for 20 days or until he pays $1,000.00. (V17 p.3628) The Order of Judge Baldwin actually stated that Millard Farmer could not talk with the children except as necessary to address the divorce custody provisions *etc*

**Larry King was held in contempt twice.** After being taken into custody and paying $1,000, Larry King was released after Judge Baldwin withdrew the first contempt that occurred as quoted below (Tr. Oct 3, 2013 p.8, lines 8-21) at the beginning of the hearing, as Larry King was attempting to explain the rights of persons charged with indirect contempt. Judge Baldwin later stated he withdrew the first contempt because he was "mad." (Tr. Oct. 3, 2013 p.19, line 4)

[MR KING] That order is on appeal, and it has been superseded.

THE COURT:  What was that?  I haven't seen an appeal.

MR. KING:  You'd have to look in the Clerk's file, Judge.

THE COURT:  It's not my business to look at the Clerk's file.  It's y'all's business to show me where it is.  Do you understand?

I'm tired of this.  I'm holding you in contempt for not having this stuff.

And I want him put in jail until he purges himself of contempt by paying at least a thousand dollars' attorney's fees.  All right.  Anything else?

At the end of hearing, Larry King was held in contempt again because Michelle Murphy failed to appear at the October 3, 2013 contempt hearing. Larry King was

61

ordered incarcerated for 20 days or until he paid One Thousand Dollars ($1,000).

(Tr. Oct. 3, 2013, p. 112, l. 4 – p.113, l. 24)

After the first contempt of Larry King, Judge Baldwin had an obligation under

the rationale of *Dowdy v. Palmour*, 251 Ga. 135 (1983) and *Hargis*, 294 Ga. 818,

822-823 (2014), to discontinue adjudicating the other contempts.

The Application contained addition information that is included elsewhere and

does not included attachments.

------------------------------------------------

The

**The Background of the Underlying Case is Relevant, as the Contempts were Retaliatory, but Worse, were Illegally and Unconstitutionally Obtained as Part of a Very Detrimental Obstruction of Justice**

Michelle Murphy, the custodial parent, is defending herself and the choices of

her children to continue living with her as a family in two equally difficult arenas

due to her income and financial resources. She is defending in the courts and

defending in the real world, where the children are being financially deprived and

emotionally attacked in order to facilitate their takeover by John Harold Murphy

and Renee Haugerud, his current multimillionaire spouse. (V16 p.3436) While the

efforts of John Harold Murphy and Renee Haugerud, (or, collectively,

"Murphy/Haugerud") are in two very different arenas, Murphy/Haugerud and

their cadre of lawyers have one unified tactic, *i.e.,* to financially deplete the

resources of Michelle Murphy to cause her submission. See, *e.g.*, Renee Haugerud's Motion for Attorney's Fees (V7 p.1437); Glover & Davis' request for attorney fees (Tr. Oct. 3, 2013, p.68, lines 13-22) motion for $9,000 supersedeas bond to allow appeal of these contempts.V18, p.3823)

The contempts adjudicated by Judge A. Quillian Baldwin, Jr. originated in a modification of custody case (V1 p.1) initiated against the custodial parent, Michelle Murphy, by John Harold Murphy, who only lived in their home until Thomas was 18 months old and Jack was 30 months old before moving to New York, leaving Michelle Murphy, Jack Murphy, now age 15, and Thomas Murphy, now almost 13 years old, in Georgia.

The litigation against Michelle Murphy was initiated and continued with combined attempts by John Harold Murphy to create a financial crisis for Michelle Murphy with the combination of expensive litigation costs and the deprivation of financial, educational support for the children that he and Renee Haugerud voluntarily provided since Superior Court Judge Louis Jack Kirby performed John Harold Murphy's marriage ceremony with Renee Haugerud, a multimillionaire hedge fund operator. (V16 p.3440)

After Michelle Murphy, informed John Harold Murphy that she would not yield to his request for her and the children to move to Tennessee near Renee Haugerud's home on Lookout Mountain, he began the Murphy/Haugerud financial

63

assault upon the family by withdrawing transportation for the children from Newnan to the private school in Atlanta that Murphy/Haugerud had previously, voluntarily provided. (V9 p.1768)

The type of conduct in which Murphy/Haugerud have engaged is a clear indication that it is not in the "best interest of the children." It is a part of the Murphy/Haugerud agenda that is to obtain another possession that just happens at this time to be the children, whom they display as ornaments. Their possession is to fill a void in what Renee Haugerud calls her 21st payoff life. (V14, 2766)

The Glover & Davis lawyer initially sent a proposed contract to Michelle Murphy that required her and the children to move to Chattanooga, or be imperiled with this modification litigation. (V8 p.1567)

John Harold Murphy and Renee Haugerud apparently view Michelle Murphy only as a "nanny" or a surrogate mother for the children. John Harold Murphy maintained that Renee Haugerud was the natural mother of Thomas Murphy on a recent visit to the emergency room for his alcohol poisoning that occurred while visiting in their Atlanta residence. (V16, p.3489) Murphy/Haugerud consider Michelle Murphy to be a hair stylist beneath their social and economic status and do not accord her the dignity deserved for the mother who raised the children when their father left their home for New York and other women long before he began living with Renee Haugerud.

64

When Michelle Murphy refused to move from Newnan to Tennessee, the Glover & Davis lawyer used an "emergency" motion to select Judge Baldwin.

He was easily selected by the Glover & Davis lawyer falsely alleging an emergency, with the sworn statement of John Harold Murphy that Michelle Murphy was planning to move to South Carolina. (V1 p.13) The Standing Order prevents such a move, in the Coweta Judicial Circuit, upon the filing of any type of domestic relations complaint without the feigned emergency hearing on the day that Judge Baldwin was presiding. This tactic was used by the Glover & Davis lawyer to hand pick Judge Baldwin for this case. (V1, p.7)

Judge Baldwin, without granting a requested hearing, over strenuous objection, signed, without reading, a Glover & Davis prepared order illegally appointing the Glover & Davis selected guardian ad litem (V1, p.23) and provided her authority unauthorized by law. This guardian ad litem had sponsored a judicial political rally with the Glover & Davis lawyer, attended by Judge Baldwin on the night before her appointment. The Order, contrary to what Judge Baldwin thought he was signing, made Michelle Murphy potentially liable for payment of the fees of the guardian ad litem. (Tr. Nov. 15, 2012, p.33, l. 25- p. 34, l. 22)

The guardian ad litem was illegally granted the authority to temporarily modify custody without judicial approval that **shall** be followed. This illegal authority is not authorized and statute, or the Uniform Superior Court Rules. Uniform Superior

Court Rule 24.9 provides the authority authorized for a guardian ad litem. Superior Court judges are restricted The authority that the Glover & Davis lawyers included in the appointment order that Judge Baldwin signed without reading is, as follows.

> The GAL may make temporary recommendations/adjustments during the pendency of this action regarding custody and parenting time and the parties shall follow said recommendations of GAL.
>
> (V1 p.23)

Judge Baldwin, without knowing, or by intentionally misstating the Uniform Superior Court Rules, states as follows in his disqualification order.

> While the court acknowledges that it is better practice to read such order, in this case it was not needed. The GAL order was a standard order that the Judge has seen a number of times. Further, the order tracts the Uniform Superior Court Rules for the duties of a GAL.

Judge Baldwin did accurately state that the Glover & Davis lawyer includes this illegal authority in the Glover & Davis prepared guardian ad litem appointment orders that apparently Judge Baldwin, as a matter of practice always signs without reading.

The guardian ad litem, to the detriment of Michelle Murphy, attempted to use this authority to create an order to Michelle Murphy about the children going to school in

66

Atlanta rather than near their home in Coweta County. This order by the guardian ad litem created expensive litigation costs for Michelle Murphy. (V16 p.3394)

The illegal conduct of the guardian ad litem is relevant, as it was the guardian ad litem alone who selected the psychologist with the illegal contract that Judge Baldwin attempts, with an aspect of the contempt, to force Michelle Murphy to sign.

This conduct of the guardian ad litem attempting to modify custody at the beginning of the school year with the approval of the Judge accepting the blanket assignment of this authority in the appointment order, initiated an expanded disqualification of Judge Baldwin motion that he denied on June 7, 2012. (V2 p.306), That disqualification motion addresses the illegal conduct that Judge Baldwin identifies as "messing" with him.

The June 7, 2012 denial of disqualification Order was appealed to this Court. The June 7, 2012 Order disputed other facts in the affidavit supporting the disqualification motion and further violated the Uniform Superior Court Rule 25, *et seq*. as Judge Baldwin did not refer the motion to another judge and did not cease acting on the merits of the case, as required by USCR 25.3

The lynchpin in all appellate matters in this case is Judge Baldwin's violations of the Canons of the Code of Judicial Conduct (or, "Canons") and the Glover & Davis lawyer's selection of Judge Baldwin. The Glover & Davis judge shopping

67

selection of Judge Baldwin was doable with a combined feigned "emergency" motion (V1 p.13) and the absence of a Uniform Superior Court Rule 3.1 case management plan. (V2 p.310; V3 pp. 436, 447, 506) Glover & Davis engaged in a pattern of judge selection conduct. See, *Mayor & Aldermen of Savannah v. Batson-Cook Co.*, 291 Ga. 114 (2012).

When John Harold Murphy began withdrawing voluntarily provided transportation to an Atlanta private school that Murphy/Haugerud had previously offered to the children, (V9 p.1768) Michelle Murphy informed the Murphy/Haugerud couple that she could not afford the transportation to Atlanta schools twice a day while engaging in her occupation as a hair stylist. The Glover & Davis lawyer, after rejecting alternative suggestions for transportation, wrote a letter accusing this hair stylist of "laziness" in not making the two trips to the Atlanta schools each day from Newnan. (V9 p.1783)

When Michelle Murphy made it clear that if alternative suggestions for transportation (Tr. Aug. 30, 2012 p. 10) were not accepted she would not take the children to the Atlanta schools, the guardian ad litem, without court approval, ordered the children to stay with John Harold Murphy in Atlanta at the beginning of school. (V9 p.1788)

Michelle Murphy refused to surrender the children, as ordered by the guardian ad litem and enrolled the children in public school in Coweta County.

68

The Glover & Davis lawyer then obtained an "emergency" hearing before Judge Baldwin on August 30, 2012. Judge Baldwin, after hearing the testimony of the psychiatrist expert witness for John Harold Murphy to whom the guardian ad litem paid $1,500 to testify, was unable to identify any emergency. (Tr. Aug.30, 2012 p. 72, lines 20-25) The hearing was a flop for the goals of "Murph," as the guardian ad litem called John Harold Murphy.

Judge Baldwin refused to obey the non-discretionary dictates of Uniform Superior Court Rule 25, *et seq*. (Recusal) and never entered an order adjudicating any other disqualification motions that were filed on June 13, 2012 (V3, p.436)**;** July 2, 2012 (V3, p.502); Aug. 19, 2013 (V10, p.1904); Aug. 28, 2013 (V11, p.2195); Sept. 13, 2013 (V12, p.2321); Oct. 7, 2013 (V14, p.2890); and Nov. 26, 2013 (V17, p.3639) until December 4, 2013 when he entered yet another Order in which he, as he did in his June 7, 2012 denial of his disqualification motion, once again opposed by disputing his disqualification motion's affidavits

> **THE COURT I'm just tired of things -- Like I noticed**
> **in this thing y'all talk about some kind of ex parte**
> **conversations. I don't think I have had any ex parte**
> **conversations with Mr. Drake about this anytime**
> **lately if I ever had any. I don't think, since the**
> **beginning of this case I have, partly because of**

**all the stuff that's been going on in the State about ex parte conversations. *    *    * And I don't believe I have had any ex parte conversations, a**

**nd I don't see how y'all could know about any unless you supposedly have my phones bugged or his phone bugged. (Tr. Oct. 3, 2013, p.15, lines 4-17).**

Before Michelle Murphy received or learned of the *ex parte* supported August 23, 2013 Order, a deputy sheriff, whose office is represented by Glover & Davis, came to the home of Michelle Murphy to get the children to comply with the modified visitation, *nunc pro tunc* to August 13, 2013. (V14, p. 2702)

The August 23, 2013 Order was obtained with an *ex parte* communication to Judge Baldwin, containing facts not in evidence and false statements, not provided to counsel for Michelle Murphy, until after the Order was obtained and filed. (Tr. Oct. 3, 2013, p. 19, lines 12-23)

On August 29, 2013, the Glover & Davis lawyers filed a Motion for Indirect Criminal Contempt accompanied only with a "notice of hearing" without a Rule Nisi or subpoena requiring that Michelle Murphy attend a hearing. (V12, p.2243), Michelle Murphy responded on September 23, 2013 to that contempt motion with

70

detailed, supporting affidavits refuting the motion. (V14, p.2721)

That motion and the Amended Contempt were abuses of the criminal process.

A proceeding on the motion occurred on October 3, 2013 without a Rule Nisi or subpoena for any person to attend. The response, with support of affidavits from the children, with a recorded cell phone conversation by one of the children with John Harold Murphy, clearly indicated that John Harold Murphy could not sustain an indirect criminal contempt, even if he had provided the due process required service, as he consented to the children not visiting, as he was in St. Thomas on his visitation time. (V14, pp. 2743, 2758, 2763)

After John Murphy and the Glover & Davis lawyers orchestrated the Deputy Sheriff's illegal display of force to the children gimmick that did not result in an incident, and the Glover & Davis lawyer realized after obtaining the response, supported by the affidavits of the children and their mother, that John Harold Murphy had made a false statement under oath, they changed their attack.

The Glover & Davis lawyers then attempted to use the August 23, 2013 Order, while it was on appeal to the Supreme Court of Georgia (V14 p.2774) as the basis for the hasty, illegal filing on Friday, September 27, 2013 of an Amended Contempt Motion (V14 p.2779) The Amended Contempt Motion was one shoddy piece of legal work apparently designed only to take additional advantage of Judge Baldwin while also initiating a threat of incarceration action against Michelle

71

Murphy and her lawyers to appease Murphy/Haugerud.

The Amended Contempt Motion was not supported with a notice of hearing that would have been an infirm due process notice to a person charged with the October 3, 2013 indirect contempts. (V14 p.2807)

The Amended Contempt Motion did not include a Rule Nisi

The Amended Contempt Motion did not subpoena any person.

The Amended Contempt Motion was not even copied to Larry King.

The Amended Contempt Motion stated that it was for contempt of "Defendant's lawyer" [singular] when Michelle Murphy had two lawyers and the lawyer charged was not named. (V14, p.2782)

The Amended Contempt Motion was not a charging document that comported with due process to the extent that it could legally be adjudicated. (V14, p.2817)

The Thursday, October 3, 2013 court calendar posted and sent to counsel from the Clerk of Court of Coweta County did not indicate that the Amended Motion for Contempt, or any motion for contempt, was on the Thursday, October 3, 2013 calendar, as the "Prosecutor/Plaintiff" Taylor Drake of Glover& Davis did not obtain from the Judge, or any Clerk, a Rule Nisi to have served upon the persons charged. (V14 p. 2807) See, *Crocker v. Crocker*, 132 Ga. App. 587, 589 (1974)

Michelle Murphy, Larry King and Millard Farmer filed a comprehensive response to the September 27, 2013 Amended Motion for Contempt.

72

(V16, p.3334) The response pled to the jurisdiction of Judge Baldwin to hear the Amended Contempt Motion.

**Enumeration of Errors in Appeal application**

**One**. Whether the Court erred in holding the applicants in contempt based upon the any or all of following infirmities:

the alleged violations of the August 23 Order that was based upon the August 13 hearing that was terminated before Michelle Murphy was allowed to present her available evidence, in violation of *Shore v. Shore*, 253 Ga. 183 (1984) and its progeny;

the alleged violations of the August 23, 2013 Order that was obtained with an *ex parte* communication (V14, p.2752); See, *Hargis v. State*, 319 Ga. App. 432, 436-437 (2012);

the alleged violations of the August 23, 2013 Order that was obtained while there were unadjudicated disqualification motions at the August 13, 2013 terminated hearing, at the time the August 23, 2013 Order was entered, when the October 3, 2013 hearing occurred, and on November 19, 2013, when the contempt Order was filed;

the alleged violations of the August 23, 2013 Order that was on appeal and subject to a supersedeas at the time of the September 27, 2013 filing of the Amended Motion for Contempt;

73

the alleged violations of the August 23, 2013 Order that directed that Michelle Murphy execute a contract with a third party psychologist, was an illegal order by the Court void as against public policy of the State, as the contract (V17 p.3627) required that Michelle Murphy waive all immunity against the psychologist and not just statutory, bad faith immunity and become liable for payments that would require financial resources from the family that would not be in the best interest of the children and litigation cost that the judge has warned on numerous occasions that he might not award. Such a contract (V17 p.3627) which a court orders executed corrupts the judicial process.

**Two**   Whether the court erred in ordering Michelle Murphy to execute the contract (V17 p.3627) required by the psychologist as a condition of her services.

**Three**   Whether the court erred in holding Michelle Murphy in contempt for not executing a contract (V17 p.3627) when the psychologist would not inform her of the method used for the "custody evaluation" and provide other information before she executed the contract; the contract required Michelle Murphy to grant the psychologist full immunity, become financially liable for fees that she could not afford, pay fees with 18% interest for late payments; and to obtain discovery and production at trial at a cost that she could not afford.

**Four**   Whether the court erred in holding the applicants in contempt without a

74

due process hearing and thereafter in adjudicating them in contempt without evidence supporting the finding beyond a reasonable doubt at a hearing when they were not required by Rule Nisi, subpoena or other due process notice to attend and defend, as they were not accorded due process notice and other due process protections.

**Five**   Whether the court erred in adjudicating Millard Farmer in contempt without a hearing, beyond a reasonable doubt and for not requiring Michelle Murphy to attend the October 3, 2013 hearing when co-counsel appeared and filed objections to the hearing, and Millard Farmer was never provided due process notice that required him or Michelle Murphy to attend, and the only notice of accusation against any lawyer was the designation "defendant's lawyer" (singular) when there were two lawyers in the case.

**Six**   Whether the court erred in adjudicating Millard Farmer in contempt without a hearing, beyond a reasonable doubt and for talking with the children.

**Seven**   Whether the Court erred in ordering, without a finding of necessity, that the children could not be explained the hearing during which Judge Baldwin met with them and informed the oldest child that his request to live with his mother would be honored, and later, when the Glover & Davis lawyer objected, Judge Baldwin retracted his commitment to the child without informing the child of his retraction of the commitment. (Tr. Aug. 13, 2013, p.263, lines 14-16)

**Eight**   Whether the court erred in adjudicating Larry King in contempt for not requiring Michelle Murphy to attend the October 3, 2013 hearing.

**Nine**   Whether the court erred in adjudicating Michelle Murphy, Millard Farmer and Larry King in contempt when they were not accorded due process protections and found guilty beyond a reasonable doubt.

**Ten**   Whether the evidence support the convictions for contempt.

**Argument and Citation of Authority to Appeal Application**

Judge Baldwin abrogated his judicial authority in all relevant matters in the entirety of this case to the Glover & Davis lawyers. It is unconscionable, but certainly not unpredictable that Judge Baldwin delegated the preparation of the contempt orders to the Glover & Davis lawyers.

It is unconscionable that Taylor Drake included false findings of fact in the Order that he prepared for Judge Baldwin to sign. The Glover & Davis lawyer included the findings in the Order that Judge Baldwin may or may not have read before singing, as on previous occasions Judge Baldwin did not read the orders that he signed.

The November 19, 2013 Order falsely states, without evidence that "Defendant and her lawyers had reasonable and sufficient notice of the hearing." Again, the Order states that "The Court further finds that Defendant had reasonable notice of the hearing but failed to appear and present evidence."

76

The ironic aspect of this finding that Defendant "failed to present evidence" is the August 23, 2013 Order that "Defendant" is accused of violating resulted from a hearing on August 13 where Michelle Murphy and each of her counsel did appear, but Judge Baldwin aborted the hearing for a personal commitment and never allowed Michelle Murphy to present any evidence, including the principal and teacher from the children's school, who awaited all of the hearing to testify. *Shore v. Shore*, 253 Ga. 183 (1984) and its progeny.

There was absolutely no evidence to support that Michelle Murphy, Larry King or Millard Farmer were provided a Rule Nisi, a subpoena to appear or any other notice that fulfills the requirements of due process.

Judge Baldwin doesn't read the orders that he signs, and, worse, has such little understanding of the law relating to contempt that on October 3, 2013, he initially held Larry King in contempt for just attempting to explain the impropriety of Judge Baldwin beginning the hearing with the shoddy papers that the Glover & Davis lawyers filed without the vaguest understanding of the due process protections associated with criminal prosecutions, albeit the prosecution for contempt.

The inability of Judge Baldwin even to allow Larry King to explain the due process protections involved in contempt actions speaks the reason that Uniform

77

Superior Court Rule 3.1 was never implemented in the Coweta Judicial Circuit and the reason that due process protections in the court is at such a low level that orders drafted by political friends are signed without reading.

Cannon 2A, 2B, Canon 3E of the Code of Judicial Conduct are substantive grounds for recusal or disqualification of a judge. These grounds should be assessed in light of two well-recognized principles of Georgia law. First, no one has a right to select the judge of their choice, and a judge, of course, has no right to select the cases over which the judge presides. *See* Uniform Superior Court Rule 3.1. Yet, that is what happened in this case and happened in the Coweta Judicial Circuit on a regular basis. (V3 pp.447-448)

Persons accused of conduct that subjects them to incarceration are entitled to a trier of fact who is not biased. Judge Baldwin and the contempt convictions do not open the first gate to uphold the contempt convictions under the *Cole v. Arkansas*, 333 U.S. 196 (1948) standard of adequate notice of the charges and under the *In re Winship,* 397 U. S. 358, requirement that to support a criminal conviction the record must reasonably support a finding of guilt beyond a reasonable doubt.

Judge Baldwin not only deprived the applicants of a fair hearing, he deprived the applicants of a motion for new trial before a fair jurist, when, after the November 19, 2013 contempt Order, he denied all of the disqualification motions that were pending before the November 19, 2013 Order., thereby not allowing

78

another judge to take over this case. With Judge Baldwin remaining in the case there is no possibility for the applicants to obtain a fair ruling on a motion for new trial that reviews the criminal contempt convictions under a different standard. See, *Walker v. State*, 292 Ga. 262, 264-265 (Ga. 2013)

In particular, Section (B) (7) of Canon 3 of the Georgia Code of Judicial Conduct forbids a judge from considering an *ex parte* communication: Judges shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. Judges shall not initiate or consider *ex parte* communications, or consider other communications made to them outside the presence of the parties concerning a pending or impending proceeding. ***

*Ex parte* communications "are presumed to have been in error."

"[W]hen the court considers facts not properly in evidence, the other party has rights that cannot be protected fully if he is thus denied the privilege of cross-examination. *Arnau v. Arnau*, 207 Ga. App. 696, 697 (Ga. Ct. App. 1993)

The law relating to indirect contempt is clear. Michelle Murphy, Millard Farmer and Larry King were accorded no due process protections that *Crocker v. Crocker*, 132 Ga. App. 587, 589 (1974) identifies must be provided:

In cases of constructive contempt of court, where the alleged contumacious conduct is disobedience to a mandate of the court, not an act in the presence

79

of the court or so near thereto as to obstruct the administration of justice, the law requires that a rule nisi issue and be served upon the accused, giving him notice of the charges against him, and that he be given an opportunity to be heard. [citations omitted]

**Conclusion of Application to Appeal**
**Request for Relief that is included for its  depiction ot the content of conduct**


**Respectfully Submitted,**
s/Millard Farmer
Millard Farmer
Georgia Bar No. 255300
P.O. Box 1728
Atlanta, GA  30301-1728
(404) 688-8116
**millardfarmer@millardfarmer.com**
/s/Millard Farmer
**Counsel for Millard Farmer**

**CERTIFICATE OF COUNSEL**

I certify that this motion meets all requirements of the Local Rules of the United States District Court for the Northern District of Georgia, regarding margins, line spacing and that a 14 point, Times New Roman Font was used.

80

This 31th day of July, 2017.


/s/Millard Farmer

Millard Farmer


**CERTIFICATE OF SERVICE**

I hereby certify that counsel for all parties, are designated to receive electronic notification at the email address listed below, of the filing of Millard Farmer's Motion in Limine  Supported with Constitutionally Challenging the Abridged, now Spoliated, Constitutional Protections due Millard Farmer and other Accused Parties that John Harold Murphy charges to be a part of the actionable conduct included in his Civil RICO Complaints [ 1]; [31] and otherwise

.


**Wilmer Parker**
Maloy Jenkins Parker
75 Fourteenth Street, 25th Floor
Atlanta, Georgia 30309
parker@mjplawyers.com


This 31stday of August 2017.

81

/s/ Millard Farmer

Millard Farmer

This foregoing Motion in Limine and its **Memorandum of Law** to the Motion in Limine is Respectively Submitted as an integral part of the In limine Motion with Constitutionally Challenging the Abridged, now Spoliated, Constitutional Protections due Millard Farmer and other Accused Parties that John Harold Murphy charges to be a part of the actionable conduct included in his Civil RICO Complaints [ 1]; [31] and otherwise

Judge Baldwin's adjudication of the contempts incarcerates Michelle Murphy for defending her family, and her lawyers for defending her.  (V17, p.3624)

Without relief from the Court, John Harold Murphy's threats to Michelle Murphy that she would "end up in a trailer" just like where she and her mother had to live for a while when her father abandoned the family, will come true. This 9th day of December, 2013. Respectfully submitted,

45. Judge Baldwin spoliated evidence of his illegal conduct in abridging the rule of Law mandated by USCR3.1 and by violating USCR 25.3 with the intent to spoliate evidence that Michelle Murphy, her counsel and the defendants in this case and the public under the rule of law were United States constitutionally entitled.

82

46. John Harold Murphy and *Galtere et al Enterprises* now compensate Wilmer "Buddy Parker and Maloy Jenkins Parker to assist Galtere *et al Enterprises* and others to engage is a vindictive continuation of evidence spoliation and illegal conduct to interfere with the livelihood, professional obligations of counsel defending the Civil RICO case and to obtain money from the Defendants for exposing the illegal conduct of Renee L. Haugerud's hedge fund operation with John Harold and her Galtere *et al Enterprises.*

47. The state court infected Due Process was inflicted upon Millard Farmer, Larry King for providing legal representation and upon the others accused in this case does not pass constitutional muster to support the Civil RICO complaint. The Defendants and other civil RICO persons' Fourteenth Amendment Due Process Equal Protection and The First Amendment protections dictate that the rope of jurisdiction corruption not be used to hang these Defendants and other of the Civil RICO victims.

48. Larry Kings' insurance carrier paid the Plaintiff an estimated $100,000 for the professed reason to avoid the expenses of the litigation. This negotiated payment to the Plaintiff was to deprive the remaining persons and entity in the Civil RICO case of the advocate for Larry King the benefit of the unadulterated witness that Larry King would be if presented by the counsel that Larry King pa1d premiums for many years to have his insurance carrier provide. and funds from the insurance

83

carrier should be recoverable by the Bankruptcy Trustee and the Defendants. Larry King possess some of the valuable evidence of the constitutional abridgments of Judge Baldwin that occurred in concert with the Glover & Davis and other lawyers of the *Galtere et al Enterprises.* Larry King, as the other defendants, is a victim.

49. Larry King, albeit that he served Michelle Murphy and her children valiantly and diligently and yes, with only pro bono compensation, provided legal services with Millard Farmer in the modification of custody case, during the time that Larry King's wife was ill in Florida, Larry King and Millard Farmer had a far more difficult task than they expected.

50. Even so, Millard Farmer and Larry King had and have a lingering professional obligation to the next Michelle Murphy's and others who now are also attacked in the Civil RICO case., as a supplement to judicial corruption The obligation of a lawyer if different from that of aLittle League baseball Umpire, the lawyer cannot quit because of rain and lightning. Larry King and Millard Farmer have an obligation to every person who lives in the Coweta judicial Circuit, or who, like Michelle Murphy, may be moved there with their children from California to be abandoned for the six months necessary to get a Georgia Divorce.

51. Larry King and Millard Farmer have an obligation to every lawyer in the Coweta Judicial Circuit, who allowed the Glover & Davis lawyers to judge shop to the

detriment of those other lawyers' clients. There is a message in this case. A pattern of judicial corruption and discriminatory triers of fact cannot exist in an environment of ethical diligent lawyers who do not offer temptation to unethical, or impaired judges and who remove temptation from unethical Judges.

52. Most every litigant, as did John Harold Murphy, wish their lawyer to have an inside relationship with their judge. Our system of justice only prevents judicial corruption with dedicated lawyers and judges who say "NO". This means that lawyers cannot allow insurance carriers to set the mark twain of justice and morality. This is twice in the last five years that Millard Farmer has observed insurance carriers tampering with justice by tampering with the motivation of witnesses being provided, otherwise unavailable, benefits . This insurance carrier of Larry King, primarily for its financial interest, participated with John Harold *Murphy and Galtere et al Enterprises in* breaching, the lingering protections that Larry King professionally owed others. Larry King had no RICO liability. The defendants are entitled to have that conduct investigated, as the absence of Larry King and his competent Civil RICO counsel contributes to the ability of the Plaintiff in spoliating evidence that can only be cured with the federal investigative assistance requested in this motion. The state court investigation, albeit by honorable persons in one incident are not of the investigative quality that an independent federal investigation. The so-called investigation of the

overcharging of fees by Nan Freeman did not even investigate the overcharging of court reporting fees to individuals and did not provide copies itemized accounts of the court reporting work by Nan Freeman, as it accepted such information as. the District Attorney often gets copies of transcripts that are not invoiced, so that is evidence of not overcharging for items that the Board of Court Reporting allows. The issue was, did Judge Baldwin agree for Nan Freeman to be paid for work that she did not submit an itemized required invoice to Judge Baldwin for his approval?, or was their a consensual relationship relating to protecting each other such that it comprised spoliated evidence of  they prohibiting Millard Farmer document that even after the USCR3.1 enactment supporting that Judge Baldwin was engaging in consensual case and judge selection.?

53. Some how, Yes,, "some how,' some lawyers and the judge fail to accept that the judicial corruption that existed in the Coweta Judicial Circuit involved the lives of minor children and the mothers' responsible for giving birth to these children that are, statistically speaking, without the funds to litigate against hedge fund operators who can financially benefit by taking a mother's children from her for the financial benefits to a hedge fund and such, instead of providing the mother adequate child support. The substitute Senior Judge for Judge Baldwin after his recusal upon the objection of relevance by John Harold Murphy's final custody hearing lawyer, Buddy Parker, yes, Taylor Drake was dumped as the trial lawyer

for that final hearing. The Senior Judge held that evidence about the need of the children for the hedge fund business was not relevant. Somehow it may be relevant to the quality of life that a mother who seeks the children does so for the exclusive love and care that she can provide to the children that a hedge fund operator will provide, or was provided when one of the children was required to go to the hospital for over consumption of alcohol during a drinking contest with older visiting friends that occurred within twenty feet of Renee L. Haugerud and John Harold Murphy in their home. This drinking contest and over consumption occurred, while John Harold Murphy had "gone to sleep" looking at television and Renee L. Haugerud was working on her computer.

54.. The factual recitations contained in the affidavit of Larry King that his competent Civil RICO experienced Counsel with the assistance of his large law firm  could have presented to the Court relates to the defense of the defendants and defense of those accused of assisting Michelle Murphy that the Civil RICO Complaint avers had evil motives and were, as Millard Farmer is accused,  of being disrespectful lawyers and judges engaging in judicial corruption involving minor children  That Larry King Affidavit is Exhibit **XX**  The factual content and other information not in that affidavit is absent its presentation to the Court with the dedication of Larry King on one of days that he alone was inflicted with the malice of Judge Baldwin that inflicted upon Larry King, probably because

Millard Farmer was lead counsel in a specially set venue changed case in Mississippi and there was no legal notice for Millard Farmer, or his client, Michelle Murphy to appear before Judge Baldwin.

55. The Glover & Davis lawyers filed a $36,914.48  garnishment against Millard Farmer based upon an abusive litigation fine imposed for Judge Baldwin dismissal of a Third Party Complaint that Millard Farmer and Larry King filed.

24This Civil RICO case avers that the Third Party Complaint was initiated as a " sham "third-party" claim against Mr. Murphy's spouse in the Child Custody Litigation, knowing such a claim was completely without any legal or factual basis. This is another of The Civil Rico' *Ashcroft v. Iqbal* not compliant falsely stated opinions in the Civil RICO Complaint.

25The Georgia Supreme Court's 2006 Supreme Court's Third Party  supporting custody Opinion by Justice Carley  in in  *Moore v. Moore,* 281 Ga. 81 (2006) Millard Farmer was not allowed to brief and the numerous national cases that supporting the absence of abusive litigation relating to the filing.

1. Frankly, there are few lawyers that are even qualified to carry Justice Carley bags and none who dare dispute his intellectual integrity and dedication to upholding the integrity of the judicial system. By any fair

88

test the third party complaint did not justify the $36,914.48 fine sought and obtained only against Millard Farmer and not against Larry King because the Senior Judge who replaced Judge Baldwin after the recusal of all the Circuit Judges enforced, Judge Baldwin's Order against Millard Farmer that "Defendant" could not file any motions, documents etc. without Judge Baldwin's approval to defend any matter.

The exceptions to abusive litigation fines, as the advancement of the law rule, "Moore," refusal to allow a filing by a judge with pending disqualifications, alone should have prevented the fine paid to the Glover &.Davis for Renee L. Haugerud, who each corrupted the justice of Judge Baldwin being ex parte consensually had selected to be the judge is a travesty of justice that this Court should adjudicate as a stand alone abridgment of Fourteen Amendment Due Process. Equal Protection and First Amendment Constitutional protections.

The Third Party state court issue is constitutionally before this federal Court as the Civil RICO Complaint raises the issue of the third party complaint only being a "sham" to delay, etc.

10

2. The factual basis. for the Third Party Complaint filed against Renee L. Haugerud was  while this Civil RICO Case was pending to further disable the financial resources of  counsel who were representing Michelle Murphy when this Civil RICO case was filed and was to deter other lawyers from going forward with attacks against the pattern of judicial corruption that  Glover & Davis engage, on behalf of Renee L. Haugerud, with a garnishment of Millard Farmer, paid Glover & Davis to obtain  $36,914.48 from Millard Farmer as a fine for Millard Farmer's and Larry King's filing of the Third Party Complaint against Renee L. Haugerud, the wife and business associate of John Harold Murphy.

3.  That Third Party Complaint, made a part of the John Harold Murphy's Complaint against Michelle Murphy in the Modification of Custody case was compliant with Georgia Supreme Court Justice Carley's Opinion in *Moore v. Moore,* 281 Ga. 81 (2006) and similar cases throughout the country.

4. Millard Farmer was not allowed to defend the $36,914.48 fine sought and obtained only against him and not Larry King because the   Senior Judge who replaced Judge Baldwin after the recusal of all the Circuit Judges enforced, Judge Baldwin's Order against Millard Farmer that "Defendant" could not file any motions, documents etc. without Judge Baldwin's approval.

5.   Millard Farmer and Larry King had a responsibility to the children of Michelle Murphy to obtain adequate child support for them.

90

6. These lawyers for Michelle Murphy attempted to pierce the crime fraud veil of John Harold Murphy, Renee L. Haugerud and *Galtere et al Enterprises* with that Third Party Complaint that Judge Baldwin's Judicial Corruption guided by Glover &Davis vindictively killed. This "Vindictively" word is used to emphasize that judicial corruption in a case involving the custody of children is something more egregious than illegal, unethical and a constitutional abridgment.

7. John Harold Murphy appeared to have a contorted moral view that financial benefits to the children were only justified when he had the children in his physical custody; for example, John Harold Murphy and Renee would not allow Michelle Murphy's children to take home shoes or clothes that they purchased for the children to wear.

8. This Civil RICO Case is basically grounded upon the legal efforts of Millard Farmer, Larry King and others attempting to assist Michelle Murphy and her children. These lawyers' defense of the illegal conduct is thereby relevant.

9. Millard Farmer, Larry King and the other Civil  RICO accused persons were swimming against an ever-strengthening  storm of unconstitutional conduct, which could make it difficult for persons never being in such a storm of judicial corruption toto unfairly judge the attempted protectors of Michelle Murphy from the  profiteers  of  their  created  judicial  corruption.  The  conduct  of  the

constitutional protectors can only best be judged by those without the financial resources to withstand the attack of a hedge fund operator who needed the children to enhance the wealth of the hedge fund.

10. The  Senior Judge who would not allow Millard Farmer to defend the amount of the fine had a history of financially benefiting from the absence of the USCR 3.1 case management Rule that allowed the Coweta Judicial Circuit to elect not serve in cases and instead to substitute compensated Senior Judges.

There is  spoliated evidence  justifying this federal court's  assistance to the Trustee in Bankruptcy and Defendants **in obtaining  investigative regulatory** assistance from **the FBI,  SEC and IRS** seeking for a full investigation of the source and the amount of the funds and in kind benefits paid and received by all parties and entities with any involvement in matters related to the pattern of illegal judicial corruption that Taylor Drake and Glover & Davis and those defending against their conduct were involved. John Harold Murphy now attempts to financially benefit for compensating Taylor Drake and Glover & Davis for participating in the illegal conduct of violating USCR 3.1 and. for participating in the illegal and unethical conduct of Judge Baldwin, who without their illegal conduct could not have inflicted the misery that he created for Michelle Murphy and her children. This, these

92

lawyers committed with malice intended to obtain the large financial gain

derived from John Harold Murphy and the *Galtere et al Enterprises*.

11. After resolving the malpractice negligence case, John Harold Murphy initiated

the Modification of Custody Case against Michelle Murphy, who by the

Divorce settlement agreement, with John Harold Murphy was designated as the

custodial parent of the two minor children. Millard Farmer and Larry King were

not counsel in the Divorce action; however, they had full knowledge of that

litigation from the malpractice negligence litigation.

12. Millard Farmer and Larry King, were co-counsel for Michelle Murphy in the

Modification of Custody Case that John Harold Murphy initiated.

It was during that Modification of Custody case that John Harold Murphy

initiated this Civil RICO case against these two attorneys and the other

Defendants who are accused in various capacities of attempting in different

ways to assist Michelle Murphy and her attorneys in protecting Michelle

Murphy's freedoms and thereby the constitutionally protected freedoms of

this mother's children.

13. custody case"expert" witnesses selected by the participating judges in the

Coweta Judicial Circuit.

14. It was the legal and ethical responsibility of the judges in the Coweta Judicial

Circuit to implement a USCR 3.1 Plan that would Order the Clerks of Courts to

adhere to the random assignment of cases according to the Supreme Court of

Georgia's Uniform Superior Court Rules Approved plan.

15. The Due Process, Equal protection and First Amendment Constitutional

abridgments of the USCR 3.1Plan, as part of the judicial corruption was more

egregiously judicially corrupt by the additional abridgment of the only defense

to the unconstitutional selected judges that is. motions for disqualification of

the judge. Judge Baldwin after agreeing to become the exclusive judge and trier

of fact, refused to comply with USCR 25.3 by refusing to refer any of the

twenty (20) disqualifications to another judge, or to allow a hearing, about his

conduct at a deposition. Judge Baldwin advanced his atrocious, conduct to the

stage of criminal conduct when he began holding Millard Farmer, Larry King

and Michelle Murphy in indirect Criminal Contempt without a constitutional

notice of a hearing, or allowing then to present evidence at a hearing before an

independent judge. See, Affidavit of Larry King Ex XX to Memo, Corruption

motion  Ex x

16. In addition to engaging in the illegal conduct that effected the abridgments of

the constitutional protections of Michelle Murphy.

17. Judge Baldwin, with malice attempted to inflict as much financial and

professional detriment to counsel for Michelle Murphy as he and counsel for

John Harold Murphy and *Galtere et al Enterprises* could envision a way to have

94

imposed. Judge Baldwin spoliated evidence of the state court actors who

assisted him in engaging in his constitutional abridgments, the least of which

were his yelling at Millard Farmer and Larry King to the extent that Michelle

Murphy and Millard Farmer lost the professional assistance of Larry King as

counsel., as Judge Baldwin Order that both counsel for Michelle Murphy were

required to be present at every court event. This was a financial burden that no

judge in the Coweta Judicial Circuit ever imposed upon any lawyers.  The

detriment to Millard Farmer and those accused of assisting Michelle Murphy

extends to this Civil RICO case. This case was devised to protect the

continuation existence  of the illegal judge selection of Taylor Drake and Glover

& Davis  The conduct of Judge Baldwin in not allowing the court reporter to

record the calendar call, as Millard Farmer requested, identifies one of the many

ways that evidence of the judicial corruption is spoliated by the judges who

participate in the ex parte judge selection in the cases they wish to try and for

the lawyers, who provide judges financially and politically compensation to

gain judicial favor that makes the lawyers' eligible to *ex parte* select the judges

they wish to try their cases. Judge Baldwin protected part of his judicial

corruption and evidence of its spoliation with the Glover & Davis lawyer,

Taylor Drake by Judge Baldwin never allowing Millard Farmer to examine him,

as USCR 25.3. provides. The This illegal conduct of evading a random and not

enforced case assignment plan by not having an enforced USCR 3.1Case

Management Plan reaches the peak of its potential judicial corruption when the

custody of the children is at issue. The exclusive trier of fact purchased is secure

because in child custody cases the judge is the exclusive trier of fact without a

jury. On appeal those decisions are reviewed under an abuse of discretion

standard. Lawyers gain status to participate with judges in this rule of law and

Constitutional abridgment system by discreetly providing benefits to the

vulnerable judges or with documented elections donations compensating, either

financially, or politically the vulnerable judges from whom they wish benefits.

The violation of an enforced Case Management Plan mandate provided Taylor Drake

and Glover & Davis, as repeat offenders of the law, to have the community reputation

for being "good lawyers." The reality is that they are repeat offenders of the law who

engaged in in various forms of judge selection, as they did in Michelle Murphy'

modification of custody case. when Taylor Drake and Glover & Davis were no more

than skillful violators of the law than some people who are called crooks, or criminals

as Taylor Drake and Glover & Davis take attorney fees in exchange for illegal conduct.

This is illegal conduct that this federal court should initially address with the

investigative assistance that Millard Farmer here request on his behalf and on behalf

of those accused in the Civil RICO Case with Millard Farmer.

Lawyers, as Taylor Drake and Glover & Davis who choose to act illegally to

96

select the judge they wish, or Judges who select  the case that they wish  provide the opportunity for the illegal judicial corruption utilized by Taylor Drake and the Glover & Davis lawyers, who were repeat illegal violators that deprived litigants who did not pay the expensive attorney fees of the Glover & Davis lawyers of their constitutional protections in civil and some types of criminal cases. The District Attorney and the judges in the Coweta Judicial Circuit did nothing to correct these constitutional abridgments of Fourteenth Amendment, Due Process Equal Protection and First Amendment protections. The Defendants and those accused of assisting them suffered the consequences of becoming victims in this case.

The Coweta Judicial Circuit has a lengthy history of depriving litigants of constitutionally composed juries, Millard Farmer and associates for nearly forty (40) years have called this discriminatory unconstitutional conduct to the attention of that Circuit's judges and District Attorneys. Ironically, now Millard Farmer for himself and others once again calls upon the protection from the federal courts.

> 11.  The Defendants with false statements, other than in the Civil RICO case  were attacked elsewhere.
>
> 12.  **Millard Farmer committed** no predicate or other RICO acts**.**
>
> 13.  2 This is a statement that the Plaintiff and Renee L. Haugerud cannot make under oath without **their** committing another **of their**

RICO predicate and other RICO acts.

14. The Glover & Davis Lawyer, Taylor Drake, in an *ex parte* agreement (*deal*) with Judge A. Quillian Baldwin, Jr. illegally selected Judge Baldwin, with his authority as the exclusive trier of fact, for a specific child custody case and for specific illegal acts.

15.. This ex parte *deal* among Judge Baldwin, Glover & Davis and Taylor Drake was planned with their knowledge that they were abridging Uniform Superior Court Rule 3.1, the rule of law, and Codes of Judicial and Rules of Professional Conduct with their participation in an unconstitutional *ex parte* gerrymandering judge selection scheme

16. That *deal* provided enormous illegally obtained financial benefits to Taylor Drake, Glover & Davis and these lawyers' client, Renee L. Haugerud's Galtere Ltd., "a global investment, hedge fund and trading company" that involved John Harold Murphy (or, *Galtere et al Enterprises*)

17. Renee L. Haugerud trusted that her husband, John Harold Murphy, and their personal friend, Coweta Judicial Circuit Judge Louis Jack Kirby, guided the Plaintiff into fruitful illegal conduct in suggesting the lawyer for the Plaintiff to obtain for his planned modification of

98

custody case against Nancy Michelle Murphy, a financially and politically weak, relatively new resident to the Coweta Judicial Circuit area. This mother styled hair from her home and spent the remainder of her time caring for her two boys.

18. Michelle Murphy informed Millard Farmer. that Renee L. Haugerud met with her, as a professed peace-maker, to inform Michelle Murphy that **she should 'not put herself through this, because it was a done deal."**

19. It is accurate that it was a well-planned and financially perfected *deal*.

20. The problem with the illegal "deal" was that Michelle Murphy, unexpected by the deal's makers, had two lawyers whom, admittedly, she could not afford with her child rearing obligations, but who were so offended by the illegal conduct that they had seen John Harold Murphy engage during the divorce case that these lawyers were willing to represent this mother, in protecting the best interest of her children from the illegal lifestyle and conduct that John Harold Murphy was engaging as a kept man with the hedge fund resources of Renee L. Haugerud's *Galtere et al Enterprises*

99

10.Judge Baldwin's agreement with Taylor Drake to become the ex parte selected judge for the Glover & Davis ' hedge fund financed client did not wait a full ten minutes after Millard Farmer and Taylor Drake went into Judge Baldwin chambers for an initial meeting before Taylor Drake displayed his judge to Millard Farmer, as a young child would show a friend a new bicycle. Taylor Drake pull out an Order that he had prepared and informed Judge Baldwin just where he wanted Judge Baldwin to sign. While Millard Farmer was explaining his objection to the Order and not having an opportunity to present evidence in response to process and Order, Judge Baldwin handed the signed Order with the name of the co-sponsor of the fund raiser with Taylor Drake name inserted as the Guardian ad litem. That display of Taylor Drake's judge was so foreign to the way that Millard Farmer had dealt with the extremely highly professionally ethical members of Taylor Drake' family members for over forty years before that day, initially led Millard Farmer to believe that for some reason Judge Baldwin was ill

After being ignored by Judge Baldwin,  Millard Farmer told Judge Baldwin that if he was going to treat Michelle Murphy the way that he did that Millard Farmer would have to move to disqualify him. Judge looked toward Taylor Drake, apparently for direction an shrugged his shoulders and left his chambers, ad did Millard Farmer and Taylor Drake . e the initial "*deal*" of the totality of the Judicial corruption.

100

11.There are approximately 5,000 pages of documents identifying the judicial corruption. That corruption was as contagious, as the purse of Renee L. Haugerud that John Harold Murphy carried, could find other participants to infect.

12. Judge Baldwin was a hostage, without a sanctuary, from his initial "deal". It was painful to see Taylor Drake's, once respected selected judge judicially wither into the character traits of some of the white-collar criminals that this Judge once had before him as defendants, or had sentenced for far less dangerous conduct to the administration of justice that the conduct that Taylor Drake, Glover & Davis, Judge Baldwin and the *Galtere et al Enterprises* had initiated.

13, Taylor Drake also Glover & Davis, except in name became expendable to John Harold Murphy and the *Galtere et al Enterprises*, as lawyers with appellate political and real trial experience replaced Taylor Drake because he, as Judge Baldwin transformed from a person with credibility into the lawyer with the reputation of the lawyer who captured Judge Baldwin with a "deal" that was the illegal conduct that Taylor Drake initiated when Judge Baldwin surrendered to him and thereafter refused to allow the USCR 25.3, Duty of the Trial Judge, hearing on any of the Disqualification motions. This withering down of Judge Baldwin brought Taylor Drake and Glover & Davis large attorney fees, but also withered their reputation from respectable to dishonest lawyers who created illegal conduct that caused each lawyer in the Coweta

101

Judicial Circuit to recuse themselves because of the illegal judge selection *deal* of Glover& Davis and Judge Baldwin.

After the judicial corruption became fully operative, Millard Farmer and Larry King were no more than clay pigeons with State of Georgia bar licenses. This was Judge Baldwin and the Glover & Davis defense to their illegal deal. Millard Farmer and Larry King served as, Michelle Murphy's legally designated defenders in a Star Chamber type of Court that was the Taylor Drake, Glover & Davis initiated, planned illegal conduct "deal" that was designed, without any legal justification for taking Michelle Murphy's children from her.

14. The children were sought for the needs of Renee L. Haugerud's hedge fund business. The illegal judge selection and subsequent operative corruption was illegally funded by the *Galtere et al Enterprises*.

15 There is a societal need for the requested relief in this motion. Galtere *et al* Enterprises have a fiduciary responsibility to persons and entities who have no direct interest in the plight of Michelle Murphy that Millard Farmer, Larry King and others who had an interest in protecting Michelle Murphy and her children from the consequences of the illegal intended beneficiary of the illegal *deal, i.e.*. Renee L. Haugerud and her *Galtere et al Enterprises that* took full aim at the defendants with funds derived in part from *Galtere et al Enterprises.* This "deal" was and continued to be illegal conduct, that corrupts the judicial system and investment funds of other

102

innocent persons who expect that principals of Galtere *et al Enterprises* are not engaging in the most egregious of judicially related crimes, the "deal" to hand select the judge designed to take a mother's child from her, instead of providing the mother the financial assistance to provide the child the benefits that the wealthy father maintains that he and his hedge fund operator wife can provide. John Harold Murphy and Renee Haugerud did not turn on and off their integrity and illegal conduct only when they attacked the Defendants, *e.g.*

When John Murphy and Renee L. Haugerud went to the Probate Court in Troup County for marriage licenses they both made false oaths for the licenses for Judge Kirby to marry them in Walker County, Georgia. This is only an example of the reality that there appeared to be no limit as to the false statements under oath that John Harold Murphy would make to a Court and elsewhere as a defense to his illegal conduct.

The Third-Party Complaint that Millard Farmer and Larry King filed to disclose to the Court Renee L. Haugerud's financial perks to John Harold Murphy that assisted him in evading the guidelines set child support to his children, was dismissed by Judge Baldwin without Judge Baldwin understanding but one thing about the third party complaint. Judge Baldwin understood that Renee L. Haugerud and Glover & Davis wanted it dismissed without discovery and that he could use the dismissal to inflict financial punishment upon Millard Farmer, who was fined $36,914.48 for filing that Georgia Supreme Court Justice Carley Opinion in *Moore v. Moore*, 281 Ga. 81

(2006).compliant third party complaint. The third party Complaint documented evidence of the child support assets that Michelle Murphy should provide to the Court that could be considered for her two children. The Substitute Senior Judge, who in the past benefitted from the USCR3.1 violations set the amount of the fine that Millard Farmer was required to pay the Glover& Davis lawyer for Renee L. Haugerud. Millard Farmer under the still enforced rules of Judge Baldwin that he must approve any motion, or response before Millard Farmer could file the tendered document was not allowed to even file a brief related to the justification or amount of the fine, as Judge Baldwin did not approve the filing that he never saw, because he had recused himself from the case by that time

 The filings that the Civil RICO Case accuses Millard Farmer and Larry King of using to delay the case, were document that Millard Farmer and Larry King used to defend the illegal and constitutional conduct that the approximate ten rotating lawyers for the *Galtere et al Enterprises* inflicted upon Millard Farmer and Larry King. These lawyers quickly learned that Judge Baldwin would and did execute any Order that he was presented without reading the content of the Orders he was signing.

Millard Farmer and Larry King filed no more than a notice of appearance until after an attempt to meet with Taylor Drake and the appointed guardian ad litem who refused, as requested, to talk with Millard Farmer and Larry King on the record about her participation in the Judge Baldwin Glover & Davis's  judge selection.

104

6 After the initial illegal conduct of Judge Baldwin, it became prudent to move for his disqualification. Millard Farmer and Larry King began doing what their conscience and profession requires of them., *i.e*. defending their client. It is that defense that the Civil RICO Complaint seeks to further punish the Defendants and those accused of assisting counsel's clients. Such work is not pleasant, or financially rewarding, but it brings what some call the Magna Carta earned and constitutionally protected Due Process, Equal Protection and First Amended protected justice to persons of all wealth and status in life., which is what the "Glover & Davis Taylor Drake "deal" prohibited and attempts to further scare lawyers from challenging with this Civil RICO Case against the Defendants, *et al*.

7The entirety of the Civil RICO complaint is the result of Millard Farmer and Larry King exposing and protecting, to the extent possible, their client's and their Fourteenth Amend Due Process, Equal Protections and First Amendment protections. from constitution abridgments, The clearly illegal conduct that created the judicial corruption was that of Judge Baldwin who was participating with Taylor Drake and the Glover & Davis lawyers in the unconstitutional historical pattern of the Glover & Davis lawyers' *ex parte* engagement in illegal conduct with Judge Baldwin from his selection throughout the litigation until Judge Baldwin's and the other

judges in the Coweta Judicial Circuit's   recusal where Judge Baldwin, as his last Due Process abridgment, left active his Orders that abridged the Defendants' Due Process, Equal Protection and First Amendment protections.

Millard Farmer here request that this Court request the assistance of the Securities and Exchange Commission in investigating the children for business benefits exploitation by John Harold Murphy and Renee L. Haugerud.

That law firm for Larry King was silenced, by Larry King's insurance carrier, Only his affidavit is included   as  or that law firm silenced itself in sharing the responsibilities in this litigation to Larry King's client, Nancy Michelle Murphy (Michelle Murphy, her minor children, Millard Farmer, Deborah Beacham, her, My Advocate Center, Inc. and those accused of acting in concert with them. This abandonment occurred apparently because it was financially beneficial to that insurance carrier to pay a reportedly $100,000 requested   by Maloy Jenkins Parker, (Buddy Parker) on behalf of John Harold Murphy and his paymaster rather than fulfilling the legal and moral commitment that Larry king attempted to share in the fulfillment of the defense of the RICO litigation for those who provided their expertise to Nancy Michelle Murphy (Michelle Murphy), her minor children J.M., These children suffered from several of the various types of child abuses

that resulted from the conduct of John Harold, Renee L. Haugerud and persons whom they compensated.

Each defendant in the Civil RICO case, was aware that Judge A. Quillian Baldwin, Jr. (Judge Baldwin) was hand selected by the Glover & Davis law firm counsel for John Harold Murphy, Taylor Drake. The record in the case was available to the insurance carrier of Larry King, and the law firm designated by the insurance carrier to provide the defense for Larry King, who was one of the victims of the Rule of Law violations of Judge Baldwin.

Larry King h

The Glover & Davis hand selected judge, A. Quillian Baldwin, Jr. rule of law abridgments exponentially expanded the opportunities for the various types of Renee L. Haugerud financed child abuses that John Harold Murphy and those assisting him engaged.

In Millard Farmer fifty years of experience of litigating discriminatory litigation against persons in courts over a wide jurisdictional territory, this litigation frequently presented different forms of abuse and attacks upon persons attempting to protect Michelle Murphy and her minor children from the conduct that Judge Baldwin created.

This Civil RICO Case will identify the Northern District of Georgia, as few other case have during the last twenty years.

107

by Murphy who suffered in confinement, as the result of a Fourteenth Amendment due process and other Rule of Law abridgments  and T.M., who was placed separate from J.M. in an unidentified institution without Fourteenth Amendment Due Process and other Rule of Law protections.

John Harold Murphy, Renee L. Haugerud, and Lisa Harwell, the guardian ad litem knew that so called "transporters" would awaken J.M. and T.M. from their sleep in their bedrooms in the residence of Renee L. Haugerud that she shared with John Harold Murphy. and forcefully, physically take control of these two minor children without prior notice to the Superior Court Judge A. Quillian Baldwin, Jr.

These two minor children taken under custody of four "transporters" from Tennessee to Utah and placed in confinement in Utah, without notice to their mother, Michelle Murphy, who was eventually able to locate her children.

The federal government, with Child Abuse Prevention and Treatment Act has established funding for various types of protections for children. In cases with a judge who will not provide evidence, funding for these protections are of little value. Michelle Murphy, until Larry King exited her case had one of the most experienced domestic relations lawyers available to Michelle Murphy. Larry King was so abusively treated by Judge Baldwin that it became and emotional and financial strain upon him that, with a wife located in Florida, who was ill and the punitive requirement of Judge Baldwin that each of Michelle Murphy lawyers must be present at each hearing, Larry

King left the case in the trial court. This left Millard Farmer, as Michelle Murphy's only counsel.

the statutory has recognized its need for protection of young children.  With the federal Child Abuse Prevention and Treatment Act defines

John Harold Murphy's civil RICO action against Millard Farmer, Alfred Lawrence King, Jr. (Larry King) Deborah Beacham, My Advocate Center, Inc and those accused of acting in concert with these defendants is brought only in the name of John Harold Murphy; however, the action is financed, sponsored and motivated by John Harold Murphy, Renee L. Haugerud her Galtere, Ltd. Hedge fund  and associated entities (or collectively, "Galtere *et al*.").

The Civil RICO Complaint is part of a strategy by Renee L. Haugerud to retaliate against the defendants for their assistance in the exposure of the intimidation, dangerous and abusive treatment of  Nancy Michelle Murphy, her minor children and, the children's friends and witnesses.

Galtere *et al*."

First, let it be said that Millard Farmer and Larry King would have hastened Michelle Murphy to a lawyer with Influence, if she could have afforded such a

lawyer. This is primarily because in modification of custody cases in Georgia, the judge is the exclusive trier of fact whose decisions are only reviewed under an appellate review standard of "abuse of discretion." This judicial authority provides substantial politically marketable power for judges such as Chief Judge A. Quillian Baldwin, Jr., who permitted himself to be judge-shopped, as Taylor Drake did for John Harold Murphy with a false affidavit from John Harold Murphy that falsely swore that Michelle Murphy was threatening to move with the children to South Carolina.

Millard Farmer only agreed to represent Michelle Murphy and to obtain the domestic relations expertise of Larry King, because they knew the mistreatment that Michelle Murphy endured in the initial divorce case during which, near the end of the divorce case, when her lawyer, Delia Tedder Crouch, squeezed Michelle Murphy for money that could have ultimately affected the welfare of J.M. and T.M. Michelle Murphy took her coat as an offer of payment to Delia Tedder Crouch in hopes that if she gave the coat, the lawyer would continue the divorce litigation, during which John Harold Murphy secreted approximately $180, 000 in stock options from the court, Michelle Murphy and her divorce lawyer until the day after a settlement agreement was executed.

110

When faced with the fear of the loss and thereby the welfare of her children,

Michelle Murphy eventually agreed to terminate the divorce case without her share of the $180,000 in funds derived from the stock options of John Harold Murphy.

It was the botched Qualified Domestic Relations Order that initiated Millard Farmer's representation of Michelle Murphy in the legal malpractice case. That case was resolved before John Harold Murphy filed the modification of custody case. There was no extortion of Renee L. Haugerud, who was represented by at least one or more lawyers who assisted her in executing a full release.

John Harold Murphy swore falsely about that case and initially included issues of that case in the RICO action before he filed his Amended RICO Complaint, after he learned that there was a paper trail that caught his perjury.

Taylor Drake and the Glover & Davis lawyers for John Harold Murphy had the "influence" to become private, criminal contempt prosecutors of Michelle Murphy and her lawyers due to the financial and political benefits that the Glover & Davis lawyers provided to Chief Judge A. Quillian Baldwin, Jr.

These lawyers were compensated by John Harold Murphy with funds provided indirectly from Renee L. Haugerud, the wife of John Harold Murphy, who is a

112

hedge fund operator. These lawyers and the Const. Abridgers with the constant and illegal insistence of John Harold Murphy, and those acting on his

113

behalf, engaged in the criminal prosecution of Millard Farmer with Orders that Judge Baldwin, on occasions, did not even read before signing, and, on other occasions, by having Millard Farmer & Larry King convicted of criminal contempt without providing them due process and other United States and Georgia constitutional protections.

The Glover & Davis lawyers for John Harold Murphy and Renee L. Haugerud were able to accomplish their illegal conduct, in part, by attacking the character of Michelle Murphy, a one chair hairdresser. This was accomplished, in part, by the Glover & Davis lawyers representing Coweta County that supplemented the salary of Chief Judge A. Quillian Baldwin, Jr. and by a long history of Glover & Davis bundling campaign contributions to Judge Baldwin.

John Harold Murphy knew that he was compensating lawyers in order to both criminally convict Millard Farmer of contempt of court and to use their "influence" obtained with Chief Judge A. Quillian Baldwin, Jr. to engage in violations of Michelle Murphy's due process and First Amendment Free Speech protections.

The Glover & Davis lawyers allowed John Harold Murphy and his wife, Renee L. Haugerud to purchase, in the guise of legal fees, their influence with

114

Chief Judge A. Quillian Baldwin, Jr.

modification of custody cases in Georgia, the judge is the exclusive trier of fact whose decisions are only reviewed under an appellate review standard of "abuse of discretion." This judicial authority provides substantial politically marketable power for judges such as Chief Judge A. Quillian Baldwin, Jr., who permitted himself to be judge-shopped, as Taylor Drake did for John Harold Murphy with a false affidavit from John Harold Murphy that falsely swore that Michelle Murphy was threatening to move with the children to South Carolina.

Millard Farmer only agreed to represent Michelle Murphy and to obtain the domestic relations expertise of Larry King, because they knew the mistreatment that Michelle Murphy endured in the initial divorce case during which, near the end of the divorce case, when her lawyer, Delia Tedder Crouch, squeezed Michelle Murphy for money that could have ultimately affected the welfare of J.M. and T.M. Michelle Murphy took her coat as an offer of payment to Delia Tedder Crouch in hopes that if she gave the coat, the lawyer would continue the divorce litigation, during which John Harold Murphy secreted approximately $180, 000 in stock options from the court, Michelle Murphy and her divorce lawyer until the day after a settlement agreement was executed.

When faced with the fear of the loss and thereby the welfare of her children,

115

Michelle Murphy eventually agreed to terminate the divorce case without her share of the $180,000 in funds derived from the stock options of John Harold Murphy.

It was the botched Qualified Domestic Relations Order that initiated Millard Farmer's representation of Michelle Murphy in the legal malpractice case. That case was resolved before John Harold Murphy filed the modification of custody case. There was no extortion of Renee L. Haugerud, who was represented by at least one or more lawyers who assisted her in executing a full release.

John Harold Murphy swore falsely about that case and initially included issues of that case in the RICO action before he filed his Amended RICO Complaint, after he learned that there was a paper trail that caught his perjury.

Taylor Drake and the Glover & Davis lawyers for John Harold Murphy had the "influence" to become private, criminal contempt prosecutors of Michelle Murphy and her lawyers due to the financial and political benefits that the Glover & Davis lawyers provided to Chief Judge A. Quillian Baldwin, Jr.

That malpractice negligence case that John Harold Murphy and Renee L. Haugerud participated in resolving with a mutual release of liability of Millard Farmer and Larry King, was followed by and the modification of custody case that John Harold Murphy instigated against Michelle Murphy.

That modification of custody of the minor children of John Harold Murphy and Michelle Murphy case was ended after Judge A. Quillian Baldwin recused himself and another judge adjudicated a "Final Order" in that modification case. The remainder of that modification case is essentially litigation about litigation in this Civil RICO case.

Larry King's insurance carrier has allegedly paid $100,000 to be released from the Civil RICO case.  Millard Farmer and the other defendants do not have insurance coverage.

John Harold Murphy maintained at the end of the custody case that he has no assets or income and that Renee L. Haugerud supports him.

by the Final Divorce Decree of the Court, together with these lawyers' Rule of Law obligation to protect the best interest of the lives of her minor children.

The business of Renee L. Haugerud's Galtere, Ltd. Hedge fund and its associated entities  to relocate these minor children to St. Thomas U.S. VI. in concert with  the need for Judge Baldwin to become the Chief Judge and gain financial benefits when combined with the hand selection of Judge Baldwin as the exclusive tier of fact when combined with a Georgia Court of Appeals' appellate panel after once adjudicating that the Court of Appeals had jurisdiction to adjudicate the issue of the Glover & Davis lawyer's selection of Judge Baldwin, in a similar  manner that it hand selected another judge and was rebuked in  *Mayor & Aldermen of Savannah v. Batson–Cook Co.*, 291 Ga. 114, 728 S.E.2d 189, 12 FCDR 1770 (Ga., 2012)

*Caperton v. A.T. Massey Coal Co*., 556 U.S. 868,  129 S.Ct. 2252,  173 L.Ed.2d 1208 (2009). Judicial integrity is "a state interest of the highest order" because the power and prerogative of a court to resolve disputes rests upon the respect

The  during litigation turmoil that was extremely dangerous to the lives of the minor children., as John Harold Murphy, Renee L. Haugerud Galtere, Ltd. and associated entities (or "Galtere *et al*.") were financially and  otherwise compensating persons to suborn and engage in criminal

conduct, including false swearing and who were otherwise not adhering to the Rule of law by falsely accusing Michelle Murphy of fondling the children with innuendoes that were published and used as facts for the personal benefit of John Harold Murphy.

John Harold Murphy's adversarial position against Millard Farmer, and Alfred Lawrence King, Jr. (Larry King) initially arose when Millard Farmer began representing Nancy Michelle Murphy (Michelle Murphy) and Larry King was employed as the expert witness, in the malpractice negligence litigation against Delia Tedder Crouch, the attorney for the Michelle Murphy in the divorce that John Harold Murphy initiated against Michelle Murphy.

It was during these two lawyers' review of the complete record of the Troup Count divorce, the depositions during divorce and the malpractice case, including the deposition of Judge Lewis Jack Kirby, the attorney for John Harold Murphy during the divorce.   and otherwise obtaining information about John Harold Murphy and Renee L. Haugerud that Millard Farmer learned the difficulty that Michelle and her counsel had in obtaining truthful and accurate information about John Harold Murphy's secreting of marital assets and false swearing.

By the time that Taylor Drake, a Glover & Davis lawyer wrote his first *ex parte* letter to Michelle Murphy Exhibit **FarmerXX** , Millard Farmer had enough information to opine that John Harold Murphy was dishonest to the extent that he engaged in criminal conduct and that he used the courts, including the Probate Court of Troup County to accomplish his pattern of an illegal agenda  in which he was joined by Renee L. Haugerud who became not only the wife of John Harold Murphy, but a business associate with John Harold Murphy in the major source of their income and lifestyle assets, Galtere, Ltd. and associated entities (or "Galtere *et al*.") .

To end and bring closure to the adversarial relationship that John Harold Murphy had with Millard Farmer, Renee L. Haugerud initiated at phone call that was forwarded to the cell phone of Millard Farmer after a conference that occurred in the Courthouse in Coweta County. Renee L. Haugerud only asked Millard Farmer if she could pay that was being sought from John Harold Murphy to end the malpractice litigation. Millard Farmer's answer was pleasantly soft and quick. Yes, call your lawyer and have him call me. The lawyer called and asked that I have the release that opposing counsel prepared executed and delivered to him. A release was delivered and the money from a fund derived from some entity of Renee L.

Haugerud. As directed by Michelle Murphy the check that was obtained was deposited in Michelle Murphy's bank account. That  very broad, as to released parties, released subject, scope and indemnity agreement is Farmer' Exhibit. **XX**

The  Galtere *et al*. illegal conduct involved funds of persons and entities

John Harold Murphy, as he did when Millard Farmer first became aware of his litigation craving, this time with his RICO civil complaint attempts to once again litigate about domestic relations litigation during which Millard Farmer and Larry King represented John Harold Murphy's former wife, Nancy Michelle Murphy, (Michelle Murphy).,

In the case before Senior Judge Smith John Harold Murphy attempted to recast his image with expert witnesses. The allegations that counsel for John Harold Murphy attempted to present about the fondling innuendoes were so false that Judge Smith ordered counsel to not mention such false allegations again.

The false statements of John Harold Murphy and Renee L. Haugerud so relevant to understanding the detriment of the hand selection of Judge Baldwin as the exclusive trier of fact in the modification of custody case until after twenty (20) disqualification motions when he and each of the

judges in the Coweta Judicial Circuit recused themselves. Each of these Coweta Judicial Circuit  judges, except for a newly appointed judge, were participants in the judge selection process by the lawyers who provided benefits to the judges. Any one of the judges could have changed the illegal judge selection system used by the Glover & Davis Lawyers.

The real detriment of the judge selection was accomplished by the selected judge being sent a letter from the lawyer, as Taylor Drake had hand delivered to Judge Baldwin *exparte* change of custody that was accomplished by a Deputy Sheriff of Coweta County delivering the Order of Judge Baldwin to the home of Michelle Murphy to have the children directed to the vehicle that John Harold Murphy was waiting to take the children to some event at which John Harold Murphy wished for the children to attend.

At the end of the negligence case involving Renee L. Haugerud and an entity of hers paying the a part of John Harold Murphy's retained portion of his $481,960.0 retirement that according to the Court Order was to be divided equally. Before Millard Farmer brought the action, John Harold Murphy had taken all of that money from Michelle Murphy except for approximately $83,000.

Renee L. Haugerud voluntarily called Millard Farmer and asked if she could pay the amount that John was due. With several pleasant sentences, Millard Farmer answered, Yes and asked that she have their lawyer contact Millard Farmer. The lawyer called and arranged with counsel for Delia Tedder Crouch for a settlement agreement and release to be executed.

That Settlement Agreement and release

Since the initiation of this Civil RICO case there has been a final Order in the modification of custody litigation that was entered by Senior Judge E Byron Smith in the Superior Court of Coweta County.

Unlike the Divorce Final Order, or the Settlement Agreement and Release of Millard Farmer in the case in which John Harold Murphy attempted to retain money that he erroneously received, but had Renee L. Haugerud return, maybe John Harold Murphy will read the Settlement Agreement and release of Millard Farmer and those associated with him on this occasion. The payment by Renee L. Haugerud to Michelle Murphy on behalf of John Harold Murphy obtained John Harold' release of Millard Farmer events that John Harold Murphy apparently cannot put to rest.

At the beginning of John Harold Murphy's hidden agenda of obtaining a divorce from Nancy Michelle Murphy (Michelle Murphy) John Harold Murphy unexpectedly moved Michelle Murphy and her two toddler age children from California to LaGrange Georgia to avid a California or New York adjudicated divorce that he wished to obtain after Michelle Murphy's six months' residency in Georgia.

After the Georgia divorce was file, it was first agreed to be resolved with an announcement to the Superior Court of Troup County of a settlement agreement that was to terminate the domestic relations dispute. The agreement only needed to be memorialized in writing and made a final Order in the Coweta Judicial Circuit.

Due to the absence of an enforced, but required, Uniform Superior Court 3.1 executed Case Management Plan, the Murphy divorce litigation, without objection by any lawyer, or judge of their knowingly absence of a USCR 3.1 case management plan, the divorce case wandered between five (5) different judges, including one Senior Judge from another judicial circuit.

The case that bounced among the different judges cost the government extra for the a Senior Judge. for no apparent reason, other than the

convivence of the judges and lawyers. The judge swapping deprived Michelle Murphy of a judge who had knowledge of the numerous previous attempts by other judges to require John Harold Murphy to accurately disclose his marital assets.

This five (5) different judge swapping proceeding permitted John Harold Murphy and his then lawyer, Louis Jack Kirby to benefit from the negligence of Michelle Murphy's lawyer and from the false swearing and other dishonesty of John Harold Murphy in attempting to hid his assets in his mother's bank account, his false swearing on his financial statement and other such conduct.

John Harold Murphy and his lawyer secreted stock options valued at approximately $180,000 from Michelle Murphy and her attorney.

Michelle Murphy offered Delia Tedder Crouch her fur coat if she would litigate further for her to obtain her share of the stock options. Delia Tedder Crouch wanted cash and refused to continue without it.

Due to an absence of affordable cash and fear of losing the custody division of her minor children that omission of the stock option in the agreement  was permitted in the illegally prepared agreement.

Michelle Murphy agreed to the entry of, a final divorce decree without

Michelle Murphy recovering the value of the stock options that were exercised by John Harold Murphy within days after the settlement agreement prepared by Louis Jack Kirby that was executed by Michelle Murphy.

That settlement agreement was made the Order of the Superior Court of Troup County by Coweta Judicial Circuit by Judge 4 of 5.

That Final Decree, with its incorrectly stated distribution of other marital assets and child support was headed for another round of litigation with the error of Judge 5 of 5, who, at the time of making the error knew nothing of the litigation, as he was only called upon to execute Delia Tedder Crouch's prepared Order.

Michelle Murphy's lawyer was aware that Judge 5 of 5 had not been involved in the settlement agreement, the adjudicating the final decree or elsewise in the case when he was presented the Order for what was to be the equal division of the retirement assets of John Harold Murphy in the amount of another $180,000.

Judge 5 of 5 was presented an invalid Order by Michelle Murphy lawyer to divide the retirement marital assets of John Harold Murphy.

Upon discovery of the erroneously entered Order by Judge 5 of 5,

Michelle Murphy informally requested for John Harold Murphy, to correct the Ordered equal division of retirement asset.

John Harold Murphy, refused to correct the division of assets he obtained with the erroneously prepared Order

At that stage in the ongoing domestic relations dispute, Millard Farmer for the first time learned of the Murphy's litigation and began representing Michelle Murphy, a person who he did not know.

. Millard Farmer filed an action on behalf of Michelle Murphy against Delia Tedder Crouch to recover for this lawyer's professional negligence.

John Harold Murphy was not included as a defendant, albeit that he was holding money that he obtained in error from the Order of Judge 5 of 5, as Michelle Murphy expressed fear of retaliation affecting the children, if Michelle Murphy began litigation against John Harold Murphy.

Millard Farmer engaged a compensated domestic relations expert, Alfred Lawrence King, Jr. (Larry King) to provide the required affidavit of negligence to file the action against Delia Tedder Crouch.

During the litigation against Delia Tedder Crouch, Millard Farmer and Larry King received calls from persons about the conduct of lawyers in domestic relations litigation in the Coweta Judicial Circuit.

The knowledge that Millard Farmer and Larry King learned about the illegal conduct of John Harold Murphy during that litigation against Delia Tedder Crouch, motivated Millard Farmer to accept representation of Michelle Murphy in the modification of custody case that John Harold Murphy filed against Michelle Murphy.

No litigant should be allowed to literally obtain legal representation that assisted the litigant in illegally taking money due a mother and her minor children. Millard Farmer after hearing of other domestic relations cases in the Coweta Judicial Circuit was amazed that the morality of Domestic Relations representation and litigation had digressed as it had since Millard Farmer primarily practiced in the Circuit. Racial discrimination was rampart when Millard Farmer practiced in the Circuit, but stealing money, or assisting clients  was never tolerated.

Millard Farmer later observed that John Harold Murphy and Renee L. Haugerud both engaged in false swearing in documents provided to governing authorities.

In attempts to resolve the negligence of Delia Tedder Crouch case, Judge 5 of 5 and the insurance carrier for Delia Tedder Crouch made it clear to counsel for Michelle Murphy that the case could not be resolved with John

Harold Murphy retaining the windfall financial benefits that he received due to the negligence of Michelle Murphy's counsel.

Rather than just providing Michelle Murphy her share of the marital assets that he obtained through error, John Harold Murphy obtained counsel and expressed litigation resistance to compensating Michelle Murphy.

Renee L. Haugerud, who had married John Harold Murphy by that time apparently began advising John Harold Murphy and consulting with his lawyers, who attempted to present sophisticated defenses, but none of which Judge 5 of 5 agreed were half, as required by the divorce decree. . Millard Farmer after conferences with the Court began preparing a motion to add John Harold Murphy to the malpractice action, as Judge 5 of 5 informed the parties that he had no information available to him that would justify John Harold Murphy retaining the windfall benefits.

It was relevant for Judge 5 of 5 to have concern about the custodial parent of the two minor children being deprived of marital assets due to the malpractice of a lawyer and error of that judge in execution the Order that provided John Harold Murphy a windfall.

for no reasoning other than the lawyers and judges' scheduling

preferences.  ended with a divorce decree [  ]accompanied with a by settlement agreement made the Order of the Court.,[ ]. that domestic relations "finality" [ ] was There was malpractice litigation about the illegal distribution of the pension that John Harold Murphy was ordered to divide evenly,. During that litigation, Renee L. Haugerud offered to pay the amount of money being sought from John Harold Murphy to evade a jury trial about the money that John Harold Murphy received that did not comply with the Final Divorce Order. . The payment to Michelle Murphy was accepted from Renee L. Haugerud that was accompanied by a release of Millard Farmer and those associated with him. The agreement includes, with an indemnification agreement that protected the released parties  from the beginning of time to the date of the agreement.

John Harold Murphy next filed the modification of custody case against Michelle Murphy and before it ended filed this civil RICO action.

The Glover & Davis lawyers then filed an action against Millard Farmer seeking OCGA  9-15 attorney fees against Millard Farmer related to the third party complaint

Millard Farmer requests relief before this federal case embarks upon a lengthy and expensive trial

involving a civil RICO trial for alleged damages sought with, among other subject matter defficiencies, a non-compliant *Ashcroft v. Iqbal*, plead Amended Civil RICO Complaint [31 ] for conduct of Millard Farmer  originating from performance of the legal representation that Millard Farmer and Larry King provided a client, and at times, themselves in fulfilling their client's rule of law deserved standard of care  legal defenses.

The legal representation that these two lawyers provided to each other, was created in defending the 'rule of law' violations inflicted upon their client, Nancy Michelle Murphy (Michelle Murphy) and the rule of law violations inflicted upon these lawyers by judges and lawyers violating the rule of law.

The rule of law violations inflicted upon Millard Farmer and Larry King were instigated as retaliation for these lawyers exposure of rule of law violations and or in furtherance of attempts by opposing parties and their counsel to conceal rule of law violations and to enlist others to engage in rule of law violations.

   The retaliation against Millard Farmer was enhanced with Renee L. Haugerud's' verbally expressed commitment to spend her last

penny, (and apparently the funds of her hedge fund participants) if necessary, to ruin Millard Farmer., who was one of the two lawyers that continued to represent Michelle Murphy after Judge Baldwin, in language that any experienced lawyer in the Coweta Judicial Circuit understood to mean that Judge Baldwin would not authorize any attorney fees, if the motions to disqualify Judge Baldwin were not ceased and essentially, under the decision in *Hargis*, 294 Ga. 818, 822-823 (2014)    waived and thereby leaving Judge Baldwin as the exclusive trier fact, (*Taylor v. Taylor* 293 Ga. 615 (2013) and the Coweta Judicial Circuit's violations of Uniform Superior Court Rule 3.1 Case Management Plan  unchanged.

It was the violation of the rule of law in judge selection and case selection by judges' rule of law violations that deprives hundreds of litigants in the Coweta Judicial Circuit of the rule of law protections afforded constitutionally to every person.

It was the Glover & Davis lawyer Taylor Drake who enriched himself and Glover & Davis by knowingly and intentionally violated the rule of law and attempted to obtain criminal contempt convictions of Millard Farmer, Larry King and Michelle Murphy to

enrich himself and Glover & Davis.

Taylor Drake used the impeccably honorable reputation of his father and grandfather as cover for his rule of law violations.

The conduct of Taylor Drake and the Glover & Davis lawyers was only petty rule of law violations until he, with the assistance of Coweta Judicial Court Judge Louis Jack Kirby was provided the mega financial resources of John Harold Murphy that were supplied to him, in substantial part by the hedge fund businesses of Renee L. Haugerud.

Millard Farmer and Larry King realized that the violations of the rule of law abridgments being permitted and engaged in by Judge Baldwin were not a constitutionally responsible use of Judge Baldwin's judicial power and the judicial power of other judges in the Coweta Judicial Circuit.

Millard Farmer and his associates litigated the trial jury unconstitutional composition in the Coweta Judicial Circuit for about ten (10) years before the United States Court of Appeals for the Eleventh Circuit in *Davis v. Zant* 721 F.2d 1478 (11th Cir. 1984) eventually corrected that unconstitutional jury composition rule of

law abridgment.

The words of Martin Luther King from Birmingham Jail remind us that there is a distinction between

law and justice. The law, even if it is uniformly applied, does not in itself guarantee a just

result. The rule of law is intended to promote stability, but a society that operates under the

rule of law must also remain vigilant to ensure the rule of law also serves the interests of

justice. As this quote points out, the continued strength of the rule of law sometimes depends on

individuals who are willing to risk punishment in pursuit of justice.

[N]either laws nor the procedures used to create or implement them should be secret; and . . . the

laws must not be arbitrary.

   Michelle Murphy and the other litigants without the available

litigation resources to employ a lawyer who was a judicial gifttorian of election funds, or political benefits deserved the financial sacrifice of Millard Farmer and Larry King that Judge Baldwin chose to extract from these lawyers as the punishment for fulfillment of their legal responsibility to their client, Michelle Murphy, the mother of the children that Renee L. Haugerud wished to obtain. It was at the Regency Hotel that Renee L. Haugerud informed Michelle Murphy that it was useless for this mother to fight to retain her children, as it was a done deal that she could not win.

The financial sacrifice of these lawyers was necessary to obtain an enforced Uniform Superior Court Rule 3.1 Case Management Plan in the Coweta Judicial Circuit.

Hundreds of litigants in cases involving child custody in the Coweta Judicial Circuit were subjected to the consequences of the Glover & Davis type of politically steeped representation that was replicated by a few other counsel in the Coweta Judicial Circuit.

This element of the rule of law violations was financially expensive to the government, as Senior Judges were compensated to fill temporary vacated judicial positions in the Coweta Judicial

Circuit for judges who chose to abandon cases that they did not wish to adjudicate.

for retribution by Renee L. Haugerud for the legally representation that this lawyer provided. Millard Farmer and Larry Kings resulted from the necessity to defend the rule of law violations that Renee L. Haugerud, Galtere, Ltd. and associated entities (or "Galtere *et al.*") and John Harold Murphy compensated a cadre of lawyers and their compensated, or politically exchanged benefits from persons to originate violations of the rule of law that Galtere *et al.* financed with funds of Galtere *et al* and funds of others with whom they owed a fiduciary legal obligation.

The Glover & Davis lawyers obtained benefits and services that belonged to the governing authority of Coweta County and State of Georgia to engage for conduct that was intimidating to potential witnesses, Michelle Murphy and her children.

Glover & Davis affiliated lawyer, Nathan Lee, provides legal services to Coweta County that provides a financial supplement to judges in the Coweta Judicial Circuit.

and. Nathan Lee provides legal services to the Sheriff of Coweta

County.

Without being provided the proper legal representation about participating in cases involving civil disputes, the best of intentioned Deputy Sheriffs answered the request of the Glover & Davis lawyer to participate in aspects of the case of John Harold Murphy v. Nancy Michelle Murphy.

The investigation of the participation of Coweta County in aspects of the Murphy litigation cannot adequately be done by the State of Georgia, as demonstrated by the "investigation" of Nan Freeman that was done by to very honorable and skilled employees from counties outside of the Coweta Judicial Circuit.   These Nan Freeman investigators did not even interview Nan Freeman before rendering a report that was used against Millard Farmer. The investigators in making report, accepted the representations of friends of Nan Freeman that were not supported under oath with documented evidence. The investigators reached the correct moral conclusion that Nan Freeman should not be criminally prosecuted. They did not reach the correct legal conclusion that Nan Freeman received money from the government that was not supported by documented and

approved statements that could be legally used to obtain compensation from the government. The investigation of Nan Freeman was a white wash of the excessive amounts of compensation that she received from litigants in the Coweta Judicial circuit including fees that were paid to her in the Murphy case.

**Rule of law protections become impotent** for a litigant whose exclusive trier of fact, and participant in the rule of law violations has been hand selected with judicial participation by the litigant's opponent.

Millard Farmer and Larry King were faced with defending a multifaceted continuum of Rule of Law violators whose rule of law violations, including violations involving minor children geographically ranging from Minnesota to St. Thomas U.S.VI to Tennessee to Utah to several locations in the State of Georgia.

The geographically jurisdictional spread of the rule of law violations were created by John Harold Murphy, Renee L. Haugerud and Galtere *et al*. related to conduct involving the minor children that were being sought to be taken from Michelle Murphy, the client of

Millard Farmer and Larry King.

The rule of law violations originated in litigation that John Harold Murphy initiated with the "emergency" need to hand select Judge Baldwin, as the exclusive trier of fact in a case involving allegation he initiated the modification of custody litigation against Michelle Murphy, a Newnan Georgia resident.

John Harold Murphy alleged in his "emergency modification of custody case that Michelle Murphy was threatening to move with the minor children to South Carolina. The emergency need for that litigation was based upon the false statement of John Harold Murphy, a Lookout Mountain, Tennessee resident that Michelle Murphy was threatening to move to South Carolina with the children. The standing order of the Coweta Judicial, without the feigned need for the emergency that was used to select Judge Baldwin, prevented the removal of all litigants from the State upon the filing of any domestic relations action. That Standing Order in the Coweta Judicial, as is attached to the modification of custody Complaint by the Clerk of Court. **Farmer Ex 5,** pp7,8.

The hand selection of Judge A. Quillian Baldwin, Jr. by Taylor

Drake, a Glover & Davis lawyer involved three violations of the Rule of Law.

The ex parte notice by Taylor Drake to Judge Baldwin that he would be hand selected was a violation ex parte violation of the rule of law by Judge Baldwin, who knowingly participated in his hand selection by the Glover & Davis lawyer, , Melissa Griffis, the co-sponsor of the judicial election fund raiser for Judge Baldwin's candidate for election and the planner of her selection, as the initial Guardian ad litem.

After being hand selected Judge Baldwin and Taylor Drake were placed on notice of their violations of the rule law violations, both orally in the initial chambers meeting.

After Judge Baldwin refused to modify his assumption as the hand selected judge, motions to disqualify him. It was at this time that Taylor Drake, the Glover & Davis lawyers,

that involved eight or more judges in the Coweta Judicial Circuit, three or more Court of Appeals judges and actions against Millard Farmer with the State Bar of Georgia.

The rule of law violations that Millard Farmer and Larry King

attempted and at times successfully defended, included criminal contempt charges knowingly illegally sought that occurred within and outside the presence of the Chief Judge Baldwin, all of which were obtained without providing due process to the accused and or convicted individuals. The intent of the criminal charges attacks upon Michelle Millard Farmer and Larry King included financial and other benefits that were initiated by Taylor Drake, the Glover & Davis lawyers through their abuse of the judicial authority of Judge Baldwin, who after eventually recusing himself, the disputed resolution of the children has apparently been resolved.

The resolution of the custody disposition of the children is relevant to the alleged illegal conduct that expanded the rule of law violators the extent that the Sheriff's Department of Coweta County was involved in intimation of witness and otherwise used in furtherance of the Taylor Drake and Glover & Davis lawyers rule of law violations.

The status of the modification of custody litigation is relevant to the need for this federal court to call upon the United States Federal Bureau of Investigation and the Securities and Exchange

Commission to investigate the conduct of Renee L. Haugerud, Galtere, Ltd. and associated entities (or "Galtere *et al.*"), John Harold Murphy the cadre of lawyers and involved in the Rule of Law violations.

The bell cow of the myriad of rule of law violations had their origin with conduct by Chief Judge A. Quillian Baldwin, Jr. who had the initial legal responsibility to prevent the consequences of the Taylor Drake /Glover & Davis lawyer's selection of Judge Baldwin and as his habitual failures of his judicial responsibility as the first responder to the myrid of additional criminally involved violations of the rule of by lawyer that financially benefited Chief Judge Baldwin, the Glover & Davis lawyers and

 directly and indirectly obtaining financial and other benefits from Renee L. Haugerud, Galtere, Ltd. and associated entities (or "Galtere *et al.*").and John Harold Murphy. The term'Rule of Law," is difficult to define, as used here it is as follows.

What makes up the rule of law?

No freemen shall be taken or imprisoned or disseised or exiled or in any way destroyed, nor will we

go upon him nor send upon him, except by the lawful judgment of his peers or by the law of the land.

—Article 39, Magna Carta (1215)

In 1215, King John of England signed the Magna Carta (or Great Charter). A group of barons, powerful noblemen who supported the king in exchange for estates of land, demanded that the king sign the charter to recognize their rights.

Article 39 of the Magna Carta was written to ensure that the life, liberty, or property of free

subjects of the king could not be arbitrarily taken away. Instead, the lawful judgment of the subject's peers or the law of the land had to be followed.

So what does Magna Carta have to do with the rule of law?

Quite a lot. It recognizes that a person's fate should not be in the hands of a single individual—here, the king.

It demands that a judgment against a person be made in accordance with the law. The Magna Carta planted the seeds for the concept of due process as it developed first in England, and then in the United States.

Due process means that everyone is entitled to a fair and impartial hearing to determine their legal rights.

If men were angels, no government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.

James Madison, Federalist Paper No. 51 (1788)

James Madison's quote from the Federalist Papers gets at the heart of the problem that even a government of law is ultimately "administered by men over men."

John Adams, who envisioned "…a government of laws, and not of men sought to protect people from the government with the Constitution.

One of the people who inspired this country to make the greatest advances in human relation in our lifetimes wrote as follows.

I submit that an individual who breaks a law that

conscience tells him is unjust, and who willingly accepts the penalty of imprisonment in order to arouse the conscience of the community over its injustice, is in reality expressing the highest respect for law.

—Martin Luther King, Jr., "Letter from Birmingham Jail" (1963)

When we [Americans] talk about the rule of law, we assume that we're talking about a law that

promotes freedom, that promotes justice, that promotes equality.

—U.S. Supreme Court Justice Anthony Kennedy, Interview with ABA President William Neukom

(2007)


Justice Kennedy suggests that the rule of law has taken on special meaning for the people of the  United States, based on our history of looking to the law to fulfill the promises of freedom,  justice, and equality set forth in our nation's founding documents develop around the belief that a primary purpose of the rule of law is the protection of certain basic rights.

                                   The Judges and lawyers and their motivators are unmask in this motion to the extent necessary to obtain the relief requested to defend the Rule of Law violations.

  Millard  Farmer  and  Alfred  Lawrence  King,  Jr.  and  persons working with then never had any relationship with Nancy Michelle

Murphy (other than that of an attorney client relationship. Millard Farmer had a written contingent fee agreement with Michelle Murphy

The involved Judges and Lawyers obtained financial and political incentives and benefits that motivated their violation of the rule of law from John Harold Murphy with funds derived directly or indirectly from Renee L. Haugerud, Galtere, Ltd. and associated entities (or "Galtere"). her hedge fund operations the government.

, as John Adams, envisioned  to be " rule of law' to be that which is "a government of laws, and not of men."

In a letter dated March 31, 1776, Abigail Adams writes to her husband, John Adams, urging him and the other members of the Continental Congress not to forget about the nation's women when fighting for America's independence from Great Britain.

The future First Lady wrote in part,

 "I long to hear that you have declared an independency. And, by the way, in the new code of laws which I suppose it will be necessary for you to make, I desire you would remember the ladies and be more generous and favorable to them than your ancestors. Do not put such unlimited power into the hands of the husbands. Remember, all men would be tyrants if they could. If particular care and attention is not paid to the ladies, we are determined to foment a

rebellion, and will not hold ourselves bound by any laws in which we have no voice or representation."

Without this federal court's limine protections the defendants' Millard Farmer, Deborah and those accused with them face a trial during which the triers of fact, who are unfamiliar with constitutional protections, or the obligations of attorneys to their clients are mesmerized into the misconception that the conduct of judges involved in the allegations against Millard Farmer and others in this civil RICO case are consistent with judicial conduct that conformed with the rule of law, which it did not.

Other cases during which Millard Farmer, as attorney for various defendants and during which various judges, who  sanctioned Millard Farmer unconstitutionally leads triers of fact down the path that Millard Farmer and others accused with Millard Farmer are persons of disrepute who, subliminal  is burdened by the triers of fact in a trial related to   life's work of Millard Farmer and those accused with Millard Farmer in the detrimentally styled RICO federal case.

aremezerized  also deprived of investigative assistancethat the Court address the following categories of the civil RICO case related issues.

The issues include, but are not limited to the reality that the entirety of the proceedings upon which the allegations against Millard Farmer, the other defendants and accused persons arose involve the U.S. unconstitutional Fourteen Amendment equal protection, Due Process and First Amendment Abridgments related to the conduct of hand selected judge and the abusive of this judge's constitutional authority by counsel for John Harold Murphy.

Stated plainly, the Glover & Davis purchased and sold more than their long term illegal relationship with judges in the Coweta Judicial Circuit an in particular Judge Baldwin who most frequently did not know or understand the consequences of the documents that he was execution, or of his oral pronouncement. Judge Baldwin failed to learn the law, failed to become computer literate and became so dependent upon the Glover & Davis lawyer that without knowingly intending, Judge Baldwin was suborning the criminal acts of lawyers and their clients.

The ability of John Harold Murphy to share the wealth of Renee

L. Haugerud with lawyers and experts was such a distraction to justice, fairness and the integrity to the Coweta Judicial Circuit Judges that Chief Judge Baldwin could only defend his conduct as such conduct would be defended of an angry person without knowledge of the elementary mandates of Uniform Superior Court Rules, the constitutional protections afforded litigants and their counsel and the Georgia Code of Judicial Conduct.

There are several clearly documented examples of Judge Baldwin's unconstitutional application of constitutional protections to both the client and counsel in a modification of custody case in which Chief Judge Baldwin was the exclusive trier of fact after being selected by counsel who sought for custody of minor children be changed from the mother defendant, who had primarily raised the children to the father plaintiff, who had little involvement in raising the children who had married a hedge fund operator who had a business interest in relocating the children from Georgia to St. Thomas U.S.V.I.

There is an audio recording of the May, 27,2014 proceeding that is initially beneficial to hear, as it depicts both the substance and demeanor of the Judge at the proceeding represented to be the client opportunity to

explain the best interest of the minor children. . Farmer Ex. XX. Highly relevant commitments of the Judge's representations to the minor children and to counsel are not contained  in the transcript that is Farmer Ex. XX

The May 27, 2014 audio recording followed the Xxxx Court reporting of the  issue relating to Millard Farmer attempting to obtain a transcript and audio recording that further documented the judge selection of cases in violation of a mandated Uniform Superior Court Rule 3.1 Case Management Plan., even after Millard Farmer and Larry King were successful in obtaining an Order that directed the Clerks of Court to activate a Rule 3.1 Case Management Plan.  The XXaudio that was much later obtained in litigation against the court reporter, Nan Freeman is Farmer Ex. XX and transcript XX.

The e-mail request to Judge Baldwin to obtain the May 27, 2014 audio and his response follows.

The following e-mail from Millard Farmer was written after the events that were recorded by the court reporter, who for some reason, even after all of the issues about obtaining the complete transcript from the beginning "All rise." to the end, when the Judge leaves the courtroom and discontinues exercising authority over counsel and

the litigants. Michelle Murphy and her counsel were constitutionally entitled to have the orders of Judge Baldwin while he was robe and exercising his judicial authority over Michelle Murphy and her counsel memorialized by a court report, as a part of an judicial proceeding.

Nan Freemen did not record Judge Baldwin's commitment to Michelle Murphy, the children and Millard Farmer that if the children waited in the witness room, that Judge Baldwin would talk with them after hearing other witnesses. The children and their witnesses, including their school authorities were relevant to the qualifying the proceeding as being eligible to comprise any degree of reliability for use as a basis for a civil RICO action against counsel for Michelle Murphy that was used to extract approximately $100,000 from Larry King's insurance carrier in exchange for dismissing him as a defendant, apparently not being subjected to having State Bar Grievance filed against him.

This conduct by counsel for John Harold Murphy in obtaining benefits in this Court in exchange for $100,000 and the loss of the legal expertise of Larry King's counsel is a United States Fourteen

Amendment Due Process protection in the presence of this Court that affects all defendants and other persons whose reputations Renee L. Haugerud and John Harold Murphy attempt to use to conceal their abuse of Michelle Murphy and her children.

Michelle Murphy was accused of fondling one of the children.

Millard Farmer from his personal knowledge of the children and the oldest child conversation with John Harold's mother that the accusation was fabricated.

This accusation was an false., as John Harold Murphy, his mother and Renee L. Haugerud knew. Patricia Nice, M.D. raised the issue from her anger of being exposed for her disease of being a substance abusing addict.

Nancy McGarrah, a psychologist after lengthy examination by Millard Farmer eventually stated that John Harold Murphy provided her information about the fondling of the children by Michelle Murphy. John Harold Murphy was in the courtroom seated within conversation distance of his Glover & Davis and Kilpatrick Townsend & Stockton LLP lawfirm, Wilmer "Buddy" Parker  Lisa Harwell, the guardian ad

litem and counsel knew that the substance of the fondling statement was untrue.

John Harold Murphy's

In the December 2013, Kilpatrick Townsend & Stockton LLP counsel for John Harold Murphy in the Response to the Application for Appeal, at p. 2, (Georgia Court of Appeals Case No. A14D0168), the lawyers for John Murphy inform the Court of Appeals that the treating psychiatrist [Patricia Nice, M.D.] disclosed "her serious concerns regarding the possible existence of sexually inappropriate conduct involving Ms. Murphy and the minor children." Further, at p. 6, the lawyers for John Murphy argue that the children were exhibiting self-destructive behavior, "(including the possibility of inappropriate sexual conduct involving their mother, Ms. Murphy)."

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
(p. 6)

In addition to impugning the personal and professional integrity of multiple judges and undermining the authority of the judicial system throughout this entire case, the conduct of Ms. Murphy and her lawyers is having a profound and potentially irreversible impact on the minor children. These two bright and capable young men, with great natural abilities and potentially unbounded opportunities, are exhibiting self-destructive behavior

on multiple levels, including but          not limited to underage and illegal alcohol consumption, school truancy, and premature sexual activity (including the possibility of inappropriate sexual conduct involving their mother, Ms. Murphy).  Not only has the conduct of Ms. Murphy and her attorneys delayed *any* meaningful examination of the myriad concerns that led Mr. Murphy to file this action in April of 2012, it has taught these minor children that authority is not to be respected and that obstinancy will be rewarded.

*Id., p. 2*
The hearing ended abruptly when, during cross-examination by Ms. Murphy's counsel, the treating psychiatrist disclosed to the trial court her serious concerns regarding the possible existence of sexually inappropriate conduct involving Ms. Murphy and the minor children. After immediately calling counsel back to chambers, where their input was solicited and received, the trial court returned to the bench and ordered the parties to participate in a full custody evaluation to be conducted as soon as possible

Millard Farmer wrote Judge Baldwin an e-mail that follows with Judge Baldwin's response.

**Dear Judge Baldwin,**

We strongly oppose the proposed order presented by Taylor Drake and proposed parenting plan.

We do demand that you file and Order immediately. The arrest of the children on Tuesday, May 27, 2014 and transfer of the Jack Murphy, age 15 and Thomas Murphy, age 13 to John Harold Murphy was illegal and unconstitutional.

There was no opportunity for Michelle Murphy to present her case at either the March 17, 2014 hearing or the hearing on May 27, 2014. This request and response to Taylor Drake is with reservation of personal jurisdiction of Michelle Murphy, Larry King and Millard Farmer, as constantly identified.

I have requested the audio of the hearing. Yesterday, Nan Freeman stated that she would not allow me to purchase a copy of the audio.

I request that you direct her to allow us to purchase this audio, as it depicts the type of judicially inappropriate conduct that resulted in the illegal transfer of the custody.

The proposed order of Taylor presents false information and information that Michelle Murphy would have rebutted, if provided an opportunity.

As respectfully as I can give you my reason for needing the audio, I can say that in my many years of practice before many judges, I have never observed any judge yell, visually emote and emotionally blow up as you did yesterday. I respectfully request that you listen to the audio with a trusted advisor.

Millard
millardfarmer@milla
rdfarmer.com404
688-8116

Judge Baldwin Responded to Millard Farmer's e-mail as follows.

Mr. Farmer:

I have not had a chance to look at Mr. Drake's order yet, however, I have decided to  prepare my own order so you do not need to worry about that.

Also, as far as a copy of Nan Freeman's audio, If the law shows that you are entitled to the audio then she will certainly give that to you. However, you will need to show me some law that specifically says she has to give you the voice recording.

Further, I will point out to you that I will not have a problem in acknowledging anything that I have done as long as you do not have a  problem  acknowledging  your  disruptive  behavior,  your inconsiderate attitude towards the Court, your making a number of false statements in pleadings and your intimidation of witnesses, in particular, Dr. Nancy McGarrah (the last two which are probably violations of state bar rules of ethics and one I believe to be an absolute violation of the law).  I have not taken the time to check this out.

My interest in this case is to resolve it in a way that is best for the boys. I do not understand why you and your client will not cooperate.  I have told  you  both that  it is my intent to give your  client custody if I can satisfy myself that some of the  Plaintiff's allegations concerning her inappropriate sexual conduct with one of the boys is unfounded and no other inappropriate behavior is discovered.  I can only assume that your client has something to hide which of course is not in the best  interest

of the children. This warrants a change of custody until these questions can be resolved. ∴

A. Quillian Baldwin, Jr.
Chief    Judge,
Superior  Court
Coweta Judicial
Circuit
706-883-1633 phone
706-298-3706 fax

In the December, 2013 Response to the Application for Appeal, at p. 2, (Georgia Court of Appeals Case No. A14D0168), the lawyers for John Murphy inform the Court of Appeals that the treating psychiatrist disclosed "her serious concerns regarding the possible existence of sexually inappropriate conduct involving Ms. Murphy and the minor children." Further, at p. 6, the lawyers for John Murphy argue that the children were exhibiting self-destructive behavior, "(including the possibility of inappropriate sexual conduct involving their mother, Ms. Murphy)."

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
(p. 6)

In addition to impugning the personal and professional integrity of multiple judges and undermining the authority of the judicial system throughout this entire case, the conduct of Ms. Murphy and her lawyers is

having a profound and potentially irreversible impact on the minor children. These two bright and capable young men, with great natural abilities and potentially unbounded opportunities, are exhibiting self-destructive behavior on multiple levels, including but not limited to underage and illegal alcohol consumption, school truancy, and premature sexual activity (including the possibility of inappropriate sexual conduct involving their mother, Ms. Murphy). Not only has the conduct of Ms. Murphy and her attorneys delayed *any* meaningful examination of the myriad concerns that led Mr. Murphy to file this action in April of 2012, it has taught these minor children that authority is not to be respected and that obstinancy will be rewarded.

*Id., p. 2*
The hearing ended abruptly when, during cross-examination by Ms. Murphy's counsel, the treating psychiatrist disclosed to the trial court her serious concerns regarding the possible existence of sexually inappropriate conduct involving Ms. Murphy and the minor children. After immediately calling counsel back to chambers, where their input was solicited and received, the trial court returned to the bench and ordered the parties to participate in a full custody evaluation to be conducted as soon as possible.

Millard Farmer responded to the mongering partner of Kilpatrick Townsend & Stockton LLP, as follows in a letter.

. These categories of issues identified here affect subject matter jurisdiction and venue.

Coweta Judicuit Judge Lewis Jack Kirby, who before becoming a Superior Court Judge represented John Harold Murphy in his divorce action against Nancy Michelle Murphy[. 74,] During that divorce action John Harold Murphy secreted stock options valued at approximante $180,000 and otherwise financially obtained more than his share of the marital assets. p.73 Exhibit  Farmer  Ex. 6, Affirmative Eighth Defense The illegal deception of John Harold Murphy that was accomplished with his, false swearing  the assistance of John Harold Murphy's mother,

a less than diligent attorney of Michelle Murphy and the unwillingness of Judge Louis Jack Kirby to correct the secreting of the approximate $180,000.

Judge Louis Jack Kirby continued a relationship with the modification of custody case by appointing the guardian ad litem of Michelle Murphy's children as a guardian ad litem in his court.

After it was determined that Coweta Judicial Circuit Judge 5 of 5 executed an incorrect Order to divide the pension that Michelle Murphy was to receive a half. It was not until Millard Farmer brought a legal malpractice action against Michelle Murphy's lawyer that Michelle Murphy was able to obtain a substantial amount of the money that John Harold Murphy was due to Michelle Murphy.

It was Renee L. Haugerud who paid the largest portion of the marital assets that John Harold murphy would not provide until after the malpractice litigation.

After becoming a Coweta Judicial Circuit Judge, as a friend, Superior Court Judge Louis Jack Kirby advised John Harold Murphy about lawyers who could best represent him in a modification of custody case that John Harold Murphy wished to file against Michelle Murphy, as

she did not subcumb to the letter to her from the Glover & Davis Lawyer Taylor Drake, requesting Michelle Murphy to move with her children to Chattanooga Tennesse, an area that she had never lived and an are that the children did not wish to live.  Exhibit **XX** With on a telephone communication, John Harold Murphy employed Glover & Davis lawyer,Taylor Drake, as suggested by Judge Louis Jack Kirby.

Taylor Drake, in the absence of UCRule 3.1  hand  selected Judge A. Quillian Baldwin, Jr. and

Judge Baldwin went far beyond his call to benefit Taylor Drake and John Harold Murphy.

Judge Baldwin, refused to allow a hearing on any of the twenty motions for his disqualification.

Judge Baldwin became and advocate for his court reporter who failed to correctively take down the court proceedings, over charged counsel for Michelle Murphy.

Judge Baldwin refused to allow Millard Farmer, counsel for Michelle Murphy to fill a motion without first sending a copy of the motion to Taylor Drake and thereafter obtaining Judge Baldwin's approval to file the motion.

Chief Judge Baldiwn, before recusing himself, with the other judges in the Coweta Judicial Circuit directed the Clerks of Court, as mandated by Uniform Superior Court Rule 3.1 to adhere to the Circuit's Case Management Plan.

Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009). Judicial integrity is "a state interest of the highest order" because the power and prerogative of a court to resolve disputes rests upon the respect

*Caperton* is highly relevant to this case, as it is the Due Process doctrine that Millard Farmer relied upon in most every motion to disqualify Judge Baldwin and at every other opportunity. Due Due Process was such a stranger to Judge Baldwin that he identified efforts to protect this, equal protection and First Amendment protection,as intimidation, or an obstruction.

The  Georgia Supreme Court addressed the Glover & Davis conduct in *Mayor & Aldermen of Savannah v. Batson–Cook Co.*, 291 Ga. 114, 728 S.E.2d 189, 12 FCDR 1770 (Ga., 2012)

The only remaining defendants are Georgia residents who live within the Atlanta Division of the Northern District of Georgia if the case is to be tried.

John Harold Murphy and the insurance carrier of Alfred Lawrence King, Jr. (Larry King) with an agreement, eliminated the Florida resident, Larry King, as a defendant. The insurance carrier of Larry King, with the approximate $100,000 payment to counsel for John Harold Murphy eliminated Larry King's share of the legal assistance and litigation cost that Larry King's counsel was providing and sharing with the other defendants. The  payment  of funds on Larry King's behalf may explain why counsel for John Harold Murphy did not initiate State Bar of Georgia grievances against Larry King for the conduct for which John Harold Murphy filed grievances against Millard Farmer. Responding to Bar grievances consume a large amount of time that disrupts a law practice.

Larry King only has two remaining areas of potential liability. The insurance carrier of Larry King abandoned responsibility for Larry King's litigation assistance in a case that involves the professional reputation of co-counsel and the lingering responsibility to others who relied upon Larry King's litigation assistance weighs heavily in increasing Larry King's lingering liability to the defendants.

Larry King has an OCGA §51-12-33   Reduction and apportionment of any award, or bar of recovery according to the percentage of fault of parties' and nonparties' remaining liability, to the parties who are proceeding *pro se*.

Larry King also has liability for his share of the $36,914.48 OCGA § 9-15-14 abusive litigation liability established by Judge A. Quillian Baldwin, Jr., (Judge Baldwin), as a condition of allowing Larry King to leave the Coweta Superior Court modification of custody case in order to comfort his ill wife.

These liability issues to the remaining defendants who Larry King's insurance carrier chose to

abandon have not been resolved and absent an agreement cannot be resolved at this time.

This Prologue is relevant to addressing systemic issues that John Harold Murphy, with his lawyers Wilmer "Buddy" Parker and Maloy Jenkins, Parker and a cadre of other lawyers representing John Harold Murphy and/or Renee L. Haugerud and her hedge fund businesses litigated in state court, and/or as State Bar grievances that were and are being pursued on behalf of the interest of John Harold Murphy, Renee L. Haugerud and her hedge fund's interest, with the intended purpose of causing financial and professional detriment to Millard Farmer and the other defendants.

Renee L. Haugerud is a relevant witness. Millard Farmer will seek the assistance of the Court in obtaining her attendance at a trial. On previous ocassions Renee L. Haugerud has provided a false identity and made other false statements to the court and to a court process server (**Exhibit XX**) while John Harold Murphy has refused to provide his residence address that is financed by Renee Haugerud, as their residence. John Harold Murphy. maintained at the child custody hearing that he had no financial

resources or income **[XX** ]. John Harold Murphy is the surrogate plaintiff in the case for the vengeance that Renee L. Haugerud seeks, personally and on behalf of her hedge fund business participants against Millard Farmer.

Renee L. Haugerud and her hedge fund business finance the lawyers who represent the surrogate plaintiff in this litigation. It is John Harold Murphy's counsel who also, on behalf of other parties, brought or instigated the various State Bar of Georgia grievances against Millard Farmer.

John Harold Murphy now, in this civil RICO case, uses most of the same factual events raised in the state court and in the State Bar of Georgia grievances that Renee L. Haugerud and/or her hedge fund business finance counsel to bring in support of this federal civil RICO case action.

OCGA § 51-7-85

The issues raised here   should affect the Court's subject matter jurisdiction and venue, both of which have substantially changed since these isssue were initially before the Court in a skeleton form without the currently available factual information.

Senior Judge E. Byron Smith, who replaced all judges in the Coweta Judicial Circuit after their recusal, rendered a "final Order" (**Exhibit XX)** in the John Harold Murphy v. Nancy Michelle Murphy custody litigation.

Senior Judge E. Byron Smith conducted a lengthy evidentiary hearing that Wilmer "Buddy" Parker, the Glover & Davis, Kilpatrick Townsend & Stockton LLP lawyers represented John Harold Murphy. These lawyers and numerous experts for John Harold Murphy were finance directly or indirectly with funds derived from the hedge fund businesses of Renee L. Haugerud. Millard Farmer, based upon the decision of Michelle Murphy and her brother who provided her guidance did not participate in the final hearing before Senior Judge E. Byron Smith. Michelle Murphy was represented by. Leslie W. Wade and Susan M. Brown during those hearings.

Senior Judge E. Byron Smith, separate from that hearing, adjudicated that Millard Farmer, based upon an opinion of Chief Judge Baldwin before his recusal, but not before the motions for his disqualification   must pay OCGA 9-15-14 attorney fees.

and numerous expert witness, participated.

all financed by Renee L. Haugerud with funds derived directly or indirectly from Renee L. Haugerud   financed and  before entering the

the custody of the minor children of Nancy Michelle Murphy (Michelle Murphy) and John H. Murphy. has been  litigation that initiated this litigation about litigation is

The intent and purpose of John Harold Murphy in bringing this litigation about litigation is

The only remaining defendants are Georgia residents who live within the Atlanta Division of the Northern District of Georgia if the case is to be tried.

John Harold Murphy and the insurance carrier of Alfred Lawrence King, Jr. (Larry King) with an agreement, eliminated the Florida resident, Larry King, as a defendant. The insurance carrier of Larry King, with the approximate $100,000 payment to counsel for John Harold Murphy eliminated Larry King's share of the legal assistance and litigation cost that Larry King's counsel was providing and sharing with the other defendants. The  payment  of

funds on Larry King's behalf may explain why counsel for John Harold Murphy did not initiate State Bar of Georgia grievances against Larry King for the conduct for which John Harold Murphy filed grievances against Millard Farmer. Responding to Bar grievances consume a large amount of time that disrupts a law practice.

Larry King only has two remaining areas of potential liability. The insurance carrier of Larry King abandoned responsibility for Larry King's litigation assistance in a case that involves the professional reputation of co-counsel and the lingering responsibility to others who relied upon Larry King's litigation assistance weighs heavily in increasing Larry King's lingering liability to the defendants.

Larry King has an OCGA §51-12-33 Reduction and apportionment of any award, or bar of recovery according to the percentage of fault of parties' and nonparties' remaining liability, to the parties who are proceeding *pro se*. See USCR [300 Ga. 78]25.3; Mayor & Aldermen of City of Savannah v. Batson–Cook Co., [supra, 291 Ga. at 119,  728 S.E.2d 189 ]. If all

three of these conditions are met, the trial court must refer the motion to

"another judge ... to hear the motion to recuse." USCR 25.3.


Daker v. State, 300 Ga. 74, 792 S.E.2d 382 (Ga., 2016)


Larry King also has liability for his share of the $36,914.48 OCGA § 9-15-14 abusive litigation liability established by Judge A. Quillian Baldwin, Jr., (Judge Baldwin), as a condition of allowing Larry King to leave the Coweta Superior Court modification of custody case to comfort his ill wife.

These liability issues to the remaining defendants who Larry King's insurance carrier chose to abandon have not been resolved and absent an agreement cannot be resolved at this time.

This Prologue is relevant to addressing systemic issues that John Harold Murphy, with his lawyers Wilmer "Buddy" Parker and Maloy Jenkins, Parker and a cadre of other lawyers representing John Harold Murphy and/or Renee L. Haugerud and her hedge fund businesses litigated in state court, and/or as State

Bar grievances that were and are being pursued on behalf of the interest of John Harold Murphy, Renee L. Haugerud and her hedge fund's interest, with the intended purpose of causing financial and professional detriment to Millard Farmer and the other defendants.

Renee L. Haugerud is a relevant witness. Millard Farmer will seek the assistance of the Court in obtaining her attendance at a trial. On previous ocassions Renee L. Haugerud has provided a false identity and made other false statements to the court and to a court process server (**Exhibit XX**) while John Harold Murphy has refused to provide his residence address that is financed by Renee Haugerud, as their residence. John Harold Murphy. maintained at the child custody hearing that he had no financial resources or income **[XX** ]. John Harold Murphy is the surrogate plaintiff in the case for the vengeance that Renee L. Haugerud seeks, personally and on behalf of her hedge fund business participants against Millard Farmer.

Renee L. Haugerud and her hedge fund business finance the lawyers who represent the surrogate plaintiff in this litigation. It is John Harold Murphy's counsel who also, on behalf of other parties,

brought or instigated the various State Bar of Georgia grievances against Millard Farmer.

John Harold Murphy now, in this civil RICO case, uses most of the same factual events raised in the state court and in the State Bar of Georgia grievances that Renee L. Haugerud and/or her hedge fund business finance counsel to bring in support of this federal civil RICO case action.

OCGA § 51-7-85 is the State of Georgia remedy that the United States Tenth Amendment and other federal subject matter jurisdictional limiting statutes raised as an affirmative defense, protect Millard in this fourth forum, involving litigation about state court litigation issues. This current action is to extract vengeance for Millard Farmer and Larry King's legal representation of Michelle Murphy that the lower court used to delay the use of the children of Michelle Murphy for the business interest of Renee L. Haugerud and her hedge fund businesses.

OCGA § 51-7-85 Exclusive remedy provides as follows.

> On and after April 3, 1989, no claim other than as provided in this article or in Code Section 9-15-14 shall be allowed, whether statutory or common law, for the torts of malicious use of civil proceedings, malicious abuse of civil process, nor abusive litigation, provided that claims filed prior to such date shall not be affected. This article is the exclusive remedy for abusive litigation.

The Amended RICO Complaint, as now pled with unwarranted, prosecutorial style hyperbole and false statements, fails the *Ashcroft v. Iqbal*, 556 US 662 (2009) specific pleading standard of actionable criminal conduct required for the predicate civil RICO acts, and John Harold Murphy's other causes of action not containing specific relevant litigation facts.

The defendants are not be required to search a lengthy Complaint to locate and attempt to connect the required, specific, relevant supporting facts that are pled with huffing and puffing rather than *Ashcroft required specific pleadings.*,

The civil RICO action's pleading is John Harold Murphy's vindictive attempt to sell bias to this Court and to lay jury members. The intended bias is engendered with allegations about Millard Farmer's legal representation of other clients which has nothing to

do with Millard Farmer's representation of Nancy Michelle Murphy ("Michelle Murphy") and nothing to do with this federal civil RICO action.

John Harold Murphy's cherry-picking of Millard Farmer's cases and articles is to inflict bias upon this lawyer related to other litigation that is not case related nor within any statute of limitations.

Millard Farmer's former clients' past legal experiences have absolutely nothing to do with Millard Farmer's representation of Michelle Murphy. The attempted use of Millard Farmer's past cases was apparently a window dressing attempt of John Harold Murphy and his publicity agent to provide cover for Renee L. Haugerud's illegal statements to court officers under oath and otherwise. These former, mostly high profile, criminal defense cases of Millard Farmer each addressed substantial systemic changes that before being challenged, were denying persons constitutional protections. There is no other lawyer in the Coweta Judicial Circuit who has provided as many litigant's constitutional triers of fact that should have been provided by the judges in the Coweta Judicial Circuit without the detriment that the changes have caused to Millard Farmer.

The first ever implementation of a Case Management plan is just one example of the changes that resulted in the Coweta Judicial Circuit providing litigants constitutionally composed triers of fact. The underlying modification of custody case litigation required the Coweta Judicial Circuit for the first time to enact the Supreme Court of Georgia's mandated Uniform Superior Rule 3.1 Case Management plan in civil and criminal cases. This alone could have prevented the Glover & Davis lawyer from hand-selecting the exclusive trier of fact in this underlying modification of custody case, and could have prevented the District Attorney from hand-selecting the judge to try cases involving the rights of persons who were criminally accused.

This unconstitutional judge selection process was not just a Uniform Superior Court Rule violation, but was also a due process abridgment. The process was being used by the Glover & Davis lawyers, even after the Supreme Court of Georgia caught them engaging in illegal judge selection conduct. See, *Mayor & Aldermen of Savannah v. Batson-Cook Co.*, 291 Ga. 114 (2012).

The persistent, unconstitutional attacks on Michelle Murphy and her

counsel in this modification of custody case were motivated by the enormous tax and regulatory benefits that Renee L. Haugerud and her hedge fund businesses would and eventually did receive by having the children together as a family with Renee L. Haugerud in the U.S. Virgin Islands. This agenda of John Harold Murphy and Renee L. Haugerud was hidden from Judge Baldwin, who was led to believe that it was the best interest of the children that was motivating the litigation.

The constitutional rights of Michelle Murphy from the first day of the underlying modification of custody case when the hand-selected judge signed without reading a highly contested Order, appointing as Guardian ad Litem a person who had co-sponsored with Taylor Drake, counsel for John Murphy, a fundraiser attended by Judge Baldwin only 36 hours before. The case ended with a $36,914.48 sanction awarded counsel for Renee L. Haugerud against Millard Farmer only, for Millard Farmer's and Larry King's filing a third party complaint against Renee L. Haugerud. **Exhibit XX Judgment).** Justice Carley had indicated that such inclusion of a party was appropriate in *Moore v. Moore,* 281 Ga. 81 (2006).

The modification of custody case was a continual act of vindictiveness against counsel who required the Coweta Judicial Circuit to adopt a Case Management Plan for the first time ever in the Coweta Judicial Circuit. The retaliation by Judges A. Quillian Baldwin, Jr. and Emory Palmer, was motivated because the enactment of a mandated case management plan made it more difficult for the judges to grant the Glover & Davis lawyers "Buddy Passes" that reaped substantial attorney fees from wealthy litigants such as John Harold Murphy, who moved his family from California to LaGrange, Georgia to obtain a Georgia divorce that provided the mother of the two minor children fewer protections than did the California courts.

Millard Farmer had no relationship with Nancy Michelle Murphy other than an attorney-client relationship. Millard Farmer had no dealings with John Harold Murphy, Renee L. Haugerud and her hedge fund business except for Millard Farmer's attorney client representation of Michelle Murphy. It is a poor reflection upon our system of justice that Deborah L. Beacham, an experienced domestic relations consultant, has to fill the home-style journalist role that she fulfills

very effectively for people who do not understand the dangers of divorce litigation in Georgia.  John Harold Murphy, with financial funding by Renee L. Haugerud and her hedge fund businesses, seeks vengeance with this RICO action, as retaliation against Millard Farmer for his representation of Michelle Murphy.

The representation of Michelle Murphy required presenting the conduct of John Harold Murphy and Renee L. Haugerud to the Court involving the best interest of the children. This included John Harold Murphy's financial obligation to support the mother of the children while also presenting the illegal conduct of John Harold Murphy and Renee L. Haugerud, as that conduct related to the best interest of the minor children of Michelle Murphy and the financial division of marital assets that Michelle Murphy was due.

**Never,** at any time did Millard Farmer, or anyone with his consent inform John Harold Murphy, or Renee L. Haugerud that Millard Farmer required the payment of $500,000.00, or any such amount paid to him, or Michelle Murphy for any reason. John Harold was obligated to pay Michelle Murphy money for child support and  to comply with the court approved and ordered

division of marital assets that Millard Farmer collected for Michelle Murphy as a part of the malpractice damages created by Michelle Murphy's lawyer, Delia Tedder Crouch.

Millard Farmer never attempted to do anything as stupid as attempting to bribe Judge A. Quillian Baldwin, Jr., or any judge, as the RICO civil action avers. Millard Farmer has never even given a judge, or a candidate to become a judge an election campaign contribution, Millard Farmer is one of the few lawyers who doesn't contribute money to judges' election campaigns and otherwise assist judges in obtaining political judicial benefits. The assistance provided to judges to obtain their judgeships is what make our system work; the down side of those judicial favored benefits occurs when with the judge returns favor to donors for their election assistance. It is that Judge Baldwin type conduct that corrupts our system of justice, as Taylor Drake and the Glover & Davis lawyers corrupted during John Harold Murphy's modification of custody case. Millard Farmer with motions, arguments and legal pleadings sought Judge Baldwin's compliance with the law by filing numerous motions that required Judge Baldwin eventual recusal from the case, as he and

all of the judges in the Coweta Judicial Circuit eventually did, as they should have done once their systemic violations of the mandated case management plan became a due process constitutional issue. It was the legal pleading and informal attempts to inform the public of the illegal conduct by many persons that resulted in having a case managemet plan enacted. Even after the plan was enacted Judge Baldwin, with the assistance of Nan Freeman the court reporter warning him that Millard Farmer wished the calendar call recorded [    ] that Judge Baldwin attempted to violate the plan. [ XX] [ There is an audio recording of Judge Baldwin yelling at Millard Farmer in a full court room in an attempt to warn other lawyers that they should not file motions attempting to document the hand selection of judges process.

The conduct of Judge Baldwin was a violation of the due process of Millard Farmer, Larry King and Michelle Murphy from the first hearing date until Judge Baldwin recused himself and he retired, leaving in place his Order that Millard Farmer had to obtain permission of the Court to file any motion and leaving in place an Order that adjudicated that Millard Farmer and Larry King based upon the *Moore v. Moore* Supreme Court of Georgia opinion of Justice Carley and decisions for

the hghest courts of other jurisdictions. had filed a third party complaint against Renee L. Haugerud **(Exhibit XX)** that subjected Millard Farmer and Larry King to 9-15-14 sanctions of $36914.48. that Millard Farmer was required to pay to the Glover & Davis attorney for  Renee L. Haugerud.

Senior Judge E. Byron Smith, who replaced Judge Baldwin based upon Judge Baldwin's Order that he maintain would not allow Millard Farmer to present a motion for filing  without the Court's approval, would not allow Millard Farmer to file a motion relating to the amount of attorney fees due the Glover & Davis lawyers.

The motions to disqualify Judge Baldwin, or any informal attempts to have Judge Baldwin disqualified  were in no way a form of bribery. Such a accusation before it could be made to a jury requires the strickest form of *Ashcroft* pleading that the RICO complaint did not provide. If such *Ashcroft* pleading had been made the Court could can vet that prejudicial assertions outside the presence of the jury.

It was John Harold Murphy and Renee L. Haugerud who engaged in numerous acts of illegal conduct.

Much of John Harold Murphy and Renee L. Haugerud's illegal conduct was  tolerated by their counsel's hand selection of the state court judge, who illegally refused to accord Michelle Murphy and her counsel their United States Fourteenth Amendment Due Process, Equal Protection, First Amendment protections and their Ga. Const. of 1983, Art. I, Sec. I, Par. I. life, liberty, property. No person shall be deprived of life, liberty, or property, except by due process of law protections, who otherwise violated the laws of Georgia, the Uniform Superior Court Rules This Prologue identifies some of the RICO action's systemic case specific jurisdictional infirmities, not as fully identified in the initial Motion to Dismiss and Answer of Millard Farmer. counsel for Michelle Murphy, who accepted the continuing obligation  to defend Michelle Murphy in a state court modification of custody case long after Judge A. Quillian Baldwin, Jr. informed Millard Farmer and Larry King that he would not likely allow them attorney fees after the motion to disqualify them was filed.[ Ans X p.    ] Millard Farmer continued to represent Michelle Murphy long after Judge Baldwin informed Millard Farmer and Larry King that each of Michelle Murphy's two counsel, and not John Harold Murphy's multiple counsel,  must appear in court at each hearing.

Judge Baldwin after Millard Farmer, as required by decisions of the Supreme Court of Georgia was required, with adequate cause, to file motions for the disqualification of Judge Baldwin, within five days of the disqualifing act and to renew the disqualification motions before each hearing, or the disqualification would be waived, as required by the decisions in *State v. Hargis*, 294 Ga. 818, 822-823 (2014) and *Pyatt v. State*, 784 S.E.2d 759 (Ga., 2016)

Rather than to have the appellate courts adjudicate that the disqualification of Judge Baldwin**Supremacism** is the worldview that a particular age, race, species, ethnicity, religion, gender, social class, ideology, nation, or culture is superior to other ...
Sexual · Racial · Religious · See also
 was waived, Millard Farmer filed the forty (40) disqualification motions.

As a form of retaliation against Millard Farmer for not waiving his disqualification, Judge Baldwin required Millard Farmer to have the Court's approval of each motion that he wished filed before the clerk of court was authorized to file any motion of Millard Farmer. **Exhibit XX**

On several occasions, Judge Baldwin and his successor judge, Senior Judge E. Byron Smith, refused to allow Millard Farmer to file motions or his behalf on behalf of his clients. Judge Baldwin denied Millard

Farmer an opportunity for a hearing on the restriction upon filing any motion without his approval or on any of his disqualification motions. Uniform Superior Court Rule 25.3. was provided to Judge Baldwin that detailed. Senior Judge E. Byron Smith even fail to provide a court reporter on the occasion that Millard Farmer appeared before him and at the close of Millard Farmer appearance before him, Senior Judge Smith pushed Millard Farmer motion back at him when Millard Farmer asked Judge Smith to take the motion that he would not allow filed. home with him to read before making a decision on allowing the motion to be filed and considered.

 Long after Larry King, the domestic relations expert, left the case to be with his ill wife in Florida, Millard Farmer continued to representing Nancy Michelle Murphy, pro bono. Millard Farmer continued to represent Michelle Murphy long after Judge Baldwin informed Millard Farmer that he must obtain Judge Baldwin's consent before he could file any motion.

Millard Farmer continued representing Michelle Murphy long after the appellate court's abridgment of the constitutional protections of

Michelle Murphy, Millard Farmer, Larry King, and persons accused of acting in concert with them by fining Millard Farmer and Larry King. This retaliation by the Court of appeal occurred after Millard Farmer filed a motion to disqualify Judge Christopher J. McFadden.  [Exhibit XXX] At the time that the following disqualification motion was filed in the Court of Appeals, At the time Millard Farmer wrote the quite adequate motion that follows he had not learned, as he did recently, that Jeff Swart, a partner at Alston & Bird LLP who lobbied for the passage of the litigation, was not informed by Judge McFadden that he had the Murphy case pending before his panel that had adjudicated jurisdiction to decided the issue of Judge Baldwin's hand selection.

The motion to disqualify Court of Appeals judge  McFadden, in part follows.

**"Summary of Motion**

   This case was docketed on December 12, 2013 after it was transferred from the Supreme Court of Georgia. The case includes the same parties before this Court in an earlier case dismissed on jurisdictional grounds. *Murphy v. Murphy,* 322 Ga. App. 829 (2013) (or, *Murphy* 1") That dismissal occurred after there was a statutory change in OCGA § 5-6-

34(a)(11) that this Court maintained deprived it of jurisdiction when this Court applied the statutory change retroactively.

The parties to *Murphy* 1 intensely litigated this Court's jurisdiction before the statutory change in OCGA § 5-6-34(a)(11).

The parties represented by Glover & Davis strongly urged the dismissal of *Murphy* 1 from the initial filing. Nancy Michelle Murphy, with equal intensity, urged that the Court hear the case and deny its dismissal.

The Court heard the case and denied the dismissal long before oral argument, during which the jurisdiction was not an issue that was either raised by the Court, or counsel for either party.

The issue in *Murphy* 1 was the disqualification *vel non* of Chief Judge A. Quillian Baldwin, Jr. The standard of review in Murphy 1 was *de novo*.

Judge Christopher J. McFadden, unknown to counsel for Nancy Michelle Murphy, advocated at times before May 6, 2013 for passage of a statute that he would later maintain deprived Nancy Michelle Murphy retroactively of jurisdiction to immediately have Chief Judge Baldwin disqualified in the pending *Murph*y 1.

Between May and July of 2013, as before that time, counsel for Nancy Michelle Murphy knew nothing of Judge Christopher J. McFadden's

advocating for passage of a revised version of the then existing OCGA § 5-6-34(a)(11). Counsel for Nancy Michelle Murphy had no notice that the changes in the statute were being considered and no notice that any changes were occurring in any jurisdictional issue in the then pending *Murphy* 1 case and therefore had no opportunity to brief the issue before the *Murphy* 1 dismissal by this Court.

**Statement of the Rule 44 and Due Process Motion**

The issue in *Murphy* 1 was the disqualification of Chief Judge A. Quillian Baldwin, Jr. The issue in this case involves the repercussions of the proceedings in the trial court after the jurisdictional dismissal of *Murphy* 1. The two cases are tightly connected.

Judge Christopher J. McFadden's involvement in the statutory change that resulted in *Murphy* 1's vacating of jurisdiction raises the core issue of this Court of Appeals Rule 44 and Due Process Disqualification Motion. The source, available to counsel for Nancy Michelle Murphy, of Judge Christopher J. McFadden's involvement is derived from the public records in this case, and a published report in the State Bar of Georgia Journal. This source was identified in the merits brief of Nancy Michelle Murphy in Supreme Court of Georgia Case No. S13G1651.

This motion seeks to disqualify Judge Christopher J. McFadden and possibly the two others panel members, Presiding Judge Sara L. Doyle and Judge Michael P. Boggs, who were also on the initial panel in Court of Appeals Case No. A13A0206, before Judge McFadden, writing for the full Court, dismissed the appeal on jurisdictional grounds in *Murphy* 1. If Presiding Judge Sara L. Doyle and Judge Michael P. Boggs knew of Judge McFadden's involvement in the statutory change, or were otherwise involved in the change of OCGA § 5-6-34(a)(11) they, too, should be disqualified.

The information that serves as the basis for this motion first came to the attention of counsel for Nancy Michelle Murphy while attempting legislative history research in preparation for a petition for writ of certiorari of *Murphy* 1. This knowledge by counsel for Nancy Michelle Murphy was obviously obtained after *Murphy* 1 was decided. See **Exhibit 3,** Affidavit of Millard Farmer.

**The State Bar of Georgia's website contains a statement attributed to Jeff Swart,** a partner at Alston & Bird LLP, who according to the article in the State Bar of Georgia Journal, serves as the chair of the Appellate Practice Section's State Practice and Legislation Committee that provides

the following legislative inducement, historical information about the changes in the statute.

> *On May 6, the Governor signed legislation enacting into law the Section's proposal to amend O.C.G.A. § 5-6-34(a)(11) to restrict the types of orders in child custody cases that can be directly and immediately appealed as a matter of right. Under the legislation, which gained the unanimous approval of both chambers of the General Assembly, parties in such cases now have a right to immediately appeal only such orders that actually affect child custody (including related contempt orders). Otherwise, parties seeking appellate review in child custody cases will need to comply with the discretionary appeal procedure provided by O.C.G.A. § 5-6-34(b). The purpose of the revision successfully proposed by the Section was to reduce the appeals of collateral orders in child custody cases, with the hope of achieving a corresponding reduction in the time and expense required to bring such cases to final judgment. **The issue was first called to the Section's attention by Hon. Christopher McFadden of the Court of Appeals of Georgia** [who is a member of the State Bar of Georgia*

*Advisory Committee on Legislation] and was thereafter noted by the Court in Collins v. Davis, 318 Ga. App. 265, 269 n.17, 733 S.E.2d 798, 801 n.17 (Oct. 30, 2012). The Section worked closely with the Family Law Section on this proposal.*

Emphasis supplied; see **Exhibit 1**

Nancy Michelle Murphy was not placed on notice that the Court was considering the statutory change of OCGA § 5-6-34(a)(11), as a jurisdictional issue, and therefore was not provided an opportunity to brief the retroactivity of the jurisdictional issue before Judge McFadden, writing for the whole Court, held that the new version of OCGA § 5-6-34(a)(11) and the overruling of *Braddy v. State*, 316 Ga. App. 292 (1) (2012) deprived her of an immediate appellate review before Chief Judge A. Quillian Baldwin, Jr. and a guardian ad litem, who should have been disqualified, Elizabeth "Lisa" F. Harwell further disrupted this family's life in this modification of custody case in which Judge Baldwin was selected and retained by a Glover & Davis lawyer in a Superior Court without a Uniform Superior Court Rule 3.1 case management plan.

Chief Judge Baldwin's interpretation of *Murphy* 1, that created some of the issues in the case that underlies Judge Baldwin's disqualification as late

as Oct. 3, 2013, is as follows.

> And I'm not going to recuse myself.  I'll tell
> you right now, I'm not going to recuse myself.
> And I'm going to put in there -- because **y'all
> have already had your chance on recusal.  It's
> been appealed.  They upheld me staying in this
> case and not recusing myself.  And we're just
> going to keep it like that.** [emphasis supplied

>       *   *   *

> Now, I don't know if your client is paying you.
> Y'all may be eating all this stuff. But I'll
> tell you what. **Because of all this stuff, I'm
> unlikely to give you any attorney's fees so
> y'all are working on this thing on your own
> money if you're doing all of this.** [Oct. 3, 2013
> Tr.pp. 17-18,emphasis supplied]

> [ End of Disqualification of Judge McFadden Motion.]

Since the filing of the disqualification motions the Court of Appeals has

fined Millard Farmer on three occasions. The unfairness of the latest

fining of Millard Farmer by the Court of Appeals is best understood by the exact copies of the brief for which Millard Farmer was fined and the Decision imposing the fine.

Exhibit brief and Decision of the Court of Appeals. Exhibit XX brief

**Exhibit XX**

The apparent messages from the Court of Appeals and Judge Baldwin is that the county line of representation of a client stops before the filing of a disqualification motion of a judge. This county line is a due process abridgment.

This illegal conduct by Judge Baldwin instigated Michelle Murphy's use of  social media to protect her and her children's constitutional protections  that the judge who was hand selected by the Glover & Davis lawyer for John Harold Murphy as the exclusive trier of fact in the modification of custody case was abridging. Judge Baldwin ordered that Michelle Murphy cease using the internet and social media. Millard Farmer and Larry King did not have a web site or social media presence. John Harold Murphy and Renee L. Haugerud employed Patrick Crosby

as their publicity expert. Patrick Crosby established a web site, social media presence and print publication for John Harold Murphy that Judge Baldwin did not restrict.

The abridgment of these United States constitutional First Amendment, due process and other protections should be addressed by this court before these protections are further degraded in the hands of a jury without the legal education to adjudicate the constitutional protecteions that contrast  our system of justice from that of most other countries.

 Violation of the *Ashcroft v. Iqbal*, 556 US 662 (2009) Pleading Standard The *Ashcroft v. Iqbal*, 556 US 662 (2009)  standard of pleading failure by John Harold Murphy's civil RICO Amended Complaint   is more relevant in defending the causes of action against Millard Farmer and Larry King and others accused of acting in concert with them has more relevance in this case than in most cases.

Many of the defenses of Millard Farmer are both time and fact related, This mandates that Millard Farmer's conduct charged as crimes  against him and charged as criminal conduct to person not acting in Millard Farmer's  presence are entitled to *Ashcroft specific notice protections as a*

*procedural and Fourteenth Amendment due process protection* for Millard Farmer and others.

Millard Farmer and the other Defendants in this RICO civil action have contractural,United States and State of Georgia constitutional, statutory and procedural protections that render John Harold Murphy's civil RICO burden of of seeking  a constitutional federal jury adjudication of Millard Farmer outside of this Court's subject matter jurisdiction that is now so obvious that  this court should adjudicate that it does not have subject matter jurisdiction and the Court should now grant the privious motions of Millard Farmer to dismiss. The Court of Appeals of Georgia and John Harold Murphy, with his hand selected judge, have extracted financial and professional punishment against Millard Farmer.

It is the conduct of Judge Baldwin and the lawyers who hand selected him in the absence of a Uniform Superior Court Rule 3.1 Case management plan that should be before a federal court, if the federal court are to begin exercising subject matter jurisdiction in such cases as John Harold brings with this civil RICO case.

This Court should revisit dismissal of the civil federal RICO Complaint, with a focus on the as applied and facial constitutional abridgments of

the alleged predicate RICO acts and causes of action. It would not serve the ends of justice to required the defendants, and the Court to endure a lengthy trial before it is determined that  John Harold Murphy left his causes of action in the several opportunities that he was provided to have a trial in the Coweta Judicial Circuit. This federal RICO case cannot resurrect John Harold Murphy's abandonment of his children when they were young by bring Michelle Murphy and the children from California to the Coweta Judicial Circuit in Georgia where he relocated Michelle Murphy and her children in order that he could obtain a Georgia divorce and distribution of his marital assets. In addition to selecting Georgia to obtain his divorce, John Harold Murphy  attempted to safe harbor in some assets in the bank accounts of his mother while. after disclosing his assets under oath, he also secreted his stock options to the determint of Michelle Murphy, until  the day after she executed a settlement agreement. It was only when John Harold Murphy became overly greedy and did not voluntarily provide Michelle Murphy one-half of his pension that John Harold Murphy during  Michelle Murphy malpractice action against her lawyer for not properly preparing an order that provided Michelle Murphy one-half of approximately $400,000 that

John Harold  was required to pay Michelle Murphy, or to have a jury resolve the dispute that resulted for the error of Michelle Murphy's lawyer, Delia Tedder Crouch.

 John Harold Murphy and Renee L. Haugerud are apparently not mindful that they now have transgressed from the Court of their hand selected forum and state court, Superior Court of the Coweta Judicial Circuit, Judge Baldwin into a system of justice that, has as its highest priority, the acording all litigants their Fourteenth constitutional due process, First Amendment protections.

 A sampling of conduct that Nancy Michelle Murphy (Michelle Murphy) and her counsel were subjected in the Coweta Judicial Circuit is included as **Exhibit XX**  This exhibit is an affidavit  provided for the court by Alfred Lawrence King, Jr. (larry King) soon after the events that the affidavit memorialized. The affidavit of Larry King memorializes facts within  his personal knowledge.

The *Ashcroft* specific pleading standard is required in this RICO case because John Harold Murphy, with his participation in other state court actions involving Millard Farmer, Larry King and Delia Tedder Crouch,

in part, released Millard Farmer and Larry King from all liability, with two a comprehensive settlement agreements **Exhibits (XX) and (XX).** John Harold Murphy's factual Revisionist version of his apparent Settlement Releasor's remorse., now vindictively fails to truthfully depict  his and Renee L. Haugerud  treatment of Michelle Murphy and her children as John Harold Murphy seeks to justify their conduct with federal litigation about state court issues. John Harold Murphy and Renee L. Haugerud revisit of their state court past litigation is burdened with ownership of the conduct that they attempted to have their hand selected judge inflict upon Michelle Murphy, and her attorneys, Millard Farmer and Larry King and those who attempted to assist Michelle Murphy.

The settlemenet agreements, releasing Millard Farmer and Larry King were, prepared on behalf of John Harold Murphy by his and Renee L. Haugerud's counsel.

There are adequate documents related to the negotiated settlement agreement involving the legal malpractice case brought against Delia Tedder Crouch that included this lawyer's failure to accurately prepare

a document to accomplish the oral settlement agreement memorialized before the Superior Court. **Exhibit XX**

Millard Farmer, Larry King and  a broad category of other persons associated with Millard Farmer were released from all of their conduct dating  "from the "beginning of time" to the date of the releases. There were no impedimnets to John Harold Murphy going to trial in the state court instead of having Renee L. Haugerud pay part of the illegally retained funds  that she paid to Michelle Murphy as a part of John Harold Murphy' contribution to Delia Tedder Crouch as settlement for John Harold Murphy's conduct relating to secreting and retention of assets that Michelle Murphy's counsel should have provided her during the divorce litigation that Millard Farmer took no part. The motion to include John Harold Murphy as a defendant in the Delia Tedder Crouch malpractice case  was prepared and provided to counsel for Larry King and Renee L. Haugerud.  who  together, with other litigants, chose to end the disputes among the parties with the comprehensive settlement agreements.

John Harold Murphy's RICO Complaint fails to "allege sufficient *Ashcroft compliant* facts from which John Harold Murphy attempts to

have the Court infer that an interstate "conspiracy " involving criminal conduct of numerous people occurred that he apparently attempt to litigate in his RICO civil action.

*Ashcroft compliant* dates of averred predicate criminal acts are absent from the Amended Complaint. These dates are *Ashcroft required* to support when each of the alleged actionable predicate acts and other causes of action occurred and were released, or protected by immunity. The failure to also "allege sufficient facts from which a conspiracy can be inferred is fatal to the pleading of the conspiracy and the other alleged predicate acts."

This RICO case, even after John Harold Murphy's amended complaint [31] fails fails to comply with the *Ashcroft v. Iqbal*, 556 US 662 (2009) federal pleading standards of this Court that John Harold Murphy chose to litigate in this litigation about litigation civil RICO case.

Compliance with the *Ashcroft v. Iqbal* pleading standard is very relevant in this RICO complaint that relies upon such unfounded allegation as those about which Millard Farmer and others are provided OCGA 51-5-7 immunity for reporting child abuse, absolute privilege of OCGA 51-6 allegations in pleadings, or about other privileges and immunities including First Amendment protections including a report to the Federal Bureau of

Investigation about the conduct of Renee L. Haugerud and John Harold Murphy  related to a child and family other than Michelle Murphy and her children.

**The RICO Complaint contains numerous various combinations of false statement of facts, that require specific pleading to adjudicate the Millard Farmer's** OCGA §§ 51-5-7 OCGA  § 51-5-protections,  and other. Immunity and First Amendment protections.

The conduct of Millard Farmer in reporting child abuse and other illegal conduct, including intimidation of a witness by persons acting on behalf of John Harold Murphy and Renee L. Haugerud relating to the child abuse of the children of  Michele Murphy and the child abuse of children visiting John Harold Murphy and Renee L. Haugerud is protected  by OCGA §§ 51-5-7 OCGA, § 51-5-8.   and other. Immunities are protecting Millard Farmer from inclusion of this information in pleadings and in exercise of Millard Farmer First Amendment protections of speech   at community gatherings..                   The    Amended    RICO Complaint places false reliance upon its forty-three (43) uses of the

various form of the word "extortion", as actionable RICO federal or State of Georgia criminal conduct; The "extortion" interpretation apparently attempted by John Harold Murphy requires an unconstitutional interpretation of "extortion"

The conduct identified as "extortion" is also protected First Amendment conduct.

RICO Predicate One and other of the Amended Complaint's use of the words "extortion" and its derivatives of extortion must be dismissed as a matter of law because O.C.G.A. § 16-8-16 is vague and overbroad in violation of the United States and · Georgia Constitutions; as both state and federal courts in Georgia have consistently held that threats of litigation and litigation itself do not form a basis for criminal charges such as extortion, or witness influencing, or analogous civil torts such as intentional infliction of emotional distress, tortious interference or RICO. Actions.

The Amended Complaint, as did the initial Complaint contained numerous false statements, but even accepting the false statements as written, the "extortion" charges must be dismissed as a matter of law.

The "extortion allegations must be dismissed as a matter of law because O.C.G.A. § 16-8-16(a)(3) is vague and overbroad in violation of the United States,

Georgia Constitutions, and both state and federal courts in Georgia have consistently held that threats of litigation and litigation itself do not form a  basis for criminal charges such as extortion or witness  influencing, or analogous civil torts such as intentional infliction of emotional distress, tortious interference or RICO.

Count II charges the crime of Conspiracy to Commit Theft by Extortion, O.C.G.A.

Predicate Act One must be dismissed because O.C.G.A. § 16-8-16 is vague and overbroad, in violation of the First and Fifth Amendments to the United States Constitution as made applicable to the states through the Fourteenth Amendment, and the counterpart provisions of the Georgia Constitution.

Decisions by Georgia courts and federal courts interpreting Georgia law have consistently held that a monetary demand made by an individual represented by counsel in connection with a threat to file a lawsuit is not a crime. Threatening a civil lawsuit or working with co-counsel on behalf of a client to threaten and actually file a lawsuit cannot violate O.C.G.A. § 16-8-16 as a matter of law.  See Markowitz *v. Wieland*, 243 Ga. App. 151 (fn. 11) (2000). Nor can participating in and making

a monetary demand during a settlement negotiations be considered as a crime.

The First Amendment plainly provides, in part as follows.

> "Congress shall make no law . .  or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." -First Amendment to the Constitution

A person   violating O.C.G.A. § 16-8-16. Does not commit extortion or further a conspiracy to commit extortion        as  the theft by extortion Statute is Unconstitutional.

Origin of Georgia's Theft by Extortion

Georgia's theft by extortion statute was enacted in 1968. Ga L. 1968, p. 1249, § 1. There have been no amendments to subsections (a) or (c) of OCGA. § 16-8-16 since it was enacted in 1968.

Based upon information and belief, there has been less than two  prosecutions under 0CGA § 16-8-16(a)(3) in the 48 years since the statute was enacted. Every theft by extortion prosecution that has occurred involved either an alleged violation of § 16-8-16(a)(l), which prohibits threats to inflict bodily injury, or (a)(6), which prohibits threats to testify or provide information or withhold testimony or information with respect to another's legal claim or defense. The fact that Georgia attorneys have make demands on behalf of their

clients nearly every week in the 48 years since OCGA § 16-8-16 was enacted and no one has been prosecuted for threatening to file a lawsuit that would disclose information tending to subject a person sued to hatred, contempt or ridicule, suggests that prior to this case prosecutors have recognized that such a prosecution would not pass constitutional muster.

The formulation in § 16-8-16(a)(3) concerning information "tending to subject any person to hatred, contempt or ridicule" is a vestige of libel, now functionally extinct in the United States as a crime. Notably, last year the General Assembly repealed OCGA § 16-11-40, which had set forth the offense of criminal defamation and,  like OCGA § 16-8-16, criminalized conduct that would expose a person to "hatred, contempt or ridicule . . . ."

O.C.G.A. § 16-8-16(a)(3) and (c) Are Unconstitutionally Vague

Section 16-8-16(a)(3) is vague as to the mental state required to violate the statute.  While the statute uses the term "unlawfully," it does not do so in a context that actually requires any particular state of mind.  Instead, the statute simply provides that a person acts "unlawfully" if he obtains property from another person by threatening to disseminate information tending to subject that person to

hatred, contempt or ridicule: there is no requirement of malice.  This is in stark contrast to the civil libel statutes, which require the statements to be both malicious and false.  OCGA §§ 51-5-1, 51-5-2.  Notably, while truth is a defense in a civil or criminal action for libel, § 16-8-16 does not exclude truthful information as a basis for criminal liability.  As a result, § 16-8-16(a)(3) on its face criminalizes the dissemination of any information that would tend to subject a person to hatred, contempt or ridicule, or to impair his credit or business repute, even if it is truthful.

Section   16-8-16(a)(3)   also makes it unlawful to threaten to disseminate information tending to impair a person's credit or "business repute."  The terms "credit" and "business repute" are not defined by the statute or any construction thereof, but on their face, they could extend to every aspect of a person's credit worthiness and reputation in the business community. For example, the statute on its face applies to a threat to file a lawsuit that truthfully alleges a person has failed to pay his debts to his creditors, because such a lawsuit could tend to impair person's credit worthiness or business reputation.  Again, this is so even if the allegations of  the lawsuit are true and the person threatening the lawsuit is not acting maliciously.  Simply put, § 16-8-16(a)(3) on its face

applies to an enormous array of entirely legitimate and justified threats, to file lawsuits and to lawsuits themselves: its language is "so vague and expansive that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Botts v. State*, 278 Ga. 538, 540 (2004) (quoting *Payne v. State*, 275 Ga 181, 183 (2002)).

The purported affirmative defense contained in § 16-8-16(c) is even more vague. That provision puts the burden on the defendant to prove that any "property obtained by threat of . . . legal action, or other invocation of official action, was honestly claimed as restitution or indemnification for harm done in the circumstance to which such . . . legal action, or other official action relates . . . ." The statute provides no guidance as to what it means for property to be "'honestly claimed' as 'restitution' or 'indemnification' for 'harm done." For example, is a claim "honest" if the person to whom the demand was made engaged in misconduct, but law enforcement, or a judge or jury conclude that the amount demanded was too high? There is no reason for the State to reference the specific amount of the mediation demand unless it is asserting that criminal liability can exist because a settlement demand was excessive.

Nor does the statute provide any guidance as to how it would apply when a threatened or actual lawsuit is based upon multiple claims. For example, what happens if five claims are asserted, four of which form a basis for an "honest claim" for restitution or indemnification, but one does not? What if one claim is an "honest claim" for restitution or indemnification, but four are not?

Another aspect of vagueness arises from the conspicuous absence from subsection (c) of the word "damages." Instead, the words "restitution" and "indemnification" are used, words which may connote a narrower meaning than the more general term "damages." This compels readers of the statute to necessarily guess at whether certain action is presumptively criminal or not. For example, what if the threatened action is a RICO action? Because a RICO verdict is automatically trebled, the majority of those trebled damages may not constitute "restitution" or "indemnification" in the sense that those words are used in § 16-8-16. The same concern exists with regard to punitive damages, which are generally not viewed as constituting either restitution or indemnification. Consequently, an individual who makes a demand based in part upon a threatened lawsuit seeking treble or punitive damages must guess whether he will be able to assert a defense

under subsection (c) because damages of those types are not restitution or indemnification within the meaning of the statute.  Thus, even a plaintiff who prevails in his action against the supposed victim of extortion may be at risk of prosecution.

Because they are so vague, § 16-8-16(a)(3) and (c) "impermissibly delegate O basic policy matters to law enforcement officers, judges, and juries for resolution on an *ad hoc* and subjective basis, with the   attendant dangers of arbitrary and discriminatory applications." *Botts,* 278 Ga. at 540 (quoting *Thelen v. State*, 272 Ga. 81, 82-83 (2000)).  In other words, the statute "leaves open … the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *Botts,* 278 Ga at 540 (quoting *United States v. L. Cohen Grocezy Co.*, 255 U.S. 81, 89 (1921)).  These concerns are heightened and subsections (a)(3) and (c) are subject to strict scrutiny because they directly impact First Amendment rights, in this case both the rights of speech and to petition for a redress of grievances.

> Vague laws in any area suffer a constitutional infirmity.  When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer.  We said in *Cantwell v. Connecticut* [310 U.S. 296 (1940)], supr that such a law must be 'narrowly drawn to prevent the supposed evil,' 301 U.S. at 307, 60 S. Ct. at 905, and that a conviction for an utterance

'based on a common law concept of the most general and undefined nature,' Id. at 308, 60 S. Ct. at 905, could not stand.

*Ashton v. Kentucky,* 384 U.S. 195, 200 (1966).

### O.C.G.A. § 16-8-16(a)(3) and (c) Are Unconstitutionally Overbroad

Georgia's theft by extortion statute also suffers from overbreadth both as applied and facially. Defendants are entitled to challenge the statute not only as applied to them, but facially, because 'the transcendent value to all society of constitutionally protected expression is deemed to justify allowing attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could be regulated by a statute drawn with the requisite narrow specificity." *Gooding v. Wilson,* 405 U.S. 518, 520 (1972) (quoting *Dumbrowski v. Pfister,* 380 U.S. 479, 486 (1965)); *NAACP v. Button,* 371 U.S. 415, 433 (1963). As a consequence, this Court can consider not only whether § 16-8-16(a)(3) suffers from vagueness and overbreadth as applied to this case, but also whether those defects appear in other circumstances.

The First Amendment right to petition protects access to the courts, while the First Amendment right of free

speech protects litigation-related speech. *N.A.A.C.P. v. Button*, 371 U.S. 415 (1963) (striking down Virginia criminal statute that unduly burdened organization's access to the courts). "They are cognate rights." *Thomas v. Collins*. 323 U.S. 516, 530 (1945).

Lawsuits are constitutionally protected petitions for the redress of grievances that *require* plaintiffs to disseminate "information" in the forms of allegations and evidence. Moreover, it is inherent in the element of many causes of action that the evidence one person possesses or expects to develop against another, particularly if it leads to a finding of liability and especially if it results in an award of punitive damages, will tend to subject that person to hatred, contempt or ridicule, and almost every lawsuit has the potential to impair a person's credit or business repute. These consequences flow naturally from the way our adversarial system of litigation is designed. *Professional Real Estate Investors. Inc. v. Columbia Pictures Indus.,* 508 U.S. 49, 69  (1993) (Stevens, J., concurring in judgment) ("We may presume that every litigant intends to harm his adversary.").

The right to petition is recognized as one of "the most precious of the liberties safeguarded by the Bill of Rights," *Mine Workers v. Illinois Bar Ass'n.* 389 U.S. 217, 222 (1967). The right of access to the court is an aspect of the right to petition

the government for a redress of grievances. *Bill Johnson's Restaurants. Inc. v. NLRB,* 461 U.S. 731, 741 (1983). On its face O.C.G.A. § 16-8-16(a)(3) applies to a substantial amount of constitutionally protected conduct. Worse, as § 16-8-16(a)(3) is written, the stronger a potential plaintiff s lawsuit may be, the more likely it becomes that a threat to pursue that lawsuit constitutes a violation of the statute.

The doctrine of overbreadth is particularly applicable where a statute infringes on a behavior protected by the First Amendment. *Broadrick v. Oklahoma,* 413 U.S. 601, 611-12 (1973); *Johnson v. State,* 264 Ga 590, 591 (1994) ("A statute is unconstitutionally over-broad if it reaches a substantial amount of constitutionally protected conduct."). This is especially the case when the overbroad statute imposes criminal sanctions. *Virginia v. Hicks,* 539 U.S. 113, 119 (2003). Subsection (a)(3) is not narrowly drawn and its impact on First Amendment freedoms is substantially greater than is necessary to further any legitimate government interest, particularly since it provides for imprisonment for up to ten years.

The statute manifestly fails to give constitutionally protected conduct the breathing space required by the First Amendment. *N.A.A.C.P. v. Button,* 371 U.S. 415, 433 (1963) ("[b]because First Amendment freedoms need breathing

space to survive, government may regulate in the area only with narrow specificity.").

Notably, the criminal offense set forth in § 16-8-16 does not contain a privilege for constitutionally protected petitioning activity. This is presumably because § 16-8-16, unlike the civil statutes dealing with libel, has not been amended since 1968 and therefore fails to recognize Supreme Court rulings that have taken place since then. In contrast, petitioning activity and allegations in pleadings are privileged from tort liability. O.C.G.A. § 51-5-7(4); 51-5-8.

This absence of breathing space is made manifest by the fact that, as noted above, there is no protection or privilege under O.C.G.A. § 16-8-16 concerning the threatened dissemination of truthful information. This alone establishes overbreadth, since under the First Amendment, truthful speech cannot be punished, even if it was made with actual malice, i.e., hatred, ill will, enmity or a wanton desire to injure. *Garrison v. State*, 379 U.S. 64, 77-78 (1964). Notably,

    there is no allegation Predicate Act One that any Defendant made or conspired to make any false statement of fact or that the videotape is false or fabricated in any way.

                The rights of free speech and pursuit of redress of grievances are inseparable and cannot be criminalized

because they are guaranteed by the federal and state constitutions. Section 16-8-16(a)(3) interferes with these rights by criminalizing for any purpose petitioning activities and doing so specifically based on the content of the speech upon which the petitioning activity is based and which it contains. The overbreadth of the statute at issue is established by the fact that other statutes specifically authorize lawsuits in constitutional parlance, petitions for a redress of grievances-which by their very nature tend to subject a person to hatred, contempt or ridicule. One example is the Hidden Predator Act, enacted in 2015, which authorizes civil actions for childhood sexual abuse, which is defined as an act committed by a defendant against a plaintiff which occurred when the plaintiff was under 18 years of age that would be in violation of statutes prohibiting rape, sodomy or aggravated sodomy, statutory rape, child molestation or aggravated child molestation, enticing a child for indecent purposes, pandering, pandering by compulsion, solicitation of sodomy, incest, sexual battery, or aggravated sexual battery. O.C.G.A. § 9-3-33.l(a)(l)(A)-{K}. A threatened or actual suit based on such allegations would certainly tend to expose a person to hatred, contempt or ridicule, and a verdict against that person would certainly do so. Such an effort by the abuse victim and her lawyers would involve both speech-both in the letter and as contained in the letter and the anticipated publicly filed complaint-as well as a petition for

a redress of grievances pursuant to a statute enacted by the General Assembly specifically for that purpose.  Yet, O.C.G.A. § 16-8-16 would subject  the plaintiff and her counsel to prosecution for a felony punishable by imprisonment for up to ten years for threatening such an action, despite the fact that the General Assembly placed such a priority on those claims that it not only authorized them in a special statute, it even revived time-barred claims.  O.C.G.A. § 9-3-33.l(d)(l).

Subsection (a)(3) cannot be saved from overbreadth by the so-called affirmative defense  set forth in subsection (c), which only further establishes that subsection (a)(3) criminalizes  conduct that includes conduct expressly protected by the First Amendment.  Subsection (c) further violates both the First Amendment and due process by shifting to defendants the burden  of proving that their First Amendment activities are legitimate, rather than requiring the State to prove that they are not.  Due process does not permit the State to place on a defendant the burden  of disproving an element of the crime with which he is charged.  *Patterson v. New York,* 432  U.S. 197, 204 (1977).

This is particularly so in matters involving First Amendment rights, because affirmative  defenses "cannot be

applied in settings where they have the collateral effect of inhibiting the freedom

of expression, by making the individual the more reluctant to exercise it." *Smith v.*

*People of California,* 361 U.S. 147, 151 (1959). In other words, affirmative

defenses that burden otherwise protected First Amendment activities cannot save

a statute. *Am. Civil Liberties Union* v. Ashcroft, 322 F.3d 257, 257-61 (3d Cir.

2003), aff'd, *Ashcroft v. Am. Civil Liberties Union,* 542 U.S. 656 (2004). As

the United States Supreme Court held in *New York Times Co. v. Sullivan,* 376

U.S. 254 (1964)

> Authoritative interpretations of the First Amendment
> guarantees have consistently refused to recognize an
> exception for any test of truth—whether administered by
> judges, juries, or administrative officials-and *especially*
> *one that puts the burden of proving  truth on the speaker.*

376 U.S. at 271 (emphasis added). Subsection (c) places the burden of going

forward on the Defendants and requires them to establish that the property the

defendants sought too obtain, i.e., the  damages demanded, "was honestly

claimed," an undefined and incurably vague term. As the United States Supreme

Court held in *Button*

> If there is an internal tension between
> proscription and protection in the statute, we
> cannot assume that, in its subsequent
> enforcement, ambiguities will be resolved in
> favor of adequate protection of First
> Amendment rights . . . Precision of regulation

must be the touchstone in an area so closely
touching our most precious freedoms.

371 U.S. at 438.

Even if it were possible to conjure
some threat under subsection (a)(3), that would not be protected by the First
Amendment, "[t]he government may not suppress lawful speech as the means to
suppress unlawful speech. Protected speech does not become unprotected merely
because it resembles the latter. The Constitution requires the reverse." *Ashcroft v.
Free Speech Coalition,* 535 U.S. 234, 255 (2002). In short, the constitution "must
give the benefit of any doubt to protecting rather than stifling speech." *Federal
Election Commission v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 469 (2007).
An affirmative defense is constitutionally insufficient if it entails as subsection
(c) certainly does—"'the open-ended rough-and-tumble of factors,' which
'invite[es] complex argument in a trial court and a virtually inevitable appeal.'"
*Id.* (quoting *Jerome B. Grubart. Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S.
527, 547 (1995).

As written, O.C.G.A. § 16-8-16
applies both to truthful speech as well as speech and conduct specifically protected
by the petition clause of the First Amendment. As the Supreme Court put it in

*Gooding v. Wilson*, 405 U.S. 518, 527 (1972), striking down a Georgia statute, "[t]he separation of legitimate from illegitimate calls for more sensitive tools than [Georgia] has supplied." *Id.,* quoting *Speiser v. Randall,* 357 U.S. 513, *525* (1958).

Given these obvious constitutional concerns, it is no surprise that numerous decisions of Georgia courts and federal courts sitting in Georgia and the Eleventh Circuit issued since § 16-8- 16 was enacted have held in interpreting other statutes that neither (i) threatening to file a lawsuit nor filing a lawsuit will support a charge of extortion or conspiracy to commit extortion.

In *United States v. Pendergraft,* 297 F.3d 1198 (11th Cir. 2002), the defendants were charged with conspiracy to extort money from a Florida county by threatening to file a complaint, supported by false affidavits, unless the county settled with them. The Eleventh Circuit reversed the convictions for conspiracy to commit extortion, holding that a threat to file litigation, *even if made in bad faith and supported by false affidavits,* was not "wrongful" within the meaning of the federal extortion statute, known as the Hobbs Act. 297 F.3d at 1208. As <u>*Pendergraft*</u> explained, "under our system, parties are encouraged to resort to courts for the redress of wrongs and the

enforcement of rights." *Id.* at 1206. "[W]e therefore encourage people to take their problems to court. We trust the courts, and their time-tested procedures, to produce reliable results, separating validity from invalidity, honesty from dishonesty. *Pendergraft* detailed additional reasons why litigation threats are not "wrongful" under the extortion statutes: (1) sanctions other than extortion prosecutions, such as civil malicious prosecution claims, are sufficient to deter 'wrongful' litigation conduct; (2) extortion prosecutions create 'yet another collateral way for litigants to attack one another;" and (3) no good cause exists to transform. state common law torts (e.g., malicious prosecution) into crimes. Id. at 1207. As *Pendergraft* unambiguously stated, "We are troubled by *any* use of this federal criminal statute to punish civil litigants." I̲d. (emphasis in original).

Following *Pendergraft,* the United States District Court for the Northern District of Georgia specifically rejected the argument that a letter containing a demand to settle a claim before pursuing litigation could amount to extortion. *Buckley v. Direct tv. Inc*., 276 F. Supp. 2d 1271 (N.D. Ga 2003).

*Buckley* was soon followed by *Raney v. Allstate Ins. Co.,* 370 F.3d 1086 (11th Cir. 2004), in which an abortion protester brought suit alleging that abortion providers and his homeowner' s

insurance carrier conspired to extort money from him in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) through the filing of malicious lawsuits. *Raney* extended *Pendergraft's* ruling that a threat to file a lawsuit does not constitute extortion to a holding that the "actual filing of a lawsuit may not state a claim for extortion under the federal RICO statutes." *Id.* at 1087. The court further "reject[ed] any potential state-law extortion" as a predicate act under RICO, explaining "that courts possess adequate procedures to distinguish valid claims from invalid claims" and "that Congress did not intend to punish citizens merely for accessing the legal system." *Id.* at 1088. The court again noted, as it had in *Pendergraft,* that "allowing litigants to be charged with extortion would open yet another collateral way for litigants to attack one another."

Recently, the Eleventh Circuit emphasized that it meant what it said in both *Pendergraft* and *Raney.* In *Town of Gulf Stream v. O'Boyle,*___ F. App'x, ___, 2016 WL 3401681 (11th Cir. June 21, 2016) the plaintiff alleged that over the course of multiple years, defendants bombarded it with nearly 2,000 public record requests, many of which were frivolous, with no intention of actually reviewing the results of those requests. Instead, the purpose of the requests was to trip up the plaintiff and provide a basis for an action for violation of Florida's Public Records Act. Defendants actually

filed 43 public records suits against the town, which had under 1,000 residents and just 17 full-time employees.

The town filed a RICO action that was based in part upon alleged extortion under the Hobbs Act. More specifically, the town alleged that the defendants' "systematic use of unjustified lawsuits as part of a more extensive extortion scheme to obtain money" supported a claim of extortion under the Hobbs Act. 2016 WL 3401681 at *3. The trial court dismissed and the Eleventh Circuit affirmed, following *Pendergraft* and *Raney* concluding that because "citizens have a constitutional right to petition the government for redress under the First Amendment, "the alleged misconduct could not as a matter of law constitute the predicate act of extortion for purposes of the plaintiffs' RICO claim. *Id.* at *3.

Significantly, the Eleventh Circuit fully recognized that, assuming the allegations of the complaint to be true, the defendants had engaged in misconduct: "Indeed, assuming the allegations in the complaint are true, as we must, the defendants have engaged in a pattern of frivolous litigation activity while abusing, on a grand scale, their statutory right to request public documents from the government." *Id.* at *3. That did not, however, prevent the court from affirming dismissal:

> Nonetheless, the same concerns driving our decisions in Pendergraft and Raney are equally present here. Our judicial system, and the [Florida Public Records] Act in particular, encourages citizens to use the courts to resolve public record disputes. *Moreover, citizens have a constitutional right to petition the government for redress.* We believe that regardless of the scope and scale of the litigation, the courts are amply equipped to deal with frivolous litigation. [Citation omitted]. *Thus, Pendergraft and Raney control, a11d the alleged misconduct cannot as a matter of law constitute the predicate act of extortion* for purposes of the plaintiffs' civil RICO claim.

*Id.* at *3 (emphasis added). In short, the federal courts have repeatedly recognized the peril that comes from criminalizing conduct integral to the constitutional right to petition the government for redress and have repeatedly refused to accept that Congress intended the federal extortion statute to encompass such activity.

The Georgia courts have consistently reached the same conclusions as their federal counterparts. In *Markowitz v. Wieland,* 243 Ga. App. 151, 155 (2000), the plaintiff asserted a Georgia RICO claim based in part on alleged violations of O.C.G.A. § 16-10-93(a), which prohibits the influencing of witnesses. The plaintiffs alleged that one of the defendants influenced a witness to recant an affidavit by threatening him with a lawsuit. Affirming the trial court's award of

summary judgment to the defendants, the Court of Appeals concluded that "We that the threat of a lawsuit amounts to conduct prohibited by O.C.G.A. § 16-10-93. We hold that such does not constitute a threat of injury or damage under the statute." 243 Ga. App. at 155. *Markowitz* relied upon *Rolleston v. Huie,* 198 Ga. App. 49, 50-51 (1990) for the principle that threatening a civil suit does not violate O.C.G.A. § 16-8-16-the charged asserted in Count One of the Indictment-nor does it state a tort claim. *Markowitz,* 243 Ga. App. at 155 n.11.

Specifically, O.C.G.A. § 16-10-93(a) provides that

> A person who, with intent to deter a witness from testifying freely, fully, and truthfully to any matter pending in any court . . . communicates, directly or indirectly, to such witness any threat of injury or damage to the person, property, or employment of the witness . . . .

*Markowitz* and *Rolleston* were followed in *DeLong v. State*, 310 Ga. App. 518, 523-24 (2011), in which the defendant was charged with influencing of witnesses by threatening to file lawsuits against them. Reversing the conviction in *DeLong,* the Court of Appeals held that neither the threat of potential monetary damage nor that of public humiliation-which *DeLong* held are inextricably intertwined with the threat of a lawsuit-constitutes a threat to person nor property, requiring reversal of the conviction. In addition, and consistent with the federal holding in *Pendergrast, Buckley, Raney* and *Town of Gulfstream*, the Court of Appeals held

in *Delong* that "even assuming arguendo that the threat of filing a lawsuit (and its attendant potential consequences) was sufficient to support a conviction for influencing a witness, *we have grave reservations as to whether such a law could be upheld under the Georgia or United States Constitutions,"* citing the First and Seventh Amendments to the United States Constitution and Article I, Section 1, V and XII of the Georgia Constitution.

*DeLong* was quickly followed by *Brown v. State,* 322 Ga. App. 446 (2013). Reviewing the decisions in *DeLong, Markowitz* and *Rolleston*, the Court of Appeals held in *Brown*:

> We conclude that actually exercising one's right to file a lawsuit, or as alleged in this case, conspiring with others to file a lawsuit, in and of itself, does not constitute a "threat" as required to support the crimes under O.C.G.A. § § 16-10-93(a); 16-10- 93(b)(l)(A); 16-10-32(b)(l); or 16-10-32(b)(4) as alleged in Counts 32-35.

> 322 Ga. App. at 444-45.

19 ————————————

> In affirming the trial court's award of judgment on the
>
> pleadings in *Rolleston,* the Court of Appeals held that "it is
>
> clear that the mere filing of a lawsuit is not the type of
>
> humiliating, insulting or terrifying conduct which will give rise

to a claim for the intentional infliction of emotional distress"
and "[t]he 'threats' associated with institution of a civil action
cannot and do not constitute duress and are not actionable in
tort" (citation and punctuation omitted, emphasis in original*);
see also Mobley v. Coast House, Ltd.,* 182 Ga. App. 305, 307
(1987) ("an act must be wrongful to constitute duress and it is
not duress to threaten what one has a legal right to do.  The
threat to bring a civil proceeding against [a] person is not
duress in a legal sense."); *Cannon v. Kitchens,* 240 Ga. 239, 240
(1977) ("'[T]hreats' associated with the institution of a civil
suit cannot and do not constitute duress.").

20

   310 Ga. App. at 525 n.35 (emphasis added

   functionally extinct in the United States as a crime.  Notably, last
year the General Assembly repealed O.C.G.A. § 16-11-40, which had set
forth the offense of criminal defamation and, like OCGA § 16-8-16,
criminalized conduct that would expose a person to "hatred, contempt
or ridicule . . . ."

Notably, last year the Georgia General Assembly repealed O.C.G.A. § 16-11-40, which had set forth the offense of criminal defamation and like O.C.G.A. § 16-8-16, criminalized conduct that would expose a person to "hatred, contempt or ridicule . . . ."

the OCGA 51-5-7 immunity is provided to Millard Farmer in reporting child abuse immunity [6]he involves counsel for Nancy Michelle Murphy 'representation of Nancy Michelle Murphy (Michelle Murphy) in the Superior Court of Coweta County State of Georgia Civil Action No. 12V-413 case of

John Harold Murphy, Plaintiff vs. Nancy Michelle Murphy, Defendant involved a modification of custody and child support case. The modification was sought only five years after the final divorce decree in the Superior Court of Troup County File NO. o4-CV-494 divorce was brought by John Harold Murphy that adjudicated with a contractual agreement resolving Troup County divorce case was made the Order of

the Troup Court. [ XX] That divorce is relevant, as John Harold engaged in illegal conduct in attempting to secret his martial assets from Michelle Murphy by transferring assets to the bank account of his mother Florence Murphy and by not disclosing stock options in the sworn identification of his assets and otherwise.

In December of 2006, about two years after the finalization of the divorce, Michelle Murphy, represented by Millard Farmer as her counsel, with Larry King as her expert witness filed a legal malpractice action Nancy Michelle Murphy vs. Delia Tedder Crouch in the Superior Court of Coweta 082137 case against Delia Tedder Crouch, her divorce lawyer when John Harold Murphy refused to provide Michelle Murphy the funds she was due under the divorce settlement agreement.

A part of the funds that Michelle Murphy's counsel allowed John Harold Murphy to obtain that he retained and would not provide to Michelle Murphy until the legal malpractice action was filed is supported by the affidavit of John Harold Murphy prepared by his counsel **Exhibit XX that avered as follows.**

From Affidavit of John Murphy, August 6, 2009: that in part states as follows.

If the calculation provided by AXA shows that I received more than half of the pension as it existed as of August, 2006, I agree that any funds that I

received which exceed my one-half share of the pension as contemplated by our settlement agreement should be paid to Ms. Murphy by me pursuant to the terms of the settlement agreement and divorce decree.

That affidavit further stated that there had been no demand for payment made upon John Harold Murphy for payment of the amount that Delia Tedder Crouch had erroneously had a Superior Court Judge, unfamiliar with the case to sign. Michelle Murphy informed Millard Farmer that she did not wish for John Harold Murphy made a part of the malpractice litigation, as she feared he would retaliate against her. The judge who signed the Order that Delia Tedder Crouch erronously prepared directed Millard Famer that he would not allow John Harold Murphy to retain the windfall benefit that was received by John Harold Murphy. It was then that Millard Farmer prepared a motion to include John Harold Murphy as a party that Millard Farmer informed all counsel that he would file and litigated if the dispute was not resolved by counsel for the insurance carrier and counsel for John Harold Murphy. An agreement was reached and Millard Farmer, Larry King and other were released in two comprehensive settlement agreements  and matters ocurring before February 1, 2011, the date of execution of the release prepared by John Harold Murphy and Renee L. Haugerud's lawyer.

John Harold Murphy's civil RICO case relies upon alleged conduct that occurred on or before February 1, 2011, eg.[31 Page 19-20 §§39,41 of the Amended Complaint

period of time, Alfred Lawrence King, Jr. (Larry King) gave rise to Renee L. Haugerud, a hedge fund operator, financing a cadre of lawyers, experts, public arelations expert, investigators in the  and this civil RICO case for John Harold Murphy, nume in a modification of custody and child support case.

It is initially relevant to explain that it was the absence of causes of action by John Harold Murphy who initiated the the

been  changes in the litigation issues since the RICO case was filed. The changes are due in part to the retaliatory litigation craving and satisfaction conduct of Renee L. Haugerud. who is a real party of interest for her surrogate, John Harold Murphy, who for the purposes of child support swore he had no money.   in various forms of retaliation against the Defendants, including Millard Farmer, *e.g.*. there are Settlement

Agreements, O.C.G.A. 13-4-101 payments of judgments that are an accords and satisfactions of some of the alleged liability in this civil RICO action. There is an apportionment payments made to John Harold Murphy by Larry King that releases Millard Farmer from liability and reduces the amount in controversy. .

 It was Renee L. Haugerud who initially financed John Harold Murphy's counsel and funds to settle the remains of John Harold Murphy' illegal retention of marital assets that were adjudicated during his divoice from Nancy Michelle Murphy (Michelle Murphy) that ended with a settlement agreement made an order of the Court. [ XX] Delia Tedder Crouch, Michelle Murphy divorce lawyer apparently could not keep track of John Harold Murph's secreting of his assets during the divorce litigation and provided an illegal distribution of assets Order to one of the six judges who only  participated in signing an Order prepared by Delian Tedder Crouch, counsel for Michelle Murphy that prepared an Order that erroneous distributed the pension assets for John Harold Murphy. a various times in the absence by the Coweta Judicial Circuit having a mandated Uniform Superior Court Rule 3.1 Case Manage

Management Plan. Millard Farmer as counsel and Alfred Lawrence King as an expert witness in a legal malpractice case

It was during that legal malpractice litigation that Millard Farmer learned of the ability of a litigant and the litigant's counsel to deceive the Court related to litigation issues and the motivation of some of the Coweta Judicial Circuit to use substitute Senior Judges. The absence of the mandated Uniform Superior Court Case Management Rule was an unwritten invitation for litigants such as John Harold Murphy to secret marital assets during the divorce and custody cases.

John Harold Murphy in this RICO civil case attempts to include conduct releasing Millard Farmer with the settlement agreements prepared by John Harold Murphy and Renee L. Haugerud's counsel. John Harold Murphy attempts to present cause of action for which Renee L. Haugerud has been paid since the filing of the RICO civil action and thereby due to that accord and satisfaction are a reduction of the alleged amount in controversy.

1. to litigate some of  the modification of child custody case. That case was initially believed to be about the two minor children

whom John Harold Murphy abandoned when the children were young that he wished to provide the fathering support that he had ignored. The reality is that the cadre of lawyers' goal was ostensibly portrayed as being about John Harold Murphy spending more time with the children. The cadre of lawyers and experts at a point in time, albeit many did not know the real reason for John Murphy and Renee L. Haugerud obsession for full custody of the children, became involved in divesting Michelle Murphy of the children for the best interest of the hedge fund related businesses. Of Renee L. Haugerud rather than the best interest of the children in an ordinary custody case, alleged to be in the initial in the modification of custody and child support case complaint that falsely alleged that Michelle Murphy was threatening to move with the children to South Carolina. At that time John Harold Murphy and Renee L. Haugerud lived on Lookout Mountain near Chattanooga Tennessee.

The case about John Murphy wishing to be a part of the two minor children lives transformed into a need for the full custody of the two minor children to benefit the business interest of hedge fund operation

of John Harold Murphy's wife, Renee L. Haugerud. Was the reason that a workable child custody agreement could not be reached The hedge fund business of Renee L. Haugerud benefited from the alienation of the minor children from their mother and the hope of Renee L. Haugerud to provide a diversion for John Harold Murphy from his alcohol craving with Renee L. Haugerud's business getting the façade of a family living together that was at one time thought to be one of the requirements for the tax and regulatory benefits that Renee needed for her hedge fund benefits.

This federal civil RICO case against Millard Farmer, Deborah L. Beacham and her corporate entity, My Advocate Center, Inc., now encompasses all facts of the state court modification of child custody and child support case that John Harold Murphy with the financial resources of Renee L. Haugerud, as a part of relocation of her hedge fund businesses for income tax and evasion of regulatory restrictions benefits has expanded into numerous forums with a cadre of lawyers and experts that including a public relations internet and print expert, Patrick Crosby. and accusations against Millard Farmer and other persons who attempted to assist Michelle Murphy.

The Defendants, with motions to dismiss and otherwise sought this Court to abstain and to dismiss this case before the state court litigation activities were in full bloom in the multiple forums being used to disable counsel for Nancy Michelle Murphy (Michelle Murphy) an in-home hair stylist who was attempting to protect the best interest of her two minor children whom, almost alone, she had reared since their birth. After filing the corresponding civil RICO action. Rather than John Harold Murphy pruning his litigation appetite, John Harold Murphy's litigation cadre expanded their litigation boundaries into the forum of the State Bar of Georgia, with Grievances against Millard Farmer that counsel for John Harold Murphy in this case prepared for John Harold Murphy and some of his state court expert witnesses to file. RICO counsel for John Harold Murphy also became trial counsel for John Harold Murphy in the Modification of custody and child support case where he attempted to obtain RICO and Bar Grievance information, information against Millard Farmer the Glover & Davis lawyers sought and obtained litigation cost for Renee L. Haugerud, the wife of John Harold Murphy against Millard Farmer and obtained Court of Appeals

penalty against Millard Farmer. After Millard Farmer and Larry King's persistence challenges to the Coweta Judicial Circuit's absence of the mandated Uniform Superior Court Rule 3.1 case management plan that allowed Taylor Drake, a Glover & Davis lawyer hand selection of Judge A. Quillian Baldwin, Jr. and persistent Rule and Fourteenth Amendment Due process and other constitutional challenges to Judge Baldwin presiding in John Harold Murphy's custody case, after first enacting as mandated by Uniform Superior Court Rule 3.1[1], which absence Millard Farmer had challenged since the beginning of the modification of custody case

---

[1]**Rule 3.1. Method of Assignment**
In multi-judge circuits, unless a majority of the judges in a circuit elect to adopt a different system, all actions, civil and criminal, shall be assigned by the clerk of each superior court according to a plan approved by such judges to the end that each judge is allocated an equal number of cases. The clerk shall have no power or discretion in determining the judge to whom any case is assigned; the clerk's duties are ministerial only in this respect and the clerk's responsibility is to carry out the method of assignment established by the judges. The assignment system is designed to prevent any persons choosing the judge to whom an action is to be assigned; all persons are directed to refrain from attempting to affect such assignment in any way. If the order or the timing of filing is a factor in determining case assignment, neither the clerk nor any member of the clerk's staff shall disclose to any person the judge to whom a case isor will be assigned until such time as the case is in fact filed and assigned.

in which Millard Farmer represented Nancy Michelle Murphy (Michelle Murphy.  each of the judges in the Coweta Judicial Circuit recused themselves when then Chief Judge Baldwin recused himself after twenty (20) *State v. Hargis*, 294 Ga. 818, 822-823 (2014) and *Pyatt  v. State* __Ga. __  S15A1734 (decided March 2016), compliant motions to disqualify Judge A. Quillian Baldwin, Jr.

It was these twenty(20) motions alone that resulted in the Coweta Judicial Circuit's change in its systemic violations of the mandated requirements of Uniform  Superior Court Management Rule 3.1. and abridgment of due process.

This abridgment of United States Fourteenth Amendment Equal Protection and due process and violation of Uniform Superior Court Rule 3.1 was permitted by the Coweta Judicial Circuit to enable, so inclined judges, to violate the law and abridge constitutional protections of litigants who were astute enough to timely detecting abridgment o due process and illegal conduct by lawyers such as the Glover & Davis lawyer Taylor Drake who primarily represented clients in domestic relations cases in which  the selected judge is the exclusive  trier of fact. This status allowed Taylor Drake and the other Glover & Davis lawyers

to obtain large legal fees from wealthy clients and thereby to cause the less wealthy parties to suffer the unconstitutional conduct that was judicially allowed and approved. This illegal conduct allowed judges to fetch political benefits with financial and other benefits. Even after the Coweta Judicial Circuit enacted the Uniform Superior Court Case ManagementRule 3.1 Plan, Judge Baldwin, with the assistance of the Court Reporter, Nan Freeman  (Murphy v. Freeman) attempted to evade detection in allowing  his hand selection and rejection of cases.

[audi]. The hand selection of case created corruption in several ways other than the obvious selection of a biased exclusive trier of fact in custody cases.

The violation of the Case Management Rule provided the elected and appointed judges to vacate their court obligation and to have a Senior Judge paid to come and serve in place of the legally designated judges who could be playing golf instead of serving the people.

From the first  disqualification  motion, as amended to the last Consolidated motion for Judge Baldwin's disqualification the relief requested  on behalf of Michelle Murphy contained various versions of the following request for relief

The attempt of John Harold Murphy to transform such languages as follows in each of the request for relief pleadings into a bribe of Judge Baldwin. Does not create  such language into a RICO predicate act.

"Counsel for Michelle Murphy and the Children Parties request that Judge Baldwin be disqualified from serving as  judge in this case

Counsel for Michelle Murphy and the Children Parties request that all Orders entered in this case, before the filing of this motion, be vacated"

 Millard Farmer cannot appropriately be held responsible for delaying the child custody litigation. It was Court of Appeals Judge Christopher J. McFadden who created the longest delay in the litigation. It was Taylor Drake, who like another  Glover & Davis lawyer in the Savannah vs. *Mayor & Aldermen of Savannah v. Batson-Cook Co.*, 291 Ga. 114 engaged in an early preparation of Judge Baldwin for his hand selection as the judge who would become the exclusive trier of fact in determining custody, in the selection of the guardian ad

Judge McFadden after hearing oral argument in an Georgia Court of Appeals appeal of Michelle Murphy's case, with the panel assigned to that case adjudicated that the Court of Appeals had jurisdiction of the case.   After this adjudication, Judge Mc Fadden participated with

section members of the State Bar of Georgia in lobbying to have a statute enacted tha the Judge McFadden panel after the statute was enacted, adjudicated that the statute shuld be applied retroactively to the case pending before the Judge McFadden Court of Appeals panel.  The Georgia Supreme Court after an extremely large amount of time in preparing a certiorari petition, struck down the retroactive application of the statute that Judge Mc Fadden lobbied to have passed. It was only much later that Millard Farmer learned from one of the people who assisted Judge Mc Fadden in divesting jurisdiction of case pending before him that Judge McFadden did not inform the State Bar that he had a case pending before him that the sought legislative change would retroactively changed. On other grounds, jurisdiction was eventually lost in Michelle Murphy's case.

It was the deception of Judge McFadden in not informing one of the most influential member of the lobbing group and thereby informing the legislative body of his conflict that corrupts the judicial process when such conduct mandates that counsel for Michelle Murphy must move to disqualify a judge, albiet a Court of Appeals Judge who engages in such

conduct with the authority of the State Bar of Georgia. The Disqualification Motion brought against the Judge McFadden panel is

Millard Farmer

John Harold Murphy, individually and on behalf of Renee L. Haugerud, his wife and her hedge fund source of financial resources,  with the RICO case now attempt to transform the lingering aspects of the state court case into a viable federal jurisdictional celebratory scorched earth retaliation action  against counsel for Michelle Murphy, as now, Nancy Michelle Murphy and her minor children are not lush targets for abuse that they once were before the cadre of John Murphy and Renee lawyers beat them into psychological disarray.

This information is relevant to the case in this Court, the conditions placed upon an attorney whom the judges informs will not be allowed any attorney fees and who is representing a client pro bono is a strong policy reason that the federal courts have held that federal judges should sustain, from becoming domestic relations jurist.

It was not the absence of a Uniform Superior Court Rule 3.1 that caused the 20 motions to disqualify Judge Baldwin.  It was the other conduct of Judge Baldwin during the interval between the motions that created the necessity to file each of the disqualification motions.

It was the filing of the disqualification motions that progressed the other illegal and unconstitutional attacks upon Millard Farmer.

 John Harold Murphy, and his cadre of attorneys and experts with the benefit of Renee L. Haugerud' financial resources habitually created litigation incidents that were designed to intimidate Michelle Murphy.

Just as Judge Baldwin did with his initial motion in appointing the co-sponsor of the judicial election fund raiser as the $250 per hour paid guardian ad litem.

. Judge Baldwin during the litigation signed orders presented to him by the Glover & Davis lawyers that contained false statements of facts, Once the Glover & Davis Lawyer, Taylor Drake and the other Glover & Davis lawyers were apparently not aggressive enough with the litigation, or not perceived to have enough political clout with an appellate judge, John Harold Murphy engaged Stephen E. Hudson, and William R. Poplin, Jr. and the

Kilpatrick Townsend & Stockton LLP law firm to assist in creating litigation issues with the assistance of that law firm's investigators and associates.

It was the absence of the mandated Rule 3.1 case management that allowed locally judicially politically connected lawyers to hand select judges, as accomplished by the Glover & Davis Lawyers accomplished in the City of Savannah vs. *Mayor & Aldermen of Savannah v. Batson-Cook Co.*, 291 Ga. 114 case.

Savannah v. Batson- Cook is a highly relevant case in understanding the background of the illegal conduct by the Court of Appeals in unconstitutionally extracting money from Millard Farmer and falsely accusing Millard Farmer of engaging in illegal appellate jurisdiction conduct that the State Bar of Georgia with efforts by John Harold Murphy's counsel was used to create a grievance against Millard Farmer.

 The step by step process follows.


It was only the 20 consistent motions to disqualify Judge Baldwin that resulted in his recusal and retirement.

Even after the Coweta Judicial Circuit enacted the Uniform Superior Court Case Management Rule 3.1 Plan, Judge Baldwin, with the assistance of the Court Reporter, Nan Freeman  (Murphy v. Freeman) attempted to evade detection in allowing hand selection of cases.

[audi]. The hand selection of case created corruption in several ways other than the obvious selection of a biased exclusive trier of fact in custody cases.

The violation of the Case Management Rule provided the elected and appointed judges to vacate their court obligation and to have a Senior Judge paid to come and serve in place of the legally designated judges who could be playing golf instead of serving the people.  From the first disqualification  motion, as amended to the last Consolidated motion for Judge Baldwin's disqualification the relief requested  on behalf of Michelle Murphy contained various versions of the following request for relief

was for the hand selected Judge to grant the following relief

Counsel for Michelle Murphy and the Children Parties request that Judge Baldwin be disqualified from serving as s judge in this case

Counsel for Michelle Murphy and the Children Parties request that all Orders entered in this case before the filing of this motion be vacated to turn the disqualification motion as provided by Uniform Superior Court Rule   over to another judge to adjudicate, or as the Judge eventually did, to recuse himself. Instead of following the law, the Glover & Davis lawyer, Taylor Drake after a fund raiser sponsored by Taylor Drake and the guardian ad litem selected by  and eventually fell apart.

Millard Farmer cannot appropriately be charged with delaying the child custody litigation. It was Court of Appeals Judge Christopher J. McFadden who created the longest delay in the litigation.

Judge McFadden after hearing oral argument in an Georgia Court of Appeals appeal of Michelle Murphy's case, with the panel assigned to that case adjudicated that the Court of Appeals had jurisdiction of the case.  After this adjudication, Judge McFadden participated with section members of the State Bar of Georgia in lobbying to have a statute enacted tha the Judge McFadden panel after the statute was enacted, adjudicated that the statute should be applied retroactively to the case pending before the Judge McFadden Court of Appeals panel.   The

Georgia Supreme Court after an extremely large amount of time in preparing a certiorari petition, struck down the retroactive application of the statute that Judge Mc Fadden lobbied to have passed. It was only much later that Millard Farmer learned from one of the people who assisted Judge Mc Fadden in divesting jurisdiction of case pending before him that Judge McFadden did not inform the State Bar that he had a case pending before him that the sought legislative change would retroactively changed. On other grounds, jurisdiction was eventually lost in Michelle Murphy's case.

It was the deception of Judge McFadden in not informing one of the most influential member of the lobbing group and thereby informing the legislative body of his conflict that corrupts the judicial process when such conduct mandates that counsel for Michelle Murphy must move to disqualify a judge, albeit a Court of Appeals Judge who engages in such conduct with the authority of the State Bar of Georgia.

**Request for Relief**

Millard Farmer and the other persons accused with him in the Civil RICO Complaint are entitled to have this motion granted to stop the scorched earth approach to resolving child custody adjudications and

retaliations and resistance against constitutional protections  against those people without the money to become big dollar subscribers to judicial corruption money bundling pools.

: 

<u>Millard Farmer's Motion in lilimine with Memo and attachments</u>

s/                                            Millard Farmer

Respectfully submitted,

<u>/s/ Millard Farmer</u>
Millard Farmer
Georgia Bar No. 255300
P.O. Box 1728
Atlanta, GA  30301-1728
(404) 688-8116
*millardfarmer@millardfarmer.com*
**Counsel for Millard Farmer**

CERTIFICATE OF COUNSEL

I certify that this motion meets all requirements of the Local Rules of the United States District Court for the Northern District of Georgia, regarding margins, line spacing and that a 14 point, Times New Roman Font was used.

This 1st day of September, 2017

t , 2017

.

/s/Millard Farmer
Millard Farmer

CERTIFICATE OF SERVICE

I hereby certify that counsel for all parties, are designated to receive electronic notification at the email address listed below, of the Motion in limine with Memo and attachments filing of Millard Farmer, as counsel for Millard Farmer.

Wilmer Parker
Maloy Jenkins Parker
*parker@mjplawyers.com*

Johannes Stuart Kingman
jkingma@carlockcopeland.com, jfreeman@carlockcopeland.com

John Colquitt Rogers
jrogers@carlockcopeland.com,
kbeazer@carlockcopeland.com

Millard Farmer , millardfarmer@millardfarmer.com,

Shannon D. Briley-Holmes
shannonbrileyholmes@gmail.com
Wilmer Parker , III

parker@mjplawyers.com,mjpassistant@gmail.com,
sramirez@mjplawyers.com

3:15-cv-00092-TCB Notice has been delivered by other means to:

My Advocate Center, Inc.
c/o Deborah L. Beacham
3025 Bluffton Way
Roswell, GA 30075


This 1st day of September, 2017.

/s/ Millard Farmer
Millard Farmer

# IN THE SUPERIOR COURT OF COWETA COUNTY
## STATE OF GEORGIA

**John Harold Murphy,**
   Plaintiff

      **vs.**                                      **Civil Action No.** 12V-413

**Nancy Michelle Murphy**,
   Defendant/Third Party Plaintiff

          **vs.**              **A Jury Trial is Requested on the Child Support Issues, the Counterclaim, the Contempt Issues and the Third Party Complaint**

**Renee Haugerud, a/k/a Lauree Smith**,
   Third Party Defendant

## Second Amended Answer with Affirmative Defenses, Second Amended Counterclaim and Second Amended Third Party Complaint

**1.    Prologue***, i.e.,*  **Factual Information Incorporated as an Integral Part of the following Second Amended Answer, Second Amended Counterclaim and Second Amended Third Party Complaint**

1.1   As this litigation progresses, it's easier to determine and document the bell cow of the litigation, *i.e.*, the immense net worth and income of John Harold Murphy, who seeks to break his Settlement Agreement Contract with Nancy Michelle Murphy (or, "Michelle Murphy") by also using the immense net worth and income of Renee Haugerud, a/k/a Lauree Smith, (or, "Renee Haugerud") who has tortiously interfered with the Settlement Agreement Contact that is part of the Final Decree (R-421) and other oral contracts that Michelle Murphy has with John Harold Murphy. This conduct by John Harold Murphy is financially detrimental to Michelle Murphy.

   1.1.1    There is an immense amount of financial net worth disparity and income disparity among the parties. The Glover & Davis lawyers for

John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, use the immense financial wealth of these client to continually maintain to the Court that some type of "emergency" exists that requires the Court's immediate attention for a hearing. This conduct by the Glover & Davis lawyers creates many hours of legal time and thereby costs for Michelle Murphy in order for her to protect the best interests of the children.

1.1.1.1    The spending of Five dollars ($5) by Michelle Murphy in defending herself and the children in this litigation against the financial resouces of John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, has more economic impact upon her life and the lives of her children,    J.M    and    T.M.    , than the economic impact of the spending of One hundred thousand dollars ($100,000) by John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, in financing the litigation, has upon their lives.

1.1.1.2    Michelle Murphy paying Five dollars ($5) for the schooling and associated transportation costs for the children has more economic impact upon her life and the lives of her children,    J.M.    and    T.M.    , than the economic impact of the spending of One hundred thousand dollars ($100,000) by John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, for the schooling and associated transportation costs for the children has upon thie lives

1.1.1.3    Michelle Murphy paying Five dollars ($5) for her share of the children's medical care has more economic impact upon her life and the lives of her children,    J.M.    and    T.M.    , than the economic impact of the spending of One hundred thousand dollars

($100,000) by John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith for their share of the children's medical care has upon their lives.

1.1.1.4    Michelle Murphy paying Five dollars ($5) for the children's clothing has more economic impact upon her life and the lives of her children,         J.M. and T.M.                          , than the economic impact of the spending of One hundred thousand dollars ($100,000) by John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, for the children's clothing has upon their lives.

1.1.1.5    Michelle Murphy paying Five dollars ($5) for the extra perks of hosting Elizabeth "Lisa" F. Harwell, the Guardian ad Litem, in her home for a meal, for the hosting of Judge Louis Jack Kirby for a boat cruise on the Tennessee River, for Judge Louis Jack Kirby's command performance of a wedding ceremony without a legal marriage license, and for political contributions, has more economic impact upon her life and the lives of her children,         J.M. and T.M.                          , than the economic impact upon the lives of John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith by their spending One hundred thousand dollars ($100,000) for the extra perks of hosting Elizabeth "Lisa" F. Harwell, the Guardian ad Litem, in her home for a meal, hosting Judge Louis Jack Kirby for a boat cruise on the Tennessee River, for Judge Louis Jack Kirby's command performance of a wedding ceremony without a legal marriage license, and for political contributions.

1.1.2    The point is made that Taylor Drake of Glover & Davis, counsel for John Harold Murphy, with a Guardian ad Litem and the unlimited financial resources of Renee Haugerud, a/k/a Lauree Smith, is subtly seeking for the

Court to use as the litigation yardstick a financial measure of what each party is providing to the lives of the children, while stymying Michelle Murphy from participating equally in this financial yardstick, best interest of the children test, by limiting the amount of the child support that John Harold Murphy is providing to Michelle Murphy, this single mom who was abandoned by John Harold Murphy in LaGrange, Georgia, while John Harold Murphy showcased for a wealthy mate in New York City.

1.1.2.1    A child custody financial yard stick is not appropriate as a matter of public policy of the State of Georgia, and, not appropriate as a matter of common sense, as Michelle Murphy has been caring for two minor children from their birth, since John Harold Murphy abandoned them many miles from the business that Michelle Murphy established in an upper New York State town that she left after marrying John Harold Murphy, eventually to be dropped off in LaGrange, Georgia with two minor children and no means of support, except what she received after the divorce, that John Harold Murphy pursued and obtained.

1.1.2.2    The Superior Court of Troup County divorce case was bounced among  Judge Allen B. Keeble,  (Judge 1  of  5)  (R-365), Judge E. Byron  Smith  (Judge 2 of  5)  (R-365),  Judge  A.  Quillian Baldwin,  Jr. (Judge  3  of  5)  (R-366),  Judge  Dennis  Blackmon, (Judge 4 of 5) (R-367) and finally, Judge William F. Lee, Jr. (Judge 5 of 5). (R-366)

1.1.2.3    Michelle Murphy was deprived of an equitable division of the marital  assets  during  the  divorce  proceedings  as  the  result  of  the

fraudulent conduct of John Harold Murphy that was not controlled by the conglomerate of Judges that tagged in at various stages of the litigation.

1.1.2.4    Michelle Murphy was deprived of child support for the minor children by the failure of John Harold Murphy's lawyer, Louis Jack Kirby, to accurately memorialize into the final Settlement Agreement contract, (R-421) ordered enforced by Judge Dennis Blackmon, (Judge 4 of 5) (R-420), the oral settlement agreement memorialized by the court reporter in open Court before Judge A. Quillian Baldwin, Jr. (Judge 3 of 5) (R-366).

1.1.2.5    There was substantial detriment to Michelle Murphy during the divorce proceedings, in violation of USCR 3.1, in which the case was switched among five judges, relating to the failure of John Harold Murphy to disclose stock options he held that were worth more than $180,000. This $180,000 in stock options was omitted from the settlement that Louis Jack Kirby had Judge Dennis Blackmon, (Judge 4 of 5) enforce. (R-420) The Disclosure by John Harold Murphy on his sworn financial affidavit was as follows, which shows a complete absence of disclosure of this asset.

4.    **ASSETS**
(If you claim or agree that all or part of an asset is non-martial, indicate the non-martial portion under the appropriate spouse's column.  The total value of each asset must be listed in the "value" column. "Value" means what you feel the item of property would be worth if it were offered for sale.)

\*   \*   \*

| Other Assets: | n/a | n/a | n/a | n/a |
| --- | --- | --- | --- | --- |

1.2   This is the Second Amended Answer with Affirmative Defenses, Second Amended Counterclaim and Second Amended Third Party Complaint of Nancy Michelle Murphy (or, "Michelle Murphy") to actions initiated against her by John Harold Murphy, first on April 11, 2012, in a Complaint for Modification of Custody, or in the Alternative Parenting Time (or, "Initial Complaint") which was replaced by his July 18, 2012 First Amended Complaint.

1.2.1   John Harold Murphy (or, "John Murphy"), a resident of Tennessee, resides with Renee Haugerud, a/k/a Lauree Smith, also a resident of Tennessee, who controls and mingles her businesses' assets and income and her personal assets and the income with the primary income and at times with the assets of John Harold Murphy, which are eligible for consideration as child support.

1.2.1.1   Renee Haugerud declared that her name was "Lauree Smith," thereby using an alias, when a State of Georgia Court approved, process server served summons and the Third Party Complaint upon her in the Ritz Carlton Hotel in the Atlanta area of Georgia.

1.2.1.2 This "Lauree Smith" alias is now interchangeably used here as a part of the moniker of Renee Haugerud.

1.2.2   Renee Haugerud, a/k/a Lauree Smith, and John Harold Murphy have increased the value of their personal assets by diverting assets belonging to and/or controlled by the businesses of Renee Haugerud, a/k/a Lauree Smith to their personal use without paying taxes on these conversions.

1.2.2.1   This non-taxpaid asset transfer scheme used by Renee Haugerud, a/k/a Lauree Smith and John Harold Murphy affects the amount of disclosed income and assets of John Harold Murphy that are available to Michelle Murphy for support of their minor children.

1.2.2.2   The non-taxpaid income and assets of Renee Haugerud, a/k/a Lauree Smith, and John Harold Murphy provide him an enormous amount of resources that he uses with this litigation and otherwise to intimidate and threaten the mother of the children, Michelle Murphy.

1.2.3   Renee Haugerud, a/k/a Lauree Smith has an immense amount of personal wealth and income. Renee Haugerud, a/k/a Lauree Smith, also obtains a minute amount of her income from her joint interest with John Harold Murphy in real estate, which they share, that is located in the State of Georgia.

1.2.3.1   Renee Haugerud, a/k/a Lauree Smith is the Chief Investment Officer of Galtere, Ltd, a registered investment advisor that is headquartered in New York City.   Galtera N.A., Inc. is the sub-advisor to Galtere, Ltd. *See* Affidavit of Renee Haugerud, **Attachment 9** to First Amended Answer with Affirmative Defenses, Counterclaim and a First Amended Third Party Complaint Necessitated by John Harold Murphy's First Amended Complaint, and (**R-495**).

1.2.3.2   Renee Haugerud, a/k/a Lauree Smith, maintains her home office at her primary residence that she shares with John Harold Murphy, which is located at 829 North Bragg Avenue, Lookout Mountain.

1.3   John Harold Murphy's July 18, 2012 First Amended Complaint includes new causes, new allegations and new requests for relief together with the

incorporation of only the causes and allegations contained in the April 11, 2012 Complaint for Modification of Custody, or in the Alternative, Parenting Time of John Harold Murphy.

1.3.1    The Initial Complaint of John Harold Murphy is now replaced by the First Amended Complaint of John Harold Murphy, as the civil practice act does not permit concurrent complaints among the same parties.

1.3.2    Michelle Murphy, a resident of Georgia, filed answers, counterclaims and third party complaints in response to each of the complaints filed by John Harold Murphy.

1.3.3    Since filing those answers, counterclaims and third party complaints, John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith have filed motions.

1.3.3.1    In addition to their motions, other information is now available to Michelle Murphy that gives rise to this Second Amended Answer with Affirmative Defenses, Second Amended Counterclaim and Second Amended Third Party Complaint (or, collectively, "Second Amended Answer, *et al.*").

1.3.3.2    This Second Amended Answer with Affirmative Defenses, Second Amended Counterclaim and Second Amended Third Party Complaint, while still only a notice pleading, is written to go beyond the notice type of pleadings that are required in order that John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith will be clearly put on notice of an overview of the information available to Michelle Murphy for her to use in defending herself from the attacks that these parties are waging against her in order to satistify their desire to

obtain the maturing minor children whom Michelle Murphy has raised since birth.

1.4  John Harold Murphy's First Amended Complaint that replaced his Initial Complaint, contains both new claims, new allegations and new requests for relief against Michelle Murphy together with the causes and allegations contained in the Initial Complaint. John Harold Murphy's First Amended Complanti does not incorporate his old requests for relief.

1.5  The incorporation of the claims and allegations in John Harold Murphy's July 18, 2012 First Amended Complaint replaces his Initial Complaint with the following language.

*1.*

*Plaintiff hereby incorporateas herein all **claims and allegations** contained in his Complaint for the Modification of Custody or in the Alternative, Parenting Time filed in the above captioned matter on April 11, 2012.*
emphasis supplied

1.6  The nature of the relief now requested in John Harold Murphy's July 18, 2012 First Amended Complaint is substantially different from the relief contained in John Harold Murphy's April 11, 2012 Initial Complaint, which Initial Complaint is now replaced and abanoned in its entirety by John Harold Murphy' July 18, 2012 First Amended Complaint.

1.7  The addition of claims and allegations, along with the replacement of the initial relief requested by John Harold Murphy in his replacement July 18, 2012  First  Amended  Complaint,  substantially  changes  the consequences of the action that John Harold Murphy brings against Michelle Murphy and thereby changes the affirmative defenses, counterclaims, requests for relief and other defenses available to Michelle Murphy.

1.8   Michelle Murphy is the mother and custodial parent of the parties' two minor children,       J.M.            (or, "     J.M.     "),   age 13,   and        T.M.                 (or, "   T.M.         "), age 11.                   and                       have   been   raised   by   Michelle   Murphy   since   birth. Michelle Murphy has been the primary custodial parent of       J.M.         and        T.M.             since  John  Murphy  filed  for  a  divorce  against  Michelle Murphy in May of 2004.

1.9   Taylor Drake of Glover & Davis P.A., with John Harold Murphy's First Amended   Complaint,   revises   and   thereby   limits   the   relief   that John Harold Murphy now requests, to be as follows.

> *WHEREFORE, Plaintiff prays for the following:*
>
> *a.     that this Court find Defendant to be in contempt of the Final Decree due to her failure to pay her share of uninsured medical expenses incurred for the benefit of the minor children;*
>
> *b.     that this Court determine Defendant's noncompliance with the Final Decree to be willful in nature;*
>
> *c.     that this Court order Defendant to reimburse Plaintiff for her share of the uninsured medical expenses incurred for the benefit of the minor children;*
>
> *d.     that this Court levy appropriate sanctions against Defendant for her willful non compliance with the Final Decree;*
>
> *e.     that Defendant be ordered to pay Plaintiff's attorney's fees associated with this contempt claim; and*
>
> *f.     that this Court grant him any additional relief as it deems appropriate under the circumstances.*

1.10     Michelle Murphy responds with her Second Amended Answer with Affirmative Defenses, Second Amended Counterclaim and Second Amended

Third Party Complaint by repleading and modifing her Answer with Affirmative Defenses, Counterclaim and Third Party Complaint to adjust to changes in events since the filing of the previous Answers, Counterclaims and Third Party Complaints, the substantial changes to the relief now requested in John Harold Murphy's First Amended Complaint, the false contempt charges that John Harold Murphy now inappropriately and procedurally illegally brings against her together with other information about the conduct of John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith.

1.11    It is relevant, and incumbent upon the obligation of counsel for Michelle Murphy, to initially state that this case is governed by Article 3, Part 2, OCGA 19-9-61 *et. seq.*, the Uniform Child Custody Jurisdiction and Enforcement Act.

1.11.1    This is an Interstate action and not an Intrastate action, as John Harold Harold Murphy is a resident of Tennessee and Michelle Murphy, the custodial parent, is a resident of Georgia.

1.11.2    In December of 2006, John Murphy obtained a divorce in the Superior Court of Troup County, Georgia styled, *John Harold Murphy v. Nancy Michelle Murphy* File No. 2004-CV-494.

1.11.3    All rights of John Harold Murphy to bring any action against Michelle Murphy are derived from the Superior Court of Troup County divorce. See, the Divorce Decree (R-420) at **Attachment 13** to June 12, 2012 Motion to Disqualify Guardian ad Litem.

1.11.4    The First Amended Complaint contains charges and now seeks relief that is only available in the Superior Court of Troup County and not the Superior Court of Coweta County.

1.11.5     The Superior Court of Troup County has personal and subject matter jurisdiction, and has the appropriate venue of this litigation, which the Superior Court of Coweta County does not have. See, OCGA §19 9-62, *Upchurch v. Smith*, 281 Ga. 28, 29 (Ga. 2006), *Lowe v. Lowe,* 314 Ga. App. 689 (2012), *Hatch v. Hatch,* 287 Ga. App. 832 (2007).

1.11.6 While John Harold Murphy has selected a Court without the jurisdiction to bring his action; it is incumbent that Michelle Murphy address issues in the Court selected by Taylor Drake of Glover & Davis on behalf of John Harold Murphy, as if the Court does have jurisdiction.

1.12     The Initial Complaint and the First Amended Complaint in this litigation are about and motivated by John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, attempting to take     J.M.     and     T.M.     , the minor children, away from their mother, Michelle Murphy, who raised and had custody of them since birth.

1.13     John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith attempt to take     J.M.     and     T.M.     away from Michelle Murphy or substantially reduce their time with Michelle Murphy by using their substantial wealth and influence with Judge Louis Jack Kirby and those who wish to curry favor and maintain their friendships with Judge Louis Jack Kirby.

1.13.1     Admittedly, Michelle Murphy cannot fly the children in a private twin engine jet airplane all over the United States nearly every other weekend that the children are with her. John Harold Murphy and

Renee Haugerud, a/k/a Lauree Smith, can and frequently do this with the Galtera Aircraft LLC, controlled by Renee Haugerud, a/k/a Lauree Smith.

1.13.2     Admittedly, Michelle Murphy cannot pay Twenty thousand plus dollars ($20,000) per child for private school tuition each year, with the stipend of $1,500 per child per month in child support provided to her by the Superior Court of Troup County Divorce Decree. John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, can do this, while also contributing an additional $10,000 to The Howard School with money originating from the businesses of Renee Haugerud, a/k/a Lauree Smith.

1.13.3     Admittedly, Michelle Murphy cannot provide million dollar homes in which the children can reside in Tennessee, for exemption from State income tax purposes, in New York, for business purposes, in Minnesota, for social purposes, and, in Atlanta, for other purposes. John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, can do this with money originating from the businesses of Renee Haugerud, a/k/a Lauree Smith.

1.13.4     Admittedly, Michelle Murphy cannot afford a chauffeured limousine to carry the children and their driver to a restaurant and spend $1,000 for the dining tab for five persons. John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, have done this.

1.13.5     Admittedly, Michelle Murphy cannot take the children to the Ritz Carlton Hotel in the Buckhead area of Atlanta on weekends. John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, can do this with money originating from the businesses of Renee Haugerud, a/k/a Lauree Smith.

1.13.6     Admittedly, Michelle Murphy cannot take the children out of school for ten days to join her on travels abroad. John Murphy and Renee Haugerud, a/k/a Lauree Smith can do this with money originating from the businesses of Renee Haugerud, a/k/a Lauree Smith.

1.13.7     Admittedly, Michelle Murphy does not have access to an eight million dollar twin jet airplane at her disposal to fly the children from Atlanta or Newnan to and from Chattanooga, New York, Minnesota and other places. John Murphy can do this by using for his personal use the assets originating from the businesses of Renee Haugerud, a/k/a Lauree Smith.

1.13.8     Admittedly, Michelle Murphy cannot pay an average of One thousand six hundred sixty five dollars ($1,665) per month for her clothes. John does pay an average of this amount for his clothes each month with money originating from the businesses of Renee Haugerud, a/k/a Lauree Smith.

1.13.9     Admittedly, Michelle Murphy cannot pay an average of Six hundred twenty five dollars ($625) per month for political contributions. John Harold Murphy can do this with money originating from Renee Haugerud, a/k/a Lauree Smith.

1.13.10    Admittedly, Michelle Murphy cannot pay Eight hundred twenty five dollars ($825) a month for boat docking expenses and One hundred seventy nine dollars ($179) a month for boat utilities. John Harold Murphy can do this with money originating from the businesses of Renee Haugerud, a/k/a Lauree Smith.

1.13.11    Admittedly, Michelle Murphy cannot pay an average of Nine thousand dollars ($9,000) per month for rental expenses for the children in places other than the home of Michelle Murphy. John Harold Murphy can do this with money originating from Renee Haugerud, a/k/a Lauree Smith.

1.13.12    John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, do have the above described amenities, all of which may impress the children, Judge Louis Jack Kirby, the Glover & Davis, P.A. lawyers and the Guardian ad Litem, Elizabeth "Lisa" F. Harwell, who has fetched $250 per hour, plus hotel and travel expenses while she has been in their Lookout Mountain, Tennessee home on two days.

1.13.13    These amenities are not a viable substitute for the love of a mother who stuck by the minor children when John Harold Murphy abandoned them in LaGrange, Georgia, where he deceitfully staged this family for the statutory period in order to establish residency to accomplish an unannounced divorce in a jurisdiction where he could conceal from the Court his assets, while he lived in a swanky, furnished New York City abode.

1.13.14    John Harold Murphy is so deceptively disingenuous and morally corrupt that he flew into LaGrange from New York on the eve of his wedding anniversary with Michelle Murphy, had sex with Michelle Murphy and then had her served the next morning with the divorce documents, on their wedding anniversary.

1.13.15    John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, cannot provide      J.M.      and     T.M.          the care and character guidance that Michelle Murphy has provided them since the day that

John Harold Murphy abandoned the family for the unfaithful, bed hopping lifestyle that eventually landed John Harold Murphy in the bed of a multimillionaire who is willing to dole him money and accord him an undeserved feeling of importance by donating in his name a half million dollars to the University of Tennessee at Chattanooga for an artificial playing surface on its football practice field.

1.13.16    There should be a monument to the potential consequences of concussions and two-facedness on the football practice field, stating that a half million dollars for this playing surface was donated by a former student, and football player, John Harold Murphy, who attempts to have his former wife, whom he is paying $1,500 per month for each of two children, held in contempt of court for not paying half of the uninsured medical coverage for his children after he earlier, voluntarily agreed to make the payments for her half of the uninsured medical coverage.

1.13.17    Such a monument to two-facedness would indeed be an educational experience for advancing the education of women in finance that Renee Haugerud, a/k/a Lauree Smith, maintains that she wishes to do.

1.13.18    John Harold Murphy does not exhibit the character traits of a person whom Superior Court Judge Louis Jack Kirby should be helping to select a politically connected lawyer to engage in litigation against the mother of the children.

1.13.19    The unethical conduct of Judge Louis Jack Kirby, while serving as a Superior Court Judge in the Coweta Judicial Circuit with an office in Coweta County, in providing legal advice to John Harold Murphy relating to the selection of a lawyer, equates to a sucker punch to the cause of

justice from the same judge who used an illegal marriage license to perform the marriage ceremony of John Harold Murphy to Renee Haugerud, a/k/a Lauree Smith.

1.13.20    Make no mistake in understanding that the Glover & Davis, P.A. lawyers understand full well that they are gaining political traction and benefits by defending the conduct of Judge A. Quillian Baldwin, Jr. and Judge Louis Jack Kirby, while assisting in establishing a long term bias against counsel for Michelle Murphy by these Judges and other Judges in the Coweta Judicial Circuit, who participate in the illegal judge shopping and case selection.

1.13.21    The violation of Superior Court Rule 3.1 by the Judges in the Coweta Judicial Circuit provides these Judges the power to fetch exchangable political support that the law prohibits John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith from obtaining from the Court.

**2. Additional Factual Information Incorporated as a Part of this Second Amended Answer with Affirmative Defenses, the Second Amended Counterclaim and the Second Amended Third Party Complaint**

2.1 John Harold Murphy's Initial Complaint, now replaced by John Harold Murphy's First Amended Complaint, viewed in the light most favorable to him, involves either the remorse of this father for abandoning his minor children for his various paramours, some eight (8) years ago, or is just another of John Harold Murphy's power plays and continuation of his habitual efforts to frustrate and consume the financial resources of his former spouse, Michelle Murphy. Presently, John Harold Murphy's First Amended Complaint is purely a vindictive action against Michelle Murphy.

2.1.1    John Harold Murphy wants both power and as much control as will be tolerated by Renee Haugerud, a/k/a Lauree Smith, and her money while also having power and control over Michelle Murphy and the children.

2.1.2    John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, make false statements in their attempts for John Harold Murphy to have Michelle Murphy's children, by constantly threatening and intimidating both Michelle Murphy and the children.

2.1.3    The saddest aspect of this litigation is that the litigation has not resolved because John Harold Murphy must continue the litigation to demonstrate to Renee Haugerud, a/k/a Lauree Smith, that he can succeed at something, as he has been an utter failure in succeeding with any of the businesses of Renee Haugerud, a/k/a Lauree Smith, in spite of her best efforts to give him prestigious job titles and responsibilities.

2.1.4    Plainly stated, John Harold Murphy, since he began living with Renee Haugerud, a/k/a Lauree Smith, and sharing her wealth, fails at everything but threatening people with the benefits he derives from the money and assets of the businesses of Renee Haugerud, a/k/a Lauree Smith.

2.1.5    Practically the only thing that John Harold Murphy can presently do successfully, other than involve other people, such as Judge Louis Jack Kirby, in his wrongdoing, is to spend the money of the businesses of Renee Haugerud, a/k/a Lauree Smith, and benefit from the consumption of her assets. This is a high price for Renee Haugerud, a/k/a Lauree Smith, to pay for the detriment that John Harold Murphy does to her reputation.

2.2 John Harold Murphy is attempting to financially disable Michelle Murphy to the extent that, in a later cause of action against her, he can seek to become the custodial parent of the parties' minor children.

2.2.1 Renee Haugerud, a/k/a Lauree Smith, is financing John Harold Murphy's quest for control of the children of Michelle Murphy, as Renee Haugerud, a/k/a Lauree Smith, controls the funds that he receives from the use of corporate assets that she controls, being used for his personal benefit through their joint tax evasion schemes.

2.3 The conduct of John Harold Murphy is designed to provide him and the person with whom he lives, Renee Haugerud, a/k/a Lauree Smith, the image of a family, rather than the image of gluttonous hedge fund operators using business assets for their personal use.

2.3.1 John Harold Murphy considers obtaining control of the lives of the children as a trophy to his power, much the same as he saw obtaining the consent of the women with whom he bed hopped before he obtained the trophy of Renee Haugerud, a/k/a Lauree Smith.

2.3.2 In providing the children as trophies, he does offer some benefit to Renee Haugerud, a/k/a Lauree Smith in having children without having to go experience the responsibilites of being an abandoned mother during the early lives of the children.

2.3.3 John Harold Murphy's quest for power is a made-for-a-documentary teaching tool for students regarding the people who gave the million and a half dollars that John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, bequested to the university in Chattanooga.

2.3.4   If someone creates this documentary, it will memorialize a great learning experience for both men and women about John Harold Murphy - - *e.g.*, finance, donations to obtain status, alcohol abuse problems, tax evasion, bed hopping, illegal conduct and sucker punches to the judicial process.

2.3.5   Renee Haugerud, a/k/a Lauree Smith, maintains to the people at the University of Tennessee at Chattanooga that she wishes to extablish a learning experience at that school for women to learn about economics that can empower them in society.

2.3.5.1   Yet, in real life, Renee Haugerud, a/k/a Lauree Smith is assisting John Harold Murphy as he attempts to diminish the financial resources of the mother of his children to the extent that he can obtain custody of the childern, whom he abandoned.

2.3.5.2   The real lesson that Renee Haugerud, a/k/a Lauree Smith, attempts to teach, may be how to get children without having to go through the problems of raising them during their early years.

2.4   John Harold Murphy's First Amended Complaint abandoned and eliminated the relief that he earlier requested. He, according to a strict construction of his pleadings, now primarily seeks monetary and other sanctions against Michelle Murphy for resourses that he gave to her for the benefit of the children.

2.5   The litigation instigated by John Harold Murphy has not only frustrated Michelle Murphy, but has been damaging to the mental health and educational endeavors of the minor children.

2.5.1   The minor children love John Murphy, beyond just loving the lavish lifestyle that he displays to them. The children wish to continue their liberal, previously court-ordered, visitation with him, but do not wish to live with John Harold Murphy.

2.5.2   The problem with the children being around John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, is the detrimental effects of their lifestyle upon these young children.

2.5.3   Both        J.M. and T.M.                    have written their desire to remain with their custodial parent, Michelle Murphy and expressed this desire to John Murphy a number of times. **Attachment 1** to Motion to Disqualify Judge A. Quillian Baldwin, Jr., filed May 1, 2012.

2.6  The conduct of John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, during this litigation may have deteriorated to the extent that, in the best interests of the children, their access to the children may need to be restricted.

2.6.1    J.M. and T.M.                          have lived with their mother, Michelle Murphy, since their birth.

2.6.2   The best interests of these children is that they live with their mother, clean their rooms, spend a part of their weekends on their school work, living the lives of children, and not be treated like adults and flown all over the country by John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, to attend parties with adults where these children serve as bartenders.

2.6.3   John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, want to showcase playmates without having the responsibilities of parents.

2.6.4    An example of the absence of understanding of the proper role of a parent occurred during the scheduled weekend visitation of the children with John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, on the weekend beginning on Friday, July 27, 2012, that was scheduled to end on Sunday at 5 p.m. on July 29, 2012.

2.6.4.1    The driver of John Harold Murphy picked up the children on Friday afternoon and delivered them to John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith. The children were whisked off to a restaurant Friday night.    T.M.    had an enormous amount of assigned reading that he should have had completed before school started. This child was sent to John Harold Murphy with some of his reading material in hopes that John Harold Murphy would assume some of the educational responsibilites. This never happened.

2.6.4.2    The children arrived home hours late on Sunday night with neither of the children having engaged during the weekend in any of their school preparation work, and Renee Haugerud, a/k/a Lauree Smith, upon request of the children, refusing to load a computer program on the children's computers that was required for school. Instead, hundreds of dollars were spent on dining out with the children.

2.6.4.3    John Murphy, with the participation of Renee Haugerud, a/k/a Lauree Smith, in order to create a hardship to Michelle Murphy, sent the children home on Sunday, July 29, 2012 after a week-end visit to the residence of Renee Haugerud, a/k/a Lauree Smith, wearing the unwashed clothes that they wore when they came to Lookout Mountain, Tennessee on Friday, July 27, 2012.

2.6.4.4    As the children were preparing to leave Lookout Mountain Tennessee, the children were warned that they could not leave wearing clean clothes that were available in the home of Renee Haugerud, a/k/a Lauree Smith. This warning was similar to the order that John Murphy gave to one of the children that they could not take home the expensive basketball shoes that he bought the weekend before, nor the school uniforms that John Murphy purchased for    T.M.             .

2.6.5    John Murphy engages in this conduct focused upon the children as retaliation against Michelle Murphy in order to create a disturbance in their family home with Michelle Murphy.

2.6.5.1    John Murphy constantly attempts to deliver the message to the children that he and Renee Haugerud, a/k/a Lauree Smith, have large amounts of money to spend on the children if they will abandon their mother for more days each month. John Harold Murphy has informed Jack Murphy that if he only visits with him 10% of the time that he will only pay 10% of the cost of buying him a car when he reaches 16 years of age and that he will only pay 10% of the cost of his college tuition.

2.6.5.2    It is unquestionably correct that Renee Haugerud, a/k/a Lauree Smith, and John Harold Murphy have more money that can be spent prudently on the children.

2.6.5.3    This conduct may help them gain favor with the children, but the conduct of Jack Murphy and Renee Haugerud, a/k/a Lauree Smith, is not in the best interest of the children, who need to place priorities upon their school work.

2.6.6   When the children arrived at home hours late on Sunday night, after visiting with John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, in Lookout Mountain, Tennessee, Michelle Murphy began preparing        T.M.        for school by participating with him in accomplishing his reading assignments. The odor from Jack Murphy's socks was so strong that she inquired about the reason for it. It was then that she learned of the latest retaliation by John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, in sending the children home in dirty, unwashed clothes.

2.7   John Harold Murphy abandoned Michelle Murphy and the two children, in LaGrange, Georgia in 2003, as he had sexual relations with numerous paramours throughout the country and moved Michelle Murphy and the minor children to LaGrange, Georgia from California, while he resided in New York.

2.7.1   This move of Michelle Murphy and the children to LaGrange, Georgia was in order that John Harold Murphy could obtain a divorce in a jurisdiction that would deprive Michelle Murphy of the financial protections that California and New York would have provided to her.

2.7.2   After the divorce, just as long before the divorce, John Murphy continued to have numerous bed hopping relations with other women until he eventually agreed to personally merge with Renee Haugerud, a/k/a Lauree Smith, and her businesses by residing with Renee Haugerud, a/k/a Lauree Smith, at a residence at 829 North Bragg Street at Lookout Mountain.

2.8   **Who is Renee Haugerud, a/k/a Lauree Smith?**

**Who is John Murphy?** Here is what they tell the public about themselves outside the Court.

**Posted on April 21, 2010 by Christina H.**
**Renee Lynn Haugerud of Galtere, Ltd.**

Media Releases

April 2009 – Renee Haugerud, Managing Principal and CIO of Galtere Ltd., a New York City based $2 billion dollar commodity hedge fund organization, will deliver the spring commencement address to approximately 850 graduates of The University of Tennessee at Chattanooga on Sunday, May 3 at 2 p.m. in McKenzie Arena. A pioneer in leveraging and combining a diverse profile and theme investment strategy along with rigorous risk management techniques, Haugerud's insight into how global markets are affected by the psychology and relationships of macroeconomic trends makes her a sought after speaker and panelist at global investment events.

April 2009 – Haugerud grew up in rural Preston, Minnesota. She attended several universities, one of which was upon a seagoing vessel traveling the world, before she focused on the University of Montana and a degree in forestry with honors. After several temporary jobs Haugerud found Cargill. She didn't fit the mold for the typical Cargill employee but, after much diligence and a won't-fail attitude, Haugerud was hired and eventually created a never-before profit center in the export and domestic sunflower seeds market.

**March 2009 – Renee Haugerud and John Murphy each made millions by running high-yield hedge funds.** The couple is working

with UTC to establish what Ms. Haugerud hopes will be a center where women will get a jump start on careers in finance.

emphasis supplied

February 2009 – Renee Haugerud and John Murphy have given $2 million to the University of Tennessee at Chattanooga. Of the total, $1.5 million has been given to establish the Renee Haugerud and John Murphy Global Finance Center at the College of Business. Another $500,000 will go to the university's football program. The couple run Galtere Ltd where she is the managing principal and chief investment officer. He is the chief development officer. Murphy is an alumnus of University of Tennessee.

August 2008 – Galtere International's Commodity-Based Global Macro Fund, run by Renee Haugerud out of New York, increased 1% in July, generating year-to-date returns to about 18%, according to two investors. Haugerud formerly traded commodities for Cargill.

See, http://www.checkfundmanager.net/wordpress/?m=201004&paged=18

2.9   Renee Haugerud, a/k/a Lauree Smith, controls the primary source of all of John Murphy's income through her personal assets and the assets of her hedge fund type of businesses, including, Galtere, Ltd., Galtera N.A., Inc., Galtera Aircraft LLC and associated entities (or "Galtere.") See **Attachment 9,** *infra*, Affidavit of Renee Haugerud.

2.10    John Murphy's income includes a substantial amount of benefits that are obtained by him in concert with Renee Haugerud, a/k/a Lauree Smith, and Galtere classifying the personal benefits received by John Murphy as business expenses, when, under the laws and regulations of the United States

Internal Revenue Service, these so called "businesses expenses" are obtained for personal use without the payment of federal income or gift taxes that are due to be paid.

2.11    John Harold Murphy was represented in the Troup County divorce case that he filed against Michelle Murphy by Louis Jack Kirby (or, "Jack Kirby"), who is now Coweta Judicial Circuit Superior Court Judge Louis Jack Kirby.

2.11.1 Judge Louis Jack Kirby acts as the hub of impropriety for the judicial and lawyer professional misconduct that that has plagued Michelle Murphy.

2.11.1.1  It is beyond rational comprehension to understand the reason that a person such as Renee Haugerud, a/k/a Lauree Smith, would give One and a half million dollars to the University of Tennessee at Chattanooga to establish what she hopes will be a center where women will get a jump start on careers in finance, while at the same time she is financing a person such as John Harold Murphy who is so hateful to the mother of the parties' children. John Harold Murphy is attempting to drain the financial resources of Michelle Murphy, and the litigation is just one of the ways that John Harold Murphy attempts to drain the financial resources of Michelle Murphy.

2.11.1.2  Is Renee Haugerud, a/k/a Lauree Smith, so ill-informed that she does not know that John Harold Murphy is attempting to have the Court hold Michelle Murphy in contempt of court with his First Amended Complaint in order that he can seek reimbursement for the

uninsured medical costs that he agreed with Michelle Murphy that he would pay on behalf of      J.M.      and      T.M.     ?

2.11.1.3  It is doubtful that there is a woman at the university in Chattanooga, which was provided the One and a half million dollar gift, who would be unable to inform Renee Haugerud, a/k/a Lauree Smith, that it is people such as John Harold Murphy who deter women from having an "jump start" in finance, or any type of economic independence, once the woman is removed from the work place to mother children, on the promise that the father can support a stay-at-home-mom,     as     Michelle     Murphy     was     promised     by John Harold  Murphy. It is not some phase of women's formal education that is needed to teach this; it is the Courts that need to understand it.

2.11.1.4  A short course that covers the John Harold Murphy relationship model for significant others can be simply explained.

2.11.1.4.1   John   Harold   Murphy,   with   his   overtly   pleasant personality, allures people into becoming emotionally and financially dependent upon him. His commitment to persons to surrender their financial and emotional stability to him is an easy sell.

2.11.1.4.2   Once a person becomes emotionally and financially dependent upon John Harold Murphy, he begins to threaten the person to obtain more commitments to him. Over time, much the same as a mechanic's ratchet wrench, John Harold Murphy demands more and more, and threatens more and more serious consequences.

2.11.1.4.3   Like a person with a short attention span, at a point in time, John Harold Murphy becomes more interested in another victim and drops cold the person who has become extremely dependent upon him.

2.11.1.4.4   A version of this scenario happened to Michelle Murphy when John Harold Murphy divorced her.

2.11.1.4.5   John Harold Murphy has staged a very analogous scenario with his two children,   J.M.   and   T.M.   .

2.11.1.4.6   The Court needs to protect the lives of these two children and prevent them from becoming the next two victims of the scenario that John Harold Murphy perfected to an almost science with his bed hopping escapades with numerous women throughout the country.

2.11.1.5   Renee Haugerud, a/k/a Lauree Smith, should take a course from John Harold Murphy and Judge Louis Jack Kirby about just how the mechanics of the judicial system in the Coweta Judicial Circuit deprived Michelle Murphy of her share of the marital assets through the illegal, deceptive acts of John Harold Murphy, in which Judge Allen B. Keeble, (Judge 1 of 5) (R-365), Judge E. Byron Smith (Judge 2 of 5) (R-365), Judge Quillian Baldwin, (Judge 3 of 5) (R-366), Dennis Blackmon (Judge 4 of 5), who was the judge who entered the divorce decree at issue (R-420), and Judge William F. Lee, Jr. (Judge 5 of 5). (R-366) each played a role, while engaging in habitual violations of Uniform Superior Court Rule 3.1.

2.11.1.6   Renee Haugerud, a/k/a Lauree Smith, does not have to leave the house she shares with John Harold Murphy to observe, in the context

of this litigation, just how women are mistreated in litigation by persons such as John Harold Murphy, who has, and, is currently, mistreating Michelle Murphy by using the financial wealth of Renee Haugerud, a/k/a Lauree Smith that he and she attempt to prevent the Court from considering in determing the financial net worth and income of John Harold Murphy.

2.11.1.7  The sad aspect of this learning experience for Renee Haugerud, a/k/a Lauree Smith, will come on the day that she decides to cease fianancing John Harold Murphy's passions.

2.11.1.8   This John Harold Murphy is the same person who, in the First Amended Complaint, is seeking to have Michelle Murphy held in contempt of court after she accepted his fully voluntary payment of the children's uninsured medical coverage on ocassions when it was not his obligation under the Divorce Decree and while he was habitually violating the Divorce Decree by not returning the children to Michelle Murphy on time after his visitations and flew the children out of the state on numerous ocassions without informing Michelle Murphy of their location.

2.11.1.9   Not only are the children returned late from their visits with John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, but tired and exhausted, when they have school on the following day. It is rare that John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, participate during their weekend visits in preparing the children for their school work.

2.11.1.10    John Harold Murphy is seeking to instantly retaliate against Michelle Murphy for the conduct of her lawyer in having Renee Haugerud, a/k/a Lauree Smith, served with process at the Ritz Carlton Hotel in the Buckhead area of Atlanta while she was attempting to evade service.

2.11.1.11    The father of Renee Haugerud, a/k/a Lauree Smith, was a Sheriff in Minnesota; she should have known that evading service and lying to a process server was a no, no.  Apparently, her father was a law abiding person of integrity. Unfortunately, Renee Haugerud, a/k/a Lauree Smith, for this event, exchanged her family values for the values of John Harold Murphy, which she was taught from childhood were wrong, wrong, wrong.

2.11.1.12    The conduct of Renee Haugerud, a/k/a Lauree Smith, in knowingly making a false statement about her identity to the process server, is typical of the gulling, *i.e.*, deceiving, tricking, cheating and hoodwinking other people, by Renee Haugerud, a/k/a Lauree Smith and John Harold Murphy.

2.11.1.13    This conduct is an attempt to make the litigation expensive to Michelle Murphy, to interfere with the custody of the minor children, to interfere with the contract that John Harold Murphy had with Michelle Murphy relating to the minor children and to obstruct justice by attempting to secret from the Court the assets of John Harold Murphy and the facts related to the counterclaim of Michelle Murphy to obtain additional child support.

2.11.1.14   **Gulling**, i.e**.,** deceiving, tricking, cheating and hoodwinking, **can rise to the level of criminal conduct,** as OCGA § 16-10-20 establishes as follows and as a civil Georgia tort, as also a predicate civil RICO act.

> A person who knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact; makes a false, fictitious, or fraudulent statement or representation; or makes or uses any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of state government or of the government of any county, city, or other political subdivision of this state shall, upon conviction thereof, be punished by a fine of not more than $1,000.00 or by imprisonment for not less than one nor more than five years, or both.

2.11.1.15   Much as a dog bites a person who is threatening to its owner, John Harold Murphy is attempting to display his power to Renee Haugerud, a/k/a Lauree Smith, with this type of retaliatory conduct that only displays his weakness, and not his power. As a matter of law, this type of service of process was necessary because John Harold Murphy and the Glover & Davis, P.A. lawyers thought it would be so expensive for Michelle Murphy to serve Renee Haugerud, a/k/a Lauree Smith, that she could evade service of process.

2.11.1.16    This John Harold Murphy is the same person who, in the Initial Complaint against Michelle Murphy, asked the Court to require Michell Murphy to pay him child support for      J.M.         and    T.M.

follows.

> *3.     that Defendant [Michelle Murphy] be required to pay him [John Harold Murphy] child support, if this Court deems it appropriate;*
> *4.     that Defendant's child support obligations be retroactively applied to the date she is served with this Complaint; and .   .   .*

2.11.1.17    John Murphy did not include the above request in his First Amended Complaint, as he included an entirely different set of requests for relief in his First Amended Complaint.

2.11.2 Louis Jack Kirby, while in private practice, represented John Harold Murphy in the divorce against Michelle Murphy.

2.11.3 During the divorce proceedings, Louis Jack Kirby announced in open Court to Judge A. Quillian Baldwin, Jr. (Judge 3 of 5) that the settlement agreement between John Harold Murphy and Michelle Murphy would provide Michelle Murphy $3,000 in child support for the two minor children,      J.M. and T.M.                        . There is a two year difference in the age of the children. When Louis Jack Kirby, then a private lawyer, prepared the written settlement agreement that he sought and had enforced by Judge Dennis Blackmon, (Judge 4 of 5) (R-367), Louis Jack Kirby provided for $1,500 per month for each child.

2.11.4 During    the    divorce    proceedings,    while    represented    by Louis Jack Kirby, John Harold Murphy concealed, among other assets that

he concealed, over $180,000 in stock options that should have been considered in a division of the marital assets. Judge Louis Jack Kirby stated during his deposition on page 26 as follows relating to the undisclosed stock options in the financial statements or discovery.

```
20   I don't think I would have had an obligation to
21   advise my client that since you didn't reveal these
22   stock options you have to do this, that, or the
23   other.  I mean, at some point the judge has got to
24   make a decision about something like that.
```

2.11.5 During the divorce litigation, Louis Jack Kirby maintained that Michelle Murphy was moving out-of-state, when she visited her parents, much as Taylor Drake alleged in an initially filed motion seeking an "emergency" hearing that Michelle Murphy as threatening to move to South Carolina. See **R-16**. The false allegation in the initial divorce proceeding, in which Louis Jack Kirby, then a private attorney, engaged, enabled John Harold Murphy to enter the family dwelling and remove a substantial amount of the marital property during the pendency of the divorce action.

2.11.6 Judge Louis Jack Kirby, while serving as a Superior Court Judge, advised John Harold Murphy that Taylor Drake would be one of the lawyers that he would suggest John Harold Murphy to employ for the current pending action against Michelle Murphy.

2.11.7 Judge Louis Jack Kirby used a marriage license that John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, two residents of Tennessee, obtained in Troup County, Georgia with the false statement that

they planned to marry in Troup County, Georgia, to perform an illegal marriage ceremony in Walker County, Georgia.

2.12    During the divorce case, John Harold Murphy secreted financial assets from then counsel for Michelle Murphy, Delia Tedder Crouch, by deceptively and falsely responding to discovery and by other methods including, but not limited to, placing assets in his mother's bank account.

2.13    Delia Tedder Crouch, counsel for Michelle Murphy in the divorce proceeding, either through her incompetent representation of Michelle Murphy, and/or the failure of Louis Jack Kirby, John Murphy's counsel to ethically and accurately require John Murphy to respond to discovery requests, eventually deprived Michelle Murphy of an equal division of the marital assets.

## 3. After the Divorce, John Murphy Continued to Rely upon the Legal Advice of Louis Jack Kirby

3.1   Jack Kirby, after representing John Harold Murphy in the divorce, became a Superior Court Judge in the Coweta Judicial Circuit on January 1, 2007.

3.2   Louis Jack Kirby and John Harold Murphy retained a close relationship after Louis Jack Kirby became a Superior Court Judge.

3.3   John Harold Murphy talked so frequently about the influence that Judge Louis Jack Kirby would have in determining issues involving the minor children,        J.M. and T.M.                      , that counsel for Michelle Murphy began investigating the relationship and prohibited practice of law by this Superior Court Judge.

3.4   The investigation revealed that Judge Louis Jack Kirby has engaged in illegal conduct with John Harold Murphy in which Renee Haugerud, a/k/a Lauree Smith, has participated. Judge Louis Jack Kirby used an illegal marriage license to officiate at the wedding of Renee Haugerud, a/k/a Lauree Smith, to Jack Harold Murphy, two Tennessee residents, in Walker County, Georgia.

3.5   Due to the illegal conduct of Judge Louis Jack Kirby with John Harold Murphy that violates the Code of Judicial Conduct, counsel for Michelle Murphy deposed Judge Louis Jack Kirby.

3.6 Counsel   for   Michelle   Murphy   moved   to   disqualify Judge A. Quillian Baldwin, Jr. The Motion to Disqualify Judge A. Quillian Baldwin, Jr., the Second Amended Motion to Disqualify Judge A. Quillian Baldwin, Jr. the Addendum to Second Amended Motion to Disqualify Judge A. Quillian Baldwin, Jr., the Second Addendum to the Second Amended Motion to disqualify Judge A. Quillian Baldwin, Jr. and the Consolidated Motions for Disqualification of Judge A. Quillian Baldwin, Jr. and the Guardians ad Litem are incorporated here.

3.7 In   addition   to   the   viable   reasons   for   the   disqualification   of Judge A. Quillian Baldwin, Jr. and the viable reasons for the disqualification of the Guardians ad Litem whom Judge A. Quillian Baldwin, Jr. appointed, there is the detriment of Judge Louis Jack Kirby tacitly and/or actually earwigging Judge A. Quillian Baldwin, Jr., the Guardian ad Litem and other persons involved in litigation related to John Harold Murphy. Each of the Guardians ad Litem appointed by Judge A. Quillian Baldwin, Jr. appear regularly before Judge Louis Jack Kirby. See, Transcript of August 30, 2012

Callendar Call before Judge Louis Jack Kirby in the Superior Court of Coweta County: Ms Harwell p. 11, L. 25; Ms. Harwell p.14, L. 24; Ms. Griffis p. 16, L.10; Ms. Griffis p. 16 L. 12; relevant pages, **Attachment 47.**

## 4. Affirmative Defenses

### 4.1   First Defense

The claims of John Harold Murphy in the First Amended Complaint are barred, in whole or in part, by the terms and conditions of a Settlement Agreement Contract and a Court Order.

### 4.2   Second Defense

The claims of John Murphy in the First Amended Complaint are barred, in whole or in part, by the doctrine of unclean hands and illegal conduct by John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith.

### 4.3   Third Defense

The claims of John Harold Murphy in the First Amended Complaint are barred, in whole or in part, as John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, are engaging in the use of business assets for their personal use without income or gift tax being paid on the uses of the business assets. It is not in the best interests of the children to be involved with persons engaged in such conduct for any more than the required limited amount of time that was established by the Final Decree and incorporated Settlement Agreement.

### 4.4   Fourth Defense

The claims of John Harold Murphy in the First Amended Complaint are barred, in whole or in part, by the doctrines of waiver, estoppel and/or laches.

**4.5   Fifth Defense**

The claims of John Harold Murphy in the First Amended Complaint are barred, in whole or in part, by the doctrine of illegality, including without limitation, the false statements contained in the First Amended Complaint.

**4.6   Sixth Defense**

The Superior Court of Coweta County does not have a Uniform Superior Court Rule 3.1 Method of Assignment Plan and is not eligible to hear any aspect of this case until such a plan is put in place, as Michelle Murphy does not waive the absence of a viable USCR 3.1 plan. This issue is on appeal to the Court of Appeals of Georgia, Case No. A13A0206.

**4.7 Seventh Defense**

Taylor Drake, and, thereby, Glover & Davis P.A., engaged in tacit and/or actual earwigging with Judge A. Quillian Baldwin, Jr., who engaged in other conduct that disqualifies him from serving in this matter, as these other matters are identified in the series of motions to disqualify Judge A. Quillian Baldwin, Jr.

**4.8   Eight Defense**

The Initial Complaint and the First Amended Complaint fail to state a claim upon which relief may be granted. The Initial Complaint and the First Amended Complaint fail to state a claim upon which relief can be granted by this Court, as the causes and allegations of the Initial Complaint and the First Amended Complaint raise issues over which the Court does not have personal jurisdiction, subject matter jurisdiction or venue. The Initial Complaint and the First Amended Complaint clearly seek relief that is covered by the Uniform Child Custody Jurisdiction and Enforcement Act

in general and in particular by OCGA 19-9-62, *Upchurch v. Smith*, 281 Ga. 28, 29 (Ga. 2006), *Lowe v. Lowe,* 314 Ga. App. 689 (2012), *Hatch v. Hatch,* 287 Ga. App. 832 (2007). The Superior Court of Troup County, Georgia is the Court with both jurisdiction and venue of the Initial Complaint and the First Amended Complaint.

**4.9   Ninth Defense**

The First Amended Complaint, in part, seeks to have Michelle Murphy held in contempt for matters relating to a financial obligation that John Harold Murphy maintains Michelle Murphy is due him. An action for contempt of court seeking sanctions is not brought by a complaint, albeit by an amended complaint. An action for contempt is anciliary to action that originated the alleged financial obligation. See, *Taylor v. Taylor, 216 Ga. 767, 768 (Ga. 1961)*

**4.10   Tenth Defense**

The allegations in the First Amended Complaint, as relating to Michelle Murphy being in contempt of court, fail to state a cause of action and the relief requested in the First Amended Complaint cannot be granted based upon the allegations in the First Amended Complaint, as this Court does not have jurisdiction to adjudicate a "complaint" seeking to have a person held in contempt of court.

**4.11   Eleventh Defense**

There are no requests for relief in the First Amended Complaint that can be granted based upon the causes of action and allegations incorporated in the First Amended Complaint and the other allegations contained in the First Amended Complaint.

**4.12    Twelfth Defense**

Some of the issues in the First Amended Complaint are outside the Statute of Limitations.

**4.13    Thirteenth Defense**

Michelle Murphy is deprived of a fair and impartial Judge and Guardian ad Litem due to the selection process of both the Judge and Guardian ad Litem. The Superior Court of Coweta County and the Coweta Judicial Circuit does not adhere to the Case Management requirements of Uniform Superior Court Rule 3.1.

**4.14    Fourteenth Defense**

Uniform Superior Court Rule 25, as applied and facially, violates the protections afforded the Michelle Murphy and Children Parties in this case and to others in all cases under the United States Constitution due process, U.S. Const. amend. XIV, § 1 and State of Georgia Constitution Bill of Rights due process protection (Ga. Const. Art. I, § 1, ¶ 1) The Judges in the Superior Court of Coweta County do not follow the dictates of USCR 25 and thereby deprive Michelle Murphy of a fair and impartial jurist.

**4.15    Fifteenth Defense**

The Order appointing the Guardian ad Litem denies Michelle Murphy, J.M. and T.M.                    the protections afforded to each by the United States Constitution **due process**, U.S. Const. amend. XIV, § 1 and State of Georgia Constitution Bill of Rights **due process protection** (Ga. Const. Art. I, § 1, ¶ 1), and the laws of Georgia. Elizabeth "Lisa" F. Harwell deprived Michelle Murphy of her contract rights by entering and document that this Guardian ad Litem maintained was a Corut Order.

**4.16    Sixteenth Defense**

Judge Louis Jack Kirby's recommendation of a lawyer to John Harold Murphy deprived Michelle Murphy of her rights protected by the laws of Georgia, the Constitution of the State of Georgia and the United States.

**5. Answers to Specific Allegations of John Harold Murphy in the First Amended Complaint**

5.1   John Harold Murphy, in Paragraph 1 of his First Amended Complaint, incorporates "all claims and allegations contained in his Complaint for the Modification of Custody or, in the Alternative, Parenting Time filed in the above captioned matter on April 11, 2012." The paragraph numbers in the Complaint for the Modification of Custody or, in the Alternative, Parenting Time of John Harold Murphy will be used in responding to the allegations in the Initial Complaint that are now based upon John Harold Murphy's new Requests for Relief, that are exclusively contained in John Harold Murphy's First Amended Complaint.

5.2   Michelle Murphy denies paragraph 1, in part, as Michelle Murphy has moved from the 43 Oak Park Square address; however she is still a resident of Coweta County, Georgia.

5.3   Michelle Murphy denies paragraph 2, as under the Requests for Relief in John Harold Murphy's First Amended Complaint, he includes a quite different prayer for relief that deprives the Court of venue and jurisdiction, as the Superior Court of Troup County, Georgia has both venue and jurisdiction of all claims and allegations that state a cause of action.

5.4   Michelle Murphy admits that she and John Murphy were divorced in the Superior Court of Troup County on December 20, 2006. Michelle Murphy

denies that a true and accurate copy of the Final Decree is, or ever was, attached to the Complaint that was served upon Michelle Murphy, or that it is in the electronic records of the Superior Court of Coweta County. This shoddy legal work by the Glover & Davis lawyers for John Harold Murphy is cured by Michelle Murphy providing the Court a copy of this Decree that is **Attachment 13** to the June 12, 2012 Motion to Disqualify the Guardian ad Litem. (R-420)

5.5   Michelle Murphy admits paragraph 4.

5.6   Michelle Murphy admits that she has primary physical custody of the children. In further response, Michelle Murphy states that the Final Decree and the Settlement Agreement between the parties more accurately includes her response to paragraph 5 than does the content of paragraph 5.

5.7   Michelle Murphy, in response to paragraph 6, states that the Final Decree and the Settlement Agreement between the parties more accurately includes her response to paragraph 6 than does the content of paragraph 6.

5.8   Michelle Murphy denies paragraph 7. In further response to paragraph 7, Michelle Murphy states that John Harold Murphy makes a knowingly false statement in swearing that Michelle Murphy "repeatedly informing Plaintiff that she intends to take the Children out of school and move with the Children from Newnan, Georgia to Greenville, South Carolina." No portion of that quoted statement is true. This sworn statement by John Harold Murphy is but an example of the false statements that John Harold Murphy makes under oath and otherwise. Counsel for John Harold Murphy used this false statement about Michelle Murphy moving to Greenville, South Carolina to feign the need for an "emergency" hearing that was used to judge shop. See,

**Attachment 21,** *infra*. John Harold Murphy made a similar, untruthful statement about Michelle Murphy leaving the jurisdiction of the Court during the divorce proceeding in the Superior Court of Troup County. It is John Harold Murphy who lives at Lookout Mountain, Tennessee and takes the children to numerous states across the country without consent of Michelle Murphy in violaton of the Divorce Decree and the Standing Order.

5.9  Michelle Murphy denies paragraph 8 and each of its subdivisions. Michelle Murphy should continue to have the rights to the custody of the children that are provided under the Final Decree and Settlement Agreement. It is only the amount of child support that is provided by John Harold Murphy that should be substantially increased. In further response to paragaph 8 (b), Michelle Murphy states that the Final Decree and Settlement Agreement provide John Murphy more than a reasonable amount of parenting time with the Children. The real issue is that John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, are abusing the parenting time that they are spending with the Children by flying them all over the country and treating them as adults who can sustain the lifestyles of John Murphy and Renee Haugerud, a/k/a Lauree Smith, rather than treating them as children.

5.10    Michelle Murphy admits the portion of paragraph 9 that states that, "Since entry of the Final Decree, no court has considered whether the parenting time detailed therein continues to be in the best interest of the Children." Michelle Murphy denies that there is any creditable evidence that it the best interest for the parenting time to be modified to allow John  Murphy "a significant increase of parenting time with the Children." Quite the contrary is true. The conduct of John  Murphy and Renee Haugerud,

a/k/a Lauree Smith, relating to the children has been such that if the Court addresses any issues relating to the children, more restrictions should be placed upon the conduct of John Murphy and Renee Haugerud, a/k/a Lauree Smith, while they are around the children.

5.11   Michell Murphy admits paragraph 10.

5.12   Michelle Murphy denies paragraph 11.

5.13   Michelle Murphy admits sections "a" through "f" of paragraph 12.

5.14   Michelle Murphy denies that John Murphy should have any of the relief that he requests in the First Amended Complaint and none of the relief that he requested in the Initial Complaint, as he intentionally abandoned these requests for relief by not including them in the First Amended Complaint. Michelle Murphy should have the relief that she requests in her counterclaim and be awarded attorney fees and the costs associated with this litigation.

5.15   Michelle Murphy is entitled to attorney fees and costs necessary to defend this action instigated by John Murphy. Michelle Murphy is entitled to these attorney fees, expenses of litigation and costs under the authority of OCGA §§ 19-9-68, 19-6-2, 19 9-3 (g) and 19-6-15 (k) (5) and the other laws of Georgia.

5.15.1   Attorney fees and litigation expenses have been very high in this case as the Glover & Davis lawyers continue to feign "emergency" needs for hearings.

5.15.2   Until this time it has been the Glover & Davis lawyers who have caused counsel for Michelle Murphy to come to Court on each ocassion and on one ocassion the Glover & Davis lawyer, Taylor Drake, in concert with the Guardian ad Litem, Elizabeth "Lisa" F. Harwell, caused counsel

for Michelle Murphy to come to Newnan from Atlanta to talk to Judge A. Quillian Baldwin, Jr. on a conference call from the law office of Glover & Davis.

5.16   Michelle Murphy requests a jury trial to determine the reasonable amount of child support that should be provided by John Murphy and all other disputed facts.

5.17   The Preliminary Domestic Relations Financial Affidavit of John Murphy that is legally inaccuate and does not contain the personal financial benefits that John Murphy receives tax free, as the assets are illegally designated as business expesses by the businesses of Renee Haugerud, a/k/a Lauree Smith, are included here and made a part of this Answer, Counterclaim and Third Party Complaint, is **Attachment 2** to the May 12, 2012 motion to disqualify Judge A. Quillian Baldwin, Jr..

5.18   John Murphy, assisted by his counsel, Taylor Drake and thereby Glover & Davis, P.A., has been stubbornly litigious in this matter by refusing to schedule the deposition of John Harold Murphy until over fifty (50) days after the instigation of the litigation and further refusing to make John Harold Murphy available for his deposition in any place outside of Chattanooga, Tenneseee. This conduct by John Murphy and Taylor Drake, and thereby Glover & Davis P.A. and another of its other lawyers, Peter A. Durham, is designed to make this litigation expensive to Michelle Murphy.

5.19   Taylor Drake and thereby Glover & Davis P.A. have engaged in tacit and/or actual earwigging with Judge A. Quillian Baldwin, Jr. See, *Mayor & Aldermen of Savannah v. Batson-Cook Co.*, 291 Ga. 114 (2012), as an

example of the benefits of tacit and/or virtual earwigging to the Glover & Davis P.A. law firm.

5.20    Michelle Murphy is only engaging in litigation against John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, as the result of John Harold Murphy instigating the action against Michelle Murphy.

5.20.1    The Glover & Davis lawyers have caused each of the appearances of this case before the Court. Presently, the Glover & Davis lawyers have falsely informed the Court of four (4) emergencies, as excuses to bring some type of action before the Court.

5.20.2    The court appearances that the Glover & Davis lawyers have caused are expensive to Michelle Murphy.

**5.21 Request for Relief by Michelle Murphy**

5.21.1  Michelle Murphy demands the case not be heard until the appeals court resolves the issues in the pending appeal, and, then, that John Harold Murphy's First Amended Complaint be denied, dismissed, or transferred to the Superior Court of Troup County.

5.21.2  Michelle Murphy requests that the Court require that the child support that John Harold Murphy is ordered to pay to Michelle Murphy for the Children be substantially increased and the Court enter an Income Deduction Order for the payment of the child support.

5.21.3  Michelle Murphy requests that John Harold Murphy be required to to pay all costs associated with the education of the children including transportation costs should the minor children be in school outside of Coweta County.

5.21.4  Michelle Murphy request that the Order appointing Elizabeth "Lisa" F. Harwell as Guardina ad Litem be vacated retroactively and no Guardian ad Litem be appointed.

5.21.5  Michelle Murphy requests that she be awarded a reasonable sum for counsel to represent her in these proceedings, as provided by OCGA §§ 19-9-68, 19-6-2, 19 9-3 (g), 19-6-15 (k) (5), 13-6-11, 51-12-5.1 and the other laws of Georgia.

5.21.6  Michelle Murphy requests such other and further relief as justice may require.


**Michelle Murphy's Second Amended Counterclaim against John Harold Murphy       A Jury Trial is Requested**

**CC-1.    Michelle Murphy brings the following Second Amended Counterclaim against John Harold Murphy.**

CC-1.1  **Incorporated Information** The factual information contained in sections 1 through 5 *et seq.* of the Answer to the First Amended Complaint is incorporated here and is to be considered in each of the causes of action in Michelle Murphy's Second Amended Counterclaim against John Harold Murphy, just as all information contained in this Counterclaim, including the attachments, is to be considered as part of Answers to the Complaint and each of the causes of action and relief requested in this Second Amended Counterclaim and in each of the causes of action and relief requested in the Second Amended Counterclaim is to be considered in each of the causes of action in the Third Party Complaint. It is only for the purpose of organization that the headings of the various sections identify the information

as associated with the causes of action against and John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, the event, explanation or relief sought.

## CC-2 Second Amended Counterclaim Cause of Action for Upward Modification of Child Support And Other Relief

CC-2.1    Michelle Murphy brings this First Cause of Action in her Second Amended Counterclaim for Upward Modification of Child Support and for other relief.

CC-2.2    John Harold Murphy (or, "John Murphy") is subject to the jurisdiction of this Court by reason of his filing the action seeking relief against Nancy Michelle Murphy (or, "Michelle Murphy").

CC-2.3    In addition to the Incorporated Information identified in CC-1 *supra*, all allegations which were contained in John Harold Murphy's First Amended Complaint and admitted by Michelle Murphy are incorporated into her Second Amended Counterclaim Cause of Action for Upward Modification of Child Support and Other Relief.".

CC-2.4    John Harold Murphy and Michelle Murphy were formerly husband and wife. They were divorced in the Superior Court of Troup County on December 20, 2006, Civil Action File Number 2004-CV-494 (or, "Troup County Divorce Decree").

CC-2.5    Troup County Divorce Decree and Settlement Agreement awarded joint legal custody of the parties' minor children,     J.M.         , born on      XX      1998, and    T.M.              , born on     XX     2001, to the parties with Michelle Murphy having primary physical custody of the parties' minor children.

CC-2.6    The Troup County Divorce Decree ordered John Harold Murphy to pay to Michelle Murphy the sum of $1,500.00 per child per month as child support for the parties' minor children. This award was incorrectly inserted in the Final Decree by Louis Jack Kirby before Judge Dennis Blackmon, (Judge 4 of 5) (R-367)  after Louis Jack Kirby announced in open Court to Judge A. Quillian Baldwin, Jr. (Judge 3 of 5) that the amount of child support that counsel for the parties had agreed to accept was a lump sum of $3000 per month that would not be prorated between the children.

CC-2.7    Subsequent to the Troup County Divorce Decree, there has been a substantial upward change in the income and financial status of John Harold Murphy so as to authorize an increase in the child support that John Harold Murphy pays to Michelle Murphy. Renee Haugerud, a/k/a Lauree Smith, with whom John Harold Murphy resides, controls the amount of income that John Harold Murphy receives and the business assets that John Harold Murphy is allowed to transfer to his personal use without paying taxes on the use of these business financial assets.

CC-2.8    Subsequent to the Troup County Divorce Decree between the parties, there has been a substantial upward change in the needs of the minor children which change authorizes an increase in child support that John Harold Murphy pays to Michelle Murphy.

CC-2.9    Both children have educational needs. During the 2011-2012 school year, both children attended a school in Atlanta, Georgia. Renee Haugerud, a/k/a Lauree Smith, her businesses and John Harold Murphy paid the cost of transportation of the children from Newnan to Atlanta to attend the school. John Harold Murphy refused to pay for the transportation cost during the last

month of the school year. It was necessary for Michelle Murphy to pay for the transportation cost that John Harold Murphy had agreed to have paid for the children. Michelle Murphy is entitled to reinbursement of this costs.

CC-2.10  It is appropriate for John Harold Murphy's financial circumstances and the best interests and needs of the children that John Harold Murphy be required to pay all costs, including transportation, for the children's education-related needs.

CC-2.11    Michelle Murphy is entitled to an upward increase in the child support Michelle Murphy receives from John Harold Murphy in conformity with the income and assets that he has; albeit, the substantial amount of his income and assets are derived from Renee Haugerud, a/k/a Lauree Smith and her businesses.

CC-2.12    Michelle Murphy is entitled to a substantial increase in child support from John Harold Murphy. Michelle Murphy requests the Court to enter an Income Deduction Order for child support for    J.M. and T.M .

CC-2.13  Michelle Murphy is entitled to and should be awarded from John Harold Murphy all costs, including transportation costs for the children to attend to their educational needs.

CC-2.14    It is necessary that Michelle Murphy employ counsel to represent her in these proceedings and John Harold Murphy should be required to pay reasonable attorneys fee to counsel, plus litigation costs incurred by Michelle Murphy in this action.

CC-2.15    Michelle Murphy requests that she be awarded a reasonable sum for counsel, litigation costs to represent her in these proceedings and punitive

damages as provided by OCGA §§ 19-6-2, 19 9-3 (g), 19-6-15 (k) (5), 13-6-11, 51-12-5.1 and the other laws of Georgia.

## CC-3  Second Amended Counterclaim Cause of Action for Breach of Contract

CC-3.1    John Harold Murphy, has broken, and seeks to break, his Settlement Agreement Contract with Nancy Michelle Murphy (or, "Michelle Murphy") by using the immense net worth and income of Renee Haugerud, a/k/a Lauree Smith, who has tortiously interfered with the Settlement Agreement Contact.

> 3.1.1.   The Settlement Agreement Contract is a part of the Final Decree entered by the Superior Court of Troup County on December 20, 2006, Civil Action File Number 2004-CV-494.

CC-3.2    John Harold Murphy   entered   into   an   oral   contract   with Michelle Murphy   to   provide   transportation   for     J.M.        and   T.M.         to and from The Howard School in Atlanta to and from her residence in Newnan, Georgia for the school year of 2011-2012.

CC-3.3    John Harold Murphy, Renee Haugerud and Michelle Murphy made the determination that the children should go to a school that could address their special needs. Michelle Murphy, with the knowledge that she had at that time, agreed that the children should go to The Howard School, but informed John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, from whom John Harold Murphy obtains his source of income and lives, that this mother of the children, Michelle Murphy, could not afford the transportation costs and tuition required for the children to attend The Howard School.

CC-3.4    Even though John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, agreed for John Harold Murphy to pay for the tuition and transportation for the children, The Howard School costs Michelle Murphy substantially more than the public schools, as she traveled to Atlanta for conferences and special events that were expensive for her to attend.

CC-3.5    Michelle    Murphy    relied    upon    the    oral    contract    of John Harold Murphy that Renee Haugerud, a/k/a Lauree Smith, finances by virtue of financing John Harold Murphy's very expensive lifestyle.

CC-3.6    Near the end of the 2010-2012 school year, the driver for the children began having a psychological meltdown, and/or began attempting to extort    favors    from    John Harold Murphy    and    Renee    Haugerud, a/k/a Lauree Smith,    in    exchange    for    his    commitment    to    assist John Harold Murphy and Renee Haugerud, a/ka Lauree Smith, in acting inappropriatly toward Michelle Murphy.

CC-3.7    Understanding that Michelle Murphy did not have money to compete with the nearly one thousand dollar evening meals that John Harold Murphy and Renee Haugerud were providing the driver and the children, the driver began engaging in explicitly sexual, crude language directed toward Michelle Murphy.

CC-3.8    Michelle Murphy informed the driver that he could not be around her or the children any longer. This caused the driver to proclaim that he was the person who was quitting.

CC-3.9    The conduct by the driver heightened just as John Harold Murphy was announcing the filing of this action against Michelle Murphy.

CC-3.10    In protection of the rights of Michelle Murphy and her children, counsel for Michelle Murphy disclosed in a motion in this litigation that John Harold Murphy was using the business assets of Renee Haugerud for his personal use without paying either income or gift tax. The motion further began disclosure of the illegal, inappropriate conduct in which Superior Court Judge Louis Jack Kirby was engaging with John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith.

CC-3.11    Once John Harold Murphy got wind that his misconduct and the illegal misconduct of Renee Haugerud, a/k/a Lauree Smith, was about to be exposed, John Harold Murphy began retaliating against Michelle Murphy and thereby the children.

CC-3.12    John Harold Murphy quit providing a driver and transportation for the children, although he had another driver and car in Atlanta, and refused to allow Michelle Murphy the use of the car or money to pay for transportation. John Harold Murphy continued to allow the former driver for the children to retain and drive the Mercedes vehicle and refused to allow the Mercedes vehicle to be used for the children's transportation to school. This was a breach of the oral contract that John Harold Murphy had with Michelle Murphy.

CC-3.13      Michelle Murphy pleaded with John Harold Murphy to provide their children transportation to and from school during the last month of school. John Harold Murphy and Michelle Murphy exchanged the following text messages. One of the Michelle Murphy to John Harold Murphy text messages explaining the Driver's misconduct follows.

> I did tecomend him. I thought he would be great, great driving record, lives in Newnan, boys knew him. I will not be able to drive them and work. Please arrange a driver. You have that great man who drives you and Renee when you are in aAtlanta around.Perhaps he can for tese last few weeks.

CC-3.13.1   Another      Michelle      Murphy      text      message      to John Harold Murphy follows.

> do you want me to try and get the car out of his care tinight. i can ask someone to go with me and I can have it taken to a dealership or someones house of your choice. I would not feel vomfortable if I were you with   Brian   having   that   car.I   am sorry...I   feel terrible  but I can not have him treat us..like that. Did you recieve the texts from him to me I forwarded you. I  can not drive them John..please work together on this. you would have NEVER tolerated his behavior like that towards Renee. I know you wouldnt have...

CC-3.13.2   John Harold Murphy e-mail to Michelle Murphy follows.

> I will take care of getting the car from Bryan . You have to get them to and from school . That is part of having primary custody . I have tried to work with you all along but it has worked against the boys and me . Here you are wanting me to pay 100 o/o for schooling and basically everything else without having the kids even at least 50 o/o . **You and your lawyer make slanderous statements about me and even Renee's business which is the source of my consulting income and ultimately the source of all of our income, for what reason?** Even though all of your accusations can be proven absolutely false , the accusations alone can cause investors to

flee . This results in the perks the boys and you have now , vanishing .  All I wanted was equal time with  J.M. and T.M.  which is fair and best for  J.M. and T.M.  . Renee has been nothing less than very nice to you and the boys and really loves the boys and cares about you and you try to destroy what she has worked 30 years to create ! Shame on you and your slanderous attorney ! I will say based on what is going on that you and the boys should get accustomed to just necessities . Why and how There will not be a driver ! It is your responsibility ! The kids are in your custody ! No driver and No car emphasis supplied

CC-3.13.3   Michelle Murphy's text message to John Harold Murphy on Monday morning, May 7, 2012 follows.

Ok. So I have located a driver. She is a mom, she is in excellent standing with the community, excellent health, perfect driving record, livrs in Newnan. She can pick up the car today, will use it only for driving the children. Of course has her own personal vehicle. Can drive the boys until the end of the school year and then you can re iew and see if she will be needed for this summer. Can you have the boys brought home today by your driver. I have a client at 3:00.

CC-3.14     John Harold Murphy refused to pay for the transportation and thereby breached the oral contract that he had with Michelle Murphy to provide transportation to and from school for the children above and beyond his obligation for child support.

CC-3.15     John Harold Murphy agreed to pay for the uninsured part of the children's medical care.

CC-3.15.1     John Harold Murphy did pay for some of the uninsured part of the children's medical care.

CC-3.15.2     Once Michelle Murphy brought a Third Party Complaint against Renee Haugerud, a/k/a Lauree Smith, John Harold Murphy, to

retaliate against Michelle Murphy, sought to have Michelle Murphy held in contempt of court for accepting the voluntary payments that John Harold Murphy agreed to make.

CC-3.15.3      John Harold Murphy is attempting to use the threat to have Michelle Murphy incarcerated in order to collect a voluntary gift that he made on behalf of the children's medical care.

CC-3.16      John Harold Murphy materially breached his contracts with Michelle Murphy and is liable to Michelle Murphy for the breach of the contract.

CC-3.17      John Harold Murphy has acted in bad faith, has been stubbornly litigious, or has caused Michelle Murphy unnecessary trouble and expense relating to the fulfillments of her contract with him to the extent that Michelle Murphy is entitled to recover the expenses of litigation, including attorney fees, as provided by OCGA 13-6-11.

CC- 3.18      John Harold Murphy is due Michelle Murphy under the provisions of OCGA §§ 19-6-2, 19 9-3 (g), 19-6-15 (k) (5), 13-6-11, 51-12-5.1 and other laws of Georgia.

CC-3.19   Michelle Murphy requests expenses of litigation, including attorney fees, as provided by OCGA 13-6-11.

CC-3.20      John Harold Murphy should have punitive damages awarded against him, as provided by OCGA §51-12-5.1, as John Harold Murphy's actions showed that he acted with the entire want of care which would raise the presumption of conscious indifference to consequences. John Harold Murphy should also have punitive damages awarded against him.

**CC-4. Second Amended Counterclaim Cause of Action for Fraudulent Conduct**

CC-4.1    John Harold Murphy acting in concert with Renee Haugerud, a/k/a Lauree Smith, has and is knowingly engaging in the fraudulent, downward manipulation of his income and assets in order to prevent the Court and Michelle Murphy from having an accurate accounting of his income and assets that are available for the distribution to Michelle Murphy for child support. This conduct has damaged and is damaging Michelle Murphy.

CC- 4.2   John Harold Murphy acting in concert with Renee Haugerud, a/k/a Lauree Smith, has knowingly made false representations and/or omissions of material facts relating to his financial net worth, assets, source of income, reporting of income for tax purposes and other purposes in order to deprive Michelle Murphy of the appropriate share of these assets, as child support.

CC-4.3    Renee Haugerud, a/k/a Lauree Smith, in concert with John Harold Murphy has made false representations and/or omissions of material facts relating to her interest in real estate in the State of Georgia in order to damage Michelle Murphy by depriving her of her appropriate share of these assets.

CC-4.4    John Harold Murphy has and is knowingly using false information in order to induce Michelle Murphy to rely upon him to pay for medical bills, provide transportation for the children to attend school and for Michelle Murphy to act in making decisions relating to establishing child support which is due to Michelle Murphy. By engaging in this type of conduct John Harold Murphy has caused Michelle Mruphy to pay expense that she would not have incurred had John Harold Murphy not made the false statements that he was providing these items voluntarily. John Harold Murphy has engaged in

this type of conduct knowing that the Court and Michelle Murphy would be justified in relying upon this conduct. John Harold Murphy intended to engage in this conduct in order to deny Michelle Murphy financial resouces necessary to have in order to obtain an equitable amount of child support. This conduct has caused Michelle Murphy damages that she is entitled to recover.

CC-4.5    John Harold Murphy, in part, engaged in this illegal and fraudulent conduct by using non-tax paid assets belonging to the business controlled by Renee Haugerud, a/k/a Lauree Smith, for his personal use that are not disclosed to the Internal Revenue Service or otherwise documented in a manner that the value of these transfers can be determined by the Court. John Harold Murphy engaged in this conduct to obtain the heighten benefit of using these assets without having an accurate record that Michelle Murphy could use to obtain a fair amount of child support.

CC-4.6    John Harold Murphy in concert with Renee Haugerud, a/k/a Lauree Smith, in part, engaged in this illegal and fraudulent conduct by using for his personal use the non-tax paid assets to provided by the businesses controlled by Renee Haugerud, a/k/a Lauree Smith.

TPC-4.7  Renee Haugerud, a/k/a Lauree Smith, in concert with and at the instance of John Harold Murphy engaged in her fraudulent conduct by assisting John Harold Murphy in his attempts to secret the use of the assets of the Haugerud businesses and her personal assets in order that Michelle Murphy cannot obtain an accurate accounting of the funds available for consideration by the Court of an upward modification of child support payments.

## CC-3.21  Request for Relief by Michelle Murphy

CC-3.21.1   Michelle Murphy requests that she be awarded damages for the breach of contract by John Harold Murphy and that the relief requested in John Harold Murphy's First Amended Complaint be denied.

CC-3.21.2   Michelle Murphy requests that the Court require that the child support that John Harold Murphy is under order to pay to Michelle Murphy for the Children be substantially increased and the Court enter an Income Deduction Order for the payment of the child support.

CC-3.22.3   Michelle Murphy requests that John Harold Murphy be required to pay all costs, including transportation for the children to attend school.

CC-3.22.4   Michelle Murphy requests that John Harold Murphy be required to pay all costs for the children to receive specialized tutoring in the Newnan, Georgia area to assist them with their school work due to their individual, special needs.

CC-3.23.5   Michelle Murphy requests that she be awarded a reasonable sum for counsel to represent her in these proceedings, as provided by OCGA §§ 19-6-2, 19 9-3 (g), 19-6-15 (k) (5), 13-6-11, 51-12-5.1 and the other laws of Georgia.

CC-3.24.6   Michelle Murphy requests that she be awarded punitive damanges and be awarded damages

CC-3.24.7   Michelle Murphy requests such other and further relief as justice may require.

## Nancy Michelle Murphy's Second Amended Third Party Complaint against Renee Haugerud, a/k/a Lauree Smith

### A Jury Trial of Twelve Persons in Requested

### TPC-1    Continuance of the Other Supporting Factual Information

TPC-1.1    **Incorporated Information** The factual information and prayers for relief contained in sections 1 through 5 *et seq.* of Michelle Murphy's Second Amended Answer to John Harold Murphy's First Amended Complaint, including the referenced attachments, are incorporated here and are to be considered in each of the causes of action in this Second Amended Third Party Complaint, just as all information contained in the Second Amended Counterclaim, including the attachments, is to be considered as part of each of the causes of action and relief requested in this Second Amended Third Party Complaint and in each of the causes of action and relief requested in the Second Amended Third Party Complaint. It is only for the purpose of organization that the headings of the various sections identify the information as associated with John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith, the event, explanation or relief sought.

### TPC-2.   The   Third   Party   Defendant,   Renee   Haugerud,   a/k/a Lauree Smith

TPC-2.1    Renee Haugerud, a/k/a Lauree Smith, who is made a third party defendant in her individual capacity, is the Chief Investment Officer of Galtere, Ltd, a registered investment advisor that is headquartered in New York City. Galtera N.A., Inc. is the sub-advisor to Galtere, Ltd. (Affidavit of Renee Haugerud, a/k/a Lauree Smith) (**R-495**)

TPC-2.1.1   The business entities of Renee Haugerud, a/k/a Lauree Smith, ( or, "Haugerud Entities") are not presently included as third party

defendants, as it is expected that Renee Haugerud, a/k/a Lauree Smith, has management control of the assets of these entities, as she is the individual who has converted the assets to the use of John Harold Murphy.

TPC-2.1.2   If it becomes necessary to include the Haugerud Entities as third party defendants, permission from the Court is required. While the primary case in on appeal there is presently not a qualified Judge to grant permission to include these entities in the lawsuit.

TPC-2.1.3   If permission to add the entities becomes necessary and the permission is not granted, a separate lawsuit will be required to seek relief from the Haugerud Entities.

TPC-2.2   Renee Haugerud, a/k/a Lauree Smith, resides in a house with John Harold Murphy in Lookout Mountain, Tennessee, as that State provides its residents exemption from State income tax; she resides in a house in New York for business purposes; she has a house and ranch in Minnesota for business related and social purposes and a place for living in the Atlanta, Georgia area for other purposes.

TPC-2.2.1   Renee Haugerud, contrary to her affidavit, **Attachment TP-2 (R-495**) apparently provided to evade jurisdiction of the Court, jointly holds title to real estate in Georgia with John H. Murphy by virtue of a Security Deed that vests title in them until the debt of Ebonie S. Wilson is paid and the Security Deed is satisfied in the real estate record of the Clerk of the Superior Court of Troup County, Georgia. **Attachment TP-3**

**SECURITY DEED**

In consideration, the receipt whereof is hereby acknowledged, **EBONIE S. WILSON**, unmarried, hereinafter designated first party, whether one or more, has this day bargained and sold and does hereby transfer and convey unto **JOHN H. MURPHY and RENEE HAUGERUD**, C/O Rothstein -Kass , Attn: Naomi Feld/Amy Schwartz, 1350 Avenue of the Americas, 15th Floor, New York, NY 10019, hereinafter designated second party, their heirs and assigns, the following described tract of land, to-wit:

All that tract or parcel of land lying and being in Land Lot 116 for the 6th District, Troup County, Georgia; and being that certain 0.321 acre, as more

TPC-2.2.2   The affidavit (**R-495**) of Renee Haugerud, a/k/a Lauree Smith, was sponsored to this Court by Peter A. Durham, a Glover & Davis lawyer who had counseled Renee Haugerud, a/k/a Lauree Smith about evading both service of process and evading jurisdiction of the Court.

TPC-2.2.3   Before sponsoring the affidavit (**R-495**) of Renee Haugerud, a/k/a Lauree Smith, to the Court, Peter A. Durham, a Glover & Davis lawyer, with real estate "expertise" had access to both electronic records and the "expertise" of other Glover & Davis lawyers who also do real estate title work and transactions.

TPC-2.2.4   Peter A. Durham, a Glover & Davis lawyer, who sponsored the affidavit (**R-495**) of Renee Haugerud, a/k/a Lauree Smith had easy access to the electronic real estate records before filing the affidavit of Renee Haugerud, a/k/a Lauree Smith.

TPC-2.2.4.1   There are lawyers at the Glover & Davis law firm who have had an ownership interest in Georgia Lawyers Insurance Company who had many years of experience in dealing with real estate in Georgia. Peter A. Durham could have obtained this available assistance, if he had chosen to detect if Renee Haugerud, a/k/a Lauree Smith, has a financial interest in real estate in Georgia.

TPC-2.2.4.2    The Glover & Davis lawyers in this case have accepted another affidavit for filing from a person who made a sworn false statement, as Renee Haugerud, a/k/a Lauree Smith made in her affidavit (**R-495**).

TPC-2.2.4.3    The point is that the Glover & Davis lawyers were on notice that Renee Haugerud, a/k/a Lauree Smith, and John Harold Murphy engaged in making false statements under oath and they possessed the knowledge and resources to detect that the affidavit (**R-495**) of Renee Haugerud, a/k/a Lauree Smith, was not truthful and being provided for illegal purposes.

TPC-2.2.4.4    The Glover & Davis lawyers should learn that John Harold Murphy will participate in placing anyone's head on a platter, albeit his lawyers' heads and apparently now the head of Peter A. Durham, Renee Haugerud, a/k/a Lauree Smith and once again what remains of the reputation of the Glover & Davis law firm after the case of *Mayor & Aldermen of Savannah v. Batson-Cook Co.*, 291 Ga. 114 (2012).

TPC-2.2.4.5    The Glover & Davis lawyers should have just asked Judge Louis Jack Kirby just how it felt after having his head placed on a platter over a show-of-status wedding ceremony.

TPC-2.2.5    The following are some examples of the false statements made under oath by Renee Haugerud, a/k/a Lauree Smith and/or John Harold Murphy that have been exposed during this litigation, even before either of these parties have been deposed.

TPC-2.2.5.1    The Court is first reminded of the false statements that Renee Haugerud, a/k/a Lauree Smith and John Harold Murphy made in obtaining their marriage license.

TPC-2.2.5.1.1    First, on the left, below, is the Application, followed on the right by the Marriage License signed by Coweta Judicial Circuit Judge Jack Kirby. **Attachment 7 pp 64-65,** to the Addendum to the First Amended Motion to Disqualify Judge Baldwin. (R-223, 224)



TPC-2.2.5.1.2    These two false statements made under oath place Judge Louis Jack Kirby's head on a platter, as the ceremony that he performed for their marriage was a violation the law of Georgia.



TPC-2.2.5.1.3     The law of Georgia provides as follows about the illegal conduct of a marriage with an improper marriage license.

> OCGA § 19-3-48. Penalty for officiating at illegal marriage ceremony.
> If the Governor or any former Governor of this state, any judge, city recorder, magistrate, minister, or other person authorized to perform the marriage ceremony joins together in matrimony any man and woman without a license or the publication of banns or if the person performing the marriage ceremony knows of any disability of either of the parties which would render a contract of marriage improper and illegal, that person shall be guilty of a misdemeanor.

TPC-2.2.5.2     The Court should also be reminded of another false statement that Renee Haugerud, a/k/a Lauree Smith made.

TPC-2.2.5.2.1     The process server provides, in part, the following sworn information. (**Attachment TP-1** to the Response of Nancy Michelle Murphy to Renee Haugerud's Motion to Dismiss Third Party Complaint for Insufficient Service of Process, Lack of Personal Jurisdiction and Improper Venue)

> On Sunday, July 15, 2012, I personally served the Third Party Defendant, Renee Haugerud, with a copy of the above-styled *Summons and Answer with Affirmative Defenses, Counterclaim and Third Party Complaint to the Complaint for Modification of Custody, or in the Alternative, Parenting Time of John Harold Murphy*, by hand delivery to her in the lobby of the Ritz Carlton Hotel located at 3434 Peachtree Road, N.E., Atlanta, Georgia 30326.

I approached Renee Haugerud at the counter in the lobby of the Ritz Carlton as she was checking out of the hotel. I said, "Renee?" and she turned around. I told her that my name was Sharon and that I had a delivery for her. She was very pleasant, and accepted the envelope containing the above-described document, which I handed her. She began to open the envelope.

I was at the door on the outside of the hotel when Renee Haugerud came running after me. She told me that I was mistaken, that her name was Lauree Smith, and that the envelope was not for her. I told her that I had a picture of her, that she was the correct person, and that she had been served. I did not take the envelope back from her, and she dropped it on the floor.

I recognized Renee Haugerud from photographs which I had been provided, and know that the person whom I served was, in fact, Renee Haugerud.

TPC-2.2.5.2.2   The conduct of Renee Haugerud, a/k/a Lauree Smith, in making a false statement about her identity to the court appointed process server is typical of the gulling by Renee Haugerud, a/k/a Lauree Smith and John Harold Murphy in an attempt to make the litigation expensive to Michelle Murphy and to engage in the conduct of interfering with the custody of the minor children, the contract that John Harold Murphy had with Michelle Murphy relating to the minor children and to obstruct justice by attempting to secret from the Court facts related to the counterclaim of Michelle Murphy to obtain additional child support by attempting to secret the assets of John Harold Murphy.

TPC-2.2.5.2.3   Gulling can rise to the level of criminal conduct, as OCGA § 16-10-20 establishes as follows and as both criminal predicate act under Georgia Racketeer Influenced and Corrupt

Organizations Act, OCGA § 16-14-1 (or, "RICO") and a civil predicate RICO violation that is a Georgia tort.

> A person who knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact; makes a false, fictitious, or fraudulent statement or representation; or makes or uses any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of state government or of the government of any county, city, or other political subdivision of this state shall, upon conviction thereof, be punished by a fine of not more than $1,000.00 or by imprisonment for not less than one nor more than five years, or both.

See also, *Haley v. State*, 289 Ga. 515, 527-528 (2011) that, in part, holds as follows.

> .   .   .   a defendant need not make his false statement directly to the federal agency with jurisdiction. See, e.g., United States v. Krause, 507 F2d 113, 117 (5th Cir. 1975). Our Court of Appeals has properly construed OCGA § 16-10-20 in this way as well. See Tesler, 295 Ga. App. at 576. Indeed, the statutory language would not bear a construction so tightly linking the false statement and the government agency, since the legislature used the phrase "in any matter within the jurisdiction of" a government agency rather than simply "to" a government agency. Compare e.g., OCGA § 16-10-26("A person who willfully and knowingly gives or causes a false report of a crime to be given to any law enforcement officer or agency of this state is guilty of a misdemeanor."). On the other hand, and while there was less consistency on

this point, at the time OCGA § 16-10-20 was enacted and substantively amended, several leading federal cases interpreted § 1001 to require that the false statement "inevitably" deceive a federal agency. See Krause, 507 F2d at 117 (citing United States v. Candella, 487 F2d 1223 (1973)). The Second Circuit in Candella had explained that "[c]ase law makes it clear . . . that a violation of § 1001 does not require that the false statement must actually have been submitted to a department or agency of the United States, but rather that it was contemplated that the statement was to be utilized in a matter which was within the jurisdiction of such department or agency." Id. at 1227 (emphasis added) (upholding a conviction under § 1001 where the defendant provided false billing affidavits to the City of New York, rather than directly to the federal Department of Housing and Urban Development, because the affidavit stated that the defendant knew the City would rely on it to seek reimbursement from HUD and would make the affidavit available to HUD).

Similarly, the Eighth Circuit had held that § 1001 applies not only to a false statement or writing presented to a federal agency, but also to "any knowing making or using of such a statement or document in intended relationship to a matter that is within the jurisdiction of the department or agency." Ebeling v. United States, 248 F2d 429, 434 (1957) (emphasis added). In more explicit terms, we are of the opinion that HN16it constitutes a violation of § 1001, for anyone willfully to make or use a false writing or document, knowing that it contains a false, fictitious or fraudulent statement or entry, and intending that it shall bear a relation or purpose as to some matter which is within the jurisdiction of a department or agency of the United

States. . . .Id. (emphasis added). See also United States v. Hooper, 596 F2d 219, 223 (7th Cir. 1979) (upholding a § 1001 jury instruction that relied on Ebeling to charge that the false statements or documents must be "used in some intended relationship to a matter within the jurisdiction of the department"); Lowe v. United States, 141 F2d 1005, 1005 (5th Cir. 1944) (reversing the § 1001 conviction of a shipyard employee who made false statements to his private employer, who would be reimbursed by the United States Maritime Commission, where the employee was apparently unaware of that arrangement and, "[i]nsofar as the employee was concerned, every aspect of his employment was exactly the same as it would have been had there been no contract with any government agency of any kind"). We think these decisions construing § 1001 are a good guide to how the General Assembly meant the statute it modeled on that law to be understood.

We recognize that in 1980 the former Fifth Circuit took a different view of § 1001. See United States v. Baker, 626 F2d 512, 515-516 (1980). After noting that "[t]he statutory language is simply unclear" as to whether the "knowingly and willfully" requirement modifies the jurisdictional element, the court looked to the "policy and purposes of the law" and concluded that "it is irrelevant whether defendant knew that his intentionally false statements might eventually influence a federal agency." Id. at 515-516 & n. 7. And four years later, the United States Supreme Court, in a 5-4 decision, held that "proof of actual knowledge of federal agency jurisdiction is not required under§ 1001." See Yermian, 468 U.S. at 75 (relying on the plain language of that statute — with the jurisdiction clause

placed at the introduction due to the 1948 [**846] revision, see footnote 3 above — and its legislative history).

But these decisions do not change our conclusion, for several reasons. First, they came after the enactment of Ga. Code Ann. § 26-2408, the predecessor to OCGA § 16-10-20 in 1976 and its last substantive amendment in 1979 and therefore could not be judicial interpretations the General Assembly considered in drafting the Georgia statute. Second, the subsequent opinions relied heavily on the legislative history and policy of § 1001 to construe that statute. See Yermian, 468 U.S. at 70-74. We have been offered no legislative history of § 16-10-20, and while we often presume that the General Assembly was aware of how courts had previously interpreted the language it included in a statute, we have not presumed that the Georgia legislature is aware of, much less relies on, the legislative history or the "purpose" of other sovereigns' statutes that it uses as a model.

Third, the majority in Yermian emphasized that it was deciding only that a defendant was not required to have "actual knowledge" that his false statements came within an agency's jurisdiction, expressly reserving the question whether some lesser degree of mens rea was required. See Yermian, 468 U.S. at 68 n.5 (noting that "[t]he Government never objected to the District Court's instruction requiring proof that respondent reasonably should have known that his false statements were made within the jurisdiction of a federal agency," so that "in this case the Government was required to prove that federal agency jurisdiction was reasonably foreseeable" (emphasis in original)), 75 n.14 (stating that the fact Yermian's jury had to find that "federal

agency jurisdiction was reasonably foreseeable by the defendant" helped to "preclude[ ] the possibility that criminal penalties were imposed on the basis of innocent conduct"). The dissent also emphasized the point: Seemingly aware of the broad range of conduct that § 1001 could sweep within its scope under today's interpretation, the Court apparently does not hold that the words "in any matter within the jurisdiction of any department or agency of the United States" are jurisdictional words only and that no state of mind is required with respect to federal agency involvement. Instead, the Court suggests that some lesser state of mind may well be required in § 1001 prosecutions in order to prevent the statute from becoming a "trap for the unwary."Yermian, 468 U.S. at 83 (Rehnquist, J., dissenting) (citation omitted; emphasis in original). See also id. at 82 (explaining that it seems "highly unlikely" that Congress "intended to criminalize the making of even the most casual false statements so long as they turned out, unbeknownst to their maker, to be material to some federal agency function. [This] interpretation would substantially extend the scope of the statute even to reach, for example, false statements privately made to a neighbor if the neighbor then uses those statements in connection with his work for a federal agency.").

Finally, while pre-1979 judicial interpretations of 18 USC § 1001 suggest how we should read the parallel language the General Assembly put in OCGA § 16-10-20, federal court interpretations of a federal statute do not, in the end, bind this Court's interpretation of a Georgia statute. At a minimum, the decisions in cases like Candella, Ebeling, Hooper, and Lowe, as well as the view of four Justices of the United States Supreme Court in Yermian, show that it is

at least reasonable to interpret § 16-10-20 to require the defendant to have some knowledge and intent with respect to the potential that a state or local government agency will respond to his false statement. And when the alternative construction would lead to substantial constitutional concerns, that is enough. See Marcus, 249 Ga. at 345. To the extent that these tools of statutory construction leave doubt about the meaning of the statute, moreover, the rule of lenity would require us to interpret it in favor of the defendant. See Harris v. State, 286 Ga. 245, 253 (686 SE2d 777) (2009); Yermian, 468 U.S. at 76, 83 (Rehnquist, J., dissenting).

Accordingly, we hold that OCGA § 16-10-20 requires proof that the defendant knowingly and willfully made a false statement and that he knowingly and willfully did so in a matter within the jurisdiction of a state or local department or agency. We reiterate that this does not require proof that the defendant made the false statement directly to the government agency, although in such cases it would normally be undisputed that the defendant knew and intended that the statement came within the jurisdiction of the agency. However, the statute does require the defendant to have made the false statement in some intended relationship to a matter within the state or local agency's jurisdiction, that is, to have contemplated that it would come to the attention of an agency with the authority to act on it. Our holding is consistent with the only Court of Appeals' decision in this area, which properly rejected the defendant's "assert[ion] that [§ 16-10-20] is designed to punish only those false statements made directly to a department or agency of state or local government." Tesler, 295 Ga. App. at 575. The Tesler majority cited and quoted

the passages from Candella and Hooper that undergird our holding (although it also cited some post-1979 federal cases). See 295 Ga. App. at 576. Moreover, Judge Blackburn's special concurrence did not suggest that no knowledge of government jurisdiction is required; to the contrary, he believed that the false statement at issue needed to be made directly to a state agency to avoid the sort of overcriminalization concerns that our construction of the statute also seeks to preclude. See id. at 578-579.

(c) When OCGA § 16-10-20 is construed as we conclude it should be, Haley's constitutional claims dissipate. It is debatable whether a false statement, standing alone, lacks any First Amendment protection, as discussed at length by the majority and dissenting opinions in United States v. Alvarez, 617 F3d 1198 (9th Cir. 2010). However, a knowingly and willfully false statement that is made knowingly and willfully in a matter within a government agency's jurisdiction is a lie that threatens to deceive and thereby harm the government, if only because the government may need to expend time and resources to determine the truth. See id. at 1212-1213. Such harm would not be self-inflicted by the government, as might be said if an agency reached out to act on a false statement someone made without any expectation that it would reach the government. Instead, the State may lawfully punish such a course of potentially deceptive and injurious conduct. See Cox v. Louisiana, 379 U.S. 536, 555 (85 SCt 453, 13 LE2d 471) (1965) (HN22"'[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" (citation omitted)).

> Thus, Haley acknowledges that § 16-10-20 would be constitutional if the false statement is "intended for a government agency or department and/or . . . made with the intent of causing some harm." We believe our construction of the statute ensures that result. Likewise, as properly construed, § 16-10-20 may only be applied to conduct that persons of common intelligence would know was wrongful because it could result in harm to the government

*Haley v. State*, 289 Ga. 515, 524-528 (Ga. 2011)

TPC-2.2.5.3    Renee Haugerud, a/k/a Lauree Smith, engages in her conduct of making false statements in concert with John Harold Murphy to assist him in his illegal endeavors, in which she has become an active participant. These endeavors include, but are not limited to, the use of the assets of the Haugerud Businesses for personal use without paying tax on the value of the asset used for personal use.

TPC-2.2.5.3.1  Renee Haugerud, a/k/a Lauree Smith, engages in concert with John Harold Murphy in order to deprive Michelle Murphy of the child support that is due for                                                  .

TPC-2.2.5.3.2      Independent of John Harold Murphy, Renee Haugerud, a/k/a Lauree Smith, intentionally engages in the tortious interference with valid contracts between Michelle Murphy and John Harold Murphy without privilege or justification to the financial detriment of Michelle Murphy.

TPC-2.26    Renee Haugerud,        a/k/a        Lauree Smith,        and John Harold Murphy use an Eight million dollar plus jet airplane to travel beween their various living places and other temporarily leased places in

Colorado with money originating from the businesses of Renee Haugerud,
a/k/a Lauree Smith.

**TPC-3    The Use of the Business Assets Controlled by Renee Haugerud,
a/k/a Lauree Smith, is Relevant to the Third Party Complaint as
Renee Haugerud, a/k/a Lauree Smith, and John Harold Murphy
Co-mingle the Assets of the Businesses of Renee Haugerud, a/k/a Lauree
Smith, with their Personal Use of the Assets**

TPC-3.1    One of business assets that John Harold Murphy and
Renee  Haugerud, a/k/a Lauree Smith, use for their non-tax paid personal trips
is a Hawker jet piloted by private pilots employed by Renee  Haugerud's
businesses. The plane is similar to the Hawker jet in the following picture.
One advertised advantage of this Hawker jet is that it only uses 277 gallons of
jet fuel per hour; which is just one of the costs that John Harold Murphy is
evading paying on his personal trips.



TPC-3.1.1  The nontax paid, financial benefits, available upon
John Harold Murphy's demand, that he receives from the businesses of
his spouse, Renee  Haugerud, a/k/a Lauree Smith, is relevant in
determining his disposable income that should be used to increase the
money that he should provide to Michelle Murphy for child support, as
well as determining the nexus of Renee Haugerud, a/k/a Lauree Smith,

to the State of Georgia for just one of the purposes of determining the Court's jurisdiction.

TPC-3.1.2   The Hawker 850XP jet airplane made at least the indicated trips from February through September 8, 2012. (see next pages)

TPC-3.1.3   The names of the pilots and other information related to the flights of this jet airplane from 07/31/2008 are not included here. This is the same jet airplane that Judge Louis Jack Kirby was describing that is used by Renee Haugerud, a/k/a Lauree Smith and John Harold Murphy to bring the children from Atlanta, KFTY to Chattanooga, KCHA.

TPC-3.1.4   The letter "K" that precedes the various airport codes, such as "KCHA," can be disregarded, it will identify the commercial code abbreviation that most people recognize, e.g., "KCHA" is "CHA," Chattanooga, Tennessee and KCCO is Newnan Coweta County.

TPC-3.1.4     Judge Jack Kirby testified, in part, as follows about the use of the airplane.

> Page 28  18:
> A.  Yeah. I understand that he uses it to get
> 19:  his children for visitation. That's what I've been
> 20:  told.

TPC-3.1.5      Some of the recent trips by this airplane are listed below. Over twenty (20) trips to **Georgia** by the airplane are documented from February to September 8 during 2012, with an approximate proportionally equal amount in 2011.

| Date | Aircraft | Origin | Destination | Departed | Arrival | Duration |
|------|----------|--------|-------------|----------|---------|----------|
| 08-Sep-2012 | H25B/Q | Newnan Coweta County (KCCO) | Lovell Field (KCHA) | 12:03PM EDT | 12:36PM EDT | 0:32 |
| 08-Sep-2012 | H25B/Q | Lovell Field (KCHA) | Newnan Coweta County (KCCO) | 09:09AM EDT | 09:30AM EDT | 0:21 |
| 07-Sep-2012 | H25B/Q | Teterboro (KTEB) | Lovell Field (KCHA) | 03:42PM EDT | 05:25PM EDT | 1:43 |
| 05-Sep-2012 | H25B/Q | Lovell Field (KCHA) | Teterboro (KTEB) | 08:34PM EDT | 10:14PM EDT | 1:40 |
| 04-Sep-2012 | H25B/Q | Lovell Field (KCHA) | Fulton County (KFTY) | 04:56PM EDT | 05:22PM EDT | 0:26 |
| 01-Sep-2012 | H25B/Q | Fulton County (KFTY) | Lovell Field (KCHA) | 03:32PM EDT | 03:56PM EDT | 0:23 |
| 29-Aug-2012 | H25B/Q | Lovell Field (KCHA) | Fulton County (KFTY) | 03:28PM EDT | 03:53PM EDT | 0:25 |
| 28-Aug-2012 | H25B/Q | Teterboro (KTEB) | Lovell Field (KCHA) | 07:26PM EDT | 09:13PM EDT | 1:47 |
| 28-Aug-2012 | H25B/Q | Lovell Field (KCHA) | Teterboro (KTEB) | 03:15PM EDT | 04:57PM EDT | 1:42 |
| 23-Aug-2012 | H25B/Q | Teterboro (KTEB) | Lovell Field (KCHA) | 04:44PM EDT | 06:34PM EDT | 1:50 |
| 19-Aug-2012 | H25B/Q | Fulton County (KFTY) | Teterboro (KTEB) | 06:00PM EDT | 07:40PM EDT | 1:40 |
| 19-Aug-2012 | H25B/Q | Lovell Field (KCHA) | Fulton County (KFTY) | 05:22PM EDT | 05:46PM EDT | 0:24 |
| 17-Aug-2012 | H25B/Q | Fulton County (KFTY) | Lovell Field (KCHA) | 06:06PM EDT | 06:28PM EDT | 0:22 |
| 17-Aug-2012 | H25B/Q | Rochester Intl (KRST) | Fulton County (KFTY) | 02:06PM CDT | 04:50PM EDT | 1:44 |
| 17-Aug-2012 | H25B/Q | Lovell Field (KCHA) | Rochester Intl (KRST) | 11:24AM EDT | 12:06PM CDT | 1:42 |
| 12-Aug-2012 | H25B/Q | Rochester Intl (KRST) | Lovell Field (KCHA) | 05:01PM CDT | 07:36PM EDT | 1:35 |
| 10-Aug-2012 | H25B/Q | Fulton County (KFTY) | Rochester Intl (KRST) | 11:25AM EDT | 12:20PM CDT | 1:55 |
| 09-Aug-2012 | H25B/Q | Rochester Intl (KRST) | Fulton County (KFTY) | 09:35PM CDT | 12:25AM EDT (+1) | 1:50 |
| 08-Aug-2012 | H25B/Q | Teterboro (KTEB) | Rochester Intl (KRST) | 08:04PM EDT | 09:23PM CDT | 2:19 |
| 06-Aug-2012 | H25B/Q | Lovell Field (KCHA) | Teterboro (KTEB) | 08:20PM EDT | 10:01PM EDT | 1:41 |
| 27-Jul-2012 | H25B/Q | Hartsfield-Jackson Intl (KATL) | Lovell Field (KCHA) | 07:07PM EDT | 07:34PM EDT | 0:27 |
| 27-Jul-2012 | H25B/Q | Lovell Field (KCHA) | Hartsfield-Jackson Intl (KATL) | 04:49PM EDT | 05:18PM EDT | 0:29 |
| 20-Jul-2012 | H25B/Q | Fulton County (KFTY) | Lovell Field (KCHA) | 04:21PM EDT | 05:14PM EDT | 0:53 |
| 29-Jun-2012 | H25B/Q | Lovell Field (KCHA) | Fulton County (KFTY) | 08:15AM EDT | 08:39AM EDT | 0:24 |
| 28-Jun-2012 | H25B/Q | Fulton County (KFTY) | Lovell Field (KCHA) | 03:12PM EDT | 03:34PM EDT | 0:22 |
| 28-Jun-2012 | H25B/Q | Lovell Field (KCHA) | Fulton County (KFTY) | 12:09PM EDT | 12:30PM EDT | 0:21 |
| 24-Jun-2012 | H25B/Q | Rochester Intl (KRST) | Lovell Field (KCHA) | 07:31PM CDT | 09:59PM EDT | 1:28 |
| 21-Jun-2012 | H25B/Q | Newnan Coweta County (KCCO) | Rochester Intl (KRST) | 06:12PM EDT | 07:12PM CDT | 2:00 |
| 21-Jun-2012 | H25B/Q | Lovell Field (KCHA) | Newnan Coweta County (KCCO) | 02:29PM EDT | 02:52PM EDT | 0:23 |
| 13-Jun-2012 | H25B/Q | Teterboro (KTEB) | Lovell Field (KCHA) | 05:50PM EDT | 07:41PM EDT | 1:51 |
| 13-Jun-2012 | H25B/Q | Lovell Field (KCHA) | Teterboro (KTEB) | 12:12PM EDT | 01:52PM EDT | 1:40 |
| 09-Jun-2012 | H25B/Q | Rochester Intl (KRST) | Lovell Field (KCHA) | 03:55PM CDT | 06:30PM EDT | 1:35 |
| 06-Jun-2012 | H25B/Q | Lovell Field (KCHA) | Rochester Intl (KRST) | 10:05AM EDT | 10:52AM CDT | 1:47 |
| 04-Jun-2012 | H25B/Q | Fulton County (KFTY) | Lovell Field (KCHA) | 01:29PM EDT | 01:52PM EDT | 0:23 |
| 04-Jun-2012 | H25B/Q | Lovell Field (KCHA) | Fulton County (KFTY) | 08:41AM EDT | 09:03AM EDT | 0:22 |
| 02-Jun-2012 | H25B/Q | Teterboro (KTEB) | Lovell Field (KCHA) | 05:47PM EDT | 07:39PM EDT | 1:52 |

| Date | Aircraft | Origin | Destination | Departed | Arrival | Duration |
|---|---|---|---|---|---|---|
| 30-May-2012 | H25B/Q | Lovell Field (KCHA) | Teterboro (KTEB) | 02:51PM EDT | 04:31PM EDT | 1:40 |
| 24-May-2012 | H25B/Q | Fulton County (KFTY) | Lovell Field (KCHA) | 10:23PM EDT | 10:44PM EDT | 0:21 |
| 22-May-2012 | H25B/Q | Fulton County (KFTY) | Lovell Field (KCHA) | 01:43PM EDT | 02:06PM EDT | 0:23 |
| 22-May-2012 | H25B/Q | Lovell Field (KCHA) | Fulton County (KFTY) | 10:54AM EDT | 11:17AM EDT | 0:23 |
| 21-May-2012 | H25B/Q | Rochester Intl (KRST) | Fulton County (KFTY) | 05:10PM CDT | 07:34PM EDT | 1:24 |
| 19-May-2012 | H25B/Q | Teterboro (KTEB) | Rochester Intl (KRST) | 04:47PM EDT | 05:50PM CDT | 2:02 |
| 19-May-2012 | H25B/Q | Fulton County (KFTY) | Teterboro (KTEB) | 02:21PM EDT | 04:07PM EDT | 1:46 |
| 19-May-2012 | H25B/Q | Lovell Field (KCHA) | Fulton County (KFTY) | 01:39PM EDT | 02:01PM EDT | 0:22 |
| 14-May-2012 | H25B/Q | Westchester County (KHPN) | Lovell Field (KCHA) | 03:54PM EDT | 05:44PM EDT | 1:50 |
| 14-May-2012 | H25B/Q | Lovell Field (KCHA) | Westchester County (KHPN) | 01:23PM EDT | 03:10PM EDT | 1:47 |
| 14-May-2012 | H25B/Q | Lovell Field (KCHA) | Teterboro (KTEB) | 01:23PM EDT | | Diverted |
| 13-May-2012 | H25B/Q | Fulton County (KFTY) | Lovell Field (KCHA) | 09:27AM EDT | 09:55AM EDT | 0:28 |
| 13-May-2012 | H25B/Q | Lovell Field (KCHA) | Fulton County (KFTY) | 08:40AM EDT | 09:08AM EDT | 0:28 |
| 11-May-2012 | H25B/Q | Hartsfield-Jackson Intl (KATL) | Lovell Field (KCHA) | 06:42PM EDT | 07:08PM EDT | 0:26 |

[List of flights continue on next page]

| 02-Apr-2012 | H25B/Q | Lovell Field (KCHA) | Teterboro (KTEB) | 07:04PM EDT | 08:56PM EDT | 1:52 |
|---|---|---|---|---|---|---|
| 30-Mar-2012 | H25B/Q | Dekalb-Peachtree (KPDK) | Lovell Field (KCHA) | 09:00PM EDT | 09:23PM EDT | 0:22 |
| 30-Mar-2012 | H25B/Q | Lovell Field (KCHA) | Dekalb-Peachtree (KPDK) | 04:57PM EDT | 05:26PM EDT | 0:29 |
| 18-Mar-2012 | H25B/Q | Fulton County (KFTY) | Lovell Field (KCHA) | 07:10PM EDT | 07:31PM EDT | 0:21 |
| 18-Mar-2012 | H25B/Q | Centennial (KAPA) | Fulton County (KFTY) | 02:26PM MDT | 06:56PM EDT | 2:30 |
| 16-Mar-2012 | H25B/Q | Dekalb-Peachtree (KPDK) | Centennial (KAPA) | 04:02PM EDT | 04:53PM MDT | 2:51 |
| 16-Mar-2012 | H25B/Q | Teterboro (KTEB) | Dekalb-Peachtree (KPDK) | 01:34PM EDT | 03:24PM EDT | 1:50 |
| 13-Mar-2012 | H25B/Q | Centennial (KAPA) | Teterboro (KTEB) | 05:21PM MDT | 10:42PM EDT | 3:21 |
| 13-Mar-2012 | H25B/Q | Lovell Field (KCHA) | Centennial (KAPA) | 02:11PM EDT | 02:45PM MDT | 2:34 |
| 04-Mar-2012 | H25B/Q | Centennial (KAPA) | Lovell Field (KCHA) | 09:05PM MST | 01:13AM EST (+1) | 2:08 |
| 04-Mar-2012 | H25B/Q | Rochester Intl (KRST) | Centennial (KAPA) | 07:57PM CST | 08:32PM MST | 1:35 |
| 04-Mar-2012 | H25B/Q | Fulton County (KFTY) | Rochester Intl (KRST) | 06:25PM EST | 07:33PM CST | 2:08 |
| 04-Mar-2012 | H25B/Q | Lovell Field (KCHA) | Fulton County (KFTY) | 05:38PM EST | 06:00PM EST | 0:22 |
| 02-Mar-2012 | H25B/Q | Dekalb-Peachtree (KPDK) | Lovell Field (KCHA) | 03:46PM EST | 04:09PM EST | 0:23 |
| 02-Mar-2012 | H25B/Q | Dekalb-Peachtree (KPDK) | Lovell Field (KCHA) | 03:46PM EST | 04:09PM EST | 0:23 |
| 02-Mar-2012 | H25B/Q | Rochester Intl (KRST) | Dekalb-Peachtree (KPDK) | 12:41PM CST | 03:33PM EST | 1:52 |
| 28-Feb-2012 | H25B/Q | Republic (KFRG) | Rochester Intl (KRST) | 06:05PM EST | 07:48PM CST | 2:43 |
| 25-Feb-2012 | H25B/Q | Lovell Field (KCHA) | Republic (KFRG) | 04:44PM EST | 06:17PM EST | 1:33 |
| 22-Feb-2012 | H25B/Q | Luis Munoz Marin Intl (TJSJ / SJU) | Lovell Field (KCHA) | 02:52PM AST | 05:50PM EST | 3:58 |
| 21-Feb-2012 | H25B/Q | Hollywood Int'l (KFLL) | Luis Munoz Marin Intl (TJSJ / SJU) | 05:20PM EST | 08:29PM AST | 2:09 |
| 19-Feb-2012 | H25B/Q | Lovell Field (KCHA) | Hollywood Int'l (KFLL) | 11:06AM EST | 12:39PM EST | 1:33 |
| 18-Feb-2012 | H25B/Q | Teterboro (KTEB) | Lovell Field (KCHA) | 05:58PM EST | 08:07PM EST | 2:09 |
| 07-Feb-2012 | H25B/Q | Lovell Field (KCHA) | Teterboro (KTEB) | 08:25PM EST | 10:02PM EST | 1:37 |
| 05-Feb-2012 | H25B/Q | Dekalb-Peachtree (KPDK) | Lovell Field (KCHA) | 11:09PM EST | 11:31PM EST | 0:22 |
| 05-Feb-2012 | H25B/Q | Rochester Intl (KRST) | Dekalb-Peachtree (KPDK) | 07:55PM CST | 10:45PM EST | 1:50 |
| 02-Feb-2012 | H25B/Q | Dekalb-Peachtree (KPDK) | Rochester Intl (KRST) | 08:37PM EST | 09:32PM CST | 1:55 |
| 02-Feb-2012 | H25B/Q | Lovell Field (KCHA) | Dekalb-Peachtree (KPDK) | 07:50PM EST | 08:15PM EST | 0:25 |

TPC-3.1.6   The flight history of this airplane also assists in showing the relationship that Renee Haugerud, a/k/a Lauree Smith, has with the State of Georgia. This airplane is used by Renee Haugerud, a/k/a Lauree Smith, in her conduct of interfering with the settlement agreement contract of

Michelle Murphy with John Harold Murphy, that the children cannot be transported outside of the State of Georgia and to engage in other conduct with the children that is not in their best interest.

TPC-3.1.7   Renee Haugerud, a/k/a Lauree Smith, interferes with the custody of the children by transporting the children across the country where they engage in alcoholic beverage parties.

TPC-3.1.7.1   Renee Haugerud, a/k/a Lauree Smith, participated with John Harold Murphy in using   J.M., T.M.,   and one of the children's friends, who was transported across state lines, as bartenders who mixed alcoholic beverages that were served to adult guests at the party, who participated in this conduct with these minor children.

TPC-3.1.7.2   According to the mother of the friend of the children, J.M. and T.M.   drank portions of the alcoholic beverages that they were mixing and serving to adults, as these children were not supervised, as required by law.

TPC-3.1.7.3   Renee Haugerud, a/k/a Lauree Smith, has participated with John Harold Murphy in threatening   J.M.   to sign a perjurious affidavit relating to his conduct with alcoholic beverages in a location that the children were transported across the state line in a aircraft under the control of Renee Haugerud, a/k/a Lauree Smith.

TPC-3.1.7.4   This conduct by Renee Haugerud, a/k/a Lauree Smith, and John Murphy relating to the alcoholic beverages was contributing to the delinquency of minor children to the extent that the mother of the friend who made the trip has prohibited her son from traveling any

longer in the care of John Murphy and Renee Haugerud, a/k/a Lauree Smith.

TPC-3.1.8   Renee Haugerud, a/k/a Lauree Smith, has participated with John Harold Murphy in threatening Jack Murphy to sign a document stating that he wished to live with Renee Haugerud, a/k/a Lauree Smith, and John Harold Murphy for thirteen (13) days a month or John Harold Murphy would never see Jack Murphy again in life. This threat occurred during a weekend visit of the children to the home owned by Renee Haugerud, a/k/a Lauree Smith, in Lookout Mountain, Tennessee between July 28, 2012 and July 29, 2012.

TPC-3.1.9     Renee Haugerud, a/k/a Lauree Smith, has participated with John Harold Murphy in sending the children home on Sunday, July 29, 2012 in the unwashed, dirty clothes which they originally wore when they left their home in Newnan, Georgia on Friday, July 27, 2012.

TPC-3.1.10    It is highly relevant to this case that John Harold Murphy and Renee Haugerud, a/k/a Lauree Smith are attempting to bring the children into an environment that appropriates money to purposes not allowed by law. This is not in the best interest of the children.

TPC-3.1.11    It is highly relevant to this case that the money of Renee Haugerud, a/k/a Lauree Smith, is being used to appease John Harold Murphy in making the life of Michelle Murphy so miserable that she will surrender her obligation of the children into a lifestyle of illegal conduct.

TPC-1.12    For example, Michelle Murphy cannot style enough hair to even pick up the tab for one $1,000 evening restaurant meal that Renee Haugerud, a/k/a Lauree Smith's, business finances for the children and their driver.

## TPC-4. Jurisdiction and Venue

TPC-4.1  One of the sources of jurisdiction in this case is established by OCGA **§ 9-10-91** that in parts provides as follows.

### Grounds for exercise of personal jurisdiction over nonresident

A court of this state may exercise personal jurisdiction over any nonresident or his or her executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, **if in person or through an agent, he or she:**

emphasis supplied

(1) Transacts any business within this state;

(2) Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act;

(3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

(4) Owns, uses, or possesses any real property situated within this state;

(5) With respect to proceedings for divorce, separate maintenance, annulment, or other domestic relations action or with respect to an independent action for support of dependents, maintains a matrimonial domicile in this state at the time of the commencement of this action or if the defendant resided in this state preceding the commencement of the action, whether cohabiting during that time or not. This paragraph shall not change the residency requirement for filing an action for divorce; or

(6) Has been subject to the exercise of jurisdiction of a court of this state which has resulted in an order of alimony, child custody, child support, equitable apportionment of debt, or equitable division of property if the action involves modification of such order and the moving party resides in this state or if the action involves enforcement of such order notwithstanding the domicile of the moving party.

TPC-4.1.1   OCGA **§ 9-10-91** (1) Transacts any business within this state

TPC-4.1.1.1   Renee Haugerud, a/k/a Lauree Smith transacts business within the State of Georgia.

TPC-4.1.1.2   Renee Haugerud, a/k/a Lauree Smith, transacts business within the State of Georgia, as indicated by the documented airplane trips to the State of Georgia and in other ways.

TPC-4.1.1.3   Renee Haugerud, a/k/a Lauree Smith, acted in concert and participated with John Harold Murphy in transacting business within the State of Georgia.

TPC-4.1.2   OCGA § (2) Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act

TPC-4.1.2.1    Renee Haugerud, a/k/a Lauree Smith committed tortious acts or omissions within the State of Georgia.

TPC-4.1.2.2    Renee Haugerud, a/k/a Lauree Smith committed tortious acts or omissions in the State of Georgia by providing denying her name and providing a false name to the court appointed process server, by making a false statement in order to obtain a marriage license and in other ways.

TPC-4.1.2.3    Renee Haugerud, a/k/a Lauree Smith, acted in concert and participated with John Harold Murphy in committing tortious acts or omissions within the State of Georgia.

TPC-4.1.4   OCGA § (4) Owns, uses, or possesses any real property situated within this state.

TPC-4.1.4.1    Renee Haugerud, a/k/a Lauree Smith owns, uses, or possesses real property situated within the State of Georgia.

TPC-4.1.4.2    Renee Haugerud, a/k/a Lauree Smith owns or possesses real property situated in Troup County, Georgia and in other locations. See, **Attachment TP-2.**

TPC-4.1.4.3    Renee Haugerud, a/k/a Lauree Smith, acted in concert and participated with John Harold Murphy in owing or possessing real property and having an equitable interest in real property within the State of Georgia.

TPC-4.1.5 Renee Haugerud, a/k/a Lauree Smith, acted in concert and participated with John Harold Murphy in providing a false affidavit of his net worth, expenses and income that also provides the Court of Jurisdiction. This Court also has jurisdiction pursuant to OCGA § 9-10-33.

TPC-4.2  Venue in this action in this action is ancillary to the venue in the action filed by John Harold Murphy by against Michelle Murphy.

TPC-4.2.1    Venue is in Superior Court of Coweta County, Georgia until this case is transferred to the Superior Court of Troup County, Georgia. The venue and jurisdiction will then be, and the jurisdiction of the equitable and other relief sought in this matter will be either in the Superior Court of Coweta County, Georgia or Superior Court of Troup County, Georgia. See, OCGA § 9-10-34.

TPC-4.3    Renee Haugerud, a/k/a Lauree Smith, has financed and acted in concert with the parties who have engaged in the tacit and/or actual earwigging of Judge Louis Jack Kirby and Judge A. Quillian Baldwin, Jr. that has deprived Michelle Murphy of her State of Georgia statutory and constitutional protections and her rights to United States Constitutional due process and equal protection.

TPC-4.4    Renee Haugerud, a/k/a Lauree Smith, has financed and acted in concert with the parties who have engaged in the judge shopping and Guardian ad Litem shopping, in part, in a Superior Court that does not conform to the requirements of Uniform Superior Court Rule 3.1.

**5. Legal Authority for Joining of Renee Haugerud, a/k/a Lauree Smith**

**TPC-**5.1 The right of a custodial parent to include a party other than the non-custodial parent in litigation who controls the financial assets of a party

in litigation involving the modification of custody or parenting time with a counterclaim for upward modification of child support does not differ from the right of a parent in an original divorce action to include a third party. The joinder of the party is especially warranted when the **non-custodial parent's income is derived in part from fraudulent tax evasion schemes with the party who is sought to be joined.**

**TPC-5.2   In *Seiz Joint Venture, LLC v. Seiz*, 290 Ga. 719, 720-721 (2012) the Court held as follows.**

> SJV contends that the trial court erred by allowing Wife to add it as a party to the divorce proceedings. However, here, there is evidence to support the trial court's conclusion that, after Wife filed for divorce, Husband violated the Standing Order for the Tallapoosa Judicial Circuit by transferring the Cobb County property from Seiz Joint Venture #1 to SJV.n2 Based on this transfer of property that was properly the subject of the divorce proceedings, the trial court was authorized to add SJV as a party in order to ensure that Wife might be afforded complete relief in the case. See, e.g., Degarmo v. Degarmo, 269 Ga. 480, 481 (2) (499 SE2d 317) (1998) v. Degarmo, 269 Ga. 480, 481 (2) (499 SE2d 317) (1998) (where there was some evidence in divorce case to support the conclusion that Husband and business partner fraudulently caused all stock in corporation to be issued in their name to the exclusion of Wife, trial court properly added corporation and business partner as parties to divorce action "in order that complete relief might be afforded among those who [were] already parties") (citation and punctuation omitted).n3 See also OCGA § 9-11-19 (a) (1).

**TPC-5.3   In *Degarmo v. Degarmo*, 269 Ga. 480, 481 (1998) the Court held as follows.**

> When one party to a divorce proceeding alleges there has been a fraudulent conveyance of property to defeat that party's rights,

joinder of additional parties involved in the allegedly fraudulent conveyance is proper. Roberts v. Roberts, 226 Ga. 203 (9) (173 S.E.2d 675) (1970). Here, Ms. DeGarmo alleges that she and Mr. DeGarmo formed a business in which they were to be partners, that a significant portion of the business capital came from her separate property, and that Mr. DeGarmo and Billy Ross fraudulently caused all the stock in the corporation to be issued in their names, excluding Ms. DeGarmo. While Mr. DeGarmo denies all wrongdoing, it is apparent that there remain factual issues to be resolved concerning the proper ownership of the stock of Super 1, Inc. Under those circumstances, Ms. DeGarmo was entitled under the principles applied in Roberts, supra, and stated in O.C.G.A. § 9-11-19 (a) (1), to have Ross and Super 1, Inc. added as parties in order that "complete relief [might] be afforded among those who are already parties." Id. The trial court's failure to add those parties was error.

TPC-5.4   A relevant issue in the Complaint and Counterclaim is the payment of child support, which is determined by the amount and availability of John Harold Murphy's income and assets. Renee Haugerud, a/k/a Lauree Smith, controls the assets that John Harold Murphy receives through the use by him and Renee Haugerud, a/k/a Lauree Smith, of non-tax paid funds received from the corporations controlled by Renee Haugerud, a/k/a Lauree Smith.

## 6. Causes of Action

### TPC-6.1   First Cause of Action for Fraudulent Conduct

TPC-6.1.1   Renee Haugerud, a/k/a Lauree Smith, is engaging in the fraudulent, downward manipulation of the income and assets of John Harold Murphy in order to prevent the Court and Michelle Murphy from having an accurate accounting of the income and assets of

John Harold Murphy that are available for the distribution to Michelle Murphy for child support.

TPC-6.1.2   Renee Haugerud, a/k/a Lauree Smith, has acted in concert with John Harold Murphy in making false representations and/or omissions of material facts relating to his financial net worth, assets, source of income, reporting of income for tax purposes and other purposes of John Harold Murphy to deprive Michelle Murphy of an equitable share of these assets for the purpose of child support.

TPC-6.1.3   Renee Haugerud, a/k/a Lauree Smith, has acted in concert with John Harold Murphy in attempting to fraudulently diminish the assets that Michelle Murphy has to increase the quality of life of the minor children in order that the minor child would wish to be with Renee Haugerud, a/k/a Lauree Smith, and John Harold Murphy in order to benefit from a substantially financially quality of life.

TPC-6.1.4   Renee Haugerud, a/k/a Lauree Smith, has acted and is acting in concert with John Harold Murphy in using the false information in order to induce Michelle Murphy to rely upon John Harold Murphy to pay for medical bills, provide transportation for the children to attend school and for Michelle Murphy to act upon in making decisions relating to establishing child support which is due to Michelle Murphy. Renee Haugerud, a/k/a Lauree Smith, knew that John Harold Murphy has engaged in this type of conduct and that the Court and Michelle Murphy would be justified in relying upon this conduct. Renee Haugerud, a/k/a Lauree Smith, and John Harold Murphy intended to engage in this conduct in order to deny Michelle Murphy financial resources necessary to have in order to

obtain an equitable amount of child support. This conduct has caused Michelle Murphy damages.

TPC-6.1.5   Renee Haugerud, a/k/a Lauree Smith, in part, engaged in this illegal and fraudulent conduct by providing non-tax paid assets to John Harold Murphy for his personal use that are not disclosed to the Internal Revenue Service or otherwise documented in a manner that the value of these transfers can be determined by the Court.

TPC-6.1.6   Renee Haugerud, a/k/a Lauree Smith, in part, engaged in this illegal and fraudulent conduct by providing non-tax paid assets to John Harold Murphy for his personal use.

TPC-6.1.7   Renee Haugerud, a/k/a Lauree Smith, engaged in her fraudulent conduct by assisting John Harold Murphy in his attempts to secret the use of the assets of the Haugerud businesses and her personal assets in order that Michelle Murphy cannot obtain an accurate accounting of the funds available for consideration by the Court of an upward modification of child support payments.

TPC-6.1.8 Renee Haugerud, a/k/a Lauree Smith, engaged in her fraudulent conduct by the use of mail and electronic transmission. This conduct comprises a Civil RICO predicate act.

## TPC-6.2  Second Cause of Action for Tortious Action

TPC-6.2.1   Renee Haugerud, a/k/a Lauree Smith, engaged in the tortious conduct of making false statements in violation of OCGA § 16-10-20 by knowingly and willfully falsifying, concealing, or covering up by a trick, scheme, or device a material fact; her legal name, by making a false, fictitious, or fraudulent statement or representation in a matter within the

jurisdiction of the Superior Court of Coweta County in an attempt to conceal from the Court relevant information involving the best interests of minor children and Michelle Murphy.

TPC-6.2.2  Renee Haugerud, a/k/a Lauree Smith, in violation of OCGA § 16-10-20, knowingly, falsely informed the Superior Court of Coweta County process server that her name was "Lauree Smith" in an attempt to evade the service of the Third Party Complaint upon her. This conduct is also a civil RICO predicate act.

TPC-6.2.3  Renee Haugerud, a/k/a Lauree Smith, provided a knowingly false affidavit to Peter A. Durham relating to the real estate interest that she has in Georgia that she knew would be used for the purposes of having the Court determine that it did not have jurisdiction of her in this litigation, in violation of OCGA § 16-10-20. This affidavit was provided to the Court. This conduct is also a dual civil RICO predict act, as the false statement was transmitted to counsel for Michelle Murphy and Elizabeth "Lisa" F. Harwell, the Guardian ad Litem, by the United States Mail.

TPC-6.2.4  Renee Haugerud, a/k/a Lauree Smith, made a knowingly false statement to the Probate Court of Troup County in order to obtain a marriage license that was illegal for Judge Louis Jack Kirby to use in Walker County, Georgia in the wedding of Renee Haugerud, a/k/a Lauree Smith, to John Harold Murphy.

TPC-6.2.5  Michelle Murphy does not bring a civil RICO cause of action against Renee Haugerud, a/k/a Lauree Smith and John Harold Murphy or others in the Second Amended Third Party Complaint or the Second

Amended Counterclaim, as the scope of the persons involved and the predicate acts has not been fully explored.

**TPC-6.3  Third Cause of Action Breach of Contract**

TPC-6.3.1      Renee Haugerud, a/k/a Lauree Smith, assisted and acted in concert with John Harold Murphy in breaching the Settlement Agreement Contract and oral contracts that John Harold Murphy had with Michelle Murphy for the benefit of the minor children.

TPC-6.3.2   Renee Haugerud, a/k/a Lauree Smith, assisted and acted in concert with John Harold Murphy in breaching the oral contracts that John Harold Murphy had with Michelle Murphy.

**TPC-6.4  Fourth Cause of Action Interfering with Contract**

TPC-6.4.1      Renee Haugerud, a/k/a Lauree Smith, acted intentionally, without privilege or legal justification to induce Elizabeth "Lisa" F. Harwell to breach the valid contract that John Harold Murphy has with Michelle Murphy relating to the custody and visitation of the children causing Michelle Murphy financial injury by tortiously interfering with the Settlement Agreement Contract that Michelle Murphy had with John Harold Murphy.

**TPC-7      Request for Relief by Michelle Murphy**

TPC-7.1  Michelle Murphy requests that she be awarded damages in excess of Ten thousand dollars ($10,000) for the conduct of Renee Haugerud, a/k/a Lauree Smith, related to damages created by the causes of action.

TPC-7.2 Michelle Murphy requests she be awarded damages against Renee Haugerud, a/k/a Lauree Smith who has in interfering with the custody of the minor children of Michelle Murphy, for contributing to the delinquent

conduct of Michelle Murphy's minor children and for Renee Haugerud's, a/k/a Lauree Smith's, participation with John Murphy in retaliation against Michelle Murphy for her counsel's disclosure of the use of business assets for personal use.

TPC-7.3  Michelle Murphy requests that the disposable assets that Renee Haugerud, a/k/a Lauree Smith, provides to John Harold Murphy be made available and eligible for child support to Michelle Murphy for the minor children of John Harold Murphy and Michelle Murphy.

TPC-7.4  Michelle Murphy requests that she be awarded damages for her conduct of acting in concert with John Harold Murphy in each of the causes of action against him and involving his conduct.

TPC-7.5  Michelle Murphy requests such other and further relief as justice may require.

**TPC-8.   Information about Record Citations**

TPC-8.1  The "R" citations refer to the record in the Supreme Court of Georgia in the pending direct appeal involving the disqualification of Judge Quillian Baldwin, (Judge 3 of 5) (R-366). This Index to the Record Appendix is included here at the end of this motion and is identified as Attachment Georgia Supreme Court Record Index.

The brief filed in the Supreme Court of Georgia on behalf of Michelle Murphy is contained in the Records of the Superior Court of Coweta County as an attachment to a document identified as "Notice of Filing Brief of Appellant Nancy Michelle Murphy in the Supreme Court of Georgia in Case No. S12A1851." The "R" cites here are to documents available online at the following URL.

http://www.coweta.ga.us/Index.aspx?page=809

**8.2   List of Incorporated Attachments to the Second Amended Answer, Second Amended Counterclaim And Second Amended Third Party Complaint**

| No. | Attachment | Record Pleading to which it is attached | Date pleading filed |
|---|---|---|---|
| 1 | Order Appointing Guardian ad Litem | Motion to Disqualify Judge Quillian A. Baldwin | 5/1/12 |
| 2 | John Murphy's Motion for Appointment of Guardian ad Litem | Motion to Disqualify Judge Quillian A. Baldwin | 5/1/12 |
| 3 | John Murphy's Financial Affidavit | Motion to Disqualify Judge Quillian A. Baldwin | 5/1/12 |
| 4 | J.M.'s and T.M.'s Affidavits | Motion to Disqualify Judge Quillian A. Baldwin | 5/1/12 |
| 5 | Standing Order | Motion to Disqualify Judge Quillian A. Baldwin | 5/1/12 |
| 6 | Affidavit of Millard Farmer | Motion to Disqualify Judge Quillian A. Baldwin | 5/1/12 |
| 7 | Transcript Deposition of Louis Jack Louis Kirby with Exhibits | Addendum to First Amended Motion to Disqualify Judge Baldwin | 6/4/12 |
| 8 | Affidavit of Millard Farmer | Addendum to First Amended Motion to Disqualify Judge Baldwin | 6/4/12 |
| 9 | Affidavit of Renee Haugerud | First Amended Answer, et al. | 8/02/12 |
| 10 | Judge Allen B. Keeble's Consent Temporary Order | First Amended Answer, et al. | 8/02/12 |
| 11 | Transcript Hearing before Judge E. Byron Smith | Motion to Disqualify Melissa Griffiths as GAL | 6/12/12 |

| No. | Attachment | Record Pleading to which it is attached | Date pleading filed |
|---|---|---|---|
| 12 | Transcript Agreement before Judge Baldwin | Motion to Disqualify Melissa Griffiths as GAL | 6/12/12 |
| 13 | Final Decree of Divorce by Judge Dennis Blackmon | Motion to Disqualify Melissa Griffiths as GAL | 6/12/12 |
| 14 | Judge Lee's 2 Orders dated 2010 and 2007 | Motion to Disqualify Melissa Griffiths as GAL | 6/12/12 |
| 15 | Judge Baldwin's Order denying his Recusal | Motion to Disqualify Melissa Griffiths as GAL | 6/12/12 |
| 16 | Response of Clerk of Coweta Superior Court to Open Records Request | Second Addendum to First Amended Motion to Disqualify Judge Baldwin | 6/13/12 |
| 17 | Open Records Request to Clerk of Superior Court | Second Addendum to First Amended Motion to Disqualify Judge Baldwin | 6/13/12 |
| 18 | Order Appointing Lisa Harwell | Motion to Disqualify Elizabeth "Lisa" F. Harwell as GAL | 7/5/12 |
| 19 | E-mail from Lisa Harwell's office transmitting Order appointing Lisa Harwell GAL | Motion to Disqualify Elizabeth "Lisa" F. Harwell as GAL | 7/5/12 |
| 20 | Melissa Griffis' Motion to Withdraw as GAL | Motion to Disqualify Elizabeth "Lisa" F. Harwell as GAL | 7/5/12 |
| 21 | John Murphy's Motion for Immediate Review | First Amended Answer, et al. | 8/02/12 |
| 22 | Published Civil, Non-Jury Calendar of cases to be heard on August 2, 2012 | Motion for Continuance of all matters before the Court on August 2, 2012 | 8/02/12 |

| No. | Attachment | Record Pleading to which it is attached | Date pleading filed |
|---|---|---|---|
| 23 | Civil, Non-Jury Calendar of cases to be heard on August 2, 2012 received by counsel on July 31, 2012 | Motion for Continuance of all matters before the Court on August 2, 2012 | 8/02/12 |
| 24 | Notice of Supersedeas | Motion for Continuance of all matters before the Court on August 2, 2012 | 8/02/12 |
| 25 | July 18, 2012 letter from Kaye Redmon to Clerk requesting calendaring | Motion for Continuance of all matters before the Court on August 2, 2012 | 8/02/12 |
| 26 | Rule Nisi filed April 11, 2012 by Taylor Drake | Motion for Continuance of all matters before the Court on August 2, 2012 | 8/02/12 |
| 27 | Notice of Hearing filed July 3, 2012 by Peter A. Durham | Motion for Continuance of all matters before the Court on August 2, 2012 | 8/02/12 |
| 28 | August 8, 2012 email to Taylor Drake from Millard Farmer, re transportation | Motion for Disqualification of Judge Allen B. Keeble | 8/27/12 |
| 29 | August 8, 2012 email from Taylor Drake to Millard Farmer, re transportation | Motion for Disqualification of Judge Allen B. Keeble | 8/27/12 |
| 30 | August 9, 2012, emails between Millard Farmer and Taylor Drake re transportation | Motion for Disqualification of Judge Allen B. Keeble | 8/27/12 |
| 31 | Emails dated August 10 through 22, 2012 re transportation and schools | Motion for Disqualification of Judge Allen B. Keeble | 8/27/12 |
| 32 | Email from attorney representing The Howard School that J.M.'s records would not be released | Motion for Disqualification of Judge Allen B. Keeble | 8/27/12 |

| 33 | July 17, 2012 letter from Peter Durham to Clerk of Superior Court cancelling previously scheduled August 2, 2012 motion hearing. | Motion for Disqualification of Judge Allen B. Keeble | 8/27/12 |
| 34 | August 20, 2012 letter from Peter Durham to Clerk of Superior Court noticing motion hearing for September 20, 2012 before Judge Keeble.. | Motion for Disqualification of Judge Allen B. Keeble | 8/27/12 |
| 35 | Renee Haugerud's Motion to Dismiss Third Party Complaint for Insufficient Service of Process, Lack of Personal Jurisdiction and Improper Venue | Motion for Disqualification of Judge Allen B. Keeble | 8/27/12 |
| 36 | Renee Haugerud's Motion to Dismiss Third Party Complaint for Failure to State a Claim Upon Which Relief can be Granted and Improper Pleading | Motion for Disqualification of Judge Allen B. Keeble | 8/27/12 |
| 37 | August 28, 2012 email forwarded from Glover & Davis including ex parte communication and Order | Motion for Continuance of All Matters | 8/30/12 |
| 38 | August 29, 2012 copy of Order received from Clerk of Court | Motion for Continuance of All Matters | 8/30/12 |
| 39 | August 6, 2012 letter from Millard Farmer to Taylor Drake re transportation arrangements | Motion for Continuance of All Matters | 8/30/12 |
| 40 | *In Re Farmer,* 212 Ga. App. 372 (1994) | Response to Joint Motion to Strike | 9/12/12 |
| 41 | 1994 Brief filed in Georgia Supreme Court on behalf of Emmitt Stephens | Response to Joint Motion to Strike | 9/12/12 |
| 42 | *Farmer v. Holton, 146 Ga. App. 102 (1978)* | Response to Joint Motion to Strike | 9/12/12 |

| 43 | *Farmer v. Knox,* 137 Ga. App. 478 (1976) | Response to Joint Motion to Strike | 9/12/12 |
|---|---|---|---|
| 44 | 1977 transcript of the testimony of Senior Judge Dunbar Harrison | Response to Joint Motion to Strike | 9/12/12 |
| 45 | *Haley v. State,* 289 Ga. 515 (2011) | Response to Joint Motion to Strike | 9/12/12 |
| 46 | September 6, 2012 letter from Peter A. Durham to Millard Farmer, re: subpoena | Response to Joint Motion to Strike | 9/12/12 |
| 47 | Excerpts from transcript of Calendar Call on August 30, 2012 before Judge Louis Jack Kirby | Second Amended Answer, Second Amended Counterclaim and Second Amended Third Party Complaint | 9/20/12 |
| TP-1 | Affidavit of Service of Sharon Jones Snellings | Response to Joint Motion to Strike | 8/30/12 |
| TP-2 | Affidavit of Renee Haugerud | Second Amended Answer, Second Amended Counterclaim and Second Amended Third Party Complaint | 9/20/12 |
| TP-3 | May 5, 2010 Security Deed, from records of Superior Court of Troup County, Deed Book 01572, pp. 0260-0261 | Second Amended Answer, Second Amended Counterclaim and Second Amended Third Party Complaint | 9/20/12 |

This 20th day of September, 2012.

Respectfully submitted,

*Millard Farmer*

Millard Farmer
Georgia Bar No. 255300
P.O. Box 1728
Atlanta, GA  30301-1728
(404) 688-8116

and

Larry King
Georgia Bar No. 419725
P. O. Box 1648
Jonesboro, GA 30237
(770) 471-3835
Fax (770) 471-8200
larrykingandls@aol.com
**Counsel for Nancy Michelle Murphy**

ILED IN OFFICE
CLERK OF
SUPERIOR/JUVENILE
COURT

12 JUL 23 AM 11:40

CINDY G. BROWN, CLERK
COWETA COUNTY, GA

## IN THE SUPERIOR COURT OF COWETA COUNTY
## STATE OF GEORGIA

**John Harold Murphy,**
    Plaintiff

      **vs.**　　　　　　　　　　　**Civil Action No.** 12V-413

**Nancy Michelle Murphy,**
    Defendant/Third Party Plaintiff

      **vs.**　　　　　　　**A Jury Trial is Requested on
the Child Support Issues, the
Counterclaim and the Third
Party Complaint**

**Renee Haugerud,**
    Third Party Defendant


State of Georgia
County of Clayton

### AFFIDAVIT OF SERVICE

Personally appeared before the undersigned, an officer duly authorized by law to administer oaths, Sharon Jones Snellings, who, after being duly sworn, states as follows.

I am over the age of 21 and am qualified to serve process in actions originating in the Superior Court of Coweta County.

On Sunday, July 15, 2012, I personally served the Third Party Defendant, Renee Haugerud, with a copy of the above-styled *Summons and Answer with Affirmative Defenses, Counterclaim and Third Party Complaint to the Complaint for Modification of Custody, or in the Alternative, Parenting Time of John Harold Murphy*, by hand delivery to her in the lobby of the Ritz Carlton Hotel located at 3434 Peachtree Road, N.E., Atlanta, Georgia 30326.


**Attachment TP-1, Page 1 of 2**

I approached Renee Haugerud at the counter in the lobby of the Ritz Carlton as she was checking out of the hotel. I said, "Renee?" and she turned around. I told her that my name was Sharon and that I had a delivery for her. She was very pleasant, and accepted the envelope containing the above-described document, which I handed her. She began to open the envelope.

I was at the door on the outside of the hotel when Renee Haugerud came running after me. She told me that I was mistaken, that her name was Lauree Smith, and that the envelope was not for her. I told her that I had a picture of her, that she was the correct person, and that she had been served. I did not take the envelope back from her, and she dropped it on the floor.

I recognized Renee Haugerud from photographs which I had been provided, and know that the person whom I served was, in fact, Renee Haugerud.

This _20th_ day of July, 2012.

_Sharon Jones Snellings_ (signature)
**Sharon Jones Snellings**
**Process Server**

Sworn to and subscribed before me
this _20_ day of July, 2012.

_Lulu Svec_ (signature)
NOTARY PUBLIC, State of Georgia

LULU SVEC
Notary Public, Fayette County, Georgia
My Commission Expires July 8, 2013

2

**Attachment  TP-1, Page 2 of 2**

IN THE SUPERIOR COURT OF COWETA COUNTY
STATE OF GEORGIA

JOHN HAROLD MURPHY,

        Plaintiff,

vs.

NANCY MICHELLE MURPHY,

        Defendant,

vs.

RENEE HAUGERUD,

        Third Party Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action File No.  2012V-413

## **AFFIDAVIT OF RENEE HAUGERUD**

Personally appeared before me the undersigned officer duly authorized by law to administer oaths, Renee Haugerud, who after first being duly sworn deposes and states under oath as follows:

1.

My name is Renee Haugerud.  I am an adult citizen of the State of Tennessee, suffer no known disabilities, and testify herein to facts that are personally known by me to be true and correct.  I understand that this Affidavit will be used in support of the position maintained by Renee Haugerud.

2.

I am currently residing at 829 North Bragg Avenue, Hamilton County, Lookout Mountain, Tennessee.  I have never been a resident of the state of Georgia, have never committed a tortious act or omission or injury in the state of Georgia and have never owned real property in the state of Georgia.

Page 1 of 3

**Attachment TP-2, Page 1 of 2**

3.

I am the Chief Investment Officer Galtere, Ltd, a registered investment advisor that is headquartered in New York City.  Galtera N.A., Inc. is the sub-advisor to Galtere, Ltd..  Connie Martin is employed as an administrative assistant for Galtera N.A., Inc.

4.

Although I maintain a home office at my primary residence located at 829 North Bragg Avenue, Lookout Mountain, Tennessee and although Connie Martin assists me in my capacity as the Chief Investment Officer of Galtere, Ltd. with scheduling meetings and arranging conference calls, Connie Martin is not authorized to accept service of process for me individually.


FURTHER AFFIANT SAITH NOT.

Renee Haugerud

Sworn to and subscribed
before the undersigned
this 20th day of June, 2012.

Notary Public, State of Tennessee

**Attachment TP-2, Page 2 of 2**

2948

Record and return To:
Raymond A. Fox, Jr., Atty., P.C.
1303 Carter Street
Chattanooga, TN 37402
**File: 10-13446**

Deed          Doc: SD
**Recorded 05/05/2010 02:19PM**
Georgia Intangible Tax Paid: $285.00
JACKIE TAYLOR
Clerk Superior Court, TROUP County, Ga.
Bk 01572    Pg  0260-0261

## SECURITY DEED

In consideration, the receipt whereof is hereby acknowledged,
**EBONIE S. WILSON**, unmarried, hereinafter designated first party,
whether one or more, has this day bargained and sold and does hereby
transfer and convey unto **JOHN H. MURPHY and RENEE HAUGERUD,**
C/O Rothstein -Kass , Attn: Naomi Feld/Amy Schwartz, 1350 Avenue of the
Americas, 15th Floor, New York, NY 10019, hereinafter designated second
party, their heirs and assigns, the following described tract of land, to-wit:

All that tract or parcel of land lying and being in Land Lot 116 for the 6th
District, Troup County, Georgia; and being that certain 0.321 acre, as more
fully shown on a plat thereof prepared by Henry H. Jackson, G.R.L.S. No.
2274 for John Ira Hudson, dated May 20, 1997 and recorded in Plat Book
50, Page 285, Troup County, Georgia records, which plat by reference is
incorporated herein and made a part hereof.

For prior title and last instrument of record affecting title to the above
described property, see deed recorded in Deed Book 1317, Page 535, in the
Office of the Clerk of the Superior Court of Troup County, Georgia.

**To Have and To Hold** the same in fee simple; and said first party
warrants the title to the same unto said second party, its successors and
assigns.

This conveyance is made to secure two notes under *Sec. 67-1301 of
the Code of Georgia*, or any other present or future indebtedness of liability
of first to second party. The debt hereby secured is evidenced by two notes:

One installment note of even date herewith in the amount of
$75,000.00 due and payable as follows:

Installment Note being due and payable at the rate of Three Hundred Fifty-
eight and 06/100 Dollars ($358.06) per month, the first installment being due
and payable on or before the first (1st) day of June, 2010, and one installment
being due and payable on or before the first (1st) day of each month
thereafter for three hundred sixty (360) months or until the sum of Seventy-
five Thousand and xx/100($75,000.00) Dollars, on the principal and all
interest thereon, shall have been fully paid and satisfied.

Second note of even date herewith in the amount of $20,000 being due
and payable as follows:

Principal shall be paid with a balloon payment on the unpaid principal
balance on or before June 1st, 2010.

THIS DOCUMENT IS PREPARED FROM INFORMATION FURNISHED
BY THE PARTIES TO THE INSTRUMENT AND NEITHER THE

Page Page numbers

## Attachment TP-3, Page 1 of 2

PREPARER NOR FIRST TITLE INSURANCE COMPANY MAKE ANY REPRESENTATION AS TO THE TITLE OR ACCURACY OF INFORMATION.

THIS INSTRUMENT WAS EXECUTED AND ACKNOWLEDGED OUTSIDE THE PRESENCE OF THE PREPARER AND/OR ITS AGENTS OR EMPLOYEES, AND PREPARER MAKES NO REPRESENTATION AS TO THE AUTHENTICITY OR RELIABILITY OF THE SIGNATURES AND/OR ACKNOWLEDGMENTS CONTAINED HEREIN.

There will be a **five (5%) percent** late payment penalty of the principal and interest payment if payment is not made within **fifteen (15) days** of the due date. There is no pre-payment penalty. This note is not assumable without the prior written authorization from the party of the second part.

In case this debt is not paid promptly when due, first authorizes second party, their legal representatives or assigns to sell said described property at public outcry before the courthouse door in Troup County, Georgia, to the highest bidder for cash to pay said debt, with interest thereon and the expenses of the proceedings, including **ten percent (10%) attorney's** fees, if the claim be placed in the hands of an attorney for collection, after advertising the time, place and terms of sale in a newspaper of general circulation in said County once a week for four weeks. And said second party, their, legal representatives or assigns, may make to the purchaser title in fee simple to the same, and said second party their legal representatives or assigns, is hereby authorized to bid and to buy at said public sale. The proceeds of said sale are to be applied first to payment of said debt and interest, and expenses of this proceeding; the remainder, if any, paid to said first party; said first party agreeing to surrender possession of said property without let or hindrance of any kind. But the foregoing powers for realizing on this security are cumulative only, and coupled with an interest and are irrevocable by death or otherwise. First party agrees to maintain a sufficient amount of fire insurance on building on this property with loss payable to second party to protect the interest of the party of the second part. First party agrees to pay all State, County and City taxes owing on above property. Failure to keep adequate insurance on premises, or failure to pay any taxes on said property when same shall become due, shall constitute a default in the terms of this Security Deed.

Said first party hereby covenants that fee simple title to said property is vested in him, and that there are no liens of any nature against him.

Witness my hand and seal, this 25th day of April, 2010.

_____          _____
Witness                                              EBONIE S. WILSON

_____          _____
Notary Public                                     My Commission Expires:

Page Page numbers

**Attachment TP-3, Page 2 of 2**

1

IN THE SUPERIOR COURT OF COWETA COUNTY
STATE OF GEORGIA

2

3   JOHN HAROLD MURPHY                    )
                                         )
4            Plaintiff,                   )   CIVIL ACTION FILE
                                         )   NO. 2012-SU-V-413
5        vs.                              )
                                         )   TRANSCRIPT OF CALENDAR CALL
6   NANCY MICHELLE MURPHY                 )
                                         )
7            Defendant.                   )

8                            - - -

9            Proceedings held before Honorable L. Jack Kirby,

10   Judge, Superior Court of Coweta County, at Coweta County

11   Justice Center, 72 Greenville Street, Newnan, Georgia,

12   before Dawn M. Davidson, Registered Professional

13   Reporter, on Thursday, August 30, 2012.

14                            - - -

15

16

17

18

19

20

21

22

23

24

25                                                                    1

1    decided to not do anything temporarily until after

2    mediation.

3         THE COURT:  Okay.

4         MS. HOLLEY-LUCAS:  We should probably --

5         THE COURT:  So it's already been here for a

6    temporary and there was no temporary relief granted?

7         MS. HOLLEY-LUCAS:  Correct, correct.

8         THE COURT:  And it's ripe for a final?

9         MS. HOLLEY-LUCAS:  Yes, your Honor.

10        THE COURT:  Mr. Aitken, any reason you can't go

11   forward with a final hearing today?

12        MR. AITKEN:  No, sir.

13        THE COURT:  What is your time estimate?

14        MS. HOLLEY-LUCAS:  Your Honor, if we could pretry

15   this, we might be able to resolve this today.

16        THE COURT:  Okay.  I'll hold it and we'll pretry it

17   on the break.

18        Rhonda Santiago versus Richard Santiago.

19        MR. MORSE:  Your Honor, good morning.  William

20   Morse for the plaintiff.  This is on for a temporary

21   hearing in a domestic case.  My guess would be an hour

22   and a half.  There's custody issues, support issues,

23   there's guardian issues.  There's all kinds of things.

24        THE COURT:  Okay.

25        MS. HARWELL:  I would say probably we would add

                                                          11

1      will probably take an hour to an hour and 15 minutes.

2      Counsel and I have not had the opportunity to discuss

3      anything in this case yet so we would like that

4      opportunity.

5           MS. BROWN:  Susan Brown on behalf of Mr. Epps.

6      That's correct, your Honor.

7           THE COURT:  Okay.  I'll hold it and let you guys

8      talk.

9           MS. BROWN:  My side will probably take 30 minutes

10     if we argue.

11          MR. ABBOTT:  Thank you, your Honor.

12          THE COURT:  Jonathan Smith versus Whitney Smith.

13          MR. SWOPE:  Judge, Matthew Swope for Mr. Smith.

14     We've agreed to continue that and try to reach an

15     agreement in mediation.

16          THE COURT:  Virginia Larios versus Margarito

17     Alvarado.

18          MR. SWOPE:  Judge, Matthew Swope for Nan Newman.

19     We believe it's uncontested.  The father has signed a

20     consent, and if you could take it up in chambers or we

21     can do it here.  It will take two minutes.

22          THE COURT:  Okay.  April Hemmings versus David

23     Hemmings, Junior.

24          MS. HARWELL:  Your Honor, this was down for a

25     compliance checks based on an order that was entered at

14

1    parenting seminar?

2         MR. DRAKE:  I can get one if you want me to.

3         THE COURT:  Okay.  Talk with Mr. Drake and find out

4    when the next available class is, and I'm going to order

5    that you attend the next available class and then go to

6    mediation thereafter, and we'll continue this case for a

7    final hearing if you're unable to resolve it in

8    mediation.  Talk to Mr. Drake and then let me know.

9         LaQuinta Whisby versus Glenn Whisby, Junior.

10        MS. GRIFFIS:  Your Honor, if we may approach.

11        (Whereupon, a brief conference was held at the

12   bench between the Court and counsel.)

13        THE COURT:  April Duke versus Marvin Duke.

14        MS. GRIFFIS:  Your Honor, that's here on a

15   contempt, and Mr. Fanning told me that his --

16        MR. FANNING:  I got a call this morning that he was

17   being admitted to the hospital.  If you'll hold that,

18   I'll confirm.

19        MS. GRIFFIS:  He's just going to confirm and --

20        MR. FANNING:  He better be.  It was a 4:00 o'clock

21   phone call.

22        THE COURT:  Okay.

23        MS. GRIFFIS:  Thank you, your Honor.

24        THE COURT:  Thomas Soukup versus Laurel Soukup.

25        MR. BAILEY:  Good morning, your Honor.  Ralph

16

CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing Second Amended Answer with Affirmative Defenses, Second Amended Counterclaim and a Second Amended Third Party Complaint upon counsel for the opposing parties by hand delivery and electronically to Taylor B. Drake, Peter A. Durham and electronically to Guardian ad Litem, Elizabeth "Lisa" F. Harwell.

This 20th day of September, 2012.

*Millard Farmer*

Millard Farmer
Georgia Bar No. 255300
P.O. Box 1728
Atlanta, GA  30301-1728
(404) 688-8116
millardfarmer@millardfarmer.com
            and
Larry King
Georgia Bar No. 419725
P. O. Box 1648
Jonesboro, GA 30237
(770) 471-3835
Fax (770) 471-8200
larrykingandls@aol.com
**Counsel for Nancy Michelle Murphy**

## Reference to False accusation of Dr. Nice

**Millard Farmer's Response to Grievance of Patricia Gail Jones-Nice, M.D.False statement and false affidavit a Psychiatrist , license, 052124, issued 10/04/2002,**

**1.** The seminal accusations by Dr. Nice are that Millard Farmer learned confidential information about her Illinois License Issues that she disclosed during the course of his representation of her and that he disclosed this information.

1.1 **The accusation is false and further is not a Rule 1.6 violation, as** Millard Farmer never, at any time obtained the information in confidence relating to Dr. Nice's substance abuses and her Medical Board Disciplinary suspensions. This information, for the protection of the public is contained in public records and not secreted from the people of Georgia, as professional licensed persons as a matter of public policy are not allowed to evade disclosure of their illegal conduct by relocating in another State, but even so, Millard Farmer did not know of Dr. Nice's substance abuse issues until he discontinued representing her and she appeared in Court in a mind altering condition.

**The accusation in which Dr. Nice falsely accuses Millard Farmer is not the only false statement by Dr. Nice that is identified and exposed in this response.** Dr. Nice's other false statement obtained by the Renee L. Haugerud directly or indirectly financed law firm was also not learned in confidence, as that other illegal conduct by Dr. Nice disclosed here is also a public record that Millard Farmer is entitled to have verified to the State Bar, as in this matter it functions as the Government and a pattern of filing Bar Complaints containing false information is as relevant to the protection of United States Constitutional Due Process as other protections provided.

The consequence to Dr. Nice and those participating with her for the other false statements made by Dr. Nice should be more severe, as the involved false statements were under oath and involved serious matters before a court that relied upon the professional integrity and personal knowledge of Dr. Nice.

Dr. Nice was paid to provide the statements that she made under oath directly or indirectly by Renee L. Haugerud and her hedge fund entity Galtere LTD.

1.2 **Even if Millard Farmer obtained in confidence, the substance abuse and history of Dr. Nice's substance abuse and it was not** -- the information is a Rule 1.6 exception to confidentiality;

1.3 Millard Farmer no longer represented Dr. Nice by the time that Millard

Farmer learned of her Disciplinary Medical License Suspensions in Illinois. From that State's public records that are published to protect patients with notice to person who have violated the law and could be a danger to others.

1.4   Dr. Nice did not disclose any suspension, or addiction issues before these professional violations were discovered by Millard Farmer.

1.5   The alleged Rule 1.6 information was obtained from the public records of the State of Illinois, after obtaining drug related behavior indications, speech pattern indications, statements and rumors of Dr. Nice's less than normal conduct from community sources and other information that supported that Dr. Nice was under the influence of mind altering medication.

1.6   Millard Farmer, as alleged by Wilmer "Buddy" Parker on behalf of Dr. Nice, has not violated the Rules of Professional Conduct, Rules. 1.6, 8.4, 3.2, 1.8(b), 3.4, and 4.4., as he did not engage in the conduct that is a violation of these rules, as most likely the lawyer who presented Dr. Nice's the affidavit to the Court after being aware of the earlier testimony in open Court by Dr. Nice could have been verified and corrected ,as Millard Farmer verified it.

2.   **The seminal grievance of Dr. Nice** against Millard Farmer arises in connection with *John Harold Murphy v. Michelle Murphy,* Civil Action No. 12V-413 in the Superior Court of Coweta County, and the accusation by Wilmer "Buddy" Parker in a pending a civil RICO Case Civil Action File No. 3:15-CV-00092-TCB brought in the United States District Court for the Northern District Court of Georgia on behalf of John Harold Murphy with funds derived directly or indirectly from Renee L. Haugerud**. Ex xx**

2.1   This  pending federal RICO case is brought against Millard Farmer, Larry King and Deb Beacham and persons accused of acting in concert with them.

One of the alleged initial predicates acts in the civil RICO Case provided to Buddy Parker by John Murphy and Renee L. Haugerud fell apart when Millard Farmer provided indisputable documentation that exposed the alleged predicate act as just another of the untruthful allegation of John Murphy and Renee L. Haugerud. These two persons have made numerous false statements, some of which are under oath made to government authorities and officials.

In order to obtain a modicum of credibility It apparently became necessary for Buddy Parker to Jerry Rig his civil RICO Complaint  against the defendants with alleged violation of the Code of Judicial Conduct violations that are not

even actionable causes of civil action by private parties that triers of fact  and the public could mistakenly assume involve illegal conduct such as the conduct that Dr. Nice committed and the sponsor of the affidavit, if the sponsor had knowledge committed.

Renee L. Haugerud with funds obtained directly or indirectly from her of her hedge fund, Galtere, LTD. Employed a public relations expert for the purposes of the case involving Michelle Murphy and her children.

These attempts at a modicum of credibility attempts also transformed the State Bar grievances into such documents, as the last filing by Buddy Parker on behalf of Dr. Nice and John Murphy into bias appealing statements such as Millard Farmer brought an action against Nan Freeman, the court reporter and Millard Farmer was only attempting to obtain the wealth of Renee L. Haugerud with payoff from her.

Importantly, the judge in all modification of custody cases is the exclusive trier of fact and thereby controls the award of attorney fees. No knowledgeable lawyer would represent the party without any substantial assets against a multimillionaire financed opponent and file twenty State v. Hargis, 294 Ga. 818, 822-823 (Ga. 2014) compliant motions to disqualify the trier of fact.  The prudent lawyer who was only seeking to obtain attorney fees would do just what the lawyers and law firms identified in Ex XX did, represent the interest of Renee L. Haugerud and her hedge fund entities.

That was said to assure everyone that Millard Farmer, was not motivated, nor did he expect to obtain large amounts of money from Renee L. Haugerud, or Nancy Michelle Murphy(Michelle Murphy). Millard Farmer's legal goal was to protect the best interest of the two minor children on behalf of Michelle Murphy. It was the professional judgment of Millard Farmer that this could not be accomplished without the disqualification of Judge A. Quillian Baldwin due to the political dependency of Judge Baldwin upon the Glover & Davis lawyers.

The treatment that Michelle Murphy, Larry King and Millard Farmer received by Judge Baldwin supported that professional opinion of Millard Farmer and Larry King.

The audio recording of the treatment that Michelle Murphy received from Judge Baldwin when he transferred the children to John Murphy is attached.

2.2 The target defendant in the federal case is Millard Farmer. According

to information obtained by Millard Farmer, Renee L. Haugerud, who is a hedge fund operator and the current wife of John Harold Murphy, has stated that she will spend her last penny, if it becomes necessary, to ruin Millard Farmer.

2.2   Renee L. Haugerud, blames Millard Farmer and those accused of acting in concert with him, for exposing her transfer of funds to John Harold Murphy and for exposure of her funding other inappropriate and illegal conduct.

To understand the grievances filed by Buddy Parker on behalf of Dr. Nice and, as well as the assertions of other alleged improper conduct of Millard Farmer by Buddy Parker, it is relevant to identify his pay master and harvesters of allegations against Millard Farmer.

Some the lawyers and law firms directly, or indirectly compensated by Renee L. Haugerud, her hedge fund, Galtere, LTD and other entities of Renee L. Haugerud to oppose Millard Farmer are included as **Ex XX.**

These lawyers and law firm became involved due to the initial representation of Michelle Murphy by Millard Farmer and Larry King during the representation of Michelle Murphy in a legal malpractice case created by Michelle Murphy's attorney, Delia Tedder Crouch, during Michelle Murphy's divorce from John Harold Murphy.

That legal malpractice case evolved into the judicially directed necessity to recovery the fraudulent martial assets that John Murphy secreted from Michelle Murphy during their divorce that John Murphy resisted in releasing.

Later, Millard Farmer and Larry King represented Michelle Murphy in the modification of custody case that John Harold Murphy filed against her.

Renee L. Haugerud became an extremely active participant in the issues related to the modification of the custody of the two minor children.

Michelle Murphy was the custodial parent after the divorce, as she had raised the children since their birth. Renee L. Haugerud's conduct became so active and detriment to the minor children and the ability of Michelle Murphy to be financially protected from the consequences of the control that Renee L. Haugerud had over John Murphy's, once independent income that became exclusively controlled by Renee L. Haugerud and her hedge fund,

Renee L. Haugerud believes that the exposure of her and John Harold Murphy's conduct relating to their treatment of the minor children of Nancy Michelle Murphy made it difficult for Renee L. Haugerud to transfer her hedge fund office to St. Thomas, U.S.V.I.

2.3   By transferring her hedge fund businesses, Renee L. Haugerud has

obtained refuge from regulations by the United States Internal Revenue and the U.S. Securities & Exchange Commission. She also obtained exemption from United States taxes. Renee L. Haugerud and her hedge fund business obtain million of dollars of tax and regulatory benefits by relocating the children of John Murphy, he and John Murphy to St. Thomas, U.S. V.I.  This was suspected, but never known until John Murphy obtained the children and  the family unit moved and qualified for the benefits.

2.4   It is the vengeance sought by Renee L. Haugerud that motivates her to fund a group of actions against the persons who have exposed her and John Harold Murphy's inappropriate and illegal conduct for which lawyers, including Buddy Parker and experts have reaped gigantic fees and have their sights on a perpetual amount of income.

2.5   Michelle Murphy, the natural mother of J.M. and T.M., is a hairdresser and those attempting to assist her had no legal chance of retaining custody of her two minor children whom she had raised since their birth, until Judge Baldwin eventually recused himself after 20 written motions to disqualify him.

2.6   Now that Renee L. Haugerud, her business and her current husband are in St. Thomas, U.S.V.I., they are aligning as many causes of action as possible to disable those who attempted to provide Michelle Murphy legal services and support during her most difficult ordeal attempting to rescue her children from the unhealthy lifestyle of Renee L. Haugerud and John Harold Murphy.

**3. T.M, the youngest of the minor children, of Michelle Murphy, is now living** with Michelle Murphy after the recusal of Judge Baldwin and a final hearing in the modification of custody case. Buddy Parker, who was financed directly or indirectly by Renee L. Haugerud, represented John Murphy during the final hearing in the modification case.  John Harold Murphy is paying no child support for T.M., who is attending a public school in Coweta County.

   Based upon information and belief, counsel for John Harold Murphy financed by Renee L. Haugerud will not provide Michelle Murphy written documentation that she is entitled to have her youngest child,T.M., living with her.

   This conduct, when similar  conduct that occurred during the trial  During the trial Buddy Parker attempted to prejudice Michelle Murphy by informing the Judge that Michelle Murphy would not dismiss the civil action that she has pending against the court reporter. The withholding of the written documentation could be interpreted as using the threat to Michelle Murphy that if she testifies against the interest of Renee L. Haugerud, or John Murphy that she will be subjected to the same type of conduct, that she and her children have just rid themselves, as the oldest child will soon become an adult.

3.1

**4. The Bar Grievance of Dr. Nice**, as was the earlier Bar Grievance filed by Wilmer "Buddy" Parker for John Harold Murphy, is an illegal, integral part of Renee L. Haugerud's attempt to seek the ultimate vengeance against Millard Farmer.

4.1   Dr. Nice is an important witness for Wilmer "Buddy" Parker to have in the RICO case, as is Nan Freeman, the court reporter who overcharged for her work to all civil litigants in the Coweta Judicial Circuit and who failed to take down the entirety of proceedings in an important proceeding in Michelle Murphy's case is certainly not a witness with whom a jury will sympathize.

4.2   Nan Freeman withheld audio recordings until Millard Farmer and Larry King brought an action against her to obtain the audio recordings that memorialized the erratic judicial conduct of Superior Court Judge A. Quillian Baldwin, Jr., who later recused himself in the modification of custody case.

4.3   The background above is relevant to understanding motivation for the Bar Grievances. Millard Farmer requests that the information contained in response to the first Bar Grievance filed by Wilmer "Buddy" Parker on behalf of John Harold Murphy be considered, related to the environment in which Millard Farmer was being required to litigate without having an opportunity to present evidence.

**5. After the workplace related representation of Dr. Nice**, Millard Farmer eventually noticed a strange pattern of physical conduct by Dr. Nice that was also brought to the attention of Millard Farmer by two court workers.

5.1   One of those court workers had many years of experience in detecting erratic conduct by individuals from whom he protected the public.

5.2   Dr. Nice's conduct appeared to be associated with mind altering substances. At least twice that occurred while Dr. Nice was testifying under oath.

5.3   The conduct of Dr. Nice, regardless of the time that it was learned, or the manner in which Millard Farmer learned of the conduct, was conduct that a lawyer may reveal without violating Rule 1.6, as it was information covered by paragraph 1.6 (a) exception providing when a lawyer may disclose. Dr. Nice in her affidavit for use of the custody evaluators at the final hearing, attempted to persuade the Court that it was Michelle Murphy who was an unfit mother. Dr. Nice either made a false statement in that affidavit, or in her testimony early to Judge Baldwin about the times that she had provided professional care to the minor children of Michelle Murphy. The lawyers financed directly or indirectly by Renee L. Haugerud sponsored both of those statement provided under oath

to the court to the relevant issue before the Court on both ocassions.

5.4   A lawyer may disclose Rule 1.6 conduct, *i.e.,* when the lawyer reasonably believes it necessary: to avoid or prevent harm or substantial financial loss to another as a result of client criminal conduct or third party criminal conduct clearly in violation of the law;

5.5   Millard Farmer disclosed the information relating to the disciplinary and Board actions in pleadings in the modification of custody case, as adequate representation of the best interest of the minor children and adequate representation of Michelle Murphy required the disclosure.

Both Dr. Nice and Millard Farmer were morally and ethically required to present the information to the Court, as the court had warned Dr. Nice that she was slurring her speech.  The question remains did Dr. Nice engage in a criminal act in driving to the Court on the condition that she appeared to be testifying. The Court workers had no reason but their concern to report the apparent condition of Dr. Nice. To cure the issue that Buddy Parker presents to the State Bar of Georgia Dr. Nice should be required to provide sworn testimony that she did now have a relapse and that she has not informed any person that she had a relapse from abstention from alcohol, or mind altering substances

6. This information about Dr. Nice was absolutely necessary for substituted counsel for Michelle Murphy to have in the modification of custody case, as Betty King used the information obtained from Dr. Nice in her custody evaluation to the Court. Dr. Nice obtained a substantial part of her information that she provided from conversations with Renee L. Haugerud and John Murphy.

5.7   The December 16, 2015 affidavit from Dr. Nice was vital for the Court in determining custody. It was necessary for the Court to have information to weigh the credibility of this witness, who may or may not been under the influence of mind altering substances when making vital decisions.


**6. John Harold Murphy** was the plaintiff in the underlying modification of custody case. Counsel for John Murphy filed this Bar Grievance on behalf of Dr. Nice, a psychiatrist who treated the minor children in the beginning of John Harold Murphy's modification of custody case.

6.1   The Bar Grievance of Dr. Nice came a year after counsel for John Harold Murphy filed a Bar Grievance against Millard Farmer and filed the federal RICO complaint against Millard Farmer and others in federal court. Dr. Nice's

Bar Grievance is meant to support the RICO complaint. One of their alleged necessary illegal acts by Millard Farmer and those acting in concert with him include false accusations involving "Dr. Nice."

The RICO case is currently pending, *John Harold Murphy v. Millard C. Farmer, Jr., Alfred L. King, Jr., Larry King, P.C., Deborah L. Beacham, and My Advocate Center, Inc.,* Civil Action File No. 3:15-CV-00092-TCB, in the United States District Court for the Northern District of Georgia, Newnan Division.

**7.   Dr. Nice has been making false statements under oath related to her disciplinary status with the Medical Boards.**

7.1   The following information is not necessary for Millard Farmer's Bar Grievance defense; however, it is extremely relevant, as a measure of Dr. Nice's credibility.

7.2   Her false statements should be reported to the DEA and the licensing authorities of Georgia and Illinois for the purpose of protecting the public.

**8.   Credibility of Dr. Nice**

8.1   Unfortunately for society, Dr. Nice does not have clean hands. She has made false statements under oath about her credentials and her involvement in the treatment of the two minor children of Michelle Murphy and John Harold Murphy. Although she had no "in-person counseling sessions" with Michelle Murphy or the minor children after July 24, 2013, she recently gave a false affidavit to the Court (**Ex. 2**), in which she tried to persuade the Court that Michelle Murphy should have no contact whatsoever with her children. Fortunately, the Court was not so persuaded.

8.2   Since the termination of her "in-person" counseling with the children in July of 2013, Dr. Nice purports to have been in close contact with John Harold Murphy and his spouse, Renee Haugerud. The December 16, 2015 affidavit of Dr. Nice, two and a half years after she last had contact with Michelle Murphy or the minor children, reveals that she maintained frequent contact with John Harold Murphy and Renee Haugerud. The affidavit does not reveal the compensation and benefits received by Dr. Nice from John Harold Murphy and Renee Haugerud for this contact.

8.3   Dr. Nice's physician profile is public information. Anyone can obtain this information from the website of the Composite Board of Medical Examiners, which is what Millard Farmer did at the time he first met Dr. Nice in January of 2011, more than a year before the child custody case was filed.  The profile

which was obtained at that time (**Ex. 1**) shows that she was first licensed to practice medicine in Georgia in October of 2002.

8.4   Dr. Nice's false affidavit, which was dated December 16, 2015 and obviously written by counsel for John Harold Murphy, clearly states, "After practicing for a few years in Chicago, Illinois, I have had a private practice in Newnan, Georgia since 1996." (**Ex. 2, p. 1**). Actually, Dr. Nice was in a four-month treatment program for substance abuse beginning in November, 1996 (**Ex. 3, p. 16**) and her medical license and controlled substance license were suspended in December, 1996 (**See Ex. 3, pp. 9-12**).

8.5   Dr. Nice's affidavit goes on to state that she "regularly treated [the minor children in this child custody case] from 2011 to 2013. I saw them monthly on a regular basis" (**Ex. 2, p. 1**). This recent affidavit was submitted to Senior Superior Court Judge E. Byron Smith, the replacement judge for Superior Court Judge A. Quillian Baldwin, Jr., who recused himself in February, 2015 after Millard Farmer penned more than twenty motions to disqualify Judge Baldwin since the case was brought in April, 2012.

8.6   However, in August, 2013, Dr. Nice testified before Judge Baldwin that she started treating one of the minor children in **April, 2012**, and the other in **May, 2012.** She further testified that she had not seen the children in May, June, or July of 2013. (**Ex. 4, pp. 1-3,** excerpts of proceedings before Judge Baldwin on August 13, 2013).

8.7   Dr. Nice's false affidavit was relied upon by Elizabeth "Betty" King, Ph.D., the "custody evaluator." Betty King testified that Dr. Nice, according to her affidavit, treated the minor children from 2011-2013. Buddy Parker further asked Elizabeth King, Ph.D., (**Ex. 11, p.** 1) to read paragraph **7 of Dr. Nice's affidavit** (**Ex. 2, p. 3**), without further comment, solely to prejudice Michelle Murphy. Had the concerns expressed in paragraph 7 been based on Dr. Nice's personal knowledge, they should have been revealed in August, 2013.

8.8   In this recent affidavit before Judge Smith, who replaced Judge Baldwin after his recusal, Dr. Nice not only made false statements about her credentials, but falsely stated that she treated the children over a three-year period, "from 2011 to 2013," (when she had in fact treated them less than half that time, and had not seen them for two and one half years at the time of her affidavit in December, 2016). (**Ex. 4, pp. 2-3**)

**9.   Information Obtained by Millard Farmer Two Days before Dr. Nice's Testimony and Pursuant to an Open Records Request after Dr. Nice's Testimony on April 13, 2013.**

9.1   In addition to Dr. Nice's strange behavior, Millard Farmer had obtained information from Michelle Murphy and other sources about the effect of Dr. Nice's medication previously prescribed for the children, the long waiting periods when they had scheduled appointments, and reports about Dr. Nice's "pill pushing" behavior.

9.2   Millard Farmer attempted to contact Dr. Nice several days before the August 13, 2013 hearing to talk with her. By August 11, Dr. Nice had not returned Millard Farmer's calls. On that day, Millard Farmer's paralegal checked the Georgia Composite Board of Medical Examiner's website. (**Ex. 12**) The paralegal then decided to check with the Illinois regulatory agency over physicians, and first encountered a page (**Ex. 13**) which contained a link to follow for disciplinary actions. She clicked on it, and pulled up a summary of disciplinary actions against Dr. Nice (**Ex. 14**).

### Illinois Department of Financial & Professional Regulation

**Manuel Flores, Acting Secretary**

8/11/2013
Information found on:
Patricia G Nice MD, 36073713, Newman, GA

| Action | Discipline Start Date | Discipline End Date | Reason For Action |
|---|---|---|---|
| Probation | 06/04/2001 | 04/03/2006 | Restored and placed on indefinite probation. |
| Suspension | 12/11/1996 | 06/04/2001 | Failing to comply with the terms and conditions of a previous Medical Disciplinary Board order. |
| Suspension | 04/19/1990 | 02/23/1990 | |
| Fine | 04/19/1988 | | |
| Probation | 04/19/1988 | 04/19/1990 | |

**10.   This was absolutely the first knowledge** that Millard Farmer had of any disciplinary actions against Dr. Nice. The only other information that could be obtained was from a link defining the various disciplinary actions (**Ex. 14**). Millard Farmer was prepared to cross-examine Dr. Nice about this when Judge Baldwin terminated the cross-examination. The record reflects that Millard Farmer was in the middle of the cross-examination when it was terminated. (**Ex. 4, p. 5**).

10.1   Late in the afternoon of August 12, 2013, Millard Farmer did speak with Dr. Nice, although the conversation in no way resembled her description Grievance. As with other "exaggerations" about her credentials and her involvement in treating the minor children, her allegations are simply untrue. For example, had she said anything about recommending a "psycho-sexual" evaluation, Millard Farmer most certainly would have remembered this. The first time he heard Dr. Nice or anyone mention a "psycho-sexual" evaluation was the following day during her testimony. Even Judge Baldwin thought this was ridiculous, and would not order it.

10.2 After the strange behavior of Dr. Nice on August 13, 2013, Millard prepared a records request to the Illinois regulatory authority on August 15, 2013. (**Ex. 15**). The Response to this request was received on or about September 12, 2013 (**Ex. 3**). Only the referenced pages of this thirty-one page report are attached; the remaining pages are electronically stored and can be sent upon request.

10.3 On August 14, 2013, Millard Farmer's paralegal sent an open records request to the Georgia Composite Board of Medical Examiners. A response was received August 16, 2013 (**Ex. 16**).

10.4 The background of Dr. Nice's history in Illinois follows, as stated in the Administrative Law Judge's Report and Recommendation filed in *In Re The Petition of Patricia Jones-Nice,* No. 95-9787, in the States of Illinois Department of Professional Regulation:

> On or about April 19, 1988, Petitioner entered into a Consent Order whereby Petitioner's Physician and Surgeon License was placed on Probation for two (2) years. On or about February 23, 1990, Petitioner entered into a Modified Consent Order which terminated the Probation and then Petitioner [Dr.Nice] entered into a Care and Counseling Agreement with the Department and Board due to an alcohol dependence.

> In 1995 and 1996, the Department received information that the Petitioner was abusing controlled substances.

> On or about July 17, 1996, the Board ordered Petitioner to submit to mental and physical examinations within thirty (30) days of Petitioner's receipt of the Order. Said failure resulted in a Stipulation and Recommendation for Settlement entered into between Petitioner and the Department. The former Director of the Department, Nikki M. Zollar, approved and adopted the Stipulation and Recommendation for Settlement, resulting in a December 11, 1996 order suspending Petitioner's license and controlled substance license. [**Ex. 3, p**. **12**, records received from the Illinois Department of Financial and Professional Regulation]

10.5 Approximately four years after Dr. Nice's license and controlled substance licenses were suspended in December, 1996, she petitioned to terminate the suspension of her physician's and surgeon's license. On June 4,

2001, an Order was entered restoring Dr. Nice's physician and surgeon's license in Illinois, but with "***Indefinite Probation***." However, Dr. Nice's petition to restore her Controlled Substance Registration was ordered to remain "***Indefinitely Suspended.***" **Ex. 3, pp. 7-9.** It appears that in 2006, Dr. Nice's probationary period, ended, which should have been reported in order for it to appear on the Georgia Medical Board's Physician Profile relating to disciplinary action.

## 11.   The Bar Complaint Seeks Additional Vengeance for Millard Farmer's Exposure of Wrongdoing

11.1 As unbelievable as it may seem, Millard Farmer has no animosity to Dr. Nice, but has a vested interest in halting the extraction of vengeance from Millard Farmer for the exposure of the illegal conduct of Taylor Drake and the Glover & Davis lawyers for using a false affidavit from John Harold Murphy that was suborned by Taylor Drake in order to obtain the selection of Judge A. Quillian Baldwin, Jr., in violation of a mandated Uniform Superior Court Rule 3.1 Case Management Plan.

11.2 On one of the occasions when Dr. Nice's conduct appeared to be under the influence of some type of mind altering substance, Judge Baldwin commented that she was slurring her speech (**Ex. 4, p. 4**) and later terminated the testimony of Dr. Nice in the middle of Millard Farmer's cross-examination. This is reflected in the transcript (**Ex. 4, p. 5**).

11.3 Judge Baldwin would not allow Millard Farmer to present evidence to an independent judge in support of any of his 20 disqualification motions and refused the right of Millard Farmer even to file motions. The medical records of Judge Baldwin are relevant to determining if he was on prescribed medication. The State Bar of Georgia has a *Brady v. Maryland,* due process obligation to accused persons.

11.4 This Bar Grievance was filed as an ancillary part of Buddy Parker's federal and state civil RICO actions filed on behalf of John Harold Murphy and compensated by funds from Renee L. Haugerud and her hedge fund businesses. There has been a previous Bar Complaint filed by Buddy Parker on behalf of John Harold Murphy and funded by Renee L. Haugerud against Millard Farmer. The vengeance that John Harold Murphy and Renee L. Haugerud attempt to extract with these actions relate to the exposure of illegal conduct by Millard Farmer in a modification of custody of custody case where Millard Farmer represented Michelle Murphy. Buddy Parker additionally entered an appearance in this child custody case one day before the final hearing in order to obtain prejudicial testimony for his federal RICO action and to intimidate

Michelle Murphy and her counsel.

11.5    Dr. Nice became a part of that litigation when Dr. Nice was first called as an expert witness by the guardian ad litem (**Ex. 5**, excerpt from November 30, 2012 transcript) appointed by Judge Baldwin, who eventually recused himself from the litigation and has now taken Senior status.

11. 6    An example of the type of witnesses, other than Dr. Nice, upon which Taylor Drake, counsel for John Harold Murphy relied is included in the transcript excerpt of the cross-examination of Judge Baldwin's custody evaluator, Elizabeth "Betty" King, a psychologist (**Ex 11, p. 2**). She testified that she sent a gratuitous draft of her report on a Rule 35 examination of Michelle Murphy to counsel for John Harold Murphy before she circulated the final report counsel for both parties, and received "data" from him in response.

## 12.    Millard Farmer's Further Response

12.1 **The initial interview** of Dr. Nice with Millard Farmer and his paralegal was on **Thursday, January 27, 2011.**

12.2    Millard Farmer had never seen or dealt with Dr. Nice before she walked into the office for an interview and only had heard that Dr. Nice sought an appointment to discuss workplace related issues at the mental health facility where she worked as an independent contractor.

12. 3    The issues Dr. Nice discussed with Millard Farmer could have resulted in compensated representation, *pro bono* representation, or, after the initial visit, it could have resulted in nothing, *i.e.*, no representation.

12.4    There was no discussion involving Dr. Nice's medical license, or her use of controlled substances in the initial conference. As a matter of course, Millard Farmer searched Dr. Nice's physician profile with the Georgia Composite Board of Medical Examiners, as previously discussed. See **Ex. 1.**

12.5    Millard Farmer believed that he resolved all of the issues which were discussed in the initial consultation until Dr. Nice emailed that some papers and log book were missing from her former workplace and she referenced a "slander" allegation about which Millard Farmer did not and had no plan to represent Dr. Nice.

12.6    The only mention of anything related to a "pain pill problem" first appeared to Millard Farmer in a March 3, 2011 email concerning what Dr. Nice referred to as slander by a former colleague, and that he would make things up about her and report her (**Ex. 10**).

12.7    Dr. Nice did not obtain a *pro bono,* season ticket for Millard Farmer to

represent of her. More importantly, Millard Farmer had no Rule 1.6, or any other Bar ethical obligation to withhold Rule 1.6 exempt illegal conduct of Dr. Nice.

12.8    Dr. Nice, at a minimum, has engaged in the identified false statements under oath that relate to her medical conduct that should be investigated and called to the attention of the DEA and the Composite Board of Medical Examiners. This conduct creates a danger to third persons, as well as those who were affected by the false statements.

12.9    Dr. Nice has been, and may still be, a hostage to her unprofessional conduct.

12.10   The agreement that Dr. Nice had with the mental health entity for which she worked was either suspended, or terminated.

12.11   The paralegal of Millard Farmer took the following notes, with the names only redacted, on January 27, 2011. These notes are in their rough draft condition, as they were retrieved from the archived computer files of Millard Farmer relating to Dr. Nice. Millard Farmer and his paralegal, until searching for the possibility of e-mail communications, had no memory of the e-mail content relating to an allusion to a "pain pill problem."

The initial interview notes follow. There were no further file notes taken, as this was a simple problem to address.

Patricia Nice, M.D.
xxxxxxxx@numail.org

Cell:  xxxxxxxxxx
Home:  xxxxxxxxx
Patricia Nice, M.D.
xxxxxxxxxxxxxxxx Drive
Newnan, GA  302xx

Worked at Pathways for 8 years.
Has worked in 8 different clinics.  Past several years only in Coweta and Meriwether.
8 Franklin Road, Newnan. Next week moving to bigger bldg..
Who are the clients?
Adult psychiatrist originally, now sees mostly kids, adolescents.
Medicaid, patients with no insurance.
She is paid $125 per hour.  Independent contractor.  Gets 2 hours travel time per day.
If she sees one patient or 50, same.
County manager, office manager, front office clerk/sec, maybe therapist, CSI (community support person).
8 years ago in Meriwether, no doctor there.  Now one of the busiest clinics.  She is the only psychiatrist.

14

She runs the clinic there. Hospital behind it.

Dr. xxxxxxx was director for 15 years, asked for 6 weeks off for prostate cancer and was fired. Run by a Board of Directors.

Joan xxxxxxx, Executive Director for years, married to Judge xxxin Meriwether County.  He was good; she was screwed up.

After Dr.XXXX, they hired xxxxxxxxxxxx, M.D.  She quit 8-10 months ago as medical director. Medical Directors are only figure heads. No power.

Now, have only a Medical Director at the hospital, not at the clinic.

Lots of state violations by Pathways:

She has documentations as of August 2010 of violations.

PathwaysCSB.org

Pathways Center for Behavioral and Developmental Growth

Pathways Community Services Board

Pathways Mental Health Center, non-profit subsidized by State

Coweta, Meriwether, Troup, Lamar, Spalding, Heard

Executive Director has hired people to come into Newnan office.


Dr. Nice had worked Tues, Wed, Friday about 15 hours a day.

On Friday morning, Jan. 21, got a call from Human Resources at 8AM demanding her to come in.

Called back at 9AM, she was at the doctor.

Human Resource person said she was suspending her.  Said she was under a gag order, cannot speak with anyone.

xxx xxxxxxx is Meriwether County Mgr; an alcoholic.

They will not talk to her nurse, do not want to hear the truth.

Saturday, Nice cleared out office xxxxxxxxxxxxx

They have been hiding tape recorders all over the office.

Charges against her:

1) Paid to have a dog put down.

2) Treating "consumers" out of her home.  She has never treated any patient out of her home.  She is allowed to have a private practice

3) Marijuana grinder turned in from patient; Dr. Nice locked it up in a cabinet.  She was told by HR that day that she should have turned it over to the police. xxxxxxxr changed story to protect herself.

4) Wrote Rx for Prenatal vitamins, iron for pregnant patient who was depressed

5) Having patients bringing medications back.  She does this when medicines do not work out. Locks it in the filing cabinet. Standard of care so no overdose.

6) Treated staff.  (every director has had her treat the staff; kept files on them, some charts missing.

7) Wait time for her patients. It is unethical to try to see a patient in 15 minutes.  She fills out forms, makes phone calls.  She is double or triple booked without ancillary help.

8) Does too much blood work.  American Academy recommends every 3 months.  She does it every 6 mos., not often enough. Sometimes throw in a PSA, has caught 5 prostate cancers in past year.

9)  Staying late (because she has so much other stuff to do)

xxxxxxx brought in evil people, xxxxx and xx.
, 2nd in command, two mos. Ago told her there has not been a complaint against Dr. Nice.
Told a patient xxxxxx that Dr. Nice was not taking patients.
xxxxx, Office Manager, hollered in front of patients. Emotionally abusive to Dr. Nice.

Dr. xxxxxx is other doctor; not a good doctor.
Dr. Nice buys pregnancy tests, and clinic charges Medicaid for it

Other CSB
**[End of notes]**

12.10   On the day following the initial meeting, January 28, 2011, Millard Farmer drafted a letter for Dr. Nice to send in an effort to resolve the workplace related issues.

12.10.1    The letter that Millard Farmer drafted, *pro bono*, for Dr. Nice to send on a letterhead that was computer generated for her to use and send to the entity for which she worked is **Ex 6.**

12.10.2    Other than advising Dr. Nice that she should not litigate the workplace issues that resulted in the termination of her agreement, the assistance in drafting the letter concluded the workplace legal issues and was designed to close the representation.

12.10.3    Millard Farmer perceived that Dr. Nice was dedicated in treating primarily indigent persons whom she on occasion financially assisted, she had a minor child and knowing that her employment had been terminated, did not charge Dr. Nice a fee. As a customary practice, but without a specific present memory, Millard Farmer would have told her good-bye, there will be no charge for his services and if she had additional need for our services, to contact him.

12.11    Dr. Nice did e-mail Millard Farmer on two occasions.

12.12    Millard Farmer attempted to refer Dr. Nice to professionals who could handle her administrative questions that need to be addressed with her new practice, such as billing. This was not a function that Millard Farmer had the time, or desire to assume other than to identify resources.

12.13    The needs of Dr. Nice appeared simple: to break away from her former workplace without further hostility, as litigation could not cure the systemic wrongs she identified, and obtain administrative support in opening a private practice.

12.14    On February 4, 2011, Millard Farmer received an email expressing

thanks for his initial help and seeking information about obtaining her log book. This was a viable legal issue that, too, could have an informal disposition. Apparently, Dr. Nice had been told how busy Millard Farmer's practice was, as she mentions that at the end of that February 4, 2011 letter in which she sought more assistance. (**Ex. 7**) The need for the log book, at the time appeared to be just a prudent medical practice.

12.15    Millard Farmer answered Dr. Nice's email. (**Ex. 8**)

Primarily due to Dr. Nice's gender, and/or the fear of her professional expertise and the bias of her new landlord, Dr. Nice was not being accepted as a person who could deal with her new office lease (**Ex. 9**)**.** That is the type of conduct by a landlord that offends us so much that Millard Farmer informally attempted to correct the problem.

12.16    Millard Farmer made phone calls to the landlord and attempted to bridge the difference of understanding and trust between the two parties until Dr. Nice could get settled in to the new office space.

12.17    Millard Farmer was not informed of any prior disciplinary, or medical board issues involving Dr. Nice.

12.18    On March 3, 2011, Dr. Nice wrote another email concerning an ongoing issue. In that email, she informed Millard Farmer that a former colleague, a physician whom she had assisted for years, was trying to undermine her now that she was in private practice, and had begun to slander her. (**Ex. 10**)

12.19    If the slander had been the legal issue for which Millard Farmer's legal services had been sought, and, if Millard Farmer had not initially seen the Georgia Medical Board information that reflected the absence of disciplinary actions, Millard Farmer would have suspected that Dr. Nice had not been truthful about her workplace issues at this point and inquired of Dr. Nice about her Illinois record, although this had nothing to do with Millard Farmer's representation of Dr. Nice.

12.20    It was only responding to this Bar Grievance by searching and reading Dr. Nice's archived file on Friday, May 6, 2016, that Millard Farmer had his memory refreshed about the existence of anything contained in Dr. Nice's March 3, 2011 email which referenced treatment for a "pain pill problem" and that she was afraid a former colleague would "make things up" about her and report her to the Medical Board. (**Ex. 10**)

12.21    Frankly, at the time Millard Farmer received the email, it appeared to be of no legal importance**,** as there had been no mention of any prior medical

board, or other disciplinary actions during the phone call arranging for the meeting with Dr. Nice, or during the meeting with Dr. Nice.

12.22   Millard Farmer is certain that he had no knowledge of Dr. Nice's background during or after this time period, as he would have never suggested to Michelle Murphy that she consider Dr. Nice as a medical provider to her children.

12.23   As customary, when Millard Farmer interviews potential professional clients, there is a check of the individual's background with their licensing board before the person arrives for an initial interview. This is done to avoid embarrassing questioning about this relevant matter in understanding the seriousness of the potential representation. Dr. Nice's physician's profile with the Board (**Ex. 1**) reflected no medical board actions against Dr. Nice. The internet sites referencing Dr. Nice, albeit that this source of information is often not accurate contained not adverse information about Dr. Nice.

12.24   A product of Dr. Nice's conduct includes making deceptively false statement under oath for use by the State of Georgia. See, the December 16, 2015 Affidavit to the Superior Court of Coweta County (**Ex. 2, p. 1**) that is different from the deceptively false statement under oath in August, 2013 (**Ex. 4, pp. 1-3**). Additionally, the Composite Board of Medical Examiners indicates that no disciplinary actions had been taken against Dr. Nice since April 11, 2001. This is the result of incorrect reporting by Dr. Nice to the medical board that is actionable conduct, in and of itself.

12.25   Dr. Nice did not mention any prior disciplinary or medical board issues.

12.26   The situation where a former colleague was saying bad things about Dr. Nice appeared to Millard Farmer to be more of the workplace back and forth communications about dissatisfaction rather than notice of Medical Board actions, as according to the Georgia Medical Board information that Millard Farmer reviewed at the time, Dr. Nice engaged in her initial conference indicated no prior issues.

12.27   There is a serious history of disciplinary actions by the Illinois Medical Board that should have appeared in the Georgia Medical Board physician profile, as Millard Farmer understands the reporting duty by the Georgia Medical Board. (**Ex. 3**).

Apparently another lawyer or professional dealt with these issues and Dr. Nice intended to secret this information from Millard Farmer.

12.28   It is relevant to provide the full name and license number of

"Dr. "Patricia G. Nice" in whose name that Wilmer "Buddy" Parker filed the Grievance. "Dr. Nice," as she is professionally known, is registered under the name, "Patricia Gail Jones-Nice." Her license number is 52124.

12.29     The name, "Patricia G. Nice," or just the last name of "Nice" does not, and never has, reflected her Georgia Composite Medical Board's Board of information about her status, as a physician and psychiatrist.

12.30     Millard Farmer never obtained **"confidential"** information about the allegations involving her substance abuse issues. Millard Farmer never obtained, expected, or asked for compensation, or anything of value from Dr. Nice. There was never a hint of *quid pro quo* between Dr. Nice and Millard Farmer.

12.31     If Millard Farmer had known that Dr. Nice had the disciplinary history as reflected by the Illinois medical board, she would have been the last person Millard Farmer would have wanted as a witness or an expert dealing with Michelle Murphy's children.

12.32     Dr. Nice was and is a hostage to her disciplinary background, and obviously counsel for John Harold Murphy used this to obtain the false affidavit (**Ex. 2**) in a futile attempt to terminate Michelle Murphy's visitation rights with her children. Dr. Nice is also a hostage of John Harold Murphy and Buddy Parker in the RICO action because of her false swearing.

12.33     The affidavit of Dr. Nice obtained by counsel for John Harold Murphy (**Ex. 2**) does not disclose the payments that have been made to Dr. Nice by John Harold Murphy and Renee L. Haugerud and others on their behalf. The affidavit does not disclose the Medical Board Orders involving Dr. Nice, nor does the affidavit disclose the false statements that Dr. Nice has made relating to her licenses.

12.34     A reasonable person can assume that it is and was those characteristics that brought Dr. Nice to the door steps of the financial wealth of Renee L. Haugerud, the hedge fund operator who is the wife of John Harold Murphy, and into the civil RICO action against Millard Farmer, Larry King and others accused of acting in concert with them.

12.35     Dr. Nice was not charged a fee by Millard Farmer, nor was anything expected from her.

12.36     Millard Farmer's law practice is not designed to, nor does it have, an annual net income.

12.37     This is not to say that some clients do not pay near market price for

legal services in order that other clients, without funds, can be assisted.

12.38    Millard Farmer applies his legal skills seven days a week and accepts, as a part of the practice, that some evil or unethical intent will be attached to his assistance of unpopular clients, or representation of other clients without any diminished tenacity and persistence in challenging illegal and unethical conduct of judges and others with political power, whom, when challenged, will retaliate to the extent of using their judicial favoritism to have Millard Farmer and his client punished in order to deter his and others' conduct in challenging their illegal conduct.

**Conclusion**

Renee L. Haugerud and John Harold Murphy have used the offense of bankrolling a RICO Action, two Bar Grievances and a motion for attorney fees for abusive litigation in seeking vengeance against Millard Farmer. The Bar Grievance of Dr. Nice is only a proactive defense of her own illegal conduct, as Buddy Parker enlisted her as a bogus victim in the purported RICO action. The ethical and illegal wrongdoing relating to the RICO action is John Harold Murphy and Buddy Parker extorting money from Larry King's insurance carrier, because it would not be economically feasible to defend it.

This 9th day of May, 2016.

Respectfully submitted,

*Millard Farmer*

Millard Farmer, Georgia Bar No. 255300
P.O. Box 1728
Atlanta, GA 30301-1728

**ORIGINAL**

FILED IN OFFICE
CLERK OF
SUPERIOR/JUVENILE
COURT

2013 OCT -7  AM 10: 32

CINDY G. BROWN, CLERK
COWETA COUNTY. GA

IN THE SUPERIOR COURT OF COWETA COUNTY
STATE OF GEORGIA

John Harold Murphy,
Plaintiff
   vs.

Nancy Michelle Murphy,
Defendant/Third Party Plaintiff
   vs.

Renee Haugerud,
Third Party Defendant

Civil Action No. 12V-413

### Affidavit of Alfred Larry King, Jr.

State of Georgia
County of Fulton

Personally appeared before me the undersigned authority, Alfred Larry King, Jr., most frequently identified as Larry King, who being first duly sworn, deposes and says as follows.

1. I am an attorney who is a member in good standing of the State Bar of Georgia. I practice law in Jonesboro, Georgia with the firm of Larry King P.C.

2. This affidavit is provided for all uses allowed by law, and, more particularly, for use as evidence in connection with events that occurred in the Superior Court of Coweta County on Thursday, October 3, 2013 before Judge A. Quillian Baldwin in the above styled case and leading up to the events that occurred on Thursday, October 3, 2013.

3. I first became knowledgeable about circumstances and events related to litigation between Nancy Michelle Murphy and John Harold Murphy in 2008 when I was employed as an expert witness in a legal malpractice case brought by Millard Farmer on behalf of Nancy Michelle Murphy. That case was in the

**Attachment 96, Page 1 of 23**

Superior Court of Coweta County and styled Nancy Michelle Murphy, Plaintiff vs. Delia Tedder Crouch, Civil Action No. 08-V-2137. The Amended Affidavit that I provided in that litigation is **Attachment 3.**

4.     The legal malpractice litigation involved the 2006 Final Decree of Divorce that included a Settlement Agreement that was made a part of the Final Decree in the Superior Court of Troup County styled Murphy v. Murphy, Civil Action 04-CV-494. This final decree is the decree that John Harold Murphy seeks to have modified in this current litigation.

5.     In connection with the legal malpractice litigation the following materials are included in the materials that I reviewed.

5.1   I reviewed the Complaint and the attachments to the Complaint, which include some of the following documents that I identify that I have read.

5.2   I reviewed the December 20, 2006 Final Decree of Divorce of the Superior Court of Troup in Murphy v. Murphy, Civil Action 04-CV-494 and Exhibit A to the Final Decree of Divorce, a Settlement Agreement, made a part of that Order.

5.3   I reviewed the April 24, 2007 Qualified Domestic Relation Order Regarding AXA Equitable Life Insurance Company Pension, which is referred to at times in the Complaint as the AXA QDRO.

5.4   I reviewed the December 2, 2008 letter to Michelle Murphy from Sheila Labita, CEBS with AXA Equitable.

5.5   I reviewed the Domestic Relations Financial Affidavit provided by John Murphy to the Court on November 22, 2005.

5.6   I reviewed the transcript of the August 7, 2006 hearing, where the settlement agreement was read in open court.

5.7   I reviewed the transcript of the October 18, 2006 hearing relating to the enforcement of the settlement agreement.

**Attachment 96, Page 2 of 23**

5.8   I reviewed the transcript of the November 15, 2006 hearing relating to the enforcement of the settlement agreement.

5.9   I reviewed by scanning the certified copy of the entire record of the Superior Court of Troup County in Murphy v. Murphy, Civil Action 04-CV-494 and selected documents in that record to read in their entirety and thumbed through other documents to view the nature of the document.

5.10   I reviewed the Billing Statement of Delia Tedder Crouch to Michelle Murphy for legal services provided in connection with a domestic relation matter that involved litigation in the Superior Court of Troup in Murphy v. Murphy, Civil Action 04-CV-494 and in the implementing of the Final Decree if Divorce in that litigation.

5.10.1  During the divorce litigation five (5) different Superior Court Judges were involved in segments of the litigation.

5.10.2  Neither party sought to remove any of the five judges from the case.

5.10.3 Each of the five (5) judges served, as the judges appeared on hearing days, or as they were available for particular segments of the divorce litigation.

5.11   That litigation was settled with a confidential settlement agreement that I did not negotiate, or participate in negotiating.

5.12   My experience with the post-divorce malpractice litigation provided me the knowledge and understanding of the issues between the parties such that I accepted the request for my participation as counsel in the modification for custody action that John Harold Murphy filed against Nancy Michelle Murphy.

**Attachment 96, Page 3 of 23**

5.12.1    In my attempt to promptly resolve the dispute in this litigation, after Renee Haugerud was made a party to the litigation, but before her answer was due or she had retained counsel, I reached out to her with a letter that resulted in her calling me. I offered to meet with me at her convenience at her home in Chattanooga, Tennessee. I extended this invitation, as she had been implemental in resolving the dispute in the malpractice case. After a cordial conversation, she refused to meet with me in an attempt to reach a resolution in this case.

6.    I began representing Nancy Michelle Murphy when John Harold Murphy brought this current action against Nancy Michelle Murphy and have represented her continually since that time with Millard Farmer.

7.    Based upon my extensive knowledge of domestic relations law and lengthy experience with litigation, the initial incident of Judge A. Quillian Baldwin, Jr. signing an order that was reported to me that he did not read designating a guardian ad litem with authority not authorized by the Uniform Superior Court Rules, and the process by which Judge A. Quillian Baldwin, Jr. was obtained to be the judge in the case, I was an active decision maker with Millard Farmer and Nancy Michelle Murphy in making the determination that a motion to disqualify Judge A. Quillian Baldwin, Jr. was necessary as an initial step in obtaining a fair proceeding for Nancy Michelle Murphy and her two children.

8.    Throughout this litigation, I have been an active decision maker with Millard Farmer and Nancy Michelle Murphy in continuing to pursue the disqualification of Judge A. Quillian Baldwin, Jr.

8.1   The reasons for the disqualification of Judge A. Quillian Baldwin, Jr. have escalated at each phase of this litigation. Nancy Michelle Murphy, nor

**Attachment 96, Page 4 of 23**

her counsel have ever been treated equally with John Harold Murphy, Renee Haugerud and their counsel.

8.2   The inequality of treatment received by Nancy Michelle Murphy and her counsel has never been legally justified.

9.   Never have I been so certain that Judge A. Quillian Baldwin, Jr. should have been and now should be disqualified as on Thursday, October 3, 2013.

9.1   On that Thursday, October 3, 2013, I realized that the conduct of Judge A. Quillian Baldwin, Jr. was more vindictive against Nancy Michelle Murphy and everyone assisting her than just his vendetta against Millard Farmer for his ill-perceived role of being the most active participant in attempts to disqualify Judge A. Quillian, Jr. There is no legal basis for the vindictiveness and bias that Judge A. Quillian Baldwin, Jr. has exercised against Nancy Michelle Murphy and her counsel.

9.2   Millard Farmer has been the scribe, expressing the law and the facts marshalled by the team of people who have attempted to assist Nancy Michelle Murphy and her two children. Beginning with the initial disqualification motion there was and is uniformity of belief by the legal team supporting Nancy Michelle Murphy that Judge A. Quillian Baldwin, Jr. is disqualified to serve in any capacity in this litigation.

10.   On Thursday, October 3, 2013 I appeared in Courtroom B of the Superior Court of Coweta County. I appeared to answer the call of the calendar call in Murphy v. Murphy.

10.1   The Thursday, October 3, 2013 calendar posted and sent to counsel from the Clerk of Court of Coweta County does not indicate that a motion for contempt is on the Thursday, October 3, 2013 calendar, as the "Prosecutor/Plaintiff" Taylor Drake of Glover& Davis did not obtain and serve a Rule Nisi upon either Nancy Michelle Murphy, or her counsel.

**Attachment 96, Page 5 of 23**

10.2   The case was requested to be placed on the calendar by "Prosecutor/Plaintiff Attorney Drake, Taylor." The calendar also designated as a movant, "Prosecutor/Plaintiff Harwell, Elizabeth F., GAL." A true and accurate clip from the Murphy v. Murphy segment of the Superior Court of Coweta County calendar for Thursday, November 3, 2013 is as follows.



10.3   Upon call of the calendar above the Court proceeded to hear a Motion for Contempt against only Nancy Michelle Murphy that was filed on August 29, 2013. This Motion for Contempt was for an Indirect Contempt based upon allegations that occurred outside the presence of the Court. The motion sought criminal and other sanctions against Nancy Michelle Murphy.

10.4   Upon the call of the calendar above the Court also proceeded to hear an Amended Motion for Contempt that was filed against Nancy Michelle Murphy on September 27, 2013. The Glover & Davis lawyers did not even serve me with a copy of this motion as their "Certificate of Service" clearly shows as follows.

**Attachment 96, Page 6 of 23**

CERTIFICATE OF SERVICE

This is to certify I have this day served a copy of the foregoing "**AMENDED MOTION FOR CONTEMPT**" via email and by depositing a copy of same in the United States Mail in an envelope with adequate postage thereon and properly addressed as follows:

Millard Farmer
P. O. Box 1728
Atlanta, Georgia 30301-1728

millardfarmer@millardfarmer.com

Elizabeth F. Harwell
12 Jackson Street
Newnan, Georgia 30263

eharwell@hbhlawyer.com

This ____27th____ day of September, 2013.

10.5   The September 27, 2013 Amended Motion for Contempt only apprised me as follows about the disposition that was sought against "Defendant's lawyer." Note "lawyer" is in the singular and not "lawyers" in the plural. There are two lawyers for Nancy Michelle Murphy. A charging document must identify the person who is being charged. When the defendant has two lawyers the charging document cannot require either lawyer to guess who is charged with the alleged contemptuous conduct. The term "sanction" further does not define the scope of punishment sought that places the charged party on notice if the charges must be proven beyond a reasonable doubt. The snip below is from the September 27, 2013 Amended Complaint.

# that this Court sanction Defendant's lawyer

**Attachment 96, Page 7 of 23**

**The Amended Motion for Contempt, Containing Distinct and Very Different Grounds for Contempt was Filed on Friday, September 27, 2013, Just Six (6) Days, that included a Saturday and a Sunday, Before the Thursday, October 3, 2013 Hearing, which was Twenty five (25) Days before a Response was Due on Monday, October 28, 2013**

10.6     It was and is my strong legal opinion that Nancy Michelle Murphy should not be assessed blame for the attempted due process violation of the "Prosecutor/Plaintiff" Taylor Drake of Glover & Davis.

   10.6.1  The time between the filing of the Amendment to the Motion for Contempt by the "Prosecutor/Plaintiff" Taylor Drake of Glover& Davis and the hearing was so short that even the "Prosecutor/Plaintiff" Taylor Drake of Glover & Davis did not have his witnesses present for the hearing, only served one lawyer, did not obtain or serve a Rule Nisi and did not serve a Notice of Hearing upon any lawyer for Nancy Michelle Murphy.

   10.6.2     The challenges that I attempted to address on behalf of Nancy Michelle Murphy are legal issues that any lawyer is entitled to raise without having his professional reputation attacked by being cited for contempt of Court, as I was cited by Judge A. Quillian Baldwin, Jr.

   10.6.3     In my more than thirty-seven years of practicing domestic relations and other areas of law, I have appeared at thousands of calendar calls, but unexpectedly and unbeknownst to me at the time of this Thursday October 3, 2013 calendar call, I was about to experience a type of judicial treatment that I had never before observed. I have never experienced or even observed such judicial conduct as was about to be directed toward me to the detriment of Nancy Michelle Murphy.

**Attachment 96, Page 8 of 23**

**The Motion for Indirect Contempt, brought with Due Process Service Deficiency Seeking Criminal Sanctions which are Reflections upon Professional Reputations**

10.7     The Motion for Contempt on the Thursday, October 3, 2013 calendar was filed on August 29, 2013, by the "Prosecutor/Plaintiff" Taylor Drake of Glover& Davis on behalf of John Harold Murphy.

10.7.1     The "Prosecutor/Plaintiff" Taylor Drake of Glover & Davis on September 12, 2013 served a Notice of a Thursday, October 3, 2013 Hearing for only the original August 29, 2013 Motion for Contempt.

10.7.2     The "Prosecutor/Plaintiff" Taylor Drake of Glover & Davis never served a Rule Nisi for the Thursday, October 3, 2013 hearing upon Nancy Michelle Murphy nor her counsel for their appearance on Thursday, October 3, 2013 for a hearing on the August 29, 2013 Motion for Contempt.

10.7.3     The "Prosecutor/Plaintiff" Taylor Drake apparently never even obtained a Rule Nisi for the Thursday, October 3, 2013 hearing on the August 29, 2013 Motion for Contempt.

10.7.4     The "Prosecutor/Plaintiff" Taylor Drake of Glover & Davis in most, if not all, of his previous hearings has included a Rule Nisi and has never to my memory filed just a "Notice of Hearing." The bench book distributed by the Judicial Council provides guidance that in contempt actions, due process requires a Rule Nisi as opposed to the quite different, Notice of Hearing. Motions seeking Indirect Contempt against a person provide very distinct statutory and constitutional protections.

**Attachment 96, Page 9 of 23**

**The Amended Motion for Contempt, Due Process Service of Charges, Adequate Time to Respond, Identity of Charged Party and an Independent Jurist not Embroiled in the Issues Deficiency.**

10.8     The "Prosecutor/Plaintiff" Taylor Drake of Glover & Davis, on September 27, 2013 filed an Amended Motion for Contempt. This was only six days, including a Saturday and a Sunday before the Thursday, October, 3, 2013 calendar date, and thirty (30) days before a response was due.

10.8.1     The "Prosecutor/Plaintiff" Taylor Drake of Glover & Davis never served a Notice of Hearing nor a Rule Nisi for the Thursday, October 3, 2013 hearing upon Nancy Michelle Murphy nor her lawyers for their appearance at a hearing on the Amended Motion for Contempt that contained a completely different array of charges for contempt. The charging documents even failed to identify the name of "defendant's lawyer. [Note: "lawyer" is singular and there are two lawyers] The Certificate of Service on the Amended Complaint accurately reflects that the charging Amended Contempt document was not served upon me as it was only served upon Millard Farmer, one of the two lawyers for Nancy Michelle Murphy.

10.8.2     The Amended Motion for Contempt was based upon an *ex parte* communication that the Glover & Davis lawyers had with Judge A. Quillian, Jr. that resulted in a modification of the custody of the children by changing the scheduled visitation days of John Harold Murphy from the schedule set out in the 2006 Final Divorce Decree and as further modified by the pronouncement in open Court that John Harold Murphy can take the children anywhere he wishes, even to "Russia" during his visitation period.

**Attachment 96, Page 10 of 23**

**The Constitutional and Statutory Detriment of the Due Process Service Deficiency**

11.   Nancy Michelle Murphy has a limited amount of financial resources that she can appropriate to this litigation without affecting the welfare of the children.

11.1   Counsel for Nancy Michelle Murphy subpoenaed the school principal of the children, a teacher of the children and another witness who had extensive knowledge of this family for the last "hearing" when Judge Baldwin abruptly terminated the hearing with the witnesses of Nancy Michelle Murphy left waiting to testify, but not allowed. The testimony of these witnesses was relevant to the issue of whether a "custody evaluator" was necessary.  The affidavit of Dr. Jan Franks, the principal of Arnall Middle School, is **Attachment 1**. The affidavit of Polly Craft is **Attachment 2.**

11.2   A Rule Nisi permits an opportunity to subpoena a key witness, Renee Haugerud, whose counsel has refused to allow her deposition and to take the deposition of Elizabeth "Lisa" F. Harwell after she produces her financial and other records for which she filed a motion to quash.

11.3   The Response to the August 29, 2013 Motion for Contempt and the Amendment to the August 29, 2013 Motion for Contempt present defenses that could have been presented if Nancy Michelle Murphy and "defendant's lawyer," if identified, had been provided due process notice.

11.4   The defective due process notification and statutory protections were clearly identified in Michelle Murphy's "Notice of Supersedeas and Plea as to the Absence of Jurisdiction and Unconstitutional Due Process Nature of the Alleged "Contempt" Actions Filed by the Glover & Davis Lawyers."

**Attachment 96, Page 11 of 23**

11.5    The "Amendment" to the Motion for Contempt that was filed on September 27, 2013 contained neither a Notice of Hearing nor a required Rule Nisi, as the Amendment was also an Indirect Contempt seeking criminal sanctions.

11.6    Neither Nancy Michelle Murphy nor Millard Farmer were subpoenaed to appear at the calendar call or hearing. Neither appeared.

**Thursday, October 3, 2013 in the Superior Court of Coweta County**

12.   That morning before court began, I filed the First Amendment to the Response of Michelle Murphy to John Murphy's Motion for Contempt. In open court, after the calendar call of the Murphy case, I filed the Notice of Supersedeas and Plea as to the Absence of Jurisdiction and Unconstitutional Due Process Nature of the Alleged "Contempt" Actions Filed by the Glover & Davis Lawyers.

12.1    Upon entering the courtroom, I sat on the wood bench on the far right side.

12.2    I observed Nan Freeman, the court reporter, set up. As soon as she had applied her last piece of duct tape to her wires, she returned to her desk.

12.3    I was aware that Judge A. Quillian Baldwin, Jr. had threatened to put Millard Farmer in jail for attempting to have the court reporter take down the calendar call. This previous event occurred as follows according to the sworn testimony supporting the "Friday, September 13, 2013 Addendum to Wednesday, August 28, 2013 Amendment to the Monday, August 19, 2013 Consolidated Motions for Disqualification of Judge A. Quillian Baldwin, Jr." that was pending awaiting a decision by Judge A. Quillian Baldwin, Jr. That Amendment to the August 19, 2013 disqualification motion states as follows.

**Attachment 96, Page 12 of 23**

4.1.2   The transcript of that August 6, 2013 hearing documents the following portion of the transcript before the lawyers, their clients and other persons awaiting a full call of the calendar.

```
2          THE COURT:  Ladies and gentlemen, I'm Quillian
3    Baldwin.  I'm one of the superior court judges in the
4    Coweta Circuit, and we're here to deal with mostly, I
5    suppose, domestic matters that are before the Court,
6    although there may be some other types of cases here.
7              Is Mr. Farmer here?
8         MR. FARMER:  Yes, Your Honor.
9         THE COURT:  All right.  Everybody that's on his
10   case --
11             What's the name of the case?
12        MR. DRAKE:  The Murphy case.
13        THE COURT:  The Murphy case.  Would y'all come up
14   here just a second?
15                  (Counsel for the parties and the
16              guardian ad litem came forward for a bench
17              conference.)
18        THE COURT:  I'm telling him that I'm not going to
19   take the whole calendar down on the record, that I will
20   take his down.  And I will make sure that everybody
21   that's involved is here, is called, and it's on the
22   record as to whether they're here or not here.  And if
23   they've got any kind of objections or motions, any of
24   that kind of stuff will be taken down.  But I'm not
25   going to take down everything; on the calendar call, I'm
```

**Attachment 96, Page 13 of 23**

1   not going to put everybody else called.  That has no

2   bearing on his case whatsoever.

3        MR. FARMER:  Your Honor, I am the person that makes

4   the determination of what are the issues in the case,

5   and I --

6        THE COURT:  No.  I am the person that makes the

7   determination, and I'm clear on that on the law.

8            Now, go have a seat, and I'm going --

9        MR. FARMER:  Can you tell me what the law is that

10  you're following?

11       THE COURT:  Yeah.  I'm following the law that we

12  say every day.  I decide what the issues are.  Okay?

13           Go have a seat.

14       MR. FARMER:  But I'm entitled to preserve them,

15  Your Honor.

16       THE COURT:  You're entitled to preserve the issues

17  of your case.

18       MR. FARMER:  My case.

19       THE COURT:  And I'll be more than glad to do it.

20       MR. FARMER:  My case.

21       THE COURT:  Look, look.

22       MR. FARMER:  My case deals with the way you call

23  the calendar.

24       THE COURT:  Look, look, Millard.  Don't argue with

25  me.  Understand?

**Attachment 96, Page 14 of 23**

```
 1          MR. FARMER:  I just want to make sure the record is
 2      clear.
 3          THE COURT:  If you keep arguing with me, now, I'm
 4      going to put you in jail.  I'm not going to mess with
 5      you anymore.  Okay?  And I don't care.  You can jump up
 6      and down all you want, and you can make all the noise
 7      you want to make, but you keep messing with me, and I'm
 8      going to put you in jail.
 9              Do you understand me?
10              Do you understand me?
11              Do you understand me?
12          MR. FARMER:  I understand.
13          THE COURT:  All right.  Go have a seat.
14              (The calendar was called by the Court.)
```

4.1.3   There was a very quiet, conversational speaking tone by counsel for John Murphy to Judge Baldwin. It was Judge Baldwin who yelled; at one point, "…I'm going to put you in jail. Do you understand me? Do you understand me?..." very loudly to Millard Farmer, who was standing still and motionless in amazement of the apparent no reason other than bias resulting from the disqualification motions for such conduct by Judge Baldwin.

12.4     In order to avoid any confrontation with Judge A. Quillian Baldwin about obtaining a recording of the calendar call, long before Court began, I informed the court reporter that I understood Judge Baldwin's position about taking down the call of the calendar and was not raising that issue again. I then pointed to the Murphy case on the calendar and stated that I wanted my announcement on this case taken down and everything said during the case taken down.

12.5     In the "Notice of Supersedeas and Plea as to the Absence of Jurisdiction and Unconstitutional Due Process Nature of the Alleged "Contempt" Actions Filed by the Glover & Davis Lawyers" document that I

**Attachment 96, Page 15 of 23**

filed in open Court, the following explanation of counsel's fear that Judge A. Baldwin, Jr. would not allow issues of law to be presented to the Court was made.

> 2.2   Nancy Michelle Murphy, Millard Farmer and Larry King, while reserving all rights, enter this notification of a plea as to the lack of jurisdiction of the court and a plea as to the statutory and constitutional authority of Judge A. Quillian Baldwin, Jr. to proceed with the following items that the Glover & Davis lawyers have requested that the Clerk of the Superior Court Coweta County place on the list of matters to be called for hearing today. This is an informational notice that documents placed on the calendar of the Court for Thursday, October 3, 2013 do not provide Nancy Michelle Murphy, Millard Farmer and Larry King their constitutionally protected rights. After appropriate notice and charging documents, and a continuance of time, they will respond fully.

12.6   I then gave the court reporter my business card, exchanged pleasantries and she agreed to my request for the takedown of all matters.

**13.   The calendar call began without the presence of the court reporter.**

13.1   When Judge A. Quillian Baldwin, Jr. called the Murphy case, I immediately stood and stated that I had made arrangements for the court reporter to take down my announcement and requested that the Murphy announcement be made when the court reporter returned. Judge Baldwin complied with my request and called the remainder of the calendar. Judge Baldwin then apparently asked for someone to retrieve the court reporter, as she appeared and the Murphy case was called at the end of the calendar.

14.   In response to the calendar call I was prepared to make my announcement in the following order.

**Attachment 96, Page 16 of 23**

14.1    I wanted to provide Judge Baldwin of the dates of the pending disqualification motions that were awaiting a ruling by him and that Uniform Superior Court Rule 25 required Judge Baldwin to cease acting on the matter until he ruled upon the disqualification motions. The following documents relating to the disqualification of Judge A. Quillian Baldwin, Jr. are pending and awaiting a ruling by Judge Baldwin or an independent judge assigned to hear the motions. These disqualification motions are summarily identified as follows.

July 2, 2012  Consolidated Motions for Disqualification of Judge A. Quillian Baldwin, Jr.

Monday, August 19, 2013 Consolidated Motions for Disqualification of Judge A. Quillian Baldwin, Jr., Constitutional Challenges to Uniform Superior Court Rule 25 et seq. and for Other Uses as Allowed by Law

August 28, 2013:   Amendment to Monday, August 19, 2013 Consolidated Motions for Disqualification of Judge A. Quillian Baldwin, Jr., Initiated with this Judge's "I'll Put You in Jail" Threats that Motivated John Murphy to Sic the Deputy Sheriff of Coweta County on the Mother of the Children whom She Raised Since John Murphy Abandoned the Family

Friday, September 13, 2013 Addendum to Wednesday, August 28, 2013 Amendment to the Monday, August 19, 2013 Consolidated Motions for Disqualification of Judge A. Quillian Baldwin, Jr.

14.2    After informing Judge Baldwin of the pending disqualification motions, I wanted to advise the Court that the required personal service and a Rule Nisi, had been given and that the matter was not before the Court.

14.3    I wanted to advise the Court that it had no jurisdiction, as the Amended Motion for Contempt attempted to add what could be one of two parties, identified as the "lawyer" for Nancy Michelle Murphy. The adding of one of possible two new parties to the motion for contempt was a violation of the rights of the newly added party but was additionally prejudicial to Nancy Michelle Murphy, as such conduct is detrimental to Michelle Murphy to have Judge Baldwin allowing the Glover & Davis lawyers attacking her lawyer.

14.4    I wanted to advise the Court that the August 23, 2013 Order was on appeal and that any contempt of that Order was superseded by the appeal.

14.5    Additionally, I wanted to advise the Court that the September 27, 2013 motion was not noticed nor ripe for hearing on October 3, 2013.

15.    At some point during my monotone announcement of the above statements of what I felt to be an initial consideration, Judge Baldwin stated something like, "I hold you in contempt. I am tired of all this stuff you all are doing. I order you incarcerated until you pay $1000.00 attorney fees as a purge."

15.1 The transcript being prepared by Nan Freeman, the court reporter, of the exact language use by Judge A. Quillian Baldwin, Jr. is being sought to obtain the exact language.

15.2    After this pronouncement by Judge A. Quillian Baldwin, Jr., I walked towards the Sheriff and Clerk with my right hand in my right pocket to retrieve the money.

15.3    The deputy, a white male raised in Clayton County who graduated from Jonesboro High School 1995, grabbed my right biceps as I attempted to obtain the purge money. I felt as if I was in his custody while I obtained

**Attachment 96, Page 18 of 23**

the money from my pocket and as I paid the purge to the Deputy Clerk in open court.

15.4    After paying the $1,000, I stated, "let the record reflect that I have paid the purge to the Clerk of Court."

15.5    Judge Baldwin seemed frustrated that I could immediately purge the contempt by paying the $1,000.

15.6    Other matters on the calendar were handled after I paid the $1,000.

15.7    Judge Baldwin took a break around 10:00 a.m. and stated that the Murphy case would be dealt with when he returned from break. I sat at counsel table during the break.

**After the Contempt for Reciting the Basis for the Court not Proceeding**

16.    I rely on the transcript for a more comprehensive statement of the events that followed; however, the following accounting of the events is accurate to the best of my knowledge and belief.

16.1    I made as my opening, a statement of some of the issues. It became obvious that any further identification of these due process and statutory protections or the disqualification motions that were not yet ruled upon would result in me being held in contempt of court once again.

16.2    The contempt action affected my presentation of issues to the Court, as it was unpredictable to me when, or what would ignite the fury of Judge A. Quillian Baldwin, Jr. once again. Judge Baldwin had held me in contempt for merely reciting some of the constitutional and statutory protections accorded persons charged as Nancy Michelle Murphy and one of the two lawyers for Nancy Michelle Murphy.

16.3    The "Prosecutor/Plaintiff" Taylor Drake of Glover & Davis called John Harold Murphy as his first witness. Taylor Drake attempted to present the issues raised in the August 29, 2013 Motion for Contempt relating to

**Attachment 96, Page 19 of 23**

visitation and the issues raised in the September 27, 2013 Amended Motion for Contempt relating to the alleged noncooperation with the custody evaluator with only the testimony of John Harold Murphy.

16.4    It is relevant to note that John Harold Murphy only provided a verification that the facts were "true and accurate to the best of his knowledge and belief" to support the motion for Contempt and the Amended Motion for Contempt.

### During the Direct Examination of John Harold Murphy, Judge Baldwin Informed Counsel that he Wished to Speak with Counsel in Chambers

17.   During John Harold Murphy's testimony, Judge A. Harold Murphy stated that he wished to talk to counsel in chambers. The court reporter did not proceed to chambers, or take down the communications that occurred in chambers.

17.1    As counsel walked down the hallway with Judge Baldwin to his chambers, he stated, "I did not want to embarrass anyone out there, but I can't do anything about the failure to cooperate with the evaluator unless I hear from her." (Meaning the Custody Evaluator). The Custody Evaluator was selected by Elizabeth "Lisa" F. Harwell, who took money from the guardian ad litem trust account as explained under oath in the "Response of Michelle Murphy to Counsel for Elizabeth "Lisa" F. Harwell,  Teresa E. Lazzaroni of Hawkins Parnell Thackston & Young's Motion on  behalf of Guardian ad Litem Elizabeth "Lisa" F. Harwell's Request for Protective Order and Motion to Quash Michelle Murphy's Subpoena for Deposition and Production of Evidence and Notice of Deposition"

1.2    The subpoenaed documents from Elizabeth "Lisa" F. Harwell, in part, relate to the illegal conversion of trust funds to the personal use of Elizabeth  "Lisa" F. Harwell. This conduct is a violation of Uniform Superior Court Rule 24.9 (8) (g), and

**Attachment 96, Page 20 of 23**

thereby OCGA §16-8-2 and Georgia Rules of Professional Conduct Rule 1.15(I)

1.2.1   Uniform Superior Court Rule 24.9 (8) (g) provides as follows.

> g. *Payment of GAL Fees and Expenses.* It shall be within the Court's discretion to determine the amount of fees awarded to the GAL, and how payment of the fees shall be apportioned between the parties. **The GAL's requests for fees shall be considered, upon application properly served upon the parties and after an opportunity to be heard, unless waived.** In the event the GAL determines that extensive travel outside of the circuit in which the GAL is appointed or other extraordinary expenditures are necessary, the GAL may petition the Court in advance for payment of such expenses by the parties. emphasis supplied

1.2.2   Elizabeth "Lisa" F. Harwell took the money that was provided in trust to Melissa Griffis, the first guardian ad litem appointed by Judge Baldwin, which she apparently transferred to Elizabeth "Lisa" F. Harwell in trust. The funds were subject to the protections of Uniform Superior Court Rule 24.9 (8) (g), and thereby OCGA §16-8-2 and Georgia Rules of Professional Conduct Rule 1.15(I) The street language for this conduct is "stealing."

1.2.2.1   The street analogy of the conduct of Elizabeth "Lisa" F. Harwell would be a company employee taking money from the cash register for the employee's personal use, with a written company policy against such conduct, after the employee had worked a few days before the employee's paycheck was due later in the week.

1.2.2.2 The message from Judge Baldwin to the people in the Coweta Judicial Circuit is that the Chief Judge believes that it is

**Attachment 96, Page 21 of 23**

permissible for a court appointed fiduciary to engage in such conduct because the conduct of the guardian ad litem is being challenged by counsel who is also challenging the judge's ethical conduct for converting to the judge's personal benefit, legally protected rights belonging to a litigant.

1.2.2.3 A political benefit is a thing of value that a judge cannot accept in exchange for denying a litigant rights protected by law.

17.2    Instead of coaching Taylor Drake about the evidence that he needed, Judge Baldwin could have done the one thing that a jurist is required to do: ask if counsel for John Harold Murphy had additional evidence to present. If the "Prosecutor/Plaintiff" Taylor Drake did not have further evidence, a dismissal was appropriate rather than Judge Baldwin taking over a portion of the prosecution of a motion which was unconstitutionally before him.

18.    Judge A. Quillian Baldwin, Jr. would not have been constitutionally accorded the opportunity to engage in the conduct in which he engaged on Thursday, October 3, 2013, if Uniform Superior Court Rule 25 was facially constitutional, as this Rule has been consistently challenged in this litigation. The challenge is as follows.

Uniform Superior Court Rule 25, as applied and facially violates the protections afforded The Michelle Murphy and Children Parties in this case and to others in all cases under the United States Constitution, equal protection U.S. Const. amend. XIV, § 1 and State of Georgia Constitution Bill or Rights equal protection (Ga. Const. Art. I, § 1, ¶ 2)

Uniform Superior Court Rule 25, as applied and facially, violates the protections afforded the Michelle Murphy and Children Parties in this case and to others in all cases under the United States Constitution due process, U.S.

**Attachment 96, Page 22 of 23**

Const. amend. XIV, § 1 and State of Georgia Constitution Bill of Rights due process protection (Ga. Const. Art. I, § 1, ¶ 1)

19.   A fair assessment of the conduct of Judge A. Quillian Baldwin, Jr. is that he is acting in the manner that Nancy Michelle Murphy has attempted to prevent since the beginning of this litigation when he signed Order without reading it that provided the guardian ad litem authority that is not accorded a guardian ad litem by the Uniform Superior Court Rule 25.

Alfred Lawrence King, Jr.

Sworn to and subscribed to before me this 7ᵗʰ day of October, 2013.

NOTARY PUBLIC
My commission expires:

KIMELLEN TUNKLE
NOTARY PUBLIC
DEKALB COUNTY
STATE OF GEORGIA
My Commission Expires January 4, 2017